**Appendix A:**
**Memorandum in Support of Petitioner Kayla Ayers First Amended Petition for Writ of**
**Habeas Corpus:**

In October 2012, Kayla Ayers was at home with her young son when a mattress in the basement of the home caught fire.  The fire was quickly extinguished. In early 2013, Ms. Ayers was convicted of aggravated arson, based primarily on expert testimony that the fire had two distinct points of origin, and therefore could not have been accidentally started by a cigarette or by Ayers' young son.

This expert testimony was almost entirely false.  In fact, there is no scientifically valid evidence indicating that the fire had two points of origin, and in violation of Crim.R.16(K), the State did not present the expert's complete conclusions to Ms. Ayers' counsel prior to trial. Furthermore, defense counsel neither consulted with its own fire expert, nor objected to the previously undisclosed "expert" conclusions offered at trial.  As a result, the jury based its verdict on entirely false—but unchallenged—conclusions about the source of the fire.

Ms. Ayers' conviction rests on false evidence, presented in violation of Ohio Criminal Rules of Procedure, and entered into the record without objection.  She did not receive a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and by the Ohio Constitution.  Her conviction should be vacated and the matter set for further proceedings.

**STATEMENT OF FACTS**

**A.  The Fire**

On October 3rd, 2012, at 8:21 P.M., the Massillon Fire Department received a report of a fire on 26th St. in Massillon, OH. *Massillon Fire Department Summary Call Sheet*, attached as

1

Exhibit A to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave*, at 120.[1] Multiple suppression units and an ambulance were dispatched. *Id*.  The first suppression units arrived at the house at 8:28 P.M. *See id*, *see also Massillon Fire Department Response Record,* attached as Exhibit B to Ms. Ayers's *Ohio Crim.R.33(B) Motion for Leave*, at 118.  They quickly extinguished the fire, which was isolated to a mattress in the basement corner. *See id*. at 119.

The only people home at the time of the fire were Kayla Ayers and her three-year-old son, Brennan Jr. (a.k.a. "Bubba"). *See Massillon Police Department Incident Report- Part 2* ("Incident Report"), attached as Exhibit C to Ms. Ayers's *Ohio Crim.R.33(B) Motion for Leave*, at 127.  Kayla sustained a laceration on her hand after she slipped and broke a glass of water while trying to extinguish the fire herself. *Massillon Fire Department EMS Run Report* ("EMS Report"), attached as Exhibit D to Ms. Ayers's *Ohio Crim.R.33(B) Motion for Leave*, at 121.  Brennan Jr. was completely unharmed. *See Incident Report* at 127.

Initial reports from the scene state that Kayla was disoriented and frantic about the possibility of losing custody of her children. *See State of Ohio v. Kayla Ayers,* Case No. 2012CR-1567, Trial Transcripts ("Tr."), attached as Exhibit E to Ms. Ayers's *Ohio Crim.R.33(B) Motion for Leave*, at 362. Her neighbor, Jennifer Conley, stated that Kayla kept "repeating was she going to lose—Am I going to lose my kids, am I going to lose my kids?" *Id*. at 360. She also reported that she thought she smelled marijuana on Kayla's breath. *Id.* at 362. A member of Kayla's church, Karen Ball, testified that Kayla had not answered the door when she showed up earlier that day to take Brennan to church.  *Id.* at 378-379.

---

[1] The complete record, as cited in Ms. Ayers's *Memorandum*, will be submitted with the Respondent's Return of Writ.  Ms. Ayers also requests the Court permit her to expand the record at an appropriate time, pursuant to Rule 7 of the Rules Governing Section 2254 Cases in Federal District Courts.

Kayla was treated at Affinity Hospital and discharged that night. *EMS Report* at 121-123. While at the hospital, Kayla was interviewed by Massillon Fire Inspector Reginald Winters and Massillon Police Dept. Sgt. Muntean. *See Massillon Fire Department Interview Report,* attached as Exhibit F to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave,* at 124. Initially, Kayla claimed that she had been doing laundry in the basement, and when she turned around, she noticed her son Brennan had started the fire. *See Id*. Inspector Winters interviewed three-year-old Brennan Jr. later that evening. Tr. at 270. **Winters confirmed that Brennan Jr. was able to light a cigarette lighter.** *Id.* at 282. Although Brennan Jr. denied starting the fire, he did confirm that his mother was sleeping just before the fire started. *Massillon Police Department Narrative Supplement* ("Narrative Supplement"), attached as Exhibit G to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave*, at 128.

The next day, the neighbor Jennifer Conley called police and told them that Kayla and her family were at the property in violation of the fire department's instructions. Tr. At 271. Two Massillon police officers arrived along with Inspector Winters. *See e.g.* Tr. at 196-197 and 271. At the scene, Inspector Winters spoke with Jeff Ayers, Kayla's father.  Jeff claimed that several weeks before, during a fight, Kayla told Jeff, "if you leave again, I'll burn this motherfucker down." *See Massillon Fire Department Voluntary Statement,* attached as Exhibit H to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave*, at 7. Another neighbor, Jason Pandrea, testifying about this same instance, said Kayla told her father she would "burn the house down." *See* Tr. at 310, 339. According to Pandrea, "it was more kind of a laugh or a joke kind of thing," and "it was like she meant it, but she didn't." *Id*. at 340.

Officers asked Kayla to come with them to the police station, where she was interviewed again. In the interview, Police Detective Ricker told Kayla he did not believe she set the fire

intentionally, but instead suggested that Kayla must have started it due to her own carelessness. *See* video file: *Kayla Ayers Police Station Interview* attached as Exhibit I to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave*, (10/04/2012) at 01:21:00-01:29:00. After questioning, Kayla admitted that she "may have fallen asleep" before the fire, but insisted that when she woke up she did what she could to put it out. *Narrative Supplement* at 128. That day, Kayla was arrested and charged with aggravated arson and endangering children. *Kayla Ayers Docket Entry ("Docket")*, attached as Exhibit J to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave*, dated 10/12/2012 and 11/06/2012. She was unable to post bail and would remain in jail for the next several months awaiting trial. *See Kayla Ayers affidavit* ("*Ayers Aff.*"), attached as Exhibit K to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave,* at ¶ 3.

### B. Pre-trial Disclosure and Trial

Kayla pleaded not guilty to all charges. *Docket* on 11/09/2012. The Stark County Public Defender's Office was appointed as counsel, and Attorney Kristina Powers was assigned. *Id.* Defense counsel made multiple requests for discovery in the months leading up to the trial. *Id.* The defense requested discovery on November 9, 2012 – over two months before trial started. *Id.* They received discovery documents from the state on November 15, November 19, December 14, and January 17 – the last disclosure just nine days before trial. *See Docket* on 11/15/2012, 11/19/2012, 12/14/2012, and 01/17/2012.

Throughout this period, Kayla remained in jail, and her trial was continued several times. Trial was originally set for December 3, 2012 but was rescheduled first to December 27. 2012 and then again to February 4, 2013. *Docket* on 11/07/2012, 11/28/2012, and 1/14/2012. The trial was rescheduled once more and finally held on January 28, 2013. *Docket* on 01/16/2013.

In mid-January 2013, less than two weeks before trial, Kayla's defense was assigned to a new attorney at the public defender's office, Matthew Kuhn. *Id.* In the 100 days leading up to trial, neither Ms. Powers nor Mr. Kuhn consulted with an independent arson expert. *Proffer of Testimony of Attorneys Kristina Powers and Matthew Kuhn*, attached as Exhibit L to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave*.

   1. <u>Testimony & Conclusions of Inspector Reginald Winters</u>

  The core of the State's case at trial was the testimony of Fire Inspector Reginald Winters. Winters testified that he had approximately 70 hours of fire investigation classes, combined with just over ten hours per year of continuing education. Tr. at 227-228.

  When he examined the fire in Kayla's home, Winters noticed an "unusual burn pattern" on the mattress, which he diagnosed as the first point of ignition:

> "Well, I had noticed that [the northeast side of the mattress] had a heavier char pattern where the springs—what we call—I'll try to explain it to you, it's called calcination.  It's basically where the fire burned so hot that it will turn the springs white and they'll collapse.  And on that end I had noticed where the fire had burnt the hottest and it traveled westward.  Like it was— there's where, right there, made a conclusion that I had a fire start there that was low and it started there and traveled west toward the wall because that's where the material was at, that it was consuming as it was burning." *Id.* at 240-241.

  According to Winters, a separate and distinct ignition occurred near a wooden post, next to where a door had been leaning against the bed:

> "If you look at [the post], you have the concrete floor, you go up and you have concrete, kind of pyramid, and then right there you can see a clear point of the V-pattern that I was telling you about, the starting point right there, the origin.  *** [The V-pattern] is telling me the point of origin of a fire consistent [sic] where the fire started.  It started low and it started climbing the post with the heavy charring and stuff like that." *Id.* at 245- 246.

Winters confirmed that his "certified arson opinion" was that the fire started in two separate and distinct locations, and that the cause of the fire was "incendiary."[2] *Id.* at 249-250.

On cross examination, defense counsel questioned Inspector Winters about an initial Executive Summary and report from his office. *Id.* at 282-285. The Initial Report claimed that the fire started on the first floor, and that ignitable liquid vapors or gasoline were used as an accelerant. *See Defendant's Trial Exhibit A*, attached as Exhibit M to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave*. Winters acknowledged that the Initial Report was incorrect, but explained that the summaries on these documents were "typo[s]," where old information from prior reports had not been removed. Tr. at 285.

On redirect, the prosecution asked Inspector Winters to read his "final" Executive Summary. *Id.* at 296. Defense counsel objected, asking whether this document had been provided.  At sidebar, the prosecution answered:

> Mr. Barr:  Provided in discovery, Your Honor, the origin and cause report, and I'm asking him [Winters] to read this based upon the cross-examination of documents that I believe he [Mr. Kuhn] received from Massillon Municipal Court that were not the final report and that contain typographical errors.  I believe the jury needs to know this.
>
> The Court:  Okay.  Do you want to take a look at this?
>
> Mr. Kuhn:  Yeah, if I could.
> Mr. Barr:  There is the discovery [November] 15, 2012, it indicates origin and cause from Massillon Fire Department.  The document he has, we don't have in our file.  This is the only document we could have given him.
>
> Mr. Kuhn: Yeah, I'll do that real quick.

---

[2] Winters also testified that, although Kayla did not have any soot on her arms and hands, swabs of her nostrils supposedly showed "light soot." Tr. at 268. Winters testified that he "did not observe" any soot when talking to Brennan Jr. at the neighbor's house later that night.  *Id.* at 270. By that time, however, Jennifer Conley had already bathed Brennan and changed his clothes. *See id.* at 363.

       ***

Mr. Kuhn:  If we signed for them, we signed for them.

The Court:  If you could approach for just a minute *** Put on the record with respect to the document with which Mr. Winters is being currently examined regarding it appears as though the Defense did sign for the report, and therefore, you are permitted to cross-examine him." *See id.* at 297-300.

The State then asked Inspector Winters to read his entire Executive Summary into the record.  According to the Executive Summary, the fire was "incendiary" and started on the mattress:

"After examination of the fire scene it was determined the fire originated in the basement on the bed.  After examination of the fire scene, interviewing witnesses, interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of *NFPA 921; A Guide for Fire and Explosion Investigation*, it is my opinion the ignition source for the fire was some type of open flame.  The materials first ignited were blankets on the bed.  The act or omission that brought the ignition source and the materials first ignited together was the deliberate act of a person or persons.  Using these elements of a fire cause, the cause of the fire is incendiary." *Id.* at 300-301.

Neither the Initial Report nor the final Executive Summary and Report mentioned Winters' conclusion that the fire had multiple points of origin.  *Id.* at 297-301. *See Defendant's Trial Exhibits A & D,* attached as Exhibit M & N to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave*.  After the confusion surrounding the Initial Report, defense counsel did not offer any further objection to the substance of Winters' testimony, nor did he challenge Winters' conclusion that the fire was started in two separate places. Tr. at 301.

    2.   <u>Closing Arguments</u>

Winters' conclusion regarding the alleged multiple points of origin became the centerpiece of the State's closing argument.  Specifically, the State argued that if the fire had two separate and distinct points of origin, then an accidental fire was practically impossible:

"I'll also remind you that common sense, your common sense, doesn't fly out the window when you walk in this courtroom.  If you fall asleep and you drop a cigarette on a mattress, it starts a fire right?  It's common sense. **It doesn't jump and start another fire, it's not possible**.  .\*\*\* **There are two separate and distinct origins here according to the expert, according to the pictures.  Fire doesn't jump like that.  So everything was ruled out except incendiary, and that was to a reasonable degree of scientific certainty.**" *Id.* at 426. (emphasis added).

The two points of origin theory was also critical to the State's argument that Brennan Jr. (a.k.a. "Bubba") could not have started the fire.  Specifically, the State argued that Brennan Jr. would have gotten soot on him if he had started a second fire while the first fire was already burning:

"And, again, common sense.  You believe that first story that the defendant said, "Bubba started the fire," he would have to hold a lighter like you remember Inspector Winters demonstrating how he had to hold that lighter?  He had to hold the lighter, ignite the mattress, **then go and start a second fire, the whole time, no soot, no smoke, not getting burned**?  **Impossible.** They all told you, the firefighters told you, he would have something on him because if he was exposed to that fire, that smoke, he would have something on him.  He had nothing.  **Because remember when—he has to start that second fire, the first point of origin is burning**." *Id.* at 426-427. (emphasis added).

During its rebuttal, the State continued to stress the importance of Winters' expert opinion in proving Kayla's guilt:

"We have a criminal justice system because criminals, even ones whose guilt have been overwhelmingly proven to you, like Kayla Ayers, don't always admit that guilt.  **And this system requires experts, like Mr. Winters, who have to come in here and give you your opinion—their opinion so that you can make decisions beyond a reasonable doubt.**" *Id.* at 449. (emphasis added).

Again, the State emphasized Winters' conclusion regarding multiple points of origin ruled out an accidental fire:

"There's one [point of origin] right there.  And there's the second one right there.  But, wait, oh, it's an accident.  An accident that started twice.  So she must have been smoking two cigarettes, one for each hand, and then threw one on this side of the bed and one on this side of the bed, when that becomes her part of the story." *Id.* at 450.

The State also re-emphasized that, with a barrier blocking a portion of the bed, three-year-old Brennan could not have lit the mattress on fire in multiple places:

"[T]here's only two other plausible explanations as it's been stated, that it was a cigarette, but it had to be two cigarettes because we got two points of origin because fire doesn't hop from one side to the other, so the other plausible explanation is Bubba started the fire.
So Bubba had to crawl over that mattress and get over here first and light this fire.  And then he can't crawl over that door there because that's a door that sits high, it's a regular door just like that door right there, sitting on its side, you know how hard it would be for you to throw your leg over it and now you're going to ask a three-year-old to crawl over that without knocking it over?  So then he has to crawl over that burning mattress and come over here to the front side of it and light this part on fire.  That's plausible? No." *Id.* at 454-455.

Defense counsel argued that the State had not proven its case beyond a reasonable doubt and insisted that the fire might have been started by Brennan or by an unattended cigarette butt. *Id.* at 447.  But Kayla's attorney did not attempt to counter any of the State's specific arguments regarding the fire's alleged multiple points of origin. *Id.* at 447-448.  Instead, the defense asked the jury to note that Inspector Winters only claimed to offer "scientific certainty," not "absolute certainty." Tr. 437-38, 448.  The jury returned a guilty verdict against Kayla on aggravated arson and endangering children charges. *Id.* at 482-483.

At sentencing, Kayla continued to maintain her innocence, explaining that she only went to trial "because I really didn't do it so I was sure I wouldn't be found guilty." Tr. at 493-494. She was sentenced to seven years' imprisonment, with three years' post-release control.

Throughout the investigation, trial, and appeals, Kayla has consistently maintained her innocence.  *Ayers Aff. at ¶11.*

### C.  2019 Report

John Lentini is one of the foremost forensic arson experts in the United States.  He is the former chair of the Forensic Science Committee for the International Association of Arson Investigators, and he was selected by the U.S. Justice Department to serve on a planning panel to recommend national standards for fire and arson investigation.  *Affidavit of John Lentini,* attached as Exhibit O to Ms. Ayers's *Ohio Crim.R. 33(B) Motion for Leave*, at ¶ 4-5.  Lentini wrote one of the primary textbooks on fire investigation, <u>Scientific Protocols for Fire Investigation</u>, which is currently in its third edition.  *Id.* at ¶ 6.  He also served as a principal Member of the National Fire Protection Association, and for twenty years he served on the technical committee responsible for drafting the *NFPA 921, Guide to Fire and Explosion Investigation*— the same guide Inspector Winters supposedly relied on for his procedures and conclusions.  *Id.* at ¶ 4.

In 2019, Mr. Lentini reviewed the 2013 testimony and summary conclusions of Inspector Winters and produced a report.  According to Lentini's analysis, "the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology."  *Id.* at ¶ 32.  Specifically, Lentini concludes "unequivocally and to a reasonable degree of professional certainty" that:

> (1) "The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology,"
>
> (2) "Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan,"

(3) "Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways," and

(4) "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard." *Id.* at ¶ 9.

None of these conclusions were ever put before either the Court or the jury during Ms. Ayers's original trial.

### D. State Post-conviction Proceedings

On April 13, 2020, Ms. Ayers submitted two filings to the Court of Common Pleas for Stark County, Ohio: a *Motion for Leave to File a Motion for New Trial* pursuant to Ohio Crim.R.33(B), and a *Petition for Postconviction Relief* pursuant to Ohio Rev.Code 2953.21-23. In these state proceedings, Ms. Ayers asserted claims of ineffective assistance of counsel, prosecutorial misconduct, actual innocence, and a violation of her due process rights by the State's use of inherently untrustworthy evidence. The State of Ohio received six separate extensions of time to respond, and the matter was eventually fully briefed by March 2021.

On November 2, 2021, the trial court entered a "Judgment Entry Denying Defendant's Petition for Post-Conviction Relief and Motion for Leave to File for New Trial." *11/02/21 Judgment Entry*. Regarding the Petition for Postconviction Relief, the trial court held that it lacked jurisdiction to consider Ms. Ayers's claims because she "was not unavoidably prevented from discovering the facts upon which she relie[d] to present her claims for relief" pursuant to R.C. 2953.23(A). *Id.* at 4. The trial court also found that, even if Ms. Ayers was unavoidably prevented from discovering the facts supporting her Petition, she "cannot show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder" would

have convicted her. *Id*. Although the trial court acknowledged that its findings deprived it of jurisdiction to consider the substance of the Petition, it further purported to find Ms. Ayers claims were "barred by res judicata and are without merit." *Id.*

The trial court also denied Ms. Ayers's Motion for Leave to File a Motion for New Trial, on grounds that Ms. Ayers did not show by clear and convincing evidence "that she was prevented from filing a motion for new trial or discovering the evidence she now, eight years later, requests to present." *Id*. On November 29, 2021, Ms. Ayers filed a timely Notice of Appeal to the Ohio Court of Appeals Fifth Appellate District.

On appeal, the Fifth District affirmed the denial of both Ms. Ayers's Petition for Postconviction Relief and her Motion for Leave to File a Motion for New Trial.  *State v. Ayers*, 5th Dist. Stark No. 2021CA00134, 2022-Ohio-1910, 2022 WL 1946586 (June 6, 2022).  The appellate court declined to reach the issue of whether Ms. Ayers was "unavoidable prevented" from having discovered the Lentini affidavit supporting her claim.  Instead, the court held Ms. Ayers's petition for postconviction relief was properly denied, because it failed to satisfy the jurisdictional prerequisite set by Ohio Rev. Code § 2953.23.  Specifically, the appellate court held that Ms. Ayers had not proven by clear and convincing evidence, that but-for the alleged constitutional violations, no reasonable factfinder would have convicted her.

With regards to the Motion for Leave to File a Motion for New Trial, the Fifth District declined to address the standard set forth in Ohio Crim.R.33(B).  Instead, the appellate court held that, had Ms. Ayers been permitted to file a motion for new trial, the hypothetical future motion would be "an exercise in futility." *Id*. at ¶121.  Specifically, the court stated a future motion for new trial would be rejected based on the "no reasonable factfinder" standard, normally applied to delayed or successive post-conviction petitions under Ohio Rev. Code Sec. 2953.23.

On July 19, 2022, Ms. Ayers filed a timely notice of appeal to the Ohio Supreme Court. The court declined jurisdiction on September 27, 2022.  *State v. Ayers*, 167 Ohio St.3d 1528 (Ohio 2022).

### E.  Federal Habeas Proceedings

Ms. Ayers originally filed her Petition for Writ of Habeas Corpus in the Federal District Court for the Northern District of Ohio on July 27, 2020.  On December 3, 2020, the Court granted Ms. Ayers's motion to hold her petition in abeyance while she pursued relief in Ohio court.  On November 29, 2022, the Court ordered Petitioner to notify the Court as to her intent to pursue her petition in federal court.  Ms. Ayers filed a Motion to Lift Stay on December 2, 2022, and on December 6, 2022, this Court entered a scheduling order permitting Petitioner to file an Amended Petition within fourteen days.

### <u>CUSTODY AND STANDING</u>

Ms. Ayers was sentenced to seven years' imprisonment and three years' post-release control.  Having served her term of imprisonment, Ms. Ayers was released from state prison on August 22, 2019.  She remained on direct state custody, on post-release control, through August 22, 2022.  A person subject to "post-release control" is "in custody" for purposes of AEDPA. *In re Stansell*, 828 F.3d 412, 416 (6th Cir. 2016)

Even after the expiration of her sentence, Ms. Ayers will continue to suffer specific, concrete harm as a result of her unconstitutional felony conviction.  See, e.g., Ohio Rev. Code Sec. 2909.15 (requiring arson offenders to register annually with the state "until the offender's death."); Ohio Rev. Code Sec. 4723.092 (categorically barring felons convicted of aggravated arson from obtaining a nursing license); Ohio Rev. Code. Sec. 4765.301 (categorically barring people convicted of arson from being appointed as emergency medical technicians); Ohio Rev.

Code Sec. 2923.13 (prohibiting anyone convicted of a violent felony from owning or carrying a firearm). The injuries Ms. Ayers currently suffers have continued beyond her post-release control, and those injuries are directly tied to the violation of her constitutional rights at trial. This court has standing to address and rectify those harms. *Gentry v. Deuth*, 456 F.3d 687, 693-95 (6th Cir.2006).

### EXHAUSTION OF CURRENT CLAIMS

A petitioner must first exhaust constitutional claims in state court before seeking habeas relief in federal court pursuant to 28 U.S.C. § 2254. *Id*. At (b)(1)(A). Although habeas petitioners generally do not need to demonstrate exhaustion in pleadings, a court may sua sponte consider the issue when failure to exhaust is apparent. See, e.g., *Carter v. Cheeks*, No. 21-1171, 2021 WL 3671139 at *1 (unreported)(6th Cir.July 23, 2021). State court remedies are "exhausted" when they can no longer be pursued in state court, "regardless of the reason for their unavailability." *Shinn v. Ramirez*, 142 S.Ct. 1718, 1732, 212 L.Ed.2d 713 (2022).

The present claims have been fully exhausted in Ohio courts. Each constitutional claim was fairly presented to the Stark County Court of Common Pleas in April 2020. She timely appealed the denial of those claims through the intermediate Ohio appellate court and the Ohio Supreme Court. *State v. Ayers*, 2022-Ohio-1910, 2022 WL 1946586. The Ohio Supreme Court declined to accept jurisdiction over the matter on September 27, 2022. *State v. Ayers*, 167 Ohio St.3d 1528 (Ohio 2022). Ms. Ayers has unsuccessfully attempted to obtain relief from Ohio courts, and her claims are now exhausted for purposes of 28 U.S.C. §2254(b)(1)(A).

### FIRST CLAIM: INEFFECTIVE ASSISTANCE OF COUNSEL—
### FAILURE TO CONSULT AN INDEPENDENT ARSON EXPERT &
### FAILURE TO OBJECT TO INADMISSIBLE "EXPERT" TESTIMONY

Criminal defendants are guaranteed effective counsel by the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Whether defense counsel is constitutionally ineffective is a two-prong test. A new trial should be granted where (1) defense counsel performance is objectively deficient, and (2) that deficiency prejudices the defendant. Defense counsel's performance is deficient if it falls below objectively reasonable professional standards. *Id*. at 688-89. A criminal defendant is prejudiced by ineffectiveness if, but -for the attorney's deficient performance, the defendant would have had a "reasonable probability" of a different outcome.

Here, the State's case depended heavily on expert testimony from Inspector Reginald Winters. Specifically, the State argued that Winters' "two points of origin" theory conclusively disproved Ayers's defenses that the fire had been started by her young son Bubba or by accident. In fact, Inspector Winters' conclusions were scientifically inaccurate and unsupported. However, because Ayers's attorneys failed to consult with an independent arson expert about the cause and origin of the fire, the jury had no reason to question Winters' unsupported testimony. Furthermore, although Winters' key conclusions were undisclosed and inadmissible pursuant to Crim.R.16(K), Ayers's trial counsel did not object to or otherwise challenge the undisclosed conclusions.

These deficiencies—individually and cumulatively—prejudiced Ms. Ayers. If her attorneys had consulted with an expert, they would have found that Inspector Winters' testimony was scientifically incorrect and fundamentally unreliable. If her attorneys had been familiar with Winters's report, they would have realized his "two points of origin" opinion was not disclosed,

in violation of Crim.R.16(K), and his testimony would likely have been excluded all together. Instead, because of defense counsel's unpreparedness, both the Court and the jury were presented with an inaccurate—but unchallenged— account of the fire's origin.  Ms. Ayers deserves an opportunity to present a properly qualified expert to a new jury, and her petition should be granted.

### A.  Ayers's counsel was deficient for failing to consult an independent arson expert.

The United States Supreme Court has recognized that the failure to consult with an expert can be ineffective assistance of counsel. *Harrington v Richter*, 562 US 86, 106, 131 S.Ct. 770 (2011) ("[Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both.").  For defense counsel's handling of expert witnesses, ineffectiveness generally falls into one of two categories:  (1) cases where the defense fails to *present* an independent defense expert at trial, and (2) "that most egregious type [of ineffectiveness], wherein lawyers altogether fail to hire an expert."  *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007).

The latter category—complete failure to consult an expert-- is especially likely to be prejudicial error.  Under Ohio law, defense attorneys can consult with an expert privately and at State expense.  *State v. Kopchak*, 2018-Ohio-1136, ¶21 (5th Dist.).  As a result, while there may be circumstances where defense counsel may choose not to produce an independent expert to *testify*, there is rarely strategic justification for failing to learn what an independent expert would say regarding a centrally important forensic issue.  *Dando v. Yukins*, 461 F.3d 791 ("Although courts are typically required to show heightened deference to an attorney's strategic decisions supported by professional judgment, where a failure to investigate does not reflect sound

professional judgment, such deference is not appropriate.").  A competent defense attorney has

no reason to remain "strategically" ignorant about the central forensic conclusion in a case.

Of course, not every failure to consult an expert rises to the level of constitutional error.

In some cases, other evidence of guilt may be overwhelming, or the defense attorney may have

the knowledge or skill to cross-examine the expert without guidance.  E.g., *Jackson v.*

*McQuiggin*, 553 Fed.Appx.575.  (Failure to call arson expert was not ineffective because the

defense attorney "considered the gains and losses associated with hiring an expert, she educated

herself on principles of arson investigation, consulted with an arson expert, conferred with

defense attorneys, and elicited concessions from Hager on cross-examination.")

On the other hand, the duty to consult with an independent expert is heightened when the

scientific issue is important to the State's case, and/or where defense counsel does not have the

knowledge or expertise to cross examine the expert effectively.  *Richey v. Bradshaw*, 498 F.3d

344 (6th Cir.2007).  Additionally, an attorney's failure to consult an independent expert becomes

especially prejudicial where the State's expert is unqualified or offers conclusions that turn out to

be false.  Defense counsel "has a duty to bring to bear such skill and knowledge as will render

the trial a reliable adversarial testing process."  *Strickland*, 466 U.S. at 688.  "A lawyer who fails

adequately to investigate, and to introduce into evidence, information that demonstrates his

client's factual innocence, or that raises sufficient doubts as to that question to undermine

confidence in the verdict, renders deficient performance." *Richey v. Bradshaw*, 498 F.3d 344.

On similar facts, the Sixth Circuit Court of Appeals has found that failure to consult with

an independent arson expert can amount to ineffective assistance of counsel.  *Richey v.*

*Bradshaw*, 498 F.3d 344 (6th Cir.2007); *see also*, *Dugas v. Coplan*, 428 F.3d 217, 328 (1st

Cir.2005).  In *Richey*, an Ohio man was convicted of aggravated felony murder for allegedly

setting fire to a woman's apartment and killing her daughter. The State of Ohio introduced two experts who testified that the fire pattern indicated use of chemical accelerants. *Id*. at 347-48. For its part, the defense consulted with a single witness, who did not have any specific experience in arson investigations, and who ultimately agreed with the State's arson conclusion. *Id*. After Richey was convicted, his postconviction attorneys consulted two additional independent arson experts. Those experts concluded that the State's witnesses "use flawed scientific methods not accepted in the fire-investigation community." *Id*. According to these experts, a discarded cigarette could have caused the fire. *Id*. at 348.

The Sixth Circuit Court of Appeals held that Richey's trial counsel was constitutionally ineffective for failing to consult with a competent expert. Although Richey's counsel did hire an expert, he ultimately "failed to know what his expert was doing to test the State's arson conclusion, *** failed to work with the expert to understand the basics of the science involved, at least for purposes of cross examining the State's experts, and [failed] to inquire about why his expert agreed with the State." *Id*. at 362. The court could "discern no strategic reason why counsel would have so readily ceded [the existence of arson]" under those circumstances. *Id*. at 363. The Sixth Circuit acknowledged that the conviction could have been sustained based on witness testimony—specifically, that Richey had threatened to "torch" the building earlier that night. Under the *Strickland* standard, however, the issue was "not one of the sufficiency of the evidence, but of undermining our confidence in the reliability of the result." *Id*. at 364. Given the centrality of the "expert" arson testimony to Richey's conviction, defense counsel's failure to consult with additional experts was prejudicial. *Id*.

*Richey* is directly applicable here. As in *Richey*, Ayers's conviction was based primarily on faulty "fire science" testimony from an arson investigator. As in *Richey*, Ayers's counsel

completely failed to cross examine State's witnesses regarding the serious flaws in their conclusions.  As in *Richey*, the State's expert's conclusions were unsupported and fundamentally flawed.  Finally, in both cases, the jury never heard evidence that would have undermined, if not completely disproven, the State's theory of the fire.

In fact, insofar as the cases are different, Ayers presents a more extreme version of ineffectiveness.  Richey's trial counsel consulted—albeit halfheartedly—with *someone* regarding the State's arson conclusions.  According to the Sixth Circuit, this was not enough; Richey's counsel was constitutionally defective for failing to take a more active role in that consultation. In contrast, Ms. Ayers's conviction was the result of "that most egregious type [of ineffectiveness], wherein lawyers altogether fail to hire an expert."  *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007).  In an arson case, with no witnesses, and where the defense knew Inspector Winters would be the centerpiece of the State's case, Ms. Ayers's counsel did not even bother to find out what an independent arson expert would have said about the origin of the fire. Given defense counsel's weak cross examination, and his seeming unfamiliarity with principles of arson investigations, there was no discernible "strategic" justification for his failure to seek out an expert opinion on the actual origin of the fire.

Furthermore, defense counsel's ignorance was as costly to Kayla Ayers as it was to the defendant in *Richey*.  Prosecutors in Ayers's case spent a large part of their closing argument reinforcing Winters' conclusions.  They insisted that Winters' testimony was critical to their case against Ayers.  E.g., tr. at 449. ("[The criminal justice system] requires experts, like Mr. Winters, who have to come in here and give you your opinion—their opinion so that you can make decisions beyond a reasonable doubt.")  And they emphasized repeatedly that Winters' "two points of origin" conclusion disproved both defense theories of the fire. In fact, if Ayers's

counsel had consulted with an independent expert, he would have been able to present evidence that Inspector Winters was "not qualified to investigate fires per NFPA 1033, the generally accepted industry standard," and his "two points of origin" conclusion—the foundation of the State's case—was "unsupportable by any generally accepted methodology." *Lentini Report* at ¶ 9.

Stripped of the faulty forensic conclusions, the remaining circumstantial case is weaker against Ayers than it was in *Richey*.  In *Richey*, the defendant had specifically threatened to "torch" the victim's apartment when she ended their relationship the night of the fire. Nonetheless, given the importance of the faulty forensic testimony at trial, the Sixth Circuit held that defense counsel's failure to challenge that evidence "undermined confidence" in the fair outcome of the trial.  Here, the only circumstantial evidence against Ayers is that she initially denied being asleep when the fire started,[3] and that she allegedly told her father she would "burn this motherfucker down" during an argument weeks before.  This may be "sufficient" evidence to sustain the conviction, in theory, but it is not the kind of overwhelming evidence that would preclude Ayers receiving a new trial.  Furthermore, in this matter, there is a plausible non-accidental explanation for the fire:  Ayers's son Bubba knew how to work a lighter, was likely unattended when the fire started, and, as noted in the NFPA 921, young children are especially likely to be curious about fire.  Under these circumstances, Ayers's counsel was objectively deficient for failing to consult with an independent fire investigation expert about the actual cause and origin of the fire.

**B.  Ayers's counsel was deficient by failing to object to Inspector Winters' undisclosed and unsupported conclusion that the fire had multiple points of origin.**

---

[3] Kayla indicated after the fire that she was afraid her children were going to be taken away from her, and in fact, at least one of her neighbors had made prior complaints to Children Protective Services.

By knowingly soliciting undisclosed expert testimony, in violation of Ohio Crim.R.16(K), the State of Ohio committed prosecutorial misconduct. *Supra*. Furthermore, by failing to object to this misconduct, Ms. Ayers's trial counsel provided constitutionally ineffective assistance of counsel.

"The failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel under *Strickland*." *Stermer v. Warren*, 959 F.3d 704, 736 (6th Cir. 2020). This is because "when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. A failure to make such an objection can have devastating consequences for an individual defendant." *Id*. Failure to object to inadmissible testimony is especially important where that failure "had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Strickland*, 466 U.S. at 695-96.

Ohio Crim.R.16(K) provides that:

"An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. **The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial**, which period may be modified by the court for good cause shown, which does not prejudice any other party. **Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial**."

The purpose of requiring pretrial disclosure of expert testimony "is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report." *State v. Joseph*, 73 Ohio St.3d 450, 458, 653 N.E.2d 285 (1995).

In this case, Inspector Winters prepared two reports leading up to trial.  The first report contained multiple inaccuracies, including findings that a chemical accelerant was used and that the fire started on the first floor.  The second report, which was the one provided to Ayers's counsel in discovery, concluded only that the fire was intentionally set and that it started on the mattress in the basement.

Neither written report concludes that the fire had multiples points of origin.  The first report—which stated that the fire started on the first floor using chemical accelerants—was not disclosed by the State and was specifically disclaimed by the State at trial.  The second report concludes only that the fire started on "blankets on the bed."  The central theme of the State's closing argument—that the fire could not have been accidental because it started in two locations—was never disclosed to the defense prior to trial.  Thus, Winters' testimony regarding "multiple points of origin" was not only factually incorrect, but it was also raised for the first time at trial and therefore should have been barred pursuant Crim.R.16(K).

Defense counsel did not object to Winters' undisclosed conclusions.  In general, courts should give defense counsel broad latitude to make tactical decisions regarding objections.  In this case, however, Ms. Ayers's trial counsel did not strategically decide to allow Winters to testify as to matters outside his report, and then attempt to discredit him during cross examination.  To the contrary, the record suggests that Ms. Ayers's trial attorney had not even seen the report that was actually disclosed to the defense in discovery:

> Mr. Barr [to Winters]:  Could you read to me the Executive Summary contained in your final original report after all the typos—
> Mr. Kuhn:  Judge, I'm going to object to this.  Is this a document I've received?
> Mr. Barr:  Yes it is, Mr. Kuhn.
> The Court:  Could you approach please?
> Mr. Kuhn: Sure
> [A conference was held at the bench outside the hearing of the jury]

Mr. Barr: Provided in discovery, Your Honor, the origin and cause report, and I'm asking him [Winters] to read this based upon the cross-examination of documents that I believe he [Mr. Kuhn] received from Massillon Municipal Court that were not the final report and that contain typographical errors. I believe the jury needs to know this.

The Court: Okay. Do you want to take a look at this?

Mr. Kuhn: Yeah, if I could.

Mr. Barr: There is the discovery [November] 15, 2012, it indicates origin and cause from Massillon Fire Department. The document he has[, the First Report], we don't have in our file. This is the only document we could have given him.

Mr. Kuhn: Yeah, I'll do that real quick.

\*\*\*

Mr. Kuhn: If we signed for them, we signed for them.

The Court: If you could approach for just a minute \*\*\* Put on the record with respect to the document with which Mr. Winters is being currently examined regarding it appears as though the Defense did sign for the report, and therefore, you are permitted to cross-examine him." Tr. 297-300.

Ms. Ayers's trial counsel prepared his cross examination based on the wrong report.[4] There is no way, even theoretically, that he could have "tactically" decided to waive an objection based on the scope of the actual Crim.R.16(K) report—a report which he does not appear to have seen until midway through the State's redirect examination.

In fact, there is no conceivable strategy that could explain defense counsel's failure to object under these circumstances. The "two points of origin" theory was central to the State's case. Of course, knowledgeable and prepared defense counsel could have potentially challenged this theory through an effective cross examination; Winters' conclusions are flatly unscientific and unsupported even under the standards that Winters' himself cited. *Lentini Affidavit*. But Ayers's counsel was not knowledgeable or prepared. He did not ask Winters a single question on the topic. Instead, his questions appeared focused on inaccuracies in the "first" report, and his

---

[4] Defense counsel's confusion around which report was actually disclosed appears to have been the grounds for Ineffective Assistance of Counsel alleged on Ayers's direct appeal. That appeal was denied because, without any evidence that Winters' conclusions were faulty, Ayers could not demonstrate prejudice by her counsel's performance at trial.

closing arguments even *conceded* Winters' conclusions to a "scientific" certainty. Tr. at 437, 448 Ayers's trial counsel does not appear to have changed his theme or tactics at all based on Winters' actual testimony, despite the State's emphasis on it.  If Ayers's trial counsel had been properly prepared, he would have known Winters' conclusions regarding "multiple points of origin" were not only factually incorrect and unsupported, but also undisclosed and therefore inadmissible pursuant to Crim.R.16(K).[5]

### C.  Ayers was prejudiced by the individual and cumulative impact of defense counsel's failures.

In determining whether these deficiencies warrant a new trial, the question is not whether, but-for trial counsel's failures, the State could have offered a minimally sufficient case to uphold a conviction.  Instead, the issue is whether Ms. Ayers received a fair trial, worthy of confidence.  Under *Strickland*, a new trial should be granted if there is a "reasonable probability" that, but-for defense counsel's deficient performance, the outcome of trial would have been different.  Here, both the failure to consult with an expert and the failure to object to undisclosed expert testimony had the same result: the State was allowed to present faulty, unsupported conclusions that the fire had multiple points of origin.  Whether or not this was "prejudicial" depends on how important Winters' faulty conclusions were to the conviction.

Winters's "two points of origin" theory was critical to the conviction.  The defense theory at trial was that the fire was caused by either a cigarette or by Brennan Jr. playing with a lighter. Tr. 447 ("There are two plausible alternative explanations; Bubba did it, [or Kayla] fell asleep with the cigarette.  Careless?  Sure.  Reckless?  Perhaps.  Knowingly?  Nope.  Can't prove it."). The defense, however, *conceded* Winters's testimony was scientific—just not 100% certain:

---

[5] Neither the Ohio Crim.R.16(K) violation itself nor trial counsel's failure to object would have been properly appealed on Ayers's direct appeal.  Both claims require evidence outside the record—specifically, evidence that the State's expert testimony was unscientific and unreliable.

[Defense Counsel Kuhn]: "Mr. Winters wasn't lying, it is his opinion. Okay, I'm not saying he's a liar when he comes in and says that's his opinion, but it's not absolutely certain. Okay, if it was, we wouldn't have a jury, we wouldn't—he would be the ultimate authority on whether an arson has been committed or not. There would be no criminal justice system, it would just be Reggie Winters, arson decider, that would be the end of it, okay. *** Investigator Winters said it was his opinion that the manual that he uses uses levels of scientific certainty, not exact certainty, not complete proof." Tr. 437-38, 448.

In turn, the State used Winters's "scientifically certain" testimony to demolish the

defense's case. According to the State's closing argument, the "two points of origin" conclusion

ruled out the fire being accidentally caused by a cigarette:

"If you fall asleep and you drop a cigarette on a mattress, it starts a fire right? It's common sense. It doesn't jump and start another fire, it's not possible. *** There are two separate and distinct origins here according to the expert, according to the pictures. Fire doesn't jump like that. So everything was ruled out except incendiary, and that was to a reasonable degree of scientific certainty." *Id.* at 426.
***

"There's one [point of origin] right there. And there's the second one right there. But, wait, oh, it's an accident. An accident that started twice. So she must have been smoking two cigarettes, one for each hand, and then threw one on this side of the bed and one on this side of the bed, when that becomes her part of the story." *Id.* at 450.

The State also told the jury that Winters' "two points of origin" conclusion meant that Ayers's

son, Bubba, could not have started the fire:

"And, again, common sense. You believe that first story that the defendant said, "Bubba started the fire," he would have to hold a lighter like you remember Inspector Winters demonstrating how he had to hold that lighter? He had to hold the lighter, ignite the mattress, **then go and start a second fire, the whole time, no soot, no smoke, not getting burned**? **Impossible.** They all told you, the firefighters told you, he would have something on him because if he was exposed to that fire, that smoke, he would have something on him. He had nothing. **Because remember when—he has to start that second fire, the first point of origin is burning.**" *Id.* at 426-427.
***

> "[T]here's only two other plausible explanations as it's been stated, that it was a cigarette, but it had to be two cigarettes because we got two points of origin because fire doesn't hop from one side to the other, so the other plausible explanation is Bubba started the fire.
>
> So Bubba had to crawl over that mattress and get over here first and light this fire.  And then he can't crawl over that door there because that's a door that sits high, it's a regular door just like that door right there, sitting on its side, you know how hard it would be for you to throw your leg over it and now you're going to ask a three-year-old to crawl over that without knocking it over?  So then he has to crawl over that burning mattress and come over here to the front side of it and light this part on fire.  That's plausible?  No." *Id.* at 454-455.

The State emphasized and reemphasized Winters' conclusions about the origin of the fire because those conclusions were critical to its case.

In fact, those conclusions were completely unscientific and unsupported.  In 2019, John Lentini reviewed the photographic evidence and testimony in this case and concluded, unequivocally, that Winters's "two points of origin" theory "is unsupportable by any generally accepted methodology."  *Lentini Affidavit* at 9, Section III. According to Lentini, Winters' methodology and conclusions are largely unsupported by the NFPA 921.  *Id*.  Winters made basic errors in terminology.  *Id*. at 20, 28-31.  He "conflate[d] V-patterns with the fire's origins." *Id*. at 16-18. He speculated significantly beyond what was called for by the facts.  In fact, according to Lentini, Inspector Winters "demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard."  *Id* at 9.  After reviewing this matter, Lentini concludes that "it is my professional opinion that the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology."  *Id*. at 32.

This evidence would have had an enormous impact on Kayla Ayers's trial.  Without Winters' testimony, the State would have been left with only two pieces of circumstantial

evidence.  First, Kayla initially told investigators she saw Bubba setting the fire, but later admitted that she had been asleep.  Second, weeks before the fire, Kayla "jokingly" told her father she would "burn this motherfucker down."  This is far from overwhelming evidence of guilt.  Ayers correctly suspected that her neighbors were trying to have her children taken away, which explains why she was reluctant to admit she had been sleeping (with Bubba unattended) prior to the fire.  And Ayers's "threat" was not a serious one.  The comment was weeks before the actual fire, and even the State's own witness admitted that he did not think it was a genuine threat.

In fact, much of the circumstantial evidence points to Kayla's innocence.  Although the State claimed Kayla's motive was anger at her father, the fire was entirely limited to Kayla's own mattress.  Kayla's son knew how to work a lighter and he confirmed that his mother was sleeping before the fire.[6]  And the only injury was to Kayla herself, who broke a glass and cut her hand *while trying to extinguish the fire*.  Without Winters's unscientific testimony, the remaining facts are completely consistent with an accidental fire, started by a curious and unattended child.  In fact, that explanation is far more plausible than the alternative:  that, in order to get revenge against her father, Kayla intentionally set fire to her own mattress and then injured herself trying to extinguish it.

The State needed Inspector Winters' testimony to rule out an accidental cause of the fire.  Because Kayla's attorneys did not hire their own expert, and because Kayla's attorneys did not object to Winters' undisclosed conclusions at trial, neither the Court nor the jury ever heard the serious flaws in Winters' conclusions.  The question is not whether the remaining evidence could

---

[6] The NFPA notes that young children can be particularly interested in playing with fire. Between 2007 and 2011, children playing with fire set an average of 7,100 structure fires per year.

have theoretically supported a conviction.  The question is not even whether there is a "preponderance of evidence" that Winters' conclusions affected the outcome.  The question is merely whether the failure to challenge Winters' faulty testimony had a "reasonable probability" of affecting the outcome.  That standard is more than satisfied.  There is, at minimum, a reasonable probability that the defense's failures affected the outcome of trial, and Ms. Ayers's *Amended Petition for Writ of Habeas Corpus* should be granted.

### SECOND CLAIM: PROSECUTORIAL MISCONDUCT

The State of Ohio solicited conclusions from Inspector Winters that it knew had never been disclosed to the defense.   In doing so, the State violated Ohio Crim.R.16(K), which is specifically designed to prevent parties from conducting criminal trials by ambush, and upon which Ayers relied as part of a fundamentally fair criminal trial.  Furthermore, the State knew or should have known that these conclusions were unsupported and false, and that Winters was not qualified to offer them.

The State's duty is not to seek convictions, but to seek justice.  Government misconduct prejudices a defendant when there is a "reasonable probability" that, but-for the State's misconduct, the result of trial would have been different.[1]7  E.g., *United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976). ("the Court has applied a strict standard of materiality, not just because [these cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process."). Furthermore, when the State knowingly presents (or fails to correct) false or misleading evidence, the U.S. Constitution requires the conviction be vacated if there is any

---

7  This prejudice standard is identical to the prejudice standard for ineffective assistance of counsel, discussed in detail *supra*.

probability that the misconduct affected the outcome.  *E.g.*, *Napue v. Illinois*, 360 U.S. 264 (1959).

As explained in detail above, Ms. Ayers would have clearly benefited from foreknowledge of Winters' "two points of origin" theory, and she was prejudiced by the presentation of these conclusions in violation of Crim.R.16(K).  Furthermore, this was not a situation where the State accidentally solicited previously undisclosed testimony—the State specifically guided Mr. Winters to testify regarding his "two points of origin" theory, and that theory was central to the State's prepared closing remarks.  Prosecutors knew exactly what had and had not been disclosed to the defense.  Ms. Ayers's conviction was obtained by prosecutorial misconduct, and the Court should grant her *Amended Petition for Writ of Habeas Corpus*.

### THIRD CLAIM: VIOLATION OF DUE PROCESS: CONVICTION OBTAINED BY FUNDAMENTALLY UNRELIABLE AND INHERENTLY UNTRUSTWORHY EVIDENCE

"Fundamental fairness [is] essential to the very concept of justice."  *Lisenba v. California*, 314, U.S. 219, 62 S.C. 280 (1941).  It would be fundamentally unfair to sustain a criminal conviction based on evidence now known to be false, unsupported, or fundamentally unreliable.  The Fourteenth Amendment to the United States Constitution is a "guarantee against conviction on inherently untrustworthy evidence."  *Stein v. New York*, 346 U.S. 156, 192, 73 S.C. 1077, 1097, 97 L.Ed. 1522 (1953)(overruled on other grounds).  The U.S. Constitution's guarantee of due process is violated "by the admission of certain categories of unreliable and prejudicial evidence."  *Barefoot v. Estelle*, 463 U.S. 880, 925, 103 S. Ct. 3383, 3411, 77 L. Ed. 2d 1090 (1983)(J.Marshall, dissenting) *citing Watkins v. Sowder*s, 449 U.S. 341, 347, 101 S.C. 654, 658, 66 L.Ed.2d 549 (1981) ("[i]t is the reliability of identification evidence that primarily determines its admissibility"); *Foster v. California*, 394 U.S. 440, 89 S.C. 1127, 22 L.Ed.2d 402 (1969).  For example, reliance on a coerced confession at trial should "vitiate" a conviction,

because that evidence "combines the persuasiveness of apparent conclusiveness with what judicial experience shows to be illusory and deceptive evidence." *Stein*, 346 U.S. at 192. This same reasoning has been directly applied to cases involving junk arson science. *Han Tak Lee v. Tennis*, No. 4:08-CV-1972, 2014 WL 3894306, at *16 (M.D. Pa. June 13, 2014), *report and recommendation adopted sub nom. Lee v. Tennis*, No. 4:CV-08-1972, 2014 WL 3900230 (M.D. Pa. Aug. 8, 2014), *aff'd sub nom. Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159 (3d Cir. 2015)(petitioner "met his burden of showing a due process violation in this case, since the verdict in this matter rests almost entirely upon scientific pillars which have now eroded.")

Inspector Winters's unsupported and unreliable testimony about the origin of the fire is "unreliable and prejudicial" and "illusory or deceptive" evidence. Ms. Ayers's conviction cannot rest on this fundamentally unfair foundation. Sustaining her conviction, despite evidence that Winters's testimony was fundamentally unreliable, would deprive Ms. Ayers of due process of law, and the Court should grant her *Amended Petition for Writ of Habeas Corpus*.

### <u>FOURTH CLAIM: ACTUAL INNOCENCE</u>

A truly persuasive demonstration of "actual innocence" made after trial renders the conviction unconstitutional. *Herrera v. Collins*, 506 U.S. 390, 418, 113 S.C. 853, 122 L.Ed.2d 203 (1993). Newly discovered evidence demonstrates Ms. Ayers is actually innocent of the charges for which she was convicted. Specifically, as included above, Inspector Winters' testimony as regarding the origin of the fire was completely unsupported, and this unsupported testimony was central to the State's case against Ms. Ayers. Without Winters's testimony, the facts are more consistent with an accidental fire, caused by Brennan Jr., than they are with intentional arson by Ms. Ayers. It is now more likely than not that a reasonable juror would not convict Ms. Ayers of aggravated arson beyond a reasonable doubt. Her conviction is inconsistent

with the U.S. Constitution's guarantee of due process of law, and the Court should grant her *Amended Petition for Writ of Habeas Corpus*.

## TIMELINESS

Each of Ms. Ayers's claims relies on evidence outside the record. Specifically, the claims are supported by scientific evidence from an independent arson expert, obtained on July 29, 2019. *Lentini Report*. This date—July 29, 2019—is the "date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. 2244(d)(1)(D). Ms. Ayers's Petition was filed within one year of that date and is therefore timely.

For ineffective assistance of counsel claims, the statute of limitations begins under 28 U.S.C. § 2244(d)(1)(D) "when the prisoner learned facts that supported a good faith basis for arguing prejudice arising from ineffective assistance of counsel." *Perry v. Wainwright*, No. 1:17-CV-673, 2018 WL 6179499, at *9–10 (N.D. Ohio Nov. 27, 2018). In determining this date, the statute "does not require the maximum feasible diligence, only 'due,' or reasonable, diligence." *Granger v. Hurt*, 90 F. App'x 97, 100 (6th Cir. 2004), *citing Wims v. United States,* 225 F.3d 186, 190 (2d Cir.2000). Although "due diligence" is an objective test, it does take into account the specifics of the petitioner's circumstances. Court should not, for example, "ignore[] the reality of the prison system" or "impose[] an unreasonable burden on prisoners seeking to appeal." *Granger* at 100; *see also Ford v. Gonzalez*, 683 F.3d 1230, 1235–36 (9th Cir. 2012). Furthermore, the Supreme Court has held that "due diligence" does not require petitioners root out possible flaws that were hidden from them as a result of misconduct at trial. *Banks v. Dretke*, 540 U.S. 668, 695-96 (2004).

Ms. Ayers was twenty-three years old when she was wrongfully imprisoned.  Although she knew that she did not actually commit the crime, she had no way of knowing that Inspector Winters's "two points of origin" theory was inaccurate and unsupported.  Even if it were somehow "reasonable" for her to question the unchallenged expert testimony offered at trial, there is no reason to believe that she would be able to educate herself on arson investigations well enough to challenge the judgment of both Inspector Winters and her own attorneys.  *Ayers Aff.* at ¶¶3, 6-10.  Eventually, the Ohio Innocence Project was able to investigate the case, question Winters's conclusions, and retain an expert—at its own cost—to review Winters's testimony.  But this level of scrutiny was not inevitable; a thorough, cost-free review by an independent scientific expert is not something prisoners can or should procure in every case as a matter of routine diligence.  Under the circumstances, it was reasonable for Ms. Ayers to trust that her attorneys had investigated these forensic issues and consulted with independent arson experts, pursuant to their obligations under the United States Constitution.

Ms. Ayers's trial attorneys failed her.  They failed to retain or even consult with an independent fire expert regarding the origin of the fire.  They failed to meaningfully challenge the State's expert, Reginald Winters, and they failed to recognize the serious flaws in Winters' opinions and qualifications.  As a result of those failures, the jury was presented with a false picture of the fire's origin.  Federal law does not require that the court put these failures on the shoulders of a twenty-three-year old criminal defendant, nor should the court hold Ms. Ayers to a higher standard of diligence and care than both the City of Massillon Fire Inspector and the professional attorneys retained to investigate and challenge the claims against her.  The completion of the Lentini Report—July 29, 2019—is the date on which Ms. Ayers could have

discovered the factual predicate of the claims through due diligence, and her Petition is therefore timely.

In the alternative, even if a different or earlier triggering date were to apply, the statute of limitations would be subject to equitable tolling.  *Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010).  The addition of a statute of limitations to habeas petitions in 1996 "did not seek to end every possible delay at all costs."  *Id*. at 649.  Instead, federal courts retain equitable authority to review the merits of a petition, notwithstanding the statute of limitations, if  (1) the petitioner "has been pursuing [her] rights diligently" and (2)  "some extraordinary circumstance stood in [her] way and prevented timely filing." *Id*., citing *Pace*, 544 U.S., at 418.

For the reasons stated above, Ms. Ayers has not intentionally or negligently delayed her filing.  To the contrary, she trusted that the State would not have introduced unscientific and unsupported expert testimony against her, and she further trusted that her attorneys would have examined and attacked any such testimony.  But the State did in fact introduce inherently untrustworthy evidence against her.  And instead of challenged that evidence, her attorneys conceded Winters's flawed conclusions to a "scientific certainty."  These are exactly the sort of "extraordinary circumstances" that should excuse a delayed filing.

Finally, Ms. Ayers has presented credible evidence of her actual innocence. In *McQuiggin v. Perkins*, the Supreme Court confirmed that *"*actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar…or…expiration of the statute of limitations." 133 S. Ct. 1924, 1928 (2013). The Court clarified that "a federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a

factor in determining whether actual innocence has been reliably shown." *Id.* The Court also held that habeas petitioners who asserts convincing actual-innocence claims do not have to prove diligence to cross a federal court's threshold, but timing is a relevant factor "in evaluating the reliability of a petitioner's proof of innocence." *Id.* at 1935.

Ms. Ayers has presented expert testimony proving that Inspector Winters' "two points of origin" theory—the primary basis for the State's case against Ms. Ayers—was scientifically inaccurate and unsupported. Ms. Ayers has consistently maintained her innocence, and for the reasons explained above, it is now likely that no reasonable juror would convict her.  A federal writ of habeas corpus may be the last chance for Ms. Ayers to obtain justice in this case, and justice requires hearing her claims on their merits.

## Prayer for Relief

**WHEREFORE,** Petitioner Kayla Ayers respectfully requests this Court allow her to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases in Federal District Courts, order an evidentiary hearing, issue a writ of habeas corpus, and her release from state custody with the conviction vacated, or for Ms. Ayers to be retried within 90 days.  Further, Ms. Ayers requests this Court grant such other relief that would be appropriate and to dispose of the matters as law and justice require.

Respectfully submitted,

/s/ Brian C. Howe
Brian C. Howe
Attorney for Petitioner
The Ohio Innocence Project
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
Phone: (513) 556-0752
Email:  brian.howe@uc.edu

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2022, I electronically filed the foregoing First

Amended Petition for Writ of Habeas Corpus under 28 U.S.C. §2254 with the Clerk of Court

using the CM/ECF system, which will provide notice to counsel for Respondent.


/s/ Brian Howe_____
Attorney for Petitioner