UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KAYLA JEAN AYERS, | : | |
| | : | CASE NO. 5:20-cv-1654 |
| Petitioner, | : | |
| | : | JUDGE SARA LOI |
| v. | : | |
| | : | Magistrate Judge Carmen E. Henderson |
| DIRECTOR, OHIO DEPARTMENT | : | |
| OF REHABILITATION & | : | |
| CORRECTION, | : | |
| | : | |
| Respondent. | : | |

---

## STATE COURT RECORD

---

Indictment
Stark County CCP, Case No. 2012 CR 1567......................................................................1

Entry
Stark County CCP, Case No. 2012 CR 1567......................................................................2

Demand for Discovery
Stark County CCP, Case No. 2012 CR 1567......................................................................3

Request for Bill Particulars
Stark County CCP, Case No. 2012 CR 1567......................................................................4

Bill of Particulars
Stark County CCP, Case No. 2012 CR 1567......................................................................5

Response to Request for Discovery
Stark County CCP, Case No. 2012 CR 1567......................................................................6

Discovery Receipt
Stark County CCP, Case No. 2012 CR 1567......................................................................7

Discovery Receipt
Stark County CCP, Case No. 2012 CR 1567......................................................................8

Supplemental Response to Discovery
Stark County CCP, Case No. 2012 CR 1567......................................................................9

Supplemental Response to Discovery
Stark County CCP, Case No. 2012 CR 1567....................................................................10

Discovery Receipt
Stark County CCP, Case No. 2012 CR 1567....................................................................11

Supplemental Response to Discovery
Stark County CCP, Case No. 2012 CR 1567....................................................................12

Discovery Receipt
Stark County CCP, Case No. 2012 CR 1567....................................................................13

Supplemental Response to Discovery
Stark County CCP, Case No. 2012 CR 1567....................................................................14

Motion in Limine
Stark County CCP, Case No. 2012 CR 1567....................................................................15

Order Directing the Evaluation of Defendant's Competence to Stand Trial
Stark County CCP, Case No. 2012 CR 1567....................................................................16

Letter from Psycho-Diagnostic Clinic, dated 1/7/2013
Stark County CCP, Case No. 2012 CR 1567....................................................................17

Motion in Limine
Stark County CCP, Case No. 2012 CR 1567....................................................................18

Motion in Limine
Stark County CCP, Case No. 2012 CR 1567....................................................................19

Sentencing Entry
Stark County CCP, Case No. 2012 CR 1567....................................................................20

Notice of Appeal
Stark County CCP, Case No. 2012 CR 1567....................................................................21

Appellant's Brief
Stark County COA, Case No. 2013 CA 00034..................................................................22

Appellee's Brief
Stark County COA, Case No. 2013 CA 00034..................................................................23

Opinion
Stark County COA, Case No. 2013 CA 00034..................................................................24

Motion to Appoint Counsel
Stark County CCP, Case No. 2012 CR 1567.................................................................25

Judgment Entry
Stark County COA, Case No. 2013 CA 00034............................................................26

Motion for Credit
Stark County CCP, Case No. 2012 CR 1567.................................................................27

Judgment Entry
Stark County CCP, Case No. 2012 CR 1567.................................................................28

Motion for Modification of Sentence
Stark County CCP, Case No. 2012 CR 1567.................................................................29

Judgment Entry
Stark County CCP, Case No. 2012 CR 1567.................................................................30

Motion for Modification
Stark County CCP, Case No. 2012 CR 1567.................................................................31

Judgment Entry Denying Motion for Modification
Stark County CCP, Case No. 2012 CR 1567.................................................................32

Motion for Judicial Release
Stark County CCP, Case No. 2012 CR 1567.................................................................33

Judgment Entry
Stark County CCP, Case No. 2012 CR 1567.................................................................34

Petition for Post-Conviction Relief
Stark County CCP, Case No. 2012 CR 1567.................................................................35

Motion for Leave to File Motion for New Trial
Stark County CCP, Case No. 2012 CR 1567.................................................................36

Post-Conviction Exhibits
Stark County CCP, Case No. 2012 CR 1567.................................................................37

Amended Petition for Post-Conviction Relief
Stark County CCP, Case No. 2012 CR 1567.................................................................38

Motion to Dismiss
Stark County CCP, Case No. 2012 CR 1567.................................................................39

Reply to Motion for Leave to File Motion for New Trial
Stark County CCP, Case No. 2012 CR 1567 ................................................................40

Response in Opposition to Plaintiff's Motion to Dismiss
Stark County CCP, Case No. 2012 CR 1567 ................................................................41

Reply in Support of Motion for Leave to File Motion for New Trial
Stark County CCP, Case No. 2012 CR 1567 ................................................................42

State's Supplemental Response to petition for Post-Conviction Relief and Motion for
Leave to File Motion for New Trial
Stark County CCP, Case No. 2012 CR 1567 ................................................................43

Motion for Leave to File Supplemental Response
Stark County CCP, Case No. 2012 CR 1567 ................................................................44

Proposed Supplemental Reply Brief
Stark County CCP, Case No. 2012 CR 1567 ................................................................45

Judgment Entry Denying Defendant's Petition for Post-Conviction Relief and
Motion for Leave to File for New Trial
Stark County CCP, Case No. 2012 CR 1567 ................................................................46

Notice of Appeal
Stark County CCP, Case No. 2012 CR 1567 ................................................................47

Appellant's Brief
Stark County COA 2021 CA 00134 ............................................................................48

Appellee's Brief
Stark County COA 2021 CA 00134 ............................................................................49

Reply Brief
Stark County COA 2021 CA 00134 ............................................................................50

Opinion
Stark County COA 2021 CA 00134 ............................................................................51

Notice of Appeal
Supreme Court of Ohio, Case No. 2022-0886 ............................................................52

Memorandum in Support of Jurisdiction of Appellant
Supreme Court of Ohio, Case No. 2022-0886 ............................................................53

Memorandum in Response
Supreme Court of Ohio, Case No. 2022-0886 ............................................................54

Entry
Supreme Court of Ohio, Case No. 2022-0886 ................................................................55

Case Docket
Stark County CCP, Case No. 2012 CR 1567 .................................................................56

Case Docket
Stark County COA, Case No. 2013 CA 00034 ..............................................................57

Case Docket
Stark County COA, Case No. 2021 CA 00134 ..............................................................58

Case Docket
Supreme Court of Ohio, Case No., 2022-0886 ..............................................................59

CASE NO.: 2012CR1567 (MMC)
KLM/wji

INDICTMENT FOR: AGGRAVATED ARSON, 1 CT. [R.C. 2909.02(A)(2)] (F2)
ENDANGERING CHILDREN, 1 CT. [R.C. 2919.22(A)] (M1)

THE STATE OF OHIO, STARK COUNTY, ss.

(FELONY)

In the Court of Common Pleas, Stark County, Ohio, of the Term of October in the year of our Lord two thousand twelve.

The Jurors of the Grand Jury of the County of Stark and State of Ohio, then and there duly impaneled, sworn and charged to inquire of and present all offenses whatever committed within the limits of said County, on their said oaths, in the name and by the authority of the State of Ohio, do find and present:

That **KAYLA JEAN AYERS** late of said County on or about the 3rd day of October in the year of our Lord two thousand twelve, at the County of Stark, aforesaid, did by means of fire or explosion, knowingly cause physical harm to 185 26th St. SE, Massillon, Stark County, Ohio, an occupied structure, in violation of Section 2909.02(A)(2) of the Ohio Revised Code, contrary to the statute in such cause made and provided, and against the peace and dignity of the State of Ohio.

## COUNT TWO

And the jurors aforesaid, by their oaths aforesaid, and by virtue of the authority aforesaid, do further find and present that **KAYLA JEAN AYERS** late of said County on or about the 3rd day of October in the year of our Lord two thousand twelve, at the County of Stark, aforesaid, did, recklessly, being the parent, guardian, custodian, person having custody or control, or person in loco parentis of three children under eighteen years of age, did create a substantial risk to the health or safety of such children, by violating a duty of care, protection or support, in violation of Section 2919.22(A) of the Ohio Revised Code, contrary to the statute in such cause made and provided, and against the peace and dignity of the State of Ohio.

John D. Ferrero, #0018590
Prosecuting Attorney
Stark County

A True Bill:

Kevin D. Granito, Foreperson, Grand Jury

Request for Warrant

**EXHIBIT 1**

THE STATE OF OHIO, STARK COUNTY, ss.

I, Nancy S. Reinbold, Clerk of the Court of Common Pleas, in and for said County, do hereby certify that the within and foregoing is a full, true and correct copy of the original indictment, together with the endorsements thereon, now on file in my office.

WITNESS my hand and the seal of said Court at Canton, Ohio, this _____ day of _____, 2012.

_____, Clerk

By _____, Deputy

Sheriff's Return:

On _____, 2012, I delivered personally to the within named _____ a true and certified copy of this indictment, with all endorsements thereon.

_____, Sheriff

IN THE COURT OF COMMON PLEAS, STARK COUNTY, OHIO

## NANCY S. REINBOLD
### STARK COUNTY CLERK OF COURTS

NANCY S. REINBOLD
CLERK OF COURTS
STARK COUNTY, OHIO

**2012 Nov 9,  10:37 AM**

THE STATE OF OHIO,

PLAINTIFF,

VS.                                                     CASE NUMBER :     **2012CR1567**

**KAYLA JEAN AYERS**                          ASSIGNED JUDGE :        **COURTROOM 3**

DEFENDANT,

ORIGINAL TO :     **CLERK OF COURTS**

COPY TO :          **, ASSISTANT PROSECUTOR**
**KRISTINA POWERS, DEFENSE COUNSEL**
**COURTROOM 3 , ASSIGNED JUDGE**

DEFENDANT APPEARED IN OPEN COURT FOR ARRAIGNMENT WITH ATTORNEY KRISTINA POWERS, WHO WAS APPOINTED AS COUNSEL AND ENTERED A PLEA OF NOT GUILTY TO ALL CHARGES.

DEFENDANT'S PRETRIAL WILL BE          **November 19, 2012 8:00 AM**
COUNSEL SHALL BE PREPARED AT THE PRETRIAL TO VERIFY THE ARREST DATE AND TRY-BY-DATE OF THE DEFENDANT.

DEFENDANT IS          **IN JAIL .**

**EXHIBIT  2**

IN THE COMMON PLEAS COURT
STARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | * | CASE NO. 2012 CR 1567 |
| Plaintiff, | * | |
| vs. | * | JUDGE |
| KAYLA AYERS, | * | |
| Defendant. | * | **DEMAND FOR DISCOVERY** |

Now comes the Defendant, by and through the undersigned counsel, and hereby respectfully demands all discovery pursuant to Rule 16 of the Ohio Rules of Criminal Procedure and the Sixth and Fourteenth Amendments to the United States Constitution, including items that are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, within the possession of, or reasonably available to the State, including but not limited to the following:

**1. STATEMENT OF THE DEFENDANT AND CO-DEFENDANT – Crim. R. 16(B)(1)**

All relevant written or recorded statements, or copies thereof, made by the Defendant or a co-defendant, including police summaries of such statements, and including grand jury testimony by either the defendant or co-defendant.

**2. CRIMINAL RECORD(S) OF DEFENDANT, CO-DEFENDANT(S), AND WITNESS(ES) – Crim. R. 16(B)(2)**

A copy of Defendant's prior criminal record as well as the criminal record of any co-defendant and/or witness associated with the instant matter that would be admissible under Rule 609 of the Ohio Rules of Evidence of a witness in the state's case-in-chief, or that is reasonably anticipates calling as a witness in rebuttal or surrebuttal. For purposes of this request, a "witness" shall include any person who has or claims to have knowledge or is believed to have knowledge concerning a fact or facts about the issue(s) involved in this criminal action or proceeding or about the credibility of another witness, irrespective of whether the State of Ohio intends to call such person as a witness at trial. See generally 4 O.J.I. § 521.04.

**3. DOCUMENTS AND TANGIBLE OBJECTS – Crim. R. 16(B)(3)**

All laboratory or hospital reports, books, papers, tangible objects, photographs, buildings or places or copies or portions, subject only to Crim. R. 16(D)(4) and Crim. R. 16(E).

**4. REPORTS OF EXAMINATIONS AND TESTS – Crim. R. 16(B)(4)**

Any results or reports of physical or mental examinations and of experiments or scientific tests, made in connection with the above-captioned case or copies, subject only to Crim. R. 16(D)(4) and Crim. R. 16(E).

**5. EVIDENCE FAVORABLE TO DEFENDANT – Crim. R. 16(B)(5), U.S. Const. Amends. VI and XIV**

All evidence or information known or which may become known to the State of Ohio which may be favorable to Defendant and material to guilt or punishment, including information or evidence which could be used to obtain evidence that would diminish the credibility of any State's witness, as well as material relevant to either guilt or punishment. "[E]vidence that would diminish the credibility of any State's witness" includes, without limitation, plea bargains, pardons, grants of clemency, grants of immunity, informal or formal promises to speak on behalf of another in a legal proceeding, whether such accommodations have been extended on behalf of the witness or on behalf of a family member, friend or associate of the witness.

**6. POLICE REPORTS – Crim. R. 16(B)(6)**

All reports from peace officers, the Ohio State Highway Patrol, and federal law enforcement agents, both original and supplemental, the existence of which may be known or may become known to the State of Ohio and that are associated with the above-captioned matter.

**EXHIBIT 3**

**7. WITNESS STATEMENTS – Crim. R. 16(B)(7)**

All written or recorded statements, or copies thereof, made by a witness in the State's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal or surrebuttal. For purposes of this request, a "witness" shall include any person who has or claims to have knowledge or is believed to have knowledge concerning a fact or facts about the issue(s) involved in this criminal action or proceeding or about the credibility of another witness, irrespective of whether the State of Ohio intends to call such person as a witness at trial. See generally  4 O.J.I. § 521.04.

**8. WITNESS NAMES AND ADDRESSES – Crim. R. 16(I)**

A written list of the names and addresses of all witnesses that the State of Ohio intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal.

**9. EXPERT WITNESSES: REPORTS – Crim R. 16(K)**

All written reports summarizing an expert witness's testimony, findings, analysis, conclusion, or opinion, and shall include a summary of the expert's qualifications.

This demand is continuing in nature. If, subsequent to compliance with this request, the State of Ohio discovers additional responsive materials, those materials shall promptly be transmitted to Defendant.  In the event the State refuses to transmit such materials, the State of Ohio shall advise Defendant of its noncompliance to allow for determination of the discoverability of the withheld materials, pursuant to Crim. R. 16(C) and/or Crim. R. 16(D)(1)-(5) and/or Crim. R. 16(E)(1), (2).

Respectfully submitted,

KRISTINA R. POWERS-REG. NO. 0068263
Attorney for Defendant
Stark County Public Defender Office
200 West Tuscarawas Street, Suite 200
Canton, OH 44702
Phone: (330) 451-7217

**CERTIFICATE OF SERVICE**

A copy of the foregoing has been served via court mail box to the  Stark County  Prosecutor's Office, Canton, Ohio this

day of  November, 2012..

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

STATE OF OHIO,                                          CASE NO. 2012 CR 1567

    PLAINTIFF                         *

VS.                                                    JUDGE

KAYLA AYERS,                              *

    DEFENDANT                         *        **REQUEST FOR BILL
                                                       OF PARTICULARS**

Pursuant to Criminal Rule 7(E), the Defendant, through Counsel, requests the Prosecuting Attorney to Provide a Bill of Particulars which will clarify all allegations in the indictment.

Counsel requests the following information be set forth in a Bill of Particulars to be filed by the State of Ohio.

1.   The location where the alleged offense charged in the indictment was committed.

2.   The time of the alleged offense;

3.   The alleged overt acts attributed to the Defendant in the commission of the offense charged in the indictment;

4.   The nature of the offense charged and the nature of Defendant's conduct;

5.   Any and all other information not set forth in the indictment.

Defense Counsel respectfully submits to the court that the information requested is vital and essential to the Defendant to enable the Defendant to prepare for trial. The failure to furnish the information requested will cause a deprivation of the Defendant's rights by the Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States of America.

Respectfully submitted,

KRISTINA R. POWERS-REG. NO. 0068263
ATTORNEY FOR DEFENDANT
STARK CO. PUBLIC DEFENDER OFFICE
200 WEST TUSC., SUITE 200
CANTON, OHIO 44702-2202
PHONE: (330) 451-7217

**PROOF OF SERVICE**

A copy of the foregoing Defendant's Request for Bill of Particulars was served by court mailbox upon the Stark County Prosecutor's Office, Canton, Ohio 44702 this _____ day of November, 2012.

**EXHIBIT 4**



11/13/12 skn  1 & 2
file/pdo

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

STATE OF OHIO,                                    CASE NO. **2012CR1567**

    Plaintiff,                                   JUDGE CHARLES E. BROWN, JR.

vs.                                              **BILL OF PARTICULARS**

**KAYLA JEAN AYERS,**

    Defendant.

      Now comes the State of Ohio, by and through Assistant Prosecuting Attorney, Toni Beth

Schnellinger Feisthamel, furnishes the following Bill of Particulars:

#### Count One

    Date: On or about October 3, 2012

    Location: 185 26th Street SE, Massillon, Stark County, Ohio

    On or about October 3, 2012, the Defendant, by means of fire or explosion, knowingly caused physical harm to 185 26th Street SE, Massillon, Stark County, Ohio, an occupied structure. Defendant set fire to a bed causing physical harm when she and her three year old child were both in the residence.

#### Count Two

    Date: On or about October 3, 2012

    Location: 185 26th Street SE, Massillon, Stark County, Ohio

    On or about October 3, 2012, the Defendant, recklessly, being the parent, guardian, custodian, person having custody or control, or person in loco parentis of three children under eighteen

**EXHIBIT 5**

years of age, created a substantial risk to the health or safety of said children. Defendant set fire to a bed inside the residence located at 185 26th Street SE, Massillon, Stark County, Ohio when she and her three year old child were both in the residence.

Respectfully submitted,

TONI BETH SCHNELLINGER FEISTHAMEL
SUPREME COURT REG # 0072638
ASSISTANT PROSECUTING ATTORNEY

PROOF OF SERVICE

A copy of the foregoing Bill of Particulars was served upon Kristina Powers, Attorney for Defendant, by placement into counsel's box at the Stark County Clerk of Courts on this 13st day of November, 2012.

TONI BETH SCHNELLINGER FEISTHAMEL
SUPREME COURT REG # 0072638
ASSISTANT PROSECUTING ATTORNEY

11/13/12 skn 1 & 2
file/pdo



IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

STATE OF OHIO,                           CASE NO. **2012CR1567**

    Plaintiff,                          JUDGE CHARLES E. BROWN, JR.

vs.                                      <u>**RESPONSE TO REQUEST FOR**</u>
                                         <u>**DISCOVERY**</u>
**KAYLA JEAN AYERS,**

    Defendant.


Now comes the Prosecuting Attorney of Stark County, Ohio, and pursuant to Criminal Rule

16 of the Ohio Rules of Criminal Procedure, replies to the Defendant's Request for Discovery as

follows:

1.    Pursuant to Rule 16(B)(1) - material written or recorded statements made by defendant or
co-defendant, police summaries of such statements, and grand jury testimony of the
defendant or co-defendant, which are within possession of, or reasonably available to the
State of Ohio.

    a. ___ See attached
    b. ___ No known statement
    c. _**X**_ Available for copying or inspection by appointment with the Prosecuting
          Attorney
    d. _**X**_ Provided by receipt

2.    Pursuant to Rule 16(B)(2) - criminal records of the defendant, a co-defendant, or witness
in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal.

    a. ___ See attached
    b. ___ No known record
    c. _**X**_ Provided by receipt

3.    Pursuant to Rule 16(B)(3) - subject to Rule 16(D)(4) and (E), laboratory or hospital
reports, books, papers, documents, photographs, tangible objects, buildings, or places.

    a. ___ See attached

**EXHIBIT 6**

b. ___ No known physical evidence

c. **✗** Available by appointment with the Prosecuting Attorney

d. **✗** Provided by receipt

4.　　Pursuant to Rule 16(B)(4) - subject to Rule 16(D)(4) and (E), results of physical or mental examinations, experiments or scientific tests.

a. ___ See attached

b. ___ No known tests conducted

c. **✗** Available by appointment with the Prosecuting Attorney

d. **✗** Provided by receipt

5.　　Pursuant to Rule 16(B)(5) - any evidence favorable to the defendant and material to guilt or punishment.

a. ___ See attached

b. **✗** None known

c. ___ Provided by receipt and designated as "counsel only" material pursuant to Rule 16(C)

6.　　Pursuant to Rule 16(B)(6) - All peace officer or Ohio State Highway Patrol reports

a. ___ See attached

b. ___ None known

c. **✗** Provided by receipt

7.　　Pursuant to Rule 16(B)(7) - Any written or recorded statement by a witness in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal.

a. ___ See attached

b. ___ None known

c. **✗** Provided by receipt

8.　　Pursuant to Rule 16(D) - The prosecuting attorney is not disclosing materials under Rule 16 and certifies to the Court that it is refusing to provide the materials based upon one of the following reasons.

a. ___ Pursuant to Rule 16(D)(1) - The prosecuting attorney has reasonable, articulable grounds to believe that disclosure will compromise the safety of a witness, victim, or third party, or subject them to intimidation or coercion.

b. ___ Pursuant to Rule 16(D)(2) - The prosecuting attorney has reasonable, articulable grounds to believe that disclosure will subject a witness, victim, or third party to a substantial risk of serious economic harm.

c. ___ Pursuant to Rule 16(D)(3) - Disclosure will compromise an ongoing criminal investigation or a confidential law enforcement technique or investigation regardless of whether that investigation involves the pending case or the defendant.

d. ___ Pursuant to Rule 16(D)(4) - A statement of a child victim of a sexually oriented offense under the age of 13.

e. ___ Pursuant to Rule 16(D)(5) - The interests of justice require non-disclosure.

f. _✗_ No certification is being made at this time.

9. Pursuant to Rule 16(I) - A written witness list, including the names and addresses of any witness the State of Ohio intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal.

Respectfully submitted,

TONI BETH SCHNELLINGER FEISTHAMEL
SUPREME COURT REG # 0072638
ASSISTANT PROSECUTING ATTORNEY

PROOF OF SERVICE

A copy of the foregoing Response to Request for Discovery was served upon Kristina Powers, Attorney for Defendant, by placement into counsel's box at the Stark County Clerk of Courts on this _14_ day of November, 2012.

TONI BETH SCHNELLINGER FEISTHAMEL
SUPREME COURT REG # 0072638
ASSISTANT PROSECUTING ATTORNEY

11/13/12                                    **KAYLA AYERS**
                                            **Case No. 2012CR1567**

9.      The following witnesses may be called to testify at time of trial:

Capt. R. Annen                    Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Tammy Wagner                      Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Chad Tharp                        Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Patrick Rhodes                    Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Latevis Greenwood                 Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Richard Davis                     Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Stephen Collins                   Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Scott. Negulici                   Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

John Tyrrell                      Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Erik Smith                        Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

M. Canfura                        Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Inspector Reginald Winters        Massillon Fire Department, 223 South Erie St., Massillon,
                                  OH

Officer Brian Muntean             Massillon Police Department, 223 South Erie St.,
                                  Massillon, OH

| | |
|---|---|
| Jeff Ayers | 185 - 26th St. SE, Massillon, OH |
| Chris Thomas | P.O. Box 2194, North canton, OH (street address to provided) |
| Jennifer Conley | 173 - 26th Street SE, Massillon, OH |
| Karen Ball | 9867 Elton St. SW, Navarre, OH |
| Jason Pandrea | 214 Gnau Ave. SW, Massillon, OH |

11/13/12 skn 1 & 2
File/pdo

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

STATE OF OHIO,                                    CASE NO. **2012CR1567**

     Plaintiff,                                  JUDGE CHARLES E. BROWN, JR.

vs.

**KAYLA JEAN AYERS,**                        **DISCOVERY RECEIPT**

     Defendant.


I, Kristina Powers, Attorney for the defendant, hereby acknowledges that he is in receipt

of the following Discovery items provided by Toni Beth Schnellinger, Assistant Prosecuting

Attorney, Stark County Prosecutor's Office.

- ●Indictment

- ●Criminal History

- ●Origin and Cause Report from Massillon Fire Department

- ●Incident Report from Massillon Police Department

- ●Fire Prevention Bureau/Voluntary Statements

- ●Reports from Massillon Fire Department


- ●Photos


_____                    _11-14-2012_
KRISTINA POWERS                                  DATE
COUNSEL FOR DEFENDANT

**EXHIBIT 7**

skn 1 & 2
File/pdo

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

STATE OF OHIO,                          CASE NO. **2012CR1567**

     Plaintiff,                       JUDGE CHARLES E. BROWN, JR.

vs.

**KAYLA JEAN AYERS**,                   **DISCOVERY RECEIPT**

     Defendant.

     I, Kristina Powers, Attorney for the defendant, hereby acknowledges that he is in receipt

of the following Discovery items provided by Toni Beth Schnellinger, Assistant Prosecuting

Attorney, Stark County Prosecutor's Office.

     ●Criminal History

_____          _11-19-12_
KRISTINA POWERS                          DATE
COUNSEL FOR DEFENDANT

**EXHIBIT 8**

11/29/12 skn 1 & 2                 B
file/pdo



IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

2012 NOV 29  PM 3:32

STATE OF OHIO,                           CASE NO. **2012CR1567**

    Plaintiff,                         JUDGE CHARLES E. BROWN, JR.

vs.

**KAYLA JEAN AYERS,**             **SUPPLEMENTAL RESPONSE
TO DISCOVERY**

    Defendant.

    Now comes the State of Ohio by and through the Assistant Prosecuting Attorney, Toni Beth

Schnellinger, and provides supplemental response to discovery as follows:

Supplement to Discovery #9:

        Brennan Scott
        address to be provided

                   Respectfully submitted,

                   TONI BETH SCHNELLINGER, #0072683
                   ASSISTANT PROSECUTING ATTORNEY

                  PROOF OF SERVICE:

    A copy of the foregoing Supplement was served upon Kristina Powers, Attorney for
Defendant, by placement into respective counsel's designated box at the Stark County Clerk of
Courts on this _29th_ day of November, 2012.

                   TONI BETH SCHNELLINGER, #0072683
                   ASSISTANT PROSECUTING ATTORNEY

**EXHIBIT 9**

12/12/12 skn 1 & 2
file/pdo

B



## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

STATE OF OHIO,

    Plaintiff,

vs.

**KAYLA JEAN AYERS,**

    Defendant.

CASE NO. **2012CR1567**

JUDGE CHARLES E. BROWN, JR.

**SUPPLEMENTAL RESPONSE
TO DISCOVERY**

Now comes the State of Ohio by and through the Assistant Prosecuting Attorney, Toni Beth

Schnellinger, and provides supplemental response to discovery as follows:

Supplement to Discovery #9:

        Officer C. Ricker
        Massillon Police Department

        Respectfully submitted,

        TONI BETH SCHNELLINGER, #0072683
        ASSISTANT PROSECUTING ATTORNEY

PROOF OF SERVICE:

    A copy of the foregoing Supplement was served upon Kristina Powers, Attorney for
Defendant, by placement into respective counsel's designated box at the Stark County Clerk of
Courts on this __13th__ day of December, 2012.

        TONI BETH SCHNELLINGER, #0072683
        ASSISTANT PROSECUTING ATTORNEY

**EXHIBIT 10**

12/12/12 skn 1 & 2
File/pdo

### IN THE COURT OF COMMON PLEAS
### STARK COUNTY, OHIO

STATE OF OHIO,

      Plaintiff,

vs.

**KAYLA JEAN AYERS,**

      Defendant.

CASE NO. **2012CR1567**

JUDGE CHARLES E. BROWN, JR.

**DISCOVERY RECEIPT**

      I, Kristina Powers, Attorney for the defendant, hereby acknowledges that he is in receipt

of the following Discovery items provided by Toni Beth Schnellinger, Assistant Prosecuting

Attorney, Stark County Prosecutor's Office.

- CD of interview with Kayla Ayers

- Jail calls on compact disc

_____
**KRISTINA POWERS**
**COUNSEL FOR DEFENDANT**

_____
DATE

**EXHIBIT   11**

12/12/12 skn 1 & 2
file/pdo

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

2013 JAN 22 PM 2:59

STATE OF OHIO,                              CASE NO. **2012CR1567**

    Plaintiff,                             JUDGE KRISTIN G. FARMER

vs.

**KAYLA JEAN AYERS,**                       **SUPPLEMENTAL RESPONSE
TO DISCOVERY**

    Defendant.

      Now comes the State of Ohio by and through the Assistant Prosecuting Attorneys, Dennis E.

Barr and Toni Beth Schnellinger, and provides supplemental response to discovery as follows:

Supplement to Discovery #9:

        Officer C. Ricker
        Massillon Police Department

           Respectfully submitted,

DENNIS E. BARR, #0020126                    TONI BETH SCHNELLINGER, #0072683
CHIEF, CRIMINAL DIVISION                    ASSISTANT PROSECUTING ATTORNEY
ASSISTANT PROSECUTING ATTORNEY

**EXHIBIT 12**

PROOF OF SERVICE:

A copy of the foregoing Supplement was served upon Matthew Kuhn, Attorney for
Defendant, by placement into respective counsel's designated box at the Stark County Clerk of
Courts on this _____ day of January, 2013.


_____           _____
DENNIS E. BARR, #0020126                     TONI BETH SCHNELLINGER, #0072683
CHIEF, CRIMINAL DIVISION                      ASSISTANT PROSECUTING ATTORNEY
ASSISTANT PROSECUTING ATTORNEY

12/12/12 skn 1 & 2
File/pdo



IN THE COURT OF COMMON PLEAS 2013 JAN 17 PM 2:34
STARK COUNTY, OHIO

STATE OF OHIO,                             CASE NO. **2012CR1567**

    Plaintiff,                             JUDGE CHARLES E. BROWN, JR.

vs.

**KAYLA JEAN AYERS,**                      **DISCOVERY RECEIPT**

    Defendant.

    I, Kristina Powers, Attorney for the defendant, hereby acknowledges that he is in receipt

of the following Discovery items provided by Toni Beth Schnellinger, Assistant Prosecuting

Attorney, Stark County Prosecutor's Office.

- Medical Records

- CD of photos

_____                  _____
KRISTINA POWERS                            DATE
COUNSEL FOR DEFENDANT

**EXHIBIT 13**

12/12/12 skn 1 & 2
file/pdo

B

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

*CLERK OF ...*
*STARK CO...*
*2013 JAN 15 PM 3: 49*

STATE OF OHIO,

    Plaintiff,

vs.

**KAYLA JEAN AYERS,**

    Defendant.

CASE NO. **2012CR1567**

JUDGE CHARLES E. BROWN, JR.

**SUPPLEMENTAL RESPONSE
TO DISCOVERY**

Now comes the State of Ohio by and through the Assistant Prosecuting Attorney, Toni Beth

Schnellinger, and provides supplemental response to discovery as follows:

Supplement to Discovery #9:

        Representative
        Stark County Jail

        Records Custodian
        Affinity Hospital

        Brennen Scott (new address)
        8132 Fohl Rd.
        Navarre, OH  44662

        Respectfully submitted,

        TONI BETH SCHNELLINGER, #0072683
        ASSISTANT PROSECUTING ATTORNEY

**EXHIBIT 14**

PROOF OF SERVICE:

A copy of the foregoing Supplement was served upon Kristina Powers, Attorney for Defendant, by placement into respective counsel's designated box at the Stark County Clerk of Courts on this _15th_ day of January, 2013.


TONI BETH SCHNELLINGER, #0072683
ASSISTANT PROSECUTING ATTORNEY

IN THE COURT OF COMMON PLEAS

STARK COUNTY, OHIO

| | | |
|---|---|---|
| CITY OF ALLIANCE, | * | CASE NO. 2012 CRB 1567 |
| PLAINTIFF, | * | |
| VS. | * | JUDGE BROWN |
| KAYLA AYERS, | * | |
| DEFENDANT. | * | <u>MOTION IN LIMINE</u> |

Now comes Defendant, by and through Counsel, and respectfully moves this Court to exclude testimony that constitutes prior bad acts prohibited by Evid. R. 404(B). Defendant requests a ruling on this Motion prior to trial.

A memorandum in support follows.

<u>MEMORANDUM</u>

1.  <u>Evidence of Prior Bad Acts</u>

The defense has reason to believe that the prosecution may attempt to introduce prior convictions and/or evidence of prior bad acts by the Defendant.  Specifically, the Defendant anticipates that the State will elicit testimony of bad parenting by the defendant and allegations of involvement of these children by the Department of Job and Family Services. Defendant asserts that any testimony regarding these incidents would constitute evidence of other crimes, wrongs or acts excluded by Evid. R. 404(B). Further, any probative value is substantially outweighed by the danger of unfair prejudice. Evid. R. 403(A). The defense requests that the prosecution be prohibited from introducing such evidence.

**EXHIBIT 15**

Defendant further requests this Court to order the prosecutor to instruct her witnesses not to testify regarding this issue.

Respectfully submitted,

Kristina R. Powers-REG. NO. 0068263

ATTORNEY FOR DEFENDANT

STARK CO. PUBLIC DEFENDER OFFICE

200 WEST TUSC., SUITE 200

CANTON, OH 44702

PHONE: 330-451-7200

## PROOF OF SERVICE

A copy of the foregoing Motion in Limine was personally served upon the Stark County Prosecutor, by court mail box this $\_/\_\mathcal{L}$ day of December, 2012.

Kristina R. Powers



12/19/12 skn  1 & 4            b
file/pdo/Jail/Pscho-clinc

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

STATE OF OHIO,                    CASE NO.  **2012CR1567**

    Plaintiff,               JUDGE CHARLES E. BROWN, JR.

vs.                               <u>ORDER DIRECTING THE EVALUATION</u>
                                  <u>OF DEFENDANT'S COMPETENCE</u>
**KAYLA JEAN AYERS,**             <u>TO STAND TRIAL</u>

    Defendant.

This matter came on for hearing on the 17th day of December, 2012, the defendant, KAYLA JEAN AYERS, being present before the court and represented by counsel, and the State being represented by the Prosecuting Attorney.

The issue of the defendant, KAYLA JEAN AYERS, competence to stand trial having come to the attention of the court, it is ORDERED that:

    1.    That the Summit County Psycho-Diagnostic Clinic will examine the defendant to determine whether the defendant is competent to stand trial.  The person conducting the examination will be an examiner as defined in Section 2945.37(A),

**EXHIBIT 16**

2.   The examination will be conducted at the Summit County
     Psycho-Diagnostic Clinic.

3.   The Correctional Health Care Group, Inc. and the Stark
     County Sheriff shall release to Psycho-Diagnostic
     Clinic any and all current medical and mental health
     care records for KAYLA JEAN AYERS that are in their
     custody, possession, or control for the purpose of
     accomplishing the competency evaluation.

4.   The Stark County Probation Department shall release to
     Psycho-Diagnostic Clinic any and all records for KAYLA
     JEAN AYERS that is in their custody, possession, or
     control for the purpose of accomplishing the competency
     evaluation.

5.   The examiner shall submit a written report of the
     examination to the court no later than thirty days
     after the date of this order.

6.   The examiner's report shall contain the findings of the
     examiner, the facts in reasonable detail on which the
     findings are based, and the opinion of the examiner as
     to the defendant's competence to stand trial; that is,
     whether the defendant is capable to understanding the
     nature  and objective of the proceedings against him
     and capable of presently assisting in his defense.

7.   If it is the examiner's opinion that the defendant is
     incompetent to stand trial, he shall also state in the
     report his opinion on the likelihood of the defendant's
     becoming competent to stand trial within one year and
     his opinion as to whether the defendant is mentally ill
     or mentally retarded.

JUDGE CHARLES E. BROWN, JR.

APPROVED BY:

TONI BETH SCHNELLINGER, #0072638
ASSISTANT PROSECUTING ATTORNEY



# Psycho-Diagnostic Clinic

209 South High Street • Akron, Ohio 44308-1610 • Telephone 330/643-2333 • Fax 330/643-8571

January 7, 2013

Honorable Charles E. Brown, Jr., Judge
Stark County Court of Common Pleas
115 Central Plaza North
Canton, OH 44702

Dear Judge Brown:

Ms. Kayla Ayers was referred to the Psycho-Diagnostic Clinic for a Competency to Stand Trial evaluation pursuant to O.R.C. 2945.371(G)(3) on December 27, 2012.

An interview with attempted with Ms. Ayers at the Stark County Jail on January 4, 2013. However, at that time, Ms. Ayers refused to participate in the evaluation. Therefore, the Competency to Stand Trial evaluation can not be completed as ordered.

If you have any questions, please feel free to contact me at 330-643-2333.

Respectfully submitted,

Arcangela S. Wood, Psy.D.
Clinical Director

ASW/ml

Cc:    File



*Serving the Common Pleas Courts of Summit, Medina, Portage, Geauga and Stark Counties*



**EXHIBIT  17**

1/15/13 tbsf 1&3
File/kuhn/judge

CLERK OF COURT
STARK COUNTY OH

2013 JAN 15  PM 3: 50

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

STATE OF OHIO,                              CASE NO.  **2012CR1567**

    Plaintiff,                              JUDGE FARMER

vs.

**KAYLA AYERS,**                          **MOTION IN LIMINE**

    Defendant.


      Now comes the State of Ohio, by and through the Prosecuting Attorney of Stark

County, Ohio, and moves this honorable court in limine to preclude the admission of any

evidence relating to a subsequent fire out of state alleged by the Defendant to have been

started by the Defendant's three year old son.

      Defendant has alleged that the Defendant's son had allegedly started a fire while in

South Carolina.  This fire is subsequent to the fire in the case at bar.  It has been since

discovered and reported to Defendant that the child did not start the fire.  The fire was

accidently started by an adult.  No police report was made, no fire department was called to

the scene.  Also, there is no evidence to support Defendant's allegation that her son started

this subsequent fire.  Furthermore, Defendant has since made other allegations claiming

that either the fire in the case at bar was accidently started by herself or other adults

purposely started the fire.

1

**EXHIBIT  18**

Pursuant to Evidence Rule 401, this allegation is not relevant as it does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  As this evidence is not relevant as it has no probative value in this case.  Furthermore, pursuant to Rule 403, even if this Court would determine said evidence to be relevant, its very nature makes it prejudicial and would outweigh any probative value that exists.  Therefore, the State would request the Court to preclude the admission of the allegation of a subsequent fire.

Respectfully submitted,

TONI BETH SCHNELLINGER FEISTHAMEL
SUPREME COURT REG # 0072638
ASSISTANT PROSECUTING ATTORNEY

**PROOF OF SERVICE**

A copy of the foregoing Motion was served upon Kristina Powers and/or Matthew Kuhn, Attorney for Defendant, by placement in Defense counsel's Stark County Court of Common Pleas mail box, on this 15th day of January, 2013.

TONI BETH SCHNELLINGER FEISTHAMEL
SUPREME COURT REG # 0072638
ASSISTANT PROSECUTING ATTORNEY

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

2013 JAN 25 PM 2: 05

| | | |
|---|---|---|
| STATE OF OHIO, | * | CASE NO. 2012 CR 1567 |
| PLAINTIFF | * | JUDGE FARMER |
| vs. | | |
| KAYLA AYERS, | * | <u>MOTION IN LIMINE</u> |
| DEFENDANT | | |

Now comes Defendant, by and through counsel, and respectfully moves this Honorable Court for an Order excluding evidence of Defendant's other crimes/bad acts in the State's case-in-chief pursuant to Evid.R. 403 and 404(B).

It is counsel's belief that the State intends to introduce evidence of some prior involvement with Child Protective Services and/or the Department of Job and Family Services regarding parenting rights, allegations of lice infestation, and having a dirty home. It is also counsel's belief that the State intends to introduce evidence regarding Defendant's mental health and medication use. Defendant requests that the Court exclude any evidence regarding these other crimes/bad acts and order that the Prosecutor instruct all witnesses to not testify regarding these acts and allegations.

Thank you for your time and consideration.

Respectfully Submitted,

Matthew S. Kuhn 0079191
Stark County Public Defender Office
200 West Tuscarawas, Suite 200
Canton, Ohio 44702
(330)451-7214

**EXHIBIT 19**

PROOF OF SERVICE

A copy of the foregoing motion was served on the ___ day of January, 2013, by court mailbox upon the Stark County Prosecutor.

_____
Matthew S. Kuhn 0079191



January 30, 2013  skn  1 & 5
file/PDO/JDF/Paula/Jail

_U13 FEB - 1   PM 4: 13

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

STATE OF OHIO,                                  CASE NO. **2012CR1567**

    Plaintiff,                                  JUDGE KRISTIN G. FARMER

vs.

**KAYLA JEAN AYERS**,                           <u>FOUND GUILTY BY JURY AND</u>
                                                <u>SENTENCE IMPOSED</u>

    Defendant.

      This day, January 28, 2013, this cause, having been regularly assigned for Trial, came on for

hearing before the Jury, the same being duly impaneled and sworn, upon the Indictment for the

crimes of Aggravated Arson, 1 Ct. [R.C. 2909.02(A)(2)](F2) and Endangering Children, 1 Ct.

[R.C. 2919.22(A)](M1) as charged in the Indictment, and the Plea of Not Guilty heretofore

entered by the defendant, upon the evidence produced on behalf of the State of Ohio and on

behalf of the defendant.

      The Jury, having been duly charged as to the law of the State of Ohio, and after due

deliberation on January 30, 2013, agreed upon their verdict, whereupon they were conducted in

Open Court in the presence of the defendant and his Attorney, and the verdict, signed by all

members of the Jury, was read to the defendant, and the verdict given, being such as the Court

may receive it, was immediately entered in full upon the minutes. It was the unanimous verdict

**EXHIBIT 20**

of the Jury that the defendant is guilty of the crimes of Aggravated Arson, 1 Ct. [R.C.

2909.02(A)(2)](F2) and Endangering Children, 1 Ct. [R.C. 2919.22(A)](M1) as charged in the

Indictment.  Thereupon the Prosecuting Attorney moved that sentence be pronounced against

said defendant.

Whereupon the Court was duly informed in the premises on the part of the State of Ohio, by

the Prosecuting Attorney, and on the part of the defendant, by the defendant and his Counsel, and

thereafter the court asked the defendant whether he had anything to say as to why judgment

should not be pronounced against him, and the defendant, after consulting with his Counsel, said

that he had nothing further to say except that which he had already said, and showing no good

and sufficient reason why sentence should not be pronounced, the Court thereupon pronounced

sentence.

The Court finds that defendant has been convicted of or plead guilty to a felony and/or a

misdemeanor as listed in division (D) of R.C. 2901.07 and hereby ORDERS that a sample of

defendant's DNA be collected pursuant to Ohio Revised Code Section 2901.07.

IT IS THEREFORE ORDERED that the defendant serve a stated prison term of seven (7)

years on the charge of Aggravated Arson, 1 Ct. [R.C. 2909.02(A)(2)](F2), and

IT IS FURTHER ORDERED that the defendant serve a period of one hundred eighty (180)

days on the charge of Endangering Children, 1 Ct. [R.C. 2919.22(A)](M1), and

IT IS THEREFORE ORDERED that the defendant shall serve these sentences concurrently,

and

IT IS FURTHER ORDERED that this defendant shall be interviewed by the Re-Entry

Program prior to transport.

Whereupon, the Court advised the defendant that he/she may be eligible to earn days of credit under the circumstances specified in O.R.C. § 2967.193.

The days of credit are not automatically awarded under § 2967.193, but they must be earned in the manner specified in that section.

Upon release from prison, the Defendant was advised that he is ordered to serve a mandatory period of three (3) years of post-release control, pursuant to R.C. 2967.28(B). This period of post-release control is imposed as part of Defendant's criminal sentence at the sentencing hearing, pursuant to R.C. 2929.19. If the Defendant violates the conditions of post-release control, the Defendant will be subject to an additional prison term of up to one-half of the stated prison term as otherwise determined by the Parole Board, pursuant to law. If the defendant commits another felony while subject to this period of control or supervision the defendant may be subject to an additional prison term consisting of the maximum period of unserved time remaining on post release control as set out above or 12 months whichever is greater.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant is entitled to jail time credit which will be calculated by the Sheriff and the number of days inserted in a certified copy of an order which shall be forwarded to the institution at a later date.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that any law enforcement agency having custody of evidence in this case may dispose of said evidence pursuant to Ohio Revised Code Section 2981.12 after the appropriate time period has passed and provided no appeals are pending in the above captioned case.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant pay the costs of this prosecution for which execution is hereby awarded.

The Court, pursuant to Ohio Revised Code Section 120.36, hereby ORDERS that if the defendant requested or was provided representation by the Stark County Public Defender there is hereby assessed a $25.00 non-refundable application fee.

WHEREUPON the Court explained to the defendant her rights to appeal according to Criminal Rule 32.

JUDGE KRISTIN G. FARMER

APPROVED BY:

JOHN D. FERRERO, #0018590
PROSECUTING ATTORNEY

DENNIS E. BARR, #0020126
CHIEF, CRIMINAL DIVISION
ASSISTANT PROSECUTING ATTORNEY

TONI BETH SCHNELLINGER, #0072638
ASSISTANT PROSECUTING ATTORNEY

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

FILED

**2013CA00034**

CASE NO. 2012CR1567

STATE OF OHIO,

    Plaintiff,

V.

KAYLA J. AYERS,

    Defendant.

JUDGE: KRISTIN G. FARMER

NOTICE OF APPEAL

FEB 2 0 2013



Notice is hereby given that the Defendant, KAYLA J. AYERS, appeals to the Fifth

District Court of Appeals, Stark County, from the Jury's decision of January 28, 2013.

Respectfully submitted,

GEORGE URBAN (0062725)
ATTORNEY FOR DEFENDANT-APPELLANT
116 CLEVELAND AVENUE NW
SUITE 808
CANTON, OHIO 44702
(330) 437-0101 / FAX: (330) 456-6220

PROOF OF SERVICE

A copy of the foregoing Notice was served by court mail upon the Stark County
Prosecutor's Office, this _____ day of February, 2013.

GEORGE URBAN

**EXHIBIT 21**



## IN THE COURT OF APPEALS, STARK COUNTY
## FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| **STATE OF OHIO** | : | |
| | : | App. No. 2013CA00034 |
| Appellee | : | Case No. 2012CR1567 |
| | : | |
| | : | |
| vs. | : | |
| | : | **On Appeal from the** |
| **KAYLA J. AYERS** | : | **Stark County, Ohio** |
| | : | **Common Pleas Court** |
| Appellant | : | |

---

### BRIEF OF APPELANT, KAYLA J. AYERS

---

STARK COUNTY PROSECUTOR
110 CENTRAL PLAZA SOUTH
CANTON, OHIO 44702
PH: (330) 451-7897
FX: (330) 451-7965

GEORGE URBAN
ATTORNEY FOR APPELLANT
116 CLEVELAND AVE. NW, SUITE 808
CANTON, OHIO 44702
PH: (330) 437-0101
FX: (330) 456-6220
urban451@msn.com



**EXHIBIT 22**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES……………………………………………….. ii

ASSIGNMENTS OF ERROR……………………………………………… 1
THE APPELLANT'S CONVICTIONS FOR ONE COUNT OF AGGRAVATED ARSON IN
VIOLATION OF R.C. 2909.02 AND ONE COUNT OF ENDANGERING CHILDREN IN
VIOLATION OF R.C. 2919.22 WERE AGAINST THE MANIFEST WEIGHT AND
SUFFICIENCY OF THE EVIDENCE.

THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DUE TO
TRIAL COUNSEL'S FAILURE TO REVIEW THE APPROPRIATE DISCOVERY
MATERIALS IN PREPARATION FOR TRIAL.

STATEMENT OF ISSUES……………………………………………….. 2
WHETHER THE DEFENDANT'S CONVICTIONS FOR AGGRAVATED ARSON AND
ENDANGERING CHILDREN WERE AGAINST THE MANIFEST WEIGHT AND
SUFFICIENCY OF THE EVIDENCE.

WHETHER THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
COUNSEL.

STATEMENT OF CASE…………………………………………………. 3

STATEMENT OF FACTS……………………………………………….. 4

ARGUMENT……………………………………………………………. 9

CONCLUSION………………………………………………………….. 17

PROOF OF SERVICE………………………………………………….. 17

APPENDIX

JUDGMENT ENTRY…………………………………………………... A

R.C. 2909.02………………………………………………………….. B

R.C. 2919.22………………………………………………………….. C

## TABLE OF AUTHORITIES

CASES:                                                                    Page

Jackson v. Virginia (1979), 43 U.S. 307……………………………….…  9

State v. Jenks (1981), 61 Ohio St.3d 259 ………………………………..  9

State v. Martin (1983), 20 Ohio App.3d 172…………………………….  9

State v. Sanders (2002), 94 Ohio St.3d 150………………………………  13

State v. Thompkins (1997), 78 Ohio St.3d 380……………………………..  9-10

State v. Waddy (1992), 63 Ohio St.3d 424………………………………  13

State v. Ward, December 28, 2010, Richland County, Case No. 2010CA0026  9

Strickland v. Washington (1984), 466 U.S. 668………………………….  13


STATUTES

R.C. 2909.02………………………………………………………………  10

R.C. 2919.22………………………………………………………………  10

R.C. 2901.22……………………………………………………………… 10-11

ii

## STATEMENT OF ASSIGNMENTS OF ERROR

### I

**THE APPELLANT'S CONVICTIONS FOR ONE COUNT OF AGGRAVATED ARSON IN VIOLATION OF R.C. 2909.02 AND ONE COUNT OF ENDANGERING CHILDREN IN VIOLATION OF R.C. 2919.22 WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.**

### II

**THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DUE TO TRIAL COUNSEL'S FAILURE TO REVIEW THE APPROPRIATE DISCOVERY MATERIALS IN PREPARATION FOR TRIAL.**

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

### I
**WHETHER THE DEFENDANT'S CONVICTIONS FOR AGGRAVATED ARSON AND ENDANGERING CHILDREN WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.**

### II
**WHETHER THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.**

## STATEMENT OF THE CASE

On November 6, 2012, Appellant Kayla Ayers was indicted on one count of Aggravated Arson in violation of R.C. § 2909.02, a felony of the second degree. Appellant was also indicted on one count of Endangering Children in violation of R.C. § 2919.22, a misdemeanor of the first degree.

On January 28, 2013, the Appellant had a jury trial on the above-referenced charges of Aggravated Arson and Endangering Children. At the close of the trial, and after deliberation, the jury returned guilty verdicts on both counts. Appellant was then sentenced to seven (7) years in prison. **(Appendix A)**.

Appellant timely filed her Notice of Appeal and the case is now before this Honorable Court for review.

## STATEMENT OF FACTS

The prosecution began the trial by calling Richard Annen to the stand.  Captain Annen, of the Massillon Fire Department, testified that he responded to a fire at 185 26th Street in Massillon, Ohio.  **(Tr. at 182).** Annen stated that he was in charge of the scene when he arrived, and took over the scene for operational work.  **(Tr. at 183).** After the scene was secured, Captain Annen spoke with the Appellant regarding her injuries and her child's injuries.  **(Tr. at 184-85).** Annen stated that Appellant's young son did not appear to have any smoke exposure or soot on him. **(Tr. at 185).** He learned that Appellant had cut her hand when running upstairs to get her son. **(Tr. at 186).** She also appeared to have been in the fire, as she had soot on her. **(Tr. at 187).**

On cross-examination, Annen stated that it was possible that Appellant had slipped and cut her hand while still in the basement. **(Tr. at 191).** He did not witness any gas cans or lighter fluids while at the residence.  **(Tr. at 192).** After Captain Annen testified, the State called Curtis Ricker to the stand.

Officer Curtis Ricker, of the Massillon Police Department, testified that he was called to Appellant's address on 26th Street in Massillon on October 4, 2012.  **(Tr. at 196).** Ricker's duties at the scene were to interview the Appellant in reference to the fire the night before.  **(Tr. at 197).** The interview took place at the Massillon Police Department, and was recorded on audio and video equipment.  **(Tr. at 200).**

On cross-examination, Ricker testified that he did not see Appellant on the day or night of the fire, nor did he speak to her on that date.  **(Tr. at 203).** He also had no role in the investigation, nor did he conduct his own after the fire.  **(Tr. at 205).** Ricker admitted that he told Appellant in an interview that he did not believe that she purposefully started

4

the fire at her residence. **(Tr. at 208)**. After Officer Ricker testified, the state called Michael Canfora to the stand.

Michael Canfora, of the Massillon Fire Department, testified that he was part of the crew that responded to the fire at Appellant's residence on October 3, 2012. **(Tr. at 211)**. Canfora was able to extinguish the fire he found in the basement with the help of his crew members. **(Tr. at 215)**. After the fire was extinguished, Canfora witnessed damage to the first-floor bathroom above the location of the fire. **(Tr. at 217)**.

On cross-examination, Canfora stated that he did not witness any gas cans or lighter fluid at the Appellant's residence. **(Tr. at 221)**. After Canfora testified, the State of Ohio called Reginald Winters to the stand.

Inspector Reginald Winters, of the Massillon Fire Department, testified that he had five years of experience as a fire investigator as a certified arson investigator. **(Tr. at 225, 228)**. Winters conducted the investigation of the fire that started at Appellant's home. **(Tr. at 237)**. Winters ruled out an electrical shortage as the cause of the fire. **(Tr. at 239)**. During his investigation, Winters stated that he determined that a mattress was where the fire originated, and that there two distinct start points for the fire. **(Tr. at 242, 250)**. He further testified that it was his opinion that the fire was not accidentally caused. **(Tr. at 250)**. During an interview with Winters, Appellant claimed that her 3-year old son Bubba started the fire. **(Tr. at 261)**. During the interview, Appellant seemed lethargic and was unable to answer certain questions posed of her. **(Tr. at 265)**.

Winters stated that in the course of his investigation, he discovered blood splatter and a bloody handprint in the first-floor kitchen of Appellant's home. **(Tr. at 274-75)**.

5

On cross-examination, Winters stated that he did not smell alcohol, marijuana, or smoke on the Appellant on the night of the fire. **(Tr. at 281)**. During his investigation, he observed the 3-year old child operate a lighter and produce a flame. **(Tr. at 282)**. The report that Winters prepared stated that the fire originated on the first floor, although he claimed it was a typo. **(Tr. at 285)**. Additionally, a copy of the report contained several other errors that Winters claimed were not supposed to be included in the final copy. **(Tr. at 294)**. Winters admitted that the report he prepared was based solely on his own opinion. **(Tr. at 289)**. Winters did observe cigarette lighters at the scene of the fire. **(Tr. at 292)**. On redirect, Winters stated that the report with the errors was not the final report. **(Tr. at 300-01)**.

Jeff Ayers, the Appellant's father, testified that he lived with Appellant prior to the fire, and that when he decided to leave, she threatened to burn the house down. **(Tr. at 310)**. On cross-examination, Ayers stated that there were no working smoke detectors in the house. **(Tr. at 316)**.

Brennan Scott, the former paramour of Appellant, testified that on the date of the fire he was working in the Wooster area. **(Tr. at 326)**. When he arrived home, the fire department was present. **(Tr. at 328)**. Scott denied staring the fire. **(Tr. at 329)**.

Jason Pandrea, a neighbor of the Appellant, testified that he knew Appellant's father, and that he was engaged in a sexual relationship with Appellant. **(Tr. at 336)**. Pandrea stated that he heard Appellant threaten her father with burning the house down if he ever left. **(Tr. at 339)**. After Pandrea testified, the state called Jennifer Conley to the stand.

Jenifer Conley, the next-door neighbor of Appellant, testified that she was home on October 3, 2012, the date of the fire. **(Tr. at 355)**. She stated that she witnessed Appellant's two daughters get on a church bus around 6:00 p.m. **(Tr. at 358)**. Around 8:00 p.m., Conley saw Appellant outside screaming, went outside, and heard Appellant state that Bubba started the fire. **(Tr. at 359)**. Conley stated that Appellant was very upset after the fire. (Tr. at 362).

On cross-examination, Conley stated that Appellant's children stayed at her house for approximately ten days after the fire. **(Tr. at 369)**. During that time, she witnessed Bubba with a lighter in his hands. **(Tr. at 369)**. After Conley testified, the state called Karen Ball to the stand.

Karen Ball testified that she knew Appellant through a church relationship. **(Tr. at 372)**. Ball stated that Appellant's children normally participated in a church bus ministry program, but that on October 3, 2012, she went to the house to pick them up at approximately 6:30 p.m. **(Tr. at 377)**. However, no one answered the door, although she heard someone saying "Shhhh" from outside the house. **(Tr. at 379)**. Ball returned to Appellant's house at approximately 8:00 p.m. and witnessed some flickering in a window. **(Tr. at 382)**. When Appellant exited the house, she told Ball that Bubba had started a fire. **(Tr. at 385)**.

On cross-examination, Ball stated that Appellant told her she cut her hand on a glass that she was trying to use to extinguish the fire. **(Tr. at 392)**. After Karen Ball testified, the State of Ohio rested. The Appellant did not call any witnesses.

After counsel gave closing arguments, the jury deliberated and returned a verdict of guilty to the one count of Aggravated Arson and to the one count of Endangering Children.

## ASSIGNMENT OF ERROR I

**WHETHER THE APPELLANT'S CONVICTIONS FOR AGGRAVATED ARSON AND ENDANGERING CHILDREN WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.**

Convictions not supported by sufficient evidence violate the Due Process Clause. Jackson v. Virginia (1979), 43 U.S. 307. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Ward, December 28, 2010, Richland County, Case No. 2010CA0026 *quoting* State v. Jenks (1981), 61 Ohio St.3d 259 at paragraph two of syllabus.

In order for a reviewing court to determine if a conviction was against the manifest weight of the evidence it must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. A new hearing should be granted in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins (1997), 78 Ohio St.3d 380, 387 *citing* State v. Martin (1983), 20 Ohio App.3d 172, 175.

Regarding sufficiency of the evidence, "sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law. State v. Thompkins (1997), 78 Ohio St.3d 380, 387.  Sufficiency is a test of adequacy, and is a question of law.  Id.

In the instant matter, Appellant was convicted of one count of Aggravated Arson in violation of R.C. § 2909.02(A)(2).  This code section states, in pertinent part:

"(A) No person, by means of fire or explosion, shall knowingly do any of the following:

(2) Cause physical harm to any occupied structure."

Additionally, Appellant was convicted of one count of Endangering Children.  The Ohio Revised Code states, in pertinent part: "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. § 2919.22.

Appellant contends that the evidence presented by the State of Ohio was insufficient to convict Appellant of Aggravated Arson and Endangering Children. Specifically, Appellant contends that the State of Ohio was unable to prove the element of knowingly.

As defined by the Ohio Revised Code, "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will

probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(C).

The testimony adduced at trial was sufficient to support that a fire occurred at Appellant's home on October 3, 2012. According to Inspector Winters opinion, the fire was purposefully started, and was not an accidental fire. However, there was no testimony that provided any direct evidence alleging that Appellant started the fire. In fact, both Jennifer Conley and Karen Ball stated that the first thing Appellant told them was that her son, Bubba, had started a fire. **(Tr. at 359, 385)**. Furthermore, Conley stated that while Bubba was staying at her house after the fire, he found a lighter and was playing with it. **(Tr. at 369)**. According to Inspector Winters, Bubba was able to pick up a lighter and create a flame with it. **(Tr. at 282)**.

The testimony established that while a fire was started at Appellant's residence, it was likely started by her three-year old son Bubba. At the very least, this testimony did not prove beyond a reasonable doubt that Appellant started the fire that damaged the house. Additionally, the fire inspector stated that he believed there were two potential starting points of the fire, which would be consistent with Bubba playing with a lighter on the mattress in the basement. Finally, Officer Ricker and Inspector Winters agreed that Appellant continuously denied setting the fire, and Officer Ricker agreed that the did not believe that Appellant purposefully set the fire.

It is notable that immediately after the fire began, when Appellant was in an emotional state, she shouted to her neighbors that it was Bubba who started the fire. As this Honorable Court is well aware, the law deems that certain statements made under the stress of a traumatic event are deemed credible enough that they can withstand a hearsay

objection. While hearsay is not at issue in the instant matter due to the statement being made by the Appellant, the same guiding principle still holds true. The statements made to Karen Ball and Jennifer Conley were essentially excited utterances or present sense impressions regarding the fire that was burning in her house. The law gives these types of statements greater weight than a statement made weeks or months after an event.

Based on the foregoing, the jury lost its way when finding Appellant guilty of Aggravated Arson. The evidence adduced at trial did not prove beyond a reasonable doubt that Appellant acted recklessly in operating the motor vehicle. Based on this lack of evidence, the jury lost its way in finding Appellant guilty.

## ASSIGNMENT OF ERROR II

**APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING HER TRIAL.**

When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that the counsel's representation fell below an objective standard of reasonableness. State v. Sanders (2002), 94 Ohio St.3d 150, 151, *citing* Strickland v. Washington (1984), 466 U.S. 668. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland v. Washington (1984), 466 U.S. 668, 698, see also State v. Waddy (1992), 63 Ohio St.3d 424.

In the instant matter, trial counsel for Appellant was deficient not for one specific incident, but rather an accumulation of errors at trial. During the cross-examination of Inspector Winters, defense counsel engaged in a line of questioning regarding the report that Winters created. **(Tr. at 283)**. This line of questioning included the following colloquy:

"Q: Sir, I'm going to hand you now what has previously been marked Defendant's Exhibit D. if you could check on the second line the Executive Summary. Sir, does that seem to indicate that the fire originated on the first floor of the building?

A: No, sir, somebody made a typo.

Q: That's a typo? Okay. Okay. And, do you know, did this Executive Summary also say the materials first ignited were blankets on the bed?" (Tr. at 285). Defense counsel continued shortly thereafter:

13

"Q: Okay.  When you were doing your investigation, you didn't observe any gas cans laying around, did you?

A: No, sir.

Q: Any lighter fluid containers?

A: No, sir.

Q: Okay. Did you observe any cigarette lighters laying around?

A: Yes, sir." **(Tr. at 292)**.

Continuing on with the questioning, defense counsel stated:

Q: I think in your report you may have made reference to household solvents; is that correct?

A: Household solvents?

Q: Yes, as possibly being the accelerant for the fire? No?

A: No.

Q: Did you make reference to gasoline?

A: No.

Q: Okay. Did you make reference to ignitable liquid vapors, gasoline?

A: No, sir.

Q: Okay.  If I - maybe you didn't prepare this.  If I showed you a document entitled Conclusion, and at the bottom it says, Massillon Prevention Bureau, Inspector Reginald Winters, would that refresh your recollection?

A: Yes.

(Thereupon defense counsel approached the witness).

14

Q: Sir, I'm handing you what has previously been marked as Defendant's Exhibit A. Do you recognize this document, sir?

A: Yes, sir.

Q: Okay. And is that the conclusion to your report?

A: That is my report and that is a template that we used that did not get taken out.

Q: Okay. So this doesn't necessarily apply to Ms. Ayer's fire?

A: That is correct sir." **(Tr. at 294)**.

On redirect, the prosecuting attorney approached the witness and showed him a copy of what was the final report submitted by Inspector Winters. (Tr. at 297). Defense counsel objected, and the parties approached the bench. During the conference at the bench, the prosecuting attorney explained that the final report was included in the discovery Defense counsel received. **(Tr. at 298)**. Furthermore, the prosecuting attorney explained that the report Defense counsel used during cross-examination was not even included in the State of Ohio's file. **(Tr. at 298)**. The trial court permitted Defense counsel an opportunity to review his file for the final report of Inspector Winters. While he apparently could not find the report, he told the trial court "If we signed for them, we signed for them." **(Tr. at 299)**.

Defense counsel's strategy in defending Appellant at trial revolved around the analysis and conclusion contained in the report from Inspector Winters. As evidenced by his cross-examination, defense counsel believed that report he used in his preparation and cross-examination was a final report. However, that was simply not true. The report

being used by defense counsel was not even a final copy, and was not contained in the discovery provided by the State of Ohio.[1]

Appellant was undoubtedly prejudiced by this failure of defense counsel to properly prepare for the trial with the actual final report of the fire inspector. Moreover, this failure of a simple discovery issue falls well below an objective standard of reasonableness. Without reviewing the report of the most critical witness the State produced, the Appellant was denied an opportunity to fully utilize her Sixth Amendment right to confront her accusers. The failure to review and prepare for a key witness must fall on the trial counsel, and demonstrates that in this instance Appellant's trial counsel fell below an objective standard of reasonableness, and materially prejudiced the Appellant in her defense.

Based on the foregoing, Appellant was denied the effective assistance of counsel in the instant matter.

---

[1] The copy of the report used by Defense counsel was likely obtained at the preliminary hearing held in the Massillon Municipal Court.

## CONCLUSION

For all the above stated reasons, Appellant requests this Honorable Court to reverse and/or vacate her convictions for Aggravated Arson in violation of R.C. § 2909.02 and Endangering Children in violation of R.C. § 2919.22.

Respectfully submitted,

GEORGE URBAN (0062725)
116 CLEVELAND AVE NW
SUITE 808
CANTON, OH 44702
PHONE: (330) 437-0101
FAX    : (330) 456-6220
ATTORNEY FOR DEFENDANT-
APPELLANT

## PROOF OF SERVICE

A copy of the foregoing Brief of Appellant was served upon the Stark County Prosecutor's Office, Canton, Ohio this 24th day of June, 2013, by court mailbox.

GEORGE URBAN (0062725)

**A**

FROM NANCY REINBOLD, STARK CO CLERK OF COURTS  (WED)JAN 30 2019 12:18/ST. 12:17/No. 7360146273 P  1

# STARK COUNTY COURT OF COMMON PLEAS
## JOURNAL ENTRY SENTENCING FORM - STATE PRISON

CASE NUMBER  2012CR1567                                        DATE:  1/30/13

DEFENDANT'S NAME  KAYLA JEAN AYERS

DEF'S COUNSEL  KRISTINA POWERS / Matt Kuhn  ☐ Appeare  ☐ Substitute

☐ CHANGE OF PLE  ☐ GUILTY ☐ NO CONTES       FINDING                DATE:

☑ FOUND GUILTY AFTER TRIAL       DATE:  1/30/13

☐ COMMUNITY CONTROL REVOKED

Upon consideration of Ohio Revised Code Sections 2929.11, 2929.12, 2929.13, and 2929.14 , and pursuant to 2953.08 (D) -
Rule 11(C) it is the sentence of the Court that the defendant be incarcerated in the appropriate state institution as

DEFENDANT SENTENCED TO  ☐ LCI (male)    ☑ OSRW (female    ☐ OTHER

**COUNT 1     2909.02 (A) (2) AGGRAVATED ARSON F2**

SENTENCE COUNT 1:  7  days/months/years  concurrent / consecutive with count(s)  2

and / or  with case(s) _____

Defendant ordered to pay a fine of _____

☐ Amended T  ☐ Lesser Included Offen

☐ Mandatory Fine  ☐ Mandatory Time          OFFENSE          O.R.C.          DEGREE

**COUNT 2     2919.22 (A) ENDANGERING CHILDREN M1**

SENTENCE COUNT 2:  180  days/months/years  concurrent / consecutive with count(s)  1

and / or  with case(s) _____

Defendant ordered to pay a fine of _____

☐ Amended T  ☐ Lesser Included Offen

☐ Mandatory Fine  ☐ Mandatory Time          OFFENSE          O.R.C.          DEGREE

TOTAL INCARCERATION  7  DAYS/ MONTHS/ YEARS

SPECIFICATION(S) TO COUNTS _____ MERGED FOR THE PURPOSE OF SENTENCING

☐ DEFENDANT'S DRIVERS LICENSE IS SUSPENDED ON COUNT(S) _____ for a period of _____
CONCURRENT / CONSECUTIVE TO ANY OTHER SUSPENSION.

☐ _____ POINTS ASSESSED TO DEFENDANT'S DRIVERS LICENSE

☑ FINES SUSPENDED PURSUANT TO AFFIDAVIT OF INDIGENCY.

☑ DEFENDANT ENTITLED TO JAIL TIME CREDIT AS PROVIDED BY LAW, TO BE CALCULATED AT A LATER DATE.

☑ DEFENDANT TO PAY COSTS OF PROSECUTION FOR WHICH EXECUTION IS GRANTED.

☐ COSTS OF PROSECUTION WAIVED.

☑ DEFENDANT ORDERED COMMITTED

☑ DEFENDANT IS TO BE INTERVIEWED BY RE-ENTRY PROGRAM PRIOR TO TRANSPORT

☐ DEFENDANT IS TO BE INTERVIEWED BY SRCCC PRIOR TO TRANSPORT

☒ THE DEFENDANT WAS ADVISED OF POST RELEASE CONTROL PURSUANT TO O.R.C. 2967.28

☒ SHERIFF IS ORDERED TO TRANSPORT THE DEFENDANT INTO THE CUSTODY OF O.D.R.C.

☐ OTHER ORDER _____

THIS FILING IS TO EXPEDITE CONVEYANCE OF THE PRISONER TO THE INSTITUTION
IT IS NOT INTENDED TO BE A FINAL SENTENCING ORDER
IT IS NOT INTENDED TO BE A FINAL APPEALABLE ORDER
A COMPLETE SENTENCING ORDER WITH FULL SENTENCING TERMS WILL FOLLOW

REVISED 03/08                                        Page 1

FROM NANCY REINBOLD, STARK CO CLERK OF COURTS   (WED)JAN 30 2013 12:16/ST. 12:17/No. 7303148273 P  2

## STARK COUNTY COURT OF COMMON PLEAS
## JOURNAL ENTRY SENTENCING FORM - STATE PRISON

CASE NUMBER  2012CR1567                                    DATE:  1/30/13

DEFENDANT'S NAME  KAYLA JEAN AYERS

DEF'S COUNSEL  KRISTINA POWERS / Matt Kuhn  ☐ Appeare   ☐ Substitute

JUDGE FARMER

January 30, 2013  skn  1 & 5
file/PDO/JDF/Paula/Jail

2013 FEB -1  PH 4: 13

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

STATE OF OHIO,                           CASE NO. **2012CR1567**

    Plaintiff,                          JUDGE KRISTIN G. FARMER

vs.

**KAYLA JEAN AYERS,**                    <u>FOUND GUILTY BY JURY AND</u>
                                         <u>SENTENCE IMPOSED</u>
    Defendant.


    This day, January 28, 2013, this cause, having been regularly assigned for Trial, came on for

hearing before the Jury, the same being duly impaneled and sworn, upon the Indictment for the

crimes of Aggravated Arson, 1 Ct. [R.C. 2909.02(A)(2)](F2) and Endangering Children, 1 Ct.

[R.C. 2919.22(A)](M1) as charged in the Indictment, and the Plea of Not Guilty heretofore

entered by the defendant, upon the evidence produced on behalf of the State of Ohio and on

behalf of the defendant.

    The Jury, having been duly charged as to the law of the State of Ohio, and after due

deliberation on January 30, 2013, agreed upon their verdict, whereupon they were conducted in

Open Court in the presence of the defendant and his Attorney, and the verdict, signed by all

members of the Jury, was read to the defendant, and the verdict given, being such as the Court

may receive it, was immediately entered in full upon the minutes.  It was the unanimous verdict

of the Jury that the defendant is guilty of the crimes of Aggravated Arson, 1 Ct. [R.C. 2909.02(A)(2)](F2) and Endangering Children, 1 Ct. [R.C. 2919.22(A)](M1) as charged in the Indictment. Thereupon the Prosecuting Attorney moved that sentence be pronounced against said defendant.

Whereupon the Court was duly informed in the premises on the part of the State of Ohio, by the Prosecuting Attorney, and on the part of the defendant, by the defendant and his Counsel, and thereafter the court asked the defendant whether he had anything to say as to why judgment should not be pronounced against him, and the defendant, after consulting with his Counsel, said that he had nothing further to say except that which he had already said, and showing no good and sufficient reason why sentence should not be pronounced, the Court thereupon pronounced sentence.

The Court finds that defendant has been convicted of or plead guilty to a felony and/or a misdemeanor as listed in division (D) of R.C. 2901.07 and hereby ORDERS that a sample of defendant's DNA be collected pursuant to Ohio Revised Code Section 2901.07.

IT IS THEREFORE ORDERED that the defendant serve a stated prison term of seven (7) years on the charge of Aggravated Arson, 1 Ct. [R.C. 2909.02(A)(2)](F2), and

IT IS FURTHER ORDERED that the defendant serve a period of one hundred eighty (180) days on the charge of Endangering Children, 1 Ct. [R.C. 2919.22(A)](M1), and

IT IS THEREFORE ORDERED that the defendant shall serve these sentences concurrently, and

IT IS FURTHER ORDERED that this defendant shall be interviewed by the Re-Entry Program prior to transport.

Whereupon, the Court advised the defendant that he/she may be eligible to earn days of credit under the circumstances specified in O.R.C. § 2967.193.

The days of credit are not automatically awarded under § 2967.193, but they must be earned in the manner specified in that section.

Upon release from prison, the Defendant was advised that he is ordered to serve a mandatory period of three (3) years of post-release control, pursuant to R.C. 2967.28(B). This period of post-release control is imposed as part of Defendant's criminal sentence at the sentencing hearing, pursuant to R.C. 2929.19. If the Defendant violates the conditions of post-release control, the Defendant will be subject to an additional prison term of up to one-half of the stated prison term as otherwise determined by the Parole Board, pursuant to law. If the defendant commits another felony while subject to this period of control or supervision the defendant may be subject to an additional prison term consisting of the maximum period of unserved time remaining on post release control as set out above or 12 months whichever is greater.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant is entitled to jail time credit which will be calculated by the Sheriff and the number of days inserted in a certified copy of an order which shall be forwarded to the institution at a later date.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that any law enforcement agency having custody of evidence in this case may dispose of said evidence pursuant to Ohio Revised Code Section 2981.12 after the appropriate time period has passed and provided no appeals are pending in the above captioned case.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant pay the costs of this prosecution for which execution is hereby awarded.

The Court, pursuant to Ohio Revised Code Section 120.36, hereby ORDERS that if the

defendant requested or was provided representation by the Stark County Public Defender there is

hereby assessed a $25.00 non-refundable application fee.

WHEREUPON the Court explained to the defendant her rights to appeal according to

Criminal Rule 32.

_____
JUDGE KRISTIN G. FARMER

APPROVED BY:

_____
JOHN D. FERRERO, #0018590
PROSECUTING ATTORNEY

_____
DENNIS E. BARR, #0020126
CHIEF, CRIMINAL DIVISION
ASSISTANT PROSECUTING ATTORNEY

_____
TONI BETH SCHNELLINGER, #0072638
ASSISTANT PROSECUTING ATTORNEY

**B**

# 2909.02 Aggravated arson.

(A) No person, by means of fire or explosion, shall knowingly do any of the following:

(1) Create a substantial risk of serious physical harm to any person other than the offender;

(2) Cause physical harm to any occupied structure;

(3) Create, through the offer or acceptance of an agreement for hire or other consideration, a substantial risk of physical harm to any occupied structure.

(B)

(1) Whoever violates this section is guilty of aggravated arson.

(2) A violation of division (A)(1) or (3) of this section is a felony of the first degree.

(3) A violation of division (A)(2) of this section is a felony of the second degree.

Effective Date: 07-01-1996

**C**

## 2919.22 Endangering children.

(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

(1) Abuse the child;

(2) Torture or cruelly abuse the child;

(3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child;

(4) Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development;

(5) Entice, coerce, permit, encourage, compel, hire, employ, use, or allow the child to act, model, or in any other way participate in, or be photographed for, the production, presentation, dissemination, or advertisement of any material or performance that the offender knows or reasonably should know is obscene, is sexually oriented matter, or is nudity-oriented matter;

(6) Allow the child to be on the same parcel of real property and within one hundred feet of, or, in the case of more than one housing unit on the same parcel of real property, in the same housing unit and within one hundred feet of, any act in violation of section 2925.04 or 2925.041 of the Revised Code when the person knows that the act is occurring, whether or not any person is prosecuted for or convicted of the violation of section 2925.04 or 2925.041 of the Revised Code that is the basis of the violation of this division.

(C)

(1) No person shall operate a vehicle, streetcar, or trackless trolley within this state in violation of division (A) of section 4511.19 of the Revised Code when one or more children under eighteen years of age are in the vehicle, streetcar, or trackless trolley. Notwithstanding any other provision of law, a person may be convicted at the same trial or proceeding of a violation of this division and a violation of division (A) of section 4511.19 of the Revised Code that constitutes the basis of the charge of the violation of this division. For purposes of sections 4511.191 to 4511.197 of the Revised Code and all related provisions of law, a person arrested for a violation of this division shall be considered to be under arrest for operating a vehicle while under the influence of alcohol, a drug of abuse, or a combination of them or for operating a vehicle with a prohibited concentration of alcohol, a controlled substance, or a metabolite of a controlled substance in the whole blood, blood serum or plasma, breath, or urine.



NANCY S. REINBOLD
CLERK OF COURT OF APPEALS
STARK COUNTY, OHIO

13 AUG 22  PM 3: 20

CASE NO. 2013-CA-00034
Criminal Appeal

IN THE COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO


STATE OF OHIO,

Plaintiff-Appellee,

vs.


KAYLA JEAN AYERS,

Defendant-Appellant.

---

ON APPEAL FROM THE COURT OF COMMON PLEAS,
STARK COUNTY, OHIO
CASE NO. 2012-CR-1567
Judge Kristen G. Farmer

---

BRIEF OF PLAINTIFF-APPELLEE,
THE STATE OF OHIO

---

JOHN D. FERRERO, #0018590
PROSECUTING ATTORNEY,
STARK COUNTY, OHIO

By:    RONALD MARK CALDWELL
       Ohio Sup. Ct. Reg. No. 0030663
       Assistant Prosecuting Attorney
       Appellate Section
       110 Central Plaza, South – Suite 510
       Canton, Ohio    44702-1413
       (330) 451-7897
FAX: (330) 451-7965


Counsel for Plaintiff-Appellee

GEORGE URBAN
Ohio Sup. Ct. Reg. No. 0062725
116 Cleveland Avenue, N.W.
808 Courtyard Centre
Canton, Ohio    44702
(330) 437-0101


Counsel for Defendant-Appellant

EXHIBIT  23

CASE NO. 2013-CA-00034
Criminal Appeal

IN THE COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO

STATE OF OHIO,

Plaintiff-Appellee,

vs.

KAYLA JEAN AYERS,

Defendant-Appellant.

ON APPEAL FROM THE COURT OF COMMON PLEAS,
STARK COUNTY, OHIO
CASE NO. 2012-CR-1567
Judge Kristin G. Farmer

BRIEF OF PLAINTIFF-APPELLEE,
THE STATE OF OHIO

JOHN D. FERRERO, #0018590
PROSECUTING ATTORNEY,
STARK COUNTY, OHIO

By:    RONALD MARK CALDWELL
        Ohio Sup. Ct. Reg. No. 0030663
        Assistant Prosecuting Attorney
        Appellate Section
        110 Central Plaza, South – Suite 510
        Canton, Ohio    44702-1413
        (330) 451-7897
FAX: (330) 451-7965

        Counsel for Plaintiff-Appellee

GEORGE URBAN
Ohio Sup. Ct. Reg. No. 0062725
116 Cleveland Avenue, N.W.
808 Courtyard Centre
Canton, Ohio    44702
(330) 437-0101

Counsel for Defendant-Appellant

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

       **ASSIGNMENT OF ERROR NO. 1**
       **THE APPELLANT'S CONVICTIONS FOR ONE COUNT OF**
       **AGGRAVATED ARSON IN VIOLATION OF R.C. 2909.02 AND**
       **ONE COUNT OF ENDANGERING CHILDREN IN VIOLATION OF**
       **R.C. 2919.22 WERE AGAINST THE MANIFEST WEIGHT AND**
       **SUFFICIENCY OF THE EVIDENCE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       **ASSIGNMENT OF ERROR NO. II**
       **WHETHER THE DEFENDANT WAS DENIED THE EFFECTIVE**
       **ASSISTANCE OF COUNSEL.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

Page

## CASES

*Cavazos v. Smith*, __ U.S. __, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (*per curiam*). . . . . . 9, 10, 11

*Cullen v. Pinholster*, 563 U.S. __ , 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). . . . . . . . . . . . . . 16

*Harrington v. Richter*, 562 U.S. __ , 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). . . . . . . . . . . . . . 16

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) . . . . . . . . . . . . . . . . 9

*Padilla v. Kentucky*, 559 U.S. __ , 130 S.Ct. 1473, 176 L.Ed.2d 283 (2010). . . . . . . . . . . . . . . 16

*State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, *cert. denied*,
    497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 768 (1990). . . . . . . . . . . . . . . . . . . . . . 14-16

*State v. Herring*, Stark App. No. 2012-CA-00045, 2012-Ohio-4788,
    2012 WL 4882705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*State v. Martin* (1983), 20 Ohio App.3d 172, 485 N.E.2d 717. . . . . . . . . . . . . . . . . . . . . . . . . . 11

*State v. Robinson*, 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148 (1955). . . . . . . . . . . . . . . . 10

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). . . . . . 14, 15, 16

*Tibbs v. Florida*, 457 U.S. 31 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Brown*, 776 F.2d 397 (2nd Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). . . . . . . . . . . . 15

## OTHER AUTHORITIES

R.C. 2909.02(A)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

R.C. 2909.02(B)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

R.C. 2919.22(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

R.C. 2919.22(E)(2)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

iii

## STATEMENT OF THE CASE

In 2012, the Stark County Grand Jury returned an indictment that charged Kayla Jean Ayers, defendant-appellant, with aggravated arson and child endangering.[1] The charges arose from Ayers setting a bed on fire while she and her three-year-old child were in the house. Ayers pleaded not guilty to the charges, and the case was set for trial in the Stark County Court of Common Pleas.[2]

During pretrial proceedings, Ayers filed two motions in limine. In the first motion, Ayers sought to exclude evidence of "bad parenting," while the second motion sought to exclude evidence of Ayers' involvement with Child Protective Services and the Department of Job and Family Services regarding "parenting rights, allegations of lice infestation, and having a dirty home," as well as evidence regarding Ayers' mental health and use of medication. With regard to the last issue, the trial court ordered that Ayers be evaluated for competency to stand trial. The evaluation, however, was not done due to Ayers' refusal to participate in the evaluation. The State also filed a pretrial motion in limine, seeking to exclude evidence of an allegation that Ayers' son had set a fire in South Carolina subsequent to the fire in this case. According to the State's motion, the South Carolina fire was actually set accidentally by an adult, and thus not intentionally set by Ayers' son.

The jury found Ayers guilty of the charges offenses, and the trial court sentenced her to an aggregate prison term of seven years – seven years for aggravated arson, and a concurrent 180-day term for the child endangering charge. Ayers appeals her convictions and sentences to this Court,

---

[1] See R.C. 2909.02(A)(2) (aggravated arson, a felony of the second degree) and R.C. 2919.22(A) (child endangering, a misdemeanor of the first degree).

[2] Judge Charles E. Brown presided over the case during the pretrial proceedings. Judge Kristin G. Farmer, however, assumed the bench upon Judge Brown's retirement, and presided over the trial.

raising two assignments of error — one that challenges the evidentiary support for her convictions, and the other challenging the effectiveness of her trial counsel.

## STATEMENT OF FACTS

Ayers was convicted of starting a fire in the basement of her residence in order to burn the house. She had earlier threatened to burn the residence down if her father moved out of the residence. The fire was started at two different places on a mattress that was in the basement, and the resulting fire reached the first floor from the basement. Ayers claimed at trial that the fire was accidental and started as a result of her three-year-old son playing with a lighter.[3]

Before the fire on the evening of October 3, 2012, Ayers and her family (her boyfriend and their three young children) were living with her father and his family (his girlfriend and her two children) in his Massillon residence. Her father, Jeff Ayers, eventually discussed with finances with Ayers and the fact that she was not contributing much. Their relationship deteriorated due to the financial situation, and Mr. Ayers told his daughter to leave and care for her own family. Ayers responded by telling her father that she was not leaving and that he should leave. Ayers then threatened to burn the house down. Fearful for himself and his pregnant girlfriend, Mr. Ayers decided to leave and force Ayers to care for her family on her own. When he told his daughter of his decision, Ayers threatened to burn the house down if he were to leave. At the time of this threat, a friend of Mr. Ayers, Jason Pandrea (who was having a sexual relationship with Ayers), overheard

---

[3]*See* T.(I) 177 (opening statement of defense) and T.(II) 436, 448 (closing argument of defense).

Ayers's threat. Mr. Ayers decided to leave the Massillon home nonetheless, and left for West Virginia to seek employment and new living arrangements during the morning of October 3.[4]

Also during this day, Ayers's boyfriend, Brennan Scott, left for work as usual, picking up his boss on the way. After work, he picked up his children from day care, dropped them off with Ayers, and then took his boss back home in Beach City, where Scott stayed for a couple hours socializing. When he returned around eight o'clock that night, he found fire trucks around his house.[5]

When the children returned home around six o'clock that night, the two oldest – the daughters, who were 5 and 4 – boarded a church bus to take them to evening services. Karen Ball, a regular attendee at this church, arrived at the Ayers residence in order to pick up Ayers and her three children. Ball knocked on the front door, but no one answered the door. Instead, she heard the dog barking, and then heard someone say, "Shhh." Getting no answer, Ball went to the kitchen door and knocked again. And again, she got no answer other than the dog barking. Ball did see, however, Ayers's purse on the deck. Ball went back to her car and talked briefly with a neighbor, which led her to believe that Ayers was inside the home.[6]

While at church, Ball decided to leave the service early to check on Ayers. Arriving at the home around eight o'clock, Ball noticed a flickering emanating from a basement window. Ball knocked on the basement door, but got no answer other than the dog barking. Ball called to Ayers repeatedly, but got no answer. So she went once again to the kitchen door to knock and call to Ayers. Still getting no answer other then the dog's persistent barking, Ball returned to her car to get

---

[4]T.(II) 307-312, 339.

[5]T.(II) 322-323, 325-328, 331.

[6]T.(II) 357-358, 371-373, 377-380.

her cane, after which she intended to go to a neighbor's to ask about Ayers. When she got to her car, she heard a thump, turned around, and saw Ayers running to her with her youngest child, three-year-old Bubba (Brennan Junior). Ayers told Ball to call 911, so the disabled woman went to the neighbors' and had them call 911. While waiting for the fire fighters to respond, Ball stayed with Ayers and Bubba. She noticed that Ayers had cut her hand, but that Bubba was fine. Ayers also kept bemoaning the fact that she was going to lose her children. The neighbor, Jennifer Conley, also heard Ayers say that Bubba had started the fire. Conley detected a strong odor of burnt marijuana on Ayers.[7]

Fire fighters from the Massillon Fire Department responded to the 911 call, and put out the fire inside the home. Once the fire was extinguished (primarily in the basement), the smoke inside the home was ventilated out, which then allowed the fire inspector to investigate the nature and origin of the fire. The fire fighters-paramedics also treated Ayers and her lacerated hand, as well as Bubba. The paramedics noted that Bubba did not have any smoke smell or soot about him; Ayers, however, had soot on her, which indicated that she had been in the basement, which was the obvious source of fire.[8]

Massillon Fire Department Inspector Reginald Winters inspected the house once the fire was extinguished and the premises ventilated. A mattress in the basement had been fully engulfed in flames, and was the origin of the fire. The mattress had an unusual burn pattern due to the fact that there were two separate points of origin, at different ends of the mattress. The cause of the fire was incendiary, i.e., an open flame. Thus, someone used an open flame to light two fires at different ends

---

[7]T.(II) 359-360, 362, 367, 381-386, 389.

[8]T.(I) 182-187, 189, 193, 213, 215.

4

of the mattress.  Winters did not find any evidence that the fire had been started by a cigarette, i.e.,

he did not find any remnant of a cigarette.  There also did not appear to be any accelerants used in

the fire.[9]

Once he had completed his investigation of the fire scene, Inspector Winters went to the

hospital to interview Ayers.  This interview included Sgt. Muntean of the Massillon Police

Department.  Ayers told the investigators that he had been in the basement folding clothes when she

noticed her son Bubba over by the bed playing with a lighter.  She shortly afterwards noticed a fire

on the bed, so Ayers grabbed a blanket and starting fanning the flame.  Unsuccessful in putting out

the fire, Ayers claimed that she ran to the washing machine, grabbed a glass of water, and threw it

on the flame.[10]  Unsuccessful yet again, she ran and got another glass of water, but tripped on her

way back to the bed, dropping the glass and breaking it, and then falling on it and cutting her hand.

Winters asked Ayers how she could see her son by the bed while she was folding clothes at the dryer

since there was a chimney, a hot water tank, and a furnace blocking the view from that location.

Ayers did not know.  Ayers maintained that the fire grew in size quickly, and that she couldn't find

the phone to call the fire department.  Winters asked her why she didn't immediately leave the house

when the fire started, and Ayers had no answer for that question.  Winters noted that Ayers's story

---

[9]T.(I) 233, 238-250; (II) 301-303.  The source of the fire were the two spots on the
mattress.  Once the mattress caught fire, the fire spread to the basement walls and ceiling,
through the floor and into the bathroom located on the first floor.  T.(I) 188, 216-217, 248.

[10]Because mattresses now have fire retardants on them, Inspector Winters testified that
the initial flame would have been small, and that a glass of water would have extinguished the
flame.  The fire retardants cause any flame to burn slowly, not fast, and that a cigarette will take
hours to light a mattress on fire.  Fanning the fire would have given it oxygen, causing the flame
to get bigger.  Winters opined that the mattress at the Ayers residence burned between ten and
twelve minutes before the fire department arrived.  T.(II) 266-268.

kept changing, and that she seemed lethargic. Ayers denied that she had been drinking, and told the investigators that she was only on Adderall for her ADHD. When Sgt. Muntean started questioning Ayers, she was not able to respond to his questions. Winters noticed that Ayers did not smell of smoke or soot, but a swab of her nostrils revealed light soot inside.[11]

Winters spoke with Bubba, and noticed that the boy did not smell of smoke or soot, did not have any burn marks, and had no soot in his nostrils. Winters did ascertain that the boy was able to light a lighter. Winters then returned to the fire scene and found a broken glass in the basement. He also found a blood splatter on the hot water tank and washing machine, and a blood trail that went up the basement steps, then back down, and that there was blood on the wall by the steps. He also found blood in the kitchen and on the kitchen table.[12]

Winters testified also that Bubba, if he had started the two fires, would have had to light the fire at one end of the mattress, then crawl to the other end while the mattress was on fire to the other end and light that spot as well.[13] Ayers had told him, however, that her boy was standing by the mattress when the fire caught her attention. In his official report, Inspector Winters reached the following conclusions about the fire:

> After examination of the fire scene it was determined the fire originated in the basement on the bed. After examination of the fire scene, interviewing witnesses, interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of NFPA 921; A Guide for Fire and Explosion Investigation, it is my opinion the ignition source for the fire was some type of open flame. The materials first ignited were blankets on the bed. The act or omission that brought the ignition

---

[11]T.(II) 262-268, 280-282..

[12]T.(II) 270, 273.

[13]T.(II) 303-305.

6

source and the materials first ignited together was the deliberate act of a person or persons. Using these elements of a fire cause, the cause of the fire is incendiary.

T.(II) 300-301.

Ayers did not testify at trial or offer any evidence in her defense.[14]

---

[14]Before sentencing, Ayers made the following statement to the trial court:

I took it all the way to the box because I really didn't do it so I was sure I wouldn't be found guilty. And I've just never been in trouble before and I can't go to prison. Please, I should have took a deal, but I didn't want to because I knew that I would win, I just knew.

I'll go - - I'll go anywhere but prison. Put me in a mental institute, I don't care. Please don't put me in prison.

T.(III) 493-494.

## ARGUMENT

## ASSIGNMENT OF ERROR NO. I

**THE APPELLANT'S CONVICTIONS FOR ONE COUNT OF AGGRAVATED ARSON IN VIOLATION OF R.C. 2909.02 AND ONE COUNT OF ENDANGERING CHILDREN IN VIOLATION OF R.C. 2919.22 WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.**

Ayers' first assignment of error challenges the sufficiency and manifest weight of the evidence against her. Her specific evidentiary challenge is essentially that she did not set the fire, that her three-year-old was in fact the guilty party.[15] Ayers argues that the court and the jury erroneously discounted her self-serving statements to investigators and neighbors on the night of the fire that blamed her son for starting the fires. The court and the trier of fact, however, correctly put these statements in their broader evidentiary context, which included substantial circumstantial evidence of her guilt. The fire was started with an open flame at opposite ends of a mattress that required the person starting the fire to ignite one area, go to the other end and ignite the second area, and then either wait for the slow burning fire to catch or to fan the flames to feed the nascent fires oxygen. In addition, Ayers gave inconsistent statements regarding her actions, and could not or did not explain some of the physical impossibilities of her statements. Sufficient evidence was presented of Ayers's guilt, and thus the assignment of error should be overruled.

---

[15]Ayers also argues that evidentiary weak point in the State's case was the culpable mental state, i.e., that the State did not present sufficient evidence that she knowingly set the fires. Such an argument concedes that Ayers did in fact set the fires, but did not do so knowingly, This argument contradicts her more complete defense that she did not set the fires at all, that it was her three-year-old son's fault.

8

***Standards of Review***

"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."[16]    The standard of review for a challenge to the sufficiency of the evidence is set forth in *Jenks*, in which the Ohio Supreme Court held that "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[17]

The *Jenks* court followed the sufficiency standard recognized by the United States Supreme Court in *Jackson* under due process. *Jackson* unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."[18]

The United States Supreme Court has recently reaffirmed the deferential nature of its *Jackson v. Virginia* standard for sufficiency challenges, a standard that the Ohio Supreme Court explicitly adopted in *Jenks*.  The Court explained that *Jackson* made clear "that it is the responsibility of the

---

[16]*State v. Thompkins*, 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541, paragraph two of the syllabus.

[17]*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus (following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

[18]*Jackson*, 433 U.S. at 326.

9

jury – not the court – to decide what conclusions should be drawn from the evidence admitted at trial."[19] As a result, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."[20] As a result of this standard, therefore, judges may very well disagree with the jury's conclusions, but must nonetheless uphold the conviction. As the Court explained, "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."[21]

Even though a conviction may survive review under this very deferential sufficiency standard, a conviction may nonetheless be against the manifest weight of the evidence under its different standard.[22] This difference in results is attributable to the different standards of review for each evidentiary claim.

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits in essence as a " 'thirteenth juror' " and

---

[19]*Cavazos v. Smith*, 565 U.S. __, 132 S.Ct. 2, 3-4, 181 L.Ed.2d 311 (2011) (*per curiam*).

[20]*Cavazos v. Smith*, 132 S.Ct. at 4.

[21]*Cavazos v. Smith*, 132 S.Ct. at 4. *See also, United States v. Brown*, 776 F.2d 397, 402 (2nd Cir. 1985) (Friendly, J.):

> Still *Jackson*'s emphasis on " any," while surely not going so far as to excise "rational," must be taken as an admonition to appellate judges not to reverse convictions because they would not have found the elements of the crime to have been proved beyond a reasonable doubt when other rational beings might do so.

[22]*Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d at 546; *State v. Robinson*, 162 Ohio St. 486, 487, 55 O.O. 388, 388-389, 124 N.E.2d 148, 149 (1955).

disagrees with the factfinder's resolution of the conflicting testimony.[23] In resolving these conflicts in testimony, the reviewing court is to determine whether the jury clearly lost its way in resolving the conflicts. As the Court of Appeals for Hamilton County has held in explaining this standard, "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."[24]

### The Offenses

Ayers's' evidentiary challenges go to her convictions for the offenses of aggravated arson and child endangering. The charged provision of the aggravated arson statute prohibits any person, "by means of fire or explosion," from knowingly causing physical harm to an occupied structure.[25]

---

[23]*Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d at 546-547. See also *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

[24]*State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721 (1983). The *Thompkins* court cited and quoted from *Martin* with approval. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d at 547. See also *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d at 549 (Cook, J., concurring) ("Accordingly, the standard set forth in *State v. Martin* [], and approved by the majority in this case, is suitable for the manifest-weight inquiry.").

For a succinct statement of both the sufficiency and manifest-weight standards by this Court, see *State v. Herring*, Stark App. No. 2012-CA-00045, 2012-Ohio-4788, 2012 WL 4882705, ¶¶ 22-23 (per Delaney, J.).

[25]R.C. 2909.02(A)(2). A violation of this provision is a felony of the second degree, per R.C. 2909.02(B)(3).

11

The relevant provision for the child endangering charge prohibits any person "who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age" from creating "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."[26]

### Application of Standards to the Evidence for Each Offense

The fact that the fire was started with an open flame at two different spots of origin on the bed mattress located in the basement was not disputed. What was disputed was who ignited the two fires. Ayers told investigators and neighbors that her three-year-old son Bubba did it; the circumstantial evidence, however, pointed to her. According to Inspector Winters, the person starting the fire would have had to ignite one spot at the end of the mattress, and then move to the other end while the fire was slowly burning to ignite another spot at the other end of the mattress. These fires would have burned slowly on their own. Ayers told investigators that she first noticed a fire on the mattress while folding clothes with Bubba standing at one end of the mattress. According to Winters, a glass of water would have been sufficient to douse either nascent flame. Ayers claimed that she attempted to put out the fire by fanning it with a blanket, before retrieving a glass of water. Instead of immediately leaving the house once her efforts to extinguish the flame were unsuccessful, Ayers apparently lingered in the house. According to Winters, the mattress was aflame some ten to twelve minutes before the fire department arrived. By that time the fire was

---

[26]R.C. 2919.22(A).  The offense is a misdemeanor of the first degree, per R.C. 2919.22(E)(2)(a).

12

raging through the basement and into the first floor. Ayer also ignored Karen Ball's arrival to pick her and her children up for church, as well as Ball's return to check on Ayers. A flicker through the basement window caught Ball's attention upon her return, and she knocked on the basement door, yelling for Ayers. Ayers ignored these attempts to get her attention, and waited until Ball had left before running from the house with Bubba. Finally, Ayers had threatened to burn the house down if her father moved out of the residence. Mr. Ayers had left for West Virginia that morning, telling Ayers of his intent to move there to work and live. This circumstantial evidence was sufficient to establish Ayers's guilty under the *Jenks* standard.

Under the manifest-weight standard, Ayers has not pointed to anything in the record that would indicate that the jury lost its way in believing the State's circumstantial-evidence case and in disbelieving Ayers' multiple self-serving statements. Ayers had threatened to burn the house down if her father moved out. Mr. Ayers told her that morning he was leaving for West Virginia. Instead of going with Karen Ball to church that night, as planned, Ayers stayed home with Bubba while sending the older girls off to church via the bus. Avoiding Ball until she left, Ayers then started the fire by first igniting one end of the basement bed mattress. Apparently dissatisfied with the slow progress of the flame, she went to the opposite end of the mattress and ignited that. Still dissatisfied, Ayers likely fanned the flames to get the fire burning. Being by the wall, the flames eventually spread to the basement wall, causing smoke to build up. Having cut herself, Ayers waited until she was sure the fire was burning sufficiently before going upstairs, grabbing her son, and exiting the burning house. The jury did not lose its way coming to this logical conclusion from the circumstantial evidence presented at trial. Its verdict was not, therefore, against the manifest weight.

According, the first assignment of error should be overruled.

13

## ASSIGNMENT OF ERROR NO. II

## WHETHER THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

Ayers' second assignment of error challenges the effectiveness of her trial counsel. She argues that her counsel was ineffective in cross-examining Inspector Winters, who investigated the fire. Ayers takes specific issue with trial counsel's use of a draft report in cross-examining this witness. The prosecutor established on redirect examination that this draft report was not the final report, which different materially from the draft report. According to Ayers, counsel's reliance on the draft report was a failure of adequate representation which prejudiced her defense. The use of the draft report in cross-examination did not prejudice Ayers in a *Strickland* sense since the origin and nature of the fire was not in dispute. Ayers's defense was not that the fire started in some other manner, but that her son, and not her, was the person who started the fire. The draft report and the final report did not reach a conclusion about that. Thus, Ayers is unable to demonstrate prejudice under the strict standard for claims of ineffective assistance of counsel ("IAC").

### *The* Strickland *Standard*

IAC claims are governed by the *Strickland* standard. Under this standard, "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance."[27]

---

[27]*State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus, *cert. denied*, 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 768 (1990) (following *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

With regard to the first prong of this test, the *Strickland* Court adopted a deferential standard as to the professional conduct of counsel. Thus, a criminal defendant "must show that counsel's representation fell below an objective standard of reasonableness" in order to satisfy this prong.[28] The Court recognized that there are "countless ways to provide effective assistance in any given case," and thus "[j]udicial scrutiny of counsel's performance must be highly deferential."[29] In other words, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"[30]

With regard to the second prong of the *Strickland* test, the Court recognized that not all errors by conduct will have an impact on the outcome of the trial. In other words, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.[31] Thus, to warrant reversal, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

---

[28]*Strickland*, 466 U.S. at 687–688, 104 S.Ct. at 2064.

[29]*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

[30]*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. *See, also, Bradley*, 42 Ohio St.3d at 379-380, 538 N.E.2d at 142.

[31]*Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. *Cf. United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667–668, 66 L.Ed.2d 564 (1981) ("At the same time and without detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests. Our relevant cases reflect this approach.").

result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."[32]

Regarding *Strickland*'s prejudice prong, the Supreme Court has noted that "likelihood of a different result must be substantial, not just conceivable."[33] As a result, "[s]urmounting *Strickland*'s high bar is never an easy task."[34]

Finally, the Supreme Court admonished in *Strickland* that it might not be necessary for reviewing courts to engage in an analysis of both prongs of the *Strickland* standard.

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.
>
> *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

*See, also, Bradley*, 42 Ohio St.3d at 143, 538 N.E.2d at 380-381.

---

[32]*Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. *See, also, Bradley*, 42 Ohio St.3d at 380, 538 N.E.2d at 142.

[33]*Harrington v. Richter*, 562 U.S. ___, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011).

[34]*Padilla v. Kentucky*, 559 U.S. ___, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 283 (2010). *See, also, Richter*, 562 U.S. at ___, 131 S.Ct. at 788; *Cullen v. Pinholster*, 563 U.S. ___, 131 S.Ct. 1388, 1408, 179 L.Ed.2d 557 (2011).

In arguing that his trial counsel was constitutionally ineffective, Ayers argues that her counsel erroneously relied upon a draft report in cross-examining Inspector Winters, instead of the final report. In making this argument, however, Ayers ignores the fact that her defense at trial (as well as on appeal) centers upon who started the fire, not how the fire was started and developed. In other words, Ayers conceded (and concedes) that the fire started as Winters testified to, that it progressed as he opined, and that was caused by an open flame. Ayers's defense was simply that her son, not she, was the person who set the fire as Winters described. Thus, the cross-examination of Winters based on a draft of his final report, instead of the final report, did not touch upon the core of this defense. Accordingly, therefore, Ayers cannot demonstrate prejudice under the *Strickland* standard.

Accordingly, the second assignment of error should be overruled.

## CONCLUSION

The Court of Appeals for Stark County (Fifth Appellate District) should overrule the two

assignments of error, and affirm the judgment of conviction and sentence entered by the Stark

County Court of Common Pleas.


**JOHN D. FERRERO, #0018590**
**PROSECUTING ATTORNEY,**
**STARK COUNTY, OHIO**


By:  *Ronald Mark Caldwell*
Ronald Mark Caldwell
Ohio Sup. Ct. Reg. No. 0030663
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio     44702-1413
(330) 451-7897
FAX: (330) 451-7965

Counsel for Plaintiff-Appellee

18

## **PROOF OF SERVICE**

A copy of the foregoing BRIEF OF APPELLEE was sent by ordinary U.S. mail, postage prepaid, this 22nd day of August, 2013, to GEORGE URBAN, counsel for defendant-appellant, at 116 Cleveland Avenue, N.W., 808 Courtyard Centre, Canton, Ohio   44702.

*Ronald Mark Caldwell*

Ronald Mark Caldwell
Ohio Sup. Ct. Reg. No. 0030663
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio    44702-1413
(330) 451-7897
FAX: (330) 451-7965

Counsel for Plaintiff-Appellee



COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO

    Plaintiff-Appellee

-vs-

KAYLA J. AYERS

    Defendant-Appellant

JUDGES:
Hon. W. Scott Gwin, P.J.
Hon. William B. Hoffman, J.
Hon. Patricia A. Delaney, J.

Case No. 2013CA00034

O P I N I O N

CHARACTER OF PROCEEDING:

Appeal from the Stark County Court of
Common Pleas, Case No. 2012CR1567

JUDGMENT:

Affirmed

DATE OF JUDGMENT ENTRY:

APPEARANCES:

For Plaintiff-Appellee

JOHN D. FERRERO
Prosecuting Attorney,
Stark County, Ohio

By: RONALD MARK CALDWELL
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio 44702-1413

For Defendant-Appellant

GEORGE URBAN
116 Cleveland Ave. NW., Suite 808
Canton, Ohio 44702

**EXHIBIT 24**

*Hoffman, J.*

{¶1}   Defendant-appellant Kayla J. Ayers appeals her conviction entered by the Stark County Court of Common Pleas on one count of aggravated arson, in violation of R.C. 2902.02, and one count of endangering children, in violation of R.C. 2919.22. Plaintiff-appellee is the state of Ohio.

## STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

{¶2}   On October 3, 2012, the Massillon Fire Department responded to a fire at Appellant's residence. The fire was extinguished in the basement of the home.

{¶3}   Appellant's defense centered upon the allegation her young son started the fire. Appellant's son did not appear to have any smoke exposure or soot on his person. Appellant cut her hand while allegedly attempting to get her son out of the residence. Appellant appeared to have smoke exposure and tested positive for soot residue on her person.

{¶4}   Inspector Reginald Winters of the Massillon Fire Department testified he ruled out an electrical shortage as the cause of the fire. Winters determined a mattress was the point of origination for the fire, and there were two distinct start points at separate ends of the mattress. Winters' report concluded the fire was not an accident.

{¶5}   During an interview with investigators Appellant claimed her three-year old son started the fire while playing with a cigarette lighter. She seemed lethargic and unable to answer the questions posed. She stated she was in the basement folding clothes when she noticed her son by the bed playing with a lighter. Shortly thereafter she noticed a fire on the bed, grabbed a blanket and started fanning the flame. She ran

and retrieved a glass of water, but tripped, breaking the glass, falling and cutting her hand. She stated she could not find the phone to call the fire department.

{¶6}   At the time of the fire, Appellant lived with her father and his family. Her father had previously discussed finances with her, and the fact she had not been contributing to the household financial situation. Their relationship eventually deteriorated and Jeff Ayers, Appellant's father, told Appellant to leave and care for her own family. Appellant refused to leave. Jeff Ayers testified at trial when he decided to leave, Appellant threatened to burn the house down.

{¶7}   Additionally, a neighbor of Appellant, Jason Pandrea, testified he heard Appellant threaten her father with burning the house down if he ever left.

{¶8}   Karen Ball testified at trial she knew Appellant through a church relationship. She visited the residence on the night of the fire to pick up the children for a church activity. She knocked on the door, but received no answer. She heard someone inside the residence say, "Shhh." Ball noticed Appellant's purse on the deck of the residence, which led her to believe Appellant was inside. At approximately 8:00 p.m. the night of the fire, Ball returned to the residence and witnessed some flickering in the window. When Appellant exited the house, she told Ball her son had started the fire.

{¶9}   Investigator Winters prepared a draft report. He concluded the fire originated on the first floor of the residence. Winters maintains this was a typographical error, and should have read the fire originated in the basement of the residence. Additionally, the report contained several other errors not to be included in the final

copy. Winters stated in his testimony at trial the report including the alleged errors was not the final report.

{¶10} During pretrial proceedings, Appellant filed two motions in limine.  In the first, Appellant sought to exclude evidence of "bad parenting" introduced by the state.

{¶11} In the second motion in limine, Appellant sought to exclude evidence of her involvement with Child Protective Services and the Department of Job and Family Services regarding "parenting rights, allegations of lice infestation, and having a dirty home," as well as, evidence regarding her mental health and use of medication.

{¶12} Following a jury trial, Appellant was convicted of one count of aggravated arson, in violation of R.C. 2909.02(A)(2), a felony of the second degree, and one count of endangering children, in violation of R.C. 2919.22(A), a misdemeanor of the first degree. Appellant was sentenced to an aggregate prison term of seven years.

{¶13} Appellant now appeals, assigning as error:

{¶14} "I.  THE  APPELLANT'S  CONVICTIONS  FOR  ONE  COUNT  OF AGGRAVATED ARSON IN VIOLATION OF R.C. 2909.02 AND ONE COUNT OF ENDANGERING CHILDREN IN VIOLATION OF RC. 2919.22 WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶15} "II.  THE  APPELLANT  WAS  DENIED  EFFECTIVE  ASSISTANCE  OF COUNSEL DUE TO TRIAL COUNSEL'S FAILURE TO REVIEW THE APPROPRIATE DISCOVERY MATERIALS IN PREPARATION FOR TRIAL."

I.

{¶16} In the first assignment of error, Appellant challenges her convictions as against the manifest weight and sufficiency of the evidence.

{¶17} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins,* 78 Ohio St.3d 380, 1997–Ohio–52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶18} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins,* supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶19} Appellant was convicted of aggravated arson, in violation of R.C. 2909.02(A)(2), which reads:

{¶20} "(A) No person, by means of fire or explosion, shall knowingly do any of the following:

{¶21} "(1) Create a substantial risk of serious physical harm to any person other than the offender;

{¶22} "(2) Cause physical harm to any occupied structure;

{¶23} "(3) ***"

{¶24} Appellant was also convicted of endangering children, in violation of R.C. 2919.22(A), which reads,

{¶25} "(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body."

{¶26} The evidence introduced at trial demonstrates the fire was started with an open flame at opposite ends of a mattress.  Appellant gave inconsistent statements regarding her actions, which contain unexplained physical impossibilities.  In addition, several witnesses testified at trial as to Appellant's prior threats to burn the residence down in retaliation for her father's moving out of the home.  The evidence demonstrates Appellant's son did not have smoke exposure or evidence of soot on his person, whereas Appellant did have evidence of soot on her person.

{¶27} Based on the above, we do not find the jury lost its way and viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt.

{¶28} The first assignment of is overruled.

II.

{¶29} In the second assignment of error, Appellant maintains she received ineffective assistance of trial counsel due to counsel's failure to cross-examine Inspector Winters with regard to the errors in his draft report and due to reliance on the draft report in preparation for trial.

{¶30} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See, Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶31} "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶32} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice"

Stark County, Case No. 2013CA00034                                                        8

prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

{¶33} Upon review of the record, we find Appellant has not established the second prong of *Strickland* in that but for the alleged error, the result of the proceeding would have been different. Appellant's defense at trial centered upon her son starting the fire, not where the fire started or developed. Appellant averred she was not where person who started the fire. She did not question how the fire progressed or how it originated. Accordingly, we find Appellant has not demonstrated prejudice as a result of the alleged professional error of trial counsel in use of the draft report in preparation for trial as opposed to the final report.

{¶34} The second assignment of error is overruled.

By: Hoffman, J.

Gwin, P.J. and

Delaney, J. concur

HON. WILLIAM B. HOFFMAN

HON. W. SCOTT GWIN

HON. PATRICIA A. DELANEY

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO                        :

    Plaintiff-Appellee              :

-vs-                                 :          JUDGMENT ENTRY

KAYLA J. AYERS                       :

    Defendant-Appellant             :          Case No. 2013CA00034

For the reasons stated in our accompanying Opinion, the judgment of the Stark

County Court of Common Pleas is affirmed.  Costs to Appellant.


_____
HON. WILLIAM B. HOFFMAN

_____
HON. W. SCOTT GWIN

_____
HON. PATRICIA A. DELANEY

*Presented for filing 6/27/3*
*Time Stamp Omitted in Error*

IN THE COURT OF COMMON PLEAS
_____Stark_____ COUNTY, OHIO

STATE OF OHIO,                          :

      Plaintiff-Respondent,          :

v.                                      :       Case No. 2022 CR 1567

_____Kayla _____       :

      Defendant-Petitioner.          :

## MOTION FOR APPOINTMENT OF COUNSEL

    Petitioner moves this Court for an order appointing counsel to represent Petitioner on the Petition for Postconviction Relief.   A memorandum in support is attached.

                    Respectfully submitted,

                    *Kayla Ayers*
                    PETITIONER, *pro se*

                    85757
                    INSTITUTION NUMBER

                    Ohio Reformatory for Women
                    INSTITUTION

                    1479 Collins Ave
                    ADDRESS/P.O. BOX NUMBER

                    Marysville OH 43040
                    CITY, STATE & ZIP CODE

**EXHIBIT 25**

**MEMORANDUM IN SUPPORT**

Petitioner lacks the skill or knowledge to adequately pursue Petitioner's rights without the assistance of counsel. Counsel is essential to insure that Petitioner's rights are fully litigated and all issues reviewed. Pursuant to R.C. 2953.21, Petitioner has only one opportunity to present his claims for post-conviction relief. Counsel is required to protect Petitioner's constitutional rights. As attested by the Affidavit of Indigency filed with the petition, Petitioner is without funds to hire an attorney.

The following special circumstances about Petitioner and/or Petitioner's case further support this request: I am requesting an attorney to assist me in obtaining additional evidence that was not Presented on my behalf at the time of my trial. I appreciate your time and concern, Thank you.

WHEREFORE, Petitioner respectfully requests that counsel be appointed.

Respectfully, submitted,

PETITIONER, *pro se*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing MOTION FOR APPOINTMENT OF

COUNSEL was forwarded by regular U.S. mail to the office of the ___Stark___

County Prosecutor, [address] ___110 Central Plaza South___

___Canton, Ohio   44702-0000___

on this ___24___ day of ___June___, 20 ___13___.

___PETITIONER, pro se___

3

**IN THE COURT OF COMMON PLEAS**
**STARK COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. ~~2012CR0405~~  2012 CR 1567 |
| | ) | |
| Plaintiff, | ) | **JUDGE KRISTIN G. FARMER** |
| | ) | |
| vs. | ) | **JUDGMENT ENTRY DENYING** |
| | ) | **DEFENDANT'S MOTION FOR** |
| KAYLA AYERS, | ) | **APPOINTMENT OF COUNSEL** |
| | ) | |
| Defendant. | ) | |

This matter came before the Court on Defendant's Motion for Appointment of Counsel filed on June 27, 2013.

Defendant's motion for appointment of counsel for Defendant's Petition for Postconviction Relief is denied. Defendant was appointed counsel for the direct appeal in this matter, which is currently pending before the Fifth District Court of Appeals.

IT IS SO ORDERED.

Judge Kristin G. Farmer

Copies:   Stark County Prosecutor
Kayla Ayers, Inmate #85757
Ohio Reformatory for Women
1479 Collins Ave
Marysville, OH 43040

1

**EXHIBIT 26**

2015 MAY 28  AM 10: 39

IN THE COURT OF COMMON PLEAS

**Stark** _____COUNTY, OHIO

STATE OF OHIO                                    CASE NO(s): 2012CR 1547

     Plaintiff                                    JUDGE:

VS                                               **DEFENDANT'S MOTION FOR CREDIT OF**
                                                 **COMMUNITY SERVICE HOURS EARNED TOWARD**
                                                 **PAYMENT OF FINES, COURT COST, AND/OR**
                                                 **RESTITUTION**

**Kayla J. Ayers**

     Defendant

    Now comes **Kayla J. Ayers**_____, the Defendant, Pro Se, and hereby moves this Honor able Court for an Order crediting the Community Service Hours earned by the Defendant while incarcerated toward payments of the Fines, Court Cost, and/or Restitution in the matter herein.  The reasons for this Motion are set forth in the attached and incorporated Memorandum In Support of Motion.

MEMORADUM IN SUPPORT OF MOTION

    The Defendant has earned to date approximately **179**_____ hours of Community Service in/through the following programs:

**Crafts, blankets, Hats, scarves, training dogs**
_____
_____

(Please see attached and incorporated Letters and /or Certificates as evidence)

    The Defendant is indigent and will remain throughout her incarceration for this matter, but desires to do what she can to make payment toward the Fines, Court Cost, and/or Restitution, as well as contribute to the betterment of the community.

**EXHIBIT 27**

Wherefore, for the foregoing reasons, the Defendant respectfully requests that this Honorable Court grant an order crediting Community Service hours earned by the Defendant while incarcerated to payment of Fines, Court Costs, and/or Restitution.

Respectfully submitted,

*Kayla J Ayers*

Defendant Pro Se
Northeast Reintegration Center
2675 East 30th Street
Cleveland, Ohio 44115

| | | | | |
|---|---|---|---|---|
| Idnumber | W85757 | | Race | WHITE |
| Last Name | AYERS | | HB/SB | NO/NO |
| First Name | KAYLA | J | Job | TUTOR |
| Institution | NEPRC | | Department | EDUCATION |
| Lock | 2/E/134A | | Location | EDUCATION |

| Activity | Month Year | Hours | Sponsor | County |
|---|---|---|---|---|
| CRAFTS | April 2015 | 64 | WOMEN OF WORTH | CUYAHOGA |
| CRAFTS | March 2015 | 61 | WOMEN OF WORTH | CUYAHOGA |
| CRAFTS | January 2015 | 36 | WOMEN OF WORTH | CUYAHOGA |
| Crafts, Sewing, & Writing | December 2014 | 2 | WOMEN OF WORTH | CUYAHOGA |
| BLANKETS | December 2013 | 4 | MY VERY OWN BLANKET | UNION |
| HATS,SCARVES,MITTENS | October 2013 | 2 | WESTERVILL 7 DAY AVENTIST CHURCH / CARING & SHARING | UNION |
| Blankets, hats, mittens, various items | June 2013 | 4 | Christian Assembly Church | |
| Blankets, hats, mittens, various items | March 2013 | 2 | Christian Assembly Church | |
| HATS,SCARVES,QUILTS | March 2013 | 2 | WARM UP AMERICA | UNION |
| TRAINING DOGS | March 2013 | 2 | TEAM GREYHOUND | UNION |

**IN THE COURT OF COMMON PLEAS**
**STARK COUNTY, OHIO**

2015 MAY 29  AM 10: 47

| | | |
|---|---|---|
| **STATE OF OHIO,** | ) | **Case No. 2012CR1567** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KRISTIN G. FARMER** |
| | ) | |
| **vs.** | ) | **JUDGMENT ENTRY DENYING** |
| | ) | **DEFENDANT'S MOTION FOR** |
| **KAYLA AYERS,** | ) | **CREDIT OF COMMUNITY** |
| | ) | **SERVICE TOWARD PAYMENT OF** |
| **Defendant.** | ) | **COURT COSTS** |

This matter came before the Court on a motion filed by the Defendant on May 28, 2015. Defendant moves the Court for credit of community service to be applied to the payment of fines, court costs and/or restitution. The Court finds Defendant's motion as to the payment of fines and restitution is moot, as the Defendant was not ordered to pay any fines or restitution. With regard to applying the community service to the payment of court costs, Defendant's motion is denied.

IT IS SO ORDERED.

Judge Kristin G. Farmer

Copies:    Stark County Prosecutor
           Kayla J. Ayers, Inmate #W085757
           Northeast Reintegration Center
           2675 East 30th Street
           Cleveland, OH  44115

**EXHIBIT 28**

LOUIS P. ~~~~~
CLERK OF COURTS
STARK COUNTY, OHIO
2015 OCT 19 PM 3: 52

### IN THE COURT OF COMMON PLEAS
### CRIMINAL DIVISION
### STARK COUNTY, OHIO

| | | |
|---|---|---|
| **STATE OF OHIO,** | : | **CASE NO: 2012 CR 1567** |
| PLAINTIFF, | : | **JUDGE:  KRISTEN G. FARMER** |
| **V.** | : | |
| **KAYLA J. AYERS** | : | <u>**MOTION FOR MODIFICATION**</u><br><u>**OF SENTENCE**</u> |
| DEFENDANT. | : | **( Oral hearing requested)** |
| | : | |

---

**AND NOW,**   Here comes Kayla J. Ayers , hereinafter referred to as the Defendant, who is acting <u>Pro se</u>, who respectfully requests a Modification of her sentence on January 28, 2013 for aggravated arson, a felony in the 2nd degree, and was sentenced to 7 years.

   Said Defendant arrived at the Ohio Reformatory for women on 2-5-2013, And was transferred to The Northeast Re-integration Center on 12-4-2014.

  The reasons for this request for motion for modification are in the attached Memorandum of Support.  An oral hearing is Respectfully requested.

       Respectfully submitted,

       *Kayla J Ayers* #85757

Kayla J. Ayers # 85757
Defendant in Pro se
Northeast re-integration center
2675 E. 30th st., unit G
Cleveland, Ohio 44115

**EXHIBIT 29**

## MEMORANDUM IN SUPPORT OF
## MODIFICATION OF SENTENCE

AND NOW, here comes Kayla J. Ayers, hereinafter referred to as the Defendant, who is acting pro se; the Defendant respectfully petitions this Honorable Court to modify the remainder of said Defendant's sentence which was imposed on January 28th 2013.

The Defendant says that pursuant to the judgement of the Court , a sentence of 7 years was imposed upon the Defendant for Aggravated Arson, a violation of Ohio Revised code 2909.02 a felony of the second degree.  The court ordered that the defendant serve this time in prison under the auspices of the Ohio Department of Rehabilitation and correction.  She has currently served 3 years 1 month on said sentence.

A Modification of Sentence is respectfully requested for the following reasons:

1.  Defendant, Kayla J. Ayers has the following  children:
    Leighlahn A. Scott, (8)        D.O.B.  02-27-07
    Nevaeh M. Scott, (7)          D.O.B.  08-08-08
    Brennan R. Scott 2nd ( 6)      D.O.B.   07-20-09

    Of whom she has signed power of attorney to their paternal grandfather, Thomas Scott while she is incarcerated.  Her children are ages 8,7, and 6 years old.  upon her release, Mr. Scott has requested that she be released to his residence where he can ensure she meet any and all conditions and requirements.  For the benefit of the children, their mother will be able to integrate back into their lives, and eventually resume full responsibility of her young children. The father of the Defendant's children, Mr. Brennan R. Scott S.R. is bedridden and unable to walk due to an automobile accident. Therefore, Mr. B. Scott is unable to help with the care of their children In common.

2.  The defendant has gained the full support of release as well as a place to reside and obtain employment while resuming responsibility of her children and being a productive member of society.

3.  The defendant has made amends with her victim who is her biological father. She has developed a relationship by mail and telephone.  Her father fully supports her release and is willing to do whatever it takes on his behalf for his daughter to come home to her family and children who are so young and deserving.

4.  The defendant has taken advantage of as many programs as possible that will be beneficial to her and her family, reducing her risk for recidivism.  She has completed and earned certificates from programs such as "cage your rage", "Tapestry Recovery" "parenting" ( offered by a YSU professor)  you will find in certificates attached as well as a list of other completed programs.

5.  The defendant earned her G.E.D.  and has went on to furthering her education by enrolling in Youngstown State University where she is still enrolled and attending classes weekly.

6.  Most importantly, the Defendant has shown complete and honest remorse for her misdeeds, wants to live a productive and law-abiding life, maintaining employment and support of her family, and ;

7.  Justice would be served with the granting of this motion giving the Defendant another chance.

The Defendant, Kayla J. Ayers, respectfully draws the attention of  the court to the fact that the Defendant had been adequately punished by the sanction of a prison term and that there is little likelihood of recidivism.

At this point, it is the position of the Defendant that a Modification of Sentence be granted with the possibility of being granted strict community control sanctions or a half-way house environment which would not demean the seriousness of the offense but would better the Defendant in entering the community as a law-abiding citizen.

The Defendant states that a community controlled sanction with supervision under the Department of probation serving the court with the right to re-impose  the sentence if the Defendant violates any such sanction or special conditions provided the Court with sufficient and far  reaching power to ensure the conduct of said Defendant.

For the reasons set forth herein and those which will be provided to the court at the time of hearing on this matter, the Defendant moves that she be respectfully granted an oral hearing to modify her sentence.

The Defendant  Kayla J. Ayers, respectfully requests that this matter be considered favorable and that all attached Exhibits be reviewed thoroughly and taken into consideration for granting this Modification of Sentence.

Respectfully submitted,

Kayla J. Ayers  #85787
Defendant in pro se.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion was sent by regular United States Postal Service to the Clerk of Courts, Criminal Division, _____ County Court of Common Pleas, _____Stark_____, _____County_____ Ohio _____ for service upon the _Stark_ County Prosecutor, this _10-14th_ day of _October_, 20 _15_ .

**\*\*\*\*\*CLERK WILL DELIVER\*\*\*\***

LOUIS P. GIAVAS?
CLERK OF COURTS
STARK COUNTY, OHIO

**IN THE COURT OF COMMON PLEAS**
**STARK COUNTY, OHIO**

2015 OCT 20  PM 3: 32

| | | |
|---|---|---|
| **STATE OF OHIO,** | ) | **Case No.  2012CR1567** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KRISTIN G. FARMER** |
| | ) | |
| **vs.** | ) | **JUDGMENT ENTRY DENYING** |
| | ) | **DEFENDANT'S MOTION FOR** |
| **KAYLA AYERS,** | ) | **MODIFICATION OF SENTENCE** |
| | ) | |
| **Defendant.** | ) | |

This matter came before the Court on Defendant's Motion for Modification of Sentence filed on October 19, 2015.

Defendant's motion is denied without a hearing.

IT IS SO ORDERED.

Judge Kristin G. Farmer

Copies:    Stark County Prosecutor
           Kayla Ayers, Inmate #85757
           Northeast Re-Integration Center
           2675 E. 30th St., Unit G
           Cleveland, OH  44115

**EXHIBIT 30**



LOUIS F. A
CLERK OF CC
STARK COUNTY

LOUIS F.
CLERK OF
STARK COU

2012CR1567

2015 OCT 27

2015 OCT 27 PM

Honorable Judge Farmer,

It is with tremendous respect, as well as high hopes that I request a modification of my sentence. As you are aware, I was sentenced to serve 7 years in prison on January 28th, 2013 for aggravated Arson (F2) and Child endangerment, an (M1). I have currently served 36 months into this sentence.

Since my arrival at The Ohio Reformatory for Women I have received appropriate mental health care for myself. I have been stable on medication for over 12 months and see a doctor regularly. I have dedicated my time to rehabilitation and correction for myself and honored my imposed sentence by taking full advantage of my opportunities. I have received my G.E.D. and am now currently enrolled in Youngstown State University College where I attend College courses every week. I have taken and participated in various groups, Programs, Siminars and classes to help better myself

**EXHIBIT 31**

and My future. I Completed The Tapestry Program at O.R.W. which is a theraputic residential Community that deals with drug and alcohol addiction as well as underlying Trauma and Mental illness. This is a 15 month Program. I was transferred to Northeast Reintegration on the 4th of December 2014 Where I continued to engage in beneficial Programs. "The military Program", "Cage your" Rage", "Trauma", "Parenting" all offered by Outside Volunteers. I have become a tutor here in the institution to help others receive their education. Taking advantage of the opportunities provided to me has enabled me to grow into the mom, woman and member of society in which I am Proud to be. I have Selected the most relevant and beneficial Certificates to Send with My Motion along with a

list of My Other Certificates.

I am pleading that you take into Consideration that I have already served 3 years for my Charges and while I Certainly do not hold a perfect Conduct report I have Seriously turned My life around. I have Undergone and endured through a lot of turmoil and pain throughout my incarceration. I have not Seen My Children in 3 years though I do Speak with them on the phone regularly now. and through the mail. I have lost a Grandmother and a younger brother While incarcerated. Also, My Children's Father was in a Car accident 18 months ago leaving him bedridden and still unable to Walk. His Father, My Children's Paternal Grandfather has assumed responsibility for Our young Children who are now ages 8, 7 and 6. Mr. Scott also

has an 11 year old daughter and a full-time Job. He does the absolute best that he can in raising our children in a healthy, happy and sober environment, however, this is a lot of stress on him. My greatest concern is my children, Your honor. My children have already been through so much turmoil and pain. Their life so far has been anything but the life they deserve. I know that I have made mistakes in my past causing their dysfunctional lifestyle and I want more than anything I have ever wanted in my whole 26 years of life to give my children the absolute best I can. I need the opportunity, please Your honor to be their mom again. To prove I can and will be a productive

law- abiding Citizen for my Children, My Community and Myself.

I have kept in contact with My father Just recently and have made amends with him. He completely Supports my release. Though he is my victim he will do anything he can to help me get home to my Children.

In the event that you grant my request, I have a sober, healthy, Stable environment where any and all conditions and requirements will be met. Reliable transportation is available to me so that I can obtain employment and continue my education. I have been blessed with the option to stay with My Children and their grandfather until I am able to take on the responsibility on my own. This Will be best for My Children and Myself to

not disrupt their stable lifestyle once again. Slowly I will integrate into their life again.

I am requesting your favor, that you please modify my sentence to atleast half of my initial 7 year sentence. I am willing to do anything at all to be given the chance to prove once and for all that I am 100% determined to live a complete law-abiding life with my children. To be with my children again - relieving my children's grandfather from such a heavy load. I want to thank you for all of your time and consideration in this matter. I have also included additional contact information for my father as well as for Mr. Scott. Thank you!

respectfully,

Kayla J tyers #85757

Kayla J Ayers #65757

10/15/15

## References

### Mr. Thomas A. Scott
(Children's grandfather / residence for myself)
1708 Windmill rd.
Leesville S.C. 29070
Phone # 803-466-8158 or 803-687-3088

### Jeff Ayers (victim)
(My father)
426 grant St.
Cadiz, Ohio. 43907
740-433-5409

### Darren S. Bell
(My step-father)
254 Bledsoe dr.
Redbank SC. 29073
803-404-2125

**IN THE COURT OF COMMON PLEAS**
**CRIMINAL DIVISION**
**STARK COUNTY, OHIO**

| | | |
|---|---|---|
| **STATE OF OHIO,** | : | **CASE NO: 2012 CR 1567** |
| PLAINTIFF, | : | **JUDGE: KRISTEN G. FARMER** |
| **V.** | : | |
| **KAYLA J. AYERS** | : | <u>**MOTION FOR MODIFICATION**</u><br><u>**OF SENTENCE**</u> |
| DEFENDANT. | : | ( Oral hearing requested) |
| | : | |

---

**AND NOW,**   Here comes Kayla J. Ayers , hereinafter referred to as the Defendant, who is acting <u>Pro se</u>, who respectfully requests a Modification of her sentence on January 28, 2013 for aggravated arson, a felony in the 2nd degree, and was sentenced to 7 years.

Said Defendant arrived at the Ohio Reformatory for women on 2-5-2013, And was transferred to The Northeast Re-integration Center on 12-2-2014.

The reasons for this request for motion for modification are in the attached Memorandum of Support.  An oral hearing is Respectfully requested.

Respectfully submitted,

*Kayla J. Ayers #85757*

Kayla J. Ayers  # 85757
Defendant in Pro se
Northeast re-integration center
2675 E. 30th st., unit G
Cleveland, Ohio 44115

## MEMORANDUM IN SUPPORT OF
## MODIFICATION OF SENTENCE

AND NOW,  here comes Kayla J. Ayers, hereinafter referred to as the Defendant, who is acting pro se; the Defendant respectfully petitions this Honorable Court to modify the remainder of said Defendant's sentence which was imposed on January 28th 2013.

The Defendant says that pursuant to the judgement of the Court , a sentence of 7 years was imposed upon the Defendant for Aggravated Arson, a violation of Ohio Revised code 2909.02 a felony of the second degree.  The court ordered that the defendant serve this time in prison under the auspices of the Ohio Department of Rehabilitation and correction.  She has currently served 3 years 1 month on said sentence.

A Modification of Sentence is respectfully requested for the following reasons:

1. Defendant, Kayla J. Ayers has the following  children:
   Leighlahn A. Scott, (8)          D.O.B.   02-27-07
   Nevaeh M. Scott, (7)             D.O.B.   08-08-08
   Brennan R. Scott 2nd ( 6)        D.O.B.   07-20-09

   Of whom she has signed power of attorney to their paternal grandfather, Thomas Scott while she is incarcerated.  Her children are ages 8,7, and 6 years old.  upon her release, Mr. Scott has requested that she be released to his residence where he can ensure she meet any and all conditions and requirements.  For the benefit of the children, their mother will be able to integrate back into their lives, and eventually resume full responsibility of her young children. The father of the Defendant's children, Mr. Brennan R. Scott S.R. is bedridden and unable to walk due to an automobile accident. Therefore, Mr. B. Scott is unable to help with the care of their children In common.

2. The defendant has gained the full support of release as well as a place to reside and obtain employment while resuming responsibility of her children and being a productive member of society.

3. The defendant has made amends with her victim who is her biological father. She has developed a relationship by mail and telephone.  Her father fully supports her release and is willing to do whatever it takes on his behalf for his daughter to come home to her family and children who are so young and deserving.

4. The defendant has taken advantage of as many programs as possible that will be beneficial to her and her family, reducing her risk for recidivism.  She has completed and earned certificates from programs such as "cage your rage", "Tapestry Recovery" "parenting" ( offered by a YSU professor)  you will find in certificates attached as well as a list of other completed programs.

5. The defendant earned her G.E.D. and has went on to furthering her education by enrolling in Youngstown State University where she is still enrolled and attending classes weekly.

6. Most importantly, the Defendant has shown complete and honest remorse for her misdeeds, wants to live a productive and law-abiding life, maintaining employment and support of her family, and ;

7. Justice would be served with the granting of this motion giving the Defendant another chance.

The Defendant, Kayla J. Ayers, respectfully draws the attention of the court to the fact that the Defendant had been adequately punished by the sanction of a prison term and that there is little likelihood of recidivism.

At this point, it is the position of the Defendant that a Modification of Sentence be granted with the possibility of being granted strict community control sanctions or a half-way house environment which would not demean the seriousness of the offense but would better the Defendant in entering the community as a law-abiding citizen.

The Defendant states that a community controlled sanction with supervision under the Department of probation serving the court with the right to re-impose the sentence if the Defendant violates any such sanction or special conditions provided the Court with sufficient and far reaching power to ensure the conduct of said Defendant.

For the reasons set forth herein and those which will be provided to the court at the time of hearing on this matter, the Defendant moves that she be respectfully granted an oral hearing to modify her sentence.

The Defendant Kayla J. Ayers, respectfully requests that this matter be considered favorable and that all attached Exhibits be reviewed thoroughly and taken into consideration for granting this Modification of Sentence.

Respectfully submitted,

_Kayla J Ayers # 85757_

Kayla J. Ayers  #85787
Defendant in pro se.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion was sent by regular United States Postal Service to the Clerk of Courts, Criminal Division, _____ County Court of Common Pleas, _Stark_____, _County___ Ohio _____ for service upon the _Stark_ County Prosecutor, this _14th_ day of _October_, 20 _15_ .

**\*\*\*\*\*CLERK WILL DELIVER\*\*\*\***



# Certificate of Achievement

**ORW**

**Clearview Branch**

**Congratulations is hereby given to:**

## KAYLA AYERS

For outstanding performance and contribution in obtaining her:

# GED

_Principal_ — 10/11/13 _Date_

_Assistant Principal_ — 10/22/13 _Date_

# CERTIFICATE of RECOGNITION

*** PRESENTED TO ***

*Ms. Kayla Ayers*

**February 6, 2014**

For making great strides in her program and for having made
considerable contributions to the Tapestry Therapeutic Community

Annette Dominguez, LCDC-III
Program Director

*WOMEN WEAVING THEIR WAY TO FREEDOM*



# Certificate of Completion

Northeast Reintegration Center
Military Program



This certificate is awarded to

## *Kayla Ayers*

In recognition of successful completion of the Military 101 Program

_Jeanne_ _____    3/15/2015
Signature                                    Date

_____    3/15/2015
Signature                                    Date



WOMEN IN THE MILITARY

# THE OHIO STATE UNIVERSITY AT MARION AND THE OHIO REFORMATORY FOR WOMEN

CERTIFIES THAT

## KAYLA AYERS

### SOC 2211: CORRECTIONS (AN "INSIDE-OUT" COURSE)

GIVEN THIS 15TH DAY OF APRIL, 2014

RONETTE BURKES
WARDEN, OHIO REFORMATORY FOR
WOMEN



THE OHIO STATE UNIVERSITY
MARION

BRENDA CHANEY
SENIOR LECTURER

# TOASTMASTERS
## INTERNATIONAL®

presents

*Kayla Ayers*

*as a*

# *Member*

*"Ours is the only organization I know that is dedicated to the individual. We work together to bring out the best in each of us and then we apply our skills to help others."*

*-Ralph Smedley, Founder Toastmasters International*

*Executive Director*

513

Kayla J. Ayers #657 57
2075 E. 30th St.
Cleveland, Ohio 44115

CLEVELAND OH 440

23 OCT 2015 PM 5 L

USA

FOREVER

44702140593

Honorable Judge Farmer, Kristen G
115 Central Plaza North
Canton, Ohio 44702- 0000

Kayla J Ayeri #88757
6075 e. 30th st.
Cleveland, Ohio 44115

44702140599

CLEVELAND OH 440
23 OCT 2015 PM 5 L

USA
FOREVER

Honorable Judge Farmer, Kristen G.
115 Central Plaza North
Canton Ohio, 44702-0000

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

| | | |
|---|---|---|
| **STATE OF OHIO,** | ) | **Case No. 2012CR1567** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KRISTIN G. FARMER** |
| | ) | |
| **vs.** | ) | **JUDGMENT ENTRY DENYING** |
| | ) | **DEFENDANT'S MOTION FOR** |
| **KAYLA AYERS,** | ) | **MODIFICATION OF SENTENCE** |
| | ) | |
| **Defendant.** | ) | |

This matter came before the Court on Defendant's Motion for Modification of Sentence filed on October 27, 2015.

Defendant's motion is denied without a hearing.

IT IS SO ORDERED.

Judge Kristin G. Farmer

Copies: Stark County Prosecutor
Kayla Ayers, Inmate #85757
Northeast Re-Integration Center
2675 E. 30th St., Unit G
Cleveland, OH 44115

CLERK OF COURT
STARK COUNTY, OHIO
2015 OCT 27 PM 2: 55

**EXHIBIT 32**

LUIS P. GIAVA
CLERK OF COURT
STARK COUNTY, OHIO

2018 FEB 12  PM 2:51

IN THE COURT OF COMMON PLEAS

_____Stark_____ COUNTY, OHIO
(YOUR COUNTY OF CONVICTION)

STATE OF OHIO,                                    :

    Plaintiff,                                   :

v.                                               :      Case No. 2012CR1567
                                                        (DOCKET #)
_Kayla J. Ayers_,                                :
(YOUR NAME)

    Defendant.

## MOTION FOR JUDICIAL RELEASE
### (HEARING REQUESTED)

Defendant is incarcerated at the _Dayton Correctional_.
(CURRENT PRISON)

Defendant was delivered to the prison system on the _5th_ day of _February_,
(DATE YOU ENTERED PRISON)

_2013_, and is now eligible for Judicial Release pursuant to R.C. §2929.20.

For the reasons set forth in the attached memorandum, Defendant respectfully
moves this court for an order granting Defendant Judicial Release subject to
appropriate community control sanctions.

Respectfully submitted,

_Kayla J Ayers_
YOUR SIGNATURE
DEFENDANT, pro se

_85757_
INSTITUTION NUMBER

_Dayton Correctional Institute_
INSTITUTION

_4104 Germantown pike rd._
ADDRESS/P.O. BOX NUMBER

_Dayton Ohio 45417_
CITY, STATE & ZIP CODE

**EXHIBIT 33**

**MEMORANDUM IN SUPPORT**

In support of the foregoing motion, Defendant submits the following reasons in favor of his/her being granted Judicial Release: I, Kayla J Ayers have Currently Served 65 of an 84 month Sentence. I am requesting that You Please Consider my early Judicial release So that I may be re-united into Society to become a productive member in it. During my incarceration I have accomplished many goals as well as the Completion of Several groups and programs which I have enclosed Copies of Certificates fun Some of my accomplishments include however are not limited to; Obtaining my G.E.D, Some College Courses. I am Currently Still enrolled in vocational training for HVAC. I am also a Certified tutor for the institution. I have completed the Tapestry recovery program, Cage your rage, anger Management, Parenting, The military program, Just to name a few. upon my release, my immediate plans are to find Stable employment So that I will be able to obtain and maintain my own residence So that I can work towards gaining Custody of my Children again. I feel that I have used this time of incarceration to better myself furthering my education and Knowledge ensuring a strong foundation to build

My future.

In the event that you grant my request for Judicial release I am prepared to comply with any and all requirements asked of me. I have a sober, stable and safe environment to go home to with a tremendous amount of support. I want to take this time to thank you for your time and consideration with this matter, and I look forward to your response.

For the foregoing reasons, Defendant hereby respectfully requests:

1. that this court order a hearing be held on this motion, pursuant to R.C. §2929.20(D); and,

2. that this court issue an order compelling Defendant's attendance at the hearing; pursuant to R.C. §2929.20(H); and,

3. that Judicial Release be granted, subject to appropriate community control sanctions.

Respectfully submitted,

_Kayla J. Ayers_

DEFENDANT, pro se

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Motion for Judicial Release

was served upon the ___Stark___ County Prosecutor, by U.S. Mail
                     (YOUR COUNTY OF CONVICTION)

addressed to his/her office at ___110 Central plaza South___
                               (PROSECUTOR'S ADDRESS FOR YOUR COUNTY OF CONVICTION)

___Canton, Ohio  44702-_____

on the __5th__ day of __~~Joonoy~~ febmary 2018__.
        (DATE YOU ARE PLACING MOTION IN MAIL)

___Kayla J Ayler_____
DEFENDANT, pro se

Revised 9/2009



**Association**

*Transforming Lives*

# Kayla Ayers

HAS SUCCESSFULLY COMPLETED THE

## TUTOR TRAINING WORKSHOP

12 HOURS IN BASIC LITERACY TRAINING

AT: CLEVELAND, OHIO    ON: 2/19/2015

STEVE STEURER, PHD.,
EXECUTIVE DIRECTOR

MORRIS DEWS, JR.
PRESIDENT

DENISE L. JUSTICE,
PROGRAM ADMINISTRATOR

MICHAEL CATHELINE,
TUTOR TRAINER

# CERTIFICATE of RECOGNITION

*** PRESENTED TO ***

## Ms. Kayla Ayers

**February 6, 2014**

For making great strides in her program and for having made
considerable contributions to the Tapestry Therapeutic Community

*Annette Dominguez, LCDC-III*
Program Director

## WOMEN WEAVING THEIR WAY TO FREEDOM



# Certificate of Achievement

**ORW**
**Clearview Branch**
**Congratulations is hereby given to:**

## KAYLA AYERS

For outstanding performance and contribution in obtaining her:

# GED

_Principal_      10/11/13
_Date_

_Assistant Principal_      10/22/13
_Date_



# Certificate of Completion

**Northeast Reintegration Center
Military Program**



This certificate is awarded to

## *Kayla Ayers*

In recognition of successful completion of the Military 101 Program

*Jeanne Ayers*
Signature

Date 3/15/2015

Signature

Date 3/15/2015



**WOMEN IN THE MILITARY**

**IN THE COURT OF COMMON PLEAS**
**STARK COUNTY, OHIO**

LOUIS P. GIAVA
CLERK OF COURTS
STARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No.  2012CR1567 |
| | ) | 2018 FEB 12  PM 2: 51 |
| Plaintiff, | ) | JUDGE KRISTIN G. FARMER |
| | ) | |
| vs. | ) | JUDGMENT ENTRY DENYING |
| | ) | DEFENDANT'S MOTION |
| KAYLA AYERS, | ) | FOR JUDICIAL RELEASE |
| | ) | |
| Defendant. | ) | |

This matter came before the Court upon Defendant's Motion for Judicial Release

filed on February 12, 2018.

Upon review, Defendant's motion is denied.

IT IS SO ORDERED.

Judge Kristin G. Farmer

Copies:     Stark County Prosecutor
            Kayla Ayers, Inmate #85757
            Dayton Correctional Inst.
            4104 Germantown
            Dayton, OH  45417

1

**EXHIBIT 34**



CLERK OF COURTS
STARK COUNTY, OHIO

**IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO**   2020 APR 13  PM 4: 09

| | | |
|---|---|---|
| **STATE OF OHIO,** | : | **Case No.   2012 CR 1567** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| -v- | : | **HON. KRISTIN G. FARMER** |
| | : | |
| **KAYLA AYERS,** | : | |
| | : | **(HEARING REQUESTED)** |
| **Defendant.** | : | |

---

### DEFENDANT KAYLA AYERS'S PETITION FOR POST-CONVICTION RELIEF PURSUANT TO R.C. 2953.21-23

---

Now comes Defendant-Petitioner Kayla Ayers, by counsel the Ohio Innocence Project, and hereby states as follows for her Petition for Post-Conviction Relief.

1. Petitioner Kayla Ayers hereby incorporates the attached *Proposed Motion for New Trial Instanter*, including all exhibits thereto, as though fully pleaded herein.

2. In 2012, Kayla and her young son, Bubba, were at home when a mattress in the basement caught fire. Both Kayla and her son escaped unharmed, except for a cut that Kayla sustained trying to extinguish the fire.

3. In 2013, Kayla was convicted of aggravated arson and endangering children. She was sentenced to seven years' imprisonment. She has consistently maintained her innocence.

4. The central piece of evidence supporting Kayla's conviction was the testimony of Massillon Fire Inspector Reginald Winters, who testified that the fire was intentionally set and that it had two separate and distinct points of origin. The State used this evidence to prove that the fire could not have been accidentally started by Kayla's son, Bubba.

**EXHIBIT 35**

5. Although Ohio law allows defendants to request funds for the hiring of experts, Kayla's attorneys did not retain or consult with an independent expert on arson or fire investigations.

6. If they had consulted with an expert, Kayla's attorneys would have learned that:

   a. Winters' conclusion that the fire had two separate points of origin is false and unsupported by the evidence;

   b. Inspector Winters' methods and conclusions were contrary to the standard manual for arson investigations, NFPA 921;

   c. Inspector Winters' training and experience were inadequate, and Winters was unqualified to offer an opinion on the origin of the fire.

7. Kayla's attorneys did not effectively challenge Inspector Winters regarding the serious deficiencies in his methods, conclusions, and qualifications.

8. Furthermore, although most of Winters' conclusions regarding the fire's origin were not disclosed prior to trial, in violation of Ohio Crim.R.16(K), Kayla's attorneys did not object to Winters' undisclosed and unfounded opinions.

9. Because Winters' faulty testimony was effectively unchallenged, the jury was presented with a false picture of the origin of the fire.  But-for the objectively deficient performance of Ayers' attorneys, there is a reasonable probability that the outcome of trial would have been different.

10. Ayers remains on post-release control.  She has maintained her innocence for the past 8 years.

11. The above facts amount to a denial of or infringement of the Petitioner's rights, so as to render the judgment void or voidable under the Ohio Constitution and/or the Constitution of the United States.

12. Petitioner was unavoidably prevented from discovery of the facts upon which she must rely to present the claims for relief as set forth below.

**COUNT ONE**
**INEFFECTIVE ASSISTANCE OF COUNSEL**
**SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

13. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

14. Petitioner was entitled to effective assistance of counsel under the Sixth Amendment to the U.S. Constitution.

15. Petitioner's counsel was deficient and fell below an objective standard of reasonableness. Specifically:

   a. Defense counsel failed to consult with an expert witness regarding the origin of the fire.

   b. Defense counsel failed to challenge false and unsupported testimony offered by the State's expert.

   c. Defense counsel failed to object to testimony that should have been barred under Ohio Crim.R.16(K).

16. Petitioner was prejudiced by counsel's ineffective assistance. Based on the totality of the evidence before the jury, there is a reasonable probability that, but-for counsel's unprofessional errors, the result of the proceeding would have been different.

17. As a result, Petitioner's conviction should be vacated, and she should be granted a new trial.

**COUNT TWO**
**PROSECUTORIAL MISCONDUCT**
**FIFTH AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION**

18. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

19. Petitioner is entitled to a fair trial, which includes the right to present facts in her favor and develop her defense in accordance with state rules of procedure.

20. In preparing her defense, Petitioner had the right to presume the State had complied with and would continue to comply with Ohio Criminal Rules of Procedure and Ohio Rules of Evidence.

21. The State committed misconduct and deprived Petitioner of a fair trial by, in violation of Crim.R.16(K), failing to disclose the complete expert opinions of Massillon Fire Inspector Reginald Winters, and by knowingly soliciting previously undisclosed "expert" opinions from Inspector Winters. This misconduct was a fundamental defect in the trial and was inconsistent with rudimentary demands of fair procedure.

22. In addition, the State knew or should have known that Reginald Winters's testimony regarding the origin of the fire was false, unsupported, and/or unqualified. The State committed misconduct by soliciting this testimony and leaving it uncorrected on the record.

23. The State's misconduct prejudiced Petitioner. There is a reasonable probability that, but-for the State's misconduct, the result of the proceeding would have been different.

24. The State's misconduct deprived Petitioner of a fundamentally fair trial and infected the trial with unfairness such that the resulting conviction was a violation of due process.

**COUNT THREE**
**RIGHT TO COMPULSORY PROCESS**
**SIXTH AMENDMENT TO THE U.S. CONSTITUTION**

25. Petitioner hereby incorporates all preceding paragraphs as thought fully pleaded herein.

26. "The very integrity of the judicial system and public confidence in the system depend on full disclosure of all of the facts, within the framework of the rules of evidence."

27. The State's failure to disclose the conclusions of its expert prior to trial, in violation of Ohio Crim.R.16(K) and as described in Count Two, *supra*, deprived Petitioner of the right to compel facts and witnesses in support of her defense. This violation amounts to a fundamental defect which inherently resulted in a complete miscarriage of justice and was inconsistent with rudimentary demands of fair procedure.

28. The State's interference with Petitioner's right to compulsory process was material and prejudicial.  There is a reasonable probability that, but-for the State's misconduct, the result of the proceeding would have been different.

**COUNT FOUR**
**ACTUAL INNOCENCE**
**FIFTH, EIGHTH, AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION**

29. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

30. Newly-discovered evidence demonstrates that Petitioner is actually innocent of the charges for which she was convicted.  Specifically, Inspector Winters' testimony regarding the origin of the fire is false, and the fire was, in fact, accidental.

31. A truly persuasive demonstration of "actual innocence" made after trial renders the conviction unconstitutional. *Herrera v. Collins*, 506 U.S. 390, 418, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)

32. As a result, Petitioner's conviction and the ongoing effects of her conviction are

inconsistent with the U.S. Constitution's guarantee of due process of law.

## COUNT FIVE
## CONVICTION OBTAINED BY FUNDAMENTALLY UNRELIABLE EVIDENCE
## FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

33. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

34. Petitioner's conviction was obtained using evidence now known to be false, unsupported,

and/or fundamentally unreliable.

35. Specifically, the testimony of Reginald Winters regarding the origin of the fire was

incorrect, unsupported, and/or fundamentally unreliable in key respects.  The probative

value of Winters' testimony, if any, was greatly outweighed by the prejudice to Petitioner

from its admission.  Its role in Petitioner's conviction is a fundamental defect which

inherently results in a miscarriage of justice.

36. This testimony was central to the State's case against Petitioner.  But-for Reginald

Winters' false, unsupported, and/or materially misleading testimony, Petitioner would not

have been convicted.

37. Winters' testimony undermined the fundamental fairness of Petitioner's trial because the

testimony was itself false, unsupported, or unreliable.  Insofar as Petitioner's conviction

depends on evidence now known to be false, unsupported, and/or materially misleading,

that conviction is inconsistent with the United States Constitution's guarantee of due

process.

## COUNT SIX
## OHIO CONSTITUTION
## ARTICLE I, SECTIONS 9, 10 & 16

38. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

39. Petitioner's conviction was obtained in violation of her right to effective assistance of counsel and right to compulsory process, as guaranteed by Article I, Section 10 of the Ohio Constitution.

40. Petitioner's conviction, based on evidence now known to be false, unsupported, and / or misleading is a violation of her right against cruel and unusual punishment and her right to due process of law, as guaranteed by Article I, Sections 9 and 16 of the Ohio Constitution.

41. Petitioner was deprived of due process of law and the fair administration of justice as guaranteed by Article I, Section 16 of the Ohio Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE Petitioner respectfully requests the Court order as follows:

A. Grant Petitioner an evidentiary hearing;

B. Vacate Petitioner's conviction as unconstitutional;

C. Order that Petitioner either be retried or that the case be dismissed within 90 days; and

D. Order any other relief the Court deems necessary and appropriate.

Respectfully Submitted,

/s/ Brian Howe
Brian Howe (0086517)
Attorney for Defendant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served upon Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular first-class U.S. mail on this 10th day of April, 2020.

/s/ Brian Howe
Attorney for Defendant



**IN THE COURT OF COMMON PLEAS**
**STARK COUNTY, OHIO**

2020 APR 13  PM 4: 09

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No.   2012 CR 1567 |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | HON. KRISTIN G. FARMER |
| | : | |
| KAYLA AYERS, | : | |
| | : | (HEARING REQUESTED) |
| Defendant. | : | |

---

## DEFENDANT KAYLA AYERS'S MOTION FOR LEAVE TO FILE MOTION FOR NEW TRIAL PURSUANT TO CRIM.R.33(B)

---

Now comes Defendant Kayla Ayers, by counsel the Ohio Innocence Project, and hereby requests the Court grant her leave to file a motion for new trial pursuant to Crim.R.33(B). Ms. Ayers has recently discovered that the forensic testimony introduced against her at trial was unsupported and seriously flawed. Furthermore, Ms. Ayers was not able to consult with an independent expert or otherwise discover this technical forensic information on her own within 120 days of her original conviction and incarceration. Ms. Ayers has requested leave within a reasonable time from having discovered this evidence, and the State would not be prejudiced by proceeding to the merits of her claims. The Court should grant leave, accept Ms. Ayers's Motion for New Trial as properly filed, and set the matter for further proceedings on the merits.

A copy of Ms. Ayers's proposed Motion for New Trial Instanter is attached.

**EXHIBIT 36**

## <u>MEMORANDUM IN SUPPORT</u>

### A. Statement of Facts

A complete statement of facts, along with all relevant exhibits and affidavits, has been presented in Ms. Ayers's proposed *Motion for New Trial Instanter*. Rather than duplicating those facts and exhibits here, Ms. Ayers incorporates them herein by reference.

### B. Standard for Leave Pursuant to Crim.R.33(B)

Criminal defendants have 120 days from the date of their conviction to file a motion for new trial without leave. Ohio Crim.R.33(B). A motion for new trial may be filed after that period, however, if "it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which [she] must rely" within that 120 day period. *Id.* "A party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Horton*, 2019-Ohio-625, ¶ 12 (5th Dist.). Once the trial court grants leave, a defendant should present and file the motion for new trial within seven days.[1]

Ohio courts have also discouraged defendants from intentionally delaying new trial proceedings to their advantage. Thus, although the text of Crim.R.33(B) does not contain a post-discovery "diligence" requirement, courts have found that a defendant should raise newly-discovered evidence within a "reasonable time" from having actually discovered it. *E.g., State v. Stansberry*, 8th Dist. Cuyahoga No. 71004, 1997 WL 626063. A delay is "reasonable" when the

---

[1] Along with her request for leave. Ms. Ayers has filed a proposed *Motion for New Trial Instanter*, which the Court may accept as properly filed upon granting leave.

2

defendant offers adequate explanation for the time between the discovery of new evidence and the request for leave. *State v. Bentley*, 2016-Ohio-180, 66 N.E.3d 180 (11th Dist.)(trial court abused its discretion by denying a motion for leave where the defendant explained the five-year delay between the discovery of recantation and the filing of the motion.)

A motion for leave should not be summarily denied, without a hearing, if the motion presents a prima facie case for unavoidable delay. *State v. Warren*, 2017-Ohio-853, P51, 86 N.E.3d 728 (2d Dist.); *State v. Baldwin*, 5th Dist. Stark No. 2013CA00134, 2014–Ohio–290, ¶ 24 (a motion for leave may be summarily denied where "neither the motion nor its supporting affidavits embody prima facie evidence of unavoidable delay.").

### C. Kayla Ayers was unavoidably prevented from discovering technical flaws in Winters' testimony during the 120-day window after trial.

John Lentini is an internationally renowned expert on fire investigations. In July 2019, Mr. Lentini reviewed the evidence in this matter. He concluded that "the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." *Affidavit of John Lentini*, attached as Exhibit O to *Motion for New Trial Instanter*. Specifically, "[t]he proposition that this fire had two points of origin is unsupportable by any generally accepted methodology, *** [City of Massillon Fire Inspector] Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan," and "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard." On her own, Ms. Ayers could not have discovered these flaws in Inspector Winters' testimony using "reasonable diligence" within 120 days of her conviction.

For purposes of Crim.R.33(B), "reasonable diligence" does not require that individual defendants overcome the investigatory failures of their trial attorneys. *State v. Howard*, 2016-Ohio-504, 59 N.E.3d 685 (10th Dist.). In *Howard*, a defendant claimed his trial attorney was ineffective for, *inter alia*, failing to investigate and discover certain medical records. The defendant conceded that he thought the victim "might" have received treatment from a particular facility, and that the records would have been available upon request. *Id.* at P34. Nonetheless, the Tenth District held that it would not "plac[e] the onus of responsibility to thoroughly investigate a case on the defendant when the defendant is represented by and relying on counsel." *Id.* According to the court, this was not a case where "the defendant knew of material information that he kept to himself prior to trial." *Id.* Instead, the defendant was "unavoidably prevented" from discovering the record because he "relied on his trial counsel to fully investigate the matter [and] had no reason to know that a post-trial phone call to Netcare was a worthwhile phone call to make." *Id.*

Ms. Ayers was in an even more precarious position than the defendant in *Howard*. Ms. Ayers could not have discovered the errors in Winters' testimony with just a phone call, even if she thought the onus were on her to do so. She had no reason to believe that she would be able to educate herself on arson investigations well enough to challenge the judgment of both Inspector Winters and her own attorneys. *Affidavit of Kayla Ayers*, attached to Motion for New Trial Instanter as Exhibit K, at 3, 6-10. And even if she had reason to doubt Winters' conclusions, her circumstances limited her ability to do anything other than trust in her attorneys. She could not effectively research fire investigation science on her own from county jail or the prison reception center. *Id.* She could not hire or consult with arson experts on her own from county jail or the prison reception center. *Id.* Her only reasonable choice under those

4

circumstances was to trust that her attorneys would investigate these forensic issues and consult with independent arson experts—pursuant to their obligations under both the United States Constitution and Ohio Constitution.

Ms. Ayers's attorneys failed her. They failed to retain or even consult with an independent fire expert regarding the origin of the fire. They failed to meaningfully challenge the State's expert, Reginald Winters, and they failed to recognize the serious flaws in Winters' opinions and qualifications. As a result of those failures, both the Court and the jury were presented with a false picture of the fire's origin. The Court should neither put these failures on the shoulders of a twenty-three-year old criminal defendant, nor hold Ms. Ayers to a higher standard of diligence and care than both the City of Massillon Fire Inspector and the professional attorneys retained to investigate and challenge the claims against her.

Without aid of effective counsel, Ms. Ayers could not have discovered errors in Winters' testimony on her own within 120 days of her conviction. The Court should grant her Motion for Leave and allow her a fair opportunity to present these claims on the merits.

### D. Ms. Ayers has requested leave within a reasonable amount of time from having obtained Lentini's report.

Although it is not in the text of Crim.R.33(B), most district courts have required defendants explain the period of delay between the discovery of the new evidence and the filing of the motion. *E.g., State v. Stansberry*, 8th Dist. Cuyahoga No. 71004, 1997 WL 626063. The purpose of this requirement is to prevent defendants from intentionally "sitting on their hands" in the hopes of gaining some tactical advantage in the litigation. *Id.*

Ms. Ayers has raised the present motion in a reasonable time. Ms. Ayers obtained the Lentini Report in July 2019, and she filed the present motion approximately nine months later.

5

During that time, undersigned counsel made numerous attempts to contact Ayers's trial counsel, who ultimately refused to cooperate or confirm even basic facts about their representation in writing. The Ohio Innocence Project also attempted to contact Inspector Winters regarding his testimony, and none of the actions of the Ohio Innocence Project since July 2019 were done for purposes of delay or in bad faith. *Affidavit of Ohio Innocence Project in Support of Kayla Ayers's Motion for Leave to File Motion for New Trial*, attached as Exhibit P to Ayers's *Motion for New Trial Instanter.* [2]  Under these circumstances, Ms. Ayers deserves to be allowed to present this matter to the Court on the merits.

## CONCLUSION

In 2019, Kayla Ayers discovered evidence that the "arson science" testimony offered against her was unsupported and false. She should have the opportunity to present this new evidence to the Court on its merits, and the Court should grant her leave to file the attached *Motion for New Trial*.

Respectfully Submitted,

/s/ Brian Howe
Brian Howe (0086517)
Attorney for Defendant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

---

[2] To the extent that the Court interprets Crim.R.33(B) to require Ms. Ayers or her counsel provide privileged material, or work product, or any other information that could require counsel to become a necessary witness in the proceedings, Defendant objects that this interpretation of Crim.R.33(B) would be unconstitutional, in violation of Ms. Ayers's right to privileged attorney-client communication, and in violation of the Ohio Rules of Professional Conduct. *See, e.g., In re Lott*, 424 F.3d 446 (6th Cir.2005); Ohio Rules of Professional Conduct 3.7.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served upon Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular first class U.S. mail on this 10th day of April, 2020.

/s/ Brian Howe_____
Attorney for Defendant

2012CR1567

| Run:10/03/2012 22:22 | Red Center | Page  1  of  1 |
|---|---|---|
| | SUMMARY CALL SHEET | |

Date: 10/03/2012  Time: 20:21:32          Dispatcher: 38

Call No.:  12 0000076178

Type of Call:     STRUCTURE FIRE
Caller's Name:    THOMAS EVANS
Incident Location:     185.00        26                          ST   SE  Suite:
                   MASSILLON              44646
Cross St./Intersect.:LINCON WAY, EAST  & CONNECTICUT AV
Comments: BEV HAMERICK 833-4784
          87.4 // 89.8 AFF

Disposition
Comments:

Report No.:                  Fire Report No.: 93-12-003484         EMS Report No.:

ESN:     037                 Map Reference:

| Unit# | Car# | DIS | ENR | OSC | TOH | ATH | CLR | INS | INQ |
|---|---|---|---|---|---|---|---|---|---|
| 200 | | 20:43:10 | 20:43:10 | 20:51:11 | 0:00:00 | 0:00:00 | 0:00:00 | 21:11:44 | 21:11:47 |
| 205 | | 20:42:57 | 20:42:57 | 20:48:56 | 21:17:07 | 21:22:38 | 0:00:00 | 22:03:31 | 0:00:00 |
| 211 | | 20:21:52 | 20:24:13 | 20:28:30 | 0:00:00 | 0:00:00 | 0:00:00 | 21:49:25 | 22:15:00 |
| 212 | | 20:21:53 | 20:23:47 | 20:29:42 | 0:00:00 | 0:00:00 | 0:00:00 | 21:15:10 | 21:15:14 |
| 240 | | 20:21:48 | 20:23:14 | 20:29:47 | 21:00:23 | 21:06:51 | 0:00:00 | 21:30:32 | 21:54:52 |

2020 APR 24  PH 2: 50

CLERK OF COUR
STARK COUNTY OHIO

2244
2084
210



Ayers Reports 000120
(rec'd August 2019)

**EXHIBIT 37**

# MASSILLON FIRE DEPARTMENT
## RESPONSE RECORD

C:/MSPUB/FORMS\RUN-REP O.F.

Station : **Z**

Alarm No.: **3484**

Date : **Oct. 03, 2012**

☒FIRE ☐PS ☐R&E

Shift: ☐1 ☐2 ☒3

Type of Call: ☐Accid.
☒Building ☐Box _____
☐Vehicle ☐Out on arrival
☐Other ☐False

Under Control: _____

| Vehicle | Enroute | On Scene | Fill | In Service | In Quarters |
|---|---|---|---|---|---|
| E - 210 | | | | | |
| E - 211 | 2024 | 2028 | | 2149 | 2215 |
| E - 212 | 2023 | 2029 | | 2115 | 2115 |
| E - 213 | | | | | |
| E - 214 | | | | | |
| E - 215 | | | | | |
| T - 216 | | | | | |
| R - 218 | | | | | |
| R - 220 | | | | | |
| R - 230 | | | | | |
| R - 240 | 2023 | 2029 | | 2130 | 2154 |

Location: **185 26th SE**

BUILDING:
Occupant(s): **BRENNAN SCOTT, KALA AYERS,** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Owner: **CHRIS THOMAS**
Address: _____
Construction Type: **WOOD FRAME**
No. of Stories'. **Two**    Type of Occupancy: **RESIDENTIAL**

Smoke Detectors: ☐Yes ☒No  Activated: ☐Yes ☒No    Bldg. Sprinklered: ☐Yes ☒No  Activated: ☐Yes ☒No

Insurance Agent (building): **UNKNOWN**
Insurance Agent (contents): _____
Estimated Loss (building): **$2000.00**    Estimated Loss (contents): **$1000.00**

VEHICLE:
Owner: _____    Driver: _____
Address: _____    Address: _____
Make: _____    V. 1. N. _____
Year: _____ License: _____ Estimated Loss: _____
Insurance Agent: _____

OTHER: _____

FIRE : (cause): _____

Origin (Floor & Location): _____
Extension to: _____

CASUALTIES: (Injuries, Deaths (Name, Age, Injury)

**KALA AYERS CUT HER HAND.**



DEFENDANT'S
EXHIBIT
B

Ayers Reports 000116
(rec'd August 2019)

| HOSE | Laid | Used | Total Feet | Section Numbers |
|---|---|---|---|---|
| Booster | | | | |
| 1 1/2" | | | | |
| 1 3/4" | '200' | '200' | '200' | 947 948 975 941 |
| 2 1/2" | | | | |
| 2 1/2" | | | | |
| 4" | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Pump Time..... | _____ | Axes............ | _____ | Aerial.......... | _____ | Hand lights...... Two |
| Ladders used.. | _____ | Pike poles.... | Two | Fans............ | One Hour | Generator....... One Hour |
| (give Length) ... | _____ | Flood lights.... | _____ | Scotts.......... | 4 | Extinguishers.. _____ |
| Other: | _____ | | | | | |

| Hydrant Location: | 26TH | Condition: | GOOD | Time: | |
|---|---|---|---|---|---|
| Hydrant Location: | _____ | Condition: | | Time: | |

**REMARKS & DETAILS -**

CALLED TO ABOVE ADDRESS FOR REPORTED FIRE. UPON ARRIVAL FOUND MATTRESS IN BASEMENT WAS THE SOURCE OF THE FIRE. PULLED LINE OFF E-211 TO PUT OUT WITHOUT INCIDENT. PRIMARY SEARCH OF HOUSE FOUND EVERYONE OUT. OCCUPANT STATED SHE WAS IN BASEMENT AND ATTEMPTED TO PUT OUT FIRE PRIOR TO OUR ARRIVAL. ALL PERSONNEL EXPOSED TO SMOKE FLAME AND EXHAUSTION.

SIGNED: (Name & Rank) _Steph L. All Asst Chief_

| VEHICLE | OFFICER | DRIVER | TAIL | MASK |
|---|---|---|---|---|
| E210 | | | | |
| E211 | COLLINS, S | NEGULICI , S | TYRRELL/ E. SMITH | M. CANFORA |
| E218 | | | | |
| E212 / R220 | RHODES | GREENWOOD | DAVIS, R | |
| E213 / R230 | | | | |
| E214 / R240 | ANNEN, R | WAGNER, T | THARP, C | |
| E215 | | | | |

**ADDITIONAL PERSONNEL:**
INSPECTOR WINTERS, CHIEF 200

# INCIDENT REPORT - PART 2

| INCIDENT NUMBER | | |
|---|---|---|
| 12-17627 | | |

**INCIDENT LOCATION** 105 26th ST SE Massillon, OH 44646

**REPORT DATE / TIME** 10/03/2012 | 2251

| NO. | NAME (Last, First, Middle) | AGE/D.O.B. | SSN |
|---|---|---|---|
| 001 | Winters, Reginald M. | | |

**ADDRESS (Street, Apt, City, State, Zip)** — PHONE

**EMPLOYER NAME AND ADDRESS (Street, Apt, City, State, Zip)** — PHONE

**STATEMENT OBTAINED** ☐ Y ☐ N TYPE ☐ WRITTEN ☒ ORAL ☐ TAPED ☐ OTHER

**CHECK CATEGORIES** ☐ STOLEN ☐ RECOVERED ☐ IMPOUNDED ☐ RECEIVED ☐ SUSPECT VEH. ☐ VICTIM'S VEH. ☐ UNAUTH. USE ☐ ABANDONED

| NO. | ☐ DAMAGE TO VEHICLE ☐ THEFT FROM VEHICLE | LIS | LIY | LIT | VIN / OAN | VALUE |
|---|---|---|---|---|---|---|
| | | | / / | | | |

| VYR | VMA | VMO | VST | VCO | TOP | BOTTOM | VEHICLE LOCKED ☐ Y ☐ N | KEYS IN VEHICLE ☐ Y ☐ N | HOLD VEHICLE ☐ Y ☐ N | RELEASE CONTENT ☐ Y ☐ N |

| VEHICLE ASSOC. W/ SUSPECT NO. | VEHICLE ASSOC. W/ VICTIM NO. | VEHICLE TOWED? ☐ Y ☐ N | TOWED BY | OWNERSHIP VERIFIED BY: | ☐ TAG RECEIPT ☐ BILL OF SALE | ☐ TITLE ☐ OTHER |

| STOLEN MOTOR VEHICLE ONLY. | NO. STOLEN | AREA STOLEN: ☐ RESID. ☐ BUSINESS ☐ RURAL | ADDITIONAL DESCRIPTION |

**AUTO INSURER NAME (Company) ADDRESS (Street, City, State, Zip)** — PHONE

| MOTOR VEHICLE RECOVERY ONLY. | NO. RECOVERED | DATE REC. | STOLEN IN YOUR JURISDICTION ☐ Y ☐ N WHERE RECOVERED? |

**TYPE PROPERTY LOSS / ETC.:** (enter codes below) ☐ NONE 3. COUNTERFEITED / FORGED 6. STOLEN / ETC. 7. RECOVERED P. PHOTO 1. BURNED 4. DESTROYED / DAMAGED / VANDALIZED 8. SEIZED U. UNKNOWN E. EVIDENCE | **TOTAL VALUE**

| LOSS CODE | QUANTITY | DESCRIPTION | | PROP CODE | VALUE |
|---|---|---|---|---|---|
| | VEH NO. | MAKE / BRAND | MODEL | | DATE RECOVERED |
| | SERIAL NUMBER | NCIC NUMBER | OTHER NUMBER | | |

| LOSS CODE | QUANTITY | DESCRIPTION | | PROP CODE | VALUE |
|---|---|---|---|---|---|
| | VEH NO. | MAKE / BRAND | MODEL | | DATE RECOVERED |
| | SERIAL NUMBER | NCIC NUMBER | OTHER NUMBER | | |

| LOSS CODE | QUANTITY | DESCRIPTION | | PROP CODE | VALUE |
|---|---|---|---|---|---|
| | VEH NO. | MAKE / BRAND | MODEL | | DATE RECOVERED |
| | SERIAL NUMBER | NCIC NUMBER | OTHER NUMBER | | |

| LOSS CODE | QUANTITY | DESCRIPTION | | PROP CODE | VALUE |
|---|---|---|---|---|---|
| | VEH NO. | MAKE / BRAND | MODEL | | DATE RECOVERED |
| | SERIAL NUMBER | NCIC NUMBER | OTHER NUMBER | | |

**PROPERTY CODES:**

**EXCHANGE MEDIUMS**
01 Money
02 Credit / Debit Card
03 Negotiable Instruments
04 Other Exchange Mediums
**DOCUMENTS**
05 Non-Negotiable Instruments
06 Personal Papers
07 Other Documents

**VALUABLES**
08 Jewelry / Precious Metals
09 Art Objects, Antiques
10 Other Valuables
**PERSONAL EFFECTS**
11 Clothing Furs
12 Purses / Handbags / Wallets
13 Other Personal Effects
**HOUSEHOLD ITEMS**
14 Household Items
**EQUIPMENT**
15 Drug / Narcotic Equip.

16 Gambling Equipment
17 Computer Hardware / Soft.
18 Office Equipment
19 Stereo / TV Equip.
20 Recordings Audio / Vis.
21 Sports Equipment
22 Photographs Equip.
23 Farm Equipment
24 Heavy Construction / Industrial
25 Building Supplies - Const.
26 Tools
27 Vehicle Parts / Acces.

28 School Supplies
29 Other Equipment
**CONSUMABLE ITEMS**
30 Alcohol
31 Drugs / Narcotics
32 Consumable Goods
**ANIMALS**
33 Livestock
34 Household Pets
**VEHICLES**
35 Aircraft

36 Automobiles
37 Bicycles
38 Buses
39 Trucks
40 Trailers
41 Watercraft
42 Recreational Veh.
43 Other Motor Veh.
**WEAPONS**
44 Firearms
45 Other Weapons

**STRUCTURES**
46 Single Occupancy
47 Other Dwellings
48 Commercial / Bus.
49 Indus. / Mfg.
50 Public / Comm.
51 Storage
52 Other Structure
**OTHER**
53 Merchandise
64 Other Property
66 Pending Inventory

**NARRATIVE:**

MFD was sent to a possible structure fire at the listed address. Upon their arrival, it was determined that the origin of the fire was in the basement and that a mattress had caught on fire. Injuries were minor to one of the adult occupants, although a young child had been present at the time (no injuries to the child), so the incident will be reviewed by the city prosecutor's office ASAP.

DEFENDANT'S EXHIBIT
C

Ayers Reports 000127
(rec'd August 2019)

**DEFENDANT'S EXHIBIT D**

## MASSILLON FIRE DEPARTMENT EMS RUN REPORT

| INCIDENT LOCATION TYPE SEE REFERENCE #1 | Res | EMS SERVICE #76-027 | PRIMARY | 218 | 220 | 230 | 240 | DATE 10-3-12 | RUN NUMBER 3184 |

| INCIDENT ADDRESS | 185 26th SE | CITY Massillon | STATE OH | ZIP 44646, 44647 | COUNTY STARK |

| PATIENT NAME: LAST Ayres | FIRST Kayla | MI | PT. PHYSICIAN None | PHONE |

| PATIENT ADDRESS | ☑ SAME AS INCIDENT | CITY | STATE | ZIP |

| AGE 53 | D.O.B. 2-10-89 | GENDER O MALE ☑ FEMALE | RACE ☑ CAUCASIAN  O ASIAN  O UNKNOWN  O AFR. AMERICAN  O AMER. INDIAN | ETHNICITY O UNKNOWN  O HISPANIC  O NON HISPANIC |

CURRENT MEDICATIONS / DOSE: Aldero

PAST MEDICAL HX:
O NONE  O ASTHMA  O DM  O SEIZURE  O DEMENTIA  O MI
O HTN  O COPD  O NIDDM  O CVA  O ANXIETY  O CAD
O RENAL  O CHF  O CA  O TIA  O PSYCH.  O ANGINA
LIST: OLHD

ALLERGIES: ☑ NKDA

| O LIST TO HOSPITAL  O NONE |

INJURY PRESENT: ☑ YES  O NO
CAUSE OF INJURY SEE REFERENCE #2: Blunt

TYPE OF INJURY:
☑ BLUNT  O BURN
O PENETRATING  O BLAST
O EXPOSURE  O FIRE
O UKNOWN  O N/A

PATIENT DISPOSITION:
☑ TREATED/TRANSPORTED EMS  O TREATED/REFUSE TRANSPORT  O CANCELLED
O TREATED/TRANSFERRED CARE  O NO TREATMENT/NO DUTY  O DOA
O TREATED/TRANSPORTED POV  O PATIENT REFUSED CARE  O PT LIFT
O TREATED/TRANSPORTED BY PD  O NO PATIENT FOUND  O N/A

DISPATCHED COMPLAINT SEE REFERENCE #3: (R) hand lac.

CHIEF COMPLAINT / ANATOMIC LOCATION:
O ABDOMEN  ☑ EXTREMITY LOWER  O BACK  O CNS/NEURO  O PULMONARY  O SKIN  O N/A
O CHEST  ☑ EXTREMITY UPPER  O NECK  O CARDIOVASCULAR  O OB/GYN  O MENTAL  O RENAL
O HEAD  O GENERAL/GLOBAL  O GENITALIA  O MUSCULOSKELETAL  O GASTRO  O GENERAL/GLOBAL

CHIEF COMPLAINT SEE REFERENCE #4: (R) hand lac.

RESPONSE MODE:
O LIGHTS/SIRENS  O NO LIGHTS/SIRENS
TRANSPORT MODE:
O LIGHTS/SIRENS  O NO LIGHTS/SIRENS

TYPE OF SERVICE REQUESTED:
O 911 RESPONSE  O WALK-IN
O PT LIFT (NONEMER)  O MUTUAL AID
O MEDIC ASSIST  O STANDBY

LEVEL OF SERVICE:
O BLS EMERGENCY  O MEDIC ASSIST
☑ ALS EMERGENCY  O SPECIALTY CARE
O ALS LEVEL 2  O N/A

### VITAL SIGNS AND PROCEDURES

| TIME | B/P | PULSE | RESP | PAIN | GCS | LEAD | RHYTHM | EKG | PUPILS | SKIN | RESP EFFORT | LUNG SOUND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2051 | 138/18 | 106/48 | 98 | | 15 | 4 12 P | S1 | L R | O RESPOND  ☑ EQUAL  O UNEQUAL  ☑ DILATED R L | O WARM  O DRY  O MOIST  O FLUSHED  O CYANOTIC  O ASHEN  O PALE  O HOT  O COOL | ☑ NORM  O SHALLOW  O INCREASED  O FATIGUED  O LABORED  O ABSENT | O CLEAR  O EQUAL  O WHEEZES R L  O RALES R L  O DIMINISH R L |
| 2058 | 110 | 20/106/19 | 100 | | | 4 12 P | | R L | | | | |

| OXYGEN TIME ___ hrs  4 lpm | O NC  O NRB  O BVM |
| RH CARE? TIME ___ hrs  O FULL C-SPINE  O KED  O PEDS BOARD  O BACKBOARD  O SPLINT |

| GCS TIME | EYE 4 3 2 1 | VERBAL 5 4 3 2 1 | MOTOR 6 5 4 3 2 1 |
| GLUCOSE TIME ___ hrs  1st | CAP REFILL O ___ | TEMP O N/A | 12 LEAD |
| GLUCOSE TIME ___ hrs  2nd | O NORM  O DELAYED  O N/A | METHOD | INTERPRETATION |

| TIME | PROCEDURE / MEDICATION (see reference 5) | DOSE | ROUTE | ATTEMPTS | SUCCESS | REACTION/COMPLICATIONS (#7-8) |
|---|---|---|---|---|---|---|
| 2051 | IV NS  20 14g | Wd (R)ac | | 1 | ☑ YES  O NO | None |
| | | | | | O YES  O NO | |
| | | | | | O YES  O NO | |
| | | | | | O YES  O NO | |

**NARRATIVE:** Pt's son was playing c lighter in basement when he caught Mattress on fire. Pt tried to put it out c cup of water while running across basement slipped & fell on cup. Pt has 2 lac's on (R) hand, 1 jagged on ring finger, 1 thumb. MSP intact bleeding controlled c dressing. Pt denies any smoke inhalation. IV initiated due to inc'd pt HR @ 140's slowed to 130's to 118-120 on arrival @ E.D. No other injuries

| MED CONTROL CONTACT:  O YES  O NO  O NFO | DESTINATION: ☑ AFFINITY MASSILLON  O MERCY MEDICAL  O AULTMAN  O OTHER | IMPRESSION | UNIT 240 R | UNIT 240 R | TRIAGE AS TRAUMA?  O YES  O NO |
| DIVERTED TO? | | INITIAL CALL 2121 | TO HOSPITAL 2100 | EMS CREW / Transport Crew: Wagner | CERT P |
| PRIMARY ROLE OF UNIT: | TRANSFERRED CARE TO: | DISPATCHED 2059 | AT HOSPITAL 2106 | WRITTEN Wagner | |
| ☑ TRANSPORT | O SMITH  TIME ___ hrs | EN ROUTE 2003 | RETURNING | | |
| O NON-TRANSPORT | O EMT  TIME ___ hrs | ON SCENE 2029 | IN SERVICE | | |
| O SUPERVISOR | O OTHER ___ hrs | AT PATIENT 2049 | COMPLETE | | |
| O RESCUE | | MILEAGE | START MILES 87.4 END MILES 89.8 | DRIVER / | |

121

## MASSILLON FIRE DEPARTMENT EMS RUN REPORT

| PAGE 2 OF 2 | SERVICE 76-027 | PRIMARY | 210 | 220 | 230 | 240 | DATE 10-3-12 | RUN NUMBER 5484 |
| | | TRANSPORT | 210 | 220 | 230 | 240 | | |

**NARRATIVE CONTINUED**

to RM 9 @ AMC @ 2107 hrs

| TIME | PROCEDURE / MEDICATION | DOSE | ROUTE | ATTEMPTS | SUCCESS | EMT | REACTIONS / COMPLICATIONS |
|---|---|---|---|---|---|---|---|
| | | | | | O YES  O NO | | |
| | | | | | O YES  O NO | | |
| | | | | | O YES  O NO | | |
| | | | | | O YES  O NO | | |

| TIME | ADVANCED AIRWAY | SIZE | CM @ LIPS | ATTEMPTS | SUCCESS | EMT | SECURED? / PLACEMENT CHECK |
|---|---|---|---|---|---|---|---|
| | O ET    O COMBITUBE  O CRICOTHYROTOMY | | | | O YES  O NO | | |
| | O ET    O COMBITUBE  O CRICOTHYROTOMY | | | | O YES  O NO | | |

| PRIOR AID (see reference sheet #'s) | PERFORMED BY | MEDICATIONS/PROCEDURES | TIME | OUTCOME |
|---|---|---|---|---|
| | | | | |

| MASS CASUALTY | NUMBER OF PATIENTS | TYPE OF DESTINATION | |
|---|---|---|---|
| O YES  O NO | O SINGLE  O MULTIPLE  O N/A | Ø HOSPITAL ED/OR/L&D    O OTHER EMS GROUND    O OTHER EMS AIR    O OTHER |

REASON FOR DESTINATION CHOICE: Ø PT/FAMILY CHOICE  O CLOSEST  O PT PHYSICIAN  O LAW ENFORCEMENT  O PROTOCOL  O MED CONTROL  O DIVERSION  O OTHER

| DELAY(S) PLEASE LIST) | DISPATCH | RESPONSE | SCENE | TRANSPORT | RETURN |
|---|---|---|---|---|---|

| EXTRICATION SECTION | | | | | | |
|---|---|---|---|---|---|---|
| EXTRICATION REQUIRED    O YES  O NO | START TIME | HRS | END TIME | HRS | TOTAL | MIN. |

| USE OF SAFETY EQUIPMENT | | AIRBAG DEPLOYMENT | |
|---|---|---|---|
| O NONE USED | O LAP BELT | O HELMET | O PROTECTIVE NON-CLOTHING | O N/A | O DEPLOYED FRONTAL |
| O NOT KNOWN | O SHOULDER BELT | O EYEWEAR | O N/A | O NONE PRESENT | O DEPLOYED SIDE |
| O CHILD RESTRAINT | O BOTH BELTS | O PROTECTIVE CLOTHING | O OTHER | O NOT DEPLOYED | O OTHER |

| CARDIAC ARREST SECTION | | | BARRIERS TO CARE | ALCOHOL/DRUG USE INDICATORS |
|---|---|---|---|---|
| CARDIAC ARREST | RESUSCITATION  O N/A  O DOA | ADVANCE DIRECTIVE | O LANGUAGE        O N/A | O PT ADMITS TO ALCOHOL USE |
| O YES PRIOR TO ARRIVAL | O DEFIBRILLATION _____ hrs | O FAMILY REQUEST | O RESTRAINT | O PT ADMITS TO DRUG USE |
| O YES AFTER ARRIVAL | O VENTILATION _____ hrs | O LIVING WILL | O DEVELOPMENT IMPAIRED | O PT ADMITS TO BOTH |
| O NO | O COMPRESSIONS _____ hrs | O NONE | O HEARING IMPAIRED | O NONE |
| CAUSE OF ARREST  O N/A | O UNKNOWN | O UNKNOWN | O SPEECH IMPAIRED | O UNKNOWN |
| O PRESUMED CARDIAC  O DROWNING | O ELECTROCUTION | O DNR FORM CC | O PHYSICALLY IMPAIRED | O N/A |
| O TRAUMA | O RESPIRATORY | O OTHER | O DNR FORM CCA | O UNCONSCIOUS | |

### STATEMENT OF PATIENT REFUSAL

I am refusing transport, treatment and/or transport to the nearest medical facility at my own insistence and against the advice of the attending crew and/or consulting hospital physicians. I have been informed by them of the dangers of my not being treated and/or transported at the time. I release Massillon Fire Department EMS Service and/or consulting hospital, their employees, and officers from liability for any adverse results caused by my decision.

| | | |
|---|---|---|
| PATIENT/GUARDIAN SIGNATURE _____ ER TECH / EMT-P | DATE SIGNED | 10-03-12 |
| GUARDIAN'S RELATIONSHIP _____ | DATE SIGNED | _____ |
| WITNESSED BY _____ | DATE SIGNED | _____ |
| WITNESSED BY _____ | DATE SIGNED | _____ |

### LIFETIME ACKNOWLEDGEMENT OF SERVICE / ASSIGNMENT / RELEASE OF INFORMATION

I hereby state that I have received services or supplies from Massillon Fire Department and that I am responsible for payment of the same. I authorize payment to City of Massillon of any and all insurance benefits, including Medicaid, Medicare, Major Medical, Worker's Compensation, and Private Insurance, that I may have covering services by City of Massillon. I agree to immediately remit to City of Massillon any payments that I receive directly from any source for the services provided to me. I authorize any holder of medical or other information about me to release same and copies of my records to City of Massillon, the center for Medicare and Medicaid Services( formerly the Health Care Financing Administration ), it's agents or carriers, necessary to determine benefits or to process claims for this and all related claims for this and all related claims on my behalf, now or in the future. In addition, I acknowledge that I was provided with, or a reasonable attempt was made to provide me with a copy of City of Massillon's Notice of Privacy Practices and my rights in accordance with the Health Insurance Portability and Accountability Act of 1996, also known as HIPPA. I also understand that in any emergency situation HIPPA will be provided upon request. A copy of this form is as valid the original.

| SIGNATURE X | DATE |
|---|---|
| SIGNED BY | RELATIONSHIP TO PT. |
| REASON UNABLE TO SIGN | |

Ayers Reports 000122
(rec'd August 2019)

122

| Unit No./MR No. | Account Number | | | | Admit: | | | | | Discharge | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0002032226 | 1227780343 | | | | Date 10/03/12 | Time 2116 | | | | Date Time | |

**Name, Address, Phone**

AYERS, KAYLA J
185 26TH ST SE
MASSILLON        OH 44646
(330) 844-7910

**Admission Information**

| Reg Units | Adm Type | Ad Source | Arrival Mode | | Type | Service | Room-Bed |
|---|---|---|---|---|---|---|---|
| DG | 1 | 1 | MASSILLON | | QMY | ED | - |
| Occurance Date | Previous Encounter Date | | Date & Time Printed | | Alert | | |
| 10/03/12 | 09/16/12 | | 10/03/12  2159 | | | | |

**Employer, Address, Phone & Occup.**

NOT EMPLOYED

(330) 000-0000

**Patient Information**

| Date of Birth | Age | Sex | Race | Mar Status | Denom. | Church |
|---|---|---|---|---|---|---|
| 02/10/89 | 23Y | F | 1 | S | CHR | NONE |
| SSN | | Emp Status 3 | Retirement Date | Occupation NONE | | County OHIO STAR |

**RELATIVE 1**

Name, Address, Phone, Relationship

AYERS, JEFF

FATHER

Empl, Address, Phone, Occupation

UNKNOWN

(330) 000-0000
UNKNOWN

**RELATIVE 2**

Name, Address, Phone, Relationship

SCOTT, BRENNAN

| Name & Relationship | Address | | Phone | Social Security Nbr. & DOB |
|---|---|---|---|---|
| AYERS, KAYLA J SELF | 185 26TH ST SE MASSILLON     OH 44646 | | (330) 844-7910 | 02/10/89 |
| Employer NOT EMPLOYED | Address | | Phone (330) 000-0000 | Occupation & Date If Retired NONE |

| a Ins.Plan Cd b Plan Name c Group Number | PC | Policy Name Address City State Zip | Group Phone Number Agent Phone Number Approval Number | ID Number Policy Number Claim Number | Insured's Name Insured's DOB Relationship to Patient Effective Date |
|---|---|---|---|---|---|
| 1a | | | | | |
| 1b | | | | | |
| 1c | | | | | |
| 1d | | | | | |
| 2a | | | | | |
| 2b | | | | | |
| 2c | | | | | |
| 2d | | | | | |
| 3a | | | | | |
| 3b | | | | | |
| 3c | | | | | |
| 3d | | | | | |
| 4a | | | | | |
| 4b | | | | | |
| 4c | | | | | |
| 4d | | | | | |

| Admitting Physician | Attending Physician | Primary Care Physician | Referring Physician |
|---|---|---|---|
| PHYSICIAN, NO | PHYSICIAN, NO | PHYSICIAN, UNKNOWN | |

**Admitting Diagnosis**

HAND LACERATION HOUSE FIRE

AYERS, KAYLA J
1227780343    0002032226    10/03/12
02/10/89  23Y QMY  ED    F
ATT: PHYSICIAN, NO
PCP: PHYSICIAN, UNKNOWN
ALERT:        Ayers Reports 000123
              (rec'd August 2019)

**Affinity**
MEDICAL CENTER  *Close to you*
875 8th St NE, Massillon OH 44646

Form Number 100-0001      Revised 07/01/11
FACESHEET

196

1   Q   Do you recall the shift that you were

2       working that day?

3   A   Day shift.

4   Q   And day shift runs from when to when?

5   A   6 a.m. to 2 p.m.

6   Q   Early on in the course of that shift, were

7       you asked to go to 185 26th Street

8       Southeast?

9   A   Yes.

10   Q   Is that located in the City of Massillon,

11       Stark County, State of Ohio?

12   A   Yes.

13   Q   Upon your arrival there -- well, first of

14       all, can you tell me what type of building

15       is located at that address?

16   A   It's a private residence.

17   Q   And upon your arrival there, were other

18       people present?

19   A   Yes.

20   Q   Do you recall who was present?

21   A   Fire Investigator Reggie Winters of the

22       Massillon Fire Department.  And I'm not

23       sure of the gentleman's name, he was an

24       occupant of the residence.

25   Q   Okay.  Approximately how long did you



DEFENDANT'S
EXHIBIT
E

197

1      remain there at the residence at that time?

2  A   I believe somewhere in the area of 30

3      minutes.

4  Q   And while there, did you learn that there

5      had been a fire there the night before?

6  A   Yes.

7  Q   After you leave, do you have an occasion to

8      go back to that residence?

9  A   Yes.

10 Q   And what brought you back to that

11     residence?

12 A   I responded back to the residence upon

13     request of Sergeant Greenfield.

14 Q   And he's your superior officer?

15 A   Yes.

16 Q   When you went back to that residence, what

17     were you asked to do?

18 A   I was asked to interview Kayla Ayers

19     regarding a fire at that residence.

20 Q   What steps did you take to make sure that

21     happened?

22 A   We asked Miss Ayers if she would willingly

23     come down to the police department and talk

24     to us regarding the fire.  She agreed to do

25     so.  We did transport her down to the

```
 1          Fire Inspector.  You have to be a certified
 2          Fire Inspector.  And then from there you
 3          have to -- it's two steps.  You have a
 4          basic Fire Investigator and then you have
 5          an advanced Fire Investigator course you
 6          have to take.
 7     Q    Let's talk about the certified Fire
 8          Inspector training first.  What does that
 9          entail?
10     A    That entails looking at multiple burn
11          scenes, learning the scientific methodology
12          of how different things burn as far as
13          oils, gases, electrical fires, the
14          synthetic fires as far as people using open
15          flames to fires, candles, paper.  And we
16          look at the different patterns the fire
17          makes, the different charring of wood and
18          stuff like that to make our determination
19          whether -- what caused the fire, whether it
20          was mechanical, accidental, or incendiary.
21     Q    Do you have to go to classes for that?
22     A    Yes, sir.
23     Q    And how long were those classes?
24     A    My first class as a basic investigator, it
25          was 32 hours.  The second part of advanced
```

228

1   was -- it was 40 hours.

2   Q   Did you successfully complete all those

3       classes?

4   A   Yes, sir.

5   Q   And then at the end of those classes, do

6       you have to take a test?

7   A   Yes, sir.

8   Q   And did you successfully pass all those

9       tests?

10  A   Yes, sir.

11  Q   So you are now a certified arson

12      investigator?

13  A   Yes.

14  Q   And that's within the State of Ohio?

15  A   Yes, sir.

16  Q   Once you complete that training, do you

17      have to continue to update your education?

18  A   Yes, sir.

19  Q   What do you have to do?

20  A   We have to -- well, we take like different

21      seminars.  One seminar I attend is the

22      International Firefighters Association of

23      Arson Investigators in Columbus.  It's an

24      annual Fire Investigator course week long.

25      We have to maintain 32 hours in a three

240

| | | |
|---|---|---|
| 1 | Q | Did you find anything in your search that |
| 2 | | would indicate to you this was a result of |
| 3 | | a cigarette being left on the mattress? |
| 4 | A | No, sir. |
| 5 | Q | What other steps did you take after you |
| 6 | | observed those findings? |
| 7 | A | After that I stepped back, I looked and I |
| 8 | | started looking at the mattress springs |
| 9 | | itself, and I started noticing the mattress |
| 10 | | itself had an unusual burn pattern to it. |
| 11 | Q | What do you mean by unusual burn pattern? |
| 12 | A | Well, I had noticed that the -- which would |
| 13 | | have been the east end of the bed, towards |
| 14 | | the east end on the north side, had a |
| 15 | | heavier char pattern where the springs -- |
| 16 | | what we call -- I'll try to explain it to |
| 17 | | you, it's called calcination.  It's |
| 18 | | basically where the fire burned so hot that |
| 19 | | it will turn the springs white and they'll |
| 20 | | collapse.  And on that end I had noticed |
| 21 | | where the fire had burnt the hottest and it |
| 22 | | traveled westward.  Like it was -- that's |
| 23 | | where, right there, made a conclusion that |
| 24 | | I had a fire start there that was low and |
| 25 | | it started there and traveled west toward |

1       the wall because that's where the material

2       was at, that it was consuming as it was

3       burning.

4    Q   Okay.

5    A   Upon that I found a V-pattern where the

6       mattress on the south was a post that was

7       up against it, which was a low V-pattern,

8       which I thought was, okay, out of the

9       ordinary.

10   Q   Okay.  When you say "out of the ordinary,"

11      what do you mean by that?

12   A   There was a makeshift door between the post

13      and the bed that looked like an area that

14      was cordoned off for like a little play

15      area, but the area itself didn't look like

16      it was habitable for anybody to be playing

17      in it because it was an open drain there

18      with no cover overtop of it.

19           So once I continued further

20      investigating, I noticed that the burn was

21      real low, the post sat on probably a 6-inch

22      concrete pad that was right in line with

23      the bottom of the box spring, met up

24      together, and somebody would have to lean

25      over, light that area too.  And so at the

245

1    as State's Exhibit 3E.  Now, is that the

2    bed frame after the mattress and box

3    springs had been removed?

4  A  Yes, sir.

5  Q  Okay.  And what's this area here?

6  A  That area right there is where, as you can

7    see, there's water droplets right there.

8    There was a soil pipe that went to the

9    upstairs bathroom, that melted and

10   water -- that was full of water.  So when

11   the plastic melted and burnt down, that

12   caught fire right here on top of that bean

13   bag.  It didn't go anywhere, it pretty much

14   stopped there and started burning upward.

15   So we had to rule that out that that wasn't

16   the cause of the fire.

17  Q  And this post over here is the post you

18    referred to in the previous picture?

19  A  Yes.  If you look at it, you have the

20    concrete floor, you go up and you have

21    concrete, kind of pyramid, and then right

22    there you can see a clear point of the

23    V-pattern that I was telling you about, the

24    starting point right there, the origin.

25  Q  And I'll show you what's been marked as

246

1      State's Exhibit 3F.  Is that a close-up of

2      that?

3  A   Yes, sir.

4  Q   And when you talk about the V-pattern, are

5      you referring to this area right in here?

6  A   Yes.

7  Q   And that indicates what to you as a

8      trained -- or a certified arson

9      investigator?

10 A   That is telling me the point of origin of a

11     fire consistent where the fire started.  It

12     started low and it started climbing the

13     post with the heavy charring and stuff like

14     that.

15 Q   Does fire burn down?

16 A   No, not necessarily.  You will have a drop

17     down, but a fire is not going to burn

18     across and then down, down, downward.

19 Q   So the other side of the bed, the other

20     corner where the calcination was, couldn't

21     have caused this damage over here to this

22     post?

23 A   No.

24 Q   And I want to show you what's been marked

25     as State's Exhibit 3G.  And what's depicted

1   A   Yes.

2   Q   And it was fine?

3   A   The electrical panel, we didn't get any --

4       didn't see any kind of arcing wires.  There

5       was some electrical above that area, but

6       that was all due to the radiant heat and

7       the flames coming up from the bottom up.

8   Q   And the gas line was intact?

9   A   The gas line was not attacked.  Our water

10      line got attacked due to the fire, the

11      water line had heated up and had melted and

12      broke.  That's actually what put some of

13      the fire out.

14  Q   I think you misunderstood my question.

15  A   I'm sorry.

16  Q   The gas line was intact, there were no gas

17      leaks --

18  A   Yeah, the gas line was intact.  I'm sorry,

19      sir.

20  Q   That's all right.  So based upon the

21      investigation and your training, your

22      education and experience, did you, to a

23      reasonable degree of scientific certainty,

24      form an opinion as to the origin and cause

25      of this fire?

250

1   A   Yes.

2   Q   Okay.  And how many origins were there?

3   A   There were two.

4   Q   And that's based on your certified arson

5       opinion?

6   A   Yes.

7   Q   And what was the cause of this fire?

8   A   The cause of the fire was incendiary, it

9       was open flame.  A person or persons with

10      the act of open flame started this fire.

11  Q   So it wasn't a cigarette butt left on a

12      mattress?

13  A   No.

14          MR. BARR:  Your Honor, I think

15      this might be a good time to stop right

16      here, if you don't mind.

17          THE COURT:  Okay.  Very good.

18      That's fine.

19          All right.  Ladies and gentlemen,

20      we are going to adjourn for today and we'll

21      start back up tomorrow morning with the

22      continuing testimony from Inspector

23      Winters.

24          But, again, I'm going to remind

25      you that during the evening recess do not

268

1     minutes.

2  Q  Now, did you notice any indications on

3     Kayla that she'd been in a fire or in a

4     home involved in a fire?

5  A  When we were at the hospital, I did swab

6     Kayla's arms, hands, and stuff like that,

7     to see if I picked up any soot.  I did take

8     tips and swabbed her nostrils.  I got very

9     light soot out of her nostrils.

10  Q  Did you smell anything on her person, of

11     her --

12  A  I could not smell anything as far as soot

13     or smoke.

14  Q  You indicated that she told you where she

15     was standing --

16  A  Yes.

17  Q  -- when she observed the fire?

18  A  Yes.

19  Q  Now, you had been in that basement and you

20     had taken photographs; is that correct?

21  A  Yes, sir.

22        MR. BARR:  Lori, could I have the

23     docucamera, please?

24     BY MR. BARR:

25  Q  And I've put here on this screen State's

270

1      the mattress that caught on fire.

2  Q    The fire area would be over to this side of

3      the picture?

4  A    Yeah, more to the west to north corner of

5      the basement.

6  Q    And standing from that vantage point, you

7      can't see anything?

8  A    No.

9  Q    After you spoke to Kayla, where did you go

10     next?

11  A   We left the res and went back to the fire

12     scene with Officer Muntean, and he wanted

13     to take a look at the scene and walk him

14     through what happened and stuff like that.

15          And then from there we went to the

16     neighbor's house where the kids were

17     staying, Brennan Junior, and I talked with

18     him.  And when talking with him, I did not

19     observe any soot on him, any soot in his

20     nostrils.  He had no burn marks on his

21     hands of any signs of being in a fire.

22  Q   Okay.  After speaking to Brennan, did you

23     do any more that night with regards to this

24     fire?

25  A   No, we didn't.

271

1    Q    The next day, October 4th, 2012, do you

2         continue your investigation?

3    A    Yes, sir.

4    Q    What do you do?

5    A    I arrived at work about 8:00.  About 8:15,

6         I receive a call from Miss Jennifer who

7         advised me that Miss Ayers and her

8         boyfriend had returned to the residence

9         with the kids.  That night before we had

10        advised them that the house was inhabitable

11        due to the electric being damaged, the soil

12        pipe being damaged, and the amount of smoke

13        damage throughout the whole house.

14             And on my arrival -- on my way to

15        the scene, the dispatcher had called me and

16        advised me that Massillon PD was already on

17        the scene for a call.

18             Once I got there, I met -- I ran

19        into Officer Ricker, and he said everything

20        was fine here.  And I said, They're not

21        allowed to be in here.  We advised them the

22        night before that the house was

23        inhabitable, that they could not stay here.

24             So at that time I notified East

25        Ohio Gas Company, I went ahead and notified

1   present at the time of questioning him, we

2   were out on the front porch.

3   Q   Was Officer Muntean taping the conversation

4       in any way --

5   A   No, sir.

6   Q   -- with a body microphone or video camera?

7   A   No, no.

8   Q   Did you attempt to have the 3-year-old

9       light a lighter?

10  A   Yes, we did.

11  Q   Okay.  Was he able to do that?

12  A   He took both hands and held the lighter and

13      he was able to do it.

14  Q   Okay.  So he seemed to be familiar with the

15      object?

16  A   Yeah.

17  Q   Okay.  Okay.  Now, did you prepare a report

18      relating to this fire?

19  A   Yes, sir.

20  Q   Okay.  It's a written report; is that

21      right?

22  A   Yes, sir.

23  Q   Okay.  And is part of the report called an

24      Executive Summary?

25  A   Yes.

283

1   Q   And what is the Executive Summary?

2   A   That is the process that we use for

3        scientific -- we use NFPA 921 which is a

4        guide for fire investigations.  And that is

5        to help us make sure that we cover all

6        points of the fire scene and --

7   Q   Okay.  So is the Executive Summary, is that

8        something that you create before you do

9        your investigation or after you do it?

10   A   That's after I do the investigation.

11   Q   Okay.

12   A   When I'm doing my report, that's after.

13        Once I've collected everything, that's when

14        I basically give my brief synopsis of what

15        I determined the fire scene to be.

16   Q   Okay.  And so if there was one of these

17        reports created in regards to the fires --

18        fire at Miss Ayers's house --

19   A   Yes.

20   Q   -- it would have been created by you; is

21        that correct?

22   A   Yes, sir.

23   Q   Okay.  Do you recall, in your Executive

24        Summary, if you stated the fire originated

25        on the first floor of the home?

284

1   A   Fire had started on the basement floor of

2       the home.

3   Q   Okay.  If I showed you the Executive

4       Summary, would that help refresh your

5       memory?

6   A   Yes.

7   Q   Okay.

8           MR. KUHN:  Your Honor, may I

9       approach the witness?

10          THE COURT:  Yes, you may.

11          MR. KUHN:  Thank you.

12          MR. BARR:  May I see that?

13          MR. KUHN:  Sure.  This has

14      previously been marked Defendant's Exhibit

15      D.

16          THE COURT:  That was Defendant

17      Exhibit what, I'm sorry?

18          MR. KUHN:  D, Judge.

19  BY MR. KUHN:

20  Q   Sir, I'm going to hand you now what has

21      previously been marked Defendant's Exhibit

22      D.  If you could check on the second line

23      the Executive Summary.  Sir, does that seem

24      to indicate that the fire originated on the

25      first floor of the building?

285

1   A   No, sir, somebody made a typo.

2   Q   That's a typo?  Okay.

3           Okay.  And, do you know, did this

4       Executive Summary also say the materials

5       first ignited were blankets on the bed?

6   A   Yes.

7   Q   Okay.

8   A   There was some remnants left on the bed on

9       the fire scene.

10  Q   Okay.  So it was a typo as to where the

11      fire originated --

12  A   Yes, sir.

13  Q   -- in your report?

14  A   Yes.

15  Q   Okay.  And Ms. Ayers did deny setting this

16      fire all along; didn't she?

17  A   Yes.

18  Q   Okay.  What year was this home built?

19  A   Not right offhand I don't know, sir.

20  Q   Do you think it's a newer home or an older

21      home?

22  A   It's an older home.

23  Q   Okay.  And did you check out the wiring of

24      the home?

25  A   Yes.

296

1          could be a torch.

2     Q    Okay.  And that's your opinion?

3     A    That is my opinion, sir.

4               MR. KUHN:  Okay.  I think that's

5          all I have.  Thank you, sir.

6               THE WITNESS:  Thank you.

7               THE COURT:  Thank you, Attorney

8          Kuhn.

9               Attorney Barr, you may redirect.

10              MR. BARR:  Thank you, Your Honor.

11         May I have your exhibits please?

12              MR. KUHN:  Sure.

13                    REDIRECT EXAMINATION

14         BY MR. BARR:

15    Q    Mr. Winters?

16    A    Yes, sir.

17    Q    You use computers?

18    A    Yes, sir.

19    Q    Are you really good at them?

20    A    No, sir.

21    Q    Me neither.  Do those computers contain

22         your reports and these templates that

23         you've talked about?

24    A    Yes.

25    Q    And sometimes you punch things up and you

297

1    put things in and you forget to change

2    everything?

3  A  Yes, sir.

4  Q  But when all is said and done, do you have

5    a final original cause and origin report

6    that you keep in your file?

7  A  Yes, sir.

8  Q  Do you have that with you by chance?

9  A  Yes, sir.

10 Q  Could you pull it out?  Could you flip to

11    the Executive Summary in your final -- and

12    this is the final original report, correct?

13 A  Yes.

14 Q  Maintained by your office in the Fire

15    Prevention Bureau --

16 A  Yes.

17 Q  -- as a record and normal course of

18    business, and you keep this and preserve

19    this forever, correct?

20 A  That is correct, sir.

21 Q  Could you read to me the Executive Summary

22    contained in your final original report

23    after all the typos --

24         MR. KUHN:  Judge, I'm going to

25    object to this.  Is this a document I've

298

1  received?

2          MR. BARR:  Yes, it is, Mr. Kuhn.

3          THE COURT:  Could you approach

4  please?

5          MR. KUHN:  Sure.

6                - - - - - -

7          (A conference was held at the

8           bench outside the hearing of the

9           jury.)

10               - - - - - -

11         MR. BARR:  Provided in discovery,

12  Your Honor, the origin and cause report,

13  and I'm asking him to read this based upon

14  the cross-examination of documents that I

15  believe he received from Massillon

16  Municipal Court that were not the final

17  report and contain typographical errors.  I

18  believe the jury needs to know this.

19         THE COURT:  Okay.  Do you want to

20  take a look at this?

21         MR. KUHN:  Yeah, if I could.

22         MR. BARR:  There is the discovery

23  number 15, 2012, it indicates origin and

24  cause from Massillon Fire Department.  The

25  document he has, we don't have in our file.

299

1    This is the only document we could have

2    given him.

3            THE COURT:  Do you want to check

4    your file?

5            MR. KUHN:  Yeah, I'll do that real

6    quick.

7            THE COURT:  Okay.

8       (End of conference at the bench.)

9            - - - - - - - - -

10           THE COURT:  Ladies and gentlemen,

11   this is one of those times where I'm going

12   to ask you to be patient while we need to

13   address some issues.  If you feel the need

14   to stand up and stretch for a little bit,

15   go ahead and feel free do so, okay?

16           MR. KUHN:  If we signed for them,

17   we signed for them.

18           THE COURT:  If you could approach

19   for just a minute.

20           MR. BARR:  Mr. Kuhn.

21           - - - - - -

22           (A conference was held at the

23            bench outside the hearing of the

24            jury.)

25           - - - - - -

300

1            THE COURT:  Put on the record with

2   respect to the document with which Mr.

3   Winters is being currently examined

4   regarding it appears as though the Defense

5   did sign for the report, and, therefore,

6   you are permitted to cross-examine him.

7         MR. BARR:  Thank you.

8         THE COURT:  Or direct.

9         MR. BARR:  Thank you.

10      (End of conference at the bench.)

11       - - - - - - - - - -

12   BY MR. BARR:

13  Q  Mr. Winters, if you would, I believe I

14    asked you to read your final original copy

15    of your Executive Summary to this jury,

16    would you do that?

17  A  Yes.  After examination of the fire scene

18    it was determined the fire originated in

19    the basement on the bed.  After examination

20    of the fire scene, interviewing witnesses,

21    interviewing the insured and using the

22    levels of scientific certainty as discussed

23    in the 2011 edition of NFPA 921; A Guide

24    for Fire and Explosion Investigation, it is

25    my opinion the ignition source for the fire

1   was some type of open flame. The materials

2   first ignited were blankets on the bed.

3   The act or omission that brought the

4   ignition source and the materials first

5   ignited together was the deliberate act of

6   a person or persons. Using these elements

7   of a fire cause, the cause of the fire is

8   incendiary.

9   Q   And that is in the original final report?

10  A   Yes, sir.

11  Q   And the exhibits, Defendant's Exhibit A and

12      Defendant's Exhibit D, that Mr. Kuhn showed

13      you are not contained in that report?

14  A   That is correct, sir.

15  Q   Thank you, Mr. Kuhn.

16          Mr. Kuhn asked you about your

17      opinion, and that opinion's based on your

18      training and education that you've

19      received?

20  A   Yes, sir.

21  Q   It's based on the years, the five years,

22      and 30-some fires that you've investigated?

23  A   Yes, sir.

24  Q   And it's also based on the physical

25      evidence that you saw at the fire scene?

310

1      thing I could do was if she wasn't going to

2      leave, I was going to leave.

3  Q  What were those threats?

4  A  Just give me a second.

5  Q  Take your time.

6  A  She told me that she wasn't going to leave

7      and before she would leave she would burn

8      the mother fucker down, in that -- in those

9      words.  And it started getting scary to me.

10     I mean, my girlfriend's pregnant, we have

11     little kids in the house.  And so prior to

12     the fire that actually did happen, possibly

13     up to a week, I don't know, I called my

14     sister and my aunt and the landlord and I

15     told them the threats she was making and it

16     was starting to scare me, I didn't know

17     what to do.

18          And I finally come to the

19     decision, I said, well, if she's not going

20     to leave, then I'm going to leave, I got to

21     get out of here.  I know she didn't have a

22     car so I figured if I get, you know, 50 or

23     a hundred miles away, she's not going to

24     follow me.  Maybe then she would step up

25     and realize, you know, she had to do

339

1   Q   Did you ever see any arguments between
2       them?

3   A   Yeah.  One night I did, yes.

4   Q   Was that right before the fire?

5   A   Um-m, it was approximately a week or so
6       before the fire.  I had talked to him the
7       night before the fire, though, and there
8       was no indication of anything going on at
9       the time.

10  Q   What about the fight that you overheard,
11      can you tell us about that?

12  A   Um-m, I was talking to her dad about the
13      boat and how much it would be to get it
14      back running.  And her dad was upset
15      because it was going to take so much, and
16      talking about he -- they're in financial
17      situations at the time, and how -- how
18      Brennan and them aren't paying rent and how
19      basically they was having a hard time with
20      the -- financially.  And that pretty much
21      Kayla come up and basically said that if
22      Jeff ever left her again, she would burn
23      the house down.

24  Q   So you heard Kayla say this?

25  A   Yes.

340

1   Q   And do you see the person that said this in

2       the courtroom?

3   A   Yes, I do.

4   Q   Could you identify her for the Court and

5       the jury?

6   A   Kayla Ayers.

7   Q   Can you describe what she's wearing?

8   A   She's wearing black and Bob Barker sandals

9       and white jeans -- or, I'm sorry, blue

10      jeans.

11  Q   Thank you.

12           MS. SCHNELLINGER:  Your Honor,

13      will the record reflect he's identified the

14      Defendant?

15           THE COURT:  Yes, so reflected.

16   BY MS. SCHNELLINGER:

17  Q   When you heard the Defendant say those

18      words to her father, can you describe her

19      emotions?

20  A   Um-m, it was like she meant it, but she

21      didn't.

22  Q   Was she laughing?

23  A   It was more -- yeah, it was more kind of a

24      laugh or a joke kind of thing.

25  Q   Okay.  But she meant it?

1    were trying to put her Pit Bull up because

2    we knew the fire department was coming.

3  Q  Okay.  Where was the Pit Bull?

4  A  It was out running in the yard.

5  Q  Okay.  Now where were you when you were

6    doing all this stuff?

7  A  I was on -- I was at their property --

8    their residence, Kayla's residence, at that

9    time.

10 Q  Where exactly on the property?

11 A  On the side of the house, which would be

12    like their backyard.

13 Q  Okay.  So what did you do next?

14 A  Um-m, after we got the dog tied up, my

15    husband brought us a bunch of wrap -- or

16    towels and stuff, and I was wrapping up her

17    hand.  Karen was asking her where the other

18    two girls were, where her children were,

19    the other two, because she didn't know

20    where they were.

21       Kayla was -- she wasn't able to

22    really respond to her.  All she kept doing

23    was repeating was she going to lose -- Am I

24    going to lose my kids, am I going to lose

25    my kids?  We kept telling her repeatedly,

362

```
 1    A      She was -- she was very upset.  She just
 2           wasn't -- she wasn't there, like she
 3           just -- it's so hard to -- I'm having a
 4           terrible time describing it, but she would
 5           kind of like go into like a blank stare at
 6           times, and then she would come back and be
 7           very upset and agitated and worrying about
 8           losing her children.
 9    Q      Okay.  Did you notice anything else about
10           her?
11    A      Yeah, there was a strong burnt smell -- it
12           was like a marijuana smell with like a
13           burnt smell to it, but I don't --
14    Q      Do you know where it was coming from?
15    A      That was coming from her breath when she
16           was sitting on my front porch, and I was
17           holding her arm at that time.
18    Q      So you were holding onto her?
19    A      Yeah, I had to hold onto her, she was
20           bleeding pretty good.
21    Q      You said it smelled like burnt marijuana?
22    A      Uh-huh, yeah.
23    Q      Have you had occasion to be around the
24           smell of burning marijuana before?
25    A      Yeah.
```

378

1           MR. BARR:  Ms. Flowers, can I have

2      the docucamera please?

3           THE BAILIFF:  Sure.

4           MR. BARR:  Thank you.  In just a

5      minute, hopefully.

6      BY MR. BARR:

7    Q   Can you see that on the screen there?

8    A   Yes, I can.

9    Q   That is what has been marked as State's

10      Exhibit 3H.  Do you recognize that?

11   A   Yes, that's the house Kayla was living in.

12   Q   So you say you got there about 6:30 on

13      Wednesday, October 3rd to pick her up?

14   A   Yes, yes.

15   Q   Which door did you go to?

16   A   This door that's on your far right-hand

17      side.  It's like the basement door.

18   Q   I'm going to circle that one.  That one

19      (Indicating)?

20   A   Yes, that one.

21   Q   And what happened when you knocked on that

22      door?

23   A   Um-m, I knocked on the door, but nobody

24      answered at first, but the dog came to the

25      window and was barking.

379

```
 1   Q   Uh-huh.
 2   A   And I heard like a shush -- shushing, like
 3       "shh," and I knocked again, nobody came,
 4       and then so I went to the other door.
 5   Q   And the other door you're referring to, is
 6       that this door over here?
 7   A   Yes.  Which -- um-m, the kitchen door.
 8   Q   Okay.
 9   A   It's -- yeah, it was right behind there.
10   Q   Now, when you knocked on the kitchen door,
11       what did you hear?
12   A   Um-m, I didn't hear anything but the dogs
13       barking.
14   Q   Did you see anything?
15   A   Only -- only the big white dog.
16   Q   Did you see anything while you were
17       knocking at either door --
18   A   Um-m, I did on the -- on the deck that was
19       there, that little deck, there's like a
20       wicker couch or chair, and Kayla's purse
21       that I had seen her carry quite often and a
22       backpack that I thought might have been
23       Layla's.
24   Q   Did anybody ever come to the door?
25   A   No.
```

339

| | | |
|---|---|---|
| 1 | Q | Did you ever see any arguments between |
| 2 | | them? |
| 3 | A | Yeah.  One night I did, yes. |
| 4 | Q | Was that right before the fire? |
| 5 | A | Um-m, it was approximately a week or so |
| 6 | | before the fire.  I had talked to him the |
| 7 | | night before the fire, though, and there |
| 8 | | was no indication of anything going on at |
| 9 | | the time. |
| 10 | Q | What about the fight that you overheard, |
| 11 | | can you tell us about that? |
| 12 | A | Um-m, I was talking to her dad about the |
| 13 | | boat and how much it would be to get it |
| 14 | | back running.  And her dad was upset |
| 15 | | because it was going to take so much, and |
| 16 | | talking about he -- they're in financial |
| 17 | | situations at the time, and how -- how |
| 18 | | Brennan and them aren't paying rent and how |
| 19 | | basically they was having a hard time with |
| 20 | | the -- financially.  And that pretty much |
| 21 | | Kayla come up and basically said that if |
| 22 | | Jeff ever left her again, she would burn |
| 23 | | the house down. |
| 24 | Q | So you heard Kayla say this? |
| 25 | A | Yes. |

340

1   Q    And do you see the person that said this in

2        the courtroom?

3   A    Yes, I do.

4   Q    Could you identify her for the Court and

5        the jury?

6   A    Kayla Ayers.

7   Q    Can you describe what she's wearing?

8   A    She's wearing black and Bob Barker sandals

9        and white jeans -- or, I'm sorry, blue

10       jeans.

11  Q    Thank you.

12             MS. SCHNELLINGER:  Your Honor,

13       will the record reflect he's identified the

14       Defendant?

15             THE COURT:  Yes, so reflected.

16  BY MS. SCHNELLINGER:

17  Q    When you heard the Defendant say those

18       words to her father, can you describe her

19       emotions?

20  A    Um-m, it was like she meant it, but she

21       didn't.

22  Q    Was she laughing?

23  A    It was more -- yeah, it was more kind of a

24       laugh or a joke kind of thing.

25  Q    Okay.  But she meant it?

426

1   evidence he was exposed to fire, no

2   evidence he was exposed to smoke, he had no

3   smoke inhalation, he was not under any kind

4   of distress whatsoever.  But we know he was

5   in a burning house for ten minutes.  We

6   know that he was at substantial risk to his

7   health and safety.  We know that.

8          Inspector Winters talked to Bubba,

9   examined him at the scene.  And he kept

10  investigating, looking for the person that

11  started that fire.  What does that tell

12  you?

13          And, again, common sense.  You

14  believe that first story that the Defendant

15  said, "Bubba started the fire," he would

16  have to hold a lighter like you remember

17  Inspector Winters demonstrating how he had

18  to hold that lighter?  He had to hold the

19  lighter, ignite the mattress, then go and

20  start a second fire, the whole time no

21  soot, no smoke, not getting burned?

22  Impossible.  They all told you, the

23  firefighters told you, he would have

24  something on him because if he was exposed

25  to that fire, that smoke, he would have

427

1    something on him.  He had nothing.  Because

2    remember when -- he has to start that

3    second fire, the first point of origin is

4    burning.

5         Only one person points the finger

6    at the three-year-old little boy, and

7    that's the Defendant.  One person.  No

8    other evidence supports that.  In fact, all

9    the evidence supports Bubba was nowhere

10   near it.

11        And why would a mother accuse her

12   three-year-old son of starting a fire?  She

13   knows he's not going to get in trouble,

14   he's three.  Place the blame on him, he's

15   three.

16        Now many people repeated those

17   words, "Bubba started the fire," but all

18   that origin -- all that came from was the

19   Defendant.  But if you recall, she only

20   said Bubba started the fire on the night of

21   the fire.  When she learned that didn't

22   make sense, the evidence didn't support

23   that, she changed her story; didn't she?

24   Bubba started the fire.  Then she learned,

25   yeah, that's not going to work, I assume

447

1    here.  And with regard to the aggravated

2    arson, that ingredient or element is

3    knowingly.  The State of Ohio had a very

4    high burden to meet.  They have not

5    successfully met that burden.  They cannot

6    prove Kayla knowingly committed the act of

7    aggravated arson.  They can show you all

8    the pictures in the world, they can bring

9    in all the phone calls in the world, they

10   can bring in all the inspectors in the

11   world, it's not going to change the fact

12   that they cannot prove that she knowingly

13   set that fire.

14         There are two plausible

15   alternative explanations; Bubba did it,

16   fell asleep with the cigarette.  Careless?

17   Sure.  Reckless?  Perhaps.  Knowingly?

18   Nope.  Can't prove it.

19         We heard about the bloody

20   handprint.  I'm not sure what that was

21   supposed to show us.  I guess that she took

22   sort of a poor route when exiting the home,

23   touched a few things, dribbled her blood

24   all over the place.  There's pets in there,

25   when she got out, she was concerned about

448

1    her children and dogs and the cat.

2            During voir dire, I talked a lot

3    about the guilt-o-meter, how it would start

4    at zero and maybe creep up depending on

5    what we've seen and heard the last two

6    days.  And in order for you to reach a

7    guilty verdict for aggravated arson, that

8    guilt-o-meter has to creep all the way up

9    to guilt to proof beyond a reasonable

10   doubt.  It has not crept up that far.  It

11   may have crept up some.

12           Officer Ricker wasn't even

13   convinced.  Investigator Winters said it

14   was his opinion that the manual that he

15   uses uses levels of scientific certainty,

16   not exact certainty, not complete proof.

17           This is a situation where an

18   accident is just an accident.  Unfortunate

19   though it may be, it sounds like the

20   firefighters did some great work, maybe

21   saved a couple pets, helped saved the

22   structure.  It sounds great.  And I

23   certainly wouldn't mean to imply that

24   they're lying to us because they're not.

25   This isn't an arson case.  Thank you.

449

1          THE COURT:  Thank you, Attorney

2     Kuhn.

3          Attorney Barr, at this time you

4     have ten minutes for your rebuttal

5     argument.

6          MR. BARR:  Thank you, Your Honor.

7          We have a criminal justice system

8     because criminals, even ones whose guilt

9     have been overwhelmingly proven to you,

10    like Kayla Ayers, don't always admit that

11    guilt.  And this system requires experts,

12    like Mr. Winters, who have to come in here

13    and give you your opinion -- their opinion

14    so that you can make decisions beyond a

15    reasonable doubt.

16         And to stand up here and to say

17    that Mr. Winters needs to find an arson

18    every once in a while to keep his job is

19    like saying every once in a while a cop has

20    to find somebody to commit a murder.  It's

21    ridiculous.  And then he wants to backtrack

22    on that and say, well, I don't want to call

23    him a liar.  But that's what he's doing.

24    He's saying that Mr. Winters came in here

25    and lied to you when he showed you the

454

1     We can't prove she acted

2   knowingly?  Ladies and gentlemen, you see

3   this picture here and you're going to see

4   these other ones here, this one right here,

5   so in order for Bubba -- there's only two

6   other plausible explanations as it's been

7   stated, that it was a cigarette, but it had

8   to be two cigarettes because we got two

9   points of origin because fire doesn't hop

10  from one side to the other, so the other

11  plausible explanation is Bubba started the

12  fire.

13     So Bubba had to crawl over that

14  mattress and get over here first and light

15  this fire.  And then he can't crawl over

16  that door there because that's a door that

17  sits high, it's a regular door just like

18  that door right there, sitting on its side,

19  you know how hard it would be for you to

20  throw your leg over it and now you're going

21  to ask a three-year-old to crawl over that

22  without knocking it over?  So then he has

23  to crawl over that burning mattress and

24  come over here to the front side of it and

25  light this part on fire.  That's plausible?

455

1      No.

2              There's one plausible explanation

3      here.  There's one person who's taken a

4      story and changed it every time she's

5      confronted with the physical evidence, the

6      physical evidence that contradicts

7      everything she says.  And now that

8      guilt-o-meter is going from here to all the

9      way over here, to proof beyond a reasonable

10     doubt, because the only plausible

11     explanation in this case is that Kayla

12     Ayers took a lighter and lit that mattress

13     twice.  The Baking Soda's been added to

14     these cookies, bake them, because Kayla

15     Ayers is guilty and it's proven beyond a

16     reasonable doubt.  Thank you.

17             THE COURT:  Thank you, Attorney

18     Barr.

19             At this point I'm going to

20     continue with my instructions of law.  And

21     at this point we're on page 13 under the

22     Deliberation Instructions.

23             And at this time I'm going to ask

24     counsel, before I go on instructing the

25     jurors with reference to the procedure of

482

```
 1            THE COURT:  All right.  Now, Juror
 2     number 24, have you -- has your jury
 3     reached a verdict --
 4            JUROR #24:  We have.
 5            THE COURT:  -- in this case?  You
 6     have?  All right.  Could you please hand
 7     the verdict forms in the envelope to the
 8     bailiff?
 9            Okay.  The Court having reviewed
10     the verdict forms and hereby pronounces the
11     verdict as follows:  In the Court of Common
12     Pleas, Stark County, Ohio:  State of Ohio,
13     Plaintiff, versus Kayla Jean Ayers,
14     Defendant, Case number 2012 CR 1567,
15     verdict as to the offense of Aggravated
16     Arson:  We, the jury in this case, being
17     duly impaneled and sworn, do find, by proof
18     beyond a reasonable doubt, the Defendant,
19     Kayla Jean Ayers, guilty of the offense of
20     Aggravated Arson as charged in Count One of
21     the indictment in violation of Revised Code
22     2909.02(A)(2).
23            Each of us said jurors concurring
24     in said verdict signs his or her name
25     hereto the 30th day of January, 2013.  And
```

483

1   the verdict form is signed by all 12

2   members of the jury.

3            The next verdict form is as

4   follows:  In the Court of Common Pleas,

5   Stark County, Ohio, State of Ohio,

6   Plaintiff versus Kayla Jean Ayers,

7   Defendant, Case number 2012 CR 1567,

8   verdict as to the offense of Endangering

9   Children:  We, the jury in this case, being

10  duly impaneled and sworn, do find, by proof

11  beyond a reasonable doubt, the Defendant,

12  Kayla Jean Ayers, guilty of the offense of

13  Endangering Children as charged in Count

14  Two of the indictment in violation of

15  Revised Code 2919.22(A).

16           Each of us said jurors concurring

17  in said verdict signs his or her name

18  hereto the 30th day of January, 2013.  And

19  the verdict form is signed by all 12

20  members of the jury.

21           At this time I'm going to ask

22  counsel if they wish to approach and review

23  the verdict forms?

24           MR. BARR:  No, Your Honor.

25           MR. KUHN:  Yes, please, Judge.

Massillon Fire Department

Interview Report

ALARM #       3484
Subject:       Kayla Ayers
INTERVIEWER: Inspector Winters
LOCATION:  Affinity ER Room 9
DATE: 10/03/2012
TIME STARTED: 21:22
TIME ENDED: 21:45

Present Sgt. Brian Muntean Massillon Police Department.

On interview with Kayla she stated that she was in the basement folding clothes, and her ▓▓▓▓▓ was with her, Kayla states ▓▓▓▓▓ was playing with a lighter at the time.

Question: Did you see ▓▓▓▓▓ Set the mattress on fire?

Answer: No I did not.

Question: What alerted you of the fire?

Answer: I saw the fire on the bed.

Question: Where was ▓▓▓▓▓ at?

Answer: He was standing at the end of the bed.

Question: what did you do next?

Answer: I took a blanket and started fanning it but it did not work, so I grab a glass of water and threw it on the fire, and I went back to the washing machine and got more water to put on the fire.  When I was running back to the fire, I trip and fell with the glass in my hand, and that how I cut my right hand.

Kayla States she never left he ▓▓▓▓ alone at any time.  Kayla also states the fire grew in size quickly.
Question: Did you fall asleep at any time?

Answer: No

Question: Are you on any meds?
Answer: Yes I take Aderol for AHD and that's it.



DEFENDANT'S EXHIBIT
E

Ayers Reports 000124
(rec'd August 2019)

# NARRATIVE SUPPLEMENT

| | | INCIDENT NUMBER |
|---|---|---|
| | | 12-17527 |
| VICTIM ▓▓▓▓▓ | OFFENSE  Endangering children | INCIDENT DATE / TIME  10/03/2012  2021 |

**Narrative Type:** Supplement          **Topic:**

**Narrative Reporting Officer:**  Muntean, Brian  SGT-70

   I was called by the MFD arson investigator (R/P) to Affinity and spoke with the suspect. The suspect is the mother of the listed victim. The suspect appeared to be very lethargic (there was no odor of alcoholic beverage) and did admit to using prescription meds that are prescribed to her. The suspect first stated that her three year old must have caught the mattress on fire, as she was doing laundry, and the lighter was lying around in the basement. After further questioning about the incident, she admitted that she "may have fallen asleep," but that she was not sure. I advised her that it's not likely that a 3 year old would take a lighter and light a mattress on fire, and then she changed her mind and again said that he must have started the fire.

   The suspect had lacerations to her hand, which she stated had been caused when she dropped a glass of water while trying to put out the fire. There was broken glass on the ground near the burned mattress.

   I did make contact with Jennifer of Stark Co. CPS, and advised her of the situation. There are three children in the home, and they all were left in the care of the neighbor ▓▓▓▓▓▓▓▓▓▓▓ since the home was not suitable for habitation for a while after the fire.

   MFD arson investigator Reggie Winters and I went to interview the three year-old, as much as we could, regarding what had happened. He did respond by shaking his head "yes" when Reggie asked if Mommy had fallen asleep before the fire. Reggie was going to try to see about getting some special counseling for young children who are subjected to fires through Akron Children's Hospital.

   In addition, there had been a check-well-being call recently, where it was suspected that the mother was under the influence of something (U-106 was sent). As noted earlier, I am going to go to the city prosecutor to discuss a charge of endangering children.

Children are:

| ON CLEARED | A ☐ DEATH OF OFFENDER | D ☐ VICTIM REFUSED TO COOP. | G ☐ ARREST - JUVENILE | J ☐ CLOSED | DATE CLEARED |
|---|---|---|---|---|---|
| | B ☐ PROSECUTION DECLINED | E ☐ JUVENILE / NO CUSTODY | H ☐ WARRANT ISSUED | K ☐ UNFOUNDED | |
| | C ☐ EXTRADITION DENIED | F ☐ ARREST - ADULT | H ☒ INVEST. PENDING | U ☐ UNKNOWN | |

| REPORTING OFFICER  Muntean, Brian | BADGE NO.  SGT-70 | DATE  10/03/2012 |
|---|---|---|
| APPROVING OFFICER  Pahlau, Richard | BADGE NO.  LT-43 | DATE  10/04/2012 |



DEFENDANT'S EXHIBIT G

Ayers Reports 000126
(rec'd August 2019)

## MASSILLON FIRE DEPARTMENT
### FIRE PREVENTION BUREAU / VOLUNTARY STATEMENT

Date: 10-4-12    Time: 10:21    Place: ▮▮▮▮▮▮▮▮
Name: Jeff Ayers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮    Age:▮
Home Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

I declare that the following statement is made of my own free will and it is true.

I have been Trying To help my daughter
Kayla get on her feet. I provided a place To
stay for her, her boyfriend and her children. She
came To Ohio 10 months ago. She has accomplished
nothing. No Phone, No Car. No place To live. When
I asked her To leave, She Told me she would burn
This Mfer down before she left. I am In fear for
my safety for me & my family.

JA

JA

JA

JA

Initials: JA    Page 1 of 1
(over)


DEFENDANT'S EXHIBIT
4

Ayers Reports 000007
(rec'd August 2019)

Please see attached Disc for Exhibit I: *Police Station Interview*



### 🖳 Case Information

# KAYLA JEAN AYERS

Assigned to Judge Farmer in Stark County Common Pleas Court

## 2012CR1567

### Charges

1. 2909.02 (A) (2) [F2] AGGRAVATED ARSON
2. 2919.22 (A) [M1] ENDANGERING CHILDREN

### Name

AYERS, KAYLA JEAN

### Date of Birth

Feb 10, 1988

### Address

185 26TH ST SE
MASSILLON, OH 44646

### Case Status

Found guilty on January 28th 2013.

### Next Action

None

### Sentence

7 years in jail.

### Attorney

GEORGE URBAN

### Money Owed

| Total | Payments | Balance |
|---|---|---|
| $4,011.39 | $8.35 | $4,003.04 |



## 🗐 Docket

| ▲ Date | Docket Entry |
| --- | --- |
| Oct 15, 2012 | DEFENDANT BOUND OVER FROM MASSILLON MUNICIPAL COURT, ON Oct 12, 2012 |
| Oct 15, 2012 | BINDOVER RECEIVED FROM MASSILLON MUNICIPAL COURT, 2012CRA02598 2909.02A2 AGGRAVATED ARSON F2 |
| Oct 15, 2012 | NOTICE OF BINDOVER SENT TO STARK COUNTY SHERIFF. |
| Oct 15, 2012 | DEFENDANT KAYLA AYERS ARRESTED ON October 04, 2012 |
| Oct 15, 2012 | DEFENDANT WAS REPRESENTED IN MASSILLON MUNICIPAL COURT BY FLYNN, BETH |
| Oct 15, 2012 | ON OCT 5, 2012 DEFENDANT HELD IN LIEU OF $50,000.00 TEN PERCENT |
| Oct 26, 2012 | SUBPOENA GRAND JURY - FILED |
| Oct 29, 2012 | SUBPOENA GRAND JURY - RETURNED SERVED |
| Nov 6, 2012 | INDICTMENT FILED. DEFENDANT INDICTED ON CHARGES OF 2909.02 (A) (2) AGGRAVATED ARSON F2; 2919.22 (A) ENDANGERING CHILDREN M1; |
| Nov 6, 2012 | ARRAIGNMENT SET ON 11-09-2012 |
| Nov 6, 2012 | WARRANT ON INDICTMENT AND COPY OF INDICTMENT ISSUED 11-06-2012 TO KAYLA JEAN AYERS BY SHERIFF TO BETH A FLYNN BY HAND DELIVERY |
| Nov 6, 2012 | CASE RANDOMLY ASSIGNED TO JUDGE COURTROOM 3 |
| Nov 7, 2012 | WARRANT ON INDICTMENT RETURNED ON 11-07-2012; SERVED ON 11-06-2012 BY SHERIFF |
| Nov 7, 2012 | INDICTMENT RETURN - SERVED 11/06/2012 |
| Nov 9, 2012 | KRISTINA POWERS APPOINTED ATTORNEY FOR KAYLA JEAN AYERS. HONORABLE COURTROOM 3 ASSIGNED JUDGE. PRETRIAL DATE SET. DEFENDANT KAYLA JEAN AYERS PLEAD NOT GUILTY. |

| △Date | Docket Entry |
|-------|--------------|
| Nov 9, 2012 | PRETRIAL ON 11/19/2012 08:00 AM. NOTICES SENT. |
| Nov 9, 2012 | HEARING DISPOSITION SHEET FILED. TRIAL DATE SET. NEXT APPEARANCE SET. |
| Nov 9, 2012 | FINAL PRETRIAL HEARING ON 11/26/2012 08:00 AM. NOTICES SENT. |
| Nov 9, 2012 | TRIAL ON 12/03/2012 09:00 AM NOTICES SENT. |
| Nov 9, 2012 | COURT REPORTER CERTIFICATE FILED |
| Nov 9, 2012 | DEFENDANT'S - REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 9, 2012 | DEFENDANT'S - REQUEST FOR BILL OF PARTICULARS - WITH PROOF OF SERVICE FILED. |
| Nov 14, 2012 | STATE'S BILL OF PARTICULARS FILED WITH PROOF OF SERVICE FILED. |
| Nov 14, 2012 | STATE'S - REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 14, 2012 | STATE ' RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 15, 2012 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Nov 19, 2012 | HEARING DISPOSITION SHEET FILED. HEARING HELD. NO CHANGE IN STATUS. LEAVE SET FOR TRIAL. |
| Nov 19, 2012 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Nov 26, 2012 | HEARING DISPOSITION SHEET FILED. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Nov 26, 2012 | FINAL PRETRIAL HEARING RESCHEDULED FROM 11/26/2012 08:00 AM TO 12/03/2012 08:00 AM NOTICES SENT. |
| Nov 26, 2012 | HEARING DISPOSITION SHEET FILED. TRIAL SET FOR 12-3-2012 IS CONTINUED UNTIL FURTHER ORDER OF THE COURT ENTRY TO FOLLOW. |

https://www.starkcjis.org/#/case/detail/CPC/2012CR1567

| ▲Date | Docket Entry |
|-------|--------------|
| Nov 27, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Nov 27, 2012 | PRETRIAL ON 11/28/2012 11:00 AM. NOTICES SENT. |
| Nov 28, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Nov 28, 2012 | TRIAL ON 12/27/2012 08:00 AM. NOTICES SENT. |
| Nov 28, 2012 | FINAL PRETRIAL HEARING RESCHEDULED FROM 12/03/2012 08:00 AM TO 12/17/2012 08:00 AM NOTICES SENT. |
| Nov 29, 2012 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 29, 2012 | COURT REPORTER CERTIFICATE FILED |
| Nov 30, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Nov 30, 2012 | PRETRIAL ON 12/03/2012 08:00 AM. NOTICES SENT. |
| Nov 30, 2012 | ORDER RELEASING MEDICAL RECORDS |
| Dec 3, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Dec 3, 2012 | PRETRIAL ON 12/10/2012 08:00 AM. NOTICES SENT. |
| Dec 7, 2012 | SUBPOENA - FILED OFF BRIAN MUNTEAN BY SHERIFF; CHRIS THOMAS BY ORDINARY MAIL W/OUT CERT OF MAILING; CHRIS THOMAS BY CERTIFIED MAIL (###447202012CR15671005!!!); JENNIFER CONLEY BY SHERIFF; KAREN BALL BY SHERIFF; JASON PANDREA BY SHERIFF |
| Dec 10, 2012 | HEARING DISPOSITION SHEET FILED. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Dec 10, 2012 | FINAL PRETRIAL HEARING RESCHEDULED FROM 12/10/2012 08:00 AM TO 12/17/2012 08:00 AM NOTICES SENT. |
| Dec 10, 2012 | SUBPOENA - RETURNED SERVED 12/10/2012 OFF BRIAN MUNTEAN; JENNIFER CONLEY; KAREN BALL; JASON PANDREA; |

| ⌂ Date | Docket Entry |
|--------|--------------|
| Dec 12, 2012 | COURT REPORTER CERTIFICATE FILED |
| Dec 12, 2012 | SUBPOENA - FILED OFF CURTISS RICKER BY SHERIFF |
| Dec 13, 2012 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Dec 13, 2012 | SUBPOENA - RETURNED SERVED 12/13/2012 OFF CURTISS RICKER; |
| Dec 14, 2012 | STATE'S RECEIPT OF DISCOVERY |
| Dec 14, 2012 | DEFENDANT'S - MOTION IN LIMINE FILED - WITH PROOF OF SERVICE FILED. |
| Dec 14, 2012 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Dec 17, 2012 | HEARING DISPOSITION SHEET FILED. COURT ORDERED COMPETENCY EVALUATION ENTRY TO FOLLOW. |
| Dec 17, 2012 | STATUS HEARING SET ON 01/07/2013 08:00 AM NOTICE SENT. |
| Dec 17, 2012 | COURT REPORTER CERTIFICATE FILED |
| Dec 28, 2012 | ORDER DIRECTING THE EVALUATION OF DEFENDANT'S COMPETENCE TO STAND TRIAL |
| Jan 11, 2013 | HEARING DISPOSITION SHEET FILED. |
| Jan 11, 2013 | PRETRIAL SET ON 01/14/2013 08:30 AM NOTICE SENT. |
| Jan 14, 2013 | HEARING DISPOSITION SHEET FILED. TRIAL DATE SET. |
| Jan 14, 2013 | TRIAL ON 02/04/2013 09:00 AM NOTICES SENT. |
| Jan 14, 2013 | SUBPOENA - RETURNED NOT SERVED CHRIS THOMAS; |
| Jan 15, 2013 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Jan 15, 2013 | STATE'S - MOTION IN LIMINE FILED - WITH PROOF OF SERVICE FILED. |
| Jan 16, 2013 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |

| ▲ Date | Docket Entry |
|--------|--------------|
| Jan 16, 2013 | FINAL PRETRIAL HEARING ON 01/23/2013 08:30 AM. NOTICES SENT. |
| Jan 16, 2013 | HEARING DISPOSITION SHEET FILED. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Jan 16, 2013 | TRIAL RESCHEDULED FROM 02/04/2013 09:00 AM TO 01/28/2013 09:00 AM NOTICES SENT. |
| Jan 17, 2013 | SUBPOENA - FILED INVEST REGGI WINTERS BY SHERIFF; JASON PANDREA BY SHERIFF; OFF BRIAN MUNTEAN BY SHERIFF; JENNIFER CONLEY BY SHERIFF; OFF CURTISS RICKER BY SHERIFF; CA CAPT R ANNEN BY SHERIFF; JOHN TYRRELL BY SHERIFF; REP STARK COUNTY JAIL BY SHERIFF; BRENNAN SCOTT BY SHERIFF; RECORDS CUSTODIAN AFFINITY MEDICAL CENTER BY SHERIFF; CHRIS THOMAS BY ORDINARY MAIL W/OUT CERT OF MAILING; JEFF AYERS BY ORDINARY MAIL W/OUT CERT OF MAILING; JEFF AYERS BY CERTIFIED MAIL (###260412012CR15671022!!!) |
| Jan 17, 2013 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Jan 18, 2013 | SUBPOENA - FILED MARY DECK BY SHERIFF |
| Jan 22, 2013 | SUBPOENA - RETURNED SERVED 01/20/2013; INVEST REGGI WINTERS; CAPT R ANNEN; JOHN TYRRELL; OFF BRIAN MUNTEAN; JENNIFER CONLEY; KAREN BALL; JASON PANDREA; OFF CURTISS RICKER; 01/17/2013 REP STARK COUNTY JAIL; 01/20/2013 BRENNAN SCOTT; 01/22/2013 RECORDS CUSTODIAN AFFINITY MEDICAL CENTER; |
| Jan 22, 2013 | SUBPOENA - RETURNED SERVED 01/21/2013 MARY DECK; |
| Jan 22, 2013 | LETTERS - PSYCHIATRIC |
| Jan 22, 2013 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Jan 23, 2013 | HEARING DISPOSITION SHEET FILED. HEARING HELD. NO CHANGE IN STATUS. LEAVE SET FOR TRIAL. |
| Jan 25, 2013 | DEFENDANT'S - MOTION IN LIMINE FILED - WITH PROOF OF SERVICE FILED. |

| ▲ Date | Docket Entry |
|--------|--------------|
| Jan 30, 2013 | SENTENCING FORM FILED ADDRESSING INCARCERATION AND CONVEY. FINAL SENTENCING ENTRY TO FOLLOW.. |
| Jan 30, 2013 | WARRANT TO CONVEY |
| Jan 30, 2013 | THE COURT ORDERS THE DEFENDANT TO BE INTERVIEWED BY RE-ENTRY PROGRAM BEFORE THE DEFENDANT IS TRANSPORTED. |
| Jan 30, 2013 | APPOINTMENT OF COUNSEL FOR APPEALS - GEORGE URBAN |
| Jan 30, 2013 | COURT REPORTER CERTIFICATE FILED |
| Jan 30, 2013 | JURY VERDICT FILED - FINDING OF GUILTY |
| Jan 31, 2013 | CONFIRMATION OF RE-ENTRY EVALUATION. |
| Feb 1, 2013 | JURY PANEL USAGE RECORD FILED |
| Feb 1, 2013 | FOUND GUILTY - DEFENDANT SENTENCED TO. MARYSVILLE JAIL ; ON CT # 1 (AGGRAVATED ARSON) FOR 7 YEAR(S) ; ON CT # 2 (ENDANGERING CHILDREN) FOR 180 DAY(S) CONC. WITH CT# : 1, FOR A TOTAL OF 7.0 YEARS INCARCERATION DEFENDENT MAY BE ELIGIBLE TO EARN DAYS OF CREDIT UNDER THE CIRCUMSTANCES SPECIFIED IN O.R.C 2967.193ANY POST RELEASE CONTROL IMPOSED. ENTITLED JAIL TIME CREDIT. OHIO REVISED CODE SECTION 2933.41 AFTER THE APPROPRIATE TIME PERIOD EVIDENCE TO BE DESTROYED PAY COSTS AND ANY MONITORING FEESPURSUANT TO ORC 120.36, IF THE DEFENDANT REQUESTED OR WAS PROVIDED REPRESENTATION BY THE STARK COUNTY PUBLIC DEFENDER, A $25.00 NON-REFUNDABLE APPLICATION FEE IS ASSESSED. NOTIFIED OF RIGHT TO APPEAL. |
| Feb 1, 2013 | NOTICE OF FELONY CONVICTION(S) SENT TO BOARD OF ELECTIONS |
| Feb 1, 2013 | DNA TEST REQUIRED PURSUANT TO O.R.C. 2901.07 |
| Feb 6, 2013 | WARRANT TO CONVEY RETURNED - SERVED 02/05/2013 DELIVERED DEFENDANT TO OHIO REFORMATORY FOR WOMEN. STARK COUNTY SHERIFF. |
| Feb 14, 2013 | JAIL TIME CREDIT (125) DAYS |

| ▲ Date | Docket Entry |
|--------|--------------|
| Feb 20, 2013 | DEFENDANT'S NOTICE OF APPEAL FILED - COURT OF APPEALS 2013CA00034 WITH PROOF OF SERVICE FILED. |
| Feb 20, 2013 | DEFENDANT'S DOCKETING STATEMENT FILED |
| Feb 20, 2013 | DEFENDANT'S PRAECIPE FOR TRANSMISSION OF RECORD WITH PROOF OF SERVICE FILED. |
| Feb 20, 2013 | DEFENDANT'S PRAECIPE FOR TRANSCRIPT WITH PROOF OF SERVICE FILED. |
| Feb 20, 2013 | DEFENDANT'S - REQUEST FOR FUNDS - WITH PROOF OF SERVICE FILED. |
| Feb 22, 2013 | SUBPOENA - RETURNED NOT SERVED JEFF AYERS; |
| Feb 22, 2013 | JUDGMENT ENTRY - GRANTING - REQUEST FOR FUNDS |
| Mar 26, 2013 | TRANSCRIPT COST |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS FILED - VOLUME 2 |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS FILED - VOLUME 3 |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS FILED - VOLUME 1 |
| Apr 4, 2013 | STATEMENT SENT TO INSTITUTION FOR $3978.39. |
| Jun 27, 2013 | DEFENDANT'S AFFIDAVIT OF INDIGENCY |
| Jun 27, 2013 | DEFENDANT'S - MOTION FOR APPOINTMENT OF COUNSEL - WITH PROOF OF SERVICE FILED. |
| Jun 28, 2013 | JUDGMENT ENTRY - DENYING - MOTION FOR APPOINTMENT OF COUNSEL |
| Oct 18, 2013 | CRIM PAYMENT RECEIVED FROM OHIO REFORMATORY FOR WOMEN - RECEIPT NO :CR147630 IN THE AMOUNT OF: $4.06 |
| Dec 9, 2013 | JUDGMENT AFFIRMED - COURT OF APPEALS 2013CA00034 |

| ▲Date | Docket Entry |
|-------|--------------|
| May 8, 2014 | JUDGMENT ENTRY - DENYING - DEFENDANT'S MOTION TO STAY EXECUTION & COLLECTION OF COSTS |
| May 13, 2014 | AFFIDAVIT OF INDIGENCY |
| May 14, 2014 | DEFENDANT'S - MOTION TO STAY EXECUTION AND COLLECTION OF COSTS |
| May 14, 2014 | JUDGMENT ENTRY - DENYING - MOTION TO STAY EXECUTION AND COLLECTION OF COSTS |
| May 28, 2015 | DEFENDANT'S - MOTION FOR CREDIT OF COMMUNITY SERVICE HOURS EARNED TOWARD PAYMENT OF FINES, COURT COSTS, AND/OR RESTITUTION |
| May 29, 2015 | JUDGMENT ENTRY - DENYING - MOTION FOR CREDIT OF COMMUNITY SERVICE HOURS EARNED TOWARD PAYMENT OF FINES, COURT COSTS, AND/OR RESTITUTION |
| Oct 19, 2015 | DEFENDANT'S - MOTION TO REDUCE OR MODIFY SENTENCE - WITH PROOF OF SERVICE FILED. |
| Oct 20, 2015 | JUDGMENT ENTRY - DENYING - MOTION TO REDUCE OR MODIFY SENTENCE |
| Oct 27, 2015 | DEFENDANT'S - MOTION TO REDUCE OR MODIFY SENTENCE (LETTER FORM) |
| Oct 27, 2015 | JUDGMENT ENTRY - DENYING - MOTION TO REDUCE OR MODIFY SENTENCE |
| Nov 9, 2015 | LETTER FROM DEFENDANT REGARDING COURT COSTS |
| Nov 18, 2015 | JUDGMENT ENTRY - DENYING - REQUEST FOR PAYMENT PLAN |
| Mar 4, 2016 | DEFENDANT'S - MOTION TO SUSPEND COLLECTION OF COURT COSTS UNTIL RELEASE FROM PRISON (LETTER FORM) |
| Mar 7, 2016 | JUDGMENT ENTRY - DENYING - MOTION TO SUSPEND COLLECTION OF COURT COSTS UNTIL RELEASE FROM PRISON (LETTER FORM) |

| ▲Date | Docket Entry |
|---|---|
| Oct 20, 2016 | CRIM PAYMENT RECEIVED FROM OHIO REFORMATORY FOR WOMEN - RECEIPT NO :CR184492 IN THE AMOUNT OF: $2.24 |
| Dec 27, 2016 | LETTER TO JUDGE FARMER |
| Jan 6, 2017 | LETTER TO JUDGE FARMER REGARDING COURT COSTS AND FINES |
| Jan 6, 2017 | JUDGMENT ENTRY: THE COURT DID ORDER THAT THE DEFENDANT PAY COURT COSTS ASSOCIATED WITH THIS MATTER |
| Jan 12, 2017 | CRIM PAYMENT RECEIVED FROM OHIO REFORMATORY FOR WOMEN - RECEIPT NO :CR187274 IN THE AMOUNT OF: $2.05 |
| Feb 15, 2017 | LETTER TO JUDGE FARMER FILED |
| Feb 15, 2017 | JUDGMENT ENTRY - DENYING - (LETTER) MOTION FOR PAYMENT PLAN AND REQUEST TO WAIVE COURT COSTS |
| Feb 12, 2018 | DEFENDANT'S - MOTION FOR JUDICIAL RELEASE - WITH PROOF OF SERVICE FILED. |
| Feb 12, 2018 | JUDGMENT ENTRY - DENYING - MOTION FOR JUDICIAL RELEASE |

Affidavit

NOV 25 2019

I Kayla Ayers hereby swear that the following is accurate and true to the best of my knowledge.

1.) Kayla J. Ayers

1.) My name is Kayla J. Ayers, I am 30 years old and I live in Stark County, Ohio. I was charged with Aggravated Arson a second degree felony in October of 2012. I was convicted of this crime in 2013, the month of January.

2.) I did not set the fire that I was accused of setting.

3.) I was constantly detained in the Stark County Jail for the entire duration of time between the date I was charged until I was sent to prison.

4.) My representing attorneys were Kristina Powers and later Matthew Kuhn

5.) I do not recall ever discussing anything about getting an arson expert.

DEFENDANT'S EXHIBIT

K

6.) I recall Matthew Kuhn Stating that he needed more time to review my case as he was just appointed to me, However I do not recall mention of getting an Arson expert to look into my case. In fact, I am positive that he never said he wanted to have an expert review my case.

7.) I was In fear of where my children were and that they may have been placed with CPS. I wanted to be home with them. I Knew I was innocent and there wasn't any way I could be convicted of Something I did not do.

8.) During my first 4 months "120 days" of Prison I was unable to pay for legal Services therefore I attempted to have a public defender represent me. George Urban represented me for my appeal and I tried to have OPD represent me for post-Conviction relief, They would not represent Me.

9) When I was Convicted I had finished 10th grade of High School. I have no education or Knowledge of Arson investigation or I am N.A. but Fire Science.

10) During My first 120 days of incarceration I was unable to pay for a private Arson expert. I was unaware that the possibility existed for an Arson expert to Challenge the Investigator.

11) When I was Sentenced to Prison I felt very hopeless. I felt like everything I believed in pertaining to the Justice System was a lie. I felt alone and like the fact that I was innocent didn't matter. Nobody was listening. I was initially very sad but I have always maintained my Innocence. I am beginning to feel more hopeful about my future.

State of Ohio } ss.     Kayle J. Ayers  11-14-19

County of Stark }

NATISHA RIGGS
Notary Public, State of Ohio
My Comm Expires April 21, 2020
Recorded in Stark County

Sworn and subscribed before me this 14th

_____ 18, 2019.

Natisha Riggs

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

STATE OF OHIO,                         :        Case No.  2012 CR 1567

   Plaintiff,                :

  -v-                           :        HON. KRISTIN G. FARMER

KAYLA AYERS,                           :

   Defendant.                :

---

## PROFFER OF TESTIMONY OF ATTORNEYS KRISTINA R. POWERS AND MATTHEW KUHN IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL INSTANTER

NOW COMES undersigned, Brian Howe, and having been duly sworn and cautioned, proffers as follows regarding the expected testimony of attorneys Kristina R. Powers and Matthew Kuhn.

1.  In preparation for this matter, undersigned counsel attempted to communicate with Matthew Kuhn and Kris Powers, the attorneys who represented Ms. Ayers leading up to her conviction in January 2013. Although Ms. Powers and Mr. Kuhn were willing to discuss certain aspects of the case over the phone, neither attorney would provide an affidavit regarding relevant facts about their representation. Without cooperation from Ms. Ayers' trial attorneys, undersigned counsel hereby proffers their testimony as follows in support of Ms. Ayers' *Motion for New Trial*, until such time as they may be subpoenaed to testify in this matter.

2.  Ms. Powers refused to provide an affidavit confirming relevant details about her representation of Ms. Ayers. Upon information and belief, if called to testify truthfully before this Court, Ms. Powers would confirm the following facts: Ms. Powers represented Kayla Ayers between approximately October 2012 and mid-January 2013, in her capacity as an attorney with the Stark County Public Defender's Office. In the course of her representation, Ms. Powers did not consult with or retain an expert on arson or fire investigations regarding the specific facts of Ms. Ayers' case. Ms. Powers did not receive any report from the State of Ohio regarding Mr. Winters' conclusion that the fire had two or more points of origin. The Stark County Public Defender's Office file for Ms. Ayers does not contain any contemporaneous notes from discussions with independent



arson experts, nor does it contain any report from the State of Ohio claiming that the fire had multiple points of origin.

3. Mr. Kuhn would not provide an affidavit or other written statement regarding his representation of Ms. Ayers. Upon information and belief, if called to testify truthfully before this Court, Mr. Kuhn would confirm the following facts: Mr. Kuhn represented Ms. Ayers between approximately January 15 and January 28, in his capacity as an attorney with the Stark County Public Defender's Office. Mr. Kuhn was lead defense attorney in Ms. Ayers' trial. During his time as Ms. Ayers' counsel, Mr. Kuhn does not recall consulting with or retaining an expert on arson or fire investigations. If he had done so, he would have taken notes of the consultation / retainer, and he would have placed those documents in the file. Mr. Kuhn does not recall ever having received a Crim.R.16(K) report that stated the fire had multiple points of origin. If Mr. Kuhn had received such a report, he would have placed it in the file. At the time of Ms. Ayers' trial, Mr. Kuhn did not have any specialized knowledge or expertise in arson investigations.

_____
Brian Howe (0086517)
Attorney for Defendant Kayla Ayers

Sworn and subscribed before me this 10th day of April, 2020.

_____
Notary Public

STEPHANIE NICOLE KING
Notary Public, State of Ohio
My Commission Expires
January 29, 2022

Insured:  Chris Thomas
Case / File #12- 3484

**Conclusion:**
After the examination of the fire scene, it was determined the fire originated in the basement on the bed.  After the examination of the fire scene, interviewing witnesses and interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of NFPA 921; 'A Guide for Fire and Explosion Investigation', it is my opinion the ignition source for the fire was some type of open flame.  The materials first ignited were ignitable liquid vapors (gasoline).  The act or omission that brought the ignition source and the material first ignited together was the deliberate act of a person or persons. Using these elements of fire cause, the cause of the fire is Incendiary.

Massillon Prevention Bureau
Inspector Reggie Winters





This fire scene examination was conducted using a scientific methodology, the basic method of fire investigation and a systematic approach as discussed in the 2011 edition of NFPA 921; " A Guide for Fire and Explosion Investigation".

**Executive Summary:** After the examination of the fire scene it was determined the fire originated on the first floor, near the south end of the north/south hallway, at/on the floor. After the examination of the fire scene, interviewing witnesses and interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of NFPA 921; "A Guide for Fire and Explosion Investigation," it is my opinion the ignition source for the fire was some type of open flame. The materials first ignited were blankets on the bed. The act or omission that brought the ignition source and the material first ignited together was the deliberate act of a person or persons. Using these elements of fire cause, the cause of the fire is Arson.

**Attachments/Exhibits:**
- Copy of Fire Department Report
- Copy of Written Statement
- Photographs





# IN THE COURT OF COMMON PLEAS

## STARK COUNTY OHIO

---

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2012CR1567 |
| | ) | |
| | ) | Hon. Kristin G. Farmer |
| vs. | ) | |
| | ) | |
| KAYLA J. AYERS, | ) | |
| | ) | |
| Defendant. | ) | |

---

Affidavit of John J. Lentini
Page 1 of 19



DEFENDANT'S EXHIBIT

# TABLE OF CONTENTS

I. Introduction...................................................................................................3

II. Retention, Scope of Work and Conclusions ...................................................5

III. There Were Not Two Points Of Origin.........................................................6

IV. Mr. Winters's Conclusion That the 3-Year-Old Boy Could Not Have

    Set the Fire Is Illogical.............................................................................12

V. Mr. Winters Did Not Follow NFPA 921.......................................................14

VI. Mr. Winters Is Not Qualified to Investigate Fires per the Industry Standard.............16

VII. Conclusion...................................................................................................19

## I. Introduction

1.

My name is John J. Lentini. I am over the age of twenty-one, am not suffering from any disabilities and I make this affidavit from personal knowledge of the matters addressed herein.

2.

As a Certified Fire Investigator, I have extensive training in the investigation of fires and explosions. I have personally investigated more than 2,000 fire scenes in my career. I hold certifications for fire scene investigation from both the International Association of Arson Investigators (IAAI) and the National Association of Fire Investigators (NAFI). Also, I hold a certification for laboratory analysis of fire debris from the American Board of Criminalistics (ABC). I have testified as an expert more than 200 times. I have been accepted as an expert in fire investigation, chemical analysis of fire debris, the standard of care in fire investigation, and the standard of care in chemical analysis of fire debris.

3.

My formal college education involved the natural sciences (chemistry, biology, physics and mathematics). Following graduation, I spent approximately three years working at the Georgia Bureau of Investigation crime laboratory, where I received extensive training and experience in the examination of physical evidence removed from fire scenes. A copy of my résumé is set forth in the Appendix as Exhibit 1.

4.

I have served on the IAAI Forensic Science Committee and am a past chair of that committee. I am also a past member of the Board of Directors of the American Board of Criminalistics, and I served three terms as Chair of the American Society for Testing and

Materials (ASTM) Committee E-30 on Forensic Sciences. I am a past chair of ASTM Subcommittee E30.01 on Criminalistics. In 1998, I was selected by the U.S. Justice Department as one of two civilians to serve on a planning panel for a document setting forth national guidelines for fire and arson investigation. The panel published its recommendations in June 2000 in a document entitled *Fire and Arson Scene Evidence: A Guide for Public Safety Personnel*. I have also served as a principal Member of the National Fire Protection Association (NFPA) Technical Committee on Fire Investigations, which publishes *NFPA 921, Guide for Fire and Explosion Investigations*. I served on that Technical Committee from 1996 through 2017. I currently serve on the NFPA Technical Committee on Fire Investigator Professional Qualifications, which publishes NFPA 1033 *Standard for Professional Qualifications for Fire Investigator*.

5.

My full-time occupation involves the investigation of fires, the examination of physical evidence from fire scenes, and the review of the work of other fire investigators. I have studied extensively regarding the standard of care for fire investigation, and I have helped to shape that standard through my publications and my work on the NFPA Technical Committees. My work with the IAAI Forensic Science Committee, with ASTM Committee E30 on Forensic Sciences, and with the NFPA Technical Committee on Fire Investigations makes me qualified to inform the Court on the history and evolution of the state of the art in fire investigation, and the investigation that was conducted at the Ayers fire scene by the State's expert.

6.

I have authored a textbook on fire investigation entitled *Scientific Protocols for Fire Investigation*, which was published in 2006 by CRC Press. The Second Edition was published in

2013 and the Third Edition was published in 2018. I have also authored more than 20 publications on fire investigation in peer-reviewed and trade journals.

## II. Retention, Scope of Work and Conclusions

### 7.

I was requested by the Ohio Innocence Project to evaluate the facts and circumstances surrounding the fire that occurred on October 3, 2012, that damaged the residence located at 185 26th Street, S.E. in Massillon Ohio, in which Kayla Ayers and her family were residing.

### 8.

I was asked to render an opinion with respect to the methodology and conclusions presented at trial by the State's expert, Reginald Winters. I have carefully reviewed the report and testimony of Mr. Winters. Additionally, I have reviewed multiple photographs of the scene, including those introduced as Exhibits during Mr. Winters's testimony.

### 9.

**As a result of my education, training, and experience, I conclude unequivocally and to a reasonable degree of professional certainty that:**

a. **The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology.**

b. **In his testimony, Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers' son Brennan.**

c. **Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways**

d.  **Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard.**

### III. There Were Not Two Points Of Origin.

10.

Mr. Winters testified that there were two points of origin on the mattress in the basement (Transcript at pages 250 and 302). The opinion that the physical evidence showed two origins was the only evidence presented that this fire was incendiary. Mr. Winters also claimed the ability to discern *the order* in which the two points were ignited. Absent a videotape of the fire's ignition, both of these conclusions are impossible for the following reasons:

11.

In the Ayers' case, all of the fire damage on the mattress is *contiguous*. Fire investigators are cautioned against making a determination of multiple fires unless there are clear areas of unconnected burning. Thus, the determination of two origins was invalid.

12.

NFPA 921 lists "multiple fires" as the first indicator of an incendiary cause. It is reasonable that it provides this guidance because accidental fires almost always start in one and only one place. The standard cautions, however, of numerous circumstances that can lead to the appearance of multiple origins.

13.

Mr. Winters's conclusion could only be reached if there was an unburned area between the two alleged points of origin. In the instant case, however, the fire damage does not come

close to meeting the definition of multiple fires. As shown in **Figure 1** below, Image 1210281

(350), no such unburned area exists.



**Figure 1.** Contiguous fire damage on the mattress. There is no credible means of determining more than one origin on this mattress.

14.

NFPA 921 contains the following language on multiple origins:[1]

**22.2.1 Multiple Fires**. Multiple fires are two or more separate, nonrelated, simultaneously burning fires. The investigator should search to uncover any additional fire sets or points of origin that may exist. In order to conclude that there are multiple fires, the investigator should determine that any "separate" fire was not the natural

---

[1] All references to NFPA 921 in this affidavit are to the 2011 edition, which Mr. Winters cited in his report at page 2 and his testimony at pages 283 and 300.

outgrowth of the initial fire.

**22.2.1.1** Fires in different rooms, fires on different stories with no connecting fire, or separate fires inside and outside a building are examples of multiple fires. A search of the fire building and its surrounding areas should be conducted to determine whether there are multiple fires.

**22.2.1.2** Separate fires that are not caused by multiple deliberate ignitions can result from the following:

(1) Fire spread by conduction, convection, or radiation

(2) Fire spread by flying brands

(3) Fire spread by direct flame impingement

(4) Fire spread by falling flaming materials (i.e., drop down) such as curtains

(5) Fire spread through shafts, such as pipe chases or air conditioning ducts

(6) Fire spread within wall or floor cavities within "balloon construction"

(7) Overloaded electrical wiring

(8) Utility system failures

(9) Lightning

15.

The "fires" on the mattress are not "separate." They are not "non-related." There is no evidence that they were "simultaneously burning." The damage is indistinguishable from damage caused by normal fire spread from a single point of origin. In the absence of evidence to the contrary, normal fire spread by direct flame impingement is the default interpretation of the damage.

16.

Mr. Winters attempted to provide evidence of multiple fires by showing two plumes. He conflates the presence of two "V-patterns" with two origins. The plume patterns shown on the column and the wall in **Figure 2** below, are what would be expected from a single fire on the mattress.



**Figure 2.** Two patterns caused by the intersection of a fire plume with a vertical surface. The pattern on the column only appears "separate" because the column is separate from the wall.

17.

In his testimony at page 230, Mr. Winters stated, "What we look for is what we call a fire pattern which is a V-pattern. That would indicate where a fire started at . . ."

18.

Contrary to Mr. Winters's claim, all that a V-pattern indicates is that there was a fuel package burning near the base of the V, and the plume generated by that burning fuel package was intersected by a vertical surface such as a wall or column. NFPA 921, in the section on origin determination states:

**17.4.1.3 Pattern Generation.** The investigator should not assume that the fire at the origin burned the longest and therefore fire patterns showing the greatest damage must be at the area of origin. Greater damage in one place than in another may be the result of differences in thermal exposure due to the differences in fuel loading, the location of the fuel package in the compartment, increased ventilation, or fire-fighting tactics. For similar reasons, a fire investigator should consider these factors when there is a possibility of multiple origins.

**17.4.1.3.1** The size, location, and heat release rate of a fuel package may have as much effect on the extent of damage as the length of time the fuel package was burning. An area of extensive damage may simply mean that there was a significant fuel package at that location. The investigator should consider whether the fire at such a location might of spread there from another location where the fuel load was smaller.

19.

Mr. Winters also explained his opinion regarding fire patterns by describing the condition

of the bedsprings. In his testimony at page 240, Mr. Winters stated,

A     After that I stepped back, I looked and I started looking at the mattress

springs itself, and I started noticing the mattress itself had an unusual burn pattern

to it.

Q     What do you mean by unusual burn pattern?

A     Well, I had noticed that the—which would have been the east end of the

bed, towards the east and on the north side, had a heavier char pattern where the

springs—what we call—I'll try to explain it to you, it's called calcination. It's

basically where the fire burned so hot that it will turn the springs white and they'll

collapse. And on that and I had noticed where the fire had burnt the hottest and it

traveled westward. Like it was — that's where, right there, made a conclusion that

I had a fire start there that was low and it started there and traveled west toward

the wall because that's where the material was at, that it was consuming as it was

burning.

20.

As will be explained below in the qualifications discussion, the term "calcination" is

totally out of place. The correct term is "annealing." Mr. Winters's entire approach to examining

bedsprings is flawed. NFPA 921 provides the following guidance about furniture springs:

**6.2.14 Collapsed Furniture Springs.** The collapse of furniture springs may provide the investigator with clues concerning the direction, duration, or intensity of the fire. However, the collapse of the springs cannot be used to indicate exposure to a specific type of heat or ignition source, such as smoldering ignition or the presence of an ignitable liquid. The results of laboratory testing indicate that the annealing of springs, and the associated loss of tension (tensile strength), is a function of the application of heat. These tests revealed that short-term heating at high temperatures and long-term heating at moderate temperatures over 400 °C (750 °F) can result in a loss of tensile strength and in the collapse of the springs. Tests also revealed that the presence of a load or weight on the springs while they are being heated increases the loss of tension.

**6.2.14.1** The value of analyzing the furniture springs is in comparing the differences in the springs to other areas of the mattress, cushion, or frame. Comparative analysis of the springs can assist the investigator in developing hypotheses concerning the relative exposure to a particular heat source. For example, if at the one end of the cushion or mattress the springs have lost their strength, and at the other end they have not, then hypotheses may be developed concerning the location of the heat source. The hypotheses should take into consideration other circumstances, effects (such as ventilation), and evidence at the scene concerning duration or intensity of the fire, area of origin, direction of heat travel, or relative proximity of the heat source. The investigator should also consider that bedding, pillows, and cushions may shield the springs, or provide an additional fuel load. The portion with the loss of spring strength may indicate more exposure to heat than those areas without the loss of strength. The investigator should also consider the condition of the springs prior to the fire.

Nothing in Mr. Winters's report or testimony indicates that he considered these "other circumstances." Further, the photograph shown below as **Figure 3**, presented to the jury as Exhibit 3D, shows that there was a large amount of material on the bed, which accounts for the shape of the fire pattern on the wall. This image was captured before the mattress was removed from the basement.



**Figure 3.** View of the mattress in place, prior to its removal. Note the large quantity of bedding materials against the wall, which kept the wall behind the pile from burning.

## IV. Winters's Conclusion that the 3-Year-Old Boy Could Not Have Set the Fire Is Illogical

21.

Mr. Winters's conclusion that there were two points of origin has been discussed. He went further when he concluded, without any basis, the order in which the two fires were set. Even assuming for argument's sake that there were two points of origin, there is no reasonable means, and none was articulated, to determine the order of ignition. Yet Mr. Winters testified (page 303-305):

A       The one on the post was started first. The one at the second—the one on the south side, north side of the bed, was started second.

Q       Okay. Now this is a door; is that correct?

A       Yes, sir.

Q       And that door was there?

A       That door was there.

Q       Okay. Now, how big was Brennan?

A       I'd say about that tall (Indicating)

Q       Would he be able, in your opinion, to lift his leg up over that door?

A       No, sir.

Q       So he would have had to crawl over that bed—

A       Yes.

Q       —start that fire on that side –

A       Yes.

Q       —then crawl over while it's burning –

...

Q       Back to my question. The original point of origin right here?

A       Yes, sir.

Q       Then someone would have to crawl across the bed and start another fire over here—

A       Correct.

Q       —while this one was lit?

A       Correct.

This is circular reasoning. It was only impossible for the boy to set the fire if there were, in fact, two points of origin and the fires were set in the order speculated by Mr. Winters. Your affiant has only rarely seen such speculative testimony actually admitted into evidence. One example was the Cameron Todd Willingham case from Texas, which is widely recognized as a grave miscarriage of justice. The fire marshal in that case first opined, without evidence, that

there was a pool of flammable liquid burning on the floor, and then inferred that the Mr. Willingham was lying about his activities because his bare feet did not get burned running through the pool of burning flammable liquid.

22.

An additional logically flawed observation presented to the jury was Mr. Winters's statement that the boy exhibited no smoke on his person. Mr. Winters saw no smoke on the defendant, and found only light smoke when he swabbed her nostrils. He did not swab the boy's nostrils, so there is no way to reliably infer that he was not exposed to the fire.

23.

Brennan's ability to use a cigarette lighter was tested. The fact that he was able to operate the lighter makes it impossible to rule out child fire play as the cause of the fire. According to NFPA, children playing with fire set an average of 7,100 structure fires per year from 2007-2011. (Source: Campbell, R., (2014), "Playing With Fire, NFPA, Quincy, MA)

### V. Mr. Winters Did Not Follow NFPA 921

24.

Mr. Winters's report opens with the following sentence: "This fire scene examination was conducted using a scientific methodology, the basic method of fire investigation and a systematic approach as discussed in the 2011 edition of NFPA 921; "A Guide for Fire and Explosion Investigation." Some deviations from NFPA 921 have already been mentioned.

- o He discerns multiple fires that do not meet the definition of multiple fires
- o He conflates V-patterns with the fire's origin
- o He misinterprets damage to bedsprings

Additionally, his testimony reveals other deviations from NFPA 921 in his approach to fires. His report states that he "uses the levels of scientific certainty as discussed in the 2011 edition of NFPA 921," but his report does not discuss his own level of certainty. NFPA 921 provides this guidance about levels of certainty:

> **4.5 Level of Certainty.** The level of certainty describes how strongly someone holds an opinion (conclusion). Someone may hold any opinion to a higher or lower level of certainty. That level is determined by assessing the investigator's confidence in the data, in the analysis of that data, and testing of hypotheses formed. That level of certainty may determine the practical application of the opinion, especially in legal proceedings.
>
> **4.5.1** The investigator should know the level of certainty that is required for providing expert opinions. Two levels of certainty commonly used are probable and possible:
> (1) Probable. This level of certainty corresponds to being more likely true than not. At this level of certainty, the likelihood of the hypothesis being true is greater than 50 percent.
> (2) Possible. At this level of certainty, the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypotheses are equally likely, then the level of certainty must be "possible."
>
> **4.5.2** If the level of certainty of an opinion is merely "suspected," the opinion does not qualify as an expert opinion. If the level of certainty is only "possible," the opinion should be specifically expressed as "possible." Only when the level of certainty is considered "probable" should an opinion be expressed with reasonable certainty.

Neither the word "possible" nor the word "probable" appear anywhere in Mr. Winters's report. Further, while NFPA 921 does discuss the level of certainty, it takes no position on the concept of "scientific certainty." In fact, it states,

> **4.5.3 Expert Opinions.** Many courts have set a threshold of certainty for the investigator to be able to render opinions in court, such as "proven to an acceptable level of certainty," "a reasonable degree of scientific and engineering certainty," or "reasonable degree of certainty within my profession." While these terms of art may be important for the specific jurisdiction or court in which they apply, **defining these terms in those contexts is beyond the scope of this document.** [Emphasis added.]

Affidavit of John J. Lentini
Page 15 of 19

25.

Perhaps more importantly, Mr. Winters believes that accelerated fires burn hotter than accidental fires, and he seems confused about the concept of vapor density. In his testimony at page 232, he stated, "And usually with ignitable liquids, they burn hotter faster because the gas will burn, give you a flash fire where it will ignite fast. Because of the vapor density of it, it will flash and it will go out automatically." NFPA 921 has, since its first edition in 1992 stated,

> **6.2.2.2** Wood and gasoline burn at essentially the same flame temperature. The turbulent diffusion flame temperatures of all hydrocarbon fuels (plastics and ignitible liquids) and cellulosic fuels are approximately the same, although the fuels release heat at different rates.

Further, vapor density has little to do with whether a fire will flash. Consider that both natural gas, which has a vapor density less than air, and gasoline, which has a vapor density greater than air can be involved in flash fires.

26.

Simply stating that one followed NFPA 921 is common, but not sufficient. A fire investigator's adherence to the Guide should be evident in his reports and testimony. Because it is a guide, one is allowed to deviate from it, but such deviations should be documented and justified. Mr. Winters failed to document his deviations from NFPA 921 and so he made no attempt to justify them.

**VI. Mr. Winters Is Not Qualified To Investigate Fires Per the Industry Standard**

27.

NFPA 1033, *Standard For Professional Qualifications For Fire Investigator*, sets forth the minimum requirements for someone in either the public sector or the private sector to conduct fire investigations. This standard requires, among other things, that an investigator have

knowledge beyond the high school level of fire science, fire chemistry, and fire dynamics. Mr. Winters did not meet these minimum qualifications when he testified at the Ayers trial.

28.

Mr. Winters is unfamiliar with the terminology of fire investigation. In his testimony at page 231 he defined "incendiary." He stated, "Incendiary means open flame, whether it's a lighter, whether it's a torch, whether it's a match. That means somebody has took an open flame and put it to that product in a lineal fire." An open flame is a kind of ignition source. "Incendiary" means intentionally set, regardless of the ignition source. NFPA 921 defines "incendiary fire cause" as follows: "**Incendiary Fire Cause**. The incendiary fire is one intentionally ignited under circumstances in which the person igniting the fire knows the fire should not be ignited."

29.

Mr. Winters described the annealing of the mattress springs as "calcination." He used this term several times in his testimony beginning at page 240. Calcination is a phenomenon that occurs in gypsum drywall and plaster. It is not something that ever happens to metal springs. NFPA 921 describes calcination as follows:

> **6.2.12.1 General**. Calcination is used by fire investigators to describe numerous chemical and physical changes that occur in gypsum wallboard surfaces during a fire. Calcination of gypsum wallboard involves driving the free and chemically bound water out of the gypsum as well as other chemical and physical changes to the gypsum component itself. Calcination involves a chemical change of the gypsum to another mineral, anhydrite. Calcined gypsum wallboard is less dense than non-calcined wallboard. The deeper the calcination into the wallboard the greater the total amount of heat exposure (heat flux and duration).

Calcination of gypsum wallboard is one of the most common effects that occur during a fire. It involves simple fire chemistry.

30.

In his testimony at page 240, Mr. Winters describes the fire pattern on the mattress springs as "unusual." An investigator who has investigated only 30 fires over a five-year period has no idea what is "usual" or "unusual." That is simply insufficient experience to develop an understanding as to normal fire behavior.

31.

Mr. Winters' reports were actually more suited to a private sector investigation than a public sector investigation. Mr. Winters refers to a "date of loss" rather than a "date of fire." More glaringly, he referred to the defendant as "the insured." There is no insurance in involved in this case. The use of the term "insured" is limited to private sector investigators working for insurance companies. Mr. Winters' report uses the term "insured" four times, including a header on page 5, which reads,

> Insured: Chris Thomas
> Case/ File #12w 3484

## VII. Conclusion

32.

For all the reasons set forth above, it is my professional opinion that the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology.

FURTHER AFFIANT SAYETH NAUGHT.

John J. Lentini, CFI, D-ABC

State of Florida

County of Monroe

Sworn and subscribed before me this _29_ day of July, 2019.

Notary Public

JOSHUA P GALLO
NOTARY
PUBLIC
Comm. # GG-258853
My Comm. Expires
Oct 16, 2022
STATE OF FLORIDA



# SCIENTIFIC FIRE ANALYSIS, LLC

88005 Overseas Highway, Suite 10-134
Islamorada, FL 33036
770-815-6392
*e-mail: scientific.fire@yahoo.com, website: www.firescientist.com*

EXHIBIT 1

AUTHOR'S CURRICULUM VITAE

*Fire Investigation, Analysis and Review*
*Fellow, ASTM International, Fellow, American Academy of Forensic Sciences,*
*Member NFPA Technical Committee on Fire Investigator Professional Qualifications*
*Member, NIST/OSAC Subcommittee on Fire and Explosion Investigations*
*Diplomate, American Board of Criminalistics*



**Resume of**
**John J. Lentini, CFI, D-ABC**
Scientific Fire Analysis, LLC
88005 Overseas Highway, #10-134
Islamorada, FL  33036
(770) 815-6392
**www.firescientist.com scientific.fire@yahoo.com**

## Capabilities

He can investigate fire or explosion scenes, locate the point of origin, and chemically determine the presence of flammable liquids or explosives. He can evaluate the validity of the work of other investigators through review of reports, testimony, photographs and other data. He is familiar with fire and building codes and can determine whether a structure, product, service or installation met applicable code requirements prior to a fire or other loss. He is capable of performing all types of chemical and instrumental analyses, and giving expert testimony as to the results of his investigations and analyses.

## Scientific Fire Analysis Responsibilities

President and Principal Investigator. Provides training to fire investigators, fire litigators and the public. Conducts preliminary evaluations of customer problems. Supervises or reviews investigations in the area of fire, arson, explosion, and asphyxiation, including review of chemical analysis issues. Prepares and presents expert testimony.  Provides litigation support.

## Education

B.A. in the Natural Sciences (Chemistry, Biology, Physics), New College, Sarasota, FL, June 1973.
Postgraduate courses in Chemistry and Criminal Investigation, University of Akron, OH, 1973-74.
Twenty credit hours Graduate Level Chemistry, Georgia State University, Atlanta, GA, 1979-80.

## Training

Short Course in Instrumental Analysis, F.B.I. Academy, Quantico, VA, 1976.
Seminar on Arson and Fraud Investigation, University of Alabama at Birmingham, 1979.
Seminar on Gas Fires and Explosions, University of Alabama at Birmingham, 1980.
33rd, 35th, 37th, 39th, 40th, 42nd and 59th International Association of Arson Investigators Seminars, 1982-91.
Southeast Arson Seminar, University of Georgia, 1979-84, 1996, 2002.
1st, 2nd and 3rd Int'l Symposia on Recent Advances in Arson Analysis and Detection, 1982, 88, 90.
American Academy of Forensic Sciences (AAFS), Annual Meetings, 1988-2016.
National Fire Protection Association (NFPA) Life Safety Code Seminar, Nashville, TN, 1991.
IAAI Electrical Fire Investigation Seminar, Atlanta, GA 1991.
AAFS Workshop on Contemporary Issues of Fire Investigation and Analysis (Panelist) Seattle, WA, 1995.
FBI International Symposium on the Forensic Aspects of Arson Investigations, Fairfax, VA, 1995.
Georgia Fire Investigators Association (GFIA) Seminar on Appliance Fires, Decatur, GA, 1997.
Workshop on Fire Investigations, Forensic Science Society, Harrogate, England, 1997.
Anglo-American Fire Investigation Conference, Brunel University, Uxbridge, England, 1997.
Forensic Fire Engineering and Failure Analysis, Society of Fire Protection Engineers (SFPE), 1998.
International Fire Investigation Conference, Brunel University, Uxbridge, England, 1999.
Fire Litigation Seminar, National Association of Fire Investigators (NAFI)/NFPA, Sarasota, FL, 2000.
Lightning 101, Global Atmospherics, Inc., Atlanta, GA, 2000.
Technical Working Group on Fire and Explosion Investigations, 2nd, 3rd and 4th Annual Symposia, Orlando, FL, 2002-2004.
Fire Dynamics Seminar, NFPA Technical Committee on Fire Investigations, Baltimore, MD, 2003.

**Training (continued)**

First International Symposium on Fire Investigation, Fire Service College, Moreton, England, 2004.
10th International Fire Science & Engineering Conference (Interflam), Edinburgh, Scotland, 2004.
Introduction to Fire Dynamics Simulator and Smokeview, SFPE, Chicago, IL, 2004.
International Fire Investigation Conference, Brunel University, Uxbridge, England, 2005.
Second International Symposium on Fire Investigation, University of Cincinnati, Cincinnati OH, 2006.
Third International Symposium on Fire Investigation, University of Cincinnati, Cincinnati OH, 2008.
Fourth International Symposium on Fire Investigation, University of Maryland, Columbia, MD, 2010.
International Association of Arson Investigators Annual Training Conference, Las Vegas, NV, 2011, 2014.
Fifth International Symposium on Fire Investigation, University of Maryland, Columbia, MD, 2012.
Australian Associations of Fire Investigators, Achieving Better Outcomes, Gold Coast, QLD, 2014.
Canadian National Advanced Fire, Arson and Explosion Training Conference, Markham, ON, 2015
Louisiana Association of Arson Investigators, Annual Training Conference, Baton Rouge, LA, 2015
67th Annual Training Course, International Association of Arson Investigators, May 18, 2016, Orlando, FL.
Canadian National Advanced Fire, Arson and Explosion Training Conference, Markham, ON, 2016.

**CFI Trainer.net modules**
The Scientific Method for Fire and Explosion Investigations, 2006.
Introduction to Fire Dynamics and Modeling, 2008.
A Ventilation-Focused Approach to the Impact of Building Structures and Systems on Fire Development, 2009.
Post Flashover Fires, 2009.
Motive, Means and Opportunity: Determining Responsibility in an Arson Case, 2010.
Evidence Examination: What Happens at the Lab?, 2011.
Understanding Fire Through the Candle Experiments, 2011.
The Practical Application of the Relationship Between NFPA 1033 and NFPA 921, 2013.
NFPA 921 and 1033 2014 Editions: Important Revisions, 2014.
Fundamentals of Residential Building Construction, 2014.
Wildland Fire Investigation, 2014.
Electrical Safety, 2014.
Residential Natural Gas Systems, 2015.
Thermometry, Heat and Heat Transfer, 2017.
Fire Investigator Scene Safety, 2017.
Fire Chemistry, 2018.
Arc Mapping Basics, 2018.

**Professional Certifications and Licensure**

He holds certifications from both the International Association of Arson Investigators (IAAI) and the National Association of Fire Investigators (NAFI). He is also a certified Diplomate of the American Board of Criminalistics, with a specialty in Fire Debris Analysis.

He holds Florida private investigator's license number C 2600083. Florida has reciprocal license agreements with the following states: CA, GA, LA, NC, OK, TN, VA.

**Experience**

**Applied Technical Services, Inc.** January 1978 - October 2006
Manager, Fire Investigations. Authored over 3,000 technical reports. Supervised two fire investigators and an electrical engineer. Managed a chemical analysis laboratory for fire debris using gas chromatography-mass spectrometry (GC-MS). Analyzed more than 20,000 fire debris samples. Served as project manager for major fire investigations. Conducted over 2,000 fire scene inspections. Conducted chemical analyses, designed and conducted physical experiments to re-create fire scenarios. Provided training, consulting and expert witness testimony.

**Metallurgical Engineers of Atlanta** May - December, 1977
Fire scene inspection. Chemical analysis of fire debris. Quantitative chemical and physical analysis on all types of metal. Radiographic inspection of fittings and welds.

## Experience (continued)

**State of Georgia Crime Laboratory** August 1974 - May 1977
Qualitative and quantitative analysis of all types of physical evidence associated with violent and/or property crimes, and testifying to the results of such analyses. Responding statewide to conduct field investigations for law enforcement agencies. Instruction of law enforcement officers in the collection and preservation of physical evidence.

## Courtroom Experience

Since 1975, he has given expert testimony in over two hundred cases in civil and criminal court in several states and in the Federal Courts. He has testified for both Plaintiffs and Defendants, and has been appointed three times as a neutral (Rule 706) expert hired to advise the court. A schedule of testimony provided since 2000, both in trial and in depositions, is available upon request.

## Professional Associations

Member, National Fire Protection Association (NFPA) Technical Committee 921 on Fire Investigations, 1996-2018. (Representing ASTM Committee E30 on Forensic Sciences)
Member, NFPA Technical Committee 1033 on Fire Investigator Professional Qualifications, 2012-present.
Member, NIJ/NIST Organization of Scientific Area Committees (OSAC), Subcommittee on Fire and Explosion Investigation, 2014-present.
Fellow of the American Academy of Forensic Sciences (AAFS) 1995-present. (Member since 1988)
AAFS Criminalistics Section: Chair, Nominating Committee, 1999-2007, Co-chair Program Committee 2012, Chair, Program Committee 2013, Section Secretary, elected 2014, Section Chair, elected 2015.
Member, AAFS Ethics Committee, 2019-present.
Chair, ASTM Committee E30 on Forensic Sciences, elected 1999, re-elected 2001 and 2003.
Vice Chair, ASTM Committee E30 on Forensic Sciences, elected 1995, re-elected 1997 and 2005.
Chair, ASTM Subcommittee E 30.01 on Criminalistics, 1991-1995.
Director, American Board of Criminalistics (ABC), elected 1993, re-elected 1996.
Chair, ABC Proficiency Administration Committee, 1993-1999.
Member, Editorial Board, *Journal of Forensic Sciences*, 2003-2018.
Peer Reviewer, *Forensic Science International*, 2006-present.
Peer Reviewer, *Fire Safety Journal*, 2006-present.
Member, Scientific Working Group on Fire and Explosion Investigations (SWGFEX), 1997-2014.
Peer Reviewer, U. S. Dept. of Justice, NIJ-Office of Science & Technology, 2002, 2007-2012.
Member of the National Association of Fire Investigators (NAFI), 1996-present.
Member of the International Association of Arson Investigators (IAAI), 1978-2001, 2008-present.
Member of the Florida Chapter of the IAAI, 2008-present.
Chair, IAAI Forensic Science Committee, 1988-1991.
Member of the Metro Atlanta Fire Investigators Association, 1978-2006. President, 1981.
Member of the American Chemical Society (ACS), 1978-present.

## Awards

Journal of Forensic Sciences. Award of Merit, 2018
Saferstein Memorial Distinguished Lecturer at Northeastern University, 2017.
Society of Fire Protection Engineers, "Person of the Year" Award, 2015.
Levy Scholars and Rodin-Silverman Scholars Lecturer, U Penn Law School, 2015.
American Academy of Forensic Sciences, Criminalistics Section Special Meritorious Service Award, 2008.
Boy Scouts of America Silver Beaver Award, Atlanta Area Council, 2004.
ASTM Award of Merit, 2001.
ASTM E30 Forensic Sciences Award, 1996.

Case: 5:20-cv-01654-SL  Doc #: 15-1  Filed: 02/10/23  256 of 656.  PageID #: 523

## Publications

### Books

*Scientific Protocols for Fire Investigation*, First Edition, 2006,
   Second Edition, 2013, Third Edition, 2018, CRC Press, Boca Raton, FL

### Book Chapters

"Confronting Inaccuracy in Fire Cause Determinations," Chapter 3 in *Forensic Science Reform*, edited by Wendy Koen and C. Michael Bowers, Elsevier, 2017.

*Encyclopedia of Forensic Sciences, 2nd Edition* contributor of three entries ("Evidence Collection at Fire Scenes;" " Fire Scene Inspection Methodology;" "Fire Patterns and Their Interpretation")
   edited by Jay Siegel, Pekka Saukko and Max Houck, Academic Press (Elsevier), London, 2013.

"Fire Scene Investigation and Laboratory Analysis of Fire Debris," Chapter 3.5 in *Forensic Science, Current Issues, Future Directions,* edited by Douglas Ubelaker, John Wiley & Sons, Hoboken, NJ, 2013.

"Analysis of Fire Debris," Chapter 3 in *Forensic Chemistry Handbook*, edited by Lawrence Kobilinsky John Wiley & Sons, Hoboken, NJ, 2012.

"Fires, Arsons and Explosions," Chapter 39 in *Modern Scientific Evidence: The Law and Science of Expert Testimony,* edited by Faigman, Kaye, Saks and Sanders, (2014 Editor: Erin Murphy) West Publishing Co., St. Paul, MN, 2014, (Previous revisions: 1997, 2001, 2007, 2011)

"Basic Fire Science," Chapter 3 and "Fire Patterns," Chapter 4 in *Fire Investigator Principles and Practice to NFPA 921 and 1033, 3rd Edition.* IAFC, IAAI, NFPA and Jones and Bartlett, publishers, 2011. (both chapters co-authored with Jeff Spaulding.)

*Wiley Encyclopedia of Forensic Science,* contributor of five entries ("Arson Investigation: Misconceptions and Mythology;" " Fire: Chemistry of;" "Fire: Dynamics and Pattern Production;" "Fire: Scene Investigation;" "Fire Debris: Laboratory Analysis of") and section editor for Fire and Explosives entries, edited by Allan Jamieson and Andre Moenssens, Wiley & Sons, West Sussex, UK, 2009.

"Forensic Arson Investigation," McGraw-Hill *Yearbook of Science and Technology*, 2003.

### Standards

*NFPA 921, Guide for Fire and Explosion Investigations*, NFPA, Quincy, MA, Contributor to the 1998 through 2017 editions as principal committee member.

*Fire and Arson Scene Evidence: A Guide for Public Safety Personnel*, National Institute of Justice Office of Justice Programs, USDOJ Publication Number NCJ 181584, Contributor to the document as a member of the Editorial Board.

"Standard Practice for Investigating Carbon Monoxide Poisoning Incidents," ASTM E2292-03, Principal Author as Task Group Coordinator.

"Standard Test Method for Flammable or Combustible Liquid Residues in Extracts from Samples of Fire Debris by Gas Chromatography," ASTM E 1387-90. Principal Author as Task Group Coordinator.

"Guidelines for Laboratories Performing Chemical and Instrumental Analysis of Fire Debris Samples," Principal author as Co-Chair of IAAI Forensic Science Committee, June 1988.

### Peer Reviewed Publications

"Fire Investigation: Historical Perspective and Recent Developments," *Forensic Science Review,* Vol. 31, No. 1, 37-44, January, 2019.

"Forensic Science Assessments: A Quality and Gap Analysis, Fire Investigation," (Co-authored with Jose Almirall, Hal Arkes, Frederick Mowrer and Janus Pawliszyn) AAAS, Washington DC, 2017.

"Pernicious, Pervasive, and Persistent Literature in Fire Investigation," *Forensic Science Research Evaluation,* edited by Bartick & Floyd, AAAS and George Washington University, 2016.

"Ignitable Liquid Residue Source Elimination by Molecular Weight Estimation," *Proceedings of the American Academy of Forensic Sciences*, AAFS, Colorado Springs, CO, 2012.

"Totality of the Evidence or Contextual Bias: Where Do You Draw the Line?" *Proceedings of the 5th Int'l Symposium on Fire Investigations Science and Technology* (ISFI), NAFI, Sarasota, FL, 2012.

John J. Lentini  Page 5 of 7  Resume (04/27/19)

**Peer Reviewed Publications (continued)**

"'Progress' in Fire Investigation: Moving from Witchcraft and Folklore to the Misuse of Models and the Abuse of Science," *Proceedings of the 4th International Symposium on Fire Investigations Science and Technology* (ISFI), NAFI, Sarasota, FL, 2010.

"Forensic Science Standards: Where They Come From and How They Are Used," *Forensic Science Policy and Management: An International Journal*, Vol. 1, No. 1, February 2009.

"Toward a More Scientific Determination: Minimizing Expectation Bias in Fire Investigations," *Proceedings of the 3rd International Symposium on Fire Investigations Science and Technology* (ISFI), NAFI, Sarasota, FL, 2008.

"The Mythology of Arson Investigation," *Proceedings of the 2nd International Symposium on Fire Investigations Science and Technology* (ISFI), NAFI, Sarasota, FL, 2006.

"ASTM Standards for Fire Debris Analysis: A Review," (co-authored with Eric Stauffer), *Forensic Science International*, 132, 63–67, 2003.

"Contamination of Brake Fluid by Power Steering Fluid," (co-authored with Eric Stauffer), *J. Forensic Sciences*, Vol. 48, No. 4, July 2003.

"Persistence of Floor Coating Solvents," *J. Forensic Sciences*, Vol. 46, No. 6, November 2001.

"The Petroleum-Laced Background," (co-authored with Julia Dolan and Cheryl Cherry), *J. Forensic Sciences*, Vol. 45, No. 5, September 2000.

"Differentiation of Asphalt and Smoke Condensates from Liquid Petroleum Distillates Using GC/MS," *J. Forensic Sciences*, Vol. 43, No. 1, January 1998.

"Comparison of the Eluting Efficiency of Carbon Disulfide with Diethyl Ether: The Case for Laboratory Safety," (co-authored with Dr. Andrew T. Armstrong), *J. Forensic Sciences*, Vol. 42, No. 2, March 1997.

"An Improved Method of Obtaining Ion Profiles From Ignitable Liquid Residue Samples," *FBI International Symposium on the Forensic Aspects of Arson Investigations*, Fairfax, VA, August 1, 1995.

"ASTM Standards for Forensic Sciences, " *J. Forensic Sciences*, Vol. 40, No. 1, January 1995.

"Behavior of Glass at Elevated Temperature," *J. Forensic Sciences*, Vol. 37, No. 5, September 1992.

"Baseline Characteristics of Residential Structures Which Have Burned to Completion: The Oakland Experience," (co-authored with David M. Smith, C.F.I. and Dr. Richard W. Henderson, C.F.I.), *Fire Technology*, Vol. 28, No. 3, August 1992.

**Editorial-Reviewed Publications**

"What Fire Litigators Need to Know in 2017," *The SciTech Lawyer*, Vol. 13, No 4 ABA, 2017.

"Contextual Bias in Fire Investigations: Scientific vs. Investigative Data." *The Brief*, American Bar Association, Tort Trial and Insurance Practice Section, Vol. 44, No. 3, Spring 2015.

"The Evolution of Fire Investigation and Its Impact on Arson Cases," *Criminal Justice*, American Bar Association, Criminal Justice Section, Vol. 27, No. 1, Spring 2012.

"Arson probes: Instinct Giving Way to Modern Science," *Journal of Insurance Fraud in America*, Vol. 2, No. 1, Coalition Against Insurance Fraud, Washington, DC, 2011.

"The Standard of Care in Fire Investigation," *Canadian Association of Fire Investigators Journal*, Spring 2007.

"Report on the Peer Review of the Expert Testimony in the Cases of *State of Texas v. Cameron Todd Willingham* and *State of Texas v. Ernest Ray Willis*," (Co-authored with Douglas J. Carpenter, Daniel L. Churchward, David M. Smith and Michael A. McKenzie), 2006. Available at www.innocenceproject.org

"What You Don't Know Can Hurt You: How Do You Know Your Lab Has It Right?" *The Fire and Arson Investigator,* Vol. 53, No. 3, April, 2003.

"A Calculated Arson," *The Fire and Arson Investigator*, Vol. 49, No. 3, April 1999.

"Unconventional Wisdom: The Lessons of Oakland," *The Fire and Arson Investigator*, Vol. 43, No. 4, June 1993.

"The Lime Street Fire: Another Perspective," *The Fire and Arson Investigator*, Vol. 43, No. 1, Sept. 1992.

"Melted Steel: How Important?" (co-authored with J. Finis McCarver, P.E.), *The National Fire and Arson Report*, Vol. 10, No. 4, August 1992.

Case: 5:20-cv-01654-SL  Doc #: 15-1  Filed: 02/10/23  258 of 656.  PageID #: 525

## Editorial-Reviewed Publications (continued)

"The Behavior of Flammable and Combustible Liquids," (co-authored with Laurel V. Waters), *The Fire and Arson Investigator*, Vol. 42, No. 1, September 1991.

"Appliance Fires: Determining Responsibility," (co-authored with R.I. Underwood, P.E.), *The National Fire and Arson Report*, Vol. 7, No. 2, April 1989.

"Incidental Accelerants," *The National Fire and Arson Report*, Vol. 2, No. 3, October, 1983.

"Isolation of Accelerant-like Residues from Roof Shingles Using Headspace Concentration," *Arson Analysis Newsletter*, Systems Engineering Associates, Vol. 6, No. 3., May, 1982

## Advisory Panels

Member, U. S. Dept. of Justice, NIJ Technical Working Group on Fire Investigations, 1997-2000.

Member, AAFS President's Panel on Scientific Integrity, 2009.

Member, Expert Witness Exchange Validation Committee, 2015-present.

Member, Technical Advisory Group for the Houston Forensic Science Center, 2015-present.

Member, Texas State Fire Marshal's Science Advisory Workgroup, 2016-2018.

Member, Underwriters Laboratories Fire Safety Research Institute (FSRI) Technical Panel on Fire Forensics, 2016-present.

Member, Forensic Fire Analysis Institute Advisory Board, 2018-present.

## Selected Recent Presentations

"Expert Challenges Using Industry Standards," *AAFS 71st Annual Meeting, Jurisprudence Section*, February 22, 2019, Baltimore, MD

"Yes, Everybody Knows a Fire Needs Oxygen, But Why Should We Care?" *AAFS 71st Annual Meeting, Criminalistics/Engineering Section*, February 21, 2019, Baltimore, MD

"Fire Investigation: Science or Art?" Florida International University Forensic Science Seminar Series, November 28, 2018, Miami, FL. Adobe Connect podcast available at https://fiuconnect.adobeconnect.com/p98jia1myaah?launcher=false&html-view=false&proto=true

"Scientific Protocols for Fire Investigation," The ClaimsPro Canadian National Advanced Fire, Arson & Explosion Training Program, October 22-24, 2018, Toronto, ON

"How Your Report and Testimony Will Be Used by Your Adversary," Advanced Origin and Cause/Courtroom Testimony (AOCCT), *ATF National Center for Explosives Training and Research*, August 7, 2018, Huntsville, AL

"Surviving NFPA 921 and 1033 Challenges," *Ontario Chapter of the International Association of Arson Investigators*, May 16, 2018, Hamilton, ON

"The Evolution of Fire Investigation," *AAFS 70th Annual Meeting*, Workshop #19 February 20, 2018, Seattle, WA

"Changes in the 2017 Edition of NFPA 921," *Texas Fire Marshal's Forum*, February 6, 2018, Corpus Christi, TX

"Surviving NFPA 921 and 1033 Challenges," *Joint meeting of the North and South Carolina Chapters of the International Association of Arson Investigators*, October 19, 2017, Myrtle Beach, SC

"Scientific Protocols for Fire Investigation," *Canadian National Advanced Fire, Arson and Explosion Training Conference*, August 28-30, 2017, Markham, ON

"How a Science Advisory Workgroup Can Help Fire Investigation Organizations Avoid Preventable Errors," National Institute of Justice's *Sentinel Events Initiative All-Stakeholder Symposium*, U.S. DOJ, June 20, 2017, Washington, DC

"Fire Analysis," Ontario Municipal Fire Prevention Officers Association, May 30, 2017, Windsor, ON

"Confronting Inaccuracies in Fire Investigations: Case Studies," and "The Difficulty and Questionable Validity of Fire Origin Determination," *18th Annual Francine and Michael Saferstein Lectures*, Northeastern University College of Science, March 30 and 31, 2017, Boston, MA

"You Only Live Once: Perspectives on 43 Years in Forensic Science," *AAFS Special Presentation*, February 14, 2017, New Orleans, LA

"How *Daubert* Has Shaped Fire Investigation," *AAFS 69th Annual Meeting, Interdisciplinary Workshop*, February 14, 2017, New Orleans, LA

### Selected Recent Presentations (continued)

"Scientific Protocols for Fire Investigation," *Canadian National Advanced Fire, Arson and Explosion Training Conference*, October 24-27, 2016 Markham, ON

"NFPA 921 Review," *50th Annual Professional Fire and Fraud Investigators Professional Development Symposium*, October 3, 2016, St. Louis, MO

"The State of Modern Arson Investigation: From Scene to Laboratory," Fordham University Law School, *7th Annual Prescriptions for Criminal Justice Forensics Conference*, June 5, 2016, NY

"Forensic Technologies in Flux," *U Penn Law School Symposium on Technology in Criminal Justice Reform*, May 13, 2016, Philadelphia, PA

"Surviving a 1033 Challenge," *67th Annual Training Course, International Association of Arson Investigators*, May 18, 2016, Orlando, FL

"Expert Challenges and the Revised NFPA 1033," *National Association of Subrogation Professionals*, November 10, 2015, Reno, NV

"NFPA 1033," "Fire and Science," and "Anatomy of a Train Wreck," *Canadian National Advanced Fire Arson and Explosion Investigation Training*, October 26-30, 2015, Markham, ON

"How Fire Investigation Organizations Get in Trouble with Preventable Errors," *NIST International Symposium on Forensic Science Error Management*, Washington, DC, July 22, 2015

"Pernicious, Pervasive, and Persistent Literature in Fire Investigation," *National Science Foundation Workshop on Forensic Science Research Evaluation*, May 26, 2015, Washington, DC

"The Questionable Validity of Fire Origin Determination," *New Topics* series, March 19, 2015, New College, Sarasota, FL

"The Long Road to Exoneration for Han Tak Lee," *AAFS 67th Annual Meeting, Jurisprudence Section*, February 19, 2015, Orlando, FL

"Cases Where Shifted Science as 'New Evidence' Played a Role," American Academy of Forensic Sciences (AAFS), Workshop #8, *From Fire Dynamics to Legal Dynamics: Shifted Science and the Criminal Justice System's Response*, February 16, 2015, Orlando, FL

"New Evidence Challenges to BS (Bad Science) in Arson Cases," *U Penn Law School, Levy/Silverman-Rodin Scholars Luncheon*, February 4, 2015, Philadelphia, PA

A list of presentations made prior to 2015 is available upon request.

### Selected Media Appearances

"Forensic Science Essentials: Challenges in Fire Analysis and Document Examination," National Clearinghouse for Science, Technology and the Law, Stetson University College of Law, June 28, 2017, Available at https://www.youtube.com/watch?v=b5B_VZ3nvik&feature=youtu.be

"NFPA 1033 and NFPA 921: How Changes in NFPA 1033 Will Affect Your Expert's Ability to Qualify," and "Origin and Cause Determination: Using NFPA 921 to Ensure Validity," Insurance Committee for Arson Control (ICAC) webinars, Available at http://www.arsoncontrol.org/Education Fire Loss Specialist Course, 2016.

"Incendiary, The Willingham Case," a 2011 documentary produced by Steve Mims and Joe Bailey, Jr. Available from iTunes.

"Death by Fire," a *Frontline* documentary about the Willingham case. First aired October 19, 2010. Sequel aired October 7, 2014. Produced by Jessie Deeter. Available at http://www.pbs.org/wgbh/pages/frontline/death-by-fire

"Burned," an *ABC News 20/20* episode about several wrongful arson prosecutions. Produced by Tom Berman. Season 30, Episode 18. First aired May 7, 2010. DVD copy available upon request.

"When Forensics Fail," a *National Geographic* documentary about the case of Texas vs. Ernest Willis. First aired October 18, 2007. DVD copy available upon request.

"Up in Smoke," *The Forensic Files*, episode about the case of Pennsylvania vs. Paul Camiolo. First aired June 29, 2005. Still in syndication, DVD copy available upon request.

"Trial by Fire," *The Forensic Files*, episode about the case of Georgia vs. Beverly Jean Long. First aired April 27, 2005. Still in syndication, DVD copy available upon request.

"The Willingham Case," Interview with NPR Host Scott Simon. First aired April 30, 2005. Available at http://www.npr.org/templates/story/story.php?storyId=4625954

**IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO**

STATE OF OHIO,                    :        Case No.  2012 CR 1567

    Plaintiff,                   :

                      :

    -v-                          :        HON. KRISTIN G. FARMER

KAYLA AYERS,                      :

    Defendant.                   :

---

**AFFIDAVIT OF OHIO INNOCENCE PROJECT IN SUPPORT OF KAYLA AYERS'
MOTION FOR LEAVE TO FILE MOTION FOR NEW TRIAL**

---

NOW COMES Brian Davis, on behalf of the Ohio Innocence Project, and having been duly sworn and cautioned, swears or affirms the following to be true:

1. I am currently a student-fellow at the Ohio Innocence Project ("OIP"), which represents Kayla Ayers in the above captioned case. I began working with OIP in May 2019. The Ohio Innocence Project is a legal clinic located at the University of Cincinnati College of Law in Cincinnati, Ohio.

2. In the summer of 2019, John Lentini reviewed materials from Kayla Ayers case and produced a report containing his conclusions.

3. Since that time, students and attorneys with OIP have made multiple trips to Massillon, Ohio to speak with former Fire Inspector Reginald Winters. Representatives from OIP spoke with Mr. Winters once on July 30, 2019. At that time, he said he would be able to discuss Ms. Ayers's case in more detail if he could look over his original file.

4. In response to a public records request, OIP received Inspector Winters's file on August 26, 2019. OIP talked to Mr. Winters over the phone again in November 2019. Mr. Winters stated that he would not agree to meet until he had received and had time to look over the files. A package with the relevant documents was sent to him on December 4, 2019. Since then, OIP has made multiple attempts to reach Mr. Winters



by phone and in person to discuss his conclusions.  Those attempts have not been successful

5. In the meantime, OIP has also been communicating with Ms. Ayers's trial attorneys in order to confirm what they did or did not do to prepare for Ms. Ayers's trial.  As of the date of this affidavit, neither of Ms. Ayers's former trial attorneys have been willing to provide an affidavit to OIP confirming or denying any aspect of their representation.

6. Students and attorneys at OIP have also been researching issues related to the NFPA and fire science generally, in order to try to understand the issues at stake in this matter before filing a claim to the Court.

7. OIP has used due diligence in researching Ms. Ayers' case and has not engaged in any undue delay in bringing the current motion for new trial.

FURTHER AFFIANT SAYETH NAUGHT.

Brian Davis

Sworn to and subscribed before me, this _10th_ day of April, 2020.

Notary Public

STEPHANIE NICOLE KING
Notary Public, State of Ohio
My Commission Expires
January 29, 2022

**IN THE COURT OF COMMON PLEAS**
**STARK COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No.  2012 CR 1567 |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | HON. KRISTIN G. FARMER |
| | : | |
| KAYLA AYERS, | : | |
| | : | (HEARING REQUESTED) |
| Defendant. | : | |

---

## DEFENDANT KAYLA AYERS'S FIRST AMENDED PETITION FOR POST-CONVICTION RELIEF PURSUANT TO R.C. 2953.21-23

---

Now comes Defendant-Petitioner Kayla Ayers, by counsel the Ohio Innocence Project, and hereby states as follows for her *First Amended Petition for Post-Conviction Relief.*[1]

1. Petitioner Kayla Ayers hereby incorporates the attached *Memorandum in Support*, including all exhibits thereto, as though fully pleaded herein.

2. In 2012, Kayla and her young son, Bubba, were at home when a mattress in the basement caught fire. Both Kayla and her son escaped unharmed, except for a cut that Kayla sustained trying to extinguish the fire.

3. In 2013, Kayla was convicted of aggravated arson and endangering children. She was sentenced to seven years' imprisonment. She has consistently maintained her innocence.

---

[1] Ms. Ayers's original petition for postconviction relief, filed in April 2020, incorporated Exhibits and facts from her proposed *Motion for New Trial Instanter*, itself an exhibit to her *Motion for Leave for File a Motion for New Trial.* The proposed *Motion for New Trial Instanter* was not accepted by the clerk's office. Rather than risk confusing the record by incorporating facts from a document not in the record, Ms. Ayers now amends her prior pleading to directly include the language and exhibits previously incorporated by reference. Pursuant to R.C. 2953.21(G)(2), "at any time before the answer or motion is filed, the petitioner may amend the petition with or without leave or prejudice to the proceedings."

1

**EXHIBIT 38**

4.  The central piece of evidence supporting Kayla's conviction was the testimony of Massillon Fire Inspector Reginald Winters, who testified that the fire was intentionally set and that it had two separate and distinct points of origin.  The State used this evidence to prove that the fire could not have been accidentally started by Kayla's son, Bubba.

5.  Although Ohio law allows defendants to request funds for the hiring of experts, Kayla's attorneys did not retain or consult with an independent expert on arson or fire investigations.

6.  If they had consulted with an expert, Kayla's attorneys would have learned that:

    a.  Winters' conclusion that the fire had two separate points of origin is false and unsupported by the evidence;

    b.  Inspector Winters' methods and conclusions were contrary to the standard manual for arson investigations, NFPA 921;

    c.  Inspector Winters' training and experience were inadequate, and Winters was unqualified to offer an opinion on the origin of the fire.

7.  Kayla's attorneys did not effectively challenge Inspector Winters regarding the serious deficiencies in his methods, conclusions, and qualifications.

8.  Furthermore, although most of Winters' conclusions regarding the fire's origin were not disclosed prior to trial, in violation of Ohio Crim.R.16(K), Kayla's attorneys did not object to Winters' undisclosed and unfounded opinions.

9.  Because Winters' faulty testimony was effectively unchallenged, the jury was presented with a false picture of the origin of the fire.  But-for the objectively deficient performance of Ayers' attorneys, there is a reasonable probability that the outcome of trial would have been different.

2

10. Ayers remains on post-release control. She has maintained her innocence for the past 8 years.

11. The above facts amount to a denial of or infringement of the Petitioner's rights, so as to render the judgment void or voidable under the Ohio Constitution and/or the Constitution of the United States.

12. Petitioner was unavoidably prevented from discovery of the facts upon which she must rely to present the claims for relief as set forth below.

### COUNT ONE
### INEFFECTIVE ASSISTANCE OF COUNSEL
### SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION

13. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

14. Petitioner was entitled to effective assistance of counsel under the Sixth Amendment to the U.S. Constitution.

15. Petitioner's counsel was deficient and fell below an objective standard of reasonableness. Specifically:

   a. Defense counsel failed to consult with an expert witness regarding the origin of the fire.

   b. Defense counsel failed to challenge false and unsupported testimony offered by the State's expert.

   c. Defense counsel failed to object to testimony that should have been barred under Ohio Crim.R.16(K).

16. Petitioner was prejudiced by counsel's ineffective assistance. Based on the totality of the evidence before the jury, there is a reasonable probability that, but-for counsel's unprofessional errors, the result of the proceeding would have been different.

17. As a result, Petitioner's conviction should be vacated, and she should be granted a new trial.

## COUNT TWO
## PROSECUTORIAL MISCONDUCT
## FIFTH AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION

18. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

19. Petitioner is entitled to a fair trial, which includes the right to present facts in her favor and develop her defense in accordance with state rules of procedure.

20. In preparing her defense, Petitioner had the right to presume the State had complied with and would continue to comply with Ohio Criminal Rules of Procedure and Ohio Rules of Evidence.

21. The State committed misconduct and deprived Petitioner of a fair trial by, in violation of Crim.R.16(K), failing to disclose the complete expert opinions of Massillon Fire Inspector Reginald Winters, and by knowingly soliciting previously undisclosed "expert" opinions from Inspector Winters. This misconduct was a fundamental defect in the trial and was inconsistent with rudimentary demands of fair procedure.

22. In addition, the State knew or should have known that Reginald Winters's testimony regarding the origin of the fire was false, unsupported, and/or unqualified. The State committed misconduct by soliciting this testimony and leaving it uncorrected on the record.

23. The State's misconduct prejudiced Petitioner. There is a reasonable probability that, but-for the State's misconduct, the result of the proceeding would have been different.

24. The State's misconduct deprived Petitioner of a fundamentally fair trial and infected the trial with unfairness such that the resulting conviction was a violation of due process.

4

## COUNT THREE
## RIGHT TO COMPULSORY PROCESS
## SIXTH AMENDMENT TO THE U.S. CONSTITUTION

25. Petitioner hereby incorporates all preceding paragraphs as thought fully pleaded herein.

26. "The very integrity of the judicial system and public confidence in the system depend on full disclosure of all of the facts, within the framework of the rules of evidence."

27. The State's failure to disclose the conclusions of its expert prior to trial, in violation of Ohio Crim.R.16(K) and as described in Count Two, *supra*, deprived Petitioner of the right to compel facts and witnesses in support of her defense. This violation amounts to a fundamental defect which inherently resulted in a complete miscarriage of justice and was inconsistent with rudimentary demands of fair procedure.

28. The State's interference with Petitioner's right to compulsory process was material and prejudicial. There is a reasonable probability that, but-for the State's misconduct, the result of the proceeding would have been different.

## COUNT FOUR
## ACTUAL INNOCENCE
## FIFTH, EIGHTH, AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION

29. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

30. Newly-discovered evidence demonstrates that Petitioner is actually innocent of the charges for which she was convicted. Specifically, Inspector Winters' testimony regarding the origin of the fire is false, and the fire was, in fact, accidental.

31. A truly persuasive demonstration of "actual innocence" made after trial renders the conviction unconstitutional. *Herrera v. Collins*, 506 U.S. 390, 418, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)

5

32. As a result, Petitioner's conviction and the ongoing effects of her conviction are inconsistent with the U.S. Constitution's guarantee of due process of law.

## COUNT FIVE
## CONVICTION OBTAINED BY FUNDAMENTALLY UNRELIABLE EVIDENCE
## FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

33. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

34. Petitioner's conviction was obtained using evidence now known to be false, unsupported, and/or fundamentally unreliable.

35. Specifically, the testimony of Reginald Winters regarding the origin of the fire was incorrect, unsupported, and/or fundamentally unreliable in key respects. The probative value of Winters' testimony, if any, was greatly outweighed by the prejudice to Petitioner from its admission. Its role in Petitioner's conviction is a fundamental defect which inherently results in a miscarriage of justice.

36. This testimony was central to the State's case against Petitioner. But-for Reginald Winters' false, unsupported, and/or materially misleading testimony, Petitioner would not have been convicted.

37. Winters' testimony undermined the fundamental fairness of Petitioner's trial because the testimony was itself false, unsupported, or unreliable. Insofar as Petitioner's conviction depends on evidence now known to be false, unsupported, and/or materially misleading, that conviction is inconsistent with the United States Constitution's guarantee of due process.

## COUNT SIX
## OHIO CONSTITUTION
## ARTICLE I, SECTIONS 9, 10 & 16

38. Petitioner hereby incorporates all preceding paragraphs as though fully pleaded herein.

39. Petitioner's conviction was obtained in violation of her right to effective assistance of counsel and right to compulsory process, as guaranteed by Article I, Section 10 of the Ohio Constitution.

40. Petitioner's conviction, based on evidence now known to be false, unsupported, and / or misleading is a violation of her right against cruel and unusual punishment and her right to due process of law, as guaranteed by Article I, Sections 9 and 16 of the Ohio Constitution.

41. Petitioner was deprived of due process of law and the fair administration of justice as guaranteed by Article I, Section 16 of the Ohio Constitution.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Petitioner respectfully requests the Court order as follows:

A. Grant Petitioner an evidentiary hearing;

B. Vacate Petitioner's conviction as unconstitutional;

C. Order that Petitioner either be retried or that the case be dismissed within 90 days; and

D. Order any other relief the Court deems necessary and appropriate.

Respectfully Submitted,

/s/ Brian Howe
Brian Howe (0086517)
Attorney for Defendant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

7

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular first-class U.S. mail on this 15th day of May, 2020.

/s/ Brian Howe
Attorney for Defendant

## MEMORANDUM IN SUPPORT

In October 2012, Kayla Ayers was at home with her young son when a mattress in the basement of the home caught fire. The fire was quickly extinguished. In early 2013, Ms. Ayers was convicted of aggravated arson, based primarily on expert testimony that the fire had two distinct points of origin, and therefore could not have been accidentally started by a cigarette or by Ayers' young son.

This expert testimony was almost entirely false. In fact, there is no scientifically valid evidence indicating that the fire had two points of origin, and in violation of Crim.R.16(K), the State did not present the expert's complete conclusions to Ms. Ayers' counsel prior to trial. Furthermore, defense counsel neither consulted with its own fire expert, nor objected to the previously undisclosed "expert" conclusions offered at trial. As a result, the jury based its verdict on entirely false—but unchallenged—conclusions about the source of the fire.

Ms. Ayers' conviction rests on false evidence, presented in violation of Ohio Criminal Rules of Procedure, and entered into the record without objection. She did not receive a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and by the Ohio Constitution. Her conviction should be vacated and the matter set for further proceedings.

## STATEMENT OF FACTS

### A. Fire & Initial Investigation

On October 3rd, 2012, at 8:21 P.M., the Massillon Fire Department received a report of a fire on 26th St. in Massillon, OH. *Massillon Fire Department Summary Call Sheet*, attached as Exhibit A, at 120. Multiple suppression units and an ambulance were dispatched. *Id.* The first suppression units arrived at the house at 8:28 P.M. *See id*, *see also Massillon Fire Department*

9

*Response Record,* attached as Exhibit B, at 118. They quickly extinguished the fire, which was isolated to a mattress in the basement corner. *See id.* at 119.

The only people home at the time of the fire were Kayla Ayers and her three-year-old son, Brennan Jr. (a.k.a. "Bubba"). *See Massillon Police Department Incident Report- Part 2* ("Incident Report"), attached as Exhibit C, at 127. Kayla sustained a laceration on her hand after she slipped and broke a glass of water while trying to extinguish the fire herself. *Massillon Fire Department EMS Run Report* ("EMS Report"), attached as Exhibit D, at 121. Brennan Jr. was completely unharmed. *See Incident Report* at 127.

Initial reports from the scene state that Kayla was disoriented and frantic about the possibility of losing custody of her children. *See State of Ohio v. Kayla Ayers,* Case No. 2012CR-1567, Trial Transcripts ("Tr."), attached as Exhibit E, at 362. Her neighbor, Jennifer Conley, stated that Kayla kept "repeating was she going to lose—Am I going to lose my kids, am I going to lose my kids?" *Id.* at 360. She also reported that she thought she smelled marijuana on Kayla's breath. *Id.* at 362. A member of Kayla's church, Karen Ball, testified that Kayla had not answered the door when she showed up earlier that day to take Brennan to church. *Id.* at 378-379.

Kayla was treated at Affinity Hospital and discharged that night. *EMS Report* at 121-123. While at the hospital, Kayla was interviewed by Massillon Fire Inspector Reginald Winters and Massillon Police Dept. Sgt. Muntean. *See Massillon Fire Department Interview Report,* attached as Exhibit F, at 124. Initially, Kayla claimed that she had been doing laundry in the basement, and when she turned around, she noticed her son Brennan had started the fire. *See Id.*

Inspector Winters interviewed three-year-old Brennan Jr. later that evening. Tr. at 270. **Winters confirmed that Brennan Jr. was able to light a cigarette lighter.** *Id.* at 282.

10

Although Brennan Jr. denied starting the fire, he did confirm that his mother was sleeping just before the fire started. *Massillon Police Department Narrative Supplement* ("Narrative Supplement"), attached as Exhibit G, at 128.

The next day, Jennifer Conley called police and told them that Kayla and her family were at the property in violation of the fire department's instructions. Tr. At 271. Two Massillon police officers arrived along with Inspector Winters. *See e.g.* Tr. at 196-197 and 271. At the scene, Inspector Winters spoke with Jeff Ayers, Kayla's father. Jeff claimed that several weeks before, during a fight, Kayla told Jeff, "if you leave again, I'll burn this motherfucker down." *See Massillon Fire Department Voluntary Statement,* attached as Exhibit H, at 7. Another neighbor, Jason Pandrea, testifying about this same instance, said Kayla told her father she would "burn the house down." *See* Tr. at 310, 339. According to Pandrea, "it was more kind of a laugh or a joke kind of thing," and "it was like she meant it, but she didn't." *Id.* at 340.

Officers asked Kayla to come with them to the police station, where she was interviewed again. In the interview, Police Detective Ricker admits he does not believe she set the fire intentionally, but instead insists she started it due to her own carelessness. *See* video file: *Kayla Ayers Police Station Interview* attached as Exhibit I, (10/04/2012) at 01:21:00-01:29:00. After questioning, Kayla admitted that she "may have fallen asleep" before the fire, but insisted that when she woke up she did what she could to put it out. *Narrative Supplement* at 128. That day, Kayla was arrested and charged with aggravated arson and endangering children. *Kayla Ayers Docket Entry ("Docket"),* attached as Exhibit J, dated 10/12/2012 and 11/06/2012. She was unable to post bail and would remain in jail for the next several months awaiting trial. *See Kayla Ayers affidavit ("Ayers Aff."),* attached as Exhibit K at ¶ 3.

**B. Pretrial Investigation and Disclosures**

Kayla pleaded not guilty to all charges. *Docket* on 11/09/2012. The Stark County Public Defender's Office was appointed as counsel, and Attorney Kristina Powers was assigned. *Id.*

Defense counsel made multiple requests for discovery in the months leading up to the trial. *Id.* The defense requested discovery on November 9, 2012 – over two months before trial started. *Id.* They received discovery documents from the state on November 15th, November 19th, December 14th, and January 17th – the last receipt being just nine days before trial. *See Docket* on 11/15/2012, 11/19/2012, 12/14/2012, and 01/17/2012.

Throughout this period, Kayla remained in jail, and her trial was continued several times. Trial was originally set for December 3rd, 2012 but was rescheduled first to December 27th, 2012 and then again to February 4th, 2013. *Docket* on 11/07/2012, 11/28/2012, and 1/14/2012. The trial was rescheduled once more and finally held on January 28th, 2013. *Docket* on 01/16/2013.

In mid-January 2013, less than two weeks before trial, Kayla's defense was assigned to a new attorney at the public defender's office, Matthew Kuhn. *Id.* In the 100 days leading up to trial, neither Ms. Powers nor Mr. Kuhn consulted with an independent arson expert. *Proffer of Testimony of Attorneys Kristina Powers and Matthew Kuhn*, attached as Exhibit L.

**C. Trial & Sentencing**

1. <u>Testimony & Conclusions of Inspector Reginald Winters</u>

The core of the State's case at trial was the testimony of Fire Inspector Reginald Winters. Winters testified that he had taken approximately 70 hours of fire investigation classes, combined with just over ten hours per year of continuing education. Tr. at 227-228.

When he examined the fire in Ayers's home, Winters noticed an "unusual burn pattern" on the mattress, which he diagnosed as the first point of ignition:

> "Well, I had noticed that [the northeast side of the mattress] had a heavier
> char pattern where the springs—what we call—I'll try to explain it to you,

it's called calcination. It's basically where the fire burned so hot that it will turn the springs white and they'll collapse. And on that end I had noticed where the fire had burnt the hottest and it traveled westward. Like it was— there's where, right there, made a conclusion that I had a fire start there that was low and it started there and traveled west toward the wall because that's where the material was at, that it was consuming as it was burning." *Id.* at 240-241.

According to Winters, a separate and distinct ignition occurred near a wooden post, next to where a door had been leaning against the bed:

"If you look at [the post], you have the concrete floor, you go up and you have concrete, kind of pyramid, and then right there you can see a clear point of the V-pattern that I was telling you about, the starting point right there, the origin. *** [The V-pattern] is telling me the point of origin of a fire consistent [sic] where the fire started. It started low and it started climbing the post with the heavy charring and stuff like that." *Id.* at 245-246.

Winters confirmed that his "certified arson opinion" was that the fire started in two separate and distinct locations, and that the cause of the fire was "incendiary."[2]*Id.* at 249-250.

On cross examination, defense counsel questioned Inspector Winters about an initial Executive Summary and report from his office. *Id.* at 282-285. The Initial Report claimed that the fire started on the first floor, and that ignitable liquid vapors or gasoline were used as an accelerant. *See Defendant's Trial Exhibit A*, attached as Exhibit M. Winters acknowledged that the Initial Report was incorrect, but explained that the summaries on these documents were "typo[s]," where old information from prior reports had not been removed. Tr. at 285.

---

[2] Winters also testified that, although Kayla did not have any soot on her arms and hands, swabs of her nostrils supposedly showed "light soot." Tr. at 268. Winters testified that he "did not observe" any soot when talking to Brennan Jr. at the neighbor's house later that night. *Id.* at 270. By that time, however, Jennifer Conley had already bathed Brennan and changed his clothes. *See id*. at 363.

On redirect, the prosecution asked Inspector Winters to read his "final" Executive

Summary. *Id.* at 296. Defense counsel objected, asking whether this document had been

provided. At side bar, the prosecution answered:

> Mr. Barr: Provided in discovery, Your Honor, the origin and cause report,
> and I'm asking him [Winters] to read this based upon the cross-examination
> of documents that I believe he [Mr. Kuhn] received from Massillon
> Municipal Court that were not the final report and that contain typographical
> errors. I believe the jury needs to know this.
> The Court: Okay. Do you want to take a look at this?
> Mr. Kuhn: Yeah, if I could.
> Mr. Barr: There is the discovery [November] 15, 2012, it indicates origin
> and cause from Massillon Fire Department. The document he has, we don't
> have in our file. This is the only document we could have given him.
> Mr. Kuhn: Yeah, I'll do that real quick.
> ***
> Mr. Kuhn: If we signed for them, we signed for them.
> The Court: If you could approach for just a minute *** Put on the record
> with respect to the document with which Mr. Winters is being currently
> examined regarding it appears as though the Defense did sign for the report,
> and therefore, you are permitted to cross-examine him." *See id.* at 297-300.

The State then asked Winters to read his entire Executive Summary into the record.

According to the Executive Summary, the fire was "incendiary" and started on the mattress:

> "After examination of the fire scene it was determined the fire originated in
> the basement on the bed. After examination of the fire scene, interviewing
> witnesses, interviewing the insured and using the levels of scientific
> certainty as discussed in the 2011 edition of *NFPA 921; A Guide for Fire
> and Explosion Investigation*, it is my opinion the ignition source for the fire
> was some type of open flame. The materials first ignited were blankets on
> the bed. The act or omission that brought the ignition source and the
> materials first ignited together was the deliberate act of a person or persons.
> Using these elements of a fire cause, the cause of the fire is incendiary." *Id.*
> at 300-301.

Neither the Initial Report nor the final Executive Summary and Report mentioned

Winters' conclusion that the fire had multiple points of origin. *Id.* at 297-301. *See Defendant's*

*Trial Exhibits A, See also Defendant's Trial Exhibit D,* attached as Exhibit N. After the

confusion surrounding the Initial Report, defense counsel did not offer any further objection to

the substance of Winters' testimony, nor did he challenge Winters' conclusion that the fire was

started in two separate places. Tr. at 301.

> 2. Closing Arguments

Winters' conclusion regarding multiple points of origin became the centerpiece of the

State's closing argument. Specifically, the State argued that if the fire had two separate and

distinct points of origin, then an accidental fire was practically impossible:

> "I'll also remind you that common sense, your common sense, doesn't fly
> out the window when you walk in this courtroom. If you fall asleep and
> you drop a cigarette on a mattress, it starts a fire right? It's common sense.
> **It doesn't jump and start another fire, it's not possible.** .*** **There are
> two separate and distinct origins here according to the expert,
> according to the pictures. Fire doesn't jump like that. So everything
> was ruled out except incendiary, and that was to a reasonable degree of
> scientific certainty.**" *Id.* at 426. (emphasis added).

The two points of origin theory was also critical to the State's argument that Brennan

could not have started the fire. Specifically, the State argued that Brennan would have gotten

soot on him if he had started a second fire while the first fire was already burning:

> "And, again, common sense. You believe that first story that the defendant
> said, "Bubba started the fire," he would have to hold a lighter like you
> remember Inspector Winters demonstrating how he had to hold that lighter?
> He had to hold the lighter, ignite the mattress, **then go and start a second
> fire, the whole time, no soot, no smoke, not getting burned? Impossible.**
> They all told you, the firefighters told you, he would have something on him
> because if he was exposed to that fire, that smoke, he would have something
> on him. He had nothing. **Because remember when—he has to start that
> second fire, the first point of origin is burning.**" *Id.* at 426-427. (emphasis
> added).

During its rebuttal, the State continued to stress the importance of Winters' expert

opinion in proving Kayla's guilt:

> "We have a criminal justice system because criminals, even ones whose
> guilt have been overwhelmingly proven to you, like Kayla Ayers, don't
> always admit that guilt. **And this system requires experts, like Mr.
> Winters, who have to come in here and give you your opinion—their**

**opinion so that you can make decisions beyond a reasonable doubt.**" *Id.*
at 449. (emphasis added).

Again, the State emphasized Winters' conclusion regarding multiple points of origin ruled out an

accidental fire:

> "There's one [point of origin] right there. And there's the second one right
> there. But, wait, oh, it's an accident. An accident that started twice. So she
> must have been smoking two cigarettes, one for each hand, and then threw
> one on this side of the bed and one on this side of the bed, when that
> becomes her part of the story." *Id.* at 450.

The State also re-emphasized that, with a barrier blocking a portion of the bed, three-year-old

Brennan could not have lit the mattress on fire in multiple places:

> "[T]here's only two other plausible explanations as it's been stated, that it
> was a cigarette, but it had to be two cigarettes because we got two points of
> origin because fire doesn't hop from one side to the other, so the other
> plausible explanation is Bubba started the fire.
> So Bubba had to crawl over that mattress and get over here first and light
> this fire. And then he can't crawl over that door there because that's a door
> that sits high, it's a regular door just like that door right there, sitting on its
> side, you know how hard it would be for you to throw your leg over it and
> now you're going to ask a three-year-old to crawl over that without
> knocking it over? So then he has to crawl over that burning mattress and
> come over here to the front side of it and light this part on fire. That's
> plausible? No." *Id.* at 454-455.

Defense counsel argued that the State had not proven its case beyond a reasonable

doubt and insisted that the fire might have been started by Brennan or by an unattended

cigarette butt. *Id.* at 447. But Kayla's attorney did not attempt to counter any of the

State's specific arguments regarding multiple points of origin. *Id.* at 447-448. The jury

returned a guilty verdict against Kayla on aggravated arson and endangering children

charges. *Id.* at 482-483.

At sentencing, Kayla continued to maintain her innocence, explaining that she

only went to trial "because I really didn't do it so I was sure I wouldn't be found guilty."

Tr. at 493-494. She was sentenced to seven years' imprisonment. Throughout the investigation, trial, and appeals, Kayla has consistently maintained her innocence. *Ayers Aff. at ¶11.*

### D. 2019 John Lentini Review & Report

John Lentini is one of the foremost forensic arson experts in the United States. He is the former chair of the Forensic Science Committee for the International Association of Arson Investigators, and he was selected by the U.S. Justice Department to serve on a planning panel to recommend national standards for fire and arson investigation. *Affidavit of John Lentini,* attached as Exhibit O, at ¶ 4-5. Lentini wrote one of the primary textbooks on fire investigation, Scientific Protocols for Fire Investigation, which is currently in its third edition. *Id.* at ¶ 6. He also served as a principal Member of the National Fire Protection Association, and for twenty years he served on the technical committee responsible for drafting the *NFPA 921, Guide to Fire and Explosion Investigation—* the same guide Inspector Winters supposedly relied on for his procedures and conclusions. *Id.* at ¶ 4.

In 2019, Mr. Lentini reviewed the 2013 testimony and summary conclusions of Inspector Winters and produced a report. According to Lentini's analysis, "the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." *Id.* at ¶ 32. Specifically, Lentini concludes "unequivocally and to a reasonable degree of professional certainty" that:

- "The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology,"

- "Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan,"

- "Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways," and

- "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard."

   *Id.* at ¶ 9.

None of these conclusions were ever put before either the Court or the jury during Ms. Ayers's original trial.

## INEFFECTIVE ASSISTANCE OF COUNSEL—
## FAILURE TO CONSULT AN INDEPENDENT ARSON EXPERT &
## FAILURE TO OBJECT TO INADMISSIBLE "EXPERT" TESTIMONY

Criminal defendants are guaranteed effective counsel by the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Whether defense counsel is constitutionally ineffective is a two-prong test. A new trial should be granted where (1) defense counsel performance is objectively deficient, and (2) that deficiency prejudices the defendant. Defense counsel's performance is deficient if it falls below objectively reasonable professional standards. *Id.* at 688-89. A criminal defendant is prejudiced by ineffectiveness if, but -for the attorney's deficient performance, the defendant would have had a "reasonable probability" of a different outcome.

A reasonable probability is something less than a preponderance of evidence—counsel's deficiency must only "undermine confidence" in the outcome at trial. *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002). That is because "[a]n ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so

finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower [than for newly discovered evidence from a neutral source]." When defense counsel's performance is deficient in multiple respects, the Court should determine prejudice based on the *cumulative* result of the ineffectiveness rather than looking at each deficiency in isolation. *State v. Kole*, 2001-Ohio-191, 92 Ohio St.3d 303, 309, 750 N.E.2d 148 (2001).

Here, the State's case depended heavily on expert testimony from Inspector Reginald Winters. Specifically, the State argued that Winters' "two points of origin" theory conclusively disproved Ayers's defenses that the fire had been started by her young son Bubba or by accident. In fact, Inspector Winters' conclusions were scientifically inaccurate and unsupported. However, because Ayers's attorneys failed to consult with an independent arson expert about the cause and origin of the fire, neither the Court nor the jury had any reason to question Winters' unsupported testimony. Furthermore, although Winters' key conclusions were undisclosed and inadmissible pursuant to Crim.R.16(K), Ayers's trial counsel did not object to or otherwise challenge the undisclosed conclusions.

These deficiencies—individually and cumulatively—prejudiced Ms. Ayers. If her attorneys had consulted with an expert, they would have found that Inspector Winters' testimony was scientifically incorrect and fundamentally unreliable. If her attorneys had been familiar with Winters's report, they would have realized his "two points of origin" opinion was not disclosed, in violation of Crim.R.16(K), and his testimony would likely have been excluded all together. Instead, because of defense counsel's unpreparedness, both the Court and the jury were presented with an inaccurate—but unchallenged— account of the fire's origin. Ms. Ayers deserves an opportunity to present a properly qualified expert to a new jury, and her petition should be granted.

**A. Ayers's present claims are not barred by res judicata.**

Ohio has two separate procedures for raising ineffective assistance of counsel: "those based only on evidence in the trial record and those based in part on evidence outside the record." *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013). Ineffective counsel claims that rely on the trial record alone must be raised on direct appeal. *Id.* If, however, the claim relies on evidence that was not presented at trial, the claim must be raised either through a petition for post-conviction relief or a motion for new trial. A court's ruling on direct appeal does not preclude future claims based on evidence outside of the record.

On direct appeal, Ayers raised ineffective assistance of counsel based on facts in the trial record. Specifically, Ayers appeal raised "counsel's failure to cross-examine Inspector Winters with regard to the errors in his draft report" and counsel's "reliance on the draft report in preparation for trial." *State v. Ayers*, 2013-Ohio-5402, P29 (5th Dist.). The Fifth District ultimately denied the appeal on grounds that Ayers had not proven a reasonable probability that, but-for counsel's mix up between the two reports, the outcome of trial would have been different.

Unlike the claims presented in Ms. Ayers's direct appeal, the present claims depend on evidence outside the record. First, the fact that Ayers's attorneys failed to consult with an expert all together is not in the trial record. More importantly, Ayers now presents outside evidence that Winters' conclusions were false. Without this outside evidence, Ayers's was unable to demonstrate the scope of her attorneys' unpreparedness, or how exactly she was prejudiced by her attorneys' failures. The present claims could not have been presented on direct appeal, and therefore her direct appeal has no preclusive effect. *McGuire*, 738 F.3d at 751 ("Generally, the introduction in [a postconviction] petition of evidence dehors the record of ineffective assistance

20

of counsel is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of res judicata.")

**B. Ayers's counsel was deficient for failing to consult an independent arson expert.**

The United States Supreme Court has recognized that the failure to consult with an expert can be ineffective assistance of counsel. *Harrington v Richter*, 562 US 86, 106, 131 S.Ct. 770 (2011) ("[Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both."). For defense counsel's handling of expert witnesses, ineffectiveness generally falls into one of two categories: (1) cases where the defense fails to *present* an independent defense expert at trial, and (2) "that most egregious type [of ineffectiveness], wherein lawyers altogether fail to hire an expert." *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007).

The latter category—complete failure to consult an expert-- is especially likely to be prejudicial error. Under Ohio law, defense attorneys can consult with an expert privately and at State expense. *State v. Kopchak*, 2018-Ohio-1136, ¶21 (5th Dist.). As a result, while there may be circumstances where defense counsel may choose not to produce an independent expert to *testify*, there is rarely strategic justification for failing to learn what an independent expert would say regarding a centrally important forensic issue. *Dando v. Yukins*, 461 F.3d 791 ("Although courts are typically required to show heightened deference to an attorney's strategic decisions supported by professional judgment, where a failure to investigate does not reflect sound professional judgment, such deference is not appropriate."). A competent defense attorney has no reason to remain "strategically" ignorant about the central forensic conclusion in a case.

Of course, not every failure to consult an expert rises to the level of constitutional error. In some cases, other evidence of guilt may be overwhelming, or the defense attorney may have

the knowledge or skill to cross-examine the expert without guidance. E.g., *State v. Foust*, 105

Ohio St.3d 137, 2004-Ohio-7006 (finding failure to present an expert was not ineffective,

because other evidence against defendant was "overwhelming" and there was no evidence that a

defense expert would have testified differently); see also *Jackson v. McQuiggin*, 553

Fed.Appx.575. (Failure to call arson expert was not ineffective because the defense attorney

"considered the gains and losses associated with hiring an expert, she educated herself on

principles of arson investigation, consulted with an arson expert, conferred with defense

attorneys, and elicited concessions from Hager on cross-examination.")

On the other hand, the duty to consult with an independent expert is heightened when the

scientific issue is important to the State's case, and/or where defense counsel does not have the

knowledge or expertise to cross examine the expert effectively. *Richey v. Bradshaw*, 498 F.3d

344 (6th Cir.2007). Additionally, an attorney's failure to consult an independent expert becomes

especially prejudicial where the State's expert is unqualified or offers conclusions that turn out to

be false. Defense counsel "has a duty to bring to bear such skill and knowledge as will render

the trial a reliable adversarial testing process." *Kole*, 92 Ohio St.3d at 306, quoting *Strickland*, at

688; *State v. Johnson*, 24 Ohio St. 3d 87, 89, 494 N.E.2d 1061, 1063 (1986)("A lawyer has a

duty to investigate the circumstances of the case and to explore all avenues leading to facts

relevant to the merits of the case and the penalty in the event of conviction.") "A lawyer who

fails adequately to investigate, and to introduce into evidence, information that demonstrates his

client's factual innocence, or that raises sufficient doubts as to that question to undermine

confidence in the verdict, renders deficient performance." *Richey v. Bradshaw*, 498 F.3d 344.

On similar facts, the Sixth Circuit Court of Appeals has found that failure to consult with

an independent arson expert can amount to ineffective assistance of counsel. *Richey v.*

*Bradshaw*, 498 F.3d 344 (6th Cir.2007); *see also*, *Dugas v. Coplan*, 428 F.3d 217, 328 (1st Cir.2005). In *Richey*, an Ohio man was convicted of aggravated felony murder for allegedly setting fire to a woman's apartment and killing her daughter. The State of Ohio introduced two experts who testified that the fire pattern indicated use of chemical accelerants. *Id*. at 347-48. For its part, the defense consulted with a single witness, who did not have any specific experience in arson investigations, and who ultimately agreed with the State's arson conclusion. *Id*. After Richey was convicted, his postconviction attorneys consulted two additional independent arson experts. Those experts concluded that the State's witnesses "use flawed scientific methods not accepted in the fire-investigation community." *Id*. According to these experts, a discarded cigarette could have caused the fire. *Id*. at 348.

The Sixth Circuit Court of Appeals held that Richey's trial counsel was constitutionally ineffective for failing to consult with a competent expert. Although Richey's counsel did hire an expert, he ultimately "failed to know what his expert was doing to test the State's arson conclusion, *** failed to work with the expert to understand the basics of the science involved, at least for purposes of cross examining the State's experts, and [failed] to inquire about why his expert agreed with the State." *Id*. At 362. The court could "discern no strategic reason why counsel would have so readily ceded [the existence of arson]" under those circumstances. *Id*. at 363. The Sixth Circuit acknowledged that the conviction could have been sustained based on witness testimony—specifically, that Richey had threatened to "torch" the building earlier that night. Under the *Strickland* standard, however, the issue was "not one of the sufficiency of the evidence, but of undermining our confidence in the reliability of the result." *Id*. at 364. Given the centrality of the "expert" arson testimony to Richey's conviction, defense counsel's failure to consult with additional experts was prejudicial. *Id*.

23

*Richey* is directly applicable here.  As in *Richey*, Ayers's conviction was based primarily on faulty "fire science" testimony from an arson investigator.  As in *Richey*, Ayers's counsel completely failed to cross examine State's witnesses regarding the serious flaws in their conclusions.  As in *Richey*, the State's expert's conclusions were unsupported and fundamentally flawed.  Finally, in both cases, the jury never heard evidence that would have undermined, if not completely disproven, the State's theory of the fire.

In fact, insofar as the cases are different, Ayers presents a more extreme version of ineffectiveness.  Richey's trial counsel consulted—albeit halfheartedly—with *someone* regarding the State's arson conclusions.  According to the Sixth Circuit, this was not enough; Richey's counsel was constitutionally defective for failing to take a more active role in that consultation.  In contrast, Ayers's conviction was the result of "that most egregious type [of ineffectiveness], wherein lawyers altogether fail to hire an expert." *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007).  In an arson case, with no witnesses, and where the defense knew Inspector Winters would be the centerpiece of the State's case, Ayers's counsel did not even bother to find out what an independent arson expert would have said about the origin of the fire.  Given defense counsel's weak cross examination, and his seeming unfamiliarity with principles of arson investigations, there was no discernible "strategic" justification for his failure to seek out an expert opinion on the actual origin of the fire.

Furthermore, defense counsel's ignorance was as costly to Kayla Ayers as it was to the defendant in *Richey*.  Prosecutors in Ayers's case spent a large part of their closing argument reinforcing Winters' conclusions.  They insisted that Winters' testimony was critical to their case against Ayers.  E.g., tr. at 449. ("[The criminal justice system] requires experts, like Mr. Winters, who have to come in here and give you your opinion—their opinion so that you can make

24

decisions beyond a reasonable doubt.") And they emphasized repeatedly that Winters' "two points of origin" conclusion disproved both defense theories of the fire. In fact, if Ayers's counsel had consulted with an independent expert, he would have been able to present evidence that Inspector Winters was "not qualified to investigate fires per NFPA 1033, the generally accepted industry standard," and his "two points of origin" conclusion—the foundation of the State's case—was "unsupportable by any generally accepted methodology." Exhibit O at ¶ 9.

Stripped of the faulty forensic conclusions, the remaining circumstantial case is weaker against Ayers than it was in *Richey*. In *Richey*, the defendant had specifically threatened to "torch" the victim's apartment when she ended their relationship the night of the fire. Nonetheless, given the importance of the faulty forensic testimony at trial, the Sixth Circuit held that defense counsel's failure to challenge that evidence "undermined confidence" in the fair outcome of the trial. Here, the only circumstantial evidence against Ayers is that she initially denied being asleep when the fire started,[3] and that she allegedly told her father she would "burn this motherfucker down" during an argument weeks before. This may be "sufficient" evidence to sustain the conviction, in theory, but it is not the kind of overwhelming evidence that would preclude Ayers receiving a new trial. Furthermore, in this matter, there is a plausible non-accidental explanation for the fire: Ayers's son Bubba knew how to work a lighter, was likely unattended when the fire started, and, as noted in the NFPA 921, young children are especially likely to be curious about fire. Under these circumstances, Ayers's counsel was objectively deficient for failing to consult with an independent fire investigation expert about the actual cause and origin of the fire.

---

[3] Kayla indicated after the fire that she was afraid her children were going to be taken away from her, and in fact, at least one of her neighbors had made prior complaints to Children Protective Services.

### C. Ayers's counsel was deficient by failing to object to Inspector Winters' undisclosed and unsupported conclusion that the fire had multiple points of origin.

Ohio Crim.R.16(K) provides that:

"An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. **The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial**, which period may be modified by the court for good cause shown, which does not prejudice any other party. **Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial**.

The purpose of requiring pretrial disclosure of expert testimony "is to avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report." *State v. Joseph*, 73 Ohio St.3d 450, 458, 653 N.E.2d 285 (1995).

When a defense attorney fails to object to otherwise inadmissible testimony, that failure can amount to ineffective assistance. *State v. Batin*, 2005-Ohio-36, ¶¶59-65 (5th Dist.)(Defendant received ineffective assistance of counsel when defense attorney failed to object to hearsay testimony regarding distance between alleged crime and school property.). Failure to object to inadmissible testimony is especially important where that failure "had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Id*. quoting *Strickland, supra*.

In this case, Inspector Winters prepared two reports leading up to trial. The first report contained multiple inaccuracies, including findings that a chemical accelerant was used and that the fire started on the first floor. The second report, which was the one provided to Ayers's

counsel in discovery, concluded only that the fire was intentionally set and that it started on the mattress in the basement.

Neither written report concludes that the fire had multiples points of origin. The first report—which stated that the fire started on the first floor using chemical accelerants—was not disclosed by the State, and was specifically disclaimed by the State at trial. The second report concludes only that the fire started on "blankets on the bed." The central theme of the State's closing argument—that the fire could not have been accidental because it started in two locations—was never disclosed to the defense prior to trial. Thus, Winters' testimony regarding "multiple points of origin" was not only factually incorrect, but it was also raised for the first time at trial and therefore should have been barred pursuant Crim.R.16(K).

Defense counsel did not object to Winters' undisclosed conclusions. In general, courts should give defense counsel broad latitude to make tactical decisions regarding objections. In this case, however, Ayers's trial counsel did not strategically decide to allow Winters to testify as to matters outside his report, and then attempt to discredit him during cross examination. To the contrary, the record suggests that Ayers's trial attorney had not even seen the report that was actually disclosed to the defense in discovery:

> Mr. Barr [to Winters]: Could you read to me the Executive Summary contained in your final original report after all the typos—
> Mr. Kuhn: Judge, I'm going to object to this. Is this a document I've received?
> Mr. Barr: Yes it is, Mr. Kuhn.
> The Court: Could you approach please?
> Mr. Kuhn: Sure
> [A conference was held at the bench outside the hearing of the jury]
> Mr. Barr: Provided in discovery, Your Honor, the origin and cause report, and I'm asking him [Winters] to read this based upon the cross-examination of documents that I believe he [Mr. Kuhn] received from Massillon Municipal Court that were not the final report and that contain typographical errors. I believe the jury needs to know this.
> The Court: Okay. Do you want to take a look at this?

27

Mr. Kuhn:  Yeah, if I could.

Mr. Barr:  There is the discovery [November] 15, 2012, it indicates origin and cause from Massillon Fire Department.  The document he has[, the First Report], we don't have in our file.  This is the only document we could have given him.

Mr. Kuhn:  Yeah, I'll do that real quick.

\*\*\*

Mr. Kuhn:  If we signed for them, we signed for them.

The Court:  If you could approach for just a minute \*\*\* Put on the record with respect to the document with which Mr. Winters is being currently examined regarding it appears as though the Defense did sign for the report, and therefore, you are permitted to cross-examine him." Tr. 297-300.

Ms. Ayers's trial counsel prepared his cross examination based on the wrong report.[4]  There is no way, even theoretically, that he could have "tactically" decided to waive an objection based on the scope of the actual Crim.R.16(K) report—a report which he does not appear to have seen until midway through the State's redirect examination.

In fact, there is no conceivable strategy that could explain defense counsel's failure to object under these circumstances.  The "two points of origin" theory was central to the State's case.  It would have been possible for knowledgeable and prepared defense counsel to challenge this theory through an effective cross examination; Winters' conclusions are flatly unscientific and unsupported even under the standards that Winters' himself cited. *Lentini Affidavit*.  But Ayers's counsel was not knowledgeable or prepared.  He did not ask Winters a single question on the topic.  Instead, his questions appeared focused on inaccuracies in the "first" report, and his closing arguments even *conceded* Winters' conclusions to a "scientific" certainty. Tr. at 437, 448 Ayers's trial counsel does not appear to have changed his theme or tactics at all based on

---

[4] Defense counsel's confusion around which report was actually disclosed appears to have been the grounds for Ineffective Assistance of Counsel alleged on Ayers's direct appeal.  That appeal was denied because, without any evidence that Winters' conclusions were faulty, Ayers could not demonstrate prejudice by her counsel's performance at trial.

Winters' actual testimony, despite the State's emphasis on it. If Ayers's trial counsel had been properly prepared, he would have known Winters' conclusions regarding "multiple points of origin" were not only factually incorrect and unsupported, but also undisclosed and therefore inadmissible pursuant to Crim.R.16(K).[5]

### D. Ayers was prejudiced by the individual and cumulative impact of defense counsel's failures.

In determining whether these deficiencies warrant a new trial, the question is not whether, but-for trial counsel's failures, the State could have offered a minimally sufficient case to uphold a conviction. Instead, the issue is whether or not Ms. Ayers received a fair trial, worthy of confidence. Therefore, under *Strickland*, a new trial should be granted if there is a "reasonable probability" that, but-for defense counsel's deficient performance, the outcome of trial would have been different. Here, both the failure to consult with an expert and the failure to object to undisclosed expert testimony had the same result: the State was allowed to present faulty, unsupported conclusions that the fire had multiple points of origin. Whether or not this was "prejudicial" depends on how important Winters' faulty conclusions were to the conviction.

Winters's "two points of origin" theory was critical to the conviction. The defense theory at trial was that the fire was caused by either a cigarette or by Brennan Jr. playing with a lighter. Tr. 447 ("There are two plausible alternative explanations; Bubba did it, [or Kayla] fell asleep with the cigarette. Careless? Sure. Reckless? Perhaps. Knowingly? Nope. Can't prove it."). The defense, however, *conceded* Winters's testimony was scientific—just not 100% certain:

> "Mr. Winters wasn't lying, it is his opinion. Okay, I'm not saying he's a liar when he comes in and says that's his opinion, but it's not absolutely certain. Okay, if it was, we wouldn't have a jury, we wouldn't—he would be the ultimate authority on whether an arson has been committed or not. There would be no criminal justice

---

[5] Neither the 16(K) violation itself, nor trial counsel's failure to object was appealable on Ayers's direct appeal record. *See infra*, at Section III.

system, it would just be Reggie Winters, arson decider, that would be the end of it, okay. *** Investigator Winters said it was his opinion that the manual that he uses uses levels of scientific certainty, not exact certainty, not complete proof." Tr. 437-38, 448.

In turn, the State used Winters' "scientifically certain" testimony to demolish the defense's case. According to the State, the "two points of origin" conclusion ruled out the fire being accidentally caused by a cigarette:

> If you fall asleep and you drop a cigarette on a mattress, it starts a fire right? It's common sense. It doesn't jump and start another fire, it's not possible. *** There are two separate and distinct origins here according to the expert, according to the pictures. Fire doesn't jump like that. So everything was ruled out except incendiary, and that was to a reasonable degree of scientific certainty." *Id.* at 426.
> ***

> "There's one [point of origin] right there. And there's the second one right there. But, wait, oh, it's an accident. An accident that started twice. So she must have been smoking two cigarettes, one for each hand, and then threw one on this side of the bed and one on this side of the bed, when that becomes her part of the story." *Id.* at 450.

The State also told the jury that Winters' "two points of origin" conclusion meant that Ayers's son, Bubba, could not have started the fire:

> And, again, common sense. You believe that first story that the defendant said, "Bubba started the fire," he would have to hold a lighter like you remember Inspector Winters demonstrating how he had to hold that lighter? He had to hold the lighter, ignite the mattress, **then go and start a second fire, the whole time, no soot, no smoke, not getting burned**? **Impossible.** They all told you, the firefighters told you, he would have something on him because if he was exposed to that fire, that smoke, he would have something on him. He had nothing. **Because remember when—he has to start that second fire, the first point of origin is burning.**" *Id.* at 426-427.
> ***

> "[T]here's only two other plausible explanations as it's been stated, that it was a cigarette, but it had to be two cigarettes because we got two points of origin because fire doesn't hop from one side to the other, so the other plausible explanation is Bubba started the fire.

30

So Bubba had to crawl over that mattress and get over here first and light this fire. And then he can't crawl over that door there because that's a door that sits high, it's a regular door just like that door right there, sitting on its side, you know how hard it would be for you to throw your leg over it and now you're going to ask a three-year-old to crawl over that without knocking it over? So then he has to crawl over that burning mattress and come over here to the front side of it and light this part on fire. That's plausible? No." *Id.* at 454-455.

The State emphasized and reemphasized Winters' conclusions about the origin of the fire because those conclusions were critical to its case.

In fact, those conclusions were completely unscientific and unsupported. In 2019, John Lentini reviewed the photographic evidence and testimony in this case and concluded, unequivocally, that Winters's "two points of origin" theory "is unsupportable by any generally accepted methodology." *Lentini Affidavit* at 9, Section III. According to Lentini, Winters' methodology and conclusions are largely unsupported by the NFPA 921. *Id.* Winters made basic errors in terminology. *Id.* at 20, 28-31. He "conflate[d] V-patterns with the fire's origins." *Id.* at 16-18. He speculated significantly beyond what was called for by the facts. In fact, according to Lentini, Mr. Winters "demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard." *Id* at 9. After reviewing this matter, Lentini concludes that "it is my professional opinion that the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." *Id.* at 32.

This evidence would have had an enormous impact on Kayla Ayers's trial. Without Winters' testimony, the State would have been left with only two pieces of circumstantial evidence. First, Kayla initially told investigators she saw Bubba setting the fire, but later admitted that she had been asleep. Second, weeks before the fire, Kayla "jokingly" told her father she would "burn this motherfucker down." This is far from overwhelming evidence of

guilt.  Ayers correctly suspected that her neighbors were trying to have her children taken away, which explains why she was reluctant to admit she had been sleeping prior to the fire.  And Ayers's "threat" was not a serious one.  The comment was weeks before the actual fire, and even the State's own witness admitted that he did not think it was a genuine threat.

In fact, much of the circumstantial evidence points to Kayla's innocence.  Although the State claimed Kayla's motive was anger at her father, the fire was entirely limited to Kayla's own mattress.  Kayla's son knew how to work a lighter and he confirmed that his mother was sleeping before the fire.[6]  And the only injury was to Kayla herself, who broke a glass and cut her hand *while trying to extinguish the fire*.  Without Winters's unscientific testimony, the remaining facts are completely consistent with an accidental fire, started by a curious and unattended child.  In fact, that explanation is far more plausible than the alternative:  that, in order to get revenge against her father, Kayla intentionally set fire to her own mattress and then injured herself trying to extinguish it.

The State needed Inspector Winters' testimony to rule out an accidental cause of the fire.  Because Kayla's attorneys did not hire their own expert, and because Kayla's attorneys did not object to Winters' undisclosed conclusions at trial, neither the Court nor the jury ever heard the serious flaws in Winters' conclusions.  The question is not whether the remaining evidence could have theoretically supported a conviction.  The question is not even whether there is a "preponderance of evidence" that Winters' conclusions affected the outcome.  The question is merely whether the failure to challenge Winters' faulty testimony had a "reasonable probability" of affecting the outcome.  That standard is more than satisfied.  There is, at minimum, a

---

[6] The NFPA notes that young children can be particularly interested in playing with fire. Between 2007 and 2011, children playing with fire set an average of 7,100 structure fires per year.

reasonable probability that the defense's failures affected the outcome of trial, and Ayers's

*Petition for Postconviction Relief* should be granted.

## COUNTS TWO & THREE
## PROSECUTORIAL MISCONDUCT & RIGHT TO COMPULSORY PROCESS—
## FIFTH SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
## CONSTITUTION

The State of Ohio solicited conclusions from Inspector Winters that it knew had never

been disclosed to the defense. In doing so, the State violated Ohio Crim.R.16(K), which is

specifically designed to prevent parties from conducting criminal trials by ambush, and upon

which Ayers relied as part of a fundamentally fair criminal trial. Furthermore, the State knew or

should have known that these conclusions were unsupported and false, and that Winters was not

qualified to offer them. The State's duty is not to seek convictions, but to seek justice. When it

commits misconduct that prejudices a criminal defendant, the Court should order a new trial.

Government misconduct prejudices a defendant when there is a "reasonable probability"

that, but-for the State's misconduct, the result of trial would have been different.[7] E.g., *United*

*States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976). ("the Court has

applied a strict standard of materiality, not just because [these cases] involve prosecutorial

misconduct, but more importantly because they involve a corruption of the truth-seeking

function of the trial process."). Furthermore, when the State knowingly presents (or fails to

correct) false or misleading evidence, the U.S. Constitution requires the conviction be vacated if

there is any probability that the misconduct affected the outcome. *E.g., Napue v. Illinois*, 360

U.S. 264 (1959).

---

[7] This prejudice standard is identical to the prejudice standard for ineffective assistance of
counsel, discussed in detail *supra*.

In addition, Ohio courts have developed their own three-part test for misconduct related to Crim.R.16(K). The State's violation of Crim.R.16(K) warrants a new trial when "(1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." *State v. Proby,* 10th Dist. Franklin No. 14AP–1067, 2015-Ohio-3364, 2015 WL 4978973, ¶ 34, quoting *State v. Joseph*, 73 Ohio St.3d 450, 458, 653 N.E.2d 285 (1995); *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 131.[8]

As explained in detail above, Ayers would have clearly benefitted from foreknowledge of Winters' "two points of origin" theory, and she was prejudiced by the presentation of these conclusions in violation of Crim.R.16(K). Furthermore, this was not a situation where the State accidentally solicited previously undisclosed testimony—the State specifically guided Mr. Winters to testify regarding his "two points of origin" theory, and that theory was central to the State's prepared closing remarks. Prosecutors knew exactly what had and had not been disclosed to the defense. This was intentional misconduct, and it warrants a new trial under both federal constitutional law and Ohio law.

### COUNTS FOUR & FIVE
### DUE PROCESS- CONVICTION SUPPORTED BY FUNDAMENTALLY UNRELIABLE EVIDENCE—ACTUAL INNOCENCE
### FIFTH, EIGHTH AND FOURTEEN AMENDMENTS TO THE UNITED STATES CONSTITUTION

---

[8] In her direct appeal, Ayers was limited to the record developed at trial. Because her trial attorneys never consulted with an independent expert, the trial record contained no evidence that Winters' conclusions were unscientific and unsupported. As a result, Ayers could not have used her direct appeal to demonstrate how she would have benefitted from foreknowledge of Winters' faulty conclusion, nor could she have demonstrated prejudice from the State's misconduct. Ayers claims are therefore not barred by res judicata.

"Fundamental fairness [is] essential to the very concept of justice." *Lisenba v. California*, 314, U.S. 219, 62 S.Ct. 280 (1941). It would be fundamentally unfair to sustain a criminal conviction based on evidence now known to be false, unsupported, or fundamentally unreliable. The Fourteenth Amendment to the United States Constitution is a "guarantee against conviction on inherently untrustworthy evidence." *Stein v. New York*, 346 U.S. 156, 192, 73 S.Ct. 1077, 1097, 97 L.Ed. 1522 (1953)(overruled on other grounds). The U.S. Constitution's guarantee of due process is violated "by the admission of certain categories of unreliable and prejudicial evidence." *Barefoot v. Estelle*, 463 U.S. 880, 925, 103 S. Ct. 3383, 3411, 77 L. Ed. 2d 1090 (1983)(J.Marshall, dissenting) *citing Watkins v. Sowder*s, 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549 (1981) ("[i]t is the reliability of identification evidence that primarily determines its admissibility"); *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). For example, submitting a coerced confession at trial should "vitiate" a conviction, because that evidence "combines the persuasiveness of apparent conclusiveness with what judicial experience shows to be illusory and deceptive evidence." *Stein*, 346 U.S. at 192. This same reasoning has been directly applied to cases involving junk arson science. *Han Tak Lee v. Tennis*, No. 4:08-CV-1972, 2014 WL 3894306, at *16 (M.D. Pa. June 13, 2014), *report and recommendation adopted sub nom. Lee v. Tennis*, No. 4:CV-08-1972, 2014 WL 3900230 (M.D. Pa. Aug. 8, 2014), *aff'd sub nom. Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159 (3d Cir. 2015)(petitioner "met his burden of showing a due process violation in this case, since the verdict in this matter rests almost entirely upon scientific pillars which have now eroded.")

Inspector Winters's unsupported and unreliable testimony about the origin of the fire is "unreliable and prejudicial" and "illusory or deceptive" evidence. Ms. Ayers's conviction cannot rest on this fundamentally unfair foundation. Sustaining her conviction, in spite of evidence that

Winters' testimony was fundamentally unreliable, would deprive Ms. Ayers's of due process of law, and the Court should grant her *Petition for Postconviction Relief*.

## CONCLUSION

Kayla Ayers was convicted based on testimony that was fundamentally unreliable and unsupported. Her own attorneys failed to investigate the claims against her, and as a result, they allowed this false evidence to be presented to the jury unchallenged. Furthermore, the State committed misconduct by presenting this evidence in the first place. Ms. Ayers should not be made to pay the price for her attorneys' unpreparedness or the State's misconduct, nor should she continue to face punishment for a conviction based on false evidence. She therefore respectfully requests the Court grant her *Petition for Postconviction Relief*, and order that the State of Ohio hold a new trial or dismiss the charges against her within ninety days.

Respectfully Submitted,

/s/ Brian Howe
Brian Howe (0086517)
Attorney for Defendant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon the Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular first class U.S. mail on this 15th day of May, 2020.

/s/ Brian Howe
Attorney for Defendant

36

Run:10/03/2012 22:22

**Red Center**

**SUMMARY CALL SHEET**

Page  1  of  1

Date:  10/03/2012   Time:  20:21:32

Dispatcher: 38

Call No.:   12 0000076178

Type of Call:     STRUCTURE FIRE

**Caller's Name:**     THOMAS EVANS

**Incident Location:**     185.00         26

MASSILLON                    44646                    ST   SE  Suite:

Cross St./Intersect.: LINCON WAY, EAST  & CONNECTICUT AV

Comments: BEV HAMERICK 833-4784

87.4 // 89.8 AFF

Disposition
Comments:

Report No.:

ESN:     037                        Fire Report No.: 93-12-003484          EMS Report No.:

Map Reference:

| Unit# | Car# | DIS | ENR | OSC | TOH | ATH | CLR | INS | INQ |
|---|---|---|---|---|---|---|---|---|---|
| 200 | | 20:43:10 | 20:43:10 | 20:51:11 | 0:00:00 | 0:00:00 | 0:00:00 | 21:11:44 | 21:11:47 |
| 205 | | 20:42:57 | 20:42:57 | 20:48:56 | 21:17:07 | 21:22:38 | 0:00:00 | 22:03:31 | 0:00:00 |
| 211 | | 20:21:52 | 20:24:13 | 20:28:30 | 0:00:00 | 0:00:00 | 0:00:00 | 21:49:25 | 22:15:00 |
| 212 | | 20:21:53 | 20:23:47 | 20:29:42 | 0:00:00 | 0:00:00 | 0:00:00 | 21:15:10 | 21:15:14 |
| 240 | | 20:21:48 | 20:23:14 | 20:29:47 | 21:00:23 | 21:06:51 | 0:00:00 | 21:30:32 | 21:54:52 |

2244
2034
210



DEFENDANT'S EXHIBIT
A

Ayers Reports 000120
(rec'd August 2019)

## MASSILLON FIRE DEPARTMENT
## RESPONSE RECORD

C:/MSPUB/FORMS\RUN-REP O.F.

Station: __Z__

Alarm No.: **3484**

Date : **Oct. 03, 2012**

☑ FIRE  ☐ PS  ☐ R&E

Shift:  ☐1  ☐2  ☑3

Type of Call:  ☐ Accid.
☑ Building  ☐ Box _____
☐ Vehicle  ☐ Out on arrival
☐ Other  ☐ False

Under Control: _____

| Vehicle | Enroute | On Scene | Fill | In Service | In Quarters |
|---------|---------|----------|------|-----------|-------------|
| E - 210 |         |          |      |           |             |
| E - 211 | 2024    | 2028     |      | 2149      | 2215        |
| E - 212 | 2023    | 2029 .   |      | 2115      | 2115        |
| E - 213 |         |          |      |           |             |
| E - 214 |         |          |      |           |             |
| E - 215 |         |          |      |           |             |
| T - 216 |         |          |      |           |             |
| R - 218 |         |          |      |           |             |
| R - 220 |         |          |      |           |             |
| R - 230 |         |          |      |           |             |
| R - 240 | 2023    | 2029     |      | 2130      | 2154        |

Location: **185 26th SE**

BUILDING:
Occupant(s):  **BRENNAN SCOTT, KALA AYERS,** ████████ ████ ████

Owner:  **CHRIS THOMAS**

Address: _____

Construction Type: **WOOD FRAME**

No. of Stories'. __**Two**__  Type of Occupancy:  **RESIDENTIAL**

Smoke Detectors: ☐Yes ☑No  Activated: ☐Yes ☑No    Bldg. Sprinklered: ☐Yes ☑No  Activated: ☐Yes ☑No

Insurance Agent (building): **UNKNOWN**

Insurance Agent (contents): _____

Estimated Loss (building): _____**$2000.00**_____    Estimated Loss (contents): _____**$1000.00**_____

VEHICLE:
Owner: _____    Driver: _____

Address: _____    Address: _____

Make: _____    V. 1. N. _____

Year: _____  License: _____    Estimated Loss: _____

Insurance Agent: _____

OTHER: _____

FIRE : (cause): _____

Origin (Floor & Location): _____

Extension to: _____

CASUALTIES: (Injuries, Deaths (Name, Age, Injury)

**KALA AYERS CUT HER HAND.**



DEFENDANT'S EXHIBIT
__B__

Ayers Reports 000118
(rec'd August 2019)

| HOSE | Laid | Used | Total Feet | Section Numbers |
|------|------|------|------------|-----------------|
| Booster | | | | |
| 1 1/2" | | | | |
| 1 3/4" | '200' | '200' | '200' | 947 948 975 941 |
| 2 1/2" | | | | |
| 2 1/2" | | | | |
| 4" | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Pump Time..... | | Axes............ | | Aerial.......... | | Hand lights...... Two |
| Ladders used.. | | Pike poles...... Two | | Fans............ One Hour | | Generator....... One Hour |
| (give Length) ... | | Flood lights.... | | Scotts.......... 4 | | Extinguishers.. |
| Other: | | | | | | |

| Hydrant Location: | 26TH | Condition: | GOOD | Time: |
|-------------------|------|------------|------|-------|
| Hydrant Location: | | Condition: | | Time: |

**REMARKS & DETAILS -**

CALLED TO ABOVE ADDRESS FOR REPORTED FIRE. UPON ARRIVAL FOUND MATTRESS IN BASEMENT WAS THE SOURCE OF THE FIRE. PULLED LINE OFF E-211 TO PUT OUT WITHOUT INCIDENT. PRIMARY SEARCH OF HOUSE FOUND EVERYONE OUT. OCCUPANT STATED SHE WAS IN BASEMENT AND ATTEMPTED TO PUT OUT FIRE PRIOR TO OUR ARRIVAL. ALL PERSONNEL EXPOSED TO SMOKE FLAME AND EXHAUSTION.

SIGNED: (Name & Rank) _Steph D. All asst Chief_

| VEHICLE | OFFICER | DRIVER | TAIL | MASK |
|---------|---------|--------|------|------|
| E210 | | | | |
| E211 | COLLINS, S | NEGULICI , S | TYRRELL/ E. SMITH | M. CANFORA |
| E218 | | | | |
| E212 / R220 | RHODES | GREENWOOD | DAVIS, R | |
| E213 / R230 | | | | |
| E214 / R240 | ANNEN, R | WAGNER, T | THARP, C | |
| E215 | | | | |

**ADDITIONAL PERSONNEL:**
INSPECTOR WINTERS, CHIEF 200

Ayers Reports 000119
(rec'd August 2019)

# INCIDENT REPORT - PART 2

**INCIDENT NUMBER:** 12-17627
**REPORT DATE / TIME:** 10/03/2012  2251

**INCIDENT LOCATION:** 185 26th ST SE Massillon, OH 44646

| REPORTEE | | |
|---|---|---|
| NO. 001 | NAME (Last, First, Middle): Winters, Reginald M. | AGE/D.O.B. | SSN | PHONE |
| | ADDRESS (Street, Apt, City, State, Zip) | | | PHONE |
| | EMPLOYER NAME AND ADDRESS (Street, Apt, City, State, Zip) | | | |

STATEMENT OBTAINED: ☐ Y ☐ N TYPE ☐ WRITTEN ☒ ORAL ☐ TAPED ☐ OTHER

CHECK CATEGORIES: ☐ STOLEN ☐ RECOVERED ☐ IMPOUNDED ☐ RECEIVED ☐ SUSPECT VEH ☐ VICTIM'S VEH ☐ UNAUTH. USE ☐ ABANDONED

**VEHICLE**

☐ DAMAGE TO VEHICLE ☐ THEFT FROM VEHICLE

| NO. | LIC | LIS | LIY / / | LIT | VIN / OAN | VALUE |

| VYR | VMA | VMO | VST | VCO | TOP / BOTTOM | VEHICLE LOCKED ☐ Y ☐ N | KEYS IN ☐ Y VEHICLE ☐ N | HOLD ☐ Y VEHICLE ☐ N | ☐ Y RELEASE ☐ N | ☐ Y CONTENT ☐ N |

| VEHICLE ASSOC. W/ SUSPECT NO. | VEHICLE ASSOC. W/ VICTIM NO. | VEHICLE TOWED? ☐ Y ☐ N | TOWED BY | OWNERSHIP VERIFIED BY: | ☐ TAG RECEIPT ☐ BILL OF SALE | ☐ Y TITLE ☐ N | ☐ OTHER |

| STOLEN MOTOR VEHICLE ONLY. NO. ☐ STOLEN | AREA STOLEN: ☐ RESID. ☐ BUSINESS ☐ RURAL | ADDITIONAL DESCRIPTION |

AUTO INSURER NAME (Company) ADDRESS (Street, City, State, Zip) | PHONE

MOTOR VEHICLE RECOVERY ONLY: NO. ☐ RECOVERED | DATE REC. | STOLEN IN YOUR JURISDICTION ☐ Y ☐ N  WHERE RECOVERED?

**PROPERTY**

TYPE PROPERTY LOSS / ETC. (enter codes below): 1 NONE  2 BURNED  3 COUNTERFEITED / FORGED  4 DESTROYED / DAMAGED / VANDALIZED  5 STOLEN / ETC.  6 SEIZED  7 RECOVERED  8 UNKNOWN  P PHOTO  E EVIDENCE | TOTAL VALUE

| LOSS CODE | QUANTITY | DESCRIPTION | | PROP CODE | VALUE |
|---|---|---|---|---|---|
| | VEH NO. | MAKE / BRAND | MODEL | | DATE RECOVERED |
| | SERIAL NUMBER | NCIC NUMBER | OTHER NUMBER | | |

| LOSS CODE | QUANTITY | DESCRIPTION | | PROP CODE | VALUE |
|---|---|---|---|---|---|
| | VEH NO. | MAKE / BRAND | MODEL | | DATE RECOVERED |
| | SERIAL NUMBER | NCIC NUMBER | OTHER NUMBER | | |

| LOSS CODE | QUANTITY | DESCRIPTION | | PROP CODE | VALUE |
|---|---|---|---|---|---|
| | VEH NO. | MAKE / BRAND | MODEL | | DATE RECOVERED |
| | SERIAL NUMBER | NCIC NUMBER | OTHER NUMBER | | |

| LOSS CODE | QUANTITY | DESCRIPTION | | PROP CODE | VALUE |
|---|---|---|---|---|---|
| | VEH NO. | MAKE / BRAND | MODEL | | DATE RECOVERED |
| | SERIAL NUMBER | NCIC NUMBER | OTHER NUMBER | | |

**PROPERTY CODES:**

EXCHANGE MEDIUMS
01 Money
02 Credit / Debit Card
03 Negotiable Instruments
04 Other Exchange Mediums
DOCUMENTS
05 Non-Negotiable Instruments
06 Personal Papers
07 Other Documents

VALUABLES
08 Jewelry / Precious Metals
09 Art Objects, Antiques
10 Other Valuables
PERSONAL EFFECTS
11 Clothing Furs
12 Purses / Handbags / Wallets
13 Other Personal Effects
HOUSEHOLD ITEMS
14 Household Items
EQUIPMENT
15 Drug / Narcotic Equip.

16 Gambling Equipment
17 Computer Hardware / Soft.
18 Office Equipment
19 Stereo / TV Equip.
20 Recordings Audio / Vis.
21 Sports Equipment
22 Photographs Equip.
23 Farm Equipment
24 Heavy Construction / Industrial
25 Building Supplies - Const.
26 Tools
27 Vehicle Parts / Acces.

28 School Supplies
29 Other Equipment
CONSUMABLE ITEMS
30 Alcohol
31 Drugs / Narcotics
32 Consumable Goods
ANIMALS
33 Livestock
34 Household Pets
VEHICLES
35 Aircraft

36 Automobiles
37 Bicycles
38 Buses
39 Trucks
40 Trailers
41 Watercraft
42 Recreational Veh.
43 Other Motor Veh.
WEAPONS
44 Firearms
45 Other Weapons

STRUCTURES
46 Single Occupancy
47 Other Dwellings
48 Commercial / Bus.
49 Indus. / Mfg.
50 Public / Comm.
51 Storage
52 Other Structure
OTHER
93 Merchandise
94 Other Property
95 Pending Inventory

**NARRATIVE**

MFD was sent to a possible structure fire at the listed address. Upon their arrival, it was determined that the origin of the fire was in the basement and that a mattress had caught on fire. Injuries were minor to one of the adult occupants, although a young child had been present at the time (no injuries to the child), so the incident will be reviewed by the city prosecutor's office ASAP.



DEFENDANT'S EXHIBIT C

Ayers Reports 000127
(rec'd August 2019)

DEFENDANT'S EXHIBIT D

## MASSILLON FIRE DEPARTMENT EMS RUN REPORT

| INCIDENT LOCATION TYPE SEE REFERENCE #1 | Res | EMS SERVICE #76-027 | PRIMARY | 218 220 230 240 | DATE 10-3-18 | RUN NUMBER 3484 |
|---|---|---|---|---|---|---|
| | | | TRANSPORT | 218 220 230 240 | | |

INCIDENT ADDRESS: 185 26th SE  CITY: Massillon  STATE: OH  ZIP: 44646 44647  COUNTY: STARK

PATIENT NAME: LAST: Ayres  FIRST: Kayla  MI:  ST. PHYSICIAN: NONE  PHONE:

PATIENT ADDRESS: ☐ SAME AS INCIDENT  CITY:  STATE:  ZIP:

| AGE 33 | D.O.B. 2-10-89 | GENDER ☐ MALE ☒ FEMALE | RACE ☒ CAUCASIAN ☐ ASIAN ☐ UNKNOWN ☐ AFR. AMERICAN ☐ AMER. INDIAN | ETHNICITY ☐ HISPANIC ☐ UNKNOWN ☐ NON HISPANIC |

CURRENT MEDICATIONS: Aderol

PAST MEDICAL Hx:
☐ NONE ☐ ASTHMA ☐ DM ☐ SEIZURE ☐ DEMENTIA ☐ MI
☐ HTN ☐ COPD ☐ NIDDM ☐ CVA ☐ ANXIETY ☐ CAD
☐ RENAL ☐ CHF ☐ CA ☐ TIA ☐ PSYCH. ☐ ANGINA
LIST: ☐ ADHD

ALLERGIES: ☒ NKDA

☐ LIST TO HOSPITAL  ☐ NONE

| INJURY PRESENT ☒ YES ☐ NO | CAUSE OF INJURY SEE REFERENCE #2 Blunt | TYPE OF INJURY ☒ BLUNT ☐ BURN ☐ PENETRATING ☐ BLAST ☐ EXPOSURE ☐ OTHER ☐ UKNOWN ☐ N/A | PATIENT DISPOSITION ☒ TREATED/TRANSPORTED EMS ☐ TREATED/REFUSE TRANSPORT ☐ CANCELLED ☐ TREATED/TRANSFERRED CARE ☐ NO TREATMENT/NO DUTY ☐ DOA ☐ TREATED/TRANSPORTED POV ☐ PATIENT REFUSED CARE ☐ PT LIFT ☐ TREATED/TRANSPORTED BY PD ☐ NO PATIENT FOUND ☐ N/A |

DISPATCHED COMPLAINT SEE REFERENCE #3: (R) hand lac.

CHIEF COMPLAINT SEE REFERENCE #4: (R) hand lac.

CHIEF COMPLAINT/ANATOMIC LOCATION:
☐ ABDOMEN ☐ EXTREMITY LOWER ☐ BACK
☐ CHEST ☒ EXTREMITY UPPER ☐ NECK
☐ HEAD ☐ GENERAL/GLOBAL ☐ GENITALIA

CHIEF COMPLAINT/ORGAN SYSTEM:
☐ CNS/NEURO ☐ PULMONARY ☐ SKIN ☐ N/A
☐ CARDIOVASCULAR ☐ OB/GYN ☐ MENTAL ☐ RENAL
☐ MUSCULOSKELETAL ☐ GASTRO ☐ GENERAL/GLOBAL

RESPONSE MODE:
☐ LIGHTS/SIRENS ☐ NO LIGHTS/SIRENS
TRANSPORT MODE:
☐ LIGHTS/SIRENS ☐ NO LIGHTS/SIRENS

TYPE OF SERVICE REQUESTED:
☒ 911 RESPONSE ☐ WALK-IN
☐ PT LIFT/(NON)EMER ☐ MUTUAL AID
☐ MEDIC ASSIST ☐ STANDBY

LEVEL OF SERVICE:
☒ BLS EMERGENCY ☐ MEDIC ASSIST
☐ ALS EMERGENCY ☐ SPECIALTY CARE
☐ ALS LEVEL 2 ☐ N/A

### VITAL SIGNS AND PROCEDURES

| TIME | PULSE | RESP | B/P | SPO2 | GCS | BGL | RHYTHM | EMT | PUPILS | SKIN | RESP EFFORT | LUNG SOUND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2051 | 138 | 18 | 106/48 | 98 | 15 | | 4 12 P | SI | ☒ NORM ☐ EQUAL ☐ UNEQUAL ☐ DILATED R L | ☒ WARM ☒ DRY ☐ MOIST ☐ FLUSHED ☐ CYANOTIC ☐ ASHEN | ☒ NORM ☐ SHALLOW ☐ INCREASED ☐ FATIGUED ☐ LABORED ☐ ABSENT | ☒ CLEAR ☐ EQUAL ☐ WHEEZES R L ☐ RALES R L |
| 2058 | 110 | 20 | 106/P | 100 | | | 4 12 P | PT | | | | |

OXYGEN: TIME ___ hrs  4 lpm  ☒ NC ☐ NRB ☐ NEB ☐ BVM
CPR/AED: TIME ___ hrs  ☐ FULL C-SPINE ☐ KED ☐ PEDS BOARD ☐ BACKBOARD ☐ SPLINT
GCS: EYE 4 3 2 1  VERBAL 5 4 3 2 1  MOTOR 6 5 4 3 2 1
GLUCOSE: TIME ___ hrs  1st  ☐ NORM ☐ DELAYED ☐ N/A
GLUCOSE: TIME ___ hrs  2nd  ☐ NORM ☐ DELAYED ☐ N/A

| TIME | PROCEDURE / MEDICATION (see reference #5) | DOSE | ROUTE | ATTEMPTS | SUCCESS | EMT | REACTION/COMPLICATIONS (#7-8) |
|---|---|---|---|---|---|---|---|
| 2051 | IV NS 20 14g | IV | (L) ac | 1 | ☒ YES ☐ NO | CI | None |
| | | | | | ☐ YES ☐ NO | | |
| | | | | | ☐ YES ☐ NO | | |

NARRATIVE: Pt's son was playing c lighter in basement when he caught mattress on fire. Pt tried to put it out c cup of water while running across basement Pt slipped & fell on cup. Pt has 2 lacs in (R) hand, 1 jagged on ring finger, 1 thumb. MSP intact bleeding controlled c dressing. Pt denies any smoke inhalation. IV iniated due to inital Pt H.R. @ 140's slowed to 130's to 118-120 on arrival @ E.D. No other injuries.

TRIAGE AS TRAUMA: ☐ YES ☐ NO

| MED CONTROL CONTACT ☐ YES ☐ NO ☒ NO | DESTINATION ☒ AFFINITY MASSILLON ☐ MERCY MEDICAL ☐ AULTMAN ☐ OTHER | IMPRESSION | UNIT 240R | UNIT R240R | |
| DIVERTED TO: | | INITIAL CALL 2021 | TO HOSPITAL 2100 | EMS CREW | Transport Crew | CERT |
| | | DISPATCHED 2023 | AT HOSPITAL 2106 | WRITTEN Wagner | | P |
| PRIMARY ROLE OF UNIT | | EN ROUTE 2023 | RETURNING | | | |
| ☒ TRANSPORT | TRANSFERRED CARE TO | ON SCENE 2029 | IN SERVICE | | | |
| ☐ NON-TRANSPORT | ☐ SMITH TIME ___ hrs | AT PATIENT 2049 | COMPLETE | | | |
| ☐ SUPERVISOR | ☐ EMT TIME ___ hrs | MILEAGE | START MILES 87.4 | | | |
| ☐ RESCUE | ☐ OTHER ___ hrs | | END MILES 89.8 | DRIVER | | |

121

## MASSILLON FIRE DEPARTMENT EMS RUN REPORT

| PAGE 2 OF 2 | | SERVICE 76-027 | PRIMARY | 218 | 220 | 230 | 240 | DATE 10-3-12 | RUN NUMBER 5484 |
|---|---|---|---|---|---|---|---|---|---|
| NARRATIVE CONTINUED | | | TRANSPORT | 218 | 220 | 230 | 240 | | |

to RM 9 @ AMC @ 2107 hrs

| TIME | PROCEDURE / MEDICATION | DOSE | ROUTE | ATTEMPTS | SUCCESS | EMT | REACTIONS / COMPLICATIONS |
|---|---|---|---|---|---|---|---|
| | | | | | O YES  O NO | | |
| | | | | | O YES  O NO | | |
| | | | | | O YES  O NO | | |
| | | | | | O YES  O NO | | |

| TIME | ADVANCED AIRWAY | | SIZE | CM @ LIPS | ATTEMPTS | SUCCESS | EMT | SECURED? / PLACEMENT CHECK |
|---|---|---|---|---|---|---|---|---|
| | O ET  O COMBITUBE  O CRICOTHYROTOMY | | | | | O YES  O NO | | |
| | O ET  O COMBITUBE  O CRICOTHYROTOMY | | | | | O YES  O NO | | |

| PRIOR AID (see reference sheet #3) | PERFORMED BY | MEDICATIONS/PROCEDURES | TIME | OUTCOME |
|---|---|---|---|---|
| | | | | |

| MASS CASUALTY | NUMBER OF PATIENTS | TYPE OF DESTINATION | | | |
|---|---|---|---|---|---|
| O YES  O NO | O SINGLE  O MULTIPLE  O N/A | Ø HOSPITAL ED/OR/L&D  O OTHER EMS GROUND  O OTHER EMS AIR  O OTHER |

| | REASON FOR DESTINATION CHOICE | |
|---|---|---|
| Ø PT/FAMILY CHOICE  O CLOSEST  O PT PHYSICIAN  O LAW ENFORCEMENT  O PROTOCOL  O MED CONTROL  O DIVERSION  O OTHER |

| DELAY(S) PLEASE LIST | DISPATCH | RESPONSE | SCENE | TRANSPORT | RETURN |
|---|---|---|---|---|---|

| EXTRICATION SECTION | EXTRICATION REQUIRED | O YES  O NO | START TIME | HRS | END TIME | HRS | TOTAL | MIN. |
|---|---|---|---|---|---|---|---|---|

| | USE OF SAFETY EQUIPMENT | | AIRBAG DEPLOYMENT |
|---|---|---|---|
| O NONE USED | O LAP BELT | O HELMET | O PROTECTIVE NON-CLOTHING | O N/A | O DEPLOYED FRONTAL |
| O NOT KNOWN | O SHOULDER BELT | O EYEWEAR | O N/A | O NONE PRESENT | O DEPLOYED SIDE |
| CHILD RESTRAINT | O BOTH BELTS | O PROTECTIVE CLOTHING | O OTHER | O NOT DEPLOYED | O OTHER |

| CARDIAC ARREST SECTION | | BARRIERS TO CARE | ALCOHOL/DRUG USE INDICATORS |
|---|---|---|---|
| CARDIAC ARREST  O N/A  O DOA | RESUSCITATION  O N/A  O DOA | ADVANCE DIRECTIVE  O LANGUAGE  O N/A | O PT ADMITS TO ALCOHOL USE |
| O YES PRIOR TO ARRIVAL | O DEFIBRILLATION ___ hrs | O FAMILY REQUEST | O RESTRAINT | O PT ADMITS TO DRUG USE |
| O YES AFTER ARRIVAL | O VENTILATION ___ hrs | O LIVING WILL | O DEVELOPMENT IMPAIRED | O PT ADMITS TO BOTH |
| O NO | O COMPRESSIONS ___ hrs | O NONE | O HEARING IMPAIRED | O NONE |
| CAUSE OF ARREST  O N/A | O UNKNOWN | O UNKNOWN | O SPEECH IMPAIRED | O N/A |
| O PRESUMED CARDIAC  O DROWNING | O ELECTROCUTION | O DNR FORM CC | O PHYSICALLY IMPAIRED | |
| O TRAUMA  O RESPIRATORY | O OTHER | O DNR FORM CCA | O UNCONSCIOUS | |

### STATEMENT OF PATIENT REFUSAL

I am refusing transport, treatment and/or transport to the nearest medical facility at my own insistence and against the advice of the attending crew and/or consulting hospital physicians. I have been informed by them of the dangers of my not being treated and/or transported at the time. I release Massillon Fire Department EMS Service and/or consulting hospital, their employees, and officers from liability for any adverse results caused by my decision.

| PATIENT/GUARDIAN SIGNATURE | _Josh K_  ER TECH / EMT-P | DATE SIGNED 10-03-12 |
|---|---|---|
| GUARDIAN'S RELATIONSHIP | _____ | DATE SIGNED _____ |
| WITNESSED BY | _____ | DATE SIGNED _____ |
| WITNESSED BY | _____ | DATE SIGNED _____ |

### LIFETIME ACKNOWLEDGEMENT OF SERVICE / ASSIGNMENT / RELEASE OF INFORMATION

I hereby state that I have received services or supplies from Massillon Fire Department and that I am responsible for payment of the same. I authorize payment to City of Massillon of any and all insurance benefits, including Medicaid, Medicare, Major Medical, Worker's Compensation, and Private Insurance, that I may have covering services by City of Massillon. I agree to immediately remit to City of Massillon any payments that I receive directly from any source for the services provided to me. I authorize any holder of medical or other information about me to release same and copies of my records to City of Massillon, the center for Medicare and Medicaid Services (formerly the Health Care Financing Administration), it's agents or carriers, necessary to determine benefits or to process claims for this and all related claims on my behalf, now or in the future. In addition, I acknowledge that I was provided with, or a reasonable attempt was made to provide me with a copy of City of Massillon's Notice of Privacy Practices and my rights in accordance with the Health Insurance Portability and Accountability Act of 1996, also known as HIPPA. I also understand that in any emergency situation HIPPA will be provided upon request. A copy of this form is as valid the original.

| SIGNATURE X | DATE |
|---|---|
| SIGNED BY | RELATIONSHIP TO PT. |
| REASON UNABLE TO SIGN | Ayers Reports 000122 (rec'd August 2019) |

122

| Unit No./MR No. | Account Number | | | | | | | Admit Date | Time | Discharge Date | Time |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0002032226 | 1227780343 | | | | | | | 10/03/12 | 2116 | | |

**Name, Address, Phone**

AYERS, KAYLA J
185 26TH ST SE
MASSILLON        OH 44646
(330) 844-7910

**Admission Information**

| Reg Units | Adm Type | Ad Source | Arrival Mode | | Type | Service | Room-Bed |
|---|---|---|---|---|---|---|---|
| DG | 1 | 1 | MASSILLON | | QMY | ED | - |
| **Occurance Date** | **Previous Encounter Date** | | **Date & Time Printed** | | | **Alert** | |
| 10/03/12 | 09/16/12 | | 10/03/12 2159 | | | | |

**Employer, Address, Phone & Occup**

NOT EMPLOYED

(330) 000-0000

**Patient Information**

| Date of Birth | Age | Sex | Race | Mar Status | Denom. | Church | |
|---|---|---|---|---|---|---|---|
| 02/10/89 | 23Y | F | 1 | S | CHR | NONE | |
| **SSN** | | **Emp Status** 3 | **Retirement Date** | **Occupation** NONE | | | **County** OHIO STAR |

**RELATIVE 1**

| Name, Address, Phone, Relationship | Empl, Address, Phone, Occupation |
|---|---|
| AYERS, JEFF | UNKNOWN |
| | (330) 000-0000 |
| FATHER | UNKNOWN |

**RELATIVE 2**

Name, Address, Phone, Relationship

SCOTT, BRENNAN

**Name & Relationship / Address / Phone / Social Security Nbr. & DOB**

| Name & Relationship | Address | Phone | Social Security Nbr. & DOB |
|---|---|---|---|
| AYERS, KAYLA J | 185 26TH ST SE | (330) 844-7910 | |
| SELF | MASSILLON    OH 44646 | | 02/10/89 |
| **Employer** | **Address** | **Phone** | **Occupation & Date if Retired** |
| NOT EMPLOYED | | (330) 000-0000 | NONE |

| | Ins-Plan Cd Plan Name Group Number | FC Policy Name Address City State Zip | Group Phone Number Agent Phone Number Approval Number | ID Number Policy Number Claim Number | Insured's Name Insured's DOB Relationship to Patient Effective Date |
|---|---|---|---|---|---|
| 1a | | | | | |
| 1b | | | | | |
| 1c | | | | | |
| 2a | | | | | |
| 2b | | | | | |
| 2c | | | | | |
| 2d | | | | | |
| 3a | | | | | |
| 3b | | | | | |
| 3c | | | | | |
| 3d | | | | | |
| 4a | | | | | |
| 4b | | | | | |
| 4c | | | | | |
| 4d | | | | | |

| Admitting Physician | Attending Physician | Primary Care Physician | Referring Physician |
|---|---|---|---|
| PHYSICIAN, NO | PHYSICIAN, NO | PHYSICIAN, UNKNOWN | |

**Admitting Diagnosis**

HAND LACERATION HOUSE FIRE



**Affinity**
MEDICAL CENTER *Close to you*
875 8th St NE, Massillon OH 44646

Form Number 100-0001    Revised 02/01/11
FACESHEET

**AYERS, KAYLA J**
1227780343    0002032226    10/03/12
02/10/89  23Y QMY ED    F
ATT: PHYSICIAN, NO
PCP: PHYSICIAN, UNKNOWN

ALERT:        Ayers Reports 000123
                  (rec'd August 2019)

196

| | | |
|---|---|---|
| 1 | Q | Do you recall the shift that you were |
| 2 | | working that day? |
| 3 | A | Day shift. |
| 4 | Q | And day shift runs from when to when? |
| 5 | A | 6 a.m. to 2 p.m. |
| 6 | Q | Early on in the course of that shift, were |
| 7 | | you asked to go to 185 26th Street |
| 8 | | Southeast? |
| 9 | A | Yes. |
| 10 | Q | Is that located in the City of Massillon, |
| 11 | | Stark County, State of Ohio? |
| 12 | A | Yes. |
| 13 | Q | Upon your arrival there -- well, first of |
| 14 | | all, can you tell me what type of building |
| 15 | | is located at that address? |
| 16 | A | It's a private residence. |
| 17 | Q | And upon your arrival there, were other |
| 18 | | people present? |
| 19 | A | Yes. |
| 20 | Q | Do you recall who was present? |
| 21 | A | Fire Investigator Reggie Winters of the |
| 22 | | Massillon Fire Department.  And I'm not |
| 23 | | sure of the gentleman's name, he was an |
| 24 | | occupant of the residence. |
| 25 | Q | Okay.  Approximately how long did you |



DEFENDANT'S
EXHIBIT
E

197

1              remain there at the residence at that time?

2        A     I believe somewhere in the area of 30

3              minutes.

4        Q     And while there, did you learn that there

5              had been a fire there the night before?

6        A     Yes.

7        Q     After you leave, do you have an occasion to

8              go back to that residence?

9        A     Yes.

10       Q     And what brought you back to that

11             residence?

12       A     I responded back to the residence upon

13             request of Sergeant Greenfield.

14       Q     And he's your superior officer?

15       A     Yes.

16       Q     When you went back to that residence, what

17             were you asked to do?

18       A     I was asked to interview Kayla Ayers

19             regarding a fire at that residence.

20       Q     What steps did you take to make sure that

21             happened?

22       A     We asked Miss Ayers if she would willingly

23             come down to the police department and talk

24             to us regarding the fire.  She agreed to do

25             so.  We did transport her down to the

227

1          Fire Inspector.  You have to be a certified

2          Fire Inspector.  And then from there you

3          have to -- it's two steps.  You have a

4          basic Fire Investigator and then you have

5          an advanced Fire Investigator course you

6          have to take.

7     Q    Let's talk about the certified Fire

8          Inspector training first.  What does that

9          entail?

10    A    That entails looking at multiple burn

11         scenes, learning the scientific methodology

12         of how different things burn as far as

13         oils, gases, electrical fires, the

14         synthetic fires as far as people using open

15         flames to fires, candles, paper.  And we

16         look at the different patterns the fire

17         makes, the different charring of wood and

18         stuff like that to make our determination

19         whether -- what caused the fire, whether it

20         was mechanical, accidental, or incendiary.

21    Q    Do you have to go to classes for that?

22    A    Yes, sir.

23    Q    And how long were those classes?

24    A    My first class as a basic investigator, it

25         was 32 hours.  The second part of advanced

228

```
 1          was -- it was 40 hours.
 2     Q    Did you successfully complete all those
 3          classes?
 4     A    Yes, sir.
 5     Q    And then at the end of those classes, do
 6          you have to take a test?
 7     A    Yes, sir.
 8     Q    And did you successfully pass all those
 9          tests?
10     A    Yes, sir.
11     Q    So you are now a certified arson
12          investigator?
13     A    Yes.
14     Q    And that's within the State of Ohio?
15     A    Yes, sir.
16     Q    Once you complete that training, do you
17          have to continue to update your education?
18     A    Yes, sir.
19     Q    What do you have to do?
20     A    We have to -- well, we take like different
21          seminars.  One seminar I attend is the
22          International Firefighters Association of
23          Arson Investigators in Columbus.  It's an
24          annual Fire Investigator course week long.
25          We have to maintain 32 hours in a three
```

240

1   Q   Did you find anything in your search that

2       would indicate to you this was a result of

3       a cigarette being left on the mattress?

4   A   No, sir.

5   Q   What other steps did you take after you

6       observed those findings?

7   A   After that I stepped back, I looked and I

8       started looking at the mattress springs

9       itself, and I started noticing the mattress

10      itself had an unusual burn pattern to it.

11   Q   What do you mean by unusual burn pattern?

12   A   Well, I had noticed that the -- which would

13      have been the east end of the bed, towards

14      the east end on the north side, had a

15      heavier char pattern where the springs --

16      what we call -- I'll try to explain it to

17      you, it's called calcination.  It's

18      basically where the fire burned so hot that

19      it will turn the springs white and they'll

20      collapse.  And on that end I had noticed

21      where the fire had burnt the hottest and it

22      traveled westward.  Like it was -- that's

23      where, right there, made a conclusion that

24      I had a fire start there that was low and

25      it started there and traveled west toward

1      the wall because that's where the material

2      was at, that it was consuming as it was

3      burning.

4   Q   Okay.

5   A   Upon that I found a V-pattern where the

6      mattress on the south was a post that was

7      up against it, which was a low V-pattern,

8      which I thought was, okay, out of the

9      ordinary.

10  Q   Okay.  When you say "out of the ordinary,"

11      what do you mean by that?

12  A   There was a makeshift door between the post

13      and the bed that looked like an area that

14      was cordoned off for like a little play

15      area, but the area itself didn't look like

16      it was habitable for anybody to be playing

17      in it because it was an open drain there

18      with no cover overtop of it.

19          So once I continued further

20      investigating, I noticed that the burn was

21      real low, the post sat on probably a 6-inch

22      concrete pad that was right in line with

23      the bottom of the box spring, met up

24      together, and somebody would have to lean

25      over, light that area too.  And so at the

245

1        as State's Exhibit 3E.  Now, is that the

2        bed frame after the mattress and box

3        springs had been removed?

4  A    Yes, sir.

5  Q    Okay.  And what's this area here?

6  A    That area right there is where, as you can

7        see, there's water droplets right there.

8        There was a soil pipe that went to the

9        upstairs bathroom, that melted and

10       water -- that was full of water.  So when

11       the plastic melted and burnt down, that

12       caught fire right here on top of that bean

13       bag.  It didn't go anywhere, it pretty much

14       stopped there and started burning upward.

15       So we had to rule that out that that wasn't

16       the cause of the fire.

17  Q   And this post over here is the post you

18       referred to in the previous picture?

19  A   Yes.  If you look at it, you have the

20       concrete floor, you go up and you have

21       concrete, kind of pyramid, and then right

22       there you can see a clear point of the

23       V-pattern that I was telling you about, the

24       starting point right there, the origin.

25  Q   And I'll show you what's been marked as

1    State's Exhibit 3F.  Is that a close-up of

2    that?

3  A    Yes, sir.

4  Q    And when you talk about the V-pattern, are

5    you referring to this area right in here?

6  A    Yes.

7  Q    And that indicates what to you as a

8    trained -- or a certified arson

9    investigator?

10  A    That is telling me the point of origin of a

11    fire consistent where the fire started.  It

12    started low and it started climbing the

13    post with the heavy charring and stuff like

14    that.

15  Q    Does fire burn down?

16  A    No, not necessarily.  You will have a drop

17    down, but a fire is not going to burn

18    across and then down, down, downward.

19  Q    So the other side of the bed, the other

20    corner where the calcination was, couldn't

21    have caused this damage over here to this

22    post?

23  A    No.

24  Q    And I want to show you what's been marked

25    as State's Exhibit 3G.  And what's depicted

249

| 1 | A | Yes. |
| 2 | Q | And it was fine? |
| 3 | A | The electrical panel, we didn't get any -- |
| 4 | | didn't see any kind of arcing wires.  There |
| 5 | | was some electrical above that area, but |
| 6 | | that was all due to the radiant heat and |
| 7 | | the flames coming up from the bottom up. |
| 8 | Q | And the gas line was intact? |
| 9 | A | The gas line was not attacked.  Our water |
| 10 | | line got attacked due to the fire, the |
| 11 | | water line had heated up and had melted and |
| 12 | | broke.  That's actually what put some of |
| 13 | | the fire out. |
| 14 | Q | I think you misunderstood my question. |
| 15 | A | I'm sorry. |
| 16 | Q | The gas line was intact, there were no gas |
| 17 | | leaks -- |
| 18 | A | Yeah, the gas line was intact.  I'm sorry, |
| 19 | | sir. |
| 20 | Q | That's all right.  So based upon the |
| 21 | | investigation and your training, your |
| 22 | | education and experience, did you, to a |
| 23 | | reasonable degree of scientific certainty, |
| 24 | | form an opinion as to the origin and cause |
| 25 | | of this fire? |

250

1   A   Yes.

2   Q   Okay.  And how many origins were there?

3   A   There were two.

4   Q   And that's based on your certified arson

5       opinion?

6   A   Yes.

7   Q   And what was the cause of this fire?

8   A   The cause of the fire was incendiary, it

9       was open flame.  A person or persons with

10      the act of open flame started this fire.

11  Q   So it wasn't a cigarette butt left on a

12      mattress?

13  A   No.

14          MR. BARR:  Your Honor, I think

15      this might be a good time to stop right

16      here, if you don't mind.

17          THE COURT:  Okay.  Very good.

18      That's fine.

19          All right.  Ladies and gentlemen,

20      we are going to adjourn for today and we'll

21      start back up tomorrow morning with the

22      continuing testimony from Inspector

23      Winters.

24          But, again, I'm going to remind

25      you that during the evening recess do not

268

1      minutes.

2   Q   Now, did you notice any indications on

3      Kayla that she'd been in a fire or in a

4      home involved in a fire?

5   A   When we were at the hospital, I did swab

6      Kayla's arms, hands, and stuff like that,

7      to see if I picked up any soot.  I did take

8      tips and swabbed her nostrils.  I got very

9      light soot out of her nostrils.

10  Q   Did you smell anything on her person, of

11     her --

12  A   I could not smell anything as far as soot

13     or smoke.

14  Q   You indicated that she told you where she

15     was standing --

16  A   Yes.

17  Q   -- when she observed the fire?

18  A   Yes.

19  Q   Now, you had been in that basement and you

20     had taken photographs; is that correct?

21  A   Yes, sir.

22          MR. BARR:  Lori, could I have the

23     docucamera, please?

24     BY MR. BARR:

25  Q   And I've put here on this screen State's

270

1       the mattress that caught on fire.

2    Q    The fire area would be over to this side of

3       the picture?

4    A    Yeah, more to the west to north corner of

5       the basement.

6    Q    And standing from that vantage point, you

7       can't see anything?

8    A    No.

9    Q    After you spoke to Kayla, where did you go

10      next?

11   A    We left the res and went back to the fire

12      scene with Officer Muntean, and he wanted

13      to take a look at the scene and walk him

14      through what happened and stuff like that.

15          And then from there we went to the

16      neighbor's house where the kids were

17      staying, Brennan Junior, and I talked with

18      him.  And when talking with him, I did not

19      observe any soot on him, any soot in his

20      nostrils.  He had no burn marks on his

21      hands of any signs of being in a fire.

22   Q    Okay.  After speaking to Brennan, did you

23      do any more that night with regards to this

24      fire?

25   A    No, we didn't.

271

1    Q    The next day, October 4th, 2012, do you

2         continue your investigation?

3    A    Yes, sir.

4    Q    What do you do?

5    A    I arrived at work about 8:00.  About 8:15,

6         I receive a call from Miss Jennifer who

7         advised me that Miss Ayers and her

8         boyfriend had returned to the residence

9         with the kids.  That night before we had

10       advised them that the house was inhabitable

11       due to the electric being damaged, the soil

12       pipe being damaged, and the amount of smoke

13       damage throughout the whole house.

14             And on my arrival -- on my way to

15       the scene, the dispatcher had called me and

16       advised me that Massillon PD was already on

17       the scene for a call.

18             Once I got there, I met -- I ran

19       into Officer Ricker, and he said everything

20       was fine here.  And I said, They're not

21       allowed to be in here.  We advised them the

22       night before that the house was

23       inhabitable, that they could not stay here.

24            So at that time I notified East

25       Ohio Gas Company, I went ahead and notified

282

1   present at the time of questioning him, we

2   were out on the front porch.

3   Q   Was Officer Muntean taping the conversation

4       in any way --

5   A   No, sir.

6   Q   -- with a body microphone or video camera?

7   A   No, no.

8   Q   Did you attempt to have the 3-year-old

9       light a lighter?

10  A   Yes, we did.

11  Q   Okay.  Was he able to do that?

12  A   He took both hands and held the lighter and

13      he was able to do it.

14  Q   Okay.  So he seemed to be familiar with the

15      object?

16  A   Yeah.

17  Q   Okay.  Okay.  Now, did you prepare a report

18      relating to this fire?

19  A   Yes, sir.

20  Q   Okay.  It's a written report; is that

21      right?

22  A   Yes, sir.

23  Q   Okay.  And is part of the report called an

24      Executive Summary?

25  A   Yes.

283

1   Q   And what is the Executive Summary?

2   A   That is the process that we use for

3       scientific -- we use NFPA 921 which is a

4       guide for fire investigations.  And that is

5       to help us make sure that we cover all

6       points of the fire scene and --

7   Q   Okay.  So is the Executive Summary, is that

8       something that you create before you do

9       your investigation or after you do it?

10  A   That's after I do the investigation.

11  Q   Okay.

12  A   When I'm doing my report, that's after.

13      Once I've collected everything, that's when

14      I basically give my brief synopsis of what

15      I determined the fire scene to be.

16  Q   Okay.  And so if there was one of these

17      reports created in regards to the fires --

18      fire at Miss Ayers's house --

19  A   Yes.

20  Q   -- it would have been created by you; is

21      that correct?

22  A   Yes, sir.

23  Q   Okay.  Do you recall, in your Executive

24      Summary, if you stated the fire originated

25      on the first floor of the home?

284

1  A   Fire had started on the basement floor of

2      the home.

3  Q   Okay.  If I showed you the Executive

4      Summary, would that help refresh your

5      memory?

6  A   Yes.

7  Q   Okay.

8              MR. KUHN:  Your Honor, may I

9      approach the witness?

10             THE COURT:  Yes, you may.

11             MR. KUHN:  Thank you.

12             MR. BARR:  May I see that?

13             MR. KUHN:  Sure.  This has

14     previously been marked Defendant's Exhibit

15     D.

16             THE COURT:  That was Defendant

17     Exhibit what, I'm sorry?

18             MR. KUHN:  D, Judge.

19  BY MR. KUHN:

20  Q   Sir, I'm going to hand you now what has

21     previously been marked Defendant's Exhibit

22     D.  If you could check on the second line

23     the Executive Summary.  Sir, does that seem

24     to indicate that the fire originated on the

25     first floor of the building?

285

| | | |
|---|---|---|
| 1 | A | No, sir, somebody made a typo. |
| 2 | Q | That's a typo?  Okay. |
| 3 | | Okay.  And, do you know, did this |
| 4 | | Executive Summary also say the materials |
| 5 | | first ignited were blankets on the bed? |
| 6 | A | Yes. |
| 7 | Q | Okay. |
| 8 | A | There was some remnants left on the bed on |
| 9 | | the fire scene. |
| 10 | Q | Okay.  So it was a typo as to where the |
| 11 | | fire originated -- |
| 12 | A | Yes, sir. |
| 13 | Q | -- in your report? |
| 14 | A | Yes. |
| 15 | Q | Okay.  And Ms. Ayers did deny setting this |
| 16 | | fire all along; didn't she? |
| 17 | A | Yes. |
| 18 | Q | Okay.  What year was this home built? |
| 19 | A | Not right offhand I don't know, sir. |
| 20 | Q | Do you think it's a newer home or an older |
| 21 | | home? |
| 22 | A | It's an older home. |
| 23 | Q | Okay.  And did you check out the wiring of |
| 24 | | the home? |
| 25 | A | Yes. |

296

```
 1          could be a torch.
 2     Q    Okay.  And that's your opinion?
 3     A    That is my opinion, sir.
 4               MR. KUHN:  Okay.  I think that's
 5          all I have.  Thank you, sir.
 6               THE WITNESS:  Thank you.
 7               THE COURT:  Thank you, Attorney
 8          Kuhn.
 9               Attorney Barr, you may redirect.
10               MR. BARR:  Thank you, Your Honor.
11          May I have your exhibits please?
12               MR. KUHN:  Sure.
13                  REDIRECT EXAMINATION
14          BY MR. BARR:
15     Q    Mr. Winters?
16     A    Yes, sir.
17     Q    You use computers?
18     A    Yes, sir.
19     Q    Are you really good at them?
20     A    No, sir.
21     Q    Me neither.  Do those computers contain
22          your reports and these templates that
23          you've talked about?
24     A    Yes.
25     Q    And sometimes you punch things up and you
```

297

```
 1              put things in and you forget to change
 2              everything?
 3         A    Yes, sir.
 4         Q    But when all is said and done, do you have
 5              a final original cause and origin report
 6              that you keep in your file?
 7         A    Yes, sir.
 8         Q    Do you have that with you by chance?
 9         A    Yes, sir.
10         Q    Could you pull it out?  Could you flip to
11              the Executive Summary in your final -- and
12              this is the final original report, correct?
13         A    Yes.
14         Q    Maintained by your office in the Fire
15              Prevention Bureau --
16         A    Yes.
17         Q    -- as a record and normal course of
18              business, and you keep this and preserve
19              this forever, correct?
20         A    That is correct, sir.
21         Q    Could you read to me the Executive Summary
22              contained in your final original report
23              after all the typos --
24                   MR. KUHN:  Judge, I'm going to
25              object to this.  Is this a document I've
```

298

1    received?

2              MR. BARR:  Yes, it is, Mr. Kuhn.

3              THE COURT:  Could you approach

4    please?

5              MR. KUHN:  Sure.

6              - - - - - -

7              (A conference was held at the

8              bench outside the hearing of the

9              jury.)

10             - - - - - -

11             MR. BARR:  Provided in discovery,

12   Your Honor, the origin and cause report,

13   and I'm asking him to read this based upon

14   the cross-examination of documents that I

15   believe he received from Massillon

16   Municipal Court that were not the final

17   report and contain typographical errors.  I

18   believe the jury needs to know this.

19             THE COURT:  Okay.  Do you want to

20   take a look at this?

21             MR. KUHN:  Yeah, if I could.

22             MR. BARR:  There is the discovery

23   number 15, 2012, it indicates origin and

24   cause from Massillon Fire Department.  The

25   document he has, we don't have in our file.

299

1   This is the only document we could have

2   given him.

3            THE COURT:  Do you want to check

4   your file?

5            MR. KUHN:  Yeah, I'll do that real

6   quick.

7            THE COURT:  Okay.

8        (End of conference at the bench.)

9            - - - - - - - - - -

10           THE COURT:  Ladies and gentlemen,

11  this is one of those times where I'm going

12  to ask you to be patient while we need to

13  address some issues.  If you feel the need

14  to stand up and stretch for a little bit,

15  go ahead and feel free do so, okay?

16           MR. KUHN:  If we signed for them,

17  we signed for them.

18           THE COURT:  If you could approach

19  for just a minute.

20           MR. BARR:  Mr. Kuhn.

21           - - - - - -

22           (A conference was held at the

23            bench outside the hearing of the

24            jury.)

25           - - - - - -

300

1     THE COURT:  Put on the record with

2   respect to the document with which Mr.

3   Winters is being currently examined

4   regarding it appears as though the Defense

5   did sign for the report, and, therefore,

6   you are permitted to cross-examine him.

7     MR. BARR:  Thank you.

8     THE COURT:  Or direct.

9     MR. BARR:  Thank you.

10    (End of conference at the bench.)

11     - - - - - - - - -

12  BY MR. BARR:

13 Q Mr. Winters, if you would, I believe I

14   asked you to read your final original copy

15   of your Executive Summary to this jury,

16   would you do that?

17 A Yes.  After examination of the fire scene

18   it was determined the fire originated in

19   the basement on the bed.  After examination

20   of the fire scene, interviewing witnesses,

21   interviewing the insured and using the

22   levels of scientific certainty as discussed

23   in the 2011 edition of NFPA 921; A Guide

24   for Fire and Explosion Investigation, it is

25   my opinion the ignition source for the fire

301

| | | |
|---|---|---|
| 1 | | was some type of open flame.  The materials |
| 2 | | first ignited were blankets on the bed. |
| 3 | | The act or omission that brought the |
| 4 | | ignition source and the materials first |
| 5 | | ignited together was the deliberate act of |
| 6 | | a person or persons.  Using these elements |
| 7 | | of a fire cause, the cause of the fire is |
| 8 | | incendiary. |
| 9 | Q | And that is in the original final report? |
| 10 | A | Yes, sir. |
| 11 | Q | And the exhibits, Defendant's Exhibit A and |
| 12 | | Defendant's Exhibit D, that Mr. Kuhn showed |
| 13 | | you are not contained in that report? |
| 14 | A | That is correct, sir. |
| 15 | Q | Thank you, Mr. Kuhn. |
| 16 | | Mr. Kuhn asked you about your |
| 17 | | opinion, and that opinion's based on your |
| 18 | | training and education that you've |
| 19 | | received? |
| 20 | A | Yes, sir. |
| 21 | Q | It's based on the years, the five years, |
| 22 | | and 30-some fires that you've investigated? |
| 23 | A | Yes, sir. |
| 24 | Q | And it's also based on the physical |
| 25 | | evidence that you saw at the fire scene? |

310

1     thing I could do was if she wasn't going to

2     leave, I was going to leave.

3   Q    What were those threats?

4   A    Just give me a second.

5   Q    Take your time.

6   A    She told me that she wasn't going to leave

7     and before she would leave she would burn

8     the mother fucker down, in that -- in those

9     words.  And it started getting scary to me.

10     I mean, my girlfriend's pregnant, we have

11     little kids in the house.  And so prior to

12     the fire that actually did happen, possibly

13     up to a week, I don't know, I called my

14     sister and my aunt and the landlord and I

15     told them the threats she was making and it

16     was starting to scare me, I didn't know

17     what to do.

18          And I finally come to the

19     decision, I said, well, if she's not going

20     to leave, then I'm going to leave, I got to

21     get out of here.  I know she didn't have a

22     car so I figured if I get, you know, 50 or

23     a hundred miles away, she's not going to

24     follow me.  Maybe then she would step up

25     and realize, you know, she had to do

339

| | | |
|---|---|---|
| 1 | Q | Did you ever see any arguments between |
| 2 | | them? |
| 3 | A | Yeah.  One night I did, yes. |
| 4 | Q | Was that right before the fire? |
| 5 | A | Um-m, it was approximately a week or so |
| 6 | | before the fire.  I had talked to him the |
| 7 | | night before the fire, though, and there |
| 8 | | was no indication of anything going on at |
| 9 | | the time. |
| 10 | Q | What about the fight that you overheard, |
| 11 | | can you tell us about that? |
| 12 | A | Um-m, I was talking to her dad about the |
| 13 | | boat and how much it would be to get it |
| 14 | | back running.  And her dad was upset |
| 15 | | because it was going to take so much, and |
| 16 | | talking about he -- they're in financial |
| 17 | | situations at the time, and how -- how |
| 18 | | Brennan and them aren't paying rent and how |
| 19 | | basically they was having a hard time with |
| 20 | | the -- financially.  And that pretty much |
| 21 | | Kayla come up and basically said that if |
| 22 | | Jeff ever left her again, she would burn |
| 23 | | the house down. |
| 24 | Q | So you heard Kayla say this? |
| 25 | A | Yes. |

1    Q    And do you see the person that said this in

2         the courtroom?

3    A    Yes, I do.

4    Q    Could you identify her for the Court and

5         the jury?

6    A    Kayla Ayers.

7    Q    Can you describe what she's wearing?

8    A    She's wearing black and Bob Barker sandals

9         and white jeans -- or, I'm sorry, blue

10        jeans.

11   Q    Thank you.

12             MS. SCHNELLINGER:  Your Honor,

13        will the record reflect he's identified the

14        Defendant?

15             THE COURT:  Yes, so reflected.

16        BY MS. SCHNELLINGER:

17   Q    When you heard the Defendant say those

18        words to her father, can you describe her

19        emotions?

20   A    Um-m, it was like she meant it, but she

21        didn't.

22   Q    Was she laughing?

23   A    It was more -- yeah, it was more kind of a

24        laugh or a joke kind of thing.

25   Q    Okay.  But she meant it?

360

1      were trying to put her Pit Bull up because

2      we knew the fire department was coming.

3    Q  Okay.  Where was the Pit Bull?

4    A  It was out running in the yard.

5    Q  Okay.  Now where were you when you were

6      doing all this stuff?

7    A  I was on -- I was at their property --

8      their residence, Kayla's residence, at that

9      time.

10   Q  Where exactly on the property?

11   A  On the side of the house, which would be

12     like their backyard.

13   Q  Okay.  So what did you do next?

14   A  Um-m, after we got the dog tied up, my

15     husband brought us a bunch of wrap -- or

16     towels and stuff, and I was wrapping up her

17     hand.  Karen was asking her where the other

18     two girls were, where her children were,

19     the other two, because she didn't know

20     where they were.

21          Kayla was -- she wasn't able to

22     really respond to her.  All she kept doing

23     was repeating was she going to lose -- Am I

24     going to lose my kids, am I going to lose

25     my kids?  We kept telling her repeatedly,

362

1  A    She was -- she was very upset.  She just

2       wasn't -- she wasn't there, like she

3       just -- it's so hard to -- I'm having a

4       terrible time describing it, but she would

5       kind of like go into like a blank stare at

6       times, and then she would come back and be

7       very upset and agitated and worrying about

8       losing her children.

9  Q    Okay.  Did you notice anything else about

10      her?

11 A    Yeah, there was a strong burnt smell -- it

12      was like a marijuana smell with like a

13      burnt smell to it, but I don't --

14 Q    Do you know where it was coming from?

15 A    That was coming from her breath when she

16      was sitting on my front porch, and I was

17      holding her arm at that time.

18 Q    So you were holding onto her?

19 A    Yeah, I had to hold onto her, she was

20      bleeding pretty good.

21 Q    You said it smelled like burnt marijuana?

22 A    Uh-huh, yeah.

23 Q    Have you had occasion to be around the

24      smell of burning marijuana before?

25 A    Yeah.

378

1      MR. BARR:  Ms. Flowers, can I have

2   the docucamera please?

3      THE BAILIFF:  Sure.

4      MR. BARR:  Thank you.  In just a

5   minute, hopefully.

6   BY MR. BARR:

7   Q   Can you see that on the screen there?

8   A   Yes, I can.

9   Q   That is what has been marked as State's

10      Exhibit 3H.  Do you recognize that?

11   A   Yes, that's the house Kayla was living in.

12   Q   So you say you got there about 6:30 on

13      Wednesday, October 3rd to pick her up?

14   A   Yes, yes.

15   Q   Which door did you go to?

16   A   This door that's on your far right-hand

17      side.  It's like the basement door.

18   Q   I'm going to circle that one.  That one

19      (Indicating)?

20   A   Yes, that one.

21   Q   And what happened when you knocked on that

22      door?

23   A   Um-m, I knocked on the door, but nobody

24      answered at first, but the dog came to the

25      window and was barking.

379

```
 1    Q    Uh-huh.
 2    A    And I heard like a shush -- shushing, like
 3         "shh," and I knocked again, nobody came,
 4         and then so I went to the other door.
 5    Q    And the other door you're referring to, is
 6         that this door over here?
 7    A    Yes.  Which -- um-m, the kitchen door.
 8    Q    Okay.
 9    A    It's -- yeah, it was right behind there.
10    Q    Now, when you knocked on the kitchen door,
11         what did you hear?
12    A    Um-m, I didn't hear anything but the dogs
13         barking.
14    Q    Did you see anything?
15    A    Only -- only the big white dog.
16    Q    Did you see anything while you were
17         knocking at either door --
18    A    Um-m, I did on the -- on the deck that was
19         there, that little deck, there's like a
20         wicker couch or chair, and Kayla's purse
21         that I had seen her carry quite often and a
22         backpack that I thought might have been
23         Layla's.
24    Q    Did anybody ever come to the door?
25    A    No.
```

339

1    Q    Did you ever see any arguments between

2         them?

3    A    Yeah.  One night I did, yes.

4    Q    Was that right before the fire?

5    A    Um-m, it was approximately a week or so

6         before the fire.  I had talked to him the

7         night before the fire, though, and there

8         was no indication of anything going on at

9         the time.

10   Q    What about the fight that you overheard,

11        can you tell us about that?

12   A    Um-m, I was talking to her dad about the

13        boat and how much it would be to get it

14        back running.  And her dad was upset

15        because it was going to take so much, and

16        talking about he -- they're in financial

17        situations at the time, and how -- how

18        Brennan and them aren't paying rent and how

19        basically they was having a hard time with

20        the -- financially.  And that pretty much

21        Kayla come up and basically said that if

22        Jeff ever left her again, she would burn

23        the house down.

24   Q    So you heard Kayla say this?

25   A    Yes.

340

1   Q   And do you see the person that said this in

2       the courtroom?

3   A   Yes, I do.

4   Q   Could you identify her for the Court and

5       the jury?

6   A   Kayla Ayers.

7   Q   Can you describe what she's wearing?

8   A   She's wearing black and Bob Barker sandals

9       and white jeans -- or, I'm sorry, blue

10      jeans.

11  Q   Thank you.

12          MS. SCHNELLINGER:  Your Honor,

13      will the record reflect he's identified the

14      Defendant?

15          THE COURT:  Yes, so reflected.

16  BY MS. SCHNELLINGER:

17  Q   When you heard the Defendant say those

18      words to her father, can you describe her

19      emotions?

20  A   Um-m, it was like she meant it, but she

21      didn't.

22  Q   Was she laughing?

23  A   It was more -- yeah, it was more kind of a

24      laugh or a joke kind of thing.

25  Q   Okay.  But she meant it?

426

1   evidence he was exposed to fire, no
2   evidence he was exposed to smoke, he had no
3   smoke inhalation, he was not under any kind
4   of distress whatsoever. But we know he was
5   in a burning house for ten minutes. We
6   know that he was at substantial risk to his
7   health and safety. We know that.
8           Inspector Winters talked to Bubba,
9   examined him at the scene. And he kept
10  investigating, looking for the person that
11  started that fire. What does that tell
12  you?
13          And, again, common sense. You
14  believe that first story that the Defendant
15  said, "Bubba started the fire," he would
16  have to hold a lighter like you remember
17  Inspector Winters demonstrating how he had
18  to hold that lighter? He had to hold the
19  lighter, ignite the mattress, then go and
20  start a second fire, the whole time no
21  soot, no smoke, not getting burned?
22  Impossible. They all told you, the
23  firefighters told you, he would have
24  something on him because if he was exposed
25  to that fire, that smoke, he would have

1    something on him.  He had nothing.  Because

2    remember when -- he has to start that

3    second fire, the first point of origin is

4    burning.

5         Only one person points the finger

6    at the three-year-old little boy, and

7    that's the Defendant.  One person.  No

8    other evidence supports that.  In fact, all

9    the evidence supports Bubba was nowhere

10    near it.

11         And why would a mother accuse her

12    three-year-old son of starting a fire?  She

13    knows he's not going to get in trouble,

14    he's three.  Place the blame on him, he's

15    three.

16         Now many people repeated those

17    words, "Bubba started the fire," but all

18    that origin -- all that came from was the

19    Defendant.  But if you recall, she only

20    said Bubba started the fire on the night of

21    the fire.  When she learned that didn't

22    make sense, the evidence didn't support

23    that, she changed her story; didn't she?

24    Bubba started the fire.  Then she learned,

25    yeah, that's not going to work, I assume

447

1    here. And with regard to the aggravated

2    arson, that ingredient or element is

3    knowingly. The State of Ohio had a very

4    high burden to meet. They have not

5    successfully met that burden. They cannot

6    prove Kayla knowingly committed the act of

7    aggravated arson. They can show you all

8    the pictures in the world, they can bring

9    in all the phone calls in the world, they

10    can bring in all the inspectors in the

11    world, it's not going to change the fact

12    that they cannot prove that she knowingly

13    set that fire.

14            There are two plausible

15    alternative explanations; Bubba did it,

16    fell asleep with the cigarette. Careless?

17    Sure. Reckless? Perhaps. Knowingly?

18    Nope. Can't prove it.

19            We heard about the bloody

20    handprint. I'm not sure what that was

21    supposed to show us. I guess that she took

22    sort of a poor route when exiting the home,

23    touched a few things, dribbled her blood

24    all over the place. There's pets in there,

25    when she got out, she was concerned about

448

1    her children and dogs and the cat.

2              During voir dire, I talked a lot

3    about the guilt-o-meter, how it would start

4    at zero and maybe creep up depending on

5    what we've seen and heard the last two

6    days.  And in order for you to reach a

7    guilty verdict for aggravated arson, that

8    guilt-o-meter has to creep all the way up

9    to guilt to proof beyond a reasonable

10   doubt.  It has not crept up that far.  It

11   may have crept up some.

12             Officer Ricker wasn't even

13   convinced.  Investigator Winters said it

14   was his opinion that the manual that he

15   uses uses levels of scientific certainty,

16   not exact certainty, not complete proof.

17             This is a situation where an

18   accident is just an accident.  Unfortunate

19   though it may be, it sounds like the

20   firefighters did some great work, maybe

21   saved a couple pets, helped saved the

22   structure.  It sounds great.  And I

23   certainly wouldn't mean to imply that

24   they're lying to us because they're not.

25   This isn't an arson case.  Thank you.

449

1              THE COURT:  Thank you, Attorney

2    Kuhn.

3              Attorney Barr, at this time you

4    have ten minutes for your rebuttal

5    argument.

6              MR. BARR:  Thank you, Your Honor.

7              We have a criminal justice system

8    because criminals, even ones whose guilt

9    have been overwhelmingly proven to you,

10   like Kayla Ayers, don't always admit that

11   guilt.  And this system requires experts,

12   like Mr. Winters, who have to come in here

13   and give you your opinion -- their opinion

14   so that you can make decisions beyond a

15   reasonable doubt.

16             And to stand up here and to say

17   that Mr. Winters needs to find an arson

18   every once in a while to keep his job is

19   like saying every once in a while a cop has

20   to find somebody to commit a murder.  It's

21   ridiculous.  And then he wants to backtrack

22   on that and say, well, I don't want to call

23   him a liar.  But that's what he's doing.

24   He's saying that Mr. Winters came in here

25   and lied to you when he showed you the

454

1    We can't prove she acted

2    knowingly?  Ladies and gentlemen, you see

3    this picture here and you're going to see

4    these other ones here, this one right here,

5    so in order for Bubba -- there's only two

6    other plausible explanations as it's been

7    stated, that it was a cigarette, but it had

8    to be two cigarettes because we got two

9    points of origin because fire doesn't hop

10   from one side to the other, so the other

11   plausible explanation is Bubba started the

12   fire.

13   So Bubba had to crawl over that

14   mattress and get over here first and light

15   this fire.  And then he can't crawl over

16   that door there because that's a door that

17   sits high, it's a regular door just like

18   that door right there, sitting on its side,

19   you know how hard it would be for you to

20   throw your leg over it and now you're going

21   to ask a three-year-old to crawl over that

22   without knocking it over?  So then he has

23   to crawl over that burning mattress and

24   come over here to the front side of it and

25   light this part on fire.  That's plausible?

455

1   No.

2           There's one plausible explanation

3   here.  There's one person who's taken a

4   story and changed it every time she's

5   confronted with the physical evidence, the

6   physical evidence that contradicts

7   everything she says.  And now that

8   guilt-o-meter is going from here to all the

9   way over here, to proof beyond a reasonable

10  doubt, because the only plausible

11  explanation in this case is that Kayla

12  Ayers took a lighter and lit that mattress

13  twice.  The Baking Soda's been added to

14  these cookies, bake them, because Kayla

15  Ayers is guilty and it's proven beyond a

16  reasonable doubt.  Thank you.

17          THE COURT:  Thank you, Attorney

18  Barr.

19          At this point I'm going to

20  continue with my instructions of law.  And

21  at this point we're on page 13 under the

22  Deliberation Instructions.

23          And at this time I'm going to ask

24  counsel, before I go on instructing the

25  jurors with reference to the procedure of

482

1          THE COURT:  All right.  Now, Juror

2     number 24, have you -- has your jury

3     reached a verdict --

4          JUROR #24:  We have.

5          THE COURT:  -- in this case?  You

6     have?  All right.  Could you please hand

7     the verdict forms in the envelope to the

8     bailiff?

9          Okay.  The Court having reviewed

10    the verdict forms and hereby pronounces the

11    verdict as follows:  In the Court of Common

12    Pleas, Stark County, Ohio:  State of Ohio,

13    Plaintiff, versus Kayla Jean Ayers,

14    Defendant, Case number 2012 CR 1567,

15    verdict as to the offense of Aggravated

16    Arson:  We, the jury in this case, being

17    duly impaneled and sworn, do find, by proof

18    beyond a reasonable doubt, the Defendant,

19    Kayla Jean Ayers, guilty of the offense of

20    Aggravated Arson as charged in Count One of

21    the indictment in violation of Revised Code

22    2909.02(A)(2).

23         Each of us said jurors concurring

24    in said verdict signs his or her name

25    hereto the 30th day of January, 2013.  And

483

1     the verdict form is signed by all 12

2     members of the jury.

3            The next verdict form is as

4     follows:  In the Court of Common Pleas,

5     Stark County, Ohio, State of Ohio,

6     Plaintiff versus Kayla Jean Ayers,

7     Defendant, Case number 2012 CR 1567,

8     verdict as to the offense of Endangering

9     Children:  We, the jury in this case, being

10    duly impaneled and sworn, do find, by proof

11    beyond a reasonable doubt, the Defendant,

12    Kayla Jean Ayers, guilty of the offense of

13    Endangering Children as charged in Count

14    Two of the indictment in violation of

15    Revised Code 2919.22(A).

16           Each of us said jurors concurring

17    in said verdict signs his or her name

18    hereto the 30th day of January, 2013.  And

19    the verdict form is signed by all 12

20    members of the jury.

21           At this time I'm going to ask

22    counsel if they wish to approach and review

23    the verdict forms?

24           MR. BARR:  No, Your Honor.

25           MR. KUHN:  Yes, please, Judge.

Massillon Fire Department

Interview Report

ALARM #      3484
Subject:    Kayla Ayers
INTERVIEWER: Inspector Winters
LOCATION: Affinity ER Room 9
DATE: 10/03/2012
TIME STARTED: 21:22
TIME ENDED: 21:45

Present Sgt. Brian Muntean Massillon Police Department.

On interview with Kayla she stated that she was in the basement folding clothes, and her ▆▆▆▆▆▆▆ was with her, Kayla state▆▆▆▆▆▆ was playing with a lighter at the time.

Question: Did you see▆▆▆▆▆▆ Set the mattress on fire?

Answer: No I did not.

Question: What alerted you of the fire?

Answer: I saw the fire on the bed.

Question: Where was▆▆▆▆▆ at?

Answer: He was standing at the end of the bed.

Question: what did you do next?

Answer: I took a blanket and started fanning it but it did not work, so I grab a glass of water and threw it on the fire, and I went back to the washing machine and got more water to put on the fire.  When I was running back to the fire, I trip and fell with the glass in my hand, and that how I cut my right hand.

Kayla States she never left he▆▆▆▆alone at any time.  Kayla also states the fire grew in size quickly.
Question: Did you fall asleep at any time?

Answer: No

Question: Are you on any meds?
Answer: Yes I take Aderol for AHD and that's it.



DEFENDANT'S
EXHIBIT
F

Ayers Reports 000124
(rec'd August 2019)

# NARRATIVE SUPPLEMENT

| | | INCIDENT NUMBER |
|---|---|---|
| | | 12-17527 |
| VICTIM ████████ | OFFENSE  Endangering children | INCIDENT DATE / TIME  10/03/2012   2021 |

**Narrative Type:** Supplement                              Topic:

**Narrative Reporting Officer:** Muntean, Brian SGT-70

I was called by the MFD arson investigator (R/P) to Affinity and spoke with the suspect. The suspect is the mother of the listed victim. The suspect appeared to be very lethargic (there was no odor of alcoholic beverage) and did admit to using prescription meds that are prescribed to her. The suspect first stated that her three year old must have caught the mattress on fire, as she was doing laundry, and the lighter was lying around in the basement. After further questioning about the incident, she admitted that she "may have fallen asleep," but that she was not sure. I advised her that it's not likely that a 3 year old would take a lighter and light a mattress on fire, and then she changed her mind and again said that he must have started the fire.

The suspect had lacerations to her hand, which she stated had been caused when she dropped a glass of water while trying to put out the fire. There was broken glass on the ground near the burned mattress.

I did make contact with Jennifer of Stark Co. CPS, and advised her of the situation. There are three children in the home, and they all were left in the care of the neighbor ████████ since the home was not suitable for habitation for a while after the fire.

MFD arson investigator Reggie Winters and I went to interview the three year-old, as much as we could, regarding what had happened. He did respond by shaking his head "yes" when Reggie asked if Mommy had fallen asleep before the fire. Reggie was going to try to see about getting some special counseling for young children who are subjected to fires through Akron Children's Hospital.

In addition, there had been a check-well-being call recently, where it was suspected that the mother was under the influence of something (U-106 was sent). As noted earlier, I am going to go to the city prosecutor to discuss a charge of endangering children.

Children are:

1. ████████
2. ████████
3. ████████

| ION CLEARED | A ☐ DEATH OF OFFENDER | D ☐ VICTIM REFUSED TO COOP. | G ☐ ARREST - JUVENILE | J ☐ CLOSED | DATE CLEARED |
|---|---|---|---|---|---|
| | B ☐ PROSECUTION DECLINED | E ☐ JUVENILE / NO CUSTODY | H ☐ WARRANT ISSUED | K ☐ UNFOUNDED | |
| | C ☐ EXTRADITION DENIED | F ☐ ARREST - ADULT | I ☒ INVEST. PENDING | U ☐ UNKNOWN | |

| REPORTING OFFICER | Muntean, Brian | BADGE NO.  SGT-70 | DATE  10/03/2012 |
|---|---|---|---|
| APPROVING OFFICER | Pahlau, Richard | BADGE NO.  LT-43 | DATE  10/04/2012 |

**DEFENDANT'S EXHIBIT**
G

Ayers Reports 000128
(rec'd August 2019)

**MASSILLON FIRE DEPARTMENT**
FIRE PREVENTION BUREAU / VOLUNTARY STATEMENT

Date: 10-4-12    Time: 10:21    Place: ███████████

Name: Jeff Ayers ████████████    Age: ███

Home Address: ██████████████████████████

I declare that the following statement is made of my own free will and it is true.

I have been Trying To help my daughter Kayla get on her feet. I Provided a place To stay for her, her boyfriend and her children. She came To Ohio 10 months ago. She has accomplished nothing. No Phone, No car, No Place To live. When I asked her To leave, she Told me she would burn This Mfer down before she left. I am In fear for my safety for me + my family.

JA

JA

JA

JA

Initials: JA    Page 1 of 1
(over)



DEFENDANT'S EXHIBIT
H

Ayers Reports 000007
(rec'd August 2019)

Please see attached Disc for Exhibit I: *Police Station Interview*



---

### 📧 Case Information

# KAYLA JEAN AYERS

Assigned to Judge Farmer in Stark County Common Pleas Court

# 2012CR1567

---

**Charges**

1. 2909.02 (A) (2) [F2] AGGRAVATED ARSON
2. 2919.22 (A) [M1] ENDANGERING CHILDREN

**Name**

AYERS, KAYLA JEAN

**Date of Birth**

Feb 10, 1988

**Address**

185 26TH ST SE
MASSILLON, OH 44646

**Case Status**

Found guilty on January 28th 2013.

**Next Action**

None

**Sentence**

7 years in jail.

**Attorney**

GEORGE URBAN

**Money Owed**

| Total | Payments | Balance |
|---|---|---|
| $4,011.39 | $8.35 | $4,003.04 |



## 🗐 Docket

| ▲ Date | Docket Entry |
|---|---|
| Oct 15, 2012 | DEFENDANT BOUND OVER FROM MASSILLON MUNICIPAL COURT, ON Oct 12, 2012 |
| Oct 15, 2012 | BINDOVER RECEIVED FROM MASSILLON MUNICIPAL COURT, 2012CRA02598 2909.02A2 AGGRAVATED ARSON F2 |
| Oct 15, 2012 | NOTICE OF BINDOVER SENT TO STARK COUNTY SHERIFF. |
| Oct 15, 2012 | DEFENDANT KAYLA AYERS ARRESTED ON October 04, 2012 |
| Oct 15, 2012 | DEFENDANT WAS REPRESENTED IN MASSILLON MUNICIPAL COURT BY FLYNN, BETH |
| Oct 15, 2012 | ON OCT 5, 2012 DEFENDANT HELD IN LIEU OF $50,000.00 TEN PERCENT |
| Oct 26, 2012 | SUBPOENA GRAND JURY - FILED |
| Oct 29, 2012 | SUBPOENA GRAND JURY - RETURNED SERVED |
| Nov 6, 2012 | INDICTMENT FILED. DEFENDANT INDICTED ON CHARGES OF 2909.02 (A) (2) AGGRAVATED ARSON F2; 2919.22 (A) ENDANGERING CHILDREN M1; |
| Nov 6, 2012 | ARRAIGNMENT SET ON 11-09-2012 |
| Nov 6, 2012 | WARRANT ON INDICTMENT AND COPY OF INDICTMENT ISSUED 11-06-2012 TO KAYLA JEAN AYERS BY SHERIFFTO BETH A FLYNN BY HAND DELIVERY |
| Nov 6, 2012 | CASE RANDOMLY ASSIGNED TO JUDGE COURTROOM 3 |
| Nov 7, 2012 | WARRANT ON INDICTMENT RETURNED ON 11-07-2012; SERVED ON 11-06-2012 BY SHERIFF |
| Nov 7, 2012 | INDICTMENT RETURN - SERVED 11/06/2012 |
| Nov 9, 2012 | KRISTINA POWERS APPOINTED ATTORNEY FOR KAYLA JEAN AYERS. HONORABLE COURTROOM 3 ASSIGNED JUDGE. PRETRIAL DATE SET. DEFENDANT KAYLA JEAN AYERS PLEAD NOT GUILTY. |

| ▲Date | Docket Entry |
|-------|--------------|
| Nov 9, 2012 | PRETRIAL ON 11/19/2012 08:00 AM. NOTICES SENT. |
| Nov 9, 2012 | HEARING DISPOSITION SHEET FILED. TRIAL DATE SET. NEXT APPEARANCE SET. |
| Nov 9, 2012 | FINAL PRETRIAL HEARING ON 11/26/2012 08:00 AM. NOTICES SENT. |
| Nov 9, 2012 | TRIAL ON 12/03/2012 09:00 AM NOTICES SENT. |
| Nov 9, 2012 | COURT REPORTER CERTIFICATE FILED |
| Nov 9, 2012 | DEFENDANT'S - REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 9, 2012 | DEFENDANT'S - REQUEST FOR BILL OF PARTICULARS - WITH PROOF OF SERVICE FILED. |
| Nov 14, 2012 | STATE'S BILL OF PARTICULARS FILED WITH PROOF OF SERVICE FILED. |
| Nov 14, 2012 | STATE'S - REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 14, 2012 | STATE ' RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 15, 2012 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Nov 19, 2012 | HEARING DISPOSITION SHEET FILED. HEARING HELD. NO CHANGE IN STATUS. LEAVE SET FOR TRIAL. |
| Nov 19, 2012 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Nov 26, 2012 | HEARING DISPOSITION SHEET FILED. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Nov 26, 2012 | FINAL PRETRIAL HEARING RESCHEDULED FROM 11/26/2012 08:00 AM TO 12/03/2012 08:00 AM NOTICES SENT. |
| Nov 26, 2012 | HEARING DISPOSITION SHEET FILED. TRIAL SET FOR 12-3-2012 IS CONTINUED UNTIL FURTHER ORDER OF THE COURTENTRY TO FOLLOW. |

| ▲ Date | Docket Entry |
|--------|--------------|
| Nov 27, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Nov 27, 2012 | PRETRIAL ON 11/28/2012 11:00 AM. NOTICES SENT. |
| Nov 28, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Nov 28, 2012 | TRIAL ON 12/27/2012 08:00 AM. NOTICES SENT. |
| Nov 28, 2012 | FINAL PRETRIAL HEARING RESCHEDULED FROM 12/03/2012 08:00 AM TO 12/17/2012 08:00 AM NOTICES SENT. |
| Nov 29, 2012 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 29, 2012 | COURT REPORTER CERTIFICATE FILED |
| Nov 30, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Nov 30, 2012 | PRETRIAL ON 12/03/2012 08:00 AM. NOTICES SENT. |
| Nov 30, 2012 | ORDER RELEASING MEDICAL RECORDS |
| Dec 3, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Dec 3, 2012 | PRETRIAL ON 12/10/2012 08:00 AM. NOTICES SENT. |
| Dec 7, 2012 | SUBPOENA - FILED OFF BRIAN MUNTEAN BY SHERIFF; CHRIS THOMAS BY ORDINARY MAIL W/OUT CERT OF MAILING; CHRIS THOMAS BY CERTIFIED MAIL (###447202012CR15671005!!!); JENNIFER CONLEY BY SHERIFF; KAREN BALL BY SHERIFF; JASON PANDREA BY SHERIFF |
| Dec 10, 2012 | HEARING DISPOSITION SHEET FILED. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Dec 10, 2012 | FINAL PRETRIAL HEARING RESCHEDULED FROM 12/10/2012 08:00 AM TO 12/17/2012 08:00 AM NOTICES SENT. |
| Dec 10, 2012 | SUBPOENA - RETURNED SERVED 12/10/2012 OFF BRIAN MUNTEAN; JENNIFER CONLEY; KAREN BALL; JASON PANDREA; |

10/7/2019                                    https://www.starkcjis.org/#/case/detail/CPC/2012CR1567

| ▲Date | Docket Entry |
|---|---|
| Dec 12, 2012 | COURT REPORTER CERTIFICATE FILED |
| Dec 12, 2012 | SUBPOENA - FILED OFF CURTISS RICKER BY SHERIFF |
| Dec 13, 2012 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Dec 13, 2012 | SUBPOENA - RETURNED SERVED 12/13/2012 OFF CURTISS RICKER; |
| Dec 14, 2012 | STATE'S RECEIPT OF DISCOVERY |
| Dec 14, 2012 | DEFENDANT'S - MOTION IN LIMINE FILED - WITH PROOF OF SERVICE FILED. |
| Dec 14, 2012 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Dec 17, 2012 | HEARING DISPOSITION SHEET FILED. COURT ORDERED COMPETENCY EVALUATION ENTRY TO FOLLOW. |
| Dec 17, 2012 | STATUS HEARING SET ON 01/07/2013 08:00 AM NOTICE SENT. |
| Dec 17, 2012 | COURT REPORTER CERTIFICATE FILED |
| Dec 28, 2012 | ORDER DIRECTING THE EVALUATION OF DEFENDANT'S COMPETENCE TO STAND TRIAL |
| Jan 11, 2013 | HEARING DISPOSITION SHEET FILED. |
| Jan 11, 2013 | PRETRIAL SET ON 01/14/2013 08:30 AM NOTICE SENT. |
| Jan 14, 2013 | HEARING DISPOSITION SHEET FILED. TRIAL DATE SET. |
| Jan 14, 2013 | TRIAL ON 02/04/2013 09:00 AM NOTICES SENT. |
| Jan 14, 2013 | SUBPOENA - RETURNED NOT SERVED CHRIS THOMAS; |
| Jan 15, 2013 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Jan 15, 2013 | STATE'S - MOTION IN LIMINE FILED - WITH PROOF OF SERVICE FILED. |
| Jan 16, 2013 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |

| ▲ Date | Docket Entry |
|--------|--------------|
| Jan 16, 2013 | FINAL PRETRIAL HEARING ON 01/23/2013 08:30 AM. NOTICES SENT. |
| Jan 16, 2013 | HEARING DISPOSITION SHEET FILED. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Jan 16, 2013 | TRIAL RESCHEDULED FROM 02/04/2013 09:00 AM TO 01/28/2013 09:00 AM NOTICES SENT. |
| Jan 17, 2013 | SUBPOENA - FILED INVEST REGGI WINTERS BY SHERIFF; JASON PANDREA BY SHERIFF; OFF BRIAN MUNTEAN BY SHERIFF; JENNIFER CONLEY BY SHERIFF; OFF CURTISS RICKER BY SHERIFF; CA CAPT R ANNEN BY SHERIFF; JOHN TYRRELL BY SHERIFF; REP STARK COUNTY JAIL BY SHERIFF; BRENNAN SCOTT BY SHERIFF; RECORDS CUSTODIAN AFFINITY MEDICAL CENTER BY SHERIFF; CHRIS THOMAS BY ORDINARY MAIL W/OUT CERT OF MAILING; JEFF AYERS BY ORDINARY MAIL W/OUT CERT OF MAILING; JEFF AYERS BY CERTIFIED MAIL (###260412012CR15671022!!!) |
| Jan 17, 2013 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Jan 18, 2013 | SUBPOENA - FILED MARY DECK BY SHERIFF |
| Jan 22, 2013 | SUBPOENA - RETURNED SERVED 01/20/2013; INVEST REGGI WINTERS; CAPT R ANNEN; JOHN TYRRELL; OFF BRIAN MUNTEAN; JENNIFER CONLEY; KAREN BALL; JASON PANDREA; OFF CURTISS RICKER; 01/17/2013 REP STARK COUNTY JAIL; 01/20/2013 BRENNAN SCOTT; 01/22/2013 RECORDS CUSTODIAN AFFINITY MEDICAL CENTER; |
| Jan 22, 2013 | SUBPOENA - RETURNED SERVED 01/21/2013 MARY DECK; |
| Jan 22, 2013 | LETTERS - PSYCHIATRIC |
| Jan 22, 2013 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Jan 23, 2013 | HEARING DISPOSITION SHEET FILED. HEARING HELD. NO CHANGE IN STATUS. LEAVE SET FOR TRIAL. |
| Jan 25, 2013 | DEFENDANT'S - MOTION IN LIMINE FILED - WITH PROOF OF SERVICE FILED. |

| ▲Date | Docket Entry |
|-------|--------------|
| Jan 30, 2013 | SENTENCING FORM FILED ADDRESSING INCARCERATION AND CONVEY. FINAL SENTENCING ENTRY TO FOLLOW.. |
| Jan 30, 2013 | WARRANT TO CONVEY |
| Jan 30, 2013 | THE COURT ORDERS THE DEFENDANT TO BE INTERVIEWED BY RE-ENTRY PROGRAM BEFORE THE DEFENDANT IS TRANSPORTED. |
| Jan 30, 2013 | APPOINTMENT OF COUNSEL FOR APPEALS - GEORGE URBAN |
| Jan 30, 2013 | COURT REPORTER CERTIFICATE FILED |
| Jan 30, 2013 | JURY VERDICT FILED - FINDING OF GUILTY |
| Jan 31, 2013 | CONFIRMATION OF RE-ENTRY EVALUATION. |
| Feb 1, 2013 | JURY PANEL USAGE RECORD FILED |
| Feb 1, 2013 | FOUND GUILTY - DEFENDANT SENTENCED TO. MARYSVILLE JAIL ; ON CT # 1 (AGGRAVATED ARSON) FOR 7 YEAR(S) ; ON CT # 2 (ENDANGERING CHILDREN) FOR 180 DAY(S) CONC. WITH CT# : 1, FOR A TOTAL OF 7.0 YEARS INCARCERATION DEFENDENT MAY BE ELIGIBLE TO EARN DAYS OF CREDIT UNDER THE CIRCUMSTANCES SPECIFIED IN O.R.C 2967.193ANY POST RELEASE CONTROL IMPOSED. ENTITLED JAIL TIME CREDIT. OHIO REVISED CODE SECTION 2933.41 AFTER THE APPROPRIATE TIME PERIOD EVIDENCE TO BE DESTROYED PAY COSTS AND ANY MONITORING FEESPURSUANT TO ORC 120.36, IF THE DEFENDANT REQUESTED OR WAS PROVIDED REPRESENTATION BY THE STARK COUNTY PUBLIC DEFENDER, A $25.00 NON-REFUNDABLE APPLICATION FEE IS ASSESSED. NOTIFIED OF RIGHT TO APPEAL. |
| Feb 1, 2013 | NOTICE OF FELONY CONVICTION(S) SENT TO BOARD OF ELECTIONS |
| Feb 1, 2013 | DNA TEST REQUIRED PURSUANT TO O.R.C. 2901.07 |
| Feb 6, 2013 | WARRANT TO CONVEY RETURNED - SERVED 02/05/2013 DELIVERED DEFENDANT TO OHIO REFORMATORY FOR WOMEN. STARK COUNTY SHERIFF. |
| Feb 14, 2013 | JAIL TIME CREDIT (125) DAYS |

| ▲Date | Docket Entry |
|-------|--------------|
| Feb 20, 2013 | DEFENDANT'S NOTICE OF APPEAL FILED - COURT OF APPEALS 2013CA00034 WITH PROOF OF SERVICE FILED. |
| Feb 20, 2013 | DEFENDANT'S DOCKETING STATEMENT FILED |
| Feb 20, 2013 | DEFENDANT'S PRAECIPE FOR TRANSMISSION OF RECORD WITH PROOF OF SERVICE FILED. |
| Feb 20, 2013 | DEFENDANT'S PRAECIPE FOR TRANSCRIPT WITH PROOF OF SERVICE FILED. |
| Feb 20, 2013 | DEFENDANT'S - REQUEST FOR FUNDS - WITH PROOF OF SERVICE FILED. |
| Feb 22, 2013 | SUBPOENA - RETURNED NOT SERVED JEFF AYERS; |
| Feb 22, 2013 | JUDGMENT ENTRY - GRANTING - REQUEST FOR FUNDS |
| Mar 26, 2013 | TRANSCRIPT COST |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS FILED - VOLUME 2 |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS FILED - VOLUME 3 |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS FILED - VOLUME 1 |
| Apr 4, 2013 | STATEMENT SENT TO INSTITUTION FOR $3978.39. |
| Jun 27, 2013 | DEFENDANT'S AFFIDAVIT OF INDIGENCY |
| Jun 27, 2013 | DEFENDANT'S - MOTION FOR APPOINTMENT OF COUNSEL - WITH PROOF OF SERVICE FILED. |
| Jun 28, 2013 | JUDGMENT ENTRY - DENYING - MOTION FOR APPOINTMENT OF COUNSEL |
| Oct 18, 2013 | CRIM PAYMENT RECEIVED FROM OHIO REFORMATORY FOR WOMEN - RECEIPT NO :CR147630 IN THE AMOUNT OF: $4.06 |
| Dec 9, 2013 | JUDGMENT AFFIRMED - COURT OF APPEALS 2013CA00034 |

| ▲ Date | Docket Entry |
|--------|--------------|
| May 8, 2014 | JUDGMENT ENTRY - DENYING - DEFENDANT'S MOTION TO STAY EXECUTION & COLLECTION OF COSTS |
| May 13, 2014 | AFFIDAVIT OF INDIGENCY |
| May 14, 2014 | DEFENDANT'S - MOTION TO STAY EXECUTION AND COLLECTION OF COSTS |
| May 14, 2014 | JUDGMENT ENTRY - DENYING - MOTION TO STAY EXECUTION AND COLLECTION OF COSTS |
| May 28, 2015 | DEFENDANT'S - MOTION FOR CREDIT OF COMMUNITY SERVICE HOURS EARNED TOWARD PAYMENT OF FINES, COURT COSTS, AND/OR RESTITUTION |
| May 29, 2015 | JUDGMENT ENTRY - DENYING - MOTION FOR CREDIT OF COMMUNITY SERVICE HOURS EARNED TOWARD PAYMENT OF FINES, COURT COSTS, AND/OR RESTITUTION |
| Oct 19, 2015 | DEFENDANT'S - MOTION TO REDUCE OR MODIFY SENTENCE - WITH PROOF OF SERVICE FILED. |
| Oct 20, 2015 | JUDGMENT ENTRY - DENYING - MOTION TO REDUCE OR MODIFY SENTENCE |
| Oct 27, 2015 | DEFENDANT'S - MOTION TO REDUCE OR MODIFY SENTENCE (LETTER FORM) |
| Oct 27, 2015 | JUDGMENT ENTRY - DENYING - MOTION TO REDUCE OR MODIFY SENTENCE |
| Nov 9, 2015 | LETTER FROM DEFENDANT REGARDING COURT COSTS |
| Nov 18, 2015 | JUDGMENT ENTRY - DENYING - REQUEST FOR PAYMENT PLAN |
| Mar 4, 2016 | DEFENDANT'S - MOTION TO SUSPEND COLLECTION OF COURT COSTS UNTIL RELEASE FROM PRISON (LETTER FORM) |
| Mar 7, 2016 | JUDGMENT ENTRY - DENYING - MOTION TO SUSPEND COLLECTION OF COURT COSTS UNTIL RELEASE FROM PRISON (LETTER FORM) |

| ▲Date | Docket Entry |
|-------|-------------|
| Oct 20, 2016 | CRIM PAYMENT RECEIVED FROM OHIO REFORMATORY FOR WOMEN - RECEIPT NO :CR184492 IN THE AMOUNT OF: $2.24 |
| Dec 27, 2016 | LETTER TO JUDGE FARMER |
| Jan 6, 2017 | LETTER TO JUDGE FARMER REGARDING COURT COSTS AND FINES |
| Jan 6, 2017 | JUDGMENT ENTRY: THE COURT DID ORDER THAT THE DEFENDANT PAY COURT COSTS ASSOCIATED WITH THIS MATTER |
| Jan 12, 2017 | CRIM PAYMENT RECEIVED FROM OHIO REFORMATORY FOR WOMEN - RECEIPT NO :CR187274 IN THE AMOUNT OF: $2.05 |
| Feb 15, 2017 | LETTER TO JUDGE FARMER FILED |
| Feb 15, 2017 | JUDGMENT ENTRY - DENYING - (LETTER) MOTION FOR PAYMENT PLAN AND REQUEST TO WAIVE COURT COSTS |
| Feb 12, 2018 | DEFENDANT'S - MOTION FOR JUDICIAL RELEASE - WITH PROOF OF SERVICE FILED. |
| Feb 12, 2018 | JUDGMENT ENTRY - DENYING - MOTION FOR JUDICIAL RELEASE |

# Affidavit

RECEIVED
NOV 25 2019
BY:

I Kayla Ayers hereby Swear that the following is accurate and true to the best of my knowledge.

1) Kayla J. Ayers

1) My name is Kayla J. Ayers; I am 30 years old and I live in Stark County, Ohio. I was Charged with Aggravated Arson a second degree felony in October of 2012. I was Convicted of this Crime in 2013, the month of January.

2) I did not set the fire that I was accused of setting.

3) I was ~~continem~~ detained in the Stark County Jail for the entire duration of time between the date I was Charged until I was sent to Prison.

4) My representing attornies were Kristina powers and later Matthew Kuhn

5) I do not recall ever discussing anything about getting an Arson expert.

DEFENDANT'S EXHIBIT
K

6.) I recall Matthew Kuhn stating that he needed more time to review my case as he was just appointed to me, However I do not recall mention of getting an Arson expert to look into my case. In fact, I am positive that he never said he wanted to have an expert review my case.

7.) I was In fear of where my children were and that they may have been placed with CPS. I wanted to be home with them. I knew I was innocent and there wasn't any way I could be convicted of something I did not do.

8.) During my first 4 months "120 days" of prison I was unable to pay for legal services therefore I attempted to have a public defender represent me. George Urban represented me for my appeal and I tried to have OPD represent me for post-conviction relief, They would not represent me.

9) When I was Convicted I had finished 10th grade of High School. I have no education or knowledge of Arson investigation or I am N.A. but Fire Science.

10) During my first 120 days of incarceration I was unable to pay for a private Arson expert. I was unaware that the possibility existed for an Arson expert to challenge the Investigator.

11) When I was Sentenced to prison I felt very hopeless. I felt like everything I believed in pertaining to the Justice System was a lie. I felt alone and like the fact that I was innocent didn't matter Nobody was listening. I was initially Very Sad but I have always maintained my Innocence. I am beginning to feel more hopeful about my future.

State of Ohio                } ss.    Kayla J. Ayers  11-14-19

County of Stark         }

Sworn NATISHA RIGBY    Subscribed before me this 14th
Notary Public, State of Ohio
My Comm Expires April 20, 2020      S, 2019.
Recorded in Stark County

Natisha Rigby

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No.  2012 CR 1567 |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | HON. KRISTIN G. FARMER |
| | : | |
| KAYLA AYERS, | : | |
| | : | |
| Defendant. | : | |

---

### PROFFER OF TESTIMONY OF ATTORNEYS KRISTINA R. POWERS AND MATTHEW KUHN IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL INSTANTER

---

NOW COMES undersigned, Brian Howe, and having been duly sworn and cautioned, proffers as follows regarding the expected testimony of attorneys Kristina R. Powers and Matthew Kuhn.

1. In preparation for this matter, undersigned counsel attempted to communicate with Matthew Kuhn and Kris Powers, the attorneys who represented Ms. Ayers leading up to her conviction in January 2013. Although Ms. Powers and Mr. Kuhn were willing to discuss certain aspects of the case over the phone, neither attorney would provide an affidavit regarding relevant facts about their representation. Without cooperation from Ms. Ayers' trial attorneys, undersigned counsel hereby proffers their testimony as follows in support of Ms. Ayers' *Motion for New Trial*, until such time as they may be subpoenaed to testify in this matter.

2. Ms. Powers refused to provide an affidavit confirming relevant details about her representation of Ms. Ayers. Upon information and belief, if called to testify truthfully before this Court, Ms. Powers would confirm the following facts: Ms. Powers represented Kayla Ayers between approximately October 2012 and mid-January 2013, in her capacity as an attorney with the Stark County Public Defender's Office. In the course of her representation, Ms. Powers did not consult with or retain an expert on arson or fire investigations regarding the specific facts of Ms. Ayers' case. Ms. Powers did not receive any report from the State of Ohio regarding Mr. Winters' conclusion that the fire had two or more points of origin. The Stark County Public Defender's Office file for Ms. Ayers does not contain any contemporaneous notes from discussions with independent



arson experts, nor does it contain any report from the State of Ohio claiming that the fire had multiple points of origin.

3. Mr. Kuhn would not provide an affidavit or other written statement regarding his representation of Ms. Ayers. Upon information and belief, if called to testify truthfully before this Court, Mr. Kuhn would confirm the following facts: Mr. Kuhn represented Ms. Ayers between approximately January 15 and January 28, in his capacity as an attorney with the Stark County Public Defender's Office. Mr. Kuhn was lead defense attorney in Ms. Ayers' trial. During his time as Ms. Ayers' counsel, Mr. Kuhn does not recall consulting with or retaining an expert on arson or fire investigations. If he had done so, he would have taken notes of the consultation / retainer, and he would have placed those documents in the file. Mr. Kuhn does not recall ever having received a Crim.R.16(K) report that stated the fire had multiple points of origin. If Mr. Kuhn had received such a report, he would have placed it in the file. At the time of Ms. Ayers' trial, Mr. Kuhn did not have any specialized knowledge or expertise in arson investigations.

Brian Howe (0086517)
Attorney for Defendant Kayla Ayers

Sworn and subscribed before me this 10th day of April, 2020.

Notary Public

STEPHANIE NICOLE KING
Notary Public, State of Ohio
My Commission Expires
January 29, 2022

Insured: Chris Thomas
Case / File #12- 3484

**Conclusion:**
After the examination of the fire scene, it was determined the fire originated in the basement on the bed. After the examination of the fire scene, interviewing witnesses and interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of NFPA 921; 'A Guide for Fire and Explosion Investigation', it is my opinion the ignition source for the fire was some type of open flame. The materials first ignited were ignitable liquid vapors (gasoline). The act or omission that brought the ignition source and the material first ignited together was the deliberate act of a person or persons. Using these elements of fire cause, the cause of the fire is Incendiary.

Massillon Prevention Bureau
Inspector Reggie Winters





This fire scene examination was conducted using a scientific methodology, the basic method of fire investigation and a systematic approach as discussed in the 2011 edition of NFPA 921; " A Guide for Fire and Explosion Investigation".

**Executive Summary:** After the examination of the fire scene it was determined the fire originated on the first floor, near the south end of the north/south hallway, at/on the floor. After the examination of the fire scene, interviewing witnesses and interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of NFPA 921; "A Guide for Fire and Explosion Investigation," it is my opinion the ignition source for the fire was some type of open flame. The materials first ignited were blankets on the bed. The act or omission that brought the ignition source and the material first ignited together was the deliberate act of a person or persons. Using these elements of fire cause, the cause of the fire is Arson.

**Attachments/Exhibits:**

- Copy of Fire Department Report
- Copy of Written Statement
- Photographs





# IN THE COURT OF COMMON PLEAS

## STARK COUNTY OHIO

STATE OF OHIO,　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　)

　　　　　　　　　Plaintiff,　　　　　)　　Case No. 2012CR1567

　　　　　　　　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　)　　Hon. Kristin G. Farmer

vs.　　　　　　　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　)

KAYLA J. AYERS,　　　　　　　　　　)

　　　　　　　　　　　　　　　　　　)

　　　　　　　　　Defendant.　　　　　)

Affidavit of John J. Lentini
Page 1 of 19



# TABLE OF CONTENTS

I. Introduction..................................................................................................3

II. Retention, Scope of Work and Conclusions ...................................................5

III. There Were Not Two Points Of Origin.......................................................6

IV. Mr. Winters's Conclusion That the 3-Year-Old Boy Could Not Have

      Set the Fire Is Illogical....................................................................12

V. Mr. Winters Did Not Follow NFPA 921....................................................14

VI. Mr. Winters Is Not Qualified to Investigate Fires per the Industry Standard............16

VII. Conclusion.............................................................................19

## I.Introduction

1.

My name is John J. Lentini. I am over the age of twenty-one, am not suffering from any disabilities and I make this affidavit from personal knowledge of the matters addressed herein.

2.

As a Certified Fire Investigator, I have extensive training in the investigation of fires and explosions. I have personally investigated more than 2,000 fire scenes in my career. I hold certifications for fire scene investigation from both the International Association of Arson Investigators (IAAI) and the National Association of Fire Investigators (NAFI). Also, I hold a certification for laboratory analysis of fire debris from the American Board of Criminalistics (ABC). I have testified as an expert more than 200 times. I have been accepted as an expert in fire investigation, chemical analysis of fire debris, the standard of care in fire investigation, and the standard of care in chemical analysis of fire debris.

3.

My formal college education involved the natural sciences (chemistry, biology, physics and mathematics). Following graduation, I spent approximately three years working at the Georgia Bureau of Investigation crime laboratory, where I received extensive training and experience in the examination of physical evidence removed from fire scenes. A copy of my résumé is set forth in the Appendix as Exhibit 1.

4.

I have served on the IAAI Forensic Science Committee and am a past chair of that committee. I am also a past member of the Board of Directors of the American Board of Criminalistics, and I served three terms as Chair of the American Society for Testing and

Materials (ASTM) Committee E-30 on Forensic Sciences. I am a past chair of ASTM Subcommittee E30.01 on Criminalistics. In 1998, I was selected by the U.S. Justice Department as one of two civilians to serve on a planning panel for a document setting forth national guidelines for fire and arson investigation. The panel published its recommendations in June 2000 in a document entitled *Fire and Arson Scene Evidence: A Guide for Public Safety Personnel.* I have also served as a principal Member of the National Fire Protection Association (NFPA) Technical Committee on Fire Investigations, which publishes *NFPA 921, Guide for Fire and Explosion Investigations.* I served on that Technical Committee from 1996 through 2017. I currently serve on the NFPA Technical Committee on Fire Investigator Professional Qualifications, which publishes NFPA 1033 *Standard for Professional Qualifications for Fire Investigator.*

5.

My full-time occupation involves the investigation of fires, the examination of physical evidence from fire scenes, and the review of the work of other fire investigators. I have studied extensively regarding the standard of care for fire investigation, and I have helped to shape that standard through my publications and my work on the NFPA Technical Committees. My work with the IAAI Forensic Science Committee, with ASTM Committee E30 on Forensic Sciences, and with the NFPA Technical Committee on Fire Investigations makes me qualified to inform the Court on the history and evolution of the state of the art in fire investigation, and the investigation that was conducted at the Ayers fire scene by the State's expert.

6.

I have authored a textbook on fire investigation entitled *Scientific Protocols for Fire Investigation,* which was published in 2006 by CRC Press. The Second Edition was published in

2013 and the Third Edition was published in 2018. I have also authored more than 20 publications on fire investigation in peer-reviewed and trade journals.

## II. Retention, Scope of Work and Conclusions

7.

I was requested by the Ohio Innocence Project to evaluate the facts and circumstances surrounding the fire that occurred on October 3, 2012, that damaged the residence located at 185 26th Street, S.E. in Massillon Ohio, in which Kayla Ayers and her family were residing.

8.

I was asked to render an opinion with respect to the methodology and conclusions presented at trial by the State's expert, Reginald Winters. I have carefully reviewed the report and testimony of Mr. Winters. Additionally, I have reviewed multiple photographs of the scene, including those introduced as Exhibits during Mr. Winters's testimony.

9.

**As a result of my education, training, and experience, I conclude unequivocally and to a reasonable degree of professional certainty that:**

    a.    **The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology.**

    b.    **In his testimony, Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers' son Brennan.**

    c.    **Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways**

d.    **Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard.**

### III. There Were Not Two Points Of Origin.

10.

Mr. Winters testified that there were two points of origin on the mattress in the basement (Transcript at pages 250 and 302). The opinion that the physical evidence showed two origins was the only evidence presented that this fire was incendiary. Mr. Winters also claimed the ability to discern *the order* in which the two points were ignited. Absent a videotape of the fire's ignition, both of these conclusions are impossible for the following reasons:

11.

In the Ayers' case, all of the fire damage on the mattress is *contiguous*. Fire investigators are cautioned against making a determination of multiple fires unless there are clear areas of unconnected burning. Thus, the determination of two origins was invalid.

12.

NFPA 921 lists "multiple fires" as the first indicator of an incendiary cause. It is reasonable that it provides this guidance because accidental fires almost always start in one and only one place. The standard cautions, however, of numerous circumstances that can lead to the appearance of multiple origins.

13.

Mr. Winters's conclusion could only be reached if there was an unburned area between the two alleged points of origin. In the instant case, however, the fire damage does not come

---

Affidavit of John J. Lentini
Page 6 of 19

close to meeting the definition of multiple fires. As shown in **Figure 1** below, Image 1210281

(350), no such unburned area exists.



**Figure 1.** Contiguous fire damage on the mattress. There is no credible means of determining more than one origin on this mattress.

14.

NFPA 921 contains the following language on multiple origins:[1]

**22.2.1 Multiple Fires**. Multiple fires are two or more separate, nonrelated, simultaneously burning fires. The investigator should search to uncover any additional fire sets or points of origin that may exist. In order to conclude that there are multiple fires, the investigator should determine that any "separate" fire was not the natural

---

[1] All references to NFPA 921 in this affidavit are to the 2011 edition, which Mr. Winters cited in his report at page 2 and his testimony at pages 283 and 300.

outgrowth of the initial fire.

**22.2.1.1** Fires in different rooms, fires on different stories with no connecting fire, or separate fires inside and outside a building are examples of multiple fires. A search of the fire building and its surrounding areas should be conducted to determine whether there are multiple fires.

**22.2.1.2** Separate fires that are not caused by multiple deliberate ignitions can result from the following:

(1) Fire spread by conduction, convection, or radiation

(2) Fire spread by flying brands

(3) Fire spread by direct flame impingement

(4) Fire spread by falling flaming materials (i.e., drop down) such as curtains

(5) Fire spread through shafts, such as pipe chases or air conditioning ducts

(6) Fire spread within wall or floor cavities within "balloon construction"

(7) Overloaded electrical wiring

(8) Utility system failures

(9) Lightning

15.

The "fires" on the mattress are not "separate." They are not "non-related." There is no evidence that they were "simultaneously burning." The damage is indistinguishable from damage caused by normal fire spread from a single point of origin. In the absence of evidence to the contrary, normal fire spread by direct flame impingement is the default interpretation of the damage.

16.

Mr. Winters attempted to provide evidence of multiple fires by showing two plumes. He conflates the presence of two "V-patterns" with two origins. The plume patterns shown on the column and the wall in **Figure 2** below, are what would be expected from a single fire on the mattress.



**Figure 2**. Two patterns caused by the intersection of a fire plume with a vertical surface. The pattern on the column only appears "separate" because the column is separate from the wall.

17.

In his testimony at page 230, Mr. Winters stated, "What we look for is what we call a fire pattern which is a V-pattern. That would indicate where a fire started at . . ."

18.

Contrary to Mr. Winters's claim, all that a V-pattern indicates is that there was a fuel package burning near the base of the V, and the plume generated by that burning fuel package was intersected by a vertical surface such as a wall or column. NFPA 921, in the section on origin determination states:

**17.4.1.3 Pattern Generation.** The investigator should not assume that the fire at the origin burned the longest and therefore fire patterns showing the greatest damage must be at the area of origin. Greater damage in one place than in another may be the result of differences in thermal exposure due to the differences in fuel loading, the location of the fuel package in the compartment, increased ventilation, or fire-fighting tactics. For similar reasons, a fire investigator should consider these factors when there is a possibility of multiple origins.

**17.4.1.3.1** The size, location, and heat release rate of a fuel package may have as much effect on the extent of damage as the length of time the fuel package was burning. An area of extensive damage may simply mean that there was a significant fuel package at that location. The investigator should consider whether the fire at such a location might of spread there from another location where the fuel load was smaller.

19.

Mr. Winters also explained his opinion regarding fire patterns by describing the condition of the bedsprings. In his testimony at page 240, Mr. Winters stated,

A    After that I stepped back, I looked and I started looking at the mattress springs itself, and I started noticing the mattress itself had an unusual burn pattern to it.

Q    What do you mean by unusual burn pattern?

A    Well, I had noticed that the—which would have been the east end of the bed, towards the east and on the north side, had a heavier char pattern where the springs—what we call—I'll try to explain it to you, it's called calcination. It's basically where the fire burned so hot that it will turn the springs white and they'll collapse. And on that and I had noticed where the fire had burnt the hottest and it traveled westward. Like it was — that's where, right there, made a conclusion that I had a fire start there that was low and it started there and traveled west toward the wall because that's where the material was at, that it was consuming as it was burning.

20.

As will be explained below in the qualifications discussion, the term "calcination" is totally out of place. The correct term is "annealing." Mr. Winters's entire approach to examining bedsprings is flawed. NFPA 921 provides the following guidance about furniture springs:

**6.2.14 Collapsed Furniture Springs**. The collapse of furniture springs may provide the investigator with clues concerning the direction, duration, or intensity of the fire. However, the collapse of the springs cannot be used to indicate exposure to a specific type of heat or ignition source, such as smoldering ignition or the presence of an ignitable liquid. The results of laboratory testing indicate that the annealing of springs, and the associated loss of tension (tensile strength), is a function of the application of heat. These tests revealed that short-term heating at high temperatures and long-term heating at moderate temperatures over 400 °C (750 °F) can result in a loss of tensile strength and in the collapse of the springs. Tests also revealed that the presence of a load or weight on the springs while they are being heated increases the loss of tension.

**6.2.14.1** The value of analyzing the furniture springs is in comparing the differences in the springs to other areas of the mattress, cushion, or frame. Comparative analysis of the springs can assist the investigator in developing hypotheses concerning the relative exposure to a particular heat source. For example, if at the one end of the cushion or mattress the springs have lost their strength, and at the other end they have not, then hypotheses may be developed concerning the location of the heat source. The hypotheses should take into consideration other circumstances, effects (such as ventilation), and evidence at the scene concerning duration or intensity of the fire, area of origin, direction of heat travel, or relative proximity of the heat source. The investigator should also consider that bedding, pillows, and cushions may shield the springs, or provide an additional fuel load. The portion with the loss of spring strength may indicate more exposure to heat than those areas without the loss of strength. The investigator should also consider the condition of the springs prior to the fire.

Nothing in Mr. Winters's report or testimony indicates that he considered these "other circumstances." Further, the photograph shown below as **Figure 3**, presented to the jury as Exhibit 3D, shows that there was a large amount of material on the bed, which accounts for the shape of the fire pattern on the wall. This image was captured before the mattress was removed from the basement.



**Figure 3**. View of the mattress in place, prior to its removal. Note the large quantity of bedding materials against the wall, which kept the wall behind the pile from burning.

## IV. Winters's Conclusion that the 3-Year-Old Boy Could Not Have Set the Fire Is Illogical

21.

Mr. Winters's conclusion that there were two points of origin has been discussed. He went further when he concluded, without any basis, the order in which the two fires were set. Even assuming for argument's sake that there were two points of origin, there is no reasonable means, and none was articulated, to determine the order of ignition. Yet Mr. Winters testified (page 303-305):

A      The one on the post was started first. The one at the second—the one on the south side, north side of the bed, was started second.

Q      Okay. Now this is a door; is that correct?

A      Yes, sir.

Q      And that door was there?

A      That door was there.

Q      Okay. Now, how big was Brennan?

A      I'd say about that tall (Indicating)

Q      Would he be able, in your opinion, to lift his leg up over that door?

A      No, sir.

Q      So he would have had to crawl over that bed—

A      Yes.

Q      —start that fire on that side –

A      Yes.

Q      —then crawl over while it's burning –

                …

Q      Back to my question. The original point of origin right here?

A      Yes, sir.

Q      Then someone would have to crawl across the bed and start another fire over here—

A      Correct.

Q      —while this one was lit?

A      Correct.

This is circular reasoning. It was only impossible for the boy to set the fire if there were, in fact, two points of origin and the fires were set in the order speculated by Mr. Winters. Your affiant has only rarely seen such speculative testimony actually admitted into evidence. One example was the Cameron Todd Willingham case from Texas, which is widely recognized as a grave miscarriage of justice. The fire marshal in that case first opined, without evidence, that

there was a pool of flammable liquid burning on the floor, and then inferred that the Mr. Willingham was lying about his activities because his bare feet did not get burned running through the pool of burning flammable liquid.

22.

An additional logically flawed observation presented to the jury was Mr. Winters's statement that the boy exhibited no smoke on his person. Mr. Winters saw no smoke on the defendant, and found only light smoke when he swabbed her nostrils. He did not swab the boy's nostrils, so there is no way to reliably infer that he was not exposed to the fire.

23.

Brennan's ability to use a cigarette lighter was tested. The fact that he was able to operate the lighter makes it impossible to rule out child fire play as the cause of the fire. According to NFPA, children playing with fire set an average of 7,100 structure fires per year from 2007-2011. (Source: Campbell, R., (2014), "Playing With Fire, NFPA, Quincy, MA)

**V. Mr. Winters Did Not Follow NFPA 921**

24.

Mr. Winters's report opens with the following sentence: "This fire scene examination was conducted using a scientific methodology, the basic method of fire investigation and a systematic approach as discussed in the 2011 edition of NFPA 921; "A Guide for Fire and Explosion Investigation." Some deviations from NFPA 921 have already been mentioned.

- o He discerns multiple fires that do not meet the definition of multiple fires

- o He conflates V-patterns with the fire's origin

- o He misinterprets damage to bedsprings

Additionally, his testimony reveals other deviations from NFPA 921 in his approach to fires. His report states that he "uses the levels of scientific certainty as discussed in the 2011 edition of NFPA 921," but his report does not discuss his own level of certainty. NFPA 921 provides this guidance about levels of certainty:

> **4.5 Level of Certainty.** The level of certainty describes how strongly someone holds an opinion (conclusion). Someone may hold any opinion to a higher or lower level of certainty. That level is determined by assessing the investigator's confidence in the data, in the analysis of that data, and testing of hypotheses formed. That level of certainty may determine the practical application of the opinion, especially in legal proceedings.

> **4.5.1** The investigator should know the level of certainty that is required for providing expert opinions. Two levels of certainty commonly used are probable and possible:
> (1) Probable. This level of certainty corresponds to being more likely true than not. At this level of certainty, the likelihood of the hypothesis being true is greater than 50 percent.
> (2) Possible. At this level of certainty, the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypotheses are equally likely, then the level of certainty must be "possible."

> **4.5.2** If the level of certainty of an opinion is merely "suspected," the opinion does not qualify as an expert opinion. If the level of certainty is only "possible," the opinion should be specifically expressed as "possible." Only when the level of certainty is considered "probable" should an opinion be expressed with reasonable certainty.

Neither the word "possible" nor the word "probable" appear anywhere in Mr. Winters's report.

Further, while NFPA 921 does discuss the level of certainty, it takes no position on the concept of "scientific certainty." In fact, it states,

> **4.5.3 Expert Opinions.** Many courts have set a threshold of certainty for the investigator to be able to render opinions in court, such as "proven to an acceptable level of certainty," "a reasonable degree of scientific and engineering certainty," or "reasonable degree of certainty within my profession." While these terms of art may be important for the specific jurisdiction or court in which they apply, **defining these terms in those contexts is beyond the scope of this document.** [Emphasis added.]

25.

Perhaps more importantly, Mr. Winters believes that accelerated fires burn hotter than accidental fires, and he seems confused about the concept of vapor density. In his testimony at page 232, he stated, "And usually with ignitable liquids, they burn hotter faster because the gas will burn, give you a flash fire where it will ignite fast. Because of the vapor density of it, it will flash and it will go out automatically." NFPA 921 has, since its first edition in 1992 stated,

> **6.2.2.2** Wood and gasoline burn at essentially the same flame temperature. The turbulent diffusion flame temperatures of all hydrocarbon fuels (plastics and ignitible liquids) and cellulosic fuels are approximately the same, although the fuels release heat at different rates.

Further, vapor density has little to do with whether a fire will flash. Consider that both natural gas, which has a vapor density less than air, and gasoline, which has a vapor density greater than air can be involved in flash fires.

26.

Simply stating that one followed NFPA 921 is common, but not sufficient. A fire investigator's adherence to the Guide should be evident in his reports and testimony. Because it is a guide, one is allowed to deviate from it, but such deviations should be documented and justified. Mr. Winters failed to document his deviations from NFPA 921 and so he made no attempt to justify them.

### VI. Mr. Winters Is Not Qualified To Investigate Fires Per the Industry Standard

27.

NFPA 1033, *Standard For Professional Qualifications For Fire Investigator*, sets forth the minimum requirements for someone in either the public sector or the private sector to conduct fire investigations. This standard requires, among other things, that an investigator have

knowledge beyond the high school level of fire science, fire chemistry, and fire dynamics. Mr. Winters did not meet these minimum qualifications when he testified at the Ayers trial.

28.

Mr. Winters is unfamiliar with the terminology of fire investigation. In his testimony at page 231 he defined "incendiary." He stated, "Incendiary means open flame, whether it's a lighter, whether it's a torch, whether it's a match. That means somebody has took an open flame and put it to that product in a lineal fire." An open flame is a kind of ignition source. "Incendiary" means intentionally set, regardless of the ignition source. NFPA 921 defines "incendiary fire cause" as follows: **Incendiary Fire Cause**. The incendiary fire is one intentionally ignited under circumstances in which the person igniting the fire knows the fire should not be ignited."

29.

Mr. Winters described the annealing of the mattress springs as "calcination." He used this term several times in his testimony beginning at page 240. Calcination is a phenomenon that occurs in gypsum drywall and plaster. It is not something that ever happens to metal springs. NFPA 921 describes calcination as follows:

> **6.2.12.1 General**. Calcination is used by fire investigators to describe numerous chemical and physical changes that occur in gypsum wallboard surfaces during a fire. Calcination of gypsum wallboard involves driving the free and chemically bound water out of the gypsum as well as other chemical and physical changes to the gypsum component itself. Calcination involves a chemical change of the gypsum to another mineral, anhydrite. Calcined gypsum wallboard is less dense than non-calcined wallboard. The deeper the calcination into the wallboard the greater the total amount of heat exposure (heat flux and duration).

Calcination of gypsum wallboard is one of the most common effects that occur during a fire. It involves simple fire chemistry.

30.

In his testimony at page 240, Mr. Winters describes the fire pattern on the mattress springs as "unusual." An investigator who has investigated only 30 fires over a five-year period has no idea what is "usual" or "unusual." That is simply insufficient experience to develop an understanding as to normal fire behavior.

31.

Mr. Winters' reports were actually more suited to a private sector investigation than a public sector investigation. Mr. Winters refers to a "date of loss" rather than a "date of fire." More glaringly, he referred to the defendant as "the insured." There is no insurance in involved in this case. The use of the term "insured" is limited to private sector investigators working for insurance companies. Mr. Winters' report uses the term "insured" four times, including a header on page 5, which reads,

Insured: Chris Thomas
Case/ File #12w 3484

## VII. Conclusion

32.

For all the reasons set forth above, it is my professional opinion that the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology.

FURTHER AFFIANT SAYETH NAUGHT.

John J. Lentini, CFI, D-ABC

State of Florida

County of Monroe

Sworn and subscribed before me this _29_ day of July, 2019.

Notary Public



# SCIENTIFIC FIRE ANALYSIS, LLC

88005 Overseas Highway, Suite 10-134
Islamorada, FL  33036
770-815-6392
*e-mail: scientific.fire@yahoo.com, website: www.firescientist.com*

EXHIBIT 1

AUTHOR'S CURRICULUM VITAE

*Fire Investigation, Analysis and Review*
*Fellow, ASTM International, Fellow, American Academy of Forensic Sciences,*
*Member NFPA Technical Committee on Fire Investigator Professional Qualifications*
*Member, NIST/OSAC Subcommittee on Fire and Explosion Investigations*
*Diplomate, American Board of Criminalistics*



**Resume of**
**John J. Lentini, CFI, D-ABC**
**Scientific Fire Analysis, LLC**
**88005 Overseas Highway, #10-134**
**Islamorada, FL 33036**
**(770) 815-6392**
**www.firescientist.com scientific.fire@yahoo.com**

## Capabilities

He can investigate fire or explosion scenes, locate the point of origin, and chemically determine the presence of flammable liquids or explosives. He can evaluate the validity of the work of other investigators through review of reports, testimony, photographs and other data. He is familiar with fire and building codes and can determine whether a structure, product, service or installation met applicable code requirements prior to a fire or other loss. He is capable of performing all types of chemical and instrumental analyses, and giving expert testimony as to the results of his investigations and analyses.

## Scientific Fire Analysis Responsibilities

President and Principal Investigator. Provides training to fire investigators, fire litigators and the public. Conducts preliminary evaluations of customer problems. Supervises or reviews investigations in the area of fire, arson, explosion, and asphyxiation, including review of chemical analysis issues. Prepares and presents expert testimony. Provides litigation support.

## Education

B.A. in the Natural Sciences (Chemistry, Biology, Physics), New College, Sarasota, FL, June 1973.
Postgraduate courses in Chemistry and Criminal Investigation, University of Akron, OH, 1973-74.
Twenty credit hours Graduate Level Chemistry, Georgia State University, Atlanta, GA, 1979-80.

## Training

Short Course in Instrumental Analysis, F.B.I. Academy, Quantico, VA, 1976.
Seminar on Arson and Fraud Investigation, University of Alabama at Birmingham, 1979.
Seminar on Gas Fires and Explosions, University of Alabama at Birmingham, 1980.
33rd, 35th, 37th, 39th, 40th, 42nd and 59th International Association of Arson Investigators Seminars, 1982-91.
Southeast Arson Seminar, University of Georgia, 1979-84, 1996, 2002.
1st, 2nd and 3rd Int'l Symposia on Recent Advances in Arson Analysis and Detection, 1982, 88, 90.
American Academy of Forensic Sciences (AAFS), Annual Meetings, 1988-2016.
National Fire Protection Association (NFPA) Life Safety Code Seminar, Nashville, TN, 1991.
IAAI Electrical Fire Investigation Seminar, Atlanta, GA 1991.
AAFS Workshop on Contemporary Issues of Fire Investigation and Analysis (Panelist) Seattle, WA, 1995.
FBI International Symposium on the Forensic Aspects of Arson Investigations, Fairfax, VA, 1995.
Georgia Fire Investigators Association (GFIA) Seminar on Appliance Fires, Decatur, GA, 1997.
Workshop on Fire Investigations, Forensic Science Society, Harrogate, England, 1997.
Anglo-American Fire Investigation Conference, Brunel University, Uxbridge, England, 1997.
Forensic Fire Engineering and Failure Analysis, Society of Fire Protection Engineers (SFPE), 1998.
International Fire Investigation Conference, Brunel University, Uxbridge, England, 1999.
Fire Litigation Seminar, National Association of Fire Investigators (NAFI)/NFPA, Sarasota, FL, 2000.
Lightning 101, Global Atmospherics, Inc., Atlanta, GA, 2000.
Technical Working Group on Fire and Explosion Investigations, 2nd, 3rd and 4th Annual Symposia, Orlando, FL, 2002-2004.
Fire Dynamics Seminar, NFPA Technical Committee on Fire Investigations, Baltimore, MD, 2003.

**Training (continued)**

First International Symposium on Fire Investigation, Fire Service College, Moreton, England, 2004.
10th International Fire Science & Engineering Conference (Interflam), Edinburgh, Scotland, 2004.
Introduction to Fire Dynamics Simulator and Smokeview, SFPE, Chicago, IL, 2004.
International Fire Investigation Conference, Brunel University, Uxbridge, England, 2005.
Second International Symposium on Fire Investigation, University of Cincinnati, Cincinnati OH, 2006.
Third International Symposium on Fire Investigation, University of Cincinnati, Cincinnati OH, 2008.
Fourth International Symposium on Fire Investigation, University of Maryland, Columbia, MD, 2010.
International Association of Arson Investigators Annual Training Conference, Las Vegas, NV, 2011, 2014.
Fifth International Symposium on Fire Investigation, University of Maryland, Columbia, MD, 2012.
Australian Associations of Fire Investigators, Achieving Better Outcomes, Gold Coast, QLD, 2014.
Canadian National Advanced Fire, Arson and Explosion Training Conference, Markham, ON, 2015
Louisiana Association of Arson Investigators, Annual Training Conference, Baton Rouge, LA, 2015
67th Annual Training Course, International Association of Arson Investigators, May 18, 2016, Orlando, FL.
Canadian National Advanced Fire, Arson and Explosion Training Conference, Markham, ON, 2016.

**CFI Trainer.net modules**
The Scientific Method for Fire and Explosion Investigations, 2006.
Introduction to Fire Dynamics and Modeling, 2008.
A Ventilation-Focused Approach to the Impact of Building Structures and Systems on Fire Development, 2009.
Post Flashover Fires, 2009.
Motive, Means and Opportunity: Determining Responsibility in an Arson Case, 2010.
Evidence Examination: What Happens at the Lab?, 2011.
Understanding Fire Through the Candle Experiments, 2011.
The Practical Application of the Relationship Between NFPA 1033 and NFPA 921, 2013.
NFPA 921 and 1033 2014 Editions: Important Revisions, 2014.
Fundamentals of Residential Building Construction, 2014.
Wildland Fire Investigation, 2014.
Electrical Safety, 2014.
Residential Natural Gas Systems, 2015.
Thermometry, Heat and Heat Transfer, 2017.
Fire Investigator Scene Safety, 2017.
Fire Chemistry, 2018.
Arc Mapping Basics, 2018.

**Professional Certifications and Licensure**

He holds certifications from both the International Association of Arson Investigators (IAAI) and the National Association of Fire Investigators (NAFI). He is also a certified Diplomate of the American Board of Criminalistics, with a specialty in Fire Debris Analysis.

He holds Florida private investigator's license number C 2600083. Florida has reciprocal license agreements with the following states: CA, GA, LA, NC, OK, TN, VA.

**Experience**

**Applied Technical Services, Inc.** January 1978 - October 2006
Manager, Fire Investigations. Authored over 3,000 technical reports. Supervised two fire investigators and an electrical engineer. Managed a chemical analysis laboratory for fire debris using gas chromatography-mass spectrometry (GC-MS). Analyzed more than 20,000 fire debris samples. Served as project manager for major fire investigations. Conducted over 2,000 fire scene inspections. Conducted chemical analyses, designed and conducted physical experiments to re-create fire scenarios. Provided training, consulting and expert witness testimony.

**Metallurgical Engineers of Atlanta** May - December, 1977
Fire scene inspection. Chemical analysis of fire debris. Quantitative chemical and physical analysis on all types of metal. Radiographic inspection of fittings and welds.

## Experience (continued)

**State of Georgia Crime Laboratory** August 1974 - May 1977
Qualitative and quantitative analysis of all types of physical evidence associated with violent and/or property crimes, and testifying to the results of such analyses. Responding statewide to conduct field investigations for law enforcement agencies. Instruction of law enforcement officers in the collection and preservation of physical evidence.

## Courtroom Experience

Since 1975, he has given expert testimony in over two hundred cases in civil and criminal court in several states and in the Federal Courts. He has testified for both Plaintiffs and Defendants, and has been appointed three times as a neutral (Rule 706) expert hired to advise the court. A schedule of testimony provided since 2000, both in trial and in depositions, is available upon request.

## Professional Associations

Member, National Fire Protection Association (NFPA) Technical Committee 921 on Fire Investigations, 1996-2018. (Representing ASTM Committee E30 on Forensic Sciences)
Member, NFPA Technical Committee 1033 on Fire Investigator Professional Qualifications, 2012-present.
Member, NIJ/NIST Organization of Scientific Area Committees (OSAC), Subcommittee on Fire and Explosion Investigation, 2014-present.
Fellow of the American Academy of Forensic Sciences (AAFS) 1995-present. (Member since 1988)
AAFS Criminalistics Section: Chair, Nominating Committee, 1999-2007, Co-chair Program Committee 2012, Chair, Program Committee 2013, Section Secretary, elected 2014, Section Chair, elected 2015.
Member, AAFS Ethics Committee, 2019-present.
Chair, ASTM Committee E30 on Forensic Sciences, elected 1999, re-elected 2001 and 2003.
Vice Chair, ASTM Committee E30 on Forensic Sciences, elected 1995, re-elected 1997 and 2005.
Chair, ASTM Subcommittee E 30.01 on Criminalistics, 1991-1995.
Director, American Board of Criminalistics (ABC), elected 1993, re-elected 1996.
Chair, ABC Proficiency Administration Committee, 1993-1999.
Member, Editorial Board, *Journal of Forensic Sciences*, 2003-2018.
Peer Reviewer, *Forensic Science International*, 2006-present.
Peer Reviewer, *Fire Safety Journal*, 2006-present.
Member, Scientific Working Group on Fire and Explosion Investigations (SWGFEX), 1997-2014.
Peer Reviewer, U. S. Dept. of Justice, NIJ-Office of Science & Technology, 2002, 2007-2012.
Member of the National Association of Fire Investigators (NAFI), 1996-present.
Member of the International Association of Arson Investigators (IAAI), 1978-2001, 2008-present.
Member of the Florida Chapter of the IAAI, 2008-present.
Chair, IAAI Forensic Science Committee, 1988-1991.
Member of the Metro Atlanta Fire Investigators Association, 1978-2006. President, 1981.
Member of the American Chemical Society (ACS), 1978-present.

## Awards

Journal of Forensic Sciences, Award of Merit, 2018
Saferstein Memorial Distinguished Lecturer at Northeastern University, 2017.
Society of Fire Protection Engineers, "Person of the Year" Award, 2015.
Levy Scholars and Rodin-Silverman Scholars Lecturer, U Penn Law School, 2015.
American Academy of Forensic Sciences, Criminalistics Section Special Meritorious Service Award, 2008.
Boy Scouts of America Silver Beaver Award, Atlanta Area Council, 2004.
ASTM Award of Merit, 2001.
ASTM E30 Forensic Sciences Award, 1996.

## Publications

### Books

> *Scientific Protocols for Fire Investigation*, First Edition, 2006,
> Second Edition, 2013, Third Edition, 2018, CRC Press, Boca Raton, FL

### Book Chapters

"Confronting Inaccuracy in Fire Cause Determinations," Chapter 3 in *Forensic Science Reform*, edited by Wendy Koen and C. Michael Bowers, Elsevier, 2017.

*Encyclopedia of Forensic Sciences, 2nd Edition* contributor of three entries ("Evidence Collection at Fire Scenes;" " Fire Scene Inspection Methodology;" "Fire Patterns and Their Interpretation") edited by Jay Siegel, Pekka Saukko and Max Houck, Academic Press (Elsevier), London, 2013.

"Fire Scene Investigation and Laboratory Analysis of Fire Debris," Chapter 3.5 in *Forensic Science, Current Issues, Future Directions,* edited by Douglas Ubelaker, John Wiley & Sons, Hoboken, NJ, 2013.

"Analysis of Fire Debris," Chapter 3 in *Forensic Chemistry Handbook*, edited by Lawrence Kobilinsky John Wiley & Sons, Hoboken, NJ, 2012.

"Fires, Arsons and Explosions," Chapter 39 in *Modern Scientific Evidence: The Law and Science of Expert Testimony*, edited by Faigman, Kaye, Saks and Sanders, (2014 Editor: Erin Murphy) West Publishing Co., St. Paul, MN, 2014, (Previous revisions: 1997, 2001, 2007, 2011)

"Basic Fire Science," Chapter 3 and "Fire Patterns," Chapter 4 in *Fire Investigator Principles and Practice to NFPA 921 and 1033, 3rd Edition*. IAFC, IAAI, NFPA and Jones and Bartlett, publishers, 2011. (both chapters co-authored with Jeff Spaulding.)

*Wiley Encyclopedia of Forensic Science,* contributor of five entries ("Arson Investigation: Misconceptions and Mythology;" " Fire: Chemistry of;" "Fire: Dynamics and Pattern Production;" "Fire: Scene Investigation;" "Fire Debris: Laboratory Analysis of") and section editor for Fire and Explosives entries, edited by Allan Jamieson and Andre Moenssens, Wiley & Sons, West Sussex, UK, 2009.

"Forensic Arson Investigation," McGraw-Hill *Yearbook of Science and Technology*, 2003.

### Standards

*NFPA 921, Guide for Fire and Explosion Investigations*, NFPA, Quincy, MA, Contributor to the 1998 through 2017 editions as principal committee member.

*Fire and Arson Scene Evidence: A Guide for Public Safety Personnel*, National Institute of Justice Office of Justice Programs, USDOJ Publication Number NCJ 181584, Contributor to the document as a member of the Editorial Board.

"Standard Practice for Investigating Carbon Monoxide Poisoning Incidents," ASTM E2292-03, Principal Author as Task Group Coordinator.

"Standard Test Method for Flammable or Combustible Liquid Residues in Extracts from Samples of Fire Debris by Gas Chromatography," ASTM E 1387-90. Principal Author as Task Group Coordinator.

"Guidelines for Laboratories Performing Chemical and Instrumental Analysis of Fire Debris Samples," Principal author as Co-Chair of IAAI Forensic Science Committee, June 1988.

### Peer Reviewed Publications

"Fire Investigation: Historical Perspective and Recent Developments," *Forensic Science Review,* Vol. 31, No. 1, 37-44, January, 2019.

"Forensic Science Assessments: A Quality and Gap Analysis, Fire Investigation," (Co-authored with Jose Almirall, Hal Arkes, Frederick Mowrer and Janus Pawliszyn) AAAS, Washington DC, 2017.

"Pernicious, Pervasive, and Persistent Literature in Fire Investigation," *Forensic Science Research Evaluation*, edited by Bartick & Floyd, AAAS and George Washington University, 2016.

"Ignitable Liquid Residue Source Elimination by Molecular Weight Estimation," *Proceedings of the American Academy of Forensic Sciences*, AAFS, Colorado Springs, CO, 2012.

"Totality of the Evidence or Contextual Bias: Where Do You Draw the Line?" *Proceedings of the 5th Int'l Symposium on Fire Investigations Science and Technology* (ISFI), NAFI, Sarasota, FL, 2012.

Case: 5:20-cv-01654-SL  Doc #: 15-1  Filed: 02/10/23  391 of 656.  PageID #: 658

**Peer Reviewed Publications (continued)**

"'Progress' in Fire Investigation: Moving from Witchcraft and Folklore to the Misuse of Models and the Abuse of Science," *Proceedings of the 4th International Symposium on Fire Investigations Science and Technology* (ISFI), NAFI, Sarasota, FL, 2010.

"Forensic Science Standards: Where They Come From and How They Are Used," *Forensic Science Policy and Management: An International Journal*, Vol. 1, No. 1, February 2009.

"Toward a More Scientific Determination: Minimizing Expectation Bias in Fire Investigations," *Proceedings of the 3rd International Symposium on Fire Investigations Science and Technology* (ISFI), NAFI, Sarasota, FL, 2008.

"The Mythology of Arson Investigation," *Proceedings of the 2nd International Symposium on Fire Investigations Science and Technology* (ISFI), NAFI, Sarasota, FL, 2006.

"ASTM Standards for Fire Debris Analysis: A Review," (co-authored with Eric Stauffer), *Forensic Science International*, 132, 63–67, 2003.

"Contamination of Brake Fluid by Power Steering Fluid," (co-authored with Eric Stauffer), *J. Forensic Sciences*, Vol. 48, No. 4, July 2003.

"Persistence of Floor Coating Solvents," *J. Forensic Sciences*, Vol. 46, No. 6, November 2001.

"The Petroleum-Laced Background," (co-authored with Julia Dolan and Cheryl Cherry), *J. Forensic Sciences*, Vol. 45, No. 5, September 2000.

"Differentiation of Asphalt and Smoke Condensates from Liquid Petroleum Distillates Using GC/MS," *J. Forensic Sciences*, Vol. 43, No. 1, January 1998.

"Comparison of the Eluting Efficiency of Carbon Disulfide with Diethyl Ether: The Case for Laboratory Safety," (co-authored with Dr. Andrew T. Armstrong), *J. Forensic Sciences*, Vol. 42, No. 2, March 1997.

"An Improved Method of Obtaining Ion Profiles From Ignitable Liquid Residue Samples," *FBI International Symposium on the Forensic Aspects of Arson Investigations*, Fairfax, VA, August 1, 1995.

"ASTM Standards for Forensic Sciences, " *J. Forensic Sciences*, Vol. 40, No. 1, January 1995.

"Behavior of Glass at Elevated Temperature," *J. Forensic Sciences*, Vol. 37, No. 5, September 1992.

"Baseline Characteristics of Residential Structures Which Have Burned to Completion: The Oakland Experience," (co-authored with David M. Smith, C.F.I. and Dr. Richard W. Henderson, C.F.I.), *Fire Technology*, Vol. 28, No. 3, August 1992.

**Editorial-Reviewed Publications**

"What Fire Litigators Need to Know in 2017," *The SciTech Lawyer*, Vol. 13, No 4 ABA, 2017.

"Contextual Bias in Fire Investigations: Scientific vs. Investigative Data." *The Brief*, American Bar Association, Tort Trial and Insurance Practice Section, Vol. 44, No. 3, Spring 2015.

"The Evolution of Fire Investigation and Its Impact on Arson Cases," *Criminal Justice*, American Bar Association, Criminal Justice Section, Vol. 27, No. 1, Spring 2012.

"Arson probes: Instinct Giving Way to Modern Science," *Journal of Insurance Fraud in America*, Vol. 2, No. 1, Coalition Against Insurance Fraud, Washington, DC, 2011.

"The Standard of Care in Fire Investigation," *Canadian Association of Fire Investigators Journal*, Spring 2007.

"Report on the Peer Review of the Expert Testimony in the Cases of *State of Texas v. Cameron Todd Willingham* and *State of Texas v. Ernest Ray Willis*," (Co-authored with Douglas J. Carpenter, Daniel L. Churchward, David M. Smith and Michael A. McKenzie), 2006. Available at www.innocenceproject.org

"What You Don't Know Can Hurt You: How Do You Know Your Lab Has It Right?" *The Fire and Arson Investigator*, Vol. 53, No. 3, April, 2003.

"A Calculated Arson," *The Fire and Arson Investigator*, Vol. 49, No. 3, April 1999.

"Unconventional Wisdom: The Lessons of Oakland," *The Fire and Arson Investigator*, Vol. 43, No. 4, June 1993.

"The Lime Street Fire: Another Perspective," *The Fire and Arson Investigator*, Vol. 43, No. 1, Sept. 1992.

"Melted Steel: How Important?" (co-authored with J. Finis McCarver, P.E.), *The National Fire and Arson Report*, Vol. 10, No. 4, August 1992.

**Editorial-Reviewed Publications (continued)**

"The Behavior of Flammable and Combustible Liquids," (co-authored with Laurel V. Waters), *The Fire and Arson Investigator*, Vol. 42, No. 1, September 1991.

"Appliance Fires: Determining Responsibility," (co-authored with R.I. Underwood, P.E.), The *National Fire and Arson Report*, Vol. 7, No. 2, April 1989.

"Incidental Accelerants," *The National Fire and Arson Report*, Vol. 2, No. 3, October, 1983.

"Isolation of Accelerant-like Residues from Roof Shingles Using Headspace Concentration," *Arson Analysis Newsletter,* Systems Engineering Associates, Vol. 6, No. 3., May, 1982

**Advisory Panels**

Member, U. S. Dept. of Justice, NIJ Technical Working Group on Fire Investigations, 1997-2000.
Member, AAFS President's Panel on Scientific Integrity, 2009.
Member, Expert Witness Exchange Validation Committee, 2015-present.
Member, Technical Advisory Group for the Houston Forensic Science Center, 2015-present.
Member, Texas State Fire Marshal's Science Advisory Workgroup, 2016-2018.
Member, Underwriters Laboratories Fire Safety Research Institute (FSRI) Technical Panel on Fire Forensics, 2016-present.
Member, Forensic Fire Analysis Institute Advisory Board, 2018-present.

**Selected Recent Presentations**

"Expert Challenges Using Industry Standards," *AAFS 71st Annual Meeting, Jurisprudence Section,* February 22, 2019, Baltimore, MD

"Yes, Everybody Knows a Fire Needs Oxygen, But Why Should We Care?" *AAFS 71st Annual Meeting, Criminalistics/Engineering Section,* February 21, 2019, Baltimore, MD

"Fire Investigation: Science or Art?" Florida International University Forensic Science Seminar Series, November 28, 2018, Miami, FL. Adobe Connect podcast available at https://fiuconnect.adobeconnect.com/p98jia1myaah?launcher=false&html-view=false&proto=true

"Scientific Protocols for Fire Investigation," The ClaimsPro Canadian National Advanced Fire, Arson & Explosion Training Program, October 22-24, 2018, Toronto, ON

"How Your Report and Testimony Will Be Used by Your Adversary," Advanced Origin and Cause/Courtroom Testimony (AOCCT), *ATF National Center for Explosives Training and Research,* August 7, 2018, Huntsville, AL

"Surviving NFPA 921 and 1033 Challenges," *Ontario Chapter of the International Association of Arson Investigators*, May 16, 2018, Hamilton, ON

"The Evolution of Fire Investigation," *AAFS 70th Annual Meeting*, Workshop #19 February 20, 2018, Seattle, WA

"Changes in the 2017 Edition of NFPA 921," *Texas Fire Marshal's Forum*, February 6, 2018, Corpus Christi, TX

"Surviving NFPA 921 and 1033 Challenges," *Joint meeting of the North and South Carolina Chapters of the International Association of Arson Investigators*, October 19, 2017, Myrtle Beach, SC

"Scientific Protocols for Fire Investigation," *Canadian National Advanced Fire, Arson and Explosion Training Conference*, August 28-30, 2017, Markham, ON

"How a Science Advisory Workgroup Can Help Fire Investigation Organizations Avoid Preventable Errors," National Institute of Justice's *Sentinel Events Initiative All-Stakeholder Symposium*, U.S. DOJ, June 20, 2017, Washington, DC

"Fire Analysis," Ontario Municipal Fire Prevention Officers Association, May 30, 2017, Windsor, ON

"Confronting Inaccuracies in Fire Investigations: Case Studies," and "The Difficulty and Questionable Validity of Fire Origin Determination," *18th Annual Francine and Michael Saferstein Lectures*, Northeastern University College of Science, March 30 and 31, 2017, Boston, MA

"You Only Live Once: Perspectives on 43 Years in Forensic Science," *AAFS Special Presentation*, February 14, 2017, New Orleans, LA

"How *Daubert* Has Shaped Fire Investigation," *AAFS 69th Annual Meeting, Interdisciplinary Workshop,* February 14, 2017, New Orleans, LA

**Selected Recent Presentations (continued)**

"Scientific Protocols for Fire Investigation," *Canadian National Advanced Fire, Arson and Explosion Training Conference*, October 24-27, 2016 Markham, ON

"NFPA 921 Review," *50th Annual Professional Fire and Fraud Investigators Professional Development Symposium*, October 3, 2016, St. Louis, MO

"The State of Modern Arson Investigation: From Scene to Laboratory," Fordham University Law School, *7th Annual Prescriptions for Criminal Justice Forensics Conference*, June 5, 2016, NY

"Forensic Technologies in Flux," *U Penn Law School Symposium on Technology in Criminal Justice Reform*, May 13, 2016, Philadelphia, PA

"Surviving a 1033 Challenge," *67th Annual Training Course, International Association of Arson Investigators*, May 18, 2016, Orlando, FL

"Expert Challenges and the Revised NFPA 1033," *National Association of Subrogation Professionals*, November 10, 2015, Reno, NV

"NFPA 1033," "Fire and Science," and "Anatomy of a Train Wreck," *Canadian National Advanced Fire Arson and Explosion Investigation Training*, October 26-30, 2015, Markham, ON

"How Fire Investigation Organizations Get in Trouble with Preventable Errors," *NIST International Symposium on Forensic Science Error Management*, Washington, DC, July 22, 2015

"Pernicious, Pervasive, and Persistent Literature in Fire Investigation," *National Science Foundation Workshop on Forensic Science Research Evaluation*, May 26, 2015, Washington, DC

"The Questionable Validity of Fire Origin Determination," *New Topics* series, March 19, 2015, New College, Sarasota, FL

"The Long Road to Exoneration for Han Tak Lee," *AAFS 67th Annual Meeting, Jurisprudence Section*, February 19, 2015, Orlando, FL

"Cases Where Shifted Science as 'New Evidence' Played a Role," American Academy of Forensic Sciences (AAFS), Workshop #8, *From Fire Dynamics to Legal Dynamics: Shifted Science and the Criminal Justice System's Response*, February 16, 2015, Orlando, FL

"New Evidence Challenges to BS (Bad Science) in Arson Cases," *U Penn Law School, Levy/Silverman-Rodin Scholars Luncheon*, February 4, 2015, Philadelphia, PA

A list of presentations made prior to 2015 is available upon request.

**Selected Media Appearances**

"Forensic Science Essentials: Challenges in Fire Analysis and Document Examination," National Clearinghouse for Science, Technology and the Law, Stetson University College of Law, June 28, 2017, Available at https://www.youtube.com/watch?v=b5B_VZ3nvik&feature=youtu.be

"NFPA 1033 and NFPA 921: How Changes in NFPA 1033 Will Affect Your Expert's Ability to Qualify," and "Origin and Cause Determination: Using NFPA 921 to Ensure Validity," Insurance Committee for Arson Control (ICAC) webinars, Available at http://www.arsoncontrol.org/Education Fire Loss Specialist Course, 2016.

"Incendiary, The Willingham Case," a 2011 documentary produced by Steve Mims and Joe Bailey, Jr. Available from iTunes.

"Death by Fire," a *Frontline* documentary about the Willingham case. First aired October 19, 2010. Sequel aired October 7, 2014. Produced by Jessie Deeter. Available at http://www.pbs.org/wgbh/pages/frontline/death-by-fire

"Burned," an *ABC News 20/20* episode about several wrongful arson prosecutions. Produced by Tom Berman. Season 30, Episode 18. First aired May 7, 2010. DVD copy available upon request.

"When Forensics Fail," a *National Geographic* documentary about the case of Texas vs. Ernest Willis. First aired October 18, 2007. DVD copy available upon request.

"Up in Smoke," *The Forensic Files*, episode about the case of Pennsylvania vs. Paul Camiolo. First aired June 29, 2005. Still in syndication, DVD copy available upon request.

"Trial by Fire," *The Forensic Files*, episode about the case of Georgia vs. Beverly Jean Long. First aired April 27, 2005. Still in syndication, DVD copy available upon request.

"The Willingham Case," Interview with NPR Host Scott Simon. First aired April 30, 2005. Available at http://www.npr.org/templates/story/story.php?storyId=4625954

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

STATE OF OHIO,                          :        Case No.  2012 CR 1567
                                        :
          Plaintiff,                    :
                                        :
    -v-                                 :        HON. KRISTIN G. FARMER
                                        :
KAYLA AYERS,                            :
                                        :
          Defendant.                    :

---

**AFFIDAVIT OF OHIO INNOCENCE PROJECT IN SUPPORT OF KAYLA AYERS'
MOTION FOR LEAVE TO FILE MOTION FOR NEW TRIAL**

---

NOW COMES Brian Davis, on behalf of the Ohio Innocence Project, and having been duly sworn and cautioned, swears or affirms the following to be true:

1. I am currently a student-fellow at the Ohio Innocence Project ("OIP"), which represents Kayla Ayers in the above captioned case.  I began working with OIP in May 2019.  The Ohio Innocence Project is a legal clinic located at the University of Cincinnati College of Law in Cincinnati, Ohio.

2. In the summer of 2019, John Lentini reviewed materials from Kayla Ayers case and produced a report containing his conclusions.

3. Since that time, students and attorneys with OIP have made multiple trips to Massillon, Ohio to speak with former Fire Inspector Reginald Winters. Representatives from OIP spoke with Mr. Winters once on July 30, 2019.  At that time, he said he would be able to discuss Ms. Ayers's case in more detail if he could look over his original file.

4. In response to a public records request, OIP received Inspector Winters's file on August 26, 2019.  OIP talked to Mr. Winters over the phone again in November 2019. Mr. Winters stated that he would not agree to meet until he had received and had time to look over the files.  A package with the relevant documents was sent to him on December 4, 2019. Since then, OIP has made multiple attempts to reach Mr. Winters



by phone and in person to discuss his conclusions.  Those attempts have not been successful

5.  In the meantime, OIP has also been communicating with Ms. Ayers's trial attorneys in order to confirm what they did or did not do to prepare for Ms. Ayers's trial.  As of the date of this affidavit, neither of Ms. Ayers's former trial attorneys have been willing to provide an affidavit to OIP confirming or denying any aspect of their representation.

6.  Students and attorneys at OIP have also been researching issues related to the NFPA and fire science generally, in order to try to understand the issues at stake in this matter before filing a claim to the Court.

7.  OIP has used due diligence in researching Ms. Ayers' case and has not engaged in any undue delay in bringing the current motion for new trial.

FURTHER AFFIANT SAYETH NAUGHT.

Brian Davis

Sworn to and subscribed before me, this ___10th___ day of April, 2020.

Notary Public

STEPHANIE NICOLE KING
Notary Public, State of Ohio
My Commission Expires
January 29, 2022

RMC/rmc 10/6/20 1 & 3

CASE NO. 2012-CR-1567
Judge Kristin G. Farmer

# In the
# Court of Common Pleas
## of Stark County, Ohio

### STATE OF OHIO,

Plaintiff-Respondent,

vs.

### KAYLA JEAN AYERS,

Defendant-Petitioner.

## MOTION TO DISMISS PETITION FOR POST-CONVICTION RELIEF –
## NOT TIMELY FILED
### [R.C. 2953.21(A)(2) and R.C. 2953.23(A)]

The State of Ohio moves the Court to dismiss the petition for post-conviction relief filed by

defendant-petitioner, Kayla Jean Ayers, since the petition was not timely filed and does not state

grounds that qualify for a late filing under R.C. 2953.23(A). Therefore, this Court is without

jurisdiction to review the merits of Ayers's petition for post-conviction relief under R.C.

*Page 1*

**EXHIBIT 39**

2953.21(A)(1).

Additional and more detailed reasons in support of the State's response and motion for summary judgment are contained in the accompanying memorandum.

Respectfully submitted,

JOHN D. FERRERO, JR.,
STARK COUNTY PROSECUTING ATTORNEY

*Ronald Mark Caldwell*

RONALD MARK CALDWELL
Ohio Sup. Ct. Reg. No. 0030663
Assistant Prosecuting Attorney
Stark County Prosecutor's Office
110 Central Plaza, South
Suite 510
Canton, Ohio  44702-1413
(330) 451-7897

Counsel for Plaintiff-Respondent

# **MEMORANDUM**

Ayers has filed a petition for post-conviction relief some eight years after her trial and conviction for aggravated arson and child endangering. She claims in this petition that she is actually innocent of these charges, despite the jury's verdict, and that she was denied effective assistance of counsel at trial by her counsel's failure to seek the services of an arson expert and to attack the State's expert in such a way as to preclude his testimony. Ayers also argues that the State committed a discovery violation relative to its expert's report, and that this violation denied her right to

*Page 2*

compulsory process to obtain the services of an expert. None of these claims, however, allow Ayers to file her petition out of time, and therefore the petition should be dismissed on these jurisdictional grounds.

### Procedural History of the Case

In 2012, the Stark County Grand Jury returned an indictment that charged Kayla Jean Ayers, defendant-appellant, with aggravated arson and child endangering.[1] The charges arose from Ayers setting a bed on fire while she and her three-year-old child were in the house. Ayers pleaded not guilty to the charges, and the case was set for trial in the Stark County Court of Common Pleas.[2]

During pretrial proceedings, Ayers filed two motions in limine. In the first motion, Ayers sought to exclude evidence of "bad parenting," while the second motion sought to exclude evidence of Ayers' involvement with Child Protective Services and the Department of Job and Family Services regarding "parenting rights, allegations of lice infestation, and having a dirty home," as well as evidence regarding Ayers' mental health and use of medication. With regard to the last issue, the trial court ordered that Ayers be evaluated for competency to stand trial. The evaluation, however, was not done due to Ayers' refusal to participate in the evaluation. The State also filed a pretrial motion in limine, seeking to exclude evidence of an allegation that Ayers' son had set a fire in South Carolina subsequent to the fire in this case. According to the State's motion, the South Carolina fire

---

[1] *See* R.C. 2909.02(A)(2) (aggravated arson, a felony of the second degree) and R.C. 2919.22(A) (child endangering, a misdemeanor of the first degree).

[2] Judge Charles E. Brown presided over the case during the pretrial proceedings. Judge Kristin G. Farmer, however, assumed the bench upon Judge Brown's retirement, and presided over the trial.

*Page 3*

was actually set accidentally by an adult, and was thus not intentionally set by Ayers' son.

The jury found Ayers guilty of the charges offenses, and the trial court sentenced her to an aggregate prison term of seven years – seven years for aggravated arson, and a concurrent 180-day term for the child endangering charge.  Ayers appealed her convictions and sentences to the Court of Appeals for Stark County (Fifth Appellate District), raising two assignments of error – one that challenges the evidentiary support for her convictions, and the other challenging the effectiveness of her trial counsel for failing to adequately challenge and cross-examine the fire inspector for submitting only a draft report on his arson investigation.  The court of appeals overruled both of these assignments of error, and affirmed Ayers's convictions and sentences. *State v. Ayers*, 5th Dist. Stark No. 2013-CA-00034, 2013-Ohio-5402, 2013 WL 6506473.

### *Statement of Facts*

Ayers was convicted of starting a fire in the basement of her residence in order to burn the house.  She had earlier threatened to burn the residence down if her father moved out of the residence.  The fire was started at two different places on a mattress that was in the basement, and the resulting fire reached the first floor from the basement.  Ayers claimed at trial that the fire was accidental and started as a result of her three-year-old son playing with a lighter.[3]

Before the fire on the evening of October 3, 2012, Ayers and her family (her boyfriend and their three young children) were living with her father and his family (his girlfriend and her two children) in his Massillon residence.  Her father, Jeff Ayers, eventually discussed with finances with

---

[3]*See* T.(I) 177 (opening statement of defense) and T.(II) 436, 448 (closing argument of defense).

Ayers and the fact that she was not contributing much. Their relationship deteriorated due to the financial situation, and Mr. Ayers told his daughter to leave and care for her own family. Ayers responded by telling her father that she was not leaving and that he should leave. Ayers then threatened to burn the house down. Fearful for himself and his pregnant girlfriend, Mr. Ayers decided to leave and force Ayers to care for her family on her own. When he told his daughter of his decision, Ayers threatened to burn the house down if he were to leave. At the time of this threat, a friend of Mr. Ayers, Jason Pandrea (who was having a sexual relationship with Ayers), overheard Ayers's threat. Mr. Ayers decided to leave the Massillon home nonetheless, and left for West Virginia to seek employment and new living arrangements during the morning of October 3.[4]

Also during this day, Ayers's boyfriend, Brennan Scott, left for work as usual, picking up his boss on the way. After work, he picked up his children from day care, dropped them off with Ayers, and then took his boss back home in Beach City, where Scott stayed for a couple hours socializing. When he returned around eight o'clock that night, he found fire trucks around his house.[5]

When the children returned home around six o'clock that night, the two oldest – the daughters, who were 5 and 4 – boarded a church bus to take them to evening services. Karen Ball, a regular attendee at this church, arrived at the Ayers residence in order to pick up Ayers and her three children. Ball knocked on the front door, but no one answered the door. Instead, she heard the dog barking, and then heard someone say, "Shhh." Getting no answer, Ball went to the kitchen door and knocked again. And again, she got no answer other than the dog barking. Ball did see, however, Ayers's purse on the deck. Ball went back to her car and talked briefly with a neighbor, which led

---

[4]T.(II) 307-312, 339.

[5]T.(II) 322-323, 325-328, 331.

*Page 5*

her to believe that Ayers was inside the home.[6]

While at church, Ball decided to leave the service early to check on Ayers. Arriving at the home around eight o'clock, Ball noticed a flickering emanating from a basement window. Ball knocked on the basement door, but got no answer other than the dog barking. Ball called to Ayers repeatedly, but got no answer. So she went once again to the kitchen door to knock and call to Ayers. Still getting no answer other then the dog's persistent barking, Ball returned to her car to get her cane, after which she intended to go to a neighbor's to ask about Ayers. When she got to her car, she heard a thump, turned around, and saw Ayers running to her with her youngest child, three-year-old Bubba (Brennan Junior). Ayers told Ball to call 911, so the disabled woman went to the neighbors' and had them call 911. While waiting for the fire fighters to respond, Ball stayed with Ayers and Bubba. She noticed that Ayers had cut her hand, but that Bubba was fine. Ayers also kept bemoaning the fact that she was going to lose her children. The neighbor, Jennifer Conley, also heard Ayers say that Bubba had started the fire. Conley detected a strong odor of burnt marijuana on Ayers.[7]

Fire fighters from the Massillon Fire Department responded to the 911 call, and put out the fire inside the home. Once the fire was extinguished (primarily in the basement), the smoke inside the home was ventilated out, which then allowed the fire inspector to investigate the nature and origin of the fire. The fire fighters-paramedics also treated Ayers and her lacerated hand, as well as Bubba. The paramedics noted that Bubba did not have any smoke smell or soot about him; Ayers, however, had soot on her, which indicated that she had been in the basement, which was the obvious

---

[6]T.(II) 357-358, 371-373, 377-380.

[7]T.(II) 359-360, 362, 367, 381-386, 389.

*Page 6*

source of fire.[8]

Massillon Fire Department Inspector Reginald Winters inspected the house once the fire was extinguished and the premises ventilated. A mattress in the basement had been fully engulfed in flames, and was the origin of the fire. The mattress had an unusual burn pattern due to the fact that there were two separate points of origin, at different ends of the mattress. The cause of the fire was incendiary, i.e., an open flame. Thus, someone used an open flame to light two fires at different ends of the mattress. Winters did not find any evidence that the fire had been started by a cigarette, i.e., he did not find any remnant of a cigarette. There also did not appear to be any accelerants used in the fire.[9]

Once he had completed his investigation of the fire scene, Inspector Winters went to the hospital to interview Ayers. This interview included Sgt. Muntean of the Massillon Police Department. Ayers told the investigators that he had been in the basement folding clothes when she noticed her son Bubba over by the bed playing with a lighter. She shortly afterwards noticed a fire on the bed, so Ayers grabbed a blanket and starting fanning the flame. Unsuccessful in putting out the fire, Ayers claimed that she ran to the washing machine, grabbed a glass of water, and threw it on the flame.[10] Unsuccessful yet again, she ran and got another glass of water, but tripped on her

---

[8]T.(I) 182-187, 189, 193, 213, 215.

[9]T.(I) 233, 238-250; (II) 301-303. The source of the fire were the two spots on the mattress. Once the mattress caught fire, the fire spread to the basement walls and ceiling, through the floor and into the bathroom located on the first floor. T.(I) 188, 216-217, 248.

[10]Because mattresses now have fire retardants on them, Inspector Winters testified that the initial flame would have been small, and that a glass of water would have extinguished the flame. The fire retardants cause any flame to burn slowly, not fast, and that a cigarette will take hours to light a mattress on fire. Fanning the fire would have given it oxygen, causing the flame to get bigger. Winters opined that the mattress at the Ayers residence burned between ten and

*Page 7*

way back to the bed, dropping the glass and breaking it, and then falling on it and cutting her hand.
Winters asked Ayers how she could see her son by the bed while she was folding clothes at the dryer
since there was a chimney, a hot water tank, and a furnace blocking the view from that location.
Ayers did not know.  Ayers maintained that the fire grew in size quickly, and that she couldn't find
the phone to call the fire department.  Winters asked her why she didn't immediately leave the house
when the fire started, and Ayers had no answer for that question.  Winters noted that Ayers's story
kept changing, and that she seemed lethargic.  Ayers denied that she had been drinking, and told the
investigators that she was only on Adderall for her ADHD.  When Sgt. Muntean started questioning
Ayers, she was not able to respond to his questions.  Winters noticed that Ayers did not smell of
smoke or soot, but a swab of her nostrils revealed light soot inside.[11]

Winters spoke with Bubba, and noticed that the boy did not smell of smoke or soot, did not
have any burn marks, and had no soot in his nostrils.  Winters did ascertain that the boy was able to
light a lighter.  Winters then returned to the fire scene and found a broken glass in the basement.  He
also found a blood splatter on the hot water tank and washing machine, and a blood trail that went
up the basement steps, then back down, and that there was blood on the wall by the steps.  He also
found blood in the kitchen and on the kitchen table.[12]

Winters testified also that Bubba, if he had started the two fires, would have had to light the
fire at one end of the mattress, then crawl to the other end while the mattress was on fire to the other

_____

twelve minutes before the fire department arrived.  T.(II) 266-268.

[11]T.(II) 262-268, 280-282..

[12]T.(II) 270, 273.

*Page 8*

end and light that spot as well.[13]  Ayers had told him, however, that her boy was standing by the

mattress when the fire caught her attention.  In his official report, Inspector Winters reached the

following conclusions about the fire:

> After examination of the fire scene it was determined the fire originated in the
> basement on the bed.  After examination of the fire scene, interviewing witnesses,
> interviewing the insured and using the levels of scientific certainty as discussed in the
> 2011 edition of NFPA 921; A Guide for Fire and Explosion Investigation, it is my
> opinion the ignition source for the fire was some type of open flame.  The materials
> first ignited were blankets on the bed.  The act or omission that brought the ignition
> source and the materials first ignited together was the deliberate act of a person or
> persons.  Using these elements of a fire cause, the cause of the fire is incendiary.
>
> T.(II) 300-301.

Ayers did not testify at trial or offer any evidence in her defense.[14]

---

[13]T.(II) 303-305.

[14]Before sentencing, Ayers made the following statement to the trial court:

I took it all the way to the box because I really didn't do it so I was sure I wouldn't
be found guilty.  And I've just never been in trouble before and I can't go to
prison.  Please, I should have took a deal, but I didn't want to because I knew that
I would win, I just knew.

I'll go - - I'll go anywhere but prison.  Put me in a mental institute, I don't care.
Please don't put me in prison.

T.(III) 493-494.

*Page 9*

### *Ohio's Post-Conviction Relief Provisions*

Convicted criminal defendants in Ohio have a generous but limited time in which to challenge their criminal convictions via a petition for post-conviction relief under R.C. 2953.21(A). At the time of Ayers's trial and convictions, the deadline for timely PCR petitions was 180 days from the time the trial transcript is filed with the court of appeals in the defendant's direct appeal from his convictions and sentences, per R.C. 2953.21(A)(2).[15]   The trial transcript in Ayers's direct appeal was filed on March 27, 2013; the deadline for her to file a timely PCR petition was therefore Monday, September 23, 2013.   Ayers did not file her petition until April 13, 2020, more than seven years outside of the statutory deadline.

This requirement to file the PCR petition within the statutorily prescribed time limit is jurisdictional. *See, e.g., State v. Fields*, 183 Ohio App.3d 647, 2009-Ohio-4187, 918 N.E.2d 204, at ¶ 9; *State v. Smith*, 180 Ohio App.3d 684, 2009-Ohio-335, 906 N.E.2d 1191, at ¶¶ 9-10; *State v. Fuller*, 171 Ohio App.3d 260, 2007-Ohio-2018, 870 N.E.2d 255, at ¶ 5 ("Thus, a common pleas court has jurisdiction to entertain a postconviction petition only if the petitioner meets either the time strictures of R.C. 2953.21 or the jurisdictional requirements of R.C. 2953.23."); *State v. Halliwell* (1999), 134 Ohio App.3d 730, 734, 732 N.E.2d 405, 408; *State v. Sanders*, Summit App. No. 22457, 2005-Ohio-4267, 2005 WL 1962964, at ¶ 10, *appeal denied*, 107 Ohio St.3d 1700, 2005-Ohio-6763, 840 N.E.2d 205, *cert. denied* (2006), 549 U.S. 850.   Since Ayers has not filed his petition within the prescribed time period, he has failed to properly invoke this Court's jurisdiction to review his collateral claims.   As a result, this Court should dismiss the petition for want of jurisdiction.

---

[15]R.C. 2953.21(A)(2) was amended in 2015 to extend this time to 365 days. *See* 2014 Sub. H.B. 663 (eff. March 23, 2015).  The amendment is not retroactive, and Ayers's time to file a timely PCR petition had long expired by the time of this amendment anyway.

*Page 10*

Ohio's PCR framework, however, does provide for a savings clause for untimely (and successive) petitions, but only if certain narrowly prescribed exceptions are satisfied.  The savings statute specifically states:

> Whether a hearing is or is not held on a petition filed pursuant to section 2953.21 of the Revised Code, a court may not entertain a petition filed after the expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner unless division (A)(1) or (2) of this section applies:
>
> (1) Both of the following apply:
>
>> (a) Either the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.
>>
>> (b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.
>
> (2) The petitioner was convicted of a felony, the petitioner is an offender for whom DNA testing was performed under sections 2953.71 to 2953.81 of the Revised Code or under former section 2953.82 of the Revised Code and analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case as described in division (D) of section 2953.74 of the Revised Code, and the results of the DNA testing establish, by clear and convincing evidence, actual innocence of that felony offense or, if the person was sentenced to death, establish, by clear and convincing evidence, actual innocence of the aggravating circumstance or circumstances the person was found guilty of committing and that is or are the basis of that sentence of death.
>
> As used in this division, "actual innocence" has the same meaning as in division

*Page 11*

(A)(1)(b) of section 2953.21 of the Revised Code, and "former section 2953.82 of the Revised Code" has the same meaning as in division (A)(1)(c) of section 2953.21 of the Revised Code.

R.C. 2953.23(A).

Ayers's petition does not qualify for any of these exceptions. Ayers does not allege, and cannot allege, that he was unavoidably prevented from discovery of facts that give rise to his claim for relief, per R.C. 2953.23(A)(1)(a). All of the evidence that Ayers now posits regarding her trial was known at the time of trial or could have been discovered by her, *e.g.,* a contrary expert witness. Ayers does not allege, and assumingly cannot allege, that she was somehow unavoidably prevented from discovery of a contrary expert witness. In addition, Ayers also does not rely upon a recent decision of the United States Supreme Court that recognizes a new federal or state right that applies retroactively, per R.C. 2953.23(A)(1)(a). Ayers, furthermore, does not show by clear and convincing evidence that but for the asserted constitutional error at trial, no reasonable factfinder would have found him guilty beyond a reasonable doubt, per R.C. 2953.23(A)(1)(b). Ayers's factual allegations focus essentially on the evidence on the points of origin of the fire, and minimizes or ignores her guilty and inculpatory conduct before, during and immediately after the fire. Finally, Ayers does not assert a claim of actual innocence based upon DNA evidence, as set forth by R.C. 2953.23(A)(2). Instead, Ayers's actual innocence allegation is based on her reliance on a decision of the United States Supreme Court that is not applicable to the instant proceeding. In that case, *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Court rejected an actual innocence challenge to a death row inmate's conviction and death sentence, holding that that a claim of actual innocence based on newly discovered evidence did not constitute either grounds for federal

*Page 12*

habeas corpus relief or for a successful federal due process challenge.  The particular page citation offered by Ayers reiterates this point in the Court's holding:

> This is not to say that petitioner's affidavits are without probative value. Had this sort of testimony been offered at trial, it could have been weighed by the jury, along with the evidence offered by the State and petitioner, in deliberating upon its verdict. Since the statements in the affidavits contradict the evidence received at trial, the jury would have had to decide important issues of credibility. But coming 10 years after petitioner's trial, this showing of innocence falls far short of that which would have to be made in order to trigger the sort of constitutional claim which we have assumed, arguendo, to exist.

*Herrera v. Collins*, 506 U.S. at 418-419, 113 S.Ct. at 870.

The holding of *Herrera v. Collins*, therefore, has no application to the issue of the timeliness of Ayers's state post-conviction relief petition either in principle or in the very language of R.C. 2953.23(A)(2). Ohio limits its actual innocence claims to those based on DNA evidence. Ayers has made no claim or allegation that DNA evidence is relevant in her case.  Accordingly, Ayers has failed to satisfied the R.C. 2953.23(A)(2) exception.

In conclusion,[16] Ayers's petition does not qualify for any of the R.C. 2953.23(A) exceptions

---

[16]While the Court should dismiss Ayers's petition on the jurisdictional timeliness ground alone, a review of her claims themselves show that they are without merit.

First, Ayers argues that her trial counsel was ineffective for failing to challenge the testimony of the State's expert, Massillon Fire Inspector Reginald Winters. Not only did trial counsel challenge the admission of this testimony, but challenged the trial court's ruling in her direct appeal via an ineffectiveness assignment of error. *See Ayers, supra*, at ¶¶ 29-34. The claim is therefore *res judicata*. Ayers also argues that her counsel was ineffective for failing to obtain the services of an expert witness. She, however, does not support his allegation with sworn statements by either of her trial counsel (Matthew Kuhn or Kris Powers). Current counsel for Ayers submitted an affidavit wherein he states that he talked with both counsel, both counsel declined to provide affidavits, and then proceeds to recount his opinion based on "information and belief" as to what both counsel would testify to if called. Such hearsay evidence would be inadmissible at any hearing, and therefore is inadmissible for purposes of consideration at this

*Page 13*

that would save an untimely petition.   The petition, therefore, should be dismissed on this

jurisdictional grounds.   As noted above, a trial court is without jurisdiction to rule on the merits of

a petition for post-conviction relief under R.C. 2953.21 if the petition is either a successive timely

petition or is an untimely petition.   Ayers's petition is clearly untimely, and such therefore be

---

proceeding.  Finally, the best that Ayers can offer is that her counsel should have turned her trial
into a battle of the experts, and that this battle on the scientific evidence would have created
reasonable doubt, hence she was prejudiced by her counsel's conduct.  This analysis ignores the
plethora of inculpatory evidence of Ayers's own incriminating conduct and words before, during,
and immediately after the fire.

Second, Ayers posits a claim of prosecutorial misconduct regarding an alleged discovery
violation.  The discovery issue regarding Winters's arson report was raised at trial and on direct
appeal, and is therefore *res judicata* for purposes of this proceeding.  Even if counsel had not
raised it, it is a claim that could have been raised, and is therefore barred on *res judicata* grounds
for this reasons as well.

Third, Ayers argues that her right to compulsory process was violated by the States's
alleged discovery violation.  Counsel was certainly alerted by the very nature of this arson case,
as well as Winters's being listed as a State's witness and his notes and summary reports being
provided in discovery, that an expert might be part of Ayers's defense, with or without Winters's
final arson report.  This right was thus not impacted by the State's discovery.  Furthermore, the
claim, since it relies upon the discovery issue as a predicate, is *res judicata*.

Fourth, Ayers's actual innocence claim seeks to pin the blame for the fire on her three-
year-old child, despite her incriminating and threatening conduct and words.  Ayers has
unsuccessfully attempted this defense from the time of the fire.

Fifth, Ayers challenges the sufficiency of the evidence of her guilt in making a due
process challenge to her conviction.  Sufficient evidence of her guilt, however, was presented at
trial.  Under the constitutional standard that reviews the sufficiency of the evidence, the evidence
presented at trial is construed in favor of the prosecution and the conviction.  The appellate court,
in affirming Ayers's conviction and sentence, held that was sufficient evidence of her guilt
presented at trial.  The claim is both without merit and *res judicata*.  *See Ayers*, *supra*, at ¶¶ 16-
28.

And sixth, Ayers reformulates her ineffectiveness and compulsory process claims in the
context of the state constitutional framework as opposed to the federal constitutional one.  The
claims fail for the same reason that they fail under the federal standards.

*Page 14*

summarily dismissed without the necessity of an evidentiary hearing.

Respectfully submitted,

JOHN D. FERRERO, JR.,
STARK COUNTY PROSECUTING ATTORNEY

*Ronald Mark Caldwell*

RONALD MARK CALDWELL
Ohio Sup. Ct. Reg. No. 0030663
Assistant Prosecuting Attorney
Stark County Prosecutor's Office
110 Central Plaza, South
Suite 510
Canton, Ohio 44702-1413
(330) 451-7897

Counsel for Plaintiff-Respondent

RMC/rmc      12/21/20      1 & 3    **Judge Kristin G. Farmer**

## CASE No. 2012-CR-1567

# In the
# Court of Common Pleas
## of Stark County, Ohio

### STATE OF OHIO,

Plaintiff,

vs.

### KAYLA JEAN AYERS,

Defendant.

### REPLY to MOTION FOR LEAVE TO FILE
### MOTION FOR NEW TRIAL PURSUANT TO CRIM. R. 33(B)

Kayla Jean Ayers has moved this Court for leave to file a motion for new trial

pursuant to Crim. R. 33(B) on the grounds that she has discovered new evidence that would

have changed the outcome of the trial, if not prove her actual innocence of the charged

offenses of aggravated arson and child endangering.  Ayers concedes that her motion for new

trial has been filed outside of the 120-day requirement for such motions based on newly

discovered evidence.  She nonetheless argues that she should be able to file her new trial

1

**EXHIBIT 40**

motion based upon Crim. R. 33(B).  Since she has, however, failed to show by clear and

convincing proof that she was unavoidably prevented from discovery of the evidence she

now relies upon in her new trial motion (and contemporaneous petition for post-conviction

relief per R.C. 2953.21), Ayers's motion for leave to file should be overruled.



Respectfully submitted,

JOHN D. FERRERO, JR.,
STARK COUNTY PROSECUTING ATTORNEY

*Ronald Mark Caldwell*
RONALD MARK CALDWELL
Ohio Sup. Ct. Reg. No. 0030663
Stark County Prosecutor's Office
110 Central Plaza, South
Suite 510
Canton, Ohio    44702-1413
(330) 451-7897

Counsel for Plaintiff



## MEMORANDUM

Ayers has filed a motion for a new trial based on newly discovered evidence, relying

upon the same factual arguments made in her contemporaneous petition for post-conviction

relief.  Ayers argues that she now has evidence via expert testimony that the fire could not

have started in the manner described by the State and its expert witness, Massillon Fire

Inspector Reginald Winters, thereby exonerating her and putting the blame for the fire on her then three-year-old son. Ayers further alleges that she was unavoidably prevented from discovering this evidence for some either years because of her lack of legal training or education. Her allegation is without merit, and the motion for leave to file should be overruled.

### *Procedural History of the Case*

In 2012, the Stark County Grand Jury returned an indictment that charged Kayla Jean Ayers, defendant-appellant, with aggravated arson and child endangering.[1] The charges arose from Ayers setting a bed on fire while she and her three-year-old child were in the house. Ayers pleaded not guilty to the charges, and the case was set for trial in the Stark County Court of Common Pleas.[2]

During pretrial proceedings, Ayers filed two motions in limine. In the first motion, Ayers sought to exclude evidence of "bad parenting," while the second motion sought to exclude evidence of Ayers' involvement with Child Protective Services and the Department of Job and Family Services regarding "parenting rights, allegations of lice infestation, and having a dirty home," as well as evidence regarding Ayers' mental health and use of medication. With regard to the last issue, the trial court ordered that Ayers be evaluated for competency to stand trial. The evaluation, however, was not done due to Ayers' refusal to participate in the evaluation. The State also filed a pretrial

---

[1] *See* R.C. 2909.02(A)(2) (aggravated arson, a felony of the second degree) and R.C. 2919.22(A) (child endangering, a misdemeanor of the first degree).

[2] Judge Charles E. Brown presided over the case during the pretrial proceedings. Judge Kristin G. Farmer, however, assumed the bench upon Judge Brown's retirement, and presided over the trial.

3

motion in limine, seeking to exclude evidence of an allegation that Ayers' son had set a fire in South Carolina subsequent to the fire in this case.  According to the State's motion, the South Carolina fire was actually set accidentally by an adult, and was thus not intentionally set by Ayers' son.

The jury found Ayers guilty of the charges offenses, and the trial court sentenced her to an aggregate prison term of seven years – seven years for aggravated arson, and a concurrent 180-day term for the child endangering charge.  Ayers appealed her convictions and sentences to the Court of Appeals for Stark County (Fifth Appellate District), raising two assignments of error  – one that challenges the evidentiary support for her convictions, and the other challenging the effectiveness of her trial counsel for failing to adequately challenge and cross-examine the fire inspector for submitting only a draft report on his arson investigation.  The court of appeals overruled both of these assignments of error, and affirmed Ayers's convictions and sentences. *State v. Ayers*, 5th Dist. Stark No. 2013-CA-00034, 2013-Ohio-5402, 2013 WL 6506473.


### *Statement of Facts from the Trial*

Ayers was convicted of starting a fire in the basement of her residence in order to burn the house.  She had earlier threatened to burn the residence down if her father moved out of the residence.  The fire was started at two different places on a mattress that was in the basement, and the resulting fire reached the first floor from the basement.  Ayers claimed at trial that the fire was accidental and started as a result of her three-year-old son playing with a lighter.[3]

Before the fire on the evening of October 3, 2012, Ayers and her family (her boyfriend and

---

[3]*See* T.(I) 177 (opening statement of defense) and T.(II) 436, 448 (closing argument of defense).

4

their three young children) were living with her father and his family (his girlfriend and her two children) in his Massillon residence. Her father, Jeff Ayers, eventually discussed with finances with Ayers and the fact that she was not contributing much. Their relationship deteriorated due to the financial situation, and Mr. Ayers told his daughter to leave and care for her own family. Ayers responded by telling her father that she was not leaving and that he should leave. Ayers then threatened to burn the house down. Fearful for himself and his pregnant girlfriend, Mr. Ayers decided to leave and force Ayers to care for her family on her own. When he told his daughter of his decision, Ayers threatened to burn the house down if he were to leave. At the time of this threat, a friend of Mr. Ayers, Jason Pandrea (who was having a sexual relationship with Ayers), overheard Ayers's threat. Mr. Ayers decided to leave the Massillon home nonetheless, and left for West Virginia to seek employment and new living arrangements during the morning of October 3.[4]

Also during this day, Ayers's boyfriend, Brennan Scott, left for work as usual, picking up his boss on the way. After work, he picked up his children from day care, dropped them off with Ayers, and then took his boss back home in Beach City, where Scott stayed for a couple hours socializing. When he returned around eight o'clock that night, he found fire trucks around his house.[5]

When the children returned home around six o'clock that night, the two oldest – the daughters, who were 5 and 4 – boarded a church bus to take them to evening services. Karen Ball, a regular attendee at this church, arrived at the Ayers residence in order to pick up Ayers and her three children. Ball knocked on the front door, but no one answered the door. Instead, she heard the dog barking, and then heard someone say, "Shhh." Getting no answer, Ball went to the kitchen door

---

[4]T.(II) 307-312, 339.

[5]T.(II) 322-323, 325-328, 331.

5

and knocked again.  And again, she got no answer other than the dog barking.  Ball did see, however, Ayers's purse on the deck.  Ball went back to her car and talked briefly with a neighbor, which led her to believe that Ayers was inside the home.[6]

While at church, Ball decided to leave the service early to check on Ayers.  Arriving at the home around eight o'clock, Ball noticed a flickering emanating from a basement window.  Ball knocked on the basement door, but got no answer other than the dog barking.  Ball called to Ayers repeatedly, but got no answer.  So she went once again to the kitchen door to knock and call to Ayers.  Still getting no answer other then the dog's persistent barking, Ball returned to her car to get her cane, after which she intended to go to a neighbor's to ask about Ayers.  When she got to her car, she heard a thump, turned around, and saw Ayers running to her with her youngest child, three-year-old Bubba (Brennan Junior).  Ayers told Ball to call 911, so the disabled woman went to the neighbors' and had them call 911.  While waiting for the fire fighters to respond, Ball stayed with Ayers and Bubba.  She noticed that Ayers had cut her hand, but that Bubba was fine.  Ayers also kept bemoaning the fact that she was going to lose her children.  The neighbor, Jennifer Conley, also heard Ayers say that Bubba had started the fire.  Conley detected a strong odor of burnt marijuana on Ayers.[7]

Fire fighters from the Massillon Fire Department responded to the 911 call, and put out the fire inside the home.  Once the fire was extinguished (primarily in the basement), the smoke inside the home was ventilated out, which then allowed the fire inspector to investigate the nature and origin of the fire.  The fire fighters-paramedics also treated Ayers and her lacerated hand, as well as

---

[6]T.(II) 357-358, 371-373, 377-380.

[7]T.(II) 359-360, 362, 367, 381-386, 389.

6

Bubba.  The paramedics noted that Bubba did not have any smoke smell or soot about him; Ayers, however, had soot on her, which indicated that she had been in the basement, which was the obvious source of fire.[8]

Massillon Fire Department Inspector Reginald Winters inspected the house once the fire was extinguished and the premises ventilated.  A mattress in the basement had been fully engulfed in flames, and was the origin of the fire.  The mattress had an unusual burn pattern due to the fact that there were two separate points of origin, at different ends of the mattress.  The cause of the fire was incendiary, i.e., an open flame.  Thus, someone used an open flame to light two fires at different ends of the mattress.  Winters did not find any evidence that the fire had been started by a cigarette, i.e., he did not find any remnant of a cigarette.  There also did not appear to be any accelerants used in the fire.[9]

Once he had completed his investigation of the fire scene, Inspector Winters went to the hospital to interview Ayers.  This interview included Sgt. Muntean of the Massillon Police Department.  Ayers told the investigators that he had been in the basement folding clothes when she noticed her son Bubba over by the bed playing with a lighter.  She shortly afterwards noticed a fire on the bed, so Ayers grabbed a blanket and starting fanning the flame.  Unsuccessful in putting out the fire, Ayers claimed that she ran to the washing machine, grabbed a glass of water, and threw it

---

[8]T.(I) 182-187, 189, 193, 213, 215.

[9]T.(I) 233, 238-250; (II) 301-303.  The source of the fire were the two spots on the mattress.  Once the mattress caught fire, the fire spread to the basement walls and ceiling, through the floor and into the bathroom located on the first floor.  T.(I) 188, 216-217, 248.

on the flame.[10]  Unsuccessful yet again, she ran and got another glass of water, but tripped on her way back to the bed, dropping the glass and breaking it, and then falling on it and cutting her hand. Winters asked Ayers how she could see her son by the bed while she was folding clothes at the dryer since there was a chimney, a hot water tank, and a furnace blocking the view from that location. Ayers did not know.  Ayers maintained that the fire grew in size quickly, and that she couldn't find the phone to call the fire department.  Winters asked her why she didn't immediately leave the house when the fire started, and Ayers had no answer for that question.  Winters noted that Ayers's story kept changing, and that she seemed lethargic.  Ayers denied that she had been drinking, and told the investigators that she was only on Adderall for her ADHD.  When Sgt. Muntean started questioning Ayers, she was not able to respond to his questions.  Winters noticed that Ayers did not smell of smoke or soot, but a swab of her nostrils revealed light soot inside.[11]

Winters spoke with Bubba, and noticed that the boy did not smell of smoke or soot, did not have any burn marks, and had no soot in his nostrils.  Winters did ascertain that the boy was able to light a lighter.  Winters then returned to the fire scene and found a broken glass in the basement.  He also found a blood splatter on the hot water tank and washing machine, and a blood trail that went up the basement steps, then back down, and that there was blood on the wall by the steps.  He also

---

[10]Because mattresses now have fire retardants on them, Inspector Winters testified that the initial flame would have been small, and that a glass of water would have extinguished the flame.  The fire retardants cause any flame to burn slowly, not fast, and that a cigarette will take hours to light a mattress on fire.  Fanning the fire would have given it oxygen, causing the flame to get bigger.  Winters opined that the mattress at the Ayers residence burned between ten and twelve minutes before the fire department arrived.  T.(II) 266-268.

[11]T.(II) 262-268, 280-282.

found blood in the kitchen and on the kitchen table.[12]

Winters testified also that Bubba, if he had started the two fires, would have had to light the fire at one end of the mattress, then crawl to the other end while the mattress was on fire to the other end and light that spot as well.[13]  Ayers had told him, however, that her boy was standing by the mattress when the fire caught her attention.  In his official report, Inspector Winters reached the following conclusions about the fire:

> After examination of the fire scene it was determined the fire originated in the basement on the bed.  After examination of the fire scene, interviewing witnesses, interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of NFPA 921; A Guide for Fire and Explosion Investigation, it is my opinion the ignition source for the fire was some type of open flame.  The materials first ignited were blankets on the bed.  The act or omission that brought the ignition source and the materials first ignited together was the deliberate act of a person or persons.  Using these elements of a fire cause, the cause of the fire is incendiary.

> T.(II) 300-301.

Ayers did not testify at trial or offer any evidence in her defense.[14]

---

[12]T.(II) 270, 273.

[13]T.(II) 303-305.

[14]Before sentencing, Ayers made the following statement to the trial court:

I took it all the way to the box because I really didn't do it so I was sure I wouldn't be found guilty.  And I've just never been in trouble before and I can't go to prison.  Please, I should have took a deal, but I didn't want to because I knew that I would win, I just knew.

I'll go - - I'll go anywhere but prison.  Put me in a mental institute, I don't care. Please don't put me in prison.

T.(III) 493-494.

9

### *Motion for New Trial – Newly Discovered Evidence*

Some eight years after Ayers's conviction and sentence, she has filed a motion for a new trial based upon newly discovered evidence under Crim. R. 33(A)(6).[15]  She has also filed a contemporaneous petition for post-conviction relief under R.C. 2953.21, making the same factual allegations in the petition as she has made in her new-trial motions.  Ayers argues that a defense that included an expert witness on fire and arson investigations would have resulted in a different verdict at trial.  This evidence would have undermined the State's expert testimony, and would have supported her defense that her three-year-old son accidentally set the fire that night.  Ayers's argument ignores or minimizes the plethora incidents of her incriminating, inculpatory, and threatening conduct and words before, during, and after the fire, which included her feeble attempts to cast the blame for the fire on her son instead of herself.

Ayers concedes that hew new-trial motion has been filed outside of the 120-day

---

[15]The rule provides:

When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

**10**

deadline for motions such as hers.  Her motion was in fact filed some eight years after her

conviction and sentence.  She nonetheless claims that she was unavoidably prevented from

discovery the expert witness that would have successfully challenged the State's evidence,

and therefore she should be excused from complying with the 120-day requirement.  Ayers's

argument is without merit.

Ayers's motion for a new trial is based on newly discovered evidence, *e.g.,* expert

assistance that would have reviewed the State's evidence and would have reached different

conclusions relative to the points of origin of the fire that night.  *See* Crim. R. 33(A)(6).

Pursuant to rule, a defendant seeking a new trial based upon newly discovered evidence has

120 days from the jury's verdict at trial to file her motion.

> Motions for new trial on account of newly discovered evidence shall be filed
> within one hundred twenty days after the day upon which the verdict was
> rendered, or the decision of the court where trial by jury has been waived. If
> it is made to appear by clear and convincing proof that the defendant was
> unavoidably prevented from the discovery of the evidence upon which he must
> rely, such motion shall be filed within seven days from an order of the court
> finding that he was unavoidably prevented from discovering the evidence
> within the one hundred twenty day period.

Crim. R. 33(B).

In order to file a new-trial motion and have the motion considered outside of this time

parameter, the defendant must show by clear and convincing evidence that she was

unavoidably prevented from discovering the evidence she is relying upon in her motion.

Ayers argues that she isn't a lawyer and relied upon her counsel to discover this evidence,

11

and her reliance thereby relieves her of the requirement to file her new-trial motion within 120 days of the jury's verdict.

Ayers's argument is without merit. She knew whether she had set the fire or had not. If she believed that her son had set the fire instead of herself, she would have reasonably known that expert testimony would be crucial to factual determination of her guilt at trial. Ayers in fact argues in her motions (and petition) that this case hinged solely on the expert evidence pertaining to the points of origin of the fire in this case. While Ayers may not have known which experts to consult during and after her trial, she should have reasonably known that such assistance would be crucial to her actual innocence defense. Yet, she claims that she did nothing for some eight years because of her lack of a legal education. Such a claim defies logic and common sense.

Ayers correctly refers to the standard governing such unavoidably-prevent claims by citing to a decision of the Fifth District Court of Appeals in *Horton*.

> The trial court found appellant guilty on August 19, 2015. Because appellant was well outside the one hundred twenty day period, he filed a motion for leave to file a motion for new trial on September 20, 2018. To obtain such leave, appellant was required to show by clear and convincing proof that he was unavoidably prevented from discovering the evidence within the one hundred twenty days. *State v. Lordi*, 149 Ohio App.3d 627, 2002-Ohio-5517, 778 N.E.2d 605. "[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Walden*, 19 Ohio App.3d 141, 483 N.E.2d 859 (1984). Clear and convincing proof is that proof "which will provide in the mind of the trier of facts a firm belief or conviction

as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

*State v. Horton*, 5th Dist. Muskingum No. CT2018-0066, 2019-Ohio-625, 2019 WL 852184, ¶ 12, *appeal denied*, 156 Ohio St.3d 1447, 2019-Ohio-2498, 125 N.E.3d 926 (Table).

Ayers specifically claims in her motion that she could not reasonably have discovered flaws in Winters's testimony because of her lack of formal legal education. The evidence, however, was not that complicated. The State, through its expert, alleged that the fire had two separate points of origin; Ayers claimed there was only one, and that it was accidentally set. With two separate points of origin, the defense would have to argue that both points were set accidentally by a three-year-old (instead of being intentionally set by an adult), an assertion that challenges common sense. The simple question at trial, therefore, was whether the physical evidence supported two separate points of origin. If Ayers firmly believed that she had not set the fire, she would have known that the conclusion by the State's expert witness had to be wrong and not supported by the evidence. Ayers therefore cannot convincingly claim that she had no knowledge of the existence of the ground supporting her new-trial motion.

Ayers also relies upon a decision of the Tenth District Court of Appeals in support of her claims that she was unavoidably prevented from discovery her new evidence. The court of appeals held that a defendant could not be held accountable to discover evidence when he relies upon counsel to discover this evidence, especially in a situation where the defendant

13

does not know of material evidence that he kept to himself.

> As the trial court notes, it was not difficult for Howard to obtain the Netcare records; all that was needed was a phone call and a signed records release. We have concerns, however, with placing the onus of responsibility to thoroughly investigate a case on the defendant when the defendant is represented by and relying on counsel. In both *Anderson* and *Golden*, this court noted it would not find unavoidable prevention where the defendants could not explain why neither they nor their trial counsel could not have discovered the evidence with the exercise of reasonable diligence. *Anderson* at ¶ 14; *Golden* at ¶ 13. Here, however, Howard has adequately explained both failures. Howard did not discover the Netcare records on his own because he alleges neither he nor his daughters knew that Delilah actually obtained treatment at Netcare. He informed his trial counsel and the social worker that he thought she had tried to obtain treatment there, and he relied on his counsel to thoroughly investigate the case. As we outlined above, Howard's trial counsel was ineffective in failing to adequately investigate the matter, and we will not penalize Howard for relying on his trial counsel to conduct an investigation when he gave them all the information he had. This is not a case where the defendant knew of material information that he kept to himself prior to trial. *See, e.g., Anderson* at ¶ 14 (no unavoidable prevention where the defendant simply "remembered" a relevant real estate transaction after trial). Instead, having relied on his trial counsel to fully investigate the matter, Howard had no reason to know that a post-trial phone call to Netcare was a worthwhile phone call to make. It was not until Howard obtained new counsel that the Netcare records came to light, and then only because Howard's new counsel adequately investigated the matter where Howard's trial counsel did not.

*State v. Howard*, 10 Dist. Franklin No. 15AP-161, 2016-Ohio-504, 59 N.E.3d 658, 699, ¶ 34,

*appeal denied*, 147 Ohio St.3d 1413, 2016-Ohio-7455, 62 N.E.3d 185 (Table).

In the instant case, Ayers most definitely knew of the material evidence at issue. She

claimed through personal knowledge that her three-year-old son accidentally set the fire,

whereas the investigators did not believe her story and concluded that the fire was set at two

14

separate locations on the mattress and thus was not accidentally set by a toddler, but was instead intentionally set by an adult. And since Ayers was the only adult present at the time of the fire, she was logically the person who intentionally set the fire. These facts did not require defense counsel to further investigate the scene in order to obtain additional crime-scene evidence that would have supported Ayers's story. Ayers was aware of her factual scenario from the time she was first interviewed by investigators on the night of the fire, asserting that her son had set the fire while she was not paying attention.[16]

In conclusion, Ayers has failed to satisfy her burden under Crim. R. 33(B) of presenting clear and convincing proof that she was unavoidably prevented from discovery the evidence she now relies upon (expert testimony about the origin of the fire). Ayers was present at the time and location of the origin of the fire in this case. She chose to lie and deny responsibility for setting the fire, blaming her three-year-old son instead. In addition, Ayers did not explain any of the substantial evidence of her incriminating and inculpatory conduct and words prior to, during, and after the fire. All of her conduct and words indicated a consciousness of guilt on her part, as well as a motive of revenge on her part for setting the fire. Under these facts and circumstances, Ayers's failure to satisfy the Crim. R. 33(B) standard warrants the motion being overruled.

---

[16]In addition to failing to satisfy the Crim. R. 33(B) standard for a late filing, Ayers cannot also satisfy the Crim. R. 33(A)(6) standard for newly discovered evidence as she cannot convincingly assert that she could not with reasonable diligence discovered the new evidence and have presented it at trial. For example, Ayers was not prevented from testifying at trial in support of her self-serving statements she made to investigators on the night of the fire.

15

Accordingly, the motion for leave to file her motion for new trial should be overruled under Crim. R. 33(B).

Respectfully submitted,

JOHN D. FERRERO, JR.,
STARK COUNTY PROSECUTING ATTORNEY

*Ronald Mark Caldwell*

RONALD MARK CALDWELL
Ohio Sup. Ct. Reg. No. 0030663
Stark County Prosecutor's Office
110 Central Plaza, South
Suite 510
Canton, Ohio    44702-1413
(330) 451-7897

Counsel for Plaintiff

16

## PROOF OF SERVICE

A copy of the foregoing **REPLY to MOTION FOR LEAVE TO FILE MOTION FOR NEW TRIAL PURSUAN TO CRIM. R. 33(B)** was served by regular U.S. mail, postage prepaid, upon BRIAN HOWE, counsel for defendant, at The Ohio Innocence Project, University of Cincinnati College of Law, P.O. Box 210040, Cincinnati, Ohio 43221-0040, on this 21st day of December, 2020.


*Ronald Mark Caldwell*
RONALD MARK CALDWELL
Ohio Sup. Ct. Reg. No. 0030663
Stark County Prosecutor's Office
110 Central Plaza, South
Suite 510
Canton, Ohio     44702-1413
(330) 451-7897

Counsel for Plaintiff

**17**

## **PROOF OF SERVICE**

A copy of the foregoing RESPONSE TO PETITION FOR POST-CONVICTION RELIEF [R.C. 2953.21] and MOTION TO DISMISS and FOR SUMMARY JUDGMENT was served by regular U.S. mail, postage prepaid, upon BRIAN HOWE, counsel for defendant-petitioner, at The Ohio Innocence Project, University of Cincinnati College of Law, P.O. Box 210040, Cincinnati, Ohio  45221-0040, on this 21st day of December, 2020.

*Ronald Mark Caldwell*

RONALD MARK CALDWELL
Ohio Sup. Ct. Reg. No.  0030663
Assistant Prosecuting Attorney
Stark County Prosecutor's Office
110 Central Plaza, South
Suite 510
Canton, Ohio   44702-1413
(330) 451-7897

Counsel for Plaintiff-Respondent

*Page 16*

# IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 2012 CR 1567 |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | HON. KRISTIN G. FARMER |
| | : | |
| KAYLA AYERS, | : | |
| | : | |
| Defendant. | : | |

---

## DEFENDANT-PETITIONER KAYLA AYERS'S RESPONSE IN OPPOSITION TO PLAINTIFF-RESPONDENT'S MOTION TO DISMISS HER PETITION FOR POSTCONVICTION RELIEF

---

On April 13, 2020, Defendant-Petitioner Kayla Ayers filed a *Petition for Postconviction Relief*, raising multiple claims under both the United States Constitution and the Ohio Constitution. On May 18, 2020, Ms. Ayers filed her *First Amended Petition for Postconviction Relief*, as of right, pursuant to R.C. 2953.21(G)(2). On December 21, 2020, the State filed a *Motion to Dismiss Petition for Post-Conviction Relief*, on grounds that Ms. Ayers's Petition failed to allege the necessary jurisdictional requisites under R.C. 2953.23(A).

The State's motion fails to seriously address the argument and case law in Ms. Ayers's *First Amended Petition for Postconviction Relief* and *Memorandum in Support*. It should be denied, and the matter should be set for an evidentiary hearing.

1

**EXHIBIT 41**

Ms. Ayers must satisfy two jurisdictional prerequisites in order for the Court to consider her delayed petition.[1] First, she must show that she was "unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief." R.C. 2953.23(A)(1)(a). Second, she must show "by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted." *Id.* at (A)(1)(b).

Ms. Ayer's Petition was supported by a Memorandum in Support and dozens of exhibits. The key evidence is an affidavit provided by John Lentini, who is one of the authors of the National Fire Prevention Association Guide to Fire and Explosion Investigation ("NFPA 921") relied upon by Inspector Winters at trial. *Affidavit of John Lentini*, attached to Amended Petition as Exhibit O. Mr. Lentini concluded, *inter alia*, that Inspector Winters was "not qualified to investigate fires per NFPA 1033, the generally accepted standard," and that Mr. Winters's testimony "was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." *Id.* Ms. Ayers directly confirmed that her attorneys never discussed hiring or consulting with an independent expert, and that she did not have the means to conduct her own investigation from the jail or from prison after her conviction. *Affidavit of Kayla Ayers*, attached to *Amended Petition* as Exhibit K. Finally, Ms. Ayers has proffered evidence that her attorneys neither hired nor consulted an independent arson expert, that they admitted this to undersigned counsel, and that they refused to provide an affidavit regarding their representation. *Proffer of Testimony of Attorneys Kristina Powers and Matthew Kuhn*, attached to Amended Petition as Exhibit L.

---

[1] Other circumstances that could allow for a delayed petition are irrelevant here. Ms. Ayers's petition does not allege newly discovered DNA evidence, nor are her claims based on a retroactive right newly recognized by the United States Supreme Court.

## ARGUMENT

The State's primary argument in favor of dismissal is that "Ayers does not allege, and cannot allege, that he [sic] was unavoidably prevented from discovery of facts that give rise to his [sic] claim for relief, per R.C. 2953.23(A)(1)(a)." *Motion to Dismiss* at 12. According to the State, "Ayers does not allege, and assumingly [sic] cannot allege, that she was somehow unavoidably prevented from discovery of a contrary expert witness."

This is simply false. Paragraph 12 of Ms. Ayers's Petition explicitly states: "**<u>Petitioner was unavoidably prevented from discovery of the facts upon which she must rely to present the claims for relief as set forth below</u>**." (emphasis added.). In fact, the central point of Ms. Ayers's Petition is that she was unavoidably prevented from discovering the serious flaws in Winters's testimony by a combination of ineffective trial counsel and prosecutorial misconduct. These facts are discussed in detail in Ayers's original *Memorandum in Support*, and additionally, in her *Reply Brief in Support of her Motion for Leave to File Motion for New Trial*.[2] In summary, Ms. Ayers, from her jail cell, could not have reasonably consulted with appropriate experts and challenged false or misleading evidence on her own. She trusted her attorneys to discover the evidence she now presents to the Court. For purposes of R.C. 2953.23(A)(1)(a), her trial counsel's ineffectiveness and the State's own misconduct unavoidably prevented Ms. Ayers from uncovering the facts on which her petition relies. *State v. Howard*, 2016-Ohio-504, ¶33-37, 59 N.E.3d 685 (10th Dist.).

---

[2] The "unavoidably prevented" standard applies both to Crim.R.33(B) motions for leave and petitions for postconviction relief. See Howard, 2016-Ohio-504 at ¶55.

Ms. Ayers has also presented ample evidence that no reasonable factfinder would have convicted her but-for the constitutional errors at trial. R.C. 2953.23(A)(1)(b). The State argues that "Ayers' factual allegations focus essentially on the evidence on the points of origin of the fire, and minimizes [sic] or ignores [sic] her guilty and inculpatory conduct before, during and immediately after the fire." However, in its response opposing Ms. Ayer's *Motion for Leave*, the State itself concedes that its "two points of origin" theory was the central issue in the case. *Response in Opposition to Leave* at 13 ("The simple question at trial, therefore, was whether the physical evidence supported two separate points of origin."). We now know that the State's "two points of origin" theory was completely baseless and unsupported. But-for multiple constitutional violations at trial, the jury would have heard evidence disproving Winters's conclusions, and it would have answered the "simple question" about the fire's origin in Ayers's favor.

The strength of Ms. Ayers's claims for purposes of 2953.23(A)(1)(a) is apparent from the State's failure to engage with the merits of her Petition. Despite obtaining six extensions over a period of eight months, the State does not meaningfully address any of Ms. Ayers's constitutional claims. Instead, the State's argument on the merits is contained to a single footnote, without citations to any relevant case law.

In opposition to Ms. Ayers's claims for ineffective assistance of counsel, the State asserts that the claim is barred by the doctrine of *res judicata*. Ms. Ayers has already addressed the State's argument, in detail, in her previous filing. *Memorandum in Support of Amended Petition* at 20-21. In summary, her current claims depend on evidence outside the record, and could not have been addressed as part of her direct appeal. *See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013). The State does not offer any contrary case law, or even

4

acknowledge Ms. Ayers's arguments on this point. Rather than simply repeating the relevant

citations and argument, Ms. Ayers refers both the State and the Court to her original filing.

The State also argues, without citation, that Ms. Ayers's proffer regarding her attorneys'

pretrial investigation is hearsay and "would be inadmissible at any hearing." Of course, the

proffer would not be necessary at any future hearing, because both witnesses would be

subpoenaed to offer direct testimony. Ohio postconviction procedures do not provide a pre-filing

means of compelling testimony from necessary witnesses. They do, however, provide that

evidentiary hearings should be allowed if a petitioner alleges facts necessary for relief. R.C.

2953.21(F)("Unless the petition and the files and records of the case show the petitioner is not

entitled to relief, the court shall proceed to a prompt hearing on the issues."). Ms. Ayers has

proffered those facts, and she intends to support that proffer with testimony from her trial

attorneys at an evidentiary hearing.

Finally, the State questions whether Ms. Ayers was prejudiced by her trial counsel's

failure to consult with an expert or object to the State's misconduct. The State does not

acknowledge or address case law finding prejudice under nearly identical circumstances. *See*

*Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007); *Dugas v. Coplan*, 428 F.3d 217, 328 (1st

Cir.2005); *State v. Batin*, 2005-Ohio-36, ¶¶59-65 (5th Dist.). It cites no other courts who have

found prejudice lacking under similar facts, and it fails to acknowledge the ongoing importance

of Inspector Winters's "two points of origin" theory to its case, including in its own recent

filings.

Regarding the prosecutorial misconduct claim, the State does not deny that it violated

Crim.R.16(K) by failing to disclose Winters's "two points of origin" theory to the defense prior

to trial. Instead, it argues this "discovery issue" was known at trial, and therefore that further

examination is barred by *res judicata*. Again, this argument has already been addressed by Ms. Ayers's *Amended Petition* and *Memorandum in Support*. First, although it appears that Ms. Ayers's trial counsel was unaware of at least part of Winters's conclusions prior to trial, there was no affirmative evidence in the trial record about the exact scope of the State's pretrial disclosure. Furthermore, to succeed on a claim of prosecutorial misconduct, Ms. Ayers must prove that the State's misconduct materially affected the outcome at trial. *United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976). Here, that means showing what her attorneys would have (or should have) done with advance notice of Winters's "two points of origin" conclusion. Ms. Ayers could not have raised this claim on direct appeal based on the record at trial, because there was no evidence in the record regarding what an actual, independent expert would have said about Winters's "two points of origin" theory. Because the prosecutorial misconduct claim relies on evidence outside the record, it could not have been appropriately raised on direct appeal, and it is not barred by *res judicata*.

Regarding the remaining claims, the State's footnote does not meaningfully address the arguments in Ms. Ayers's *Petition and Memorandum in Support*,[3] and Ms. Ayers stands on her original filings.

## CONCLUSION

For the foregoing reasons, Ms. Ayers respectfully requests the Court deny the State's *Motion to Dismiss* and either grant Ms. Ayers relief or set the matter for an evidentiary hearing on the merits.

---

[3] The State appears to construe Count Five of the Amended Petition as a sufficiency of evidence claim. In fact, Count Five raises a due process challenge to grounding her conviction and ongoing sentence on an expert opinion now known to be fundamentally unreliable and materially misleading.

6

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

STATE OF OHIO,                    :      Case No.  2012 CR 1567
                                  :
      Plaintiff,               :
                                  :
   -v-                          :      HON. KRISTIN G. FARMER
                                  :
KAYLA AYERS,                      :
                                  :
      Defendant.               :

---

## DEFENDANT-MOVANT KAYLA AYERS'S REPLY IN SUPPORT OF HER MOTION FOR LEAVE TO FILE MOTION FOR NEW TRIAL

---

On April 13, 2020, Defendant-Movant Kayla Ayers filed a *Motion for Leave to File a Motion for New Trial,* based on newly discovered exculpatory evidence that:

- The State's central witness, Inspector Reggie Winters, was unqualified by generally accepted arson investigation standards,

- Inspector Winters made multiple basic errors in his evaluation and investigation into the fire, and his testimony was "unreliable, unscientific, and at odds with generally accepted fire investigation methodology,"

- Inspector Winters's conclusion that the fire had multiple points of origins was scientifically invalid and unsupported, and

- Ms. Ayers's own attorneys did not consult with an independent arson investigator, were not qualified to independently examine Mr. Winters's conclusions, and did not know what conclusions had and had not been disclosed prior to trial.

Ms. Ayers seeks to present this evidence to the Court in support of multiple distinct claims, including (1) that the new evidence would have produced a strong probability of a different outcome at trial per *State v. Petro,* (2) that her attorneys were constitutionally ineffective by failing to consult with an expert, and this ineffectiveness was material to her conviction, and (3)

1

**EXHIBIT 42**

that the State's failure to disclose its "two-points-of-origin" theory prior to trial was material misconduct that resulted in a verdict unworthy of confidence.

On December 21, 2020, the State of Ohio filed a response to Ms. Ayers's *Motion for Leave to File a Motion for New Trial*, asking the Court to deny Ms. Ayers the chance to present her *Motion for New Trial* on its merits.

The State does not contest that Ms. Ayers was diligent in presenting the evidence to the Court after having discovered it. Instead, the State's sole argument opposing leave appears to be that Ms. Ayers should have been able to discover the evidence in question within 120 days of her conviction. The State argues that "[t]he simple question at trial [ ] was whether the physical evidence supported two separate points of origin." *Response* at 13. According to the State, if Ms. Ayers were innocent "she would have known that the conclusion by the State's expert witness had to be wrong and not supported by the evidence." Therefore, according to the State, Ms. Ayers "most definitely knew of the material evidence at issue" at the time of trial, and her *Motion for Leave* should be denied under Crim.R.33(B).

In fact, Ms. Ayers had no way of knowing what a proper arson investigation would have shown about the origin of the fire. The State repeatedly refers to Ms. Ayers's initial statements to investigators, that Brennan Jr. started the fire while she was doing laundry. However, Ms. Ayers almost immediately admitted that she had fallen asleep before the fire, and that she had simply assumed Brennan Jr. had started it.[1] *Narrative Supplement*, attached to *Motion for Leave* as Exhibit G, at 128. Her three-year-old son, Brennan Jr., confirmed to investigators that Kayla was asleep when the fire started. *Id.* And by the time of trial, both sides characterized Kayla's

---

[1] Ms. Ayers was terrified that her children would be taken away from her as a result of the fire. Tr. 360. (She kept "repeating was she going to lose—Am I going to lose my kids am I going to lose my kids?").

2

defense as being that she was asleep when the fire started. *See, e.g.*, State of Ohio Closing Argument, Tr. 430 ("Well, then when that gets flushed out a little bit, then she says, I fell asleep. Inspector Winters explained to you how that's impossible.").

The State is correct that Ms. Ayers knew she did not start the fire. But this knowledge did not put her in any special position to identify what a qualified and competent arson expert would say about the fire. It does not give her any insight into which parts of Winters's testimony were spurious, or where the fire actually started, or the difference between calcination and annealing, or how Winters's qualifications compared to industry standards. A person's knowledge of his or her own innocence is not enough to protect against false or misleading forensic testimony: approximately 25% of the 2,708 wrongful convictions identified in the U.S. to date involved "false or misleading forensic evidence."[2]

Nor could Ms. Ayers have been expected to uncover this information about arson forensics on her own. Neither Ohio law nor the United States Constitution requires an individual defendant to conduct her or her own independent, parallel, forensic investigation from jail or prison. Ms. Ayers's trial lawyers were the ones with the investigative resources and responsibility to investigate forensic issues on behalf of their client. Had they done so, they would have known that Inspector Winters was unqualified to testify as an expert. They would have known that the physical evidence is completely consistent with Brennan Jr. having accidentally started the fire, and they would have known that research shows children are often sources of accidental fires. *See Lentini Affidavit* at 23, citing Cambell, *Playing with Fire*, National Fire Protection Association (2014). Ms. Ayers trusted her attorneys to investigate the

---

[2] https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx (last accessed January 8, 2021).

3

State's evidence, and she trusted prosecutors not to put forth false or unsupported forensic evidence. This is not something she did wrong. Ohio law encourages defendants to have faith in the basic efficacy and fairness of its criminal justice system, and Ms. Ayers should not be penalized for that trust.

The State does not cite to any court—in Ohio or anywhere else—that has placed the burden for uncovering faulty forensic testimony on a *pro se* defendant in the first four months of her imprisonment. To the contrary, the only relevant case law provided by either party specifically refused to place that burden on *pro se* defendants. *State v. Howard*, 2016-Ohio-504, 59 N.E.3d 685 (10th Dist.). The fact that Inspector Winter's testimony was "unreliable, unscientific, and at odds with generally accepted fire investigation methodology" was not something Ms. Ayers knew of, but kept to herself prior to trial. Ms. Ayers did not strategically hold back her knowledge that Winters was unqualified as an arson expert. As in *Howard*, Ayers's "trial counsel was ineffective in failing to investigate the matter," and this Court should "not penalize [Ayers] for relying on [her] trial counsel to conduct an investigation." *Id.*

Finally, this case is unique in that the State itself is at least partly to blame for the present circumstances. Even assuming Ms. Ayers were obligated to conduct her own parallel, independent forensic investigation from jail, she could not have possibly investigated Inspector Winters's spurious "two points of origin" theory—**because the State failed to disclose this theory to the defense prior to trial, in violation of Crim.R.16(K).** It is especially brazen for the State to sandbag the defense with undisclosed expert testimony at trial, and then fault Ms. Ayers for not independently discovering the flaws in that testimony, after trial, from her jail cell. The procedural requirements in Crim.R.33(B) are not intended as loopholes to reward and protect prosecutorial misconduct, and the Court need not interpret them as such.

4

## CONCLUSION

For the foregoing reasons, Defendant-Movant Kayla Ayers respectfully requests the

Court GRANT her *Motion for Leave to File a Motion for New Trial* and allow her permission to

file a *Motion for New Trial* within seven days of the Court's order.

Respectfully Submitted,

Brian Howe (0086517)
Attorney for Defendant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon the Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular U.S. mail on this 8th day of January, 2020.

Attorney for Defendant

Respectfully Submitted,

Brian Howe (0086509)
Attorney for Defendant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon the Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular U.S. mail on this 8th day of January, 2020.

Attorney for Defendant

7

CRINN M. TOLAS
CLERK OF COURTS
STARK COUNTY, OHIO

**IN THE COURT OF COMMON PLEAS**
**STARK COUNTY, OHIO**

2021 FEB 22  PM 2: 33

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 2012-CR-1567 |
| Plaintiff, | ) | JUDGE KRISTIN FARMER |
| vs. | ) | **STATE'S SUPPLEMENTAL** |
| | ) | **RESPONSE TO PETITION FOR** |
| | ) | **POST CONVICTION RELIEF AND MOTION FOR** |
| KAYLA AYERS, | ) | **LEAVE TO FILE MOTION FOR NEW TRIAL** |
| Defendant. | ) | |
| | ) | |

Now comes the State of Ohio, and hereby supplements its responses to its Reply to Motion

for Leave to File Motion for New Trial Pursuant to Crim. R. 33(B) and Motion to Dismiss Petition

for Post-Conviction Relief Not Timely Filed, which are incorporated herein by reference. The

reasons are more fully set for the in the attached Memorandum in Support.

Respectfully submitted,

**KYLE L. STONE #0095140**
**PROSECUTING ATTORNEY,**
**STARK COUNTY, OHIO**

By:  *Vicki deSantis*

VICKI L. DeSANTIS
Ohio Sup. Ct. Reg. No. 0075716
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza South,
Suite 510
Canton, OH 44702
(330) 451-7897
Counsel for Plaintiff

**EXHIBIT 43**

## MEMORANDUM IN SUPPORT

The pertinent questions for this Court raised by Ayer's Post-Conviction Relief Petition (hereinafter "PCR") and Motion for Leave to File a Motion for New Trial are: 1) whether the Court lacks jurisdiction to hear an untimely PCR when the exceptions provided in R.C. 2953.23(A) have not been met, 2) whether a hearing is required especially when the petitioner has not set forth sufficient operative facts to establish substantive grounds for relief, 3) whether res judicata bars Ayers from raising ineffective assistance of counsel, even when raised on direct appeal, if there is no additional mitigation evidence based on evidence outside the record, 4) whether Ayers has failed to show by clear and convincing proof that she was unavoidably prevented from discovery of evidence that warrants filing her Motion outside of the 120 day requirement, and  5) whether this case is moot as Ayers has already served her time in prison.

The first question needs to be analyzed in the specific context of this case – what was the last day Ayers should have filed her Motions. In 2013, a PCR must have been filed not later than 180 days after the filing of the trial transcript in the court of appeals in the course of the direct appeal of a criminal case. RC 2953.21(A)(2). Seven years past the time to file is clearly untimely. A petition for post-conviction relief that is not timely filed or is successive may be summarily dismissed by the court without filing findings of fact or conclusions of law. *State ex rel. George v. Burnside*, 118 Ohio St. 3d 406, 407, 2008-Ohio-2702, 889 N.E.2d 533 (2008); *State ex rel. Bunting v. Haas*, 102 Ohio St. 3d 161, 164, 2004-Ohio-2055, 807 N.E.2d 359, 361 (2004). This is true even if the defendant alleges that he or she was unavoidably prevented from discovering the facts to allow a timely claim. *State ex rel. Ashipa v. Kubicki*, 114 Ohio St. 3d 459, 459, 2007-Ohio-4563, 872 N.E.2d 1235 (2007).

Second, the mere filing of a PCR also does not automatically entitle the petitioner to an

evidentiary hearing. The trial court has "a gatekeeping role as to whether a defendant will even receive a hearing" and may dismiss the petition without a hearing "where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *State v. Gondor*, 112 Ohio St. 3d 377, 388, 2006-Ohio-6679, 860 N.E.2d 77 (2006) (citing *State v. Calhoun*, 86 Ohio St. 3d 279, 291–92, 1999-Ohio-102, 714 N.E.2d 905 (1999)).

Part of what petitioner must demonstrate to show grounds for substantive relief is some actual prejudice from the claimed constitutional violation. *State v. Williams*, 162 Ohio App. 3d 55, 60, 2005-Ohio-3366, 832 N.E.2d 783 (6th Dist. Lucas County 2005) (citing *State v. Jackson*, 64 Ohio St. 2d 107, 18 Ohio Op. 3d 348, 413 N.E.2d 819 (1980)). Broad, open-ended assertions, even alleging ineffective counsel, are insufficient to overcome the interests of judicial economy and efficiency in deciding to grant a hearing. *Jackson, supra.* The petitioner must offer substantial evidence to merit a hearing. *Williams, supra.* Ayers has failed to show grounds for substantive relief.

Third, the doctrine of res judicata applies to post-conviction proceedings, *State v. Nichols*, 11 Ohio St. 3d 40, 41, 463 N.E.2d 375 (1984), and bars the raising of issues that were raised or could have been raised at the trial or on an appeal from the trial court's judgment. E.g., *State v. Darden*, 64 Ohio App. 3d 691, 694–95, 582 N.E.2d 1065 (6th Dist. Sandusky County 1989) (defendant precluded from raising claims of faulty indictment, insufficient evidence for sentencing enhancement, or error in jury instructions; as determination of all these issues rested solely on evidence in the record, they should have been presented on direct appeal). *State v. Fuller*, 171 Ohio App. 3d 260, 268, 2007-Ohio-2018, 870 N.E.2d 255 (1st Dist. Hamilton County 2007) (citing *State v. Perry*, 10 Ohio St. 2d 175, 39 Ohio Op. 2d 189, 226 N.E.2d 104 (1967)). That is not the

case here.

Ayers did file a direct appeal. Ayers claimed ineffective assistance of counsel. The Fifth District overruled this assignment of error and affirmed the jury's verdict. Ayers did not attach any new evidentiary materials to her PCR that wasn't already manifested by the record. Her proposed mitigation evidence is expert testimony in the form of an affidavit to dispute the State's arson expert. However, that is simply a battle of the experts, not newly discovered evidence. It is inconsequential to the ultimate outcome of her case and Ayers has not explained how this is newly discovered evidence outside of the record. Ayers has failed to demonstrate by clear and convincing evidence that would create a reasonable probability that the outcome of the proceeding would have been different. Based upon the totality of all the evidence against her, it was reasonable for the jury to have found her guilty of arson and child endangering.

Fourth, clearly filing a Motion for New Trial more than 8 years later is untimely. In addition, Ayers failed to show she was prevented from discovering new evidence that would allow an untimely filing. In fact, she has not discovered new evidence. She merely got the opinion of another arson expert who is basing his opinions on the same evidence introduced at trial. Simply because the Ohio Innocence project has gotten involved in her case does not mean she can go through the back door with the same evidence she already used through the front door. Ayers is simply trying to get the trial court to second-guess the Fifth District Court of Appeals. Moreover, her argument that she isn't a lawyer and relied upon her counsel to discover this evidence is without merit. See attached 'Motion for Appointment of Counsel,' as "Exhibit 'A'", where, in her own handwriting, she claims she needs assistance to obtain additional evidence not presented at trial. This document was filed on June 27, 2013.

Finally, Ayers cannot show prejudice as she has served her time and is out of prison. Thus,

her Motions are moot.

For the reasons set forth in the State's Memorandum the Petition for Post-Conviction Relief and the Motion for Leave to File a Motion for New Trial should be dismissed or in the alternative denied, pursuant to the doctrine of res judicata.

Respectfully submitted,

**KYLE L. STONE #0095140**
**PROSECUTING ATTORNEY,**
**STARK COUNTY, OHIO**

By: _Vicki DeSantis_

VICKI L. DeSANTIS
Ohio Sup. Ct. Reg. No. 0075716
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza South,
Suite 510
Canton, OH 44702
(330) 451-7897

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

A copy of the foregoing Response was sent to BRIAN HOWE, counsel for defendant, by

U.S. mail, postage prepaid, at The Ohio Innocence Project, University of Cincinnati College of

Law, P.O. Box 210040, Cincinnati, Ohio 43221-0040, this 22nd day of February, 2021.


VICKI L. DeSANTIS
Ohio Sup. Ct. Reg. No. 0075716
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza South,
Suite 510
Canton, OH 44702
(330) 451-7897

Counsel for Plaintiff

Presented for Filing 6/27/3
Time Stamp Omitted in Error

IN THE COURT OF COMMON PLEAS
_Stark_____COUNTY, OHIO

STATE OF OHIO,                          :

        Plaintiff-Respondent,          :

. v.                                    :      Case No. _2022CR1567_

_Kayla Ayers_____,                :

        Defendant-Petitioner.          :

## MOTION FOR APPOINTMENT OF COUNSEL

    Petitioner moves this Court for an order appointing counsel to represent Petitioner on the Petition for Postconviction Relief.  A memorandum in support is attached.

                    Respectfully submitted,

                    _Kayla Ayers_____
                    PETITIONER, *pro se*
                    _85757_____
                    INSTITUTION NUMBER
                    _Ohio Reformatory for Women_
                    INSTITUTION
                    _1479 Collins Ave_____
                    ADDRESS/P.O. BOX NUMBER
                    _Marysville OH 43040_____
                    CITY, STATE & ZIP CODE

## EXHIBIT "A"

## MEMORANDUM IN SUPPORT

Petitioner lacks the skill or knowledge to adequately pursue Petitioner's rights without the assistance of counsel.  Counsel is essential to insure that Petitioner's rights are fully litigated and all issues reviewed.  Pursuant to R.C. 2953.21, Petitioner has only one opportunity to present his claims for post-conviction relief.  Counsel is required to protect Petitioner's constitutional rights.  As attested by the Affidavit of Indigency filed with the petition, Petitioner is without funds to hire an attorney.

The following special circumstances about Petitioner and/or Petitioner's case further support this request: I am requesting an attorney to assist me in obtaining additional evidence that was not Presented On my behalf at the time of my trial. I appreciate your time, and Concern, Thank you.

WHEREFORE, Petitioner respectfully requests that counsel be appointed.

Respectfully, submitted,

PETITIONER, *pro se*

2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing MOTION FOR APPOINTMENT OF

COUNSEL was forwarded by regular U.S. mail to the office of the ___Stark___

County Prosecutor, [address] __110 Central Plaza South__

__Canton, Ohio  44702-0000__

on this __24__ day of __June__, 20 __13__.

PETITIONER, *pro se*

3

## IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No.  2012 CR 1567 |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | HON. KRISTIN G. FARMER |
| | : | |
| KAYLA AYERS, | : | |
| | : | |
| Defendant. | : | |

## MOVANT-PETITIONER KAYLA AYERS'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL RESPONSE

On April 13, 2020, Movant-Petitioner Kayla Ayers filed a Motion for Leave to File a Motion for New Trial and a Petition for Postconviction Relief. An Amended Petition for Postconviction Relief was submitted on May 18, 2020. The State of Ohio responded to both the motion for leave and the postconviction petition on December 21, 2020. On January 8, 2021, Ms. Ayers filed reply briefs on both issues.

On February 22, 2021, the State filed a *Supplemental Response to Petition for Postconviction Relief and Motion for Leave to File Motion for New Trial* ("Supplemental Response"). The State's latest response (now the fourth round of briefing on the matter) raises several new arguments for the first time. Ms. Ayers now seeks leave to file a brief reply, limited only to those issues that are raised for the first time in the State's Supplemental Response. See, e.g., *U.S. Bank Natl. Assn. v. Green Meadow SWS, L.L.C.*, 2013-Ohio-2002, ¶¶37-38 (5th Dist.).

A proposed Supplemental Reply Brief Instanter is attached hereto.

1

**EXHIBIT 44**

Respectfully Submitted,


/s/ Brian Howe
Brian Howe (0086517)
Attorney for Defendant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular first class U.S. mail on this 31st day of March, 2021.

/s/ Brian Howe
Attorney for Defendant

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 2012 CR 1567 |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | HON. KRISTIN G. FARMER |
| | : | |
| KAYLA AYERS, | : | |
| | : | |
| Defendant. | : | |

---

**MOVANT-PETITIONER KAYLA AYERS'S PROPOSED SUPPLEMENTAL REPLY BRIEF**

---

In its Supplemental Response, the State raises several arguments for the first time. First, the State argues that the information in the Lentini Report is not actually "new" evidence. Second, the State argues that Ms. Ayers's 2013 *Motion for Appointment of Counsel* shows she did not need attorney assistance to discover her present claims. Finally, the State argues that the matters before the Court are now moot since Ms. Ayers completed her sentence. None of these new arguments have merit.

First, the State claims that "Ayers did not attach any new evidentiary materials to her PCR that wasn't already manifested by the record." *Supplemental Response* at 3. To pick one example, Ms. Ayers has included sworn testimony from an internationally-renowned arson expert showing that Inspector Winters was grossly unqualified by industry standards, and that his "two-points-of-origin" conclusion—upon which the State's case relied—was false and

1

**EXHIBIT 45**

unsupported. The State does not offer a specific citation for where John Lentini's conclusions would have been "manifested by the trial record."[1]

Instead, the State argues that the Lentini Report is "simply a battle of the experts, not newly discovered evidence." *Supplemental Response* at 3. But "newly discovered evidence" does not exclude "newly discovered forensic evidence." All newly discovered exculpatory evidence, whether proven by expert or lay testimony, has some relationship to evidence that was already introduced at trial. And in this case, at trial, there was no battle of the experts. Inspector Winters was presented as a qualified arson investigator, and his conclusions about the fire's origin were unchallenged. Inspector Winters's serious errors were not "manifest in the record" because, until the review conducted by John Lentini, no qualified expert had ever examined the fire. Through no fault of her own, Ms. Ayers has had to discover these deficiencies herself. She does not deserve a new trial "simply because the Ohio Innocence Project has gotten involved in her case." Supplemental Response at 3. She deserves a new trial because she was convicted on the basis of testimony that is now known to be false and unsupported, that was introduced unchallenged as a result of attorney error and prosecutorial misconduct, and that has only come to light now because Ms. Ayers has been more diligent—not less diligent—than most similarly-situated defendants.

Second, the State claims that Ms. Ayers's "argument that she isn't a lawyer and relied upon her counsel to discover this evidence is without merit." Supplemental Response at 3. As proof, the State notes that, in June 2013, Ms. Ayers requested an attorney "to assist me in obtaining additional evidence that was not presented on my behalf at the time of my trial."

---

[1] Although the State continues to present new and evolving procedural arguments as to why Ms. Ayers's motions should be dismissed, it has failed to defend the merits of Inspector Winters's conclusions about the fire, or to challenge the conclusions in the Lentini Report.

*Motion for Appointment of Counsel* (6/27/2013). This motion was denied, and Ms. Ayers was never appointed post-conviction counsel.

Ms. Ayers's motion for counsel does not mention flaws in Winters's testimony, or his qualification as an expert, or any other issue with the arson testimony. She did not request help "presenting" arson evidence that she had uncovered on her own. She requested help "obtaining" evidence. Ms. Ayers knew she was innocent and she knew she needed help to investigate her case. Her *Motion for Appointment of Counsel* shows that she has consistently done everything she could to get help proving her innocence, and that without constitutionally effective counsel, she lacked the ability and resources to do so on her own.

Finally, the State argues that Ms. Ayers postconviction filings should be dismissed as moot since she has been released from prison. The State does not cite any case law in support of its position. In fact, the Ohio Supreme Court has held that an appeal of a felony conviction is not mooted by the satisfaction of the sentence:

> "Given the numerous adverse collateral consequences imposed upon convicted felons, it is clear to us that a person convicted of a felony has a substantial stake in the judgment of conviction which survives the satisfaction of the judgment imposed upon him or her. Therefore, an appeal challenging a felony conviction is not moot even if the entire sentence has been satisfied before the matter is heard on appeal. The collateral legal consequences associated with a felony conviction are severe and obvious. Thus, a convicted felon, who has completed his or her sentence during the pendency of an appeal from the felony conviction, need not present evidence that he or she will suffer some collateral legal disability or loss of civil rights in order to maintain the appeal."

*State v. Golston*, 1994-Ohio-109, 71 Ohio St.3d 224, 643 N.E.2d 109. See *also*, *State v. Turpin*, 19 Ohio App.2d 116 (5th Dist.1969)(a petitioner "does not have to be in custody or under sentence in order to seek postconviction relief in the form of vindication or removal of the stigma of a long sentence fully served"); *State v. Callihan*, 2002-Ohio-5878, fn.1 (4th Dist.); *State v. Foster*, Montgomery County No. 14684, 1995 WL 324651 (2d Dist.). Ms. Ayers was on post-

3

release control when her Motion for Leave and Petition for Postconviction Relief were filed.[2]

Furthermore, even today she faces ongoing collateral consequences from her conviction. *E.g.*, Ohio Rev. Code Sec. 4723.092 (categorically barring felons convicted of aggravated arson from obtaining a nursing license); Ohio Rev. Code. Sec. 4765.301 (categorically barring people convicted of arson from being appointed as emergency medical technicians); Ohio Rev. Code Sec. 2923.13 (prohibiting anyone convicted of a violent felony from owning or carrying a firearm).

For the foregoing reasons, Ms. Ayers respectfully requests the Court grant Ms. Ayers leave to file a Motion for New Trial, deny the State's Motion to Dismiss, and set the matter for an evidentiary hearing on the merits.

> Respectfully Submitted,
>
> /s/ Brian Howe
> Brian Howe (0086517)
> Attorney for Defendant Kayla Ayers
> THE OHIO INNOCENCE PROJECT
> University of Cincinnati College of Law
> P.O. Box 210040
> Cincinnati, OH 45221-0040
> (513) 556-0752
> Brian.Howe@uc.edu
> (513) 556-0702

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular first class U.S. mail on this 31st day of March, 2021.

> /s/ Brian Howe
> Attorney for Defendant

---

[2] Ms. Ayers's sentence expired during the eight-month period between her initial filings and the State's initial response.

IN THE COURT OF COMMON PLEAS
STARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. 2012CR1567 |
| | ) | |
| Plaintiff, | ) | JUDGE KRISTIN G. FARMER |
| | ) | |
| vs. | ) | JUDGMENT ENTRY DENYING |
| | ) | DEFENDANT'S PETITION FOR |
| KAYLA AYERS, | ) | POST-CONVICTION RELIEF AND |
| | ) | MOTION FOR LEAVE TO FILE |
| Defendant. | ) | FOR NEW TRIAL |

This matter came before the Court on Defendant's Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23 filed on April 13, 2020, and Defendant's First Amended Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23 filed on May 18, 2020.  Defendant also filed a Motion for Leave to File for New Trial Pursuant to Crim.R. 33(B) on April 13, 2020.

On December 21, 2020, Plaintiff filed a Motion to Dismiss Petition for Post-Conviction Relief – Not Timely Filed, pursuant to R.C. 2953.21(A)(2) and R.C. 2953.23(A).   Defendant filed a Response in Opposition to Plaintiff's Motion to Dismiss on January 8, 2021.

Plaintiff filed a Supplement on February 22, 2021.  Defendant filed a Motion for Leave to File a Supplemental Response on March 31, 2021.[1]

---

[1] The Court grants Defendant's motion for leave to file a supplemental response.  The supplemental response was attached to the motion and has been considered by the Court.

**EXHIBIT 46**

## Procedural History

On November 6, 2012, Defendant was indicted on one count of Aggravated Arson (R.C. 2909.02(A)(2)), a felony of the second degree, and one count of Endangering Children (R.C. 2919.22(A)), a first degree misdemeanor.

The matter proceeded to trial, and on January 30, 2013, the Defendant was found guilty by a jury of both offenses, i.e. Aggravated Arson and Endangering Children, as charged in the indictment.

Defendant was sentenced to serve a prison term of seven years on the charge of Aggravated Arson and a concurrent sentence of one hundred eighty days on the charge of Endangering Children.  Defendant has served her prison term in this case.

Defendant appealed her convictions and sentences to the Fifth District Court of Appeals on February 20, 2013.  Defendant asserted two assignments of error on appeal. The first assignment of error challenged her convictions as against the manifest weight and sufficiency of the evidence.  The second assignment of error alleged ineffective assistance of trial counsel.  Defendant's convictions and sentences were affirmed by the Fifth District Court of Appeals on December 9, 2013. *State v. Ayers*, (Ohio App. 5 Dist), 2013-Ohio-5402, 2013 WL 6506473.

Defendant's Motions for Post-Conviction Relief and Motion for Leave to File Motion for New Trial, and Plaintiff's Motion to Dismiss are now before the Court.

Defendant claims that she was denied effective assistance of counsel at trial.

## Law and Analysis

A petition for post-conviction relief is subject to strict filing requirements. Prior to March 2015, R.C. 2953.21(A)(2) required a petition for post-conviction relief be filed, " * no later than one hundred eighty days after the date on which the trial transcript is

2

filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication ***."

The trial transcript in this matter was filed with the Fifth District Court of Appeals on March 27, 2013. Therefore, the Court finds that the Defendant's petition in this matter was not timely filed, as said petition was not filed on or before September 23, 2013, i.e. 180 days from March 27, 2013.

"A trial court is without jurisdiction to entertain an untimely petition for post-conviction relief unless the petitioner demonstrates that one of the exceptions in R.C. 2953.23(A) applies. R.C. 2953.23(A)(1)(a) allows a trial court to consider an untimely petition in the following situations: (1) where a petitioner shows that he was unavoidably prevented from discovering the facts upon which he relies to present his claims for relief; or (2) where a petitioner shows that the United States Supreme Court has recognized a new federal or state right, after the time period set forth in former R.C. 2953.21(A)(2) expired, that applies retroactively to the petitioner and that is the basis of the petitioner's claim for relief. R.C. 2953.23(A)(1)(a). In either case, the petitioner must also show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which he was convicted. R.C. 2953.23(A)(2) allows a trial court to consider an untimely petition in certain cases involving DNA testing." *State v. Nolde* (Ohio App. 3d Dist.), 2016-Ohio-636.

In the instant case, the Court finds that the Defendant has failed to demonstrate the applicability of either of the exceptions found in R.C. 2953.23(A), which would allow the Court to consider the Defendant's Petition.

The Court finds that the Defendant was not "unavoidably prevented from discovering the facts upon which she relies to present her claims for relief". Additionally, the Court finds that there is no new federal or state right that applies retroactively to the petitioner and that is the basis of the petitioner's claim for relief.

Even if the Court were to find that Defendant was unavoidably prevented from discovering the facts upon which she now wishes to present, the Court finds that Defendant cannot show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which he was convicted.

Since the Court finds that Defendant's Petition does not qualify for either of the exceptions found in R.C. 2953.23(A), the Court dismisses Defendant's Petition on jurisdictional grounds.

Notwithstanding the Court's finding that the Defendant's Petition is untimely and fails to satisfy the applicability of either of the exceptions found in R.C. 2953.23(A), and that it is dismissed on jurisdictional grounds, the Court further finds that the Defendant's claims are barred by *res judicata* and are without merit.

Lastly, the Court adopts the Memorandum, contained in the State of Ohio's responses to Defendant's Petition for Post-Conviction Relief. See, *State v. Lorraine*, 1996 WL 207676 (Ohio App. 11 Dist.), wherein the Eleventh District Court of Appeals adopted the decision of the First District Court of Appeals in *State v. Sowell* (1991), 73 Ohio App.3d 672. In *Sowell*, the First District Court of Appeals determined that the trial court's adoption of the state's findings of fact and conclusions of law does not, by itself, deprive the petitioner of a meaningful review of his petition for post-conviction relief. See also, *State v. Powell* (1993), 90 Ohio App.3d 260, 263, *State v. Murphy* (May 12,

4

1995), Marion App. NO. 9-94-52, unreported, and *State v. Jester*, 2004 WL1532205

(Ohio App. 8 Dist.)

For the reasons set forth above, the Court denies the Defendant's Petition for

Post-Conviction Relief and dismisses same.

Defendant also moves the Court for a new trial based upon Crim. R. 33(B), which

provides:

> **(B) Motion for New Trial; Form, Time.** Application for a new
> trial shall be made by motion which, except for the cause of newly
> discovered evidence, shall be filed within fourteen days after the verdict
> was rendered, or the decision of the court where a trial by jury has been
> waived, unless it is made to appear by clear and convincing proof that
> the defendant was unavoidably prevented from filing his motion for a
> new trial, in which case the motion shall be filed within seven days from
> the order of the court finding that the defendant was unavoidably
> prevented from filing such motion within the time provided herein.

> Motions for new trial on account of newly discovered evidence
> shall be filed within one hundred twenty days after the day upon which
> the verdict was rendered, or the decision of the court where trial by jury
> has been waived. If it is made to appear by clear and convincing proof
> that the defendant was unavoidably prevented from the discovery of the
> evidence upon which he must rely, such motion shall be filed within
> seven days from an order of the court finding that he was unavoidably
> prevented from discovering the evidence within the one hundred twenty
> day period.

Defendant claims that she was unavoidably prevented from discovering the new

evidence that she is relying upon in the filing of her motion, namely, the opinion of her

own expert that would have challenged Plaintiff's expert as to the points of origin of the

fire in this case.

Upon review, the Court finds that Defendant cannot show by clear and

convincing evidence that she was prevented from filing a motion for new trial or

discovering the evidence she now, eight years later, requests to present.  Therefore,

Defendant's Motion for Leave to File Motion for New trial is denied.

IT IS SO ORDERED.

Judge Kristin G. Farmer

Copies:      Stark County Prosecutor
             Brian Howe, Esq.

**IN THE COURT OF COMMON PLEAS**
**STARK COUNTY, OHIO**

2021 CA 0 0 1 3 4

| | | |
|---|---|---|
| **STATE OF OHIO,** | : | **Case No.  2012 CR 1567** |
| c/o Stark County Pros. Atty | : | |
| 110 Central Plaza, S# 510 | | |
| Canton, OH 44702 | | |
| | | FILED |
| | | NOV 2 9 2021 |
| Plaintiff-Appellee, | : | |
| | : | |
| -v- | : | **HON. KRISTIN G. FARMER** |
| | : | |
| **KAYLA AYERS,** | : | |
| c/o Ohio Innocence Project | : | |
| P.O. Box 210040 | : | |
| Cincinnati, OH 45221 | : | |
| Defendant-Appellant. | : | |

FILED

NOV 2 9 2021

LYNN M. TODARO
Clerk of Court of Appeals
STARK COUNTY, OHIO

---

**NOTICE OF APPEAL**

---

Notice is hereby given that Defendant Kayla Ayers hereby appeals to the Court of

Appeals of Stark County, Ohio, Fifth Appellate District from the order of the Stark County Court

of Common Pleas entered on November 2, 2021, captioned *Judgment Entry Denying*

*Defendant's Petition for Post-Conviction Relief and Motion for Leave to File for New Trial.*

Respectfully Submitted,

Brian Howe (0086517)
Attorney for Defendant-Appellant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

**EXHIBIT 47**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served upon Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular first-class U.S. mail on this 26th day of November, 2021.

Attorney for Defendant-Appellant

# IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

**FILED**

**NOV 02 2021**

LYNN M. TODARO
STARK COUNTY OHIO
CLERK OF COURTS

| | | |
|---|---|---|
| **STATE OF OHIO,** | ) | **Case No. 2012CR1567** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KRISTIN G. FARMER** |
| | ) | |
| **vs.** | ) | **JUDGMENT ENTRY DENYING** |
| | ) | **DEFENDANT'S PETITION FOR** |
| **KAYLA AYERS,** | ) | **POST-CONVICTION RELIEF AND** |
| | ) | **MOTION FOR LEAVE TO FILE** |
| **Defendant.** | ) | **FOR NEW TRIAL** |

This matter came before the Court on Defendant's Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23 filed on April 13, 2020, and Defendant's First Amended Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23 filed on May 18, 2020. Defendant also filed a Motion for Leave to File for New Trial Pursuant to Crim.R. 33(B) on April 13, 2020.

On December 21, 2020, Plaintiff filed a Motion to Dismiss Petition for Post-Conviction Relief – Not Timely Filed, pursuant to R.C. 2953.21(A)(2) and R.C. 2953.23(A). Defendant filed a Response in Opposition to Plaintiff's Motion to Dismiss on January 8, 2021.

Plaintiff filed a Supplement on February 22, 2021. Defendant filed a Motion for Leave to File a Supplemental Response on March 31, 2021.[1]

---

[1] The Court grants Defendant's motion for leave to file a supplemental response. The supplemental response was attached to the motion and has been considered by the Court.

## Procedural History

On November 6, 2012, Defendant was indicted on one count of Aggravated Arson (R.C. 2909.02(A)(2)), a felony of the second degree, and one count of Endangering Children (R.C. 2919.22(A)), a first degree misdemeanor.

The matter proceeded to trial, and on January 30, 2013, the Defendant was found guilty by a jury of both offenses, i.e. Aggravated Arson and Endangering Children, as charged in the indictment.

Defendant was sentenced to serve a prison term of seven years on the charge of Aggravated Arson and a concurrent sentence of one hundred eighty days on the charge of Endangering Children. Defendant has served her prison term in this case.

Defendant appealed her convictions and sentences to the Fifth District Court of Appeals on February 20, 2013. Defendant asserted two assignments of error on appeal. The first assignment of error challenged her convictions as against the manifest weight and sufficiency of the evidence. The second assignment of error alleged ineffective assistance of trial counsel. Defendant's convictions and sentences were affirmed by the Fifth District Court of Appeals on December 9, 2013. *State v. Ayers*, (Ohio App. 5 Dist), 2013-Ohio-5402, 2013 WL 6506473.

Defendant's Motions for Post-Conviction Relief and Motion for Leave to File Motion for New Trial, and Plaintiff's Motion to Dismiss are now before the Court.

Defendant claims that she was denied effective assistance of counsel at trial.

## Law and Analysis

A petition for post-conviction relief is subject to strict filing requirements. Prior to March 2015, R.C. 2953.21(A)(2) required a petition for post-conviction relief be filed, " * no later than one hundred eighty days after the date on which the trial transcript is

2

filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication ***."

The trial transcript in this matter was filed with the Fifth District Court of Appeals on March 27, 2013. Therefore, the Court finds that the Defendant's petition in this matter was not timely filed, as said petition was not filed on or before September 23, 2013, i.e. 180 days from March 27, 2013.

"A trial court is without jurisdiction to entertain an untimely petition for post-conviction relief unless the petitioner demonstrates that one of the exceptions in R.C. 2953.23(A) applies. R.C. 2953.23(A)(1)(a) allows a trial court to consider an untimely petition in the following situations: (1) where a petitioner shows that he was unavoidably prevented from discovering the facts upon which he relies to present his claims for relief; or (2) where a petitioner shows that the United States Supreme Court has recognized a new federal or state right, after the time period set forth in former R.C. 2953.21(A)(2) expired, that applies retroactively to the petitioner and that is the basis of the petitioner's claim for relief. R.C. 2953.23(A)(1)(a).  In either case, the petitioner must also show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which he was convicted. R.C. 2953.23(A)(2) allows a trial court to consider an untimely petition in certain cases involving DNA testing." *State v. Nolde* (Ohio App. 3d Dist.), 2016-Ohio-636.

In the instant case, the Court finds that the Defendant has failed to demonstrate the applicability of either of the exceptions found in R.C. 2953.23(A), which would allow the Court to consider the Defendant's Petition.

3

The Court finds that the Defendant was not "unavoidably prevented from discovering the facts upon which she relies to present her claims for relief". Additionally, the Court finds that there is no new federal or state right that applies retroactively to the petitioner and that is the basis of the petitioner's claim for relief.

Even if the Court were to find that Defendant was unavoidably prevented from discovering the facts upon which she now wishes to present, the Court finds that Defendant cannot show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which he was convicted.

Since the Court finds that Defendant's Petition does not qualify for either of the exceptions found in R.C. 2953.23(A), the Court dismisses Defendant's Petition on jurisdictional grounds.

Notwithstanding the Court's finding that the Defendant's Petition is untimely and fails to satisfy the applicability of either of the exceptions found in R.C. 2953.23(A), and that it is dismissed on jurisdictional grounds, the Court further finds that the Defendant's claims are barred by *res judicata* and are without merit.

Lastly, the Court adopts the Memorandum, contained in the State of Ohio's responses to Defendant's Petition for Post-Conviction Relief. See, *State v. Lorraine*, 1996 WL 207676 (Ohio App. 11 Dist.), wherein the Eleventh District Court of Appeals adopted the decision of the First District Court of Appeals in *State v. Sowell* (1991), 73 Ohio App.3d 672. In *Sowell*, the First District Court of Appeals determined that the trial court's adoption of the state's findings of fact and conclusions of law does not, by itself, deprive the petitioner of a meaningful review of his petition for post-conviction relief. See also, *State v. Powell* (1993), 90 Ohio App.3d 260, 263, *State v. Murphy* (May 12,

1995), Marion App. NO. 9-94-52, unreported, and *State v. Jester*, 2004 WL1532205 (Ohio App. 8 Dist.)

For the reasons set forth above, the Court denies the Defendant's Petition for Post-Conviction Relief and dismisses same.

Defendant also moves the Court for a new trial based upon Crim. R. 33(B), which provides:

> **(B) Motion for New Trial; Form, Time.** Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.
>
> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Defendant claims that she was unavoidably prevented from discovering the new evidence that she is relying upon in the filing of her motion, namely, the opinion of her own expert that would have challenged Plaintiff's expert as to the points of origin of the fire in this case.

Upon review, the Court finds that Defendant cannot show by clear and convincing evidence that she was prevented from filing a motion for new trial or

discovering the evidence she now, eight years later, requests to present.   Therefore,

Defendant's Motion for Leave to File Motion for New trial is denied.

IT IS SO ORDERED.

Judge Kristin G. Farmer

Copies:        Stark County Prosecutor
               Brian Howe, Esq.

6



LYNN M. TODARO
CLERK OF COURTS
STARK COUNTY, OHIO

2022 FEB 22  PM 3: 16

IN THE COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No.  2021 CA 134 |
| | :- | |
| | : | C.P. Case No. 2012 CR 1567 |
| Plaintiff-Appellee, | : | Farmer |
| | : | |
| -v- | : | |
| | : | |
| KAYLA AYERS, | : | |
| | : | ORAL ARGUMENT REQUESTED |
| Defendant-Appellant. | : | |

---

### BRIEF OF APPELLANT KAYLA AYERS

---

**Attorneys for Appellant:**

**Brian C. Howe (0086517)**
**Mark Godsey (0074484)**
**OHIO INNOCENCE PROJECT**
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
(513) 556-0702 (fax)
Brian.Howe@uc.edu

**Attorney for Appellee:**

**Kyle L. Stone (0095140)**
**Stark County Prosecutor**
110 Central Plaza S., Ste. 510
Canton, OH 44702
(330) 451-7897
(330) 451-7097 (fax)

i

**EXHIBIT 48**

# TABLE OF CONTENTS

STATEMENT OF THE CASE............................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 2

THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR LEAVE TO
FILE A MOTION FOR NEW TRIAL.......................................................................... 12

   A.  "Reasonable diligence" did not require Ms. Ayers to conduct an independent arson
investigation from prison within 120 days of her conviction.................................... 12

   B.  Under the trial court's reading of Crim.R.33(B), some criminal defendants in Ohio will be
deprived of any effective means of enforcing their right to constitutionally effective counsel.17

THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST AMENDED PETITION
FOR POSTCONVICTION RELIEF............................................................................ 19

   A.  Because of her ineffective trial counsel and her own incarceration, Ms. Ayers was
unavoidably prevented from discovering the forensic evidence supporting her postconviction
claims. .................................................................................................................... 20

   B.  But-for constitutional error at trial, no reasonable factfinder would have found Ms. Ayers
guilty of aggravated arson...................................................................................... 21

      1.  Ineffective Assistance of Counsel .................................................................. 21

      2.  ·Claims Alleging Prosecutorial Misconduct, Compulsory Process, Actual Innocence, and
Fundamentally Unreliable Evidence. .................................................................. 28

   C.  Res judicata does not bar the claims presented in Ms. Ayers's Petition............................ 29

THE TRIAL COURT ERRED BY FAILING TO HOLD AN EVIDENTIARY HEARING ..... 29

CONCLUSION.............................................................................................................. 30

# TABLE OF AUTHORITIES

Cases

*Allison v. State*, 914 N.W.2d 866, 891 (Iowa 2018) ......................................... 18

*Barefoot v. Estelle*, 463 U.S. 880, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983)......... 28

*Dando v. Yukins*, 461 F.3d 791 (6th Cir.2006)............................................... 22

*Douglas v. California*, 372 U.S. 353, 355, 83 S.Ct. 8149 L.Ed.2d 811 (1963)......... fn.5

*Foley v. Commonwealth*, No.2019-SC-0182-MR, 2020 WL 6390212 (Ky.2020)..... 18

*Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969)............. 28

*Martinez v. Ryan*, 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012)................ 16-18

*McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013)....... 17

*Pennsylvania v. Finley,* 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)........ 17

*Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007)........................................... 21-24

*State v. Ayers*, Fifth Dist. Stark No 2013CA0034, 2013-Ohio-5402.................... passim

*State v. Barnes*, Fifth Dist. Muskingum CT2017-0092, 2018-Ohio-1585.............. 29

*State v. Batin*, Fifth Dist. Stark No. 2004CA0128, 2005-Ohio-36........................ 24

*State v. Bentley*, 66 N.E.3d 180, 2016-Ohio-3290 (11th Dist.)........................... 29

*State v. Crawford*, Fifth Dist. Richard No. 09CA16, 2009-Ohio-5176................. 14

*State v. Davis*, Fifth Dist. Licking No 09-CA-0019, 2012-Ohio-32...................... 14

*State v. Davis*, 295 So.3d 396, 397-98 (La.2020)........................................... 18

*State v. Hill*, Fifth Dist. Stark No. 2020CA0019, 2020-Ohio-4050..................... 13-14

*State v. Howard*, 59 N.E.3d 685, 2016-Ohio-504 (10th Dist.).......................... 13-16

*State v. Johnson*, 24 Ohio St. 3d 87, 89, 494 N.E.2d 1061, 1063 (1986)............... 22

*State v. Kopchak*, Fifth Dist. Muskingum No. CT2017-0036, 2018-Ohio-1136........ 21

*State v. Millow*, 1st Dist. Hamilton No. C180259, 2019-Ohio-1751.................... 29

*State v. Pahoundis*, Fifth Dist. Coshocton No. 07CA04, 2007-Ohio-3515............. 14

*State v. Petrone*, Fifth Dist. Stark No. 2012CA0096, 2013-Ohio-1138................. 14

*State v. Proby*, 10th Dist. Franklin No. 14AP–1067, 2015-Ohio-3364................. fn.8

*State v. Selmon*, Fifth Dist. Richland No. 15CA83, 2016-Ohio-723...................... 29

*State v. Smith*, Fifth Dist. Muskingum No. 2019-0077, 2020-Ohio-5096............... 12

*State v. Thornton*, Fifth Dist. Muskingum No. CT2016-0041, 2017-Ohio-637.......... 20

*State v. Warren*, 86 N.E.3d 728, 2017-Ohio-853 (2nd Dist.).............................. 29

*State v. Weaver*, 114 N.E.3d 766, 2018-Ohio-2509 (5th Dist.)............................ 29

*Stein v. New York*, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953)................. 28

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)...... 17, 22-24

*United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).......... 28

Rules & Statutes

Ohio Crim.R.33.................................................................................... passim

Ohio Rev. Code 2953.23......................................................................... passim

Ohio Crim.R.16.................................................................................... 24-25

Other Sources

*NFPA 921, Guide to Fire and Explosion Investigation* (2011 ed.)...................... 6, 10, 26

## APPELLANT'S ASSIGNMENTS OF ERROR

**ASSIGNMENT OF ERROR No. I**: THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL

**ASSIGNMENT OF ERROR No. II**: THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST AMENDED PETITION FOR POSTCONVICTION RELIEF

**ASSIGNMENT OF ERROR No. III**:  THE TRIAL COURT ERRED BY FAILING TO HOLD AN EVIDENTIARY HEARING

## ISSUES PRESENTED FOR REVIEW

**ISSUE 1**: A criminal defendant is unavoidably prevented from discovering necessary evidence, for purposes of both Crim.R.33(B) and R.C. 2953.23(A), when the evidence in question depends on expert forensic analysis not reasonably available to the defendant after trial, and when the evidence was not available at trial due to trial counsel's ineffectiveness.

**ISSUE 2**: When a criminal defendant does not receive effective assistance of trial counsel, and when the evidence of that ineffectiveness is outside the original trial record, the defendant's lack of competent postconviction representation may unavoidably prevent him or her from filing a motion for leave to file a motion for new trial pursuant to Crim.R.33(B) and/or a petition for postconviction relief pursuant to R.C. 2953.23.

**ISSUE 3**:  When a criminal trial attorney fails to consult an independent arson expert, and thereafter fails to challenge or object to false and unsupported conclusions upon which the State's case depends, and when the State offers previously undisclosed and false forensic testimony in support of its case at trial, no reasonable fact-finder would find the defendant guilty but-for the violation of the defendant's constitutional rights.

**ISSUE 4**:  When a movant presents a prima facie case showing they were unavoidably prevented from discovering necessary evidence for purposes of Crim.R.33(B), the trial court errs by denying the motion for leave without an evidentiary hearing.

## STATEMENT OF THE CASE

In October 2012, Kayla Ayers was at home with her young son when her mattress in the basement of the home caught fire. The fire was quickly extinguished. In early 2013, Ms. Ayers was convicted of aggravated arson, based primarily on expert testimony that the fire had two distinct points of origin, and therefore could not have been accidentally started by a cigarette or by Ayers' young son.

At trial, Ms. Ayers's trial counsel neither consulted with its own fire expert, nor objected to previously undisclosed "expert" conclusions offered at trial. As a result, the first time an independent arson expert reviewed the matter was in 2019, as part of an investigation by the Ohio Innocence Project.

That review found that "the expert testimony presented to the jury *** was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." The State's expert was "not qualified to investigate fires," and he "disregarded the guidance" of the textbook on which he claimed his conclusions were based. Most importantly, the State's "two points of origin" theory was and is "unsupportable by any generally accepted methodology."

Once she became aware of the flaws in her trial, Ms. Ayers attempted to present these issues in a Motion for Leave and a Petition for Postconviction Relief. The trial court denied both on procedural grounds, finding that Ms. Ayers could not show she was "unavoidably prevented" from discovering the independent arson analysis that supported her 2020 filings.

In fact, Ms. Ayers lacked the means and the ability to independently uncover evidence of the State's flawed arson testimony and her own attorneys' ineffectiveness. She was unavoidably prevented from discovering the evidence supporting her postconviction filings, and the trial court's decision should be reversed.

1

## STATEMENT OF FACTS

### A. Fire & Initial Investigation

On October 3rd, 2012, at 8:21 P.M., the Massillon Fire Department received a report of a fire on 26th St. in Massillon, OH. *Massillon Fire Department Summary Call Sheet*, attached as Exhibit A[1] to *Petition for Postconviction Relief*, at 120. Multiple suppression units and an ambulance were dispatched. *Id.* The first suppression units arrived at the house at 8:28 P.M. *See id, see also Massillon Fire Department Response Record,* attached as Exhibit B to *Petition for Postconviction Relief,* at 118. They quickly extinguished the fire, which was isolated to a mattress in the basement corner. *See id.* at 119.

The only people home at the time of the fire were Kayla Ayers and her three-year-old son, Brennan Jr. (a.k.a. "Bubba"). *See Massillon Police Department Incident Report- Part 2* ("Incident Report"), attached as Exhibit C to *Petition for Postconviction Relief,* at 127. Kayla sustained a laceration on her hand after she slipped and broke a glass of water while trying to extinguish the fire herself. *Massillon Fire Department EMS Run Report* ("EMS Report"), attached as Exhibit D to *Petition for Postconviction Relief,* at 121. Brennan Jr. was completely unharmed. *See Incident Report* at 127.

Initial reports from the scene state that Kayla was disoriented and frantic about the possibility of losing custody of her children. *See State of Ohio v. Kayla Ayers,* Case No. 2012CR-1567, Trial Transcripts ("Tr."), attached as Exhibit E to *Petition for Postconviction Relief,* at 362. Her neighbor, Jennifer Conley, stated that Kayla kept "repeating was she going to

---

[1] All exhibits referenced herein were submitted both as part of Ms. Ayers's Motion for Leave to File a Motion for New Trial ("Motion for Leave") and were incorporated by reference as part of Ms. Ayers's initial Petition for Postconviction Relief. Ms. Ayers subsequently filed a First Amended Petition for Postconviction Relief ("Petition for Postconviction Relief"), attaching the exhibits directly thereto.

2

lose—Am I going to lose my kids, am I going to lose my kids?" *Id.* at 360. She also reported that she thought she smelled marijuana on Kayla's breath. *Id.* at 362. A member of Kayla's church, Karen Ball, testified that Kayla had not answered the door when she showed up earlier that day to take Brennan to church. *Id.* at 378-379.

Kayla was treated at Affinity Hospital and discharged that night. *EMS Report* at 121-123. While at the hospital, Kayla was interviewed by Massillon Fire Inspector Reginald Winters and Massillon Police Dept. Sgt. Muntean. *See Massillon Fire Department Interview Report,* attached as Exhibit F to *Petition for Postconviction Relief,* at 124. Initially, Kayla claimed that she had been doing laundry in the basement, and when she turned around, she noticed her son Brennan had started the fire. *See Id.*

Inspector Winters interviewed three-year-old Brennan Jr. later that evening. Tr. at 270. Winters confirmed that Brennan Jr. was able to light a cigarette lighter. *Id.* at 282. Although Brennan Jr. denied starting the fire, he instead told investigators that his mother was sleeping just before the fire started. *Massillon Police Department Narrative Supplement* ("Narrative Supplement"), attached as Exhibit G to *Petition for Postconviction Relief,* at 128.

The next day, Jennifer Conley called police and told them that Kayla and her family were at the property in violation of the fire department's instructions. Tr. At 271. Two Massillon police officers arrived along with Inspector Winters. *See e.g.* Tr. at 196-197 and 271. At the scene, Inspector Winters spoke with Jeff Ayers, Kayla's father. Jeff claimed that several weeks before, during a fight, Kayla told Jeff, "if you leave again, I'll burn this motherfucker down." *See Massillon Fire Department Voluntary Statement,* attached as Exhibit H to *Petition for Postconviction Relief,* at 7. Another neighbor, Jason Pandrea, testifying about this same instance, said Kayla told her father she would "burn the house down." *See* Tr. at 310, 339. According to

3

Pandrea, "it was more kind of a laugh or a joke kind of thing," and "it was like she meant it, but she didn't." *Id.* at 340.

Officers asked Kayla to come with them to the police station, where she was interviewed again. In the interview, Police Detective Ricker admits he does not believe she set the fire intentionally, but instead insists she started it due to her own carelessness. *See* video file: *Kayla Ayers Police Station Interview* attached as Exhibit I to *Petition for Postconviction Relief,* (10/04/2012) at 01:21:00-01:29:00. After questioning, Kayla admitted that she "may have fallen asleep" before the fire, but insisted that when she woke up she did what she could to put it out. *Narrative Supplement* at 128. That day, Kayla was arrested and charged with aggravated arson and endangering children. *Kayla Ayers Docket Entry ("Docket")*, attached as Exhibit J to *Petition for Postconviction Relief,* dated 10/12/2012 and 11/06/2012. She was unable to post bail and would remain in jail for the next several months awaiting trial. *See Kayla Ayers affidavit* ("*Ayers Aff.*"), attached as Exhibit K to *Petition for Postconviction Relief* at ¶ 3.

## B. Pretrial Investigation and Disclosures

Kayla pleaded not guilty to all charges. *Docket* on 11/09/2012. The Stark County Public Defender's Office was appointed as counsel, and Attorney Kristina Powers was assigned. *Id.*

Defense counsel made multiple requests for discovery in the months leading up to the trial. *Id.* The defense requested discovery on November 9, 2012 – over two months before trial started. *Id.* The State disclosed documents on November 15, November 19, December 14, and January 17 – the last receipt being just nine days before trial. *See Docket* on 11/15/2012, 11/19/2012, 12/14/2012, and 01/17/2012.

Throughout this period, Kayla remained in jail, and her trial was continued several times. Trial was originally set for December 3, 2012 but was rescheduled first to December 27·2012

4

and then again to February 4, 2013. *Docket* on 11/07/2012, 11/28/2012, and 1/14/2012. The trial

was rescheduled once more and finally held on January 28, 2013. *Docket* on 01/16/2013.

In mid-January 2013, less than two weeks before trial, Kayla's defense was assigned to a

new attorney at the public defender's office, Matthew Kuhn. *Id.* In the 100 days leading up to

trial, neither Ms. Powers nor Mr. Kuhn consulted with an independent arson expert. *Proffer of*

*Testimony of Attorneys Kristina Powers and Matthew Kuhn*, attached as Exhibit L to *Petition for*

*Postconviction Relief.*

## C. Trial & Sentencing

### 1. Testimony & Conclusions of Inspector Reginald Winters

The core of the State's case at trial was the testimony of Fire Inspector Reginald Winters.

Winters testified that he had taken approximately 70 hours of fire investigation classes,

combined with just over ten hours per year of continuing education. Tr. at 227-228.

When he examined the fire in Ayers's home, Winters noticed an "unusual burn pattern"

on the mattress, which he diagnosed as the first point of ignition:

> "Well, I had noticed that [the northeast side of the mattress] had a heavier
> char pattern where the springs—what we call—I'll try to explain it to you,
> it's called calcination. It's basically where the fire burned so hot that it will
> turn the springs white and they'll collapse. And on that end I had noticed
> where the fire had burnt the hottest and it traveled westward. Like it was—
> there's where, right there, made a conclusion that I had a fire start there that
> was low and it started there and traveled west toward the wall because that's
> where the material was at, that it was consuming as it was burning."

*Id.* at 240-241. According to Winters, a separate and distinct ignition occurred near

a wooden post, next to where a door had been leaning against the bed:

> "If you look at [the post], you have the concrete floor, you go up and you
> have concrete, kind of pyramid, and then right there you can see a clear
> point of the V-pattern that I was telling you about, the starting point right
> there, the origin. *** [The V-pattern] is telling me the point of origin of a

5

fire consistent [sic] where the fire started. It started low and it started climbing the post with the heavy charring and stuff like that."

*Id.* at 245-246. Winters confirmed that his "certified arson opinion" was that the fire started in two separate and distinct locations, and that the cause of the fire was "incendiary."[2]*Id.* at 249-250.

On cross examination, defense counsel questioned Inspector Winters about an initial Executive Summary and report from his office. *Id.* at 282-285. The Initial Report claimed that the fire started on the first floor, and that ignitable liquid vapors or gasoline were used as an accelerant. *See Defendant's Trial Exhibit A*, attached as Exhibit M to *Petition for Postconviction Relief*. Winters acknowledged that the Initial Report was incorrect, but explained that the summaries on these documents were "typo[s]," where old information from prior reports had not been removed. Tr. at 285.

On redirect, the prosecution asked Inspector Winters to read his "final" Executive Summary. *Id.* at 296. Defense counsel objected, asking whether this document had been provided. At side bar, the prosecution answered:

> Mr. Barr: Provided in discovery, Your Honor, the origin and cause report, and I'm asking him [Winters] to read this based upon the cross-examination of documents that I believe he [Mr. Kuhn] received from Massillon Municipal Court that were not the final report and that contain typographical errors. I believe the jury needs to know this.
> The Court: Okay. Do you want to take a look at this?
> Mr. Kuhn: Yeah, if I could.
> Mr. Barr: There is the discovery [November] 15, 2012, it indicates origin and cause from Massillon Fire Department. The document he has, we don't have in our file. This is the only document we could have given him.
> Mr. Kuhn: Yeah, I'll do that real quick.

---

[2] Winters also testified that, although Kayla did not have any soot on her arms and hands, swabs of her nostrils supposedly showed "light soot." Tr. at 268. Winters testified that he "did not observe" any soot when talking to Brennan Jr. at the neighbor's house later that night. *Id.* at 270. By that time, however, Jennifer Conley had already bathed Brennan Jr. and changed his clothes. *See id.* at 363.

\*\*\*
Mr. Kuhn: If we signed for them, we signed for them.
The Court: If you could approach for just a minute \*\*\* Put on the record
with respect to the document with which Mr. Winters is being currently
examined regarding it appears as though the Defense did sign for the report,
and therefore, you are permitted to cross-examine him."

*See id.* at 297-300.

The State then asked Winters to read his entire Executive Summary into the record.

According to the Executive Summary, the fire was "incendiary" and started on the mattress:

"After examination of the fire scene it was determined the fire originated in
the basement on the bed. After examination of the fire scene, interviewing
witnesses, interviewing the insured and using the levels of scientific
certainty as discussed in the 2011 edition of *NFPA 921; A Guide for Fire
and Explosion Investigation,* it is my opinion the ignition source for the fire
was some type of open flame. The materials first ignited were blankets on
the bed. The act or omission that brought the ignition source and the
materials first ignited together was the deliberate act of a person or persons.
Using these elements of a fire cause, the cause of the fire is incendiary."

*Id.* at 300-301.

Neither the Initial Report nor the final Executive Summary and Report mentioned

Winters' conclusion that the fire had multiple points of origin. *Id.* at 297-301. *See Defendant's

Trial Exhibits A, See also Defendant's Trial Exhibit D,* attached as Exhibit N to *Petition for

Postconviction Relief.* After the confusion surrounding the Initial Report, defense counsel did not

offer any further objection to the substance of Winters' testimony, nor did he challenge Winters'

conclusion that the fire was started in two separate places. Tr. at 301.

2. Closing Arguments

Winters' conclusion—that the fire had multiple points of origin—became the centerpiece

of the State's closing argument. Specifically, the State argued that if the fire had two separate

and distinct points of origin, then an accidental fire was practically impossible:

7

> "I'll also remind you that common sense, your common sense, doesn't fly out the window when you walk in this courtroom. If you fall asleep and you drop a cigarette on a mattress, it starts a fire right? It's common sense. **It doesn't jump and start another fire, it's not possible. .*** There are two separate and distinct origins here according to the expert, according to the pictures. Fire doesn't jump like that. So everything was ruled out except incendiary, and that was to a reasonable degree of scientific certainty."** *Id.* at 426. (emphasis added).

The two points of origin theory was also critical to the State's argument that Brennan Jr. could not have started the fire. Specifically, the State argued that he would have had soot on him if he had started a second fire while the first fire was already burning:

> "And, again, common sense. You believe that first story that the defendant said, "[Brennan Jr.] started the fire," he would have to hold a lighter like you remember Inspector Winters demonstrating how he had to hold that lighter? He had to hold the lighter, ignite the mattress, **then go and start a second fire, the whole time, no soot, no smoke, not getting burned? Impossible.** They all told you, the firefighters told you, he would have something on him because if he was exposed to that fire, that smoke, he would have something on him. He had nothing. **Because remember when—he has to start that second fire, the first point of origin is burning."** *Id.* at 426-427. (emphasis added).

During its rebuttal, the State continued to stress the importance of Winters' expert opinion in proving Kayla's guilt:

> "We have a criminal justice system because criminals, even ones whose guilt have been overwhelmingly proven to you, like Kayla Ayers, don't always admit that guilt. **And this system requires experts, like Mr. Winters, who have to come in here and give you your opinion—their opinion so that you can make decisions beyond a reasonable doubt."** *Id.* at 449. (emphasis added).

Again, the State emphasized Winters' conclusion regarding multiple points of origin ruled out an accidental fire:

> "There's one [point of origin] right there. And there's the second one right there. But, wait, oh, it's an accident. An accident that started twice. So she must have been smoking two cigarettes, one for each hand, and then threw one on this side of the bed and one on this side of the bed, when that becomes her part of the story." *Id.* at 450.

8

The State also re-emphasized that, with a barrier blocking a portion of the bed, three-year-old Brennan could not have lit the mattress on fire in multiple places:

> "[T]here's only two other plausible explanations as it's been stated, that it was a cigarette, but it had to be two cigarettes because we got two points of origin because fire doesn't hop from one side to the other, so the other plausible explanation is [Brennan Jr.] started the fire.
>
> So [Brennan Jr.] had to crawl over that mattress and get over here first and light this fire. And then he can't crawl over that door there because that's a door that sits high, it's a regular door just like that door right there, sitting on its side, you know how hard it would be for you to throw your leg over it and now you're going to ask a three-year-old to crawl over that without knocking it over? So then he has to crawl over that burning mattress and come over here to the front side of it and light this part on fire. That's plausible? No." *Id.* at 454-455.

Defense counsel argued that the State had not proven its case beyond a reasonable doubt and insisted that the fire might have been started by Brennan Jr. or by an unattended cigarette butt. *Id.* at 447. But Kayla's attorney did not attempt to counter any of the State's specific arguments regarding the alleged multiple points of origin. *Id.* at 447-448. The jury returned a guilty verdict against Kayla on aggravated arson and endangering children charges. *Id.* at 482-483.

At sentencing, Kayla continued to maintain her innocence, explaining that she only went to trial "because I really didn't do it so I was sure I wouldn't be found guilty." Tr. at 493-494. She was sentenced to seven years' imprisonment. Throughout the investigation, trial, and appeals, Kayla has consistently maintained her innocence. *Ayers Aff.* at ¶11.

### D.  Direct Appeal

Two issues were raised on direct appeal: whether Kayla's conviction was against the manifest weight and sufficiency of the evidence, and whether, based on the evidence available at

trial, Kayla's trial attorneys were constitutionally ineffective. *State v. Ayers*, Fifth Dist. Stark No 2013CA0034, 2013-Ohio-5402, ¶¶14-15. This Court held that the convictions were not against the manifest weight of the evidence, viewing the evidence in a light most favorable to the prosecution. Id. at ¶27. Furthermore, the Court held that Kayla had not proven that her trial counsel's confusion between the draft version and the final version of Winter's report prejudiced her at trial. Specifically, the Court held that Kayla "has not established the second prong of *Strickland*, in that but-for the alleged error, the result of the proceeding would have been different." *Id*. at ¶33.

### E. 2019 John Lentini Review & Report

John Lentini is one of the foremost forensic arson experts in the United States. He is the former chair of the Forensic Science Committee for the International Association of Arson Investigators, and he was selected by the U.S. Justice Department to serve on a planning panel to recommend national standards for fire and arson investigation. *Affidavit of John Lentini*, ("Lentini Affidavit") attached as Exhibit O to *Petition for Postconviction Relief*, at ¶ 4-5. Lentini wrote one of the primary textbooks on fire investigation, Scientific Protocols for Fire Investigation, which is currently in its third edition. *Id.* at ¶ 6. He also served as a principal Member of the National Fire Protection Association, and for twenty years he served on the technical committee responsible for drafting the *NFPA 921, Guide to Fire and Explosion Investigation*— the same guide Inspector Winters supposedly relied on for his procedures and conclusions. *Id.* at ¶ 4.

In 2019, Mr. Lentini reviewed the 2013 testimony and summary conclusions of Inspector Winters and produced a report. According to Lentini's analysis, "the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds

with generally accepted fire investigation methodology." *Id.* at ¶ 32. Specifically, Lentini concludes "unequivocally and to a reasonable degree of professional certainty" that:

- "The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology,"

- "Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan,"

- "Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways," and

- "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard."

  *Id.* at ¶ 9.

None of these conclusions were ever put before either the Court or the jury during Ms. Ayers's original trial.

### F. Postconviction Filings

On April 13, 2020, Ms. Ayers filed a *Motion for Leave to File a Motion for New Trial* ("Motion for Leave") and a *Petition for Postconviction Relief.* Both filings raised constitutional issues based on the newly-discovered Lentini report, including, *inter alia*, that her trial attorneys were constitutionally ineffective.

The State requested and received six separate extensions of time to respond. On December 21, 2020, the State filed a response opposing Ms. Ayers' Motion for Leave and a motion to dismiss her Petition for Postconviction Relief. On January 8, 2021, Ms. Ayers filed a Reply in support of her Motion for Leave and a Response in Opposition to the State's Motion to Dismiss. After receiving several additional extensions, the State filed a "Supplement to Response to Petition for Postconviction Relief and Motion for Leave to File Motion for New Trial," raising

several new arguments opposing each motion. On March 31, 2021, Ms. Ayers filed a Motion for Leave to File a Supplemental Response and a Proposed Supplemental Reply Brief Instanter, addressing the State's new arguments in opposition.

On November 2, 2021, the trial court entered a "Judgment Entry Denying Defendant's Petition for Post-Conviction Relief and Motion for Leave to File for New Trial." *11/02/21 Judgment Entry*. Regarding the Petition for Postconviction Relief, the trial court held that Ms. Ayers "was not unavoidably prevented from discovering the facts upon which she relie[d] to present her claims for relief" pursuant to R.C. 2953.23(A). *Id.* at 4. The trial court also found that, even if Ms. Ayers was unavoidably prevented from discovering the facts supporting her Petition, she "cannot show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder" would have convicted her. *Id.* Although the trial court acknowledged that its findings deprived it of jurisdiction to consider the substance of the Petition, it further held that Ms. Ayers claims "are barred by res judicata and are without merit." *Id.*

The trial court also denied Ms. Ayers's Motion for Leave to File a Motion for New Trial, on grounds that Ms. Ayers did not show by clear and convincing evidence "that she was prevented from filing a motion for new trial or discovering the evidence she now, eight years later, requests to present." *Id.* On November 29, 2021, Ms. Ayers filed a timely Notice of Appeal.

## FIRST ASSIGNMENT OF ERROR—
## THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL

A. **"Reasonable diligence" did not require Ms. Ayers to conduct an independent arson investigation from prison within 120 days of her conviction, and her attorneys' failures unavoidably prevented her from discovering both the flaws in the State's arson theory and her lack of a fair trial.**

Under Ohio Crim.R.33(B), a motion for new trial based on newly-discovered evidence should generally be filed within 120 days of the verdict. After that time, a defendant may be granted leave to file a delayed motion for new trial by showing "by clear and convincing evidence that [she] was unavoidably prevented from the discovery of the evidence" within the initial 120-day period. Ohio Crim.R.33(B).

Whether a defendant was "unavoidably prevented" from discovering new evidence within 120 days of trial depends on whether she was "reasonably diligent" during that time. *State v. Smith*, Fifth Dist. Muskingum No. 2019-0077, 2020-Ohio-5096, ¶34. "A party is 'unavoidably prevented' from filing a motion for a new trial if they had no knowledge of the ground supporting the motion and could not have learned of the existence of that ground within the time prescribed for filing the motion in the exercise of reasonable diligence." *Id.* at ¶34. "The phrase 'unavoidably prevented' means that a defendant was both unaware of the facts and was unable to learn of them through reasonable diligence." *Id.* at ¶36; *State v. Hill*, Fifth Dist. Stark No. 2020CA0019, 2020-Ohio-4050, ¶21.

In this context, "reasonable diligence" does not require criminal defendants independently discover evidence that should have been investigated and uncovered by competent trial counsel. *State v. Howard*, 59 N.E.3d 685, 2016-Ohio-504 (10th Dist.). In *Howard*, a defendant was convicted of murder when his wife was found dead in their home. At trial, the defense had unsuccessfully argued that the victim had committed suicide. Four years after his conviction, the defendant filed a motion for leave to file a motion for new trial, based on newly discovered evidence of his trial counsel's ineffectiveness. According to the defendant, he told his trial counsel that he believed his wife may have sought mental health treatment at a facility called Netcare, but his attorney did not investigate. In fact, when the records were discovered by

13

the Wrongful Conviction Project four years later, they showed the victim had serious mental health issues, including at least two prior suicide attempts.

A key issue before the Tenth District was whether Howard had been "unavoidably prevented"[3] from discovering his wife's mental health records—the records that supported his ineffective assistance of counsel claim. The State argued that Howard knew his wife had sought treatment at Netcare, and that the records would have been available to him with just "a phone call and a signed records release." *Id.* at ¶34. Although the Tenth District noted that it "was not difficult for Howard to obtain the Netcare records," it nonetheless found the trial court abused its discretion by denying Howard leave to file a motion for new trial. *Id.* Specifically, the court emphasized its "concerns *** with placing the onus of responsibility to thoroughly investigate a case on the defendant when the defendant is represented by and relying on counsel." *Id.* The defendant himself was reasonably diligent by informing his attorney what information he knew. His "trial counsel was ineffective in failing to adequately investigate the matter, and we will not penalize Howard for relying on his trial counsel to conduct an investigation when he gave them all the information he had." *Id.* The Tenth District specifically distinguished those facts from situations where a defendant "knew of material that he kept to himself prior to trial."

The Fifth District has not specifically adopted *Howard*, nor has it ruled on whether and to what extent Crim.R.33(B) requires a criminal defendant to conduct an independent investigation into their own trial counsel after trial. In at least one case, the Fifth District has held that a specific allegation of ineffective assistance of counsel did not demonstrate the defendant was

---

[3] The Tenth District primarily analyzed the "unavoidably prevented" requirement in Ohio R.C. 2953.23(A), which it held should be interpreted consistently with the "unavoidably prevented" language in Crim.R.33(B). This Court has recognized that "unavoidably prevented" means the same thing in both R.C. 2953.23 and Crim.R.33(B). *State v. Thornton*, Fifth Dist. Muskingum No. CT2016-0041, 2017-Ohio-637, ¶47

unavoidably prevented from discovering the underlying evidence at issue. *State v. Davis*, Fifth Dist. Licking No 09-CA-0019, 2012-Ohio-32, ¶15-16. The Fifth District has held that movants are not unavoidably prevented from raising claims where those claims depend on "facts and circumstances which occurred and were known to Appellant prior to or during trial." *State v. Pahoundis*, Fifth Dist. Coshocton No. 07CA04, 2007-Ohio-3515, ¶26. The key distinction in these cases appears to be whether or not the defendant had personal knowledge of or access to the evidence at issue at the time of trial. *Hill*, 2020-Ohio-4050 at ¶¶31-32. *State v. Crawford*, Fifth Dist. Richard No. 09CA16, 2009-Ohio-5176, ¶22; *State v. Petrone*, Fifth Dist. Stark No. 2012CA0096, 2013-Ohio-1138, ¶¶42-43.

*Howard* is directly applicable here. Ms. Ayers did not hold back evidence that Inspector Winters was unqualified to testify as an expert regarding fire investigations. Of course, she knew that she did not set the fire. But this knowledge did not put her in any special position to identify what a qualified and competent arson expert would say about the fire. It does not give her any insight into which parts of Winters's testimony were spurious, or where the fire actually started, or the difference between calcination and annealing, or how Winters's qualifications compared to industry standards. A person's knowledge of his or her own innocence is not enough to protect against false or misleading forensic testimony: approximately 25% of the 2,708 wrongful convictions identified in the U.S. to date involved "false or misleading forensic evidence."[4]

In fact, Ms. Ayers was in a worse position than the defendant in *Howard*. In *Howard*, the defendant knew his wife had sought treatment at Netcare, and he could have discovered her subsequent treatment with "a phone call and a medical release." Nevertheless, the Tenth District

---

[4] https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx (last accessed February 22, 2022).

15

recognized that Howard exercised reasonable diligence by placing his faith in his attorneys to investigate the matter. Their failure to investigate unavoidably prevented him from discovering the information for purposes of Crim.R.33(B).

Ms. Ayers would have needed more than a phone call to uncover her attorneys' ineffectiveness in the 120 days after trial. Because Ms. Ayers's attorneys failed to consult an independent arson expert, Ms. Ayers "was both unaware [of the flaws in Winters's testimony] and was unable to learn of them through reasonable diligence." Smith, 2020-Ohio-5096, ¶36. Presenting this evidence within 120 days of the verdict would have required Ms. Ayers to either independently educate herself on the principles of arson investigation, or somehow, despite her indigence, come up with her own funds to hire a qualified expert to review the matter.[5] As the *Howard* court recognized, requiring pro se defendants to replicate work that should have been done by competent counsel cannot be the standard for "reasonable diligence" required of all criminal defendants in Ms. Ayers's position. *See also, Martinez v. Ryan*, 566 U.S. 1, 12, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012)("While confined to prison, the prisoner is in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on evidence outside the trial record.")

Ms. Ayers's trial lawyers were the ones with the investigative resources and responsibility to investigate forensic issues on behalf of their client. Had they done so, they would have known that Inspector Winters was unqualified to testify as an expert. They would have known that the physical evidence is completely consistent with Brennan Jr. having accidentally started the fire, and they would have known that research shows children are often

---

[5] The United States Supreme Court has recognized that "there can be no equal justice where the kind of an appeal a man enjoys depends on the amount of money he has." *Douglas v. California*, 372 U.S. 353, 355, 83 S.Ct. 8149 L.Ed.2d 811 (1963).

sources of accidental fires. *See Lentini Affidavit* at 23, citing Cambell, *Playing with Fire*, National Fire Protection Association (2014). Ms. Ayers trusted her attorneys to investigate the State's evidence, and she trusted prosecutors not to put forth false or unsupported forensic evidence. This is not something she did wrong. Ohio law encourages defendants to have faith in the basic efficacy and fairness of its criminal justice system, and Ms. Ayers should not be penalized for that trust.

**B. Under the trial court's reading of Crim.R.33(B), some criminal defendants in Ohio will be deprived of any effective means of enforcing their right to constitutionally effective counsel.**

Criminal defendants are guaranteed effective counsel by the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ohio law provides two separate procedures for a criminal defendant to raise a claim of ineffective assistance of counsel. *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013). Ineffective counsel claims that rely on the trial record alone must be raised on direct appeal. *Id.* If, however, the claim relies on evidence outside the original trial record, then the claim must be raised in a collateral proceeding, either through a petition for post-conviction relief or a motion for new trial. *Id.*

While defendants are guaranteed the right to effective counsel on at least one level of direct appeal, no such guarantee applies to collateral postconviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). When a trial attorney's ineffectiveness is apparent from the record, a defendant should at least receive assistance from competent appellate counsel to vindicate her rights. When a meritorious ineffectiveness claim relies on evidence outside the record, however, the prisoner's conviction may become final without a competent attorney ever having reviewed the matter.

17

In many ways, initial-review collateral proceedings like Crim.R.33(B) are "the equivalent of a prisoner's direct appeal" for ineffectiveness claims based on evidence outside the record. "By deliberately choosing to move trial-ineffectiveness claims outside of the direct-appeal process, where counsel is constitutionally guaranteed, the State significantly diminishes prisoners' ability to file such claims." *Martinez*, 566 U.S. at 13. Noting that "the right to effective assistance of counsel at trial is a bedrock principle in our justice system," the U.S. Supreme Court crafted an equitable remedy, by allowing ineffective assistance of *postconviction* counsel to excuse a procedural default for initial-review trial-ineffectiveness claims brought in a federal petition for habeas corpus. *Id.*

Ms. Ayers's pending appeal does not involve a federal habeas petition. However, the principle recognized by the Supreme Court in *Martinez* has caused other states to consider similar exceptions to procedural default under their respective state postconviction processes. The Iowa Supreme Court, for example, created an equitable exception to its postconviction statute of limitations to avoid ineffective postconviction counsel from prejudicing initial-review ineffective assistance of trial counsel claims. *Allison v. State*, 914 N.W.2d 866, 891 (Iowa 2018) ("This is a variant of the equitable doctrine employed in Martinez to allow a petitioner in federal habeas to avoid a procedural default in state court."). See also, *Foley v. Commonwealth*, No. 2019-SC-0182-MR, 2020 WL 6390212, at *5 (Ky. Oct. 29, 2020)(acknowledging that the application of *Martinez* to Kentucky postconviction procedures "is an interesting question that deserves consideration in the appropriate case," but deciding the case on other grounds.); *State v. Davis*, 295 So.3d 396, 397-98 (La.2020)(Johnson, C.J., concurring)("If defendant's failure to timely file his application for post-conviction relief (alleging a colorable claim of ineffective

assistance of trial counsel) was solely the result of ineffective post-conviction counsel's ignorance of relevant law, the failure to timely file the application should be excused.")

This Court need not craft a separate equitable exception to the language of Crim.R.33 in order to address the concerns raised in *Martinez*. Crim.R.33(B) already contains a "safety valve" allowing prisoners to raise claims based on evidence that they were "unavoidably prevented" from discovering with reasonable diligence within 120 days of trial. That safety valve can and should be applied to situations contemplated in *Martinez*—initial-review collateral proceedings raising ineffective assistance of trial counsel, where the defendant did not have the benefit of competent counsel in the 120-day period. The alternative—and the result endorsed by the trial court below—means that some Ohio convictions will become final without any competent defense counsel having reviewed the underlying facts of the case.

Ms. Ayers could not have discovered the evidence supporting her claims with reasonable diligence within 120 days of her conviction, and the trial court erred by denying her Motion for Leave. The trial court's denial should be reversed, and the matter remanded for Ms. Ayers to submit a substantive motion for new trial.

**SECOND ASSIGNMENT OF ERROR**
**THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST AMENDED**
**PETITION FOR POSTCONVICTION RELIEF**

Under Ohio law, a petition for postconviction relief may be filed within 1 year of the certification of the transcript to the court of appeals. R.C. 2953.21(A). Ms. Ayers petition was filed outside that deadline and is therefore governed by R.C. 2953.23(A). Under that statute, a court does not have jurisdiction to consider delayed or successive petitions for postconviction relief unless "the petitioner shows that [she] was unavoidably prevented from discovery of the facts upon which [she] must rely to present to claim for relief" and "the petitioner shows by clear

19

and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty."[6]

In its decision denying Ms. Ayers's Petition for Postconviction Relief, the trial court found that Ms. Ayers had not satisfied the first factor, regarding unavoidable prevention. *11/02/21 Judgment Entry.* The trial court went on to offer additional alternative grounds for dismissing her complaint. Specifically, the trial court held that if Ms. Ayers were not unavoidably prevented, her petition would be denied on grounds that she had not shown by clear and convincing evidence that no reasonable factfinder would have found her guilty. Finally, although its prior findings would have deprived it of jurisdiction to consider the claims, the trial court found that Ms. Ayers claims were "barred by res judicata and are without merit." *Id.* at 4.

### A. Because of her ineffective trial counsel and her own incarceration, Ms. Ayers was unavoidably prevented from discovering the forensic evidence supporting her postconviction claims.

The "unavoidably prevented" language appears in both R.C. 2953.23(A)(1)(a) and Crim.R.33(B). The language has the same meaning in both instances. *State v. Thornton*, Fifth Dist. Muskingum No. CT2016-0041, 2017-Ohio-637, ¶47. Here, Ms. Ayers's Motion for Leave and her Petition for Postconviction Relief both rested on the same newly discovered evidence— the report showing that a competent independent arson expert would have testified that the State's arson expert was unqualified and that the State's theory regarding the fire was false and unfounded. Each claim in her postconviction petition rests on the same newly discovered evidence that was the focus of her motion for leave to file a motion for new trial. Therefore, for

---

[6] As an alternative to the "unavoidably prevented" standard in section (A)(1)(a), a petitioner may show that his or her claim relies on new and retroactive precedent from the United States Supreme Court. No such retroactive precedent applies here.

the same reasons discussed above with regards to Crim.R.33(B), Ms. Ayers was also "unavoidably prevented" from discovering this evidence for purposes of R.C. 2953.23(A)(1)(a).

**B.  But-for constitutional error at trial, no reasonable factfinder would have found Ms. Ayers guilty of aggravated arson.**

Ms. Ayers raised six claims in her Petition for Postconviction Relief: (1) ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution, (2) prosecutorial misconduct in violation of the Fifth and Fourteenth Amendments to the United States Constitution, (3) violation of her right to compulsory process, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, (4) Ayers's actual innocence should prevent her ongoing imprisonment pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, (5) her conviction was obtained by fundamentally unreliable evidence, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and (6) violation of her due process rights under the Ohio Constitution.

As an alternative to its finding that she was not unavoidably prevented from discovering evidence supporting these claims, the trial court found that Ms. Ayers "cannot show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which he [sic] was convicted." 11/02/22 Judgment Entry at 4. This finding was in error and should be reversed.

**1.  Ineffective Assistance of Counsel**

The United States Supreme Court has recognized that the failure to consult with an expert can be ineffective assistance of counsel. *Harrington v Richter*, 562 US 86, 106, 131 S.Ct. 770 (2011) ("[Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or

21

both."). For defense counsel's handling of expert witnesses, ineffectiveness generally falls into one of two categories: (1) cases where the defense fails to *present* an independent defense expert at trial, and (2) "that most egregious type [of ineffectiveness], wherein lawyers altogether fail to hire an expert." *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007).

· The latter category—complete failure to consult an expert-- is especially likely to be prejudicial error. Under Ohio law, defense attorneys can consult with an expert privately and at State expense. *State v. Kopchak*, Fifth Dist. Muskingum No. CT2017-0036, 2018-Ohio-1136, ¶21. As a result, while there may be circumstances where defense counsel may choose not to produce an independent expert to *testify*, there is rarely strategic justification for failing to learn what an independent expert would say regarding a centrally important forensic issue. *Dando v. Yukins*, 461 F.3d 791 (6th Cir.2006). A competent defense attorney has no reason to remain "strategically" ignorant about the central forensic conclusion in a case.

· The duty to consult with an independent expert is heightened when the scientific issue is important to the State's case, and/or where defense counsel does not have the knowledge or expertise to cross examine the expert effectively. *Richey*. Additionally, an attorney's failure to consult an independent expert becomes especially prejudicial where the State's expert is unqualified or offers conclusions that turn out to be false. Defense counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688; *State v. Johnson*, 24 Ohio St. 3d 87, 89, 494 N.E.2d 1061, 1063 (1986) "A lawyer who fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance." *Richey*, 498 F.3d at 362.

On similar facts, the Sixth Circuit Court of Appeals has found that failure to consult with an independent arson expert can amount to ineffective assistance of counsel. *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007). In *Richey*, an Ohio man was convicted of aggravated felony murder for allegedly setting fire to a woman's apartment and killing her daughter. The State of Ohio introduced two experts who testified that the fire pattern indicated use of chemical accelerants. *Id*. at 347-48. For its part, the defense consulted with a single witness, who did not have any specific experience in arson investigations, and who ultimately agreed with the State's arson conclusion. *Id*. After Richey was convicted, his postconviction attorneys consulted two additional independent arson experts. Those experts concluded that the State's witnesses "use flawed scientific methods not accepted in the fire-investigation community." *Id*. According to these experts, a discarded cigarette could have caused the fire. *Id*. at 348.

The Sixth Circuit Court of Appeals held that Richey's trial counsel was constitutionally ineffective for failing to consult with a competent expert. Although Richey's counsel did hire an expert, he ultimately "failed to know what his expert was doing to test the State's arson conclusion, *** failed to work with the expert to understand the basics of the science involved, at least for purposes of cross examining the State's experts, and [failed] to inquire about why his expert agreed with the State." *Id*. at 362. The court could "discern no strategic reason why counsel would have so readily ceded [the existence of arson]" under those circumstances. *Id*. at 363. The Sixth Circuit acknowledged that the conviction could have been sustained based on witness testimony—specifically, that Richey had threatened to "torch" the building earlier that night. Under the *Strickland* standard, however, the issue was "not one of the sufficiency of the evidence, but of undermining our confidence in the reliability of the result." *Id*. at 364. Given the

centrality of the "expert" arson testimony to Richey's conviction, defense counsel's failure to consult with additional experts was prejudicial. *Id.*

*Richey* is directly applicable here. As in *Richey*, Ayers's conviction was based primarily on faulty "fire science" testimony from an arson investigator. As in *Richey*, Ayers's counsel completely failed to cross examine State's witnesses regarding the serious flaws in their conclusions. As in *Richey*, the State's expert's conclusions were unsupported and fundamentally flawed. Finally, in both cases, the jury never heard evidence that would have undermined, if not completely disproven, the State's theory of the fire.

In fact, insofar as the cases are different, Ayers presents a more extreme version of ineffectiveness. Richey's trial counsel consulted—albeit halfheartedly—with *someone* regarding the State's arson conclusions. According to the Sixth Circuit, this was not enough; Richey's counsel was constitutionally defective for failing to take a more active role in that consultation. In contrast, Ayers's conviction was the result of "that most egregious type [of ineffectiveness], wherein lawyers altogether fail to hire an expert." *Richey*, 498 F.3d at 362. In an arson case, with no witnesses, and where the defense knew Inspector Winters would be the centerpiece of the State's case, Ayers's counsel did not even bother to find out what an independent arson expert would have said about the origin of the fire. Given defense counsel's weak cross examination, and his seeming unfamiliarity with principles of arson investigations, there was no discernible "strategic" justification for his failure to consult an expert regarding the actual origin of the fire.

Ayers's trial counsel was also deficient for failing to object to Inspector Winters's "two points of origin" theory, which was not disclosed prior to trial, and which would have been inadmissible under Ohio Crim.R.16(K). When a defense attorney fails to object to otherwise inadmissible testimony, that failure can amount to ineffective assistance. *State v. Batin*, Fifth

24

Dist. Stark No. 2004CA0128, 2005-Ohio-36, ¶¶59-65. Failure to object to inadmissible testimony is especially important where that failure "had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Id.* quoting *Strickland, supra.*

In this case, Inspector Winters prepared two reports leading up to trial. Neither written report concludes that the fire had multiples points of origin. Thus, Winters' testimony regarding "multiple points of origin" was not only factually incorrect, but it was also raised for the first time at trial and therefore should have been barred pursuant Crim.R.16(K).

Defense counsel did not object to Winters' undisclosed conclusions. In general, courts should give defense counsel broad latitude to make tactical decisions regarding objections. In this case, however, Ayers's trial counsel did not strategically decide to allow Winters to testify as to matters outside his report, and then attempt to discredit him during cross examination. To the contrary, Ayers's trial attorney had not even seen the report that was actually disclosed to the defense in discovery. Tr. 297-300. [7] There is no way, even theoretically, that trial counsel could have "tactically" decided to waive an objection based on the scope of the actual Crim.R.16(K) report—a report which he does not appear to have seen until midway through the State's redirect examination.

Both of these deficiencies prejudiced Ms. Ayers at trial. Winters's "two points of origin" theory was critical to the conviction. The defense theory at trial was that the fire was caused by

---

[7] Defense counsel's confusion around which report was actually disclosed appears to have been the grounds for Ineffective Assistance of Counsel alleged on Ayers's direct appeal. That appeal was denied because, without any evidence that Winters' conclusions were faulty, Ayers could not demonstrate prejudice by her counsel's performance at trial. In order to properly present the claim, Ms. Ayers had to provide evidence outside the record in a collateral proceeding.

either a cigarette or by Brennan Jr. playing with a lighter. Tr. 447. The defense, however, *conceded* Winters's testimony was scientific—just not 100% certain. Tr. 437-38, 448.

In turn, the State used Winters' "scientifically certain" testimony to demolish the defense's case. According to the State, the "two points of origin" conclusion ruled out the fire being accidentally caused by a cigarette:

> If you fall asleep and you drop a cigarette on a mattress, it starts a fire right? It's common sense. It doesn't jump and start another fire, it's not possible. *** There are two separate and distinct origins here according to the expert, according to the pictures. Fire doesn't jump like that. So everything was ruled out except incendiary, and that was to a reasonable degree of scientific certainty." *Id.* at 426.
> ***
>
> "There's one [point of origin] right there. And there's the second one right there. But, wait, oh, it's an accident. An accident that started twice. So she must have been smoking two cigarettes, one for each hand, and then threw one on this side of the bed and one on this side of the bed, when that becomes her part of the story."

*Id.* at 450. The State also told the jury that Winters' "two points of origin" conclusion meant that Ayers's son, Brennan Jr., could not have started the fire:

> And, again, common sense. You believe that first story that the defendant said, "[Brennan Jr.] started the fire," he would have to hold a lighter like you remember Inspector Winters demonstrating how he had to hold that lighter? He had to hold the lighter, ignite the mattress, **then go and start a second fire, the whole time, no soot, no smoke, not getting burned**? **Impossible.** They all told you, the firefighters told you, he would have something on him because if he was exposed to that fire, that smoke, he would have something on him. He had nothing. **Because remember when—he has to start that second fire, the first point of origin is burning.**" (emphasis added).

*Id.* at 426-427. *See also*, *id.* at 454-55. The State emphasized and reemphasized Winters' conclusions about the origin of the fire because those conclusions were critical to its case.

In fact, those conclusions were completely unscientific and unsupported. In 2019, John Lentini reviewed the photographic evidence and testimony in this case and concluded,

26

unequivocally, that Winters's "two points of origin" theory "is unsupportable by any generally accepted methodology." *Lentini Affidavit* at 9. According to Lentini, Winters' methodology and conclusions are largely unsupported by the NFPA 921. *Id.* Winters made basic errors in terminology. *Id.* at 20, 28-31. He "conflate[d] V-patterns with the fire's origins." *Id.* at 16-18. He speculated significantly beyond what was called for by the facts. In fact, according to Lentini, Mr. Winters "demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard." *Id* at 9. After reviewing this matter, Lentini concludes that "it is my professional opinion that the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." *Id.* at 32.

This evidence would have had an enormous impact on Kayla Ayers's trial. Without Winters' testimony, the State would have been left with only two pieces of circumstantial evidence. First, Kayla initially told investigators she saw Brennan Jr. setting the fire, but later admitted that she had been asleep. Second, weeks before the fire, Kayla "jokingly" told her father she would "burn this motherfucker down." This is far from overwhelming evidence of guilt. Ayers correctly suspected that her neighbors were trying to have her children taken away, which explains why she was reluctant to admit she had been sleeping prior to the fire. And Ayers's "threat" was not a serious one. The comment was weeks before the actual fire, and even the State's own witness admitted that he did not think it was a genuine threat.

In fact, much of the circumstantial evidence points to Kayla's innocence. Although the State claimed Kayla's motive was anger at her father, the fire was entirely limited to Kayla's own mattress. Kayla's son knew how to work a lighter and he confirmed that his mother was

sleeping before the fire.[8] And the only injury was to Kayla herself, who broke a glass and cut her hand *while trying to extinguish the fire*. Without Winters's unscientific testimony, the remaining facts are completely consistent with an accidental fire, started by a curious and unattended child. In fact, that explanation is far more plausible than the alternative: that, in order to get revenge against her father, Kayla intentionally set fire to *her own* mattress and then injured herself trying to extinguish it.

The State needed Inspector Winters' testimony to rule out an accidental cause of the fire. Because Kayla's attorneys did not consult an independent expert, and because Kayla's attorneys did not object to Winters' undisclosed conclusions at trial, neither the Court nor the jury ever heard the serious flaws in Winters' conclusions. But-for this error, no reasonable fact finder would have found Ayers guilty of aggravated arson.

## 2. Claims Alleging Prosecutorial Misconduct, Compulsory Process, Actual Innocence, and Fundamentally Unreliable Evidence.

Ms. Ayers remaining constitutional claims each turn on Inspector Winters's faulty and unsupported conclusions regarding the origin of the fire, and the State's improper soliciting of that testimony without notice. First, government misconduct prejudices a defendant when there is a "reasonable probability" that, but-for the State's misconduct, the result of trial would have been different. E.g., *United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976). By failing to disclose expert testimony on which its case would depend, the State committed misconduct and deprived Ms. Ayers of due process. [9] Second, due process is violated

---

[8] The NFPA notes that young children can be particularly interested in playing with fire. Between 2007 and 2011, children playing with fire set an average of 7,100 structure fires per year.

[9] Ms. Ayers could not have raised a successful Crim.R.16(K) claim on direct appeal, because such a claim requires proof that the foreknowledge of the testimony in question would have benefited the accused in preparing a defense and the accused suffered some prejudicial effect. *State v. Proby*, 10th Dist. Franklin No. 14AP–1067, 2015-Ohio-3364, ¶ 34. Ms. Ayers could not

when a conviction is based on evidence that is "unreliable and prejudicial" or "illusory or

deceptive." *Stein v. New York*, 346 U.S. 156, 192, 73 S.Ct. 1077, 1097, 97 L.Ed. 1522

(1953)(overruled on other grounds); *Barefoot v. Estelle*, 463 U.S. 880, 925, 103 S. Ct. 3383,

3411, 77 L. Ed. 2d 1090 (1983)(J.Marshall, dissenting); *Foster v. California*, 394 U.S. 440, 89

S.Ct. 1127, 22 L.Ed.2d 402 (1969). As discussed at length above, Inspector Winters's testimony

was fundamentally unreliable, unsupported, and deceptive, and its admission against Ms. Ayers

deprived her of due process. Finally, the due process guarantees of the Ohio Constitution

independently protect each of these rights. But for the cumulative impact of these constitutional

violations at trial, no reasonable fact finder would have convicted Ms. Ayers, and the trial court's

decision dismissing her Petition should be reversed.

## C. Res judicata does not bar the claims presented in Ms. Ayers's Petition

After finding that it lacked jurisdiction to consider Ms. Ayers's Petition under R.C.

2953.23(A), the trial court went on to issue an alternative holding that her claims were barred by

res judicata and lacked merit. In fact, as discussed at length above, each of Ms. Ayers's claims

depends on evidence outside the record—specifically, the 2019 Lentini Affidavit finding that

Inspector Winter's testimony was unscientific and unsupported. Res judicata does not apply to

initial collateral claims based on evidence *de hors* the record. *See, e.g., State v. Weaver*, 114

N.E.3d 766, 2018-Ohio-2509, ¶21 (5th Dist.); *State v. Selmon*, Fifth Dist. Richland No. 15CA83,

2016-Ohio-723, ¶ 43. To the extent the trial court had jurisdiction to dismiss Ms. Ayers's

Petition on res judicata grounds, that decision was reversible error.

## THIRD ASSIGNMENT OF ERROR—
## THE TRIAL COURT ERRED BY FAILING TO HOLD AN EVIDENTIARY HEARING

satisfy either prong without outside evidence undermining Winters's "two points of origin"
testimony, and her claim is properly presented in postconviction proceedings.

If a Motion for Leave filed pursuant to Crim.R.33(B) sets forth a prima facie case showing that the movant was unavoidably prevented from discovering the evidence within 120 days of trial, the trial court commits reversible error by denying an evidentiary hearing. *State v. Barnes*, Fifth Dist. Muskingum CT2017-0092, 2018-Ohio-1585, ¶36; *State v. Bentley*, 66 N.E.3d 180, 2016-Ohio-3290, ¶10-13 (11th Dist.); *State v. Millow*, 1st Dist. Hamilton No. C180259, 2019-Ohio-1751, ¶8; *State v. Warren*, 86 N.E.3d 728, 2017-Ohio-853, ¶ 51 (2nd Dist.).  In this case, Ms. Ayers submitted dozens of exhibits with her Motion for Leave showing that she was unavoidably prevented from discovering the evidence at issue within the 120-day period, including a written proffer that her trial attorneys failed to consult with an independent arson expert.  This amounts to a prima facie showing under Crim.R.33(B), and the trial court erred by denying her Motion for Leave without an evidentiary hearing.[10]

## CONCLUSION

Kayla Ayers was convicted based on testimony that was fundamentally unreliable and unsupported.  Her own attorneys failed to investigate the claims against her, and as a result, they allowed this false evidence to be presented to the jury unchallenged.  Furthermore, the State committed misconduct by presenting this evidence in the first place.  Ms. Ayers should not be made to pay the price for her attorneys' unpreparedness or the State's misconduct, nor should she continue to face punishment for a conviction based on false evidence.  For the foregoing reasons, Ms. Ayers respectfully requests the court reverse the trial court's decision denying her Motion for Leave and dismissing her Petition for Postconviction Relief, and remand the matter for an evidentiary hearing.

---

[10] To the extent the Court finds the trial court has jurisdiction over Ms. Ayers's Petition for Postconviction Relief, she would then be entitled to an evidentiary hearing on that filing as well. *Poulton*, 2019-Ohio-1705 at ¶¶26-27 (5th Dist.).

Respectfully Submitted,

Brian Howe (0086517)
Attorney for Appellant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Stark Co. Prosecuting

Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via regular first class U.S. mail on

this 22nd day of February, 2022.

Attorney for Appellant

31



CLERK OF COURT
STARK COUNTY, OHIO

# IN THE COURT OF COMMON PLEAS
## STARK COUNTY, OHIO

| | | |
|---|---|---|
| **STATE OF OHIO,** | ) | **Case No. 2012CR1567** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KRISTIN G. FARMER** |
| | ) | |
| **vs.** | ) | **JUDGMENT ENTRY DENYING** |
| | ) | **DEFENDANT'S PETITION FOR** |
| **KAYLA AYERS,** | ) | **POST-CONVICTION RELIEF AND** |
| | ) | **MOTION FOR LEAVE TO FILE** |
| **Defendant.** | ) | **FOR NEW TRIAL** |

This matter came before the Court on Defendant's Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23 filed on April 13, 2020, and Defendant's First Amended Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23 filed on May 18, 2020. Defendant also filed a Motion for Leave to File for New Trial Pursuant to Crim.R. 33(B) on April 13, 2020.

On December 21, 2020, Plaintiff filed a Motion to Dismiss Petition for Post-Conviction Relief – Not Timely Filed, pursuant to R.C. 2953.21(A)(2) and R.C. 2953.23(A). Defendant filed a Response in Opposition to Plaintiff's Motion to Dismiss on January 8, 2021.

Plaintiff filed a Supplement on February 22, 2021. Defendant filed a Motion for Leave to File a Supplemental Response on March 31, 2021.[1]

---

[1] The Court grants Defendant's motion for leave to file a supplemental response. The supplemental response was attached to the motion and has been considered by the Court.

## Procedural History

On November 6, 2012, Defendant was indicted on one count of Aggravated Arson (R.C. 2909.02(A)(2)), a felony of the second degree, and one count of Endangering Children (R.C. 2919.22(A)), a first degree misdemeanor.

The matter proceeded to trial, and on January 30, 2013, the Defendant was found guilty by a jury of both offenses, i.e. Aggravated Arson and Endangering Children, as charged in the indictment.

Defendant was sentenced to serve a prison term of seven years on the charge of Aggravated Arson and a concurrent sentence of one hundred eighty days on the charge of Endangering Children. Defendant has served her prison term in this case.

Defendant appealed her convictions and sentences to the Fifth District Court of Appeals on February 20, 2013. Defendant asserted two assignments of error on appeal. The first assignment of error challenged her convictions as against the manifest weight and sufficiency of the evidence. The second assignment of error alleged ineffective assistance of trial counsel. Defendant's convictions and sentences were affirmed by the Fifth District Court of Appeals on December 9, 2013. *State v. Ayers*, (Ohio App. 5 Dist), 2013-Ohio-5402, 2013 WL 6506473.

Defendant's Motions for Post-Conviction Relief and Motion for Leave to File Motion for New Trial, and Plaintiff's Motion to Dismiss are now before the Court.

Defendant claims that she was denied effective assistance of counsel at trial.

## Law and Analysis

A petition for post-conviction relief is subject to strict filing requirements. Prior to March 2015, R.C. 2953.21(A)(2) required a petition for post-conviction relief be filed, " * no later than one hundred eighty days after the date on which the trial transcript is

2

filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication ***."

The trial transcript in this matter was filed with the Fifth District Court of Appeals on March 27, 2013. Therefore, the Court finds that the Defendant's petition in this matter was not timely filed, as said petition was not filed on or before September 23, 2013, i.e. 180 days from March 27, 2013.

"A trial court is without jurisdiction to entertain an untimely petition for post-conviction relief unless the petitioner demonstrates that one of the exceptions in R.C. 2953.23(A) applies. R.C. 2953.23(A)(1)(a) allows a trial court to consider an untimely petition in the following situations: (1) where a petitioner shows that he was unavoidably prevented from discovering the facts upon which he relies to present his claims for relief; or (2) where a petitioner shows that the United States Supreme Court has recognized a new federal or state right, after the time period set forth in former R.C. 2953.21(A)(2) expired, that applies retroactively to the petitioner and that is the basis of the petitioner's claim for relief. R.C. 2953.23(A)(1)(a). In either case, the petitioner must also show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which he was convicted. R.C. 2953.23(A)(2) allows a trial court to consider an untimely petition in certain cases involving DNA testing." *State v. Nolde* (Ohio App. 3d Dist.), 2016-Ohio-636.

In the instant case, the Court finds that the Defendant has failed to demonstrate the applicability of either of the exceptions found in R.C. 2953.23(A), which would allow the Court to consider the Defendant's Petition.

3

The Court finds that the Defendant was not "unavoidably prevented from discovering the facts upon which she relies to present her claims for relief". Additionally, the Court finds that there is no new federal or state right that applies retroactively to the petitioner and that is the basis of the petitioner's claim for relief.

Even if the Court were to find that Defendant was unavoidably prevented from discovering the facts upon which she now wishes to present, the Court finds that Defendant cannot show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which he was convicted.

Since the Court finds that Defendant's Petition does not qualify for either of the exceptions found in R.C. 2953.23(A), the Court dismisses Defendant's Petition on jurisdictional grounds.

Notwithstanding the Court's finding that the Defendant's Petition is untimely and fails to satisfy the applicability of either of the exceptions found in R.C. 2953.23(A), and that it is dismissed on jurisdictional grounds, the Court further finds that the Defendant's claims are barred by *res judicata* and are without merit.

Lastly, the Court adopts the Memorandum, contained in the State of Ohio's responses to Defendant's Petition for Post-Conviction Relief. See, *State v. Lorraine*, 1996 WL 207676 (Ohio App. 11 Dist.), wherein the Eleventh District Court of Appeals adopted the decision of the First District Court of Appeals in *State v. Sowell* (1991), 73 Ohio App.3d 672. In *Sowell*, the First District Court of Appeals determined that the trial court's adoption of the state's findings of fact and conclusions of law does not, by itself, deprive the petitioner of a meaningful review of his petition for post-conviction relief. See also, *State v. Powell* (1993), 90 Ohio App.3d 260, 263, *State v. Murphy* (May 12,

4

1995), Marion App. NO. 9-94-52, unreported, and *State v. Jester*, 2004 WL1532205 (Ohio App. 8 Dist.)

For the reasons set forth above, the Court denies the Defendant's Petition for Post-Conviction Relief and dismisses same.

Defendant also moves the Court for a new trial based upon Crim. R. 33(B), which provides:

> **(B) Motion for New Trial; Form, Time.** Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.
>
> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Defendant claims that she was unavoidably prevented from discovering the new evidence that she is relying upon in the filing of her motion, namely, the opinion of her own expert that would have challenged Plaintiff's expert as to the points of origin of the fire in this case.

Upon review, the Court finds that Defendant cannot show by clear and convincing evidence that she was prevented from filing a motion for new trial or

discovering the evidence she now, eight years later, requests to present. Therefore, Defendant's Motion for Leave to File Motion for New trial is denied.

IT IS SO ORDERED.

Judge Kristin G. Farmer

Copies: Stark County Prosecutor
Brian Howe, Esq.

6

IN THE COURT OF APPEALS
FIFTH APPELLATE DISTRICT
STARK COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 2021CA00134 |
| | ) | |
| Plaintiff-Appellee, | ) | CRIMINAL APPEAL |
| | ) | |
| vs. | ) | |
| | ) | |
| KAYLA AYERS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

ON APPEAL FROM THE COURT OF COMMON PLEAS,
STARK COUNTY, OHIO
CASE NO. 2012-CR-1567

---

BRIEF OF PLAINTIFF-APPELLEE,
THE STATE OF OHIO

---

KYLE L. STONE, #0095140
PROSECUTING ATTORNEY
STARK COUNTY, OHIO

By:  Vicki L. DeSantis
     Sup. Ct. Reg. No. 0075716
     Assistant Prosecuting Attorney
     Appellate Division
     110 Central Plaza South Ste. 510
     Canton, Ohio 44702-1413
     (330) 451-7897
     (330) 451-7965 (Fax)
     vldesantis@starkcountyohio.gov

     Counsel for Plaintiff-Appellee

Brian Howe
Sup. Ct. Reg. No. 0086517
Ohio Innocence Project
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, Ohio 45221
(513) 556-0752
(513) 556-0702 (Fax)
Brian.Howe@uc.edu

Counsel for Defendant-Appellant

**EXHIBIT 49**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

STATEMENT OF THE CASE ............................................................................. 1

STATEMENT OF THE FACTS ........................................................................... 2

ARGUMENT
**ASSIGNMENT OF ERROR NO I** ..................................................................... 7
**THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL**
**A.**     **Standard of Review** .......................................................................... 7
**B.**     **Law and Argument** .......................................................................... 8
       a.     **Ayers failed to use any reasonable diligence in this case- there is no description of any investigative actions undertaken within the 120-day period for timely filing a Crim.R. 33(A)(6) motion nor a sufficient explanation as to why she was unavoidably prevented from discovering the evidence before the 120-day period elapsed** .......................................... 10
       b.     **A claim of ineffective assistance of counsel is not a substitute for the failure to exercise reasonable diligence in discovering a factual basis to move for a new trial** ................................................................ 15
**ASSIGNMENT OF ERROR NO II** .................................................................... 19
**THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST AMENDED PETITION FOR POSTCONVICTION RELIEF**
**A.**     **Standard of Review** .......................................................................... 19
**B.**     **Law and Argument** .......................................................................... 20
       a.     **Ayers had ample opportunity to obtain forensic evidence to support her claim of innocence** ........................................................ 21
       b.     **Claims alleging prosecutorial misconduct, compulsory process, actual innocence, and fundamentally unreliable evidence are without merit** ........ 21
       c.     **Ayers's claims are barred by *res judicata*** ................................... 23
**ASSIGNMENT OF ERROR NO III** ................................................................... 24
**THE TRIAL COURT ERRED BY FAILING TO HOLD AN EVIDENTIARY HEARING**
**A.**     **Standard of Review** .......................................................................... 24
**B.**     **Law and Argument** .......................................................................... 25

CONCLUSION ................................................................................................. 27

CERTIFICATE OF SERVICE ........................................................................... 28

# **TABLE OF AUTHORITIES**

## **CASES**

*Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 653 N.E.2d 226, 1995-Ohio-331 ............................ 23

*Hoover-Moore*, 10th Dist. No. 14AP-1049, 2015-Ohio-4863, 50 N.E.3d 1010 .......................... 10

*Martinez v. Ryan*, 566 U.S. 1, 17, 132 S.Ct. 1309, (2012) ...................................................... 16-17

*State ex rel. Ashipa v. Kubicki*, 114 Ohio St. 3d 459, 459, 2007-Ohio-4563, 872 N.E.2d 1235
(2007).............................................................................................................................................. 20

*State ex rel. Bunting v. Haas*, 102 Ohio St. 3d 161, 164, 2004-Ohio-2055, 807 N.E.2d 359, 361
(2004).............................................................................................................................................. 20

*State ex rel. George v. Burnside*, 118 Ohio St. 3d 406, 407, 2008-Ohio-2702, 889 N.E.2d 533
(2008).............................................................................................................................................. 20

*State v. Adams*, 62 Ohio St.2d 151, 157 (1980)................................................................................ 8

*State v. Ayers*, 5th Dist. Stark No. 2013CA00034, 2013-Ohio-5402 ............................................. 1

*State v. Baldwin*, 5th Dist. Stark No. 2013CA00134, 2014-Ohio-290 .................................... 14,26

*State v. Barnes*, 5th Dist. Muskingum No. CT2017-0092, 2018-Ohio-1585 ................................ 9

*State v. Barnes*, 94 Ohio St.3d 21 ....................................................................................... 19,22,24-25

*State v. Bethel*, 10th Dist. Franklin No. 19AP-324, 2020-Ohio-1343 .................................... 19-20

*State v. Bethel*, Slip Opinion No. 2022-Ohio-783 ................................................................... 7,17

*State v. Bush*, 10th Dist. Franklin No. 08AP–627, 2009–Ohio–441 ........................................... 26

*State v. Clumm*, 4th Dist. Athens No. 08CA32, 2010–Ohio–342................................................ 26

*State v. Conway*, 10th Dist. Franklin No. 17AP-90, 2019-Ohio-382 .......................................... 19

*State v. Davis*, 5th Dist. Licking No. 09-CA-0019, 2012-Ohio-32 ............................................. 15

*State v. Davis*, 9th Dist. Lorain No. 12CA010256, 2013-Ohio-846....................................... 11, 24

*State v. Durr*, 5th Dist. Richland No. 18CA78, 2019-Ohio-807 ................................................ 19

*State v. Franklin*, 7th Dist. Mahoning No. 09 MA 96, 2010-Ohio-4317...................................... 12

*State v. Frase*, 5th Dist. Licking No. 99CA32, 1999 WL 668717, *1...................................... 8,13

*State v. Gibson*, 5th Dist. Stark No. 2016CA00070, 2016-Ohio-6983 ......................................... 7

*State v. Golden*, 10th Dist. No. 09AP-1004, 2010-Ohio-4438 .................................................... 13

*State v. Hensley*, 12th Dist. No. CA2002–01–002, 2002–Ohio–3494.......................................... 24

*State v. Hicks*, 5th Dist. Muskingum No. CT2012-0017, 2012-Ohio-3985................................. 20

*State v. Hill*, 5th Dist. Stark No. 2020CA00019, 2020-Ohio-4050 ............................................. 10

*State v. Holmes*, 9th Dist. No. 05CA008711, 2006–Ohio–1310 .................................................. 24

*State v. Hoover-Moore*, 10th Dist. No. 14AP-1049, 2015-Ohio-4863, 50 N.E.3d 1010.............. 10

*State v. Howard*, 10th Dist. Franklin No. 15AP-161, 2016-Ohio-504, 59 N.E.3d 685 ...... 15-16,20

*State v. King*, 5th Dist. Stark No. 2021CA00140, 2022-Ohio-676.......................................... 25-26

*State v. Long*, 53 Ohio St.2d 91, (1978)..................................................................................... 22

*State v. Marshall*, 5th Dist. Richland No. 00CA26, 2000 WL 1289402, *2 .................................. 13

*State v. McKelton*, 12th Dist., 2016-Ohio-3216, 55 N.E.3d 26 .................................................... 17

*State v. Meeks*, 5th Dist. Stark No. 2016CA00050, 2016-Ohio-7517 .................................... 12,22

*State v. Murphy*, 10th Dist. No. 00AP–233, 2000 WL 1877526 (Dec. 26, 2000)....................... 20

*State v. Murphy*, 5th Dist. Tuscarawas No. 87AP050039, 1987 WL 19835 (Oct. 29, 1987)....... 26

*State v. Norman*, 10th Dist. Franklin No. 04AP–1312, 2005–Ohio–5087 .................................. 26

*State v. Ollison*, 2016-Ohio-8269 ................................................................................. 22
*State v. Parker*, 178 Ohio App.3d 574, 2008–Ohio–5178.......................................... 26
*State v. Peals*, 6th Dist. Lucas No. L–10–1035, 2010–Ohio–5893 ............................ 26
*State v. Perry*, 10 Ohio St.2d 175, 39, 226 N.E.2d 104 (1967) .................................. 23
*State v. Perry*, 5th Dist. No.2010CA00185, 2011–Ohio–274 ..................................... 20
*State v. Petrone*, 5th Dist. Stark No. 2013 CA 00213, 2014-Ohio-3395...................... 15
*State v. Pinkerman*, 88 Ohio App.3d 158, 160 (4th Dist.1993)..................................... 7
*State v. Reynolds*, 79 Ohio St.3d 158, 161, 679 N.E.2d 1131 (1997)........................... 23
*State v. Roberts*, 5th Dist. Guernsey No. 21-CA000018, 2022-Ohio-844 ................... 10, 14-15,24
*State v. Schiebel*, 55 Ohio St.3d 71, (1990) ............................................................... 7-8
*State v. Smith*, 5th Dist. Delaware No. 18 CAA 03 0020, 2019-Ohio-1339................. 12
*State v. Smith*, 5th Dist. Muskingum No. CT2019-0077, 2020-Ohio-5096..................... 9, 11, 24
*State v. Snyder*, 5th Dist. Licking No. 10CA0010, 2010-Ohio-3588 ............................ 14,23
*State v. Somers*, 5th Dist. Muskingum No. CT2019-0020, 2019-Ohio-3157 ............... 19,21-23,25
*State v. Spangler*, 5th Dist. Delaware No. 02 CA 56, 2003-Ohio-2895 ......................... 7
*State v. Starling*, 10th Dist. No. 01AP–1344, 2002–Ohio–3683 ................................. 24
*State v. Thornton*, 5th Dist. Muskingum No. CT2016-0041, 2017-Ohio-637................. 10, 26
*State v. Waddy*, 10th Dist. Franklin No. 15AP-397, 2016-Ohio-4911, 68 N.E.3d 381 ................. 9
*State v. Wesson*, 9th Dist. Summit No. 28412, 2018-Ohio-834, 2018 WL 1189383 .................. 17
*State v. Wilks*, 154 Ohio St. 3d 359, 375, 2018-Ohio-1562......................................... 21
*State v. Williams*, 12th Dist. Butler No. CA2003–01–001, 2003–Ohio–5873 ............................ 10

## STATUTES AND RULES

Crim.R. 33.............................................................................................. 9, 15, 17
Crim.R. 33(A)(6) ........................................................................................ 7, 10
Crim.R. 33(B) ........................................................................................... passim
Crim.R. 52(B) .............................................................................................. 21
R.C. 2909.02 ................................................................................................. 2
R.C. 2909.02(A)............................................................................................. 1
R.C. 2919.22 ................................................................................................. 2
R.C. 2919.22(A)............................................................................................. 1
R.C. 2953.21 ............................................................................................ 2, 19
R.C. 2953.23 ................................................................................................ 19
R.C. 2953.23(A)............................................................................................ 20
R.C. 2953.23(A)(1)(a)................................................................................. 4, 19
R.C. 2953.21(A)(2)........................................................................................ 20

## STATEMENT OF THE CASE

The Stark County Grand Jury indicted Defendant-Appellant, Kayla Ayers's (hereinafter "Ayers"), on one count of aggravated arson in violation of R.C. 2909.02(A), a felony of the second degree and endangering children in violation of R.C. 2919.22(A), a first-degree misdemeanor. The charges arose from Ayers setting a mattress on fire while she was home alone with her three-year-old son. Ayers entered a plea of not guilty to the charges.

The matter proceeded to trial on January 28, 2013. The State presented nine witnesses. Ayers's chose not put on any witnesses. A jury verdict was rendered on January 30, 2013, finding her guilty on both counts. The court sentenced her according to law. Ayers filed a direct appeal of her conviction in this Court in *State v. Ayers*, 5th Dist. Stark No. 2013CA00034, 2013-Ohio-5402 (*Ayers I*) on February 20, 2013. On December 9, 2013, this Court overruled the assignments of error and affirmed the conviction.

On June 27, 2013, Ayers filed a motion for appointment of counsel, which the trial court denied. On October 19 and October 27, 2015, following affirmance by the Court of Appeals of her convictions, she filed motions to reduce or modify her sentence. Both motions were denied.

On April 13, 2020, Ayers filed both a motion for leave to file motion for new trial and a petition for postconviction relief ("PCR"). The trial court issued an order on November 2, 2021, ruling on both. The court dismissed the PCR petition on jurisdictional grounds, finding the petition was not timely filed and did not fall within any exceptions of R.C. 2953.23(A). Further, the court found the claims in the PCR petition were barred by *res judicata*. Regarding Ayers's motion for leave to file a motion for new trial, the trial court found that she failed to make the requisite showing that she was unavoidably prevented from discovering the evidence she sought to present in a motion for new trial.

Ayers now appeals this November 2, 2021 judgment entry denying her motions, presenting three assignments of error for this Court's review.

## STATEMENT OF THE FACTS

The timeliness of Ayers's motion for leave to file a new trial and PCR petition are at the center of this matter. Glaringly absent from Ayers's brief is her Statement of the Case, when the procedural history is especially relevant here. Ayers appealed her conviction and sentence in February of 2013 with two assignments of error: "The appellant's convictions for one count of aggravated arson in violation of R.C. 2909.02 and one count of endangering children in violation of R.C. 2919.22 were against the manifest weight and sufficiency of the evidence" and "[t]he appellant was denied effective assistance of counsel due to trial counsel's failure to review the appropriate discovery materials in preparation for trial." *Ayers I* at ¶¶ 14, 15. Specifically, with regards to assignment of error number two, Ayers argued that her trial counsel did not effectively challenge/cross-examine the State's arson expert, Mr. Winters, regarding his reports. *Id*. at ¶ 29. The Fifth District Court of Appeals affirmed her conviction.

In June of 2013, Ayers filed a motion for appointment of counsel to represent her in a PCR motion pursuant to R.C. 2953.21 claiming she wanted to obtain "additional evidence that was not presented on my behalf at the time of my trial." The court denied the request to appoint counsel.

It was not until April 13, 2020, that Ayers filed both a motion for leave to file a new trial motion and PCR petition. However, both motions were extremely untimely. Her motion for leave was filed 2,627 days after the day upon which the verdict was rendered. Her PCR petition was filed 2,573 days after the trial transcripts were filed with the court of appeals. On April 24, Ayers filed unauthenticated exhibits to her motion for leave. On May 18, Ayers amended her petition for PCR, now attaching the same exhibits she filed for her motion for leave. The deadline to file a new

2

trial motion, if based upon newly discovered evidence, was 120 days after the day upon which the verdict was rendered, or May 30, 2013.

Similarly, at the time of Ayers's trial and through 2015, the deadline for filing a PCR petition was 180 days from the time the trial transcript was filed with the court of appeals in her direct appeal. That date was March 27, 2013, making a PCR petition due on or before September 23, 2013.

Although, Ayers asserts that her trial counsel was ineffective and that she has "new evidence" as a reason for the delay of her motions, she cannot show by clear and convincing proof how she was unavoidably prevented from obtaining an expert within the 120 days for a new trial or 180 days to file a PCR petition, let alone for over seven years. In her merit brief, Ayers states "trial counsel neither consulted with its own fire expert, nor objected to previously undisclosed 'expert' conclusions offered at trial. As a result, the first time an independent arson expert reviewed the matter was in 2019 * * *." Aplt. Merit Brief at p. 1. This is merely a conclusory allegation. Ayers fails to explain what investigatory steps she took in the 120 days, 180 days, or the over 2600 days for that matter to find new evidence. Nor did she explain how this evidence is "new" and why her claims would not be barred by *res judicata*. Ayers had the opportunity to argue these issues— impeachment of the State's expert and not obtaining her own expert on direct appeal— issues that would have been known at the time of trial.

In the trial court's order dismissing Ayers's petition for PCR, the court explained its findings and conclusions. The court concluded that: Ayers had served her prison term, that her petition, due on or before September 23, 2013, was not timely filed within the 180 days, that Ayers was not unavoidably prevented from discovering the facts upon which she now wishes to present, even if they were present she could not show by clear and convincing evidence that but for the

constitutional error at trial, no reasonable jury would have found her guilty, the exceptions in R.C. 2953.23(A)(1)(a) were not demonstrated by Ayers, and therefore the court was without jurisdiction to hear the motion. The court also found Ayers's claims were barred by *res judicata* and were without merit.

In addition, the trial court denied Ayers's motion for leave to file a motion for new trial *instanter*. Ayers sought leave to file a motion for new trial to present her own expert to challenge the State's expert as to the points of origin of the fire in this case. But, the court declined to grant leave to file a motion for new trial, finding Ayers did not show by clear and convincing evidence that she was prevented from filing her motion or discovering the evidence she now requests to present years later.

Prior to trial, the State and Ayers exchanged discovery. Counsel for Ayers signed for the discovery in November and December of 2012, and January of 2013, that included: the indictment, criminal history, origin and cause report from Massillon Fire Department ("MFD"), Incident Report from Massillon Police Department (MPD"), Fire Prevention Bureau/Voluntary Statements, Reports from MFD, photos, CD of interview with Ayers, and jail calls on CD. Docket 11/15/12, 11/19/12, 12/14/12, 01/17/13.

At the time of trial, the State offered nine witnesses. Richard Annen, an MFD Captain and paramedic testified he responded to a basement fire at 185 26th Street, S.E., Massillon, Stark County, Ohio. 1T, 182 (For clarity sake, the transcripts of the jury trial will be referred to by volume and page number as V, T, at page). Capt. Annen did not see soot or smoke on the little boy in the house despite the large amount of smoke in the basement. 1T, 185. Capt. Annen spoke with Ayers who seemed confused and talking inappropriately. 1T, 187. He testified there was no doubt Ayers had been in the basement and he could tell she had been in a fire. 1T, 187. Officer Curtis

4

Ricker of the MPD asked Ayers to come to the police station to interview her. 1T, 197. That interview was recorded as State's Exhibit 1, and played for the jury. 1T, 199. Ayers gave differing accounts of what happened that evening.[1] Off. Ricker testified Ayers told him her son started the fire and later said she may have fallen asleep. 1T, 206-207.

Firefighter Michael Canfora, from the MFD, noticed an orange glow fire and some hot spots in the basement when he arrived to the residence. 1T, 215. He testified that he helped put out the fire. Inspector Reginald Winters, was the State's expert. 1T, 225. Insp. Winters testified as to his qualifications and experience. Following this exchange, the State offered Insp. Winters as an expert. No objection was made by the defense. The court found him qualified to render expert testimony. 1T, 229. Insp. Winters did not find evidence of a cigarette as the cause of the fire. 1T, 240. Insp. Winters identified the State's Photograph Exhibits that he took of the scene of the fire. 1T, 243, 2T, 273, 275. Insp. Winters was able to exclude cigarettes, natural gas, accelerants, and an electrical cause for the fire. 1T, 248- 249. Insp. Winters testified the cause of the fire was incendiary (open flame) and a person or persons started the fire. 1T, 250. Insp. Winters also interviewed Ayers at the hospital (she had cut her hand on a glass). 2T, 260. When he asked her how she could see a small fire on the bed with the chimney, hot water tank and furnace blocking her view from her position near the clothes dryer she was unable to answer. 2T, 263. Insp. Winters said her story kept changing while he interviewed her. 2T, 264. Defense counsel cross examined Insp. Winters on his cause and origin report. 2T, 282-296. Defense counsel acknowledged they signed for the report before trial on the record. 2T, 300.

Jeff Ayers, Ayers's father, who lived with his daughter until the day of the fire, also testified. Mr. Ayers testified that Ayers told him if he left she would burn the "mother fucker

---

[1] State's Exhibit 1, audio/video CD of Oct. 4, 2012 interview, See 17:18, 35:10; 40:04; 412; 44:20; 51:00, 56:20; 101:30; 114:50; 115:22-time frames.

5

down". 2T, 310. Mr. Ayers left the house on October 3, 2012, the same day as the fire. 2T, 311. Additional witnesses that testified at trial included: Brennan Scott, Ayers's boyfriend, Jason Pandrea, a friend of Jeff Ayers and prior boyfriend of Ayers, who also heard Ayers say that she would burn the house down and she meant it, 2T, 347-348, Jennifer Conley and Karen Ball.

## ARGUMENT

## ASSIGNMENT OF ERROR NO. I

THE TRIAL COURT ERRED BY DENYING APPELLANT'S
MOTON FOR LEAVE TO FILE A MOTION FOR NEW TRIAL

The trial court properly denied Ayers's motion for leave to file a motion for a new trial. In her motion, Ayers claimed to have newly discovered evidence: the opinion of an expert on fire investigations who disagrees with the testimony and opinion offered by the State's fire investigation expert at trial. In her motion for leave, Ayers made the conclusory claim that she could not have discovered this "new evidence," which she believes would rebut and impeach the credibility of the expert evidence presented during the trial, within 120 days of her conviction. The trial court correctly concluded that Ayers failed to show by clear and convincing evidence that she was unavoidably prevented from discovering the evidence, upon which she now wishes to offer as grounds for a new trial, in an untimely Crim.R. 33(A)(6) motion.

### A. **Standard of Review**

"A motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion." *State v. Spangler*, 5th Dist. Delaware No. 02 CA 56, 2003-Ohio-2895, ¶ 9, quoting *State v. Schiebel*, 55 Ohio St.3d 71, (1990) paragraph one of the syllabus. However, "until a trial court grants leave to file a motion for a new trial, the motion for a new trial is not properly before the court." *State v. Bethel*, Slip Opinion No. 2022-Ohio-783, ¶ 41. Still, an abuse of discretion standard also applies to an appellate court's review of a trial court's decision to deny a motion for leave to file a delayed motion for a new trial. *State v. Gibson*, 5th Dist. Stark No. 2016CA00070, 2016-Ohio-6983, ¶ 13, citing *State v. Pinkerman*, 88 Ohio App.3d 158, 160 (4th Dist.1993). A trial court abuses its discretion when

7

it exercises its discretion in an unreasonable, arbitrary, or unconscionable manner. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

Under Crim.R. 33(B), a motion for new trial based on "newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered * * *" Further,

> [i]f it is made to appear by *clear and convincing proof* that the defendant was *unavoidably prevented* from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

(Emphasis added.) Crim.R. 33(B). Thus, the prerequisite to filing a delayed motion for a new trial is a finding of unavoidable delay in timely discovering the new evidence underlying the motion. *State v. Frase*, 5th Dist. Licking No. 99CA32, 1999 WL 668717, *1. When reviewing the denial of a motion for leave to file a motion for a new trial, an appellate court considers whether a defendant presented sufficient evidence to meet the "clear and convincing" standard of Crim.R. 33(B). *Id*. If the competent and credible evidence of the record supports the denial of the motion, the appellate court cannot substitute its judgment for that of the trial court. *Id*. citing *Schiebel*, 55 Ohio St.3d 71, 74.

### B. Law and Argument

On January 30, 2013, the jury returned a verdict finding Ayers guilty on one count of aggravated arson and one count of child endangerment. The trial court sentenced Ayers and entered the judgment of conviction on February 1, 2013. On April 23, 2020, Ayers moved the trial court for an order, pursuant to Crim.R. 33(B), which requires a finding that she was "unavoidably prevented" from discovering evidence to support a motion for a new trial within 120 days from her conviction. Her motion for leave to file a motion for a new trial came 2,627 days after her

conviction, which is 2,507 days beyond the 120-day period Crim.R. 33 provides for the filing of a motion for a new trial on account of newly discovered evidence.

In her motion for leave, Ayers downplayed the significance of her burden in filing a motion beyond the 120-day timeframe. *See State v. Barnes*, 5th Dist. Muskingum No. CT2017-0092, 2018-Ohio-1585, ¶ 26, citing *State v. Waddy*, 10th Dist. Franklin No. 15AP-397, 2016-Ohio-4911, 68 N.E.3d 381, ¶ 13. Rather than demonstrating unavoidable delay in discovering what she claims as new evidence, Ayers attempts to obscure the issues by pulling the merits of her would-be motion for a new trial in as a basis for granting leave to file such a motion. Although Ayers failed to raise this issue in her direct appeal or in a timely postconviction proceeding, Ayers now attempts to excuse her failure to exercise reasonable diligence on the alleged ineffective assistance of her trial counsel.

Despite the attempt to circumvent the issue, Ayers could not avoid that the "central inquiry" in the trial court's evaluation of her "motion for leave to file a motion for a new trial is whether [s]he was unaware of the facts disclosed by the evidence and whether [s]he was unavoidably prevented from obtaining that information through reasonable diligence." *State v. Smith*, 5th Dist. Muskingum No. CT2019-0077, 2020-Ohio-5096, ¶ 37. The trial court properly concluded that Ayers did not meet her burden by clear and convincing evidence and, therefore, denied her request to file her motion for a new trial.

On appeal, Ayers contends the trial court erred in its decision, but Ayers fails to demonstrate that alleged error in the record. In her merit brief, Ayers claims she was not required to exercise "reasonable diligence" to uncover new evidence within the 120-day timeframe for filing a motion for a new trial based on her unsubstantiated claim that trial counsel "unavoidably prevented her from discovering" the alleged new claim. Aplt. Merit Brief at p. 12. Essentially,

Ayers asserts that she is excused from demonstrating unavoidable delay by contending trial counsel was ineffective. Even if this were an appropriate juncture at which to raise an ineffective assistance of counsel argument, which it is not, Ayers fails to set forth any legitimate basis for claiming unavoidable delay in the 120 days following the conviction or the more than seven intervening years until she filed the present motion.

      **a. Ayers failed to use any reasonable diligence in this case—there is no description of any investigative actions undertaken within the 120-day period for timely filing a Crim.R. 33(A)(6) motion nor a sufficient explanation as to why she was unavoidably prevented from discovering the evidence before the 120-day period elapsed**

Again, a party is "unavoidably prevented" from discovering evidence to support a motion for a new trial "if the party had no knowledge of the existence of the ground supporting the motion and could not have learned of that existence within the time prescribed for filing the motion in 'the exercise of reasonable diligence.'" *State v. Hill*, 5th Dist. Stark No. 2020CA00019, 2020-Ohio-4050, ¶ 19, quoting *State v. Hoover-Moore*, 10th Dist. No. 14AP-1049, 2015-Ohio-4863, 50 N.E.3d 1010, ¶ 13. "The 'phrases "unavoidably prevented" and "clear and convincing proof" do not allow one to claim that evidence was undiscoverable simply because [the evidence was] not obtained sooner.'" *State v. Thornton*, 5th Dist. Muskingum No. CT2016-0041, 2017-Ohio-637, ¶ 48, quoting *State v. Williams*, 12th Dist. Butler No. CA2003–01–001, 2003–Ohio–5873, ¶ 21.

"In determining whether a defendant has exercised reasonable diligence, courts have held 'the defendant must describe all investigative actions undertaken within the 120-day period for timely filing a Crim.R. 33(A)(6) motion and explain why he was unavoidably prevented from discovering the evidence before the 120-day period elapsed.'" *State v. Roberts*, 5th Dist. Guernsey No. 21-CA000018, 2022-Ohio-844, ¶ 37. A mere allegation does not qualify as evidence that a defendant was unavoidably prevented from discovering the evidence she seeks to introduce as

support for a new trial. *State v. Davis*, 9th Dist. Lorain No. 12CA010256, 2013-Ohio-846, ¶ 7. "Appellant's proof must be more than conclusory allegations." *State v. Smith*, 5th Dist. Muskingum No. CT2019-0077, 2020-Ohio-5096, ¶ 35.

In her brief, Ayers challenges the denial of her motion for new trial premised on her claim of newly discovered forensic evidence. Neither Ayers's motion for leave nor the affidavits appended to her motion provide "clear and convincing" proof that she was "unavoidably prevented" from discovering this alleged new evidence within the 120-day period, let alone a nearly seven-year period. Ayers fails to identify any investigative steps she took, or was prevented from taking within the 120-day period or until she obtained her expert's opinion in July of 2019.

On April 24, 2020, eleven days after filing her motion, Ayers filed "exhibits" to her motion for leave to file a motion for a new trial. These exhibits included unauthenticated excerpts of transcripts from the trial, an Origin and Cause Report from Massillon Fire Department, an Incident Report from Massillon Police Department, Fire Prevention Bureau/Voluntary Statements, Reports from Massillon Fire Department, Ayers's Affidavit, Brian Howe's Proffer, a copy of the docket transcript, and the affidavit of Mr. Lentini, Ayers's proposed expert witness. The only item in this list that even arguably relates to the issue of whether she was unavoidably delayed in discovering new evidence is Ayers's self-serving affidavit. Except for her affidavit, Mr. Lentini's report, and defense counsel's affidavit/proffer, all of these documents were available before trial and signed for in discovery. Def's Receipt of Discovery, November 15, 2012. The exhibits are neither newly discovered evidence, nor do they support a claim of unavoidable delay in the discovery of new evidence.

While the report itself, of Mr. Lentini, did not exist before trial, or within 120 days of the verdict, Ayers does not provide a legitimate explanation as to how she was unavoidably prevented

11

from obtaining a report from him or any other relevant expert. The proposed rebuttal expert merely opined on the same evidence that existed at the time of trial and basically attempted to impeach the credibility of the State's expert, Inspector Winters, and contradict the State's evidence. See *State v. Meeks*, 5th Dist. Stark No. 2016CA00050, 2016-Ohio-7517, ¶ 55 (finding appellant's proffered affidavits did not constitute newly-discovered evidence, but were merely to impeach or contradict appellee's evidence).

Mr. Lentini presented no new fire analysis that did not exist at the time of trial. In fact, Mr. Lentini used the same fire manual (NFPA 921; 2011 ed., "A Guide for Fire and Explosion Investigation") that Inspector Winters used for his opinions, the same photographs, and the same fire department documents and statements. Mr. Lentini's affidavit does not suggest the existence of new, state of the art fire technology that enabled Mr. Lentini to offer an opinion now that he could not have offered within 120 days from her conviction. *See State v. Franklin*, 7th Dist. Mahoning No. 09 MA 96, 2010-Ohio-4317, ¶ 20 ("The use of an affidavit signed outside the time limit for a timely motion that fails to offer any reason why it could not have been obtained sooner is not adequate to show by clear and convincing proof that the evidence could not have been obtained within the prescribed time period.")

This is not a case in which Ayers truly alleges she has discovered new, potentially exculpatory evidence, rather it is a request to move for a new trial wherein Ayers would present additional evidence of her own in an attempt to rebut evidence the State presented during the trial. She merely obtained the opinion of another arson expert who is basing his opinions on the same evidence introduced at trial. "Yet, with reasonable, diligence before or during h[er] trial, [s]he could have discovered and could have presented the evidence that [s]he now labels as 'new.'" *State v. Smith*, 5th Dist. Delaware No. 18 CAA 03 0020, 2019-Ohio-1339, ¶ 19. "That kind of evidence

cannot rightly be described as evidence that [s]he was 'unavoidably prevented' from discovering before now." *Id.* at ¶ 19-21 (concurring "with the trial court's well-reasoned analysis" in denying leave to file a motion for new trial).

Ayers's own affidavit fails to demonstrate the exercise of reasonable diligence in the discovery of any facts unavailable within the timeframe for filing a motion for new trial based on new evidence. *See* Exhibit K to Motion for leave. She attributes her delay to her inability—while incarcerated—to pay for an arson expert or get a public defender to represent her for postconviction proceedings. She also cites to her limited education and lack of knowledge regarding arson investigations.

However, it is insufficient for Ayers to claim that "she was unavoidably prevented from discovering the alleged newly discovered evidence in a timely manner due to her incarceration [or] her lack of knowledge as to the law * * *." *Frase*, 1999 WL 668717 at *2 (Holding "the fact of her incarceration, by itself, does not equate to clear and convincing proof that she was unavoidably prevented from discovering the evidence within the time parameters set forth in Crim.R. 33(B)."); see also *State v. Golden*, 10th Dist. No. 09AP-1004, 2010-Ohio-4438, ¶ 16 (Finding that appellant's incarceration "clearly did not impede his ability to discover" a statement made to police when appellant "admits that he obtained the summary of [the] police interview while incarcerated in state prison."). Further, a defendant's alleged lack of education, knowledge, and access to postconviction counsel does not excuse delay in obtaining evidence. *State v. Marshall*, 5th Dist. Richland No. 00CA26, 2000 WL 1289402, *2 (rejecting defendant's contention "that he was unavoidably prevented from discovering [] evidence since he was 'functionally illiterate[,] * * * unable to understand the law, and [] the assistance of counsel due to his incarceration[.]'").

Neither Ayers nor her counsel have set forth sufficient facts, in either their motions or attached materials, to warrant an order granting leave to file a delayed motion for a new trial. In her affidavit, Ayers suggests she was not aware the possibility existed for an arson expert to challenge the investigation, but, the record belies this claim. *See* Ayers's Motion for Appointment of Counsel, June 27, 2013. The affidavit presented by counsel for Ayers in the present proceedings—a proffer of what he thinks the evidence will show—fails to explain how Ayers was unavoidably prevented from timely discovering the information. Ayers has no legitimate explanation to establish she was "unavoidably prevented" from discovering her so called 'new evidence' earlier.

Where a motion for leave to file—even with supporting affidavits—fails to "embody prima facie evidence of unavoidable delay[,]" the trial court may summarily deny the motion without an evidentiary hearing. *State v. Baldwin*, 5th Dist. Stark No. 2013CA00134, 2014-Ohio-290, ¶ 24. "The question of whether to decide a motion on the supporting evidence filed with the motion or to hold an evidentiary hearing is within the discretion of the trial court." *State v. Roberts*, 5th Dist. Guernsey No. 21-CA000018, 2022-Ohio-844, ¶ 33. Thus, the trial court properly denied the motion, without hearing, because none of the attached exhibits offered support for Ayers's claim that she was unavoidably prevented from obtaining "newly discovered evidence."

Ayers has not presented sufficient evidence to show that she could not, with reasonable diligence, have obtained an expert opinion, which is based on facts and information that was available during trial and in the 120-day period following her conviction. *See State v. Snyder*, 5th Dist. Licking No. 10CA0010, 2010-Ohio-3588, ¶ 33 (Rejecting defendant's claim of newly discovered evidence (a handwriting expert) when it was "clear from the motion itself that this is not newly discovered evidence, but new evidence not brought up at trial."). Ayers "failed to

demonstrate by clear and convincing evidence that [she] had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Petrone,* 5th Dist. Stark No. 2013 CA 00213, 2014-Ohio-3395, ¶ 80. The trial court properly found that Ayers failed to show clear and convincing evidence to explain how she was unavoidably prevented from discovering the evidence before the 120-day period of Crim,R. 33 elapsed. *Roberts,* 2022-Ohio-844 at ¶ 37.

### b. A claim of ineffective assistance of counsel is not a substitute for the failure to exercise reasonable diligence in discovering a factual basis to move for a new trial

An untimely allegation of ineffective assistance of counsel does not constitute clear and convincing evidence that a defendant was unavoidably prevented from discovering "new evidence" in the form of an expert opinion to contradict testimony presented during trial. *See State v. Davis,* 5th Dist. Licking No. 09-CA-0019, 2012-Ohio-32, ¶ 14-16 (Affirming denial of leave to file a motion for new trial because, while "trial counsel's ineffectiveness may or may not be grounds for a new trial, it does not demonstrate [an appellant] was unavoidably prevented from procuring [an expert]'s testimony in the 120 days after the trial.").

Ayers contends the trial court should apply the reasoning of the Tenth District Court of Appeals in *State v. Howard* to hold that reasonable diligence did not require Ayers, as a criminal defendant, to independently discover evidence that should have been investigated and uncovered by competent trial counsel. See *State v. Howard,* 10th Dist. Franklin No. 15AP-161, 2016-Ohio-504, 59 N.E.3d 685. However, the circumstances of *Howard* are incongruent to the facts and circumstances of the present case. In *Howard,* the court recognized its decision states a *rare instance* where trial counsel's failure to adequately investigate explained Howard's failure to

15

discover the certain evidence within the deadline. *Id.* at ¶55. Further, that court rejected the defendant's argument that he was unavoidably prevented from timely discovering four of the five evidentiary bases he argued to the court. *Id.* at ¶ 52. The *sole exception* the *Howard* court found was psychiatric treatment records, the existence of which he believed his attorney was investigating. *Id.* at ¶ 55.

The present case is distinguishable upon several grounds, chief among them is that Ayers was aware, before, during, and after trial, that counsel had not presented testimony of an arson expert. This is *not* a case where she incorrectly believed trial counsel pursued an independent expert to investigate the fire but later discovered counsel had not. Ayers knew she did not have an expert at the time of trial. Trial counsel may have had valid reasons for not obtaining a rebuttal expert, particularly when there was independent evidence of her guilt, including two witnesses who heard Ayers say she was going to burn the "mf house down." Ayers could have argued on direct appeal that trial counsel was ineffective for failing to obtain an expert. Even assuming such an argument was not proper for a direct appeal, Ayers has not identified any legitimate impediment that would have prevented her from raising this in a timely PCR petition.

Ayers makes the blanket, circular argument that the alleged ineffectiveness of her trial counsel prevented her from discovering said alleged ineffectiveness within 120 days of her conviction. This contention appears to be premised upon the perceived difficulties an incarcerated defendant may face, post-conviction, in developing an evidentiary basis for a claim of ineffective assistance of counsel based on evidence outside the trial record. Ayers contends the newly discovered evidence exception of Crim.R. 33(B) should apply in situations contemplated in *Martinez v. Ryan*, 566 U.S. 1, 17, 132 S.Ct. 1309, (2012), where a defendant raises the claim of ineffective assistance of counsel more that 120-days after conviction. *Martinez*, though, is focused

on federal habeas proceedings and is intended to address issues that arise in that context. Ayers acknowledges this is inapplicable to her present appeal, but suggests it gives cause for states to expand review of claims of ineffective assistance of counsel in postconviction processes. The right to effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution "does not extend to state postconviction relief proceedings." *State v. McKelton*, 12th Dist., 2016-Ohio-3216, 55 N.E.3d 26, ¶ 31. See also *State v. Wesson*, 9th Dist. Summit No. 28412, 2018-Ohio-834, 2018 WL 1189383, ¶ 10 ("there is no constitutional right to the effective assistance of post-conviction counsel").

Even if *Martinez* was applicable to collateral postconviction proceedings, "it is clear that under Ohio law, a motion for leave to file a motion for a new trial is not a collateral challenge under" Ohio's postconviction statute. *Bethel*, 2022-Ohio-783 at ¶ 49. The fact remains that an untimely motion for a new trial is not the appropriate procedural vehicle to bring this challenge. Absent unique circumstances, not present here, a defendant cannot allege ineffective assistance of counsel as an alternative to exercising reasonable diligence to discover evidence she now believes would show ineffective assistance of counsel as grounds to move for a new trial.

Ayers asserts in her merit brief that "this Court need not craft a separate equitable exception" to Crim.R. 33 because the rule already contains a "safety valve." Aplt. Merit Brief p. 19. However, absent a new, judicially-created addition to Crim.R. 33, a defendant must show "clear and convincing proof" that the defendant was "unavoidably prevented" from the discovery of new evidence. Crim.R. 33(B). Simply claiming the evidence was not discovered because of alleged ineffective assistance of counsel does not, per se, alleviate the required showing of unavoidable delay. Ayers fails to meet the minimum threshold showing to take advantage of this "safety valve."

Ayers failed to state an argument to demonstrate the existence of newly discovered evidence which she was unavoidably prevented from discovering within the 120-day time frame of Crim.R. 33(B). Thus, the trial court correctly concluded Ayers did not show she was unavoidably prevented from discovering the "new evidence" she sought to offer in support of her motion for a new trial and properly denied the motion. Therefore, the first assignment of error should be overruled.

## ASSIGNMENT OF ERROR NO. II

THE TRIAL COURT ERRED BY DENYING APPELLANT'S
FIRST AMENDED PETITION FOR POSTCONVICTION
RELIEF

Because Ayers's petition for PCR was untimely under R.C. 2953.21, she had to show under R.C. 2953.23 that, (1) she was unavoidably prevented from discovery of the facts upon which her claim relies and (2) by clear and convincing evidence, that no reasonable fact-finder would have found her guilty but for the constitutional error at trial. *Bethel* at ¶ 20. The 'unavoidably prevented' requirement in R.C. 2953.23(A)(1)(a) mirrors the 'unavoidably prevented' requirement in Crim.R. 33(B). *Barnes* at ¶ 28. However, there is no indication that Ayers made any effort to obtain the evidence on which she now relies within the time limitations applicable to petitions for post-conviction relief. Ayers misstates the law on PCR's in her brief at page 19. She had 180 days, not 365 days, to file her petition. Because the trial court correctly dismissed her petition for lack of jurisdiction upon finding that she failed to show she was unavoidably prevented from discovering the facts upon which she intends to rely, her second assignment of error should be overruled.

### A. Standard of Review

If the petition for post-conviction relief (PCR") is not filed according to the 365-day rule, (180-day rule in the present case) or if it does not explicitly fit either of the two exceptions, the petition will be dismissed for lack of jurisdiction, the merits of the petition will not be examined, and the trial court will not be required to issue findings of fact and conclusions of law. *State v. Conway*, 10th Dist. Franklin No. 17AP-90, 2019-Ohio-382, ¶ 8. Dismissals of petitions as untimely and decided without a hearing, involve a question of law and fact. *State v. Somers*, 5th Dist. Muskingum No. CT2019-0020, 2019-Ohio-3157, ¶ 15 citing *State v. Durr*, 5th Dist. Richland No. 18CA78, 2019-Ohio-807. Thus, a manifest weight standard is applied in reviewing a trial

court's findings on factual issues underlying the substantive grounds for relief, but the court must review the trial court's legal conclusions de novo. *Id.*

### B. Law and Argument

The first question needs to be analyzed in the specific context of this case – what was the last day Ayers should have filed her motion. In 2013, a PCR must have been filed not later than 180 days after the filing of the trial transcript in the court of appeals in the course of the direct appeal of a criminal case. R.C. 2953.21(A)(2), *State v. Howard*, 10th Dist. No. 15AP-161, 2016-Ohio-504, 59 N.E.3d 685, ¶ 17. The timing requirements for filing a petition are strict and firmly enforced. R.C. 2953.23(A), *Howard* at ¶ 17. Seven years past the time to file is clearly untimely. A PCR that is not timely filed or is successive may be summarily dismissed by the court without filing findings of fact or conclusions of law. *State ex rel. George v. Burnside*, 118 Ohio St. 3d 406, 407, 2008-Ohio-2702, 889 N.E.2d 533 (2008); *State ex rel. Bunting v. Haas*, 102 Ohio St. 3d 161, 164, 2004-Ohio-2055, 807 N.E.2d 359, 361 (2004). This is true even if the defendant alleges that he or she was unavoidably prevented from discovering the facts to allow a timely claim. *State ex rel. Ashipa v. Kubicki*, 114 Ohio St. 3d 459, 459, 2007-Ohio-4563, 872 N.E.2d 1235 (2007).

A PCR "is a means to reach constitutional issues that would otherwise be impossible to reach because the evidence supporting those issues is not contained in the record of the petitioner's criminal conviction." *State v. Hicks*, 5th Dist. Muskingum No. CT2012-0017, 2012-Ohio-3985, ¶ 22, citing *State v. Perry*, 5th Dist. No.2010CA00185, 2011–Ohio–274, ¶ 12, citing *State v. Murphy*, 10th Dist. No. 00AP–233, 2000 WL 1877526 (Dec. 26, 2000). "The defendant cannot claim evidence was undiscoverable simply because no one made efforts to obtain the evidence sooner." *State v. Bethel*, 10th Dist. Franklin No. 19AP-324, 2020-Ohio-1343, ¶ 20, appeal allowed, 159 Ohio St.3d 1487, 2020-Ohio-4232, 151 N.E.3d 633, ¶ 20, aff'd by, 2022-Ohio-783. Similarly,

conclusory allegations are insufficient, as is evidence that merely impeaches or contradicts the former evidence. *Id.* at ¶¶ 19, 20.

### a. Ayers had ample opportunity to obtain forensic evidence to support her claim of innocence

Ayers argues that the State's arson expert was unqualified and the State's theory of the fire was false and unfounded. Ayers's Br. at 20. However, trial counsel did not object to Inspector Winters being offered as an expert at trial, 1T. at 229, nor did she argue the State's claims were false or unsupported. Thus, had this been argued in her direct appeal, it would have been reviewed under a plain error standard since it was not objected to, and would have been argued for the first time on appeal. As it is, this issue is not appropriate for a PCR petition, in this instance, and is barred by *res judicata*.

### b. Claims alleging prosecutorial misconduct, compulsory process, actual innocence, and fundamentally unreliable evidence are without merit.

In her merit brief, Ayers premises part of her claim on newly discovered evidence of prosecutorial misconduct. Any alleged prosecutorial misconduct that she claims regarding Inspector Winter's report and opinions would have been part of the record in this case. Ayers had the opportunity to raise any of these issues at trial but chose not to do so. Further, Ayers could have argued these issues on direct appeal. In *Somers*, where the appellant also had the opportunity to raise the claim of prosecutorial misconduct at trial or in a direct appeal, this Court found such claims barred under the doctrine of *res judicata. Id.* at ¶ 21.

Initially, where a defendant does not raise an issue in the trial court, "the defendant forfeits the right to assert an error on appeal by failing to bring it to the trial court's attention in the first instance," thus, "an appellate court applies plain-error review." *State v. Wilks*, 154 Ohio St. 3d 359, 375, 2018-Ohio-1562, ¶ 92. Plain error under Crim.R. 52(B) requires an error, constituting

an obvious defect in the trial proceedings and affecting a defendant's substantial rights, such that the error affected the outcome of the trial." *State v. Ollison*, 2016-Ohio-8269 at ¶ 27. Plain error is to be noticed "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27, quoting *State v. Long*, 53 Ohio St.2d 91, (1978), paragraph three of the syllabus.

In *Meeks* at ¶ 48, this Court stated that 1) "the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial," 2) "[i]t must be clear beyond a reasonable doubt that absent the prosecutor's conduct, the jury would have found the defendant not guilty," and 3) "[t]he test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and prejudicially affected the substantial rights of the defendant". Ayers has not presented an argument to demonstrate any error, let alone plain error. The State proved each and every element of the charges beyond a reasonable doubt. And, the trial court found the State's expert qualified to give his opinions on the fire at trial, without objection.

With regards to compulsory process, the State never impinged upon Ayers's right to present a defense or to offer witnesses on her behalf. The State provided timely discovery including the prosecution's witness list. Only now does Ayers want to argue her version of the facts. However, even Ayers did not testify on her own behalf despite her claims she was innocent. Similar to the facts in *Somers*, nothing in the record suggests Ayers's decision to not testify was the result of coercion. Ayers has not shown nor has she claimed that her decision to not testify was not of her own free will. But holding back arguments until now games the system. Ayers cannot now claim prejudice when it was her own failures not to compel witnesses at trial or to call an expert.

Furthermore, this is not ineffective assistance of counsel as it appears trial counsel in the within matter employed the same trial strategy as in *Somers*. "[T]rial counsel employed a strategy that allowed him to attack the evidence without putting his client on the witness stand and exposing to cross examination." *Somers* at ¶ 30. "The decision whether to call any witness falls within the purview of trial tactics." *Id.* at ¶ 25.

### c. Ayers's claims are barred by *res judicata*

Here, the trial court ruled that Ayers had not met the requirements for a new trial based on newly discovered evidence and that she failed to show she was unavoidably prevented from discovering the facts upon which she intends to rely within the time frame of the statute. Notwithstanding the court's finding dismissing the petition on jurisdictional grounds, the court further found *res judicata* barred Ayers's claims. *Res judicata* bars claims for post-conviction relief that are based on allegations that the petitioner raised or could have raised at trial or on direct appeal. *State v. Reynolds*, 79 Ohio St.3d 158, 161, 679 N.E.2d 1131 (1997). See also, *State v. Perry*, 10 Ohio St.2d 175, 39, 226 N.E.2d 104 (1967), at paragraph nine of the syllabus. *Res judicata* is defined as "[a] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Snyder at* ¶ 24, citing *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 653 N.E.2d 226, 1995-Ohio-331, syllabus. Thus, *res judicata* was merely secondary to the court's actual finding—her lack of showing she was unavoidably prevented from discovering new evidence and failure to show by clear and convincing evidence that no reasonable fact-finder would have found her guilty, but for the constitutional error at trial, which further defeated her claims.

The second assignment of error should be overruled as her PCR petition is untimely and therefore, the trial court did not have jurisdiction to grant her petition for postconviction relief.

23

## ASSIGNMENT OF ERROR NO. III

THE TRIAL COURT ERRED BY FAILING TO HOLD AN
EVIDENTIARY HEARING

In Ayers's third assignment of error, she claims that the trial court erred by denying her a

hearing on her motion for leave because she presented a 'prima facie' showing of unavoidable

delay under Crim.R.33(B) since she attached "dozens of exhibits "with her motion. Aptl's Br. 30.

To the contrary, Ayers completely ignores the law that the court could not even entertain the

exhibits she attached to her motion for new trial *instanter* or her petition, because the court had to

rule on the motion for leave first. Moreover, Ayers's proffered affidavit was well outside the time

frame of 120 days, and without a sufficient explanation as to why her evidence could not have

been obtained sooner, the trial court did not abuse its discretion in denying a hearing. Ayers's

affidavit was "inadequate to show that the movant was unavoidably prevented from obtaining the

evidence within the prescribed time". *Barnes* at ¶ 36. Because Ayers cannot show that the trial

court abused its discretion, this assignment of error fails.

### A. Standard of Review

The question of whether to hold an evidentiary hearing is within the discretion of the trial

court. *Roberts* at ¶ 32. Just as a trial court's decision to grant or deny a motion for leave for a new

trial will not be reversed absent an abuse of discretion, likewise, the decision on whether the motion

warrants a hearing also lies within the trial court's discretion. *State v. Smith*, 5th Dist. Muskingum

No. CT2019-0077, 2020-Ohio-5096, ¶ 33, *State v. Davis*, 9th Dist. Lorain No. 12CA010256, 2013-

Ohio-846, *State v. Holmes*, 9th Dist. No. 05CA008711, 2006–Ohio–1310, ¶ 8 quoting *State v.

Starling*, 10th Dist. No. 01AP–1344, 2002–Ohio–3683, ¶ 10, citing *State v. Hensley*, 12th Dist.

No. CA2002–01–002, 2002–Ohio–3494, ¶ 7.

In fn 10 of her appellate brief, Ayers also claims she should have had a hearing on her PCR petition. The *Somers* court stated with regard to an assertion that appellant was entitled to a hearing:

> [T]he Supreme Court of Ohio held that "[i]n post-conviction cases, a trial court has a gatekeeping role as to whether a defendant will even receive a hearing." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77. A petition for post-conviction relief does not provide a petitioner a second opportunity to litigate his or her conviction, nor is the petitioner automatically entitled to an evidentiary hearing on the petition. *State v. Wilhelm*, 5th Dist. Knox No. 05-CA-31, 2006-Ohio-2450, citing *State v. Jackson*, 64 Ohio St.2d 107, 413 N.E.2d 819 (1980). Pursuant to R.C. 2953.21(C), a defendant's petition may be denied without a hearing when the petition, supporting affidavits, documentary evidence, files, and records do not demonstrate that the petitioner set forth sufficient operative facts to establish substantive grounds for relief." *State v. Adams*, 11th Dist. No.2003–T–0064, 2005–Ohio–348, ¶ 36 quoting *State v. Calhoun*, 86 Ohio St.3d 279, 282, 714 N.E.2d 905 (1999).

Id. at ¶ 16, See also, *State v. King*, 5th Dist. Stark No. 2021CA00140, 2022-Ohio-676, ¶ 20 (a petitioner seeking post-conviction relief is not automatically entitled to an evidentiary hearing.)

## B. Law and Argument

In *Barnes*, this Court held that,

> No hearing is required, and leave may be summarily denied, where neither the motion nor its supporting affidavits embody prima facie evidence of unavoidable delay. *State v. Baldwin*, 5th Dist. Stark No. 2013CA00134, 2014–Ohio–290, ¶ 24, citing *State v. Peals*, supra, at ¶ 23; *State v. Clumm*, 4th Dist. Athens No. 08CA32, 2010–Ohio–342, ¶ 28; *State v. Bush*, 10th Dist. Franklin No. 08AP–627, 2009–Ohio–441, ¶ 12; *State v. Parker*, 178 Ohio App.3d 574, 2008–Ohio–5178, ¶ 21 (2nd Dist.); *State v. Norman*, 10th Dist. Franklin No. 04AP–1312, 2005–Ohio–5087, ¶ 9. Affidavits filed outside of the 120–day time limit of Crim. R. 33 that fail to offer a sufficient explanation as to why evidence could not have been obtained sooner are inadequate to show that the movant was unavoidably prevented from obtaining the evidence within the prescribed time.

*Barnes* at ¶ 36.

In *Barnes*, the court found appellant failed to demonstrate why he could not have learned of the evidence with reasonable diligence. *Id.* ¶ 37. The court also found appellant failed to prove

by clear and convincing evidence that he was unavoidably prevented from discovering, within the time period, the evidence to support his motion and petition. *Id.* ¶ 38. As a result, the court found the trial court did not abuse its discretion in denying the motions without a hearing, as, the evidence on its face, did not support appellant's allegations he was unavoidably prevented from timely discovery. *Id.* See also *State v. Baldwin*, 5th Dist. Stark No. 2013CA00134, 2014–Ohio–290, ¶ 24, citing *State v. Peals*, 6th Dist. Lucas No. L–10–1035, 2010–Ohio–5893, ¶ 23, *State v. Clumm*, 4th Dist. Athens No. 08CA32, 2010–Ohio–342, ¶ 28; *State v. Bush*, 10th Dist. Franklin No. 08AP–627, 2009–Ohio–441, ¶ 12; *State v. Parker*, 178 Ohio App.3d 574, 2008–Ohio–5178, ¶ 21 (2nd Dist.), *State v. Norman*, 10th Dist. Franklin No. 04AP–1312, 2005–Ohio–5087, ¶ 9, *State v. Thornton*, 5th Dist. Muskingum No. CT2016-0041, 2017-Ohio-637, ¶ 57 (Finding that the trial court did not abuse its discretion in denying the motions without a hearing because the evidence, on its face, did not support appellant's claims that he was unavoidably prevented from timely discovery of the evidence.)

With regard to her PCR petition, this Court has held that: "[B]efore a petitioner can be granted a hearing in proceedings for post-conviction relief upon a claim of ineffective assistance of trial counsel, petitioner bears the initial burden to submit evidentiary quality material containing sufficient operative facts that demonstrate a substantial violation of any of trial counsel's essential duties, in addition to prejudice arising from that ineffectiveness." *King* at ¶ 24. Moreover, the failure to present essential operative facts in supporting evidentiary quality materials warrants dismissal of the PCR without a hearing. *Id.* citing *State v. Murphy*, 5th Dist. Tuscarawas No. 87AP050039, 1987 WL 19835 (Oct. 29, 1987).

A postconviction- relief hearing was not merited here as the evidence on its face, did not support Ayers's allegations she was unavoidably prevented from timely discovery. Here, the trial

court was not required to hold an evidentiary hearing before ruling on the petition and did not err by doing so. The third assignment of error should be overruled.

## **CONCLUSION**

Ayers failed to prove by clear and convincing evidence that she was unavoidably prevented from discovering, within the prescribed time periods, the evidence she is relying on to support her motion and petition. Accordingly, the trial court did not abuse its discretion in denying Ayer's motion for leave to file a motion for new trial and PCR petition, or holding a hearing. The Fifth District Court of Appeals should overrule the three assignments of error, and affirm the judgment of conviction and sentence entered by the Stark County Court of Common Pleas.

**KYLE L. STONE, #0095140**
**PROSECUTING ATTORNEY**
**STARK COUNTY, OHIO**

By:

Vicki L.DeSantis
Sup. Ct. Reg. No. 0075716
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza South Ste. 510
Canton, Ohio 44702-1413
(330) 451-7897
(330) 451-7965 (Fax)
vldesantis@starkcountyohio.gov

Counsel for Plaintiff-Appellee

## CERTIFICATE OF SERVICE

A copy of the foregoing BRIEF OF APPELLEE was sent by electronic mail, this 4th day

of April, 2022, to Brian Howe, counsel for Defendant-Appellant, at **Brian.Howe@uc.edu.**


Vicki L. DeSantis (0075716)
Counsel for Plaintiff-Appellee

28

## IN THE COURT OF APPEALS
## FIFTH APPELLATE DISTRICT
## STARK COUNTY, OHIO

| | | |
|---|---|---|
| **STATE OF OHIO,** | : | **Case No.  2021 CA 134** |
| | : | |
| | : | **C.P. Case No. 2012 CR 1567** |
| **Plaintiff-Appellee,** | : | |
| | : | |
| **-v-** | : | |
| | : | |
| **KAYLA AYERS,** | : | |
| | : | **ORAL ARGUMENT REQUESTED** |
| **Defendant-Appellant.** | : | |

---

### REPLY BRIEF OF APPELLANT KAYLA AYERS

---

**Attorneys for Appellant:**

**Brian C. Howe (0086517)**
**Mark Godsey (0074484)**
OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
(513) 556-0702 (fax)
Brian.Howe@uc.edu

**Attorney for Appellee:**

**Kyle L. Stone (0095140)**
**Vicki L. Desantis (0075716)**
**Stark County Prosecutor**
110 Central Plaza S., Ste. 510
Canton, OH 44702
(330) 451-7897
(330) 451-7097 (fax)
vldesantis@starkcountyohio.gov

i

**EXHIBIT 50**

## TABLE OF CONTENTS

**FIRST ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL** ........................ 1

A.  **"Reasonable diligence" did not require Ms. Ayers independently qualify herself as a forensic arson expert within 120 days of her conviction or find funds to hire an expert on her own.** .......... 1

B.  **Ms. Ayers's claims rely on evidence outside the record and are not barred by res judicata.** . 7

**SECOND ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST AMENDED PETITION FOR POSTCONVICTION RELIEF** .................... 8

**THIRD ASSIGNMENT OF ERROR:  THE TRIAL COURT ERRED BY FAILING TO HOLD AN EVIDENTIARY HEARING** .................................................................................................................... 9

**CONCLUSION** .................................................................................................................................. 10

ii

## **TABLE OF AUTHORITIES**

Cases

*Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710 (1993)............................    7

*State v. Bethel*, 10th Dist. No. 19AP-324, 2020-Ohio-1343..............................    6

*State v. Bethel*, 2022-Ohio-783, ¶23-25, _____ N.E.3d _____ ......................................    6

*State v. Brumback*, 109 Ohio App.3d 65, 75, 671 N.E.2d 1064 (9th Dist.).............    4

*State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982)................................    6

*State v. Davis*, 5th Dist. Licking No. 09-CA-19, 2012-Ohio-32.........................    5

*State v. Howard*, 59 N.E.3d 685, 2016-Ohio-504 (10th Dist.)...........................    4-5

*State v. Meeks*, 5th Dist. Stark No. 2016CA0050, 2016-Ohio-7517....................    8

*State v. Petro*, 148 Ohio St. 505 (1947).....................................................    5

*State v. Snyder*, 5th Dist. Licking No. 10CA0010, 2010-Ohio-3588....................    5

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)......    7

*United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)..........    7


Rules & Statutes

Ohio Crim.R.33...................................................................................    passim

Ohio Crim.R.16....................................................................................    8


Other Sources

Jeffrey Bellin, *Reconceptualizing the Fifth Amendment Prohibition of Adverse Comment on Criminal Defendants' Trial Silence*, 71 Ohio St. L.J. 229, 241 (2010)..................    9

# APPELLANT'S ASSIGNMENTS OF ERROR

**ASSIGNMENT OF ERROR No. I**: THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL

**ASSIGNMENT OF ERROR No. II**: THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST AMENDED PETITION FOR POSTCONVICTION RELIEF

**ASSIGNMENT OF ERROR No. III**: THE TRIAL COURT ERRED BY FAILING TO HOLD AN EVIDENTIARY HEARING

# ISSUES PRESENTED FOR REVIEW

**ISSUE 1**: A criminal defendant is unavoidably prevented from discovering necessary evidence, for purposes of both Crim.R.33(B) and R.C. 2953.23(A), when the evidence in question depends on expert forensic analysis not reasonably available to the defendant after trial, and when the evidence was not available at trial due to trial counsel's ineffectiveness.

**ISSUE 2**: When a criminal defendant does not receive effective assistance of trial counsel, and when the evidence of that ineffectiveness is outside the original trial record, the defendant's lack of competent postconviction representation may unavoidably prevent him or her from filing a motion for leave to file a motion for new trial pursuant to Crim.R.33(B) and/or a petition for postconviction relief pursuant to R.C. 2953.23.

**ISSUE 3**: When a criminal trial attorney fails to consult an independent arson expert, and thereafter fails to challenge or object to false and unsupported conclusions upon which the State's case depends, and when the State offers previously undisclosed and false forensic testimony in support of its case at trial, no reasonable fact-finder would find the defendant guilty but-for the violation of the defendant's constitutional rights.

**ISSUE 4**: When a movant presents a prima facie case showing they were unavoidably prevented from discovering necessary evidence for purposes of Crim.R.33(B), the trial court errs by denying the motion for leave without an evidentiary hearing.

iv

## ARGUMENT

**FIRST ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL**

With regards to Ms. Ayers's motion for leave to file a motion for new trial, Appellee makes two arguments in favor of affirming the trial court's opinion.  First, Appellee suggests that Ms. Ayers could have independently uncovered facts in the Lentini report within 120 days of trial.  Second, Appellee argues that Ms. Ayers's claims should be barred by res judicata.  Both arguments are without merit.

### A. "Reasonable diligence" did not require Ms. Ayers independently qualify herself as a forensic arson expert within 120 days of her conviction or find funds to hire an expert on her own.

Appellee repeatedly misstates Ms. Ayers's arguments regarding diligence.  Ms. Ayers does not claim that "she is excused from demonstrating unavoidable delay." *Appellee Brief* at 9.  Nor does she claim that she "was not required to exercise 'reasonable diligence' to uncover new evidence within the 120-day time frame." *Id.*  To the contrary, Ms. Ayers's merit brief acknowledges that criminal defendants must use "reasonable diligence" to uncover new evidence within 120 days of their conviction.  The question before the Court is not whether Ms. Ayers was required to exercise reasonable diligence in that time frame.  The question is what "reasonable diligence" looks like in these specific circumstances.

The parties appear to agree on the facts relevant to leave.  The uncontested evidence, through proffer,[1] is that Ms. Ayers's trial attorneys did not consult with a fire expert at any time prior to trial.  It is also uncontested that Ms. Ayers was indigent and that she was held in jail

---

[1] The trial court rejected Ms. Ayers's request to hold a hearing, at which her former attorneys could have been examined as to their efforts, if any, to consult an independent arson expert prior to trial.

1

prior to trial. Ms. Ayers submitted her own affidavit, stating under oath that her attorneys did not

discuss retaining an arson expert with her, that she has a tenth-grade education, and that she has

no personal education or knowledge of arson investigations or fire science. *Ayers Affidavit*,

attached to Motion for Leave as Exhibit K.[2] Appellee did not offer any conflicting evidence in

the record below, and it does not appear to contest any of these facts today.

Instead, the primary disagreement between the parties appears to be—given these facts—

what Ms. Ayers could have or should have done using reasonable diligence within 120 days of

her conviction. Appellee claims that "with reasonable diligence before or during her trial, [Ms.

Ayers] could have discovered and could have presented the evidence that she now labels as

new." But Appellee does not provide any details about exactly what this would entail. Appellee

does not explain how exactly Ms. Ayers would have been able to obtain the Lentini report, on

her own, from her jail cell prior to trial or from prison after her conviction. Does reasonable

diligence require criminal defendants conduct their own independent forensic analyses? Was it

objectively unreasonable for Ms. Ayers to trust her trial attorneys to evaluate and challenge

forensic testimony? Does "reasonable diligence" somehow require criminal defendants find the

funds to hire an expert on their own, postconviction, from prison? Appellee's merit brief does

not offer an answer to any of these questions, or any specific allegation of what Ms. Ayers

should have done under these circumstances. In fact, it was objectively reasonable for Ms. Ayers

---

[2] Appellee claims that Ms. Ayers submitted the exhibits in support of her motion eleven days after the motion itself. This is incorrect. The complete exhibits were submitted to the Stark County Clerk of Courts on April 10, 2020, along with the motion for leave, a petition for postconviction relief, and a proposed motion for new trial instanter. Although the clerk— without explanation-- refused to docket the proposed motion for new trial instanter and the corresponding exhibits, those exhibits were submitted to the clerk, referenced throughout Ms. Ayers's motion for leave and petition for postconviction relief, and served to the Stark County Prosecutor's Office, all on April 10, 2020.

2

to trust her trial attorneys to evaluate forensic issues related to the State's case. When those attorneys failed to conduct even the most basic diligence regarding those claims, "reasonable diligence" does not require a twenty-three-year-old indigent defendant to take this task on herself from prison.

Appellee argues that the Lentini report relied on existing standards that could have been discovered—presumably *by her attorneys*-- at the time of trial. In fact, that is the central point of Ms. Ayers claim of ineffective assistance of counsel. It is true that, had Ms. Ayers had constitutionally effective counsel, Inspector Winters could have been disqualified as an expert in 2013, and the State's "two-points-of-origin" theory that resulted in Ms. Ayers's conviction could have been shown to be unsupported and unsound. Her trial attorneys, however, did not take even minimal steps to consult an independent arson expert. The question now before the Court is whether, given her trial attorneys' failures, "reasonable diligence" requires Ms. Ayers *herself* to uncover this evidence within 120 days of her conviction. Again, Appellee does not offer any explanation for how Ms. Ayers, on her own, from a prison cell, could have or should have obtained anything like the independent arson review that supports her current claims.

Appellee also argues that "the record belies [the] claim" that Ms. Ayers was not "aware of the possibility" of hiring an independent arson expert on her own after her conviction. In support, without explanation, Appellee cites Ms. Ayers June 2013 Motion for Appointment of Counsel. This request for postconviction counsel was one for general assistance—a desperate person seeking help proving her innocence. It was not based on any suggestion or hypothesis that the State had rested its case on unsound arson testimony. Of course, if her request had been granted within 120 days of her conviction, then that would certainly be relevant for whether she was unavoidably prevented from obtaining an arson expert. But Ms. Ayers's request was denied.

3

The Motion for Appointment of Counsel demonstrates that (1) Ms. Ayers was actively seeking help in reviewing her case in the months after her conviction, (2) she did not have funds to pay for the kind of independent review that might have uncovered flaws in Inspector Winters's testimony, and (3) the trial court declined to appoint assistance at State expense. It bolsters her demonstration of diligence, not belies it.

Appellee also points out that pro se criminal defendants cannot use ignorance of the law to excuse compliance with procedural rules. However, this rule applies to legal matters, not factual ones. *State v. Brumback*, 109 Ohio App.3d 65, 75, 671 N.E.2d 1064 (9th Dist.). The new evidence in this matter is a detailed nineteen-page report, by an internationally renowned arson expert, who concludes that Inspector Winters's testimony was unsupported and false, and that Winters himself was unqualified to offer expert testimony. This is not the sort of knowledge imputed to criminal defendants. Ohio law may presume that criminal defendants are familiar with rules surrounding postconviction procedures. It does not presume that criminal defendants should know the difference between calcination and annealing, or specific NFPA requirements for arson investigations, or how to determine a fire's origin. These are complicated questions of fact that require expert analysis—expert analysis that should have been solicited by Ms. Ayers's trial counsel.

The Ohio case most applicable to the present facts appears to be *State v. Howard*, 10th Dist. Franklin No. 15AP-161, 2016-Ohio-504, 59 N.E.3d 685. In *Howard*, the Tenth District recognized that reasonable diligence does not require a criminal defendant to conduct an independent or parallel investigation into matters his attorney could have and should have investigated. *Id.* at ¶35. Appellee argues that *Howard* is inapplicable because, "Ayers was aware before during and after trial that counsel had not presented testimony of an arson expert."

4

But the defendant in *Howard* was also aware that his attorney did not introduce the Netcare records at trial. In fact, the defendant in *Howard* had unquestionably *better* access to his wife's medical records than Ms. Ayers would have had to consult on her own with an independent arson expert. Nevertheless, the Tenth District held that Howard should be granted leave to file a motion for new trial-- not because he did not realize what was happening in his trial, but because he was reasonably diligent when he trusted his attorneys to investigate the matter. Like the defendant in *Howard*, Ms. Ayers had no way to know whether and how to challenge specific details offered by the State's expert witness. That same rationale applies here. If anything, these facts present an even clearer case, since the evidence at issue is complicated forensic analysis, not records available to Ms. Ayers with a simple "phone call and a signed records release." *Id.*

The cases relied upon by Appellee are more clearly distinguishable on their facts. In *State v. Davis*, 5th Dist. Licking No. 09-CA-19, 2012-Ohio-32, this Court upheld the denial of leave to file a motion for new trial, where the newly discovered evidence was an expert report on allegedly flawed DNA evidence. The Court specifically noted that the alleged flaws in the DNA evidence were known to the defendant and had been previously raised (albeit without sufficient foundation) in a timely petition for postconviction relief. *Id.* at ¶13. Given that defendant had already attempted to raise the issue in a previous filing, the Court held that he was not unavoidably prevented from properly presenting an expert report in the timeframe contemplated by Crim.R.33(B). Here, unlike in *Davis*, Ms. Ayers was never represented by postconviction counsel, and there is no evidence that Ms. Ayers or anyone else had any knowledge of the specific flaws in Inspector Winters's qualifications and testimony within 120 days of trial.

In *State v. Snyder*, 5th Dist. Licking No. 10CA0010, 2010-Ohio-3588, the Court upheld the denial of a motion for leave to file a motion for new trial based on a newly discovered

handwriting expert. The claim in *Snyder* does not appear to have been that the defendant's trial counsel was ineffective for failing to present or consult with an expert. Instead, the defendant appears to have argued that the handwriting expert could provide newly discovered evidence of his innocence, as separate grounds for a new trial under *State v. Petro*, 148 Ohio St. 505 (1947). In finding that leave was properly denied, the Court noted that handwriting analysis was available to the defendant at trial. *Snyder*, 2012-Ohio-3588 at ¶38. Here, the legal issue is different than the one presented in *Snyder*. Although the Lentini report is newly discovered evidence of Ms. Ayers's innocence, she has not raised this as an independent basis for relief under *Petro*. Instead, the essence of her claim is that this evidence was *not* available to her at trial, because of her attorneys' failure to consult an expert, and that failure prevented her from having a fair trial.

Appellee also argues that a "defendant cannot claim evidence was undiscoverable simply because no one made efforts to obtain the evidence sooner." *Appellee Brief* at 20, citing *State v. Bethel*, 10th Dist. No. 19AP-324, 2020-Ohio-1343, ¶20. In March 2022, however, in the same case cited by Appellee, the Ohio Supreme Court reached exactly the *opposite* conclusion: that "reasonable diligence" did *not* require a criminal defendant conduct his own independent investigation where he had relied on the State to disclose exculpatory evidence. *State v. Bethel*, 2022-Ohio-783, ¶23-25, ____ N.E.3d ____. Like the defendant in *Bethel*, Ms. Ayers relied on the proper functioning of the criminal trial process. She was entitled to trust her attorneys would evaluate the soundness of critical forensic testimony, and she need not conduct her own independent forensic review in order to satisfy Crim.R.33(B).

6

**B. Ms. Ayers's claims rely on evidence outside the record and are not barred by res judicata.**

Appellee also argues that Ms. Ayers's claims should be barred by res judicata. Appellee is correct that res judicata will bar postconviction claims that could have been raised on direct appeal. However, Ohio law is clear that an appellant cannot use his or her direct appeal to litigate claims that depend on evidence outside the original trial record. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982), *syllabus* (res judicata only applies to direct appeal issues that "could fairly have been determined without resort to evidence dehors the record.") Instead, such claims *must* be raised in postconviction proceedings.

Each of Ms. Ayers's claims depend on evidence outside the record, and none of them could have been properly raised on direct appeal. Specifically, Ms. Ayers's current claims depend on the 2019 Lentini Report, which demonstrates that she was actually harmed by the admission of Inspector Winters's testimony and by her attorneys' failure to consult an independent arson expert. Ms. Ayers's ineffective assistance of counsel claim requires a showing that, but for her trial counsel's failures, there would have been a reasonable probability of a different outcome at trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Her prosecutorial misconduct claim requires the same showing, that misconduct resulted a "reasonable probability" of a different outcome at trial. *United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976). In fact, each of her claims depends on the evidence showing the State's arson testimony—and especially the "two points of origin" conclusion offered by Inspector Winters-- was false and unsupported. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710 (1993)(constitutional errors are considered harmless without a showing of "actual prejudice"). If Inspector Winters had been qualified and his conclusions had been correct, then there would have been no reversible error. Without the

7

Lentini Report, Ms. Ayers appellate counsel could not have raised or even considered raising these claims on direct appeal. Because the claims could not be raised on direct appeal, they are not barred by res judicata.

Ms. Ayers did not "fail to raise" her current claims on direct appeal. She could not have properly done so under Ohio law. The party seeking to use res judicata to bar a postconviction claim has the burden to prove its applicability. *Bethel*, 2022-Ohio-783, ¶18. Appellee did not and could not meet its burden to show Ms. Ayers's claims are barred by res judicata.

## SECOND ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST AMENDED PETITION FOR POSTCONVICTION RELIEF

With regards to Ms. Ayers's petition for postconviction relief, Appellee reasserts that Ms. Ayers was not reasonably diligent, and that her claims are barred by res judicata. The analysis on each of these arguments is identical to the analysis offered for purposes of her motion for leave under Crim.R.33(B), and Ms. Ayers reasserts her responses above.

In addition, Appellee asserts that several of Ms. Ayers claims are "without merit." Appellee offers arguments against two of the claims: prosecutorial misconduct and compulsory process.

Ms. Ayers's prosecutorial misconduct claim centers on the fact that the State violated Crim.R.16(K) by failing to disclose its key expert conclusion prior to trial. In response, Appellee claims that "Ayers has not presented an argument to demonstrate any error." To the contrary, the record is clear that the expert report turned over in discovery did *not* include the finding most important to the State's case—that the fire supposedly had two points of origin. Tr. 296, 300-301. This is a straightforward violation of Crim.R.16(K). Appellee points out that the claim was not raised on direct appeal and reasserts that Ms. Ayers's claim is barred by res judicata. For a

8

prosecutorial misconduct claim to be successful, however, a defendant must show "beyond a reasonable doubt that absent the prosecutor's misconduct, the jury would have found the defendant not guilty." *State v. Meeks*, 5th Dist. Stark No. 2016CA0050, 2016-Ohio-7517, ¶48. In this case, Ms. Ayers's claim requires her to prove how proper disclosure pursuant to Crim.R.16(K) could have actually resulted in her acquittal. This necessarily requires evidence outside the record—specifically, that Winters's undisclosed conclusions were unsound and unscientific. It could not have been made on direct appeal, and it is not barred by res judicata.

Ms. Ayers compulsory process claim is an alternative pleading to her ineffective assistance of counsel claim. Specifically, the State's failure to disclose its key expert conclusion prior to trial was not only a violation of Crim.R.16(K), but an impediment to Ms. Ayers's constitutional right to call an expert witness who could have rebutted Winters's unsupported testimony regarding the origin of the fire. In response, Appellee argues that "even Ayers did not testify on her own behalf despite her claims she was innocent." Appellee Brief at 22. Not only is this a non sequitur, but it improperly and incorrectly suggests that innocent defendants routinely testify on their own behalf. Jeffrey Bellin, *Reconceptualizing the Fifth Amendment Prohibition of Adverse Comment on Criminal Defendants' Trial Silence*, 71 Ohio St. L.J. 229, 241 (2010).

Although Appellee also asserts that Ms. Ayers's constitutional claims regarding actual innocence and fundamentally unreliable evidence are without merit, it offers no actual arguments in support of its position, and Ms. Ayers rests on the arguments presented in her original petition and her merit brief on appeal.

## THIRD ASSIGNMENT OF ERROR:  THE TRIAL COURT ERRED BY FAILING TO HOLD AN EVIDENTIARY HEARING

Both parties appear to agree on the legal standard governing whether an evidentiary hearing should be granted on a motion for leave. Specifically, a defendant is entitled to a hearing on a motion for leave pursuant to Crim.R.33(B) when the motion and supporting affidavits present prima facie evidence that the defendant was unavoidably prevented from discovering the evidence at issue within 120 days of his or her conviction.

Once again, the disagreement between the parties turns on what reasonable diligence requires Ms. Ayers prove under these circumstances. Ms. Ayers has submitted evidentiary quality material showing that she had neither the resources nor the training to discover the flaws in Inspector Winters's testimony on her own. Furthermore, although she was not given the opportunity to take testimony from her trial attorneys at a hearing, Ms. Ayers has proffered that neither attorney consulted with an expert regarding the cause of the fire. Because neither the trial court nor Appellee have provided any specific argument as to what more Ms. Ayers should have or could have done under these circumstances, it is not clear what additional evidence Appellee believes is missing. Ms. Ayers has presented ample evidence that she was unavoidably prevented from discovering the Lentini report within 120 days of trial, and the trial court abused its discretion by denying her leave without an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, Ms. Ayers respectfully requests the court reverse the trial court's decision denying her Motion for Leave and dismissing her Petition for Postconviction Relief, and remand the matter for an evidentiary hearing.

Respectfully Submitted,

Brian Howe (0086517)
Attorney for Appellant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu
(513) 556-0702

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via electronic mail to Vicki L.

DeSantis, attorney for Appellee State of Ohio, at vldesantis@starkcountyohio.gov, on this 11th

day of April, 2022.

Attorney for Appellant

11

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Earle E. Wise, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2021CA00134 |
| KAYLA AYERS | : |  |
|  | : |  |
| Defendant-Appellant | : | <u>OPINION</u> |

CHARACTER OF PROCEEDING:     Crimina appeal from the Stark County Court
of Common Pleas, Case No. 2012-CR-
1567

*Judge Farmer*

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:

APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

KYLE L. STONE                         BRIAN HOWE
Prosecuting Attorney                  Ohio Innocence Project
BY: VICKI L. DESANTIS                 PO. Box 210040
Assistant Prosecutor                  Cincinnati, OH 45221
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

**EXHIBIT 51**

4ρ

Stark County, Case No. 2021CA00134                                          2

*Gwin, J.,*

{¶1}     Appellant Kayla Jean Ayers ["Ayers"] appeals from the November 2, 2021 Judgement Entry of the Stark County Court of Common Pleas overruling her motion for a New Trial and her Petition for Post-Conviction Relief without a hearing.

*Facts and Procedural History*

{¶2}     Before the fire on the evening of October 3, 2012, Ayers and her family (her boyfriend and their three young children) were living with her father and his family (his girlfriend and her two children) in his Massillon residence. 2T. at 307-312[1]. Her father, Jeff Ayers, eventually discussed finances with Ayers and the fact that she was not contributing much toward the household expenses. Their relationship deteriorated due to the financial situation, and Mr. Ayers told his daughter to leave and care for her own family. Ayers responded by telling her father that she was not leaving and that he should leave. Ayers then threatened to burn the house down. Fearful for himself and his pregnant girlfriend, Mr. Ayers decided to leave and force Ayers to care for her family on her own. When he told his daughter of his decision, Ayers threatened to burn the house down if he were to leave. Id. At the time of this threat, a friend of Mr. Ayers, Jason Pandrea (who was having a sexual relationship with Ayers), overheard Ayers's threat. Mr. Ayers decided to leave the Massillon home nonetheless, and left for West Virginia to seek employment and new living arrangements during the morning of October 3, 2012. 2T. at 307-321; 339.

{¶3}     On October 3, 2012, Ayers's boyfriend, Brennan Scott, left for work as usual, picking up his boss on the way. 2T. at 325-376. After work, he picked up Ayers and then

---

[1] For clarity, the transcript from Ayers's jury trial on January 28, 29, and January 30, 2013 will be referred to as, "__T.__," signifying the volume and the page number.

went to get their children from day care around 6:30 p.m.  2T. at 327.  Scott then took his boss and his boss's children home to Beach City, where Scott stayed for a couple hours socializing.  2T. at 327-328.  Two of Ayers's children, the daughters, who were 5 and 4, boarded a church bus to take them to evening services around that time.  2T. at 327. When Brennan Scott returned around eight o'clock that night, he found fire trucks around his house.  2T. at 328.

{¶4}   Karen Ball, a regular attendee at this church, arrived at the Ayers residence in order to pick up Ayers and her three children.  2T. at 376-377.  Ball knocked on the front door, but no one answered the door.  Id. at 378.  Instead, she heard the dog barking, and then heard someone say, "Shhh."  2T. at 378-379.  Getting no answer, Ball went to the kitchen door.  2T. at 379.  Ball was able to see Ayers's purse and a backpack on a chair on the deck.  2T. at 379.  Ball talked briefly with a neighbor, which led her to believe that Ayers was inside the home.  2T. at 380-381.

{¶5}   While at church, Ball decided to leave the service early to check on Ayers. 2T. at 381.  Arriving at the home around eight o'clock, Ball noticed a flickering emanating from a basement window.  2T. at 381-382.  Ball knocked on the basement door, but got no answer other than the dog barking.  Ball called to Ayers repeatedly, but got no answer. 2T. at 383.  She went once again to the kitchen door to knock and call to Ayers.  Still getting no answer other than the dog's persistent barking, Ball returned to her car to get her cane, after which she intended to go to a neighbors to ask about Ayers.  2T. at 384. When she got to her car, she heard a thump, turned around, and saw Ayers running to her with her youngest child, three-year- old Bubba (Brennan, Jr.).  2T. at 384-385.  Ayers told Ball to call 9-1-1, so the disabled woman went to the neighbors' and had them call 9-

Stark County, Case No. 2021CA00134                                      4

1-1. 2T. at 385-386. While waiting for the fire fighters to respond, Ball stayed with Ayers

and Bubba. She noticed that Ayers had cut her hand, but that Bubba was fine. 2T. at

386. Ayers also kept bemoaning the fact that she was going to lose her children. 2T. at

389.

{¶6}    The neighbor, Jennifer Conley, heard Ayers say that Bubba had started the

fire. Conley detected a strong odor of burnt marijuana on Ayers. 2T. at 359-360, 362,

367.

{¶7}    Fire fighters from the Massillon Fire Department responded to the 9-1-1 call,

and put out the fire inside the home. Once the fire was extinguished (primarily in the

basement), the smoke inside the home was ventilated out, which then allowed the fire

inspector to investigate the nature and origin of the fire. The fire fighters-paramedics also

treated Ayers and her lacerated hand, as well as Bubba. The paramedics noted that

Bubba did not have any smoke smell or soot about him; Ayers, however, had soot on

her, which indicated that she had been in the basement, which was the obvious source of

fire. 1T. at 182-187, 189, 193, 213, 215.

{¶8}    Inspector Reginald Winters of the Massillon Fire Department testified he

ruled out an electrical shortage as the cause of the fire. Winters determined a mattress

was the point of origination for the fire, and there were two distinct start points at separate

ends of the mattress. Winters opined that the cause of the fire was incendiary, i.e., an

open flame 1T. at 231. Thus, someone used an open flame to light two fires at different

ends of the mattress. Winters did not find any evidence that the fire had been started

by a cigarette, i.e., he did not find any remnant of a cigarette. 1T. at 239-240. There

also did not appear to be any accelerants used in the fire. 1T. at 248; 2T. at 293-294.

Stark County, Case No. 2021CA00134                                                    5

{¶9}   Because mattresses now have fire retardants on them, Inspector Winters testified that the initial flame would have been small, and that a glass of water would have extinguished the flame.  The fire retardants cause any flame to burn slowly, not fast, and that a cigarette will take hours to light a mattress on fire. Fanning the fire would have given it oxygen, causing the flame to get bigger.  Winters opined that the mattress at the Ayers residence burned between ten and twelve minutes before the fire department arrived. 2T. at 266-268.

{¶10}   Winters testified that Bubba, if he had started the two fires, would have had to light the fire at one end of the mattress, and then crawl to the other end while the mattress was on fire to the other end and light that spot as well. 2T. at 303-305.

{¶11}  In his official report, Inspector Winters reached the following conclusions about the fire:

> After examination of the fire scene it was determined the fire originated in the basement on the bed.  After examination of the fire scene, interviewing witnesses, interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of NFPA 921; A Guide for Fire and Explosion Investigation, it is my opinion the ignition source for the fire was some type of open flame.  The materials first ignited were blankets on the bed.  The act or omission that brought the ignition source and the materials first ignited together was the deliberate act of a person or persons.  Using these elements of a fire cause, the cause of the fire is incendiary.

2T. at 300-301.

Stark County, Case No. 2021CA00134                                    6

{¶12} Winters' report concluded the fire was not an accident. 1T. at 250. Investigator Winters prepared a draft report. In that report, which he referred to as a template, he concluded the fire originated on the first floor of the residence. Winters maintains this was a typographical error, and should have read the fire originated in the basement of the residence. Additionally, the report contained several other errors not to be included in the final copy. Winters stated in his testimony at trial, the report that had included the alleged errors was not the final report. *State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402, ¶9.

{¶13} Ayers's defense centered upon the allegation her young son started the fire. Id. at 3. The defense did not present any expert testimony during the jury trial. After the fire, Ayers's son did not appear to have any smoke exposure or soot on his person. Ayers's appeared to have smoke exposure and tested positive for soot residue on her person. Id. at ¶3.

{¶14} Winters interviewed Ayers at the hospital where she had been taken due to the cut on her hand. 2T. at 260. At the hospital, Ayers told Winters that she was in the basement folding clothes when she noticed Bubba was over by the mattress playing with a lighter. Id. at 261; *Petition for Post-Conviction Relief,* filed May 18, 2020 at Exhibit F. Ayers did not respond when asked by Winters if she had attempted to take the lighter away from the child. 2T. at 262. She was alerted to the fire when she saw a very small red glow. Id. She grabbed a blanket and began to attempt to smother the fire by beating it with the blanket. Id. When that only fanned the flames, Ayers said she attempted to get water from the washing machine to douse the fire. Id. Ayers pours a glass of water on the flames; however, it failed to extinguish the fire. 2T. at 262-263. She fell and cut

Stark County, Case No. 2021CA00134                                                    7

her hand while retrieving a second glass of water. Id. Ayers indicated that the child

remained in the basement the entire time that she was trying to put out the fire. 2T. at

263.

{¶15} Once he had completed his investigation of the fire scene, Inspector

Winters went to the Massillon Police Department to interview Ayers. This interview

included Patrolman Curtis Rucker of the Massillon Police Department. 1T. at 198-

200. The redacted portion of this interview was admitted into evidence during Ayers's

jury trial as State's Exhibit 1. 2T. at 396-397.[2] In the interview, Ayers told the officers that

she had been in the basement folding clothes. Ayers noticed Bubba standing next to the

mattress. She did not notice anything in his hands. State's Exhibit 1. She shortly

afterwards noticed a fire on the bed, so Ayers grabbed a blanket and starting fanning the

flame. Unsuccessful in putting out the fire, Ayers claimed that she ran to the washing

machine, grabbed a glass of water, and threw it on the flame. Unsuccessful yet again,

she ran and got another glass of water, but tripped on her way back to the bed, dropping

the glass and breaking it, and then falling on it and cutting her hand. The child remained

in the basement with Ayers during the entire ordeal.

{¶16} Winters asked Ayers how she could see her son by the bed while she was

folding clothes at the dryer since there was a chimney, a hot water tank, and a furnace

blocking the view from that location. Ayers did not know. When asked why she told

another officer that she might have fallen asleep, Ayers seem confused. State's Exhibit

1. Ayers denied ever threatening to burn the house down. She denied ever telling anyone

that she had threatened to burn the house down. State's Exhibit 1. Ayers denied having

---

[2] This Court has reviewed State's Exhibit 1.

Stark County, Case No. 2021CA00134                                          8

problems with her father.  She stated her father only asked her to move out when he was drunk.  When Ayers was shown the written statement that her father had given to the police stating that she had threatened to burn the house down, Ayers told the officers that her father was a liar and a terrible alcoholic, who has mistreated her since childhood. State's Exhibit 1; *Petition for Post-Conviction Relief,* filed May 18, 2020 at Exhibit H.

{¶17}  By the end of the interview, Ayers told the officers that she must have gone to sit on the bed to smoke a cigarette while she was waiting to change loads of laundry, and that she must have fallen asleep.  State's Exhibit 1.  Ayers denied that she had been drinking or using drugs, and told the investigators that she was only on Adderall for her ADHD.  When offered, Ayers declined a drug test.  State's Exhibit 1.

{¶18}  Winters spoke with Bubba, and noticed that the boy did not smell of smoke or soot, did not have any burn marks, and had no soot in his nostrils.  Winters did ascertain that the boy was able to light a lighter.  Winters then returned to the fire scene and found a broken glass in the basement.  He also found a blood splatter on the hot water tank and washing machine, and a blood trail that went up the basement steps, then back down, and that there was blood on the wall by the steps.  He also found blood in the kitchen and on the kitchen table.  2T. at 270-273.

{¶19}  Ayers was indigent.  The record contains no evidence that the defense requested the trial court provide funds to consult with an expert witness.  Ayers did not testify at trial or offer any evidence in her defense.

{¶20}  On November 6, 2012, Ayers was indicted on one count of Aggravated Arson, in violation of R.C. 2909.02(A)(2), a felony of the second degree, and one count of Endangering Children, in violation of R.C. 2919.22(A), a first-degree misdemeanor.

Stark County, Case No. 2021CA00134                                                      9

{¶21} The matter proceeded to a jury trial, and on January 30, 2013, Ayers was found guilty by a jury of both offenses. Ayers was sentenced to serve a prison term of seven years on the charge of Aggravated Arson and a concurrent sentence of one hundred eighty days on the charge of Endangering Children. This Court upheld Ayers's conviction and sentences. *State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402. Ayers has served her prison term in this case.

{¶22} In June of 2013, Ayers filed a motion for appointment of counsel to represent her in a petition for post-conviction relief pursuant to R.C. 2953.21 claiming she wanted to obtain "additional evidence that was not presented on my behalf at the time of my trial." The court denied the request to appoint counsel. Ayers did not file a petition for post-conviction relief at that time.

{¶23} On May 7, 2014, Ayers pro se filed a Motion to Stay Execution and Collection of Court Costs. The trial court overruled the motion by Judgment Entry filed May 8, 2014. [Docket No. 93].

{¶24} On May 13, 2014, Ayers filed a pro se Motion to Stay Execution and Collection of Court Costs and an Affidavit of Indigency. [Docket No. 95]. The trial court overruled the motion by Judgment Entry filed May 14, 2014. [Docket No. 96].

{¶25} On May 28, 2015, Ayers filed pro se, "Defendant's Motion for Credit of Community Service Hours Earned Toward Payment of Fines, Court Costs, and/or Restitution," together with an attachment showing Ayers's 179 hours of community service earned in prison. [Docket No. 97]. The trial court overruled the motion by Judgment Entry filed May 29, 2015. [Docket No. 98].

{¶26} On October 19, 2015, Ayers filed pro se a "Motion for Modification of Sentence," together with a Memorandum in support. [Docket No. 99]. The trial court overruled the motion by Judgment Entry filed October 20, 2015. [Docket No. 100].

{¶27} On October 27, 2015, Ayers filed pro se a Motion to Reduce or Sentence, together with numerous attachments. [Docket No. 101]. The trial court overruled the motion by Judgment Entry filed October 27, 2015. [Docket No. 102].

{¶28} On November 9, 2015, Ayers sent a letter to the trial judge requesting a payment plan be established for her court costs. [Docket No. 103]. The trial court overruled the request by Judgment Entry filed November 18, 2015. [Docket No. 104].

{¶29} On March 4, 2016, Ayers wrote a letter to the judge asking to suspend the collection of her court costs until her release from prison. [Docket No. 105]. The trial court overruled the motion by Judgment Entry filed March 7, 2016. [Docket No. 106].

{¶30} On December 27, 2016, Ayers's aunt sent a letter to the judge to reduce or waive Ayers's court costs. [Docket No. 107].

{¶31} On January 6, 2017, Ayers sent a letter to the trial judge to reduce or waive Ayers's court costs. [Docket No. 108]. The trial court overruled the motion by Judgment Entry filed January 6, 2017. [Docket No. 109].

{¶32} On February 15, 2017, Ayers sent a letter to the trial judge to reduce or waive Ayers's court costs or establish a payment plan. [Docket No. 110]. The trial court overruled the motion by Judgment Entry filed February 15, 2017. [Docket No. 111].

{¶33} On February 12, 2018, Ayers filed pro se a Motion for Judicial Release, together with attachments and a request for a hearing. [Docket No. 112]. The trial court overruled the motion by Judgment Entry filed February 12, 2018. [Docket No. 113].

Stark County, Case No. 2021CA00134                                          11

{¶34}  On April 13, 2020, Ayers, through counsel, filed a Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23. ["PCR"] Ayers also filed a Motion for Leave to File for New Trial Pursuant to Crim.R 33(B) on April 13, 2020.  Ayers filed her First Amended Petition for Post-Conviction Relief Pursuant to R.C. 2953.21-23 on May 18, 2020.

{¶35}  Submitted in support of each motion, Ayers attached an affidavit from John Lentini. Mr. Lentini is one of the foremost forensic arson experts in the United States. In 2019, Mr. Lentini reviewed the 2013 testimony and summary conclusions of Inspector Winters and produced a report.  According to Lentini's analysis, "the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology."  Affidavit of John Lentini, ("Lentini Affidavit") attached as Exhibit O to Petition for Post-conviction Relief, ¶32. Specifically, Lentini concludes "unequivocally and to a reasonable degree of professional certainty" that,

1). "The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology,"

2). "Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan,"

3). "Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways," and

4). "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard."

Stark County, Case No. 2021CA00134                                    12

Lentini Affidavit at ¶ 9.

{¶36} By Judgment Entry filed November 2, 2021, the trial court denied both of Ayers's motions. The trial court dismissed the PCR petition on jurisdictional grounds, finding the petition was not timely filed and did not fall within any exceptions of R.C. 2953.23(A). Further, the trial court found the claims in the PCR petition were barred by res judicata. Regarding Ayers's motion for leave to file a motion for new trial, the trial court found that she failed to make the requisite showing that she was unavoidably prevented from discovering the evidence she sought to present in a motion for new trial.

*Assignments of Error*

{¶37} Ayers raises two Assignments of Error,

{¶38} "I. THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL.

{¶39} "II. THE TRIAL COURT ERRED BY DENYING APPELLANT'S FIRST AMENDED PETITION FOR POSTCONVICTION RELIEF."

II.

{¶40} For ease of discussion, we will address Ayers's Assignments of Error out of sequence.

{¶41} In her Second Assignment of Error, Ayers argues that the trial court erred in overruled her untimely petition for post-conviction relief without a hearing.

**Petition for Post-Conviction Relief**

{¶42} R.C. 2953.21(A) states, in part, as follows: "(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there

Stark County, Case No. 2021CA00134                                    13

was such a denial or infringement of the person's rights as to render the judgment void or

voidable under the Ohio Constitution or the Constitution of the United States may file a

petition in the court that imposed sentence, stating the grounds for relief relied upon, and

asking the court to vacate or set aside the judgment or sentence or to grant other

appropriate relief".

{¶43}  A post-conviction proceeding is a collateral civil attack on a criminal

conviction. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905(1999); *State v.

Phillips*, 9th Dist. No. 20692, 2002-Ohio-823.  In order to obtain post-conviction relief, a

petitioner must show that "there was such a denial or infringement of the person's rights

as to render the judgment void or voidable under the Ohio Constitution or the Constitution

of the United States [.]" R.C. 2953.21; *State v. Watson*, 126 Ohio App.3d 316, 323, 710

N.E.2d 340 (12th Dist. 1998).

*Right to evidentiary hearing is not automatic*

{¶44}  Under R.C. 2953.21, a petitioner seeking post-conviction relief is not

automatically entitled to an evidentiary hearing.  *Calhoun*, 86 Ohio St.3d at 282, 714

N.E.2d 905.  Significantly, the Ohio Supreme Court has held that the proper basis for

dismissing a petition for post-conviction relief without holding an evidentiary hearing

include: 1) the failure of the petitioner to set forth sufficient operative facts to establish

substantive grounds for relief, and 2) the operation of res judicata to bar the constitutional

claims raised in the petition.  *Calhoun,* 86 Ohio St.3d at paragraph two of the syllabus;

*State v. Lentz*, 70 Ohio St.3d 527, 530, 639 N.E.2d 784(1994).

{¶45}  In order for an indigent petitioner to be entitled to an evidentiary hearing in

a post-conviction relief proceeding on a claim that he was denied effective assistance of

Stark County, Case No. 2021CA00134                                          14

counsel, the two-part analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104

S.Ct. 2052, 80 L.Ed.2d 674(1984) is to be applied. *Hill v. Lockhart*, 474 U.S. 52, 58, 106

S.Ct. 366, 88 L.Ed.2d 203(1985); *State v. Lytte*, 48 Ohio St.2d 391, 358 N.E.2d

623(1976); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989); *State v. Cole,*

*supra*, 2 Ohio St.3d at 114, 443 N.E.2d 169. The petitioner must therefore prove that: 1).

counsel's performance fell below an objective standard of reasonable representation; and

2). there exists a reasonable probability that, were it not for counsel's errors, the result of

the trial would have been different. Id.

{¶46} R.C. 2953.21 does not expressly mandate a hearing for every post-

conviction relief petition; therefore, a hearing is not automatically required. In determining

whether a hearing is required, the Ohio Supreme Court in *State v. Jackson*, 64 Ohio St.2d

107, 413 N.E.2d 819(1980), stated the pivotal concern is whether there are substantive

grounds for relief which would warrant a hearing based upon the petition, the supporting

affidavits, and the files and records of the case. As the Supreme Court further explained

in *Jackson,* "[b]road assertions without a further demonstration of prejudice do not warrant

a hearing for all post-conviction relief petitions." Id. at 111, 413 N.E.2d 819. Rather, a

petitioner must submit evidentiary documents containing sufficient operative facts to

support his claim before an evidentiary hearing will be granted. Accordingly, "a trial court

properly denies a defendant's petition for post-conviction relief without holding an

evidentiary hearing where the petition, the supporting affidavits, the documentary

evidence, the files, and the records do not demonstrate that petitioner set forth sufficient

operative facts to establish substantive grounds for relief." *Calhoun,* 86 Ohio St.3d at

paragraph two of the syllabus; see R.C. 2953.21(C).

Stark County, Case No. 2021CA00134                                        15

{¶47}  Furthermore, before a hearing is granted in proceedings for post-conviction relief upon a claim of ineffective assistance of trial counsel, the petitioner bears the initial burden to submit evidentiary material containing sufficient operative facts that demonstrate a substantial violation of any of defense counsel's essential duties to his client and prejudice arising from counsel's ineffectiveness.  *Calhoun,* 86 Ohio St.3d at 289, 714 N.E.2d 905; *State v. Jackson*, 64 Ohio St.2d 107, 413 N.E.2d 819(1980), *syllabus; see, also Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, 693(1984).

{¶48}  "In determining how to assess the credibility of supporting affidavits in post-conviction relief proceedings, the Supreme Court adopted the reasoning of the First Appellate District in *State v. Moore*, 99 Ohio App.3d 748, 651 N.E.2d 1319(1st Dist. 1994), which had looked to federal habeas corpus decisions for guidance.  Id. at 753-754, 651 N.E.2d at 1322-1323. The Supreme Court ultimately determined that the trial court should consider all relevant factors in assessing the credibility of affidavit testimony in 'so-called paper hearings,' including the following: '(1) whether the judge viewing the post-conviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony.' *Calhoun*, 86 Ohio St.3d at 285, 714 N.E.2d at 911-912, *citing*

*Moore,* 99 Ohio App.3d at 754-756, 651 N.E.2d at 1323-1324." *State v. Kinley,* 136 Ohio App.3d 1, 13-14, 735 N.E.2d 921, 930-31(2nd Dist. 1999). A trial court that discounts the credibility of sworn affidavits must include an explanation of its basis for doing so in its findings of fact and conclusions of law in order that meaningful appellate review may occur. Id. at 285, 735 N.E.2d 921, 714 N.E.2d at 911-912.

### *Res Judicata*

{¶49}   Another proper basis upon which to deny a petition for post-conviction relief without holding an evidentiary hearing is res judicata. *State v. Lentz,* 70 Ohio St.3d 527, 530, 1994-Ohio-532, 639 N.E.2d 784; *State v. Perry,* 10 Ohio St.2d 175, 39 O.O.2d 189, 226 N.E.2d 104(1967); *State v. Phillips,* 9th Dist. No. 20692, 2002-Ohio-823. Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment. *State v. Szefcyk,* 77 Ohio St.3d 93, 671 N.E.2d 233(1996), *syllabus, approving and following State v. Perry, 10 Ohio St.2d 175, 226 N.E.2d 104(1967), paragraph nine of the syllabus.* It is well settled that, "pursuant to res judicata, a defendant cannot raise an issue in a [petition] for post-conviction relief if he or she could have raised the issue on direct appeal." *State v. Reynolds,* 79 Ohio St.3d 158, 161, 679 N.E.2d 1131(1997).

{¶50}   Similarly, regarding claims of ineffective assistance of trial counsel in post-conviction proceedings, the Ohio Supreme Court has stated that where a defendant, represented by different counsel on direct appeal, "fails to raise [in the direct appeal] the

issue of competent trial counsel and said issue could fairly have been determined without resort to evidence dehors the record, res judicata is a proper basis for dismissing defendant's petition for post-conviction relief." *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169(1982), syllabus; *see, also, Lentz*, 70 Ohio St.3d at 530, 639 N.E.2d 784; *State v. Phillips, supra.*

### *Time requirements for filing*

{¶51}  The pertinent jurisdictional time requirements for a post-conviction petition at the time of Ayers's direct appeal were set forth in R.C. 2953.21(A)(2) as follows,

> A petition under division (A)(1) of this section shall be filed no later than one hundred eighty days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication * * *.

{¶52}  In order for a court to recognize an untimely post-conviction petition, **both of the following requirements must apply** (R.C. 2953.23(A)(1)):

> (a) Either the petitioner shows that the petitioner was *unavoidably prevented* from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

> (b) The petitioner shows by clear and convincing evidence that, *but for constitutional error at trial, no reasonable factfinder would have found*

Stark County, Case No. 2021CA00134                                              18

*the petitioner guilty of the offense of which the petitioner was convicted* or,

if the claim challenges a sentence of death that, but for constitutional error

at the sentencing hearing, no reasonable factfinder would have found the

petitioner eligible for the death sentence. (Emphasis added).

{¶53}  In the case at bar, Ayers agrees that her petition was filed outside the 180-

day time limit in effect at the time of her conviction.

### Standard of Review – Untimely petition for Post-Conviction Relief

{¶54}  A post-conviction proceeding is a collateral civil attack on the judgment,

*State v. Calhoun,* 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999), and the "right to file a

post-conviction petition is a statutory right, not a constitutional right," *State v. Broom*, 146

Ohio St.3d 60, 2016-Ohio-1028, 51 N.E.3d 620, ¶ 28.   A post-conviction petitioner

therefore "receives no more rights than those granted by the statute." *Calhoun* at 281,

714 N.E.2d 905.  This means that any right to post-conviction relief must arise from the

statutory scheme enacted by the General Assembly.

{¶55}  That includes the right to have one's claim heard at all: R.C. 2953.23(A)

provides that "a court *may not entertain* a petition filed after the expiration of the period

prescribed in [ R.C. 2953.21(A)] or a second petition or successive petitions for similar

relief on behalf of a petitioner *unless*" one of the exceptions in R.C. 2953.23(A) applies.

(Emphasis added.)   *State v. Apanovitch,* 155 Ohio St.3d 358, 2018-Ohio-4744, 121

N.E.3d 351, ¶ 36.  Therefore, a petitioner's failure to satisfy R.C. 2953.23(A) deprives a

trial court of jurisdiction to adjudicate the merits of an untimely or successive post-

conviction petition. *Apanovitch* at ¶ 36.

{¶56} Accordingly, given the substance of Ayers's allegations, for the trial court to have subject-matter jurisdiction to consider the petition, Ayers had to show (1) that she was "unavoidably prevented from discovery of the facts" upon which her claim relies *and* (2) by clear and convincing evidence, that no reasonable fact-finder would have found her guilty or eligible for the death sentence but for the constitutional error at trial. R.C. 2953.23(A)(1). *See State v. Apanovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 36. *State v. Bethel,* __Ohio St.3d ___, 2022-Ohio-783, __N.E.3d__, ¶20.

{¶57} We review de novo whether the trial court had subject-matter jurisdiction to entertain Ayers's petition. *Apanovitch* at ¶ 24; *Bethel* at .¶20.

{¶58} We must first decide does the post-conviction petition satisfy an exception provided in R.C. 2953.23(A). *State v. Apanovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 23.

*"[U]navoidably prevented from discovery of the facts"*

{¶59} For the trial court to have jurisdiction to entertain the ineffective assistance of trial counsel claim alleged in the post-conviction petition, Ayers first had to establish that she was "unavoidably prevented from discovery of the facts" on which she relies. R.C. 2953.23(A)(1)(a). To meet this standard, courts in Ohio have previously held that a defendant ordinarily must show that he was unaware of the evidence he is relying on and that he could not have discovered the evidence by exercising reasonable diligence. Bethel, at ¶21 *citing State v. Harrison*, 8th Dist. Cuyahoga No. 105909, 2018-Ohio-1396, 2018 WL 1778661, ¶ 6.

{¶60} We find it unnecessary to reach this issue because even if we assume arguendo that Ayers was "unavoidably prevented from discovery of the facts" on which

Stark County, Case No. 2021CA00134                                          20

she relies, Ayers must also show by clear and convincing evidence that no reasonable
fact-finder would have found her guilty but for constitutional error at trial. *Apanovitch,* 155
Ohio St.3d at ¶26.

> *No reasonable fact-finder would have found Ayers guilty but for the constitutional*
> *error at trial*

{¶61} Ayers's post-conviction petition faces an additional jurisdictional hurdle:
under R.C. 2953.23(A)(1)(b). Therefore, we must first decide whether a constitutional
error occurred during Ayers's jury trial. If a constitutional error occurred, we must then
find by clear and convincing evidence that no reasonable fact-finder would have found
her guilty but for constitutional error at trial. This question goes to the heart of the second
prong of the *Strickland- Brady* test for claims of ineffective assistance of counsel, which
requires Ayers to show that is there is a reasonable probability that but for counsel's
unprofessional errors, the result of her trial would have been different. *Strickland v.
Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42
Ohio St.3d 136, 538 N.E.2d 373(1989). In *Harrington v. Richter,* the United States
Supreme Court discussed the prejudice prong of the *Strickland* test,

> A reasonable probability is a probability sufficient to undermine
> confidence in the outcome." *[Strickland]*, at 694, 104 S.Ct. 2052. It is not
> enough "to show that the errors had some conceivable effect on the
> outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors
> must be "so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable." Id., at 687, 104 S.Ct. 2052.

562 U.S. 86, 104,131 S.Ct. 770, 178 L.Ed.2d 624(2011).

Stark County, Case No. 2021CA00134                                              21

## Substantive Claims

### First Ground for Relief

{¶62}  In the First Count of her petition for post-conviction relief Ayers contends that she was denied effective assistance of counsel.  Specifically, Ayers contends 1). Defense counsel failed to consult with an expert witness regarding the origin of the fire; 2). Defense counsel failed to challenge false and unsupported testimony offered by the state's expert; and 3). Defense counsel failed to object to testimony that should have been barred under Ohio Crim.R.16(K).

*1). Failure to consult with an expert.*

{¶63}  In support of her contention that she was denied effective assistance of counsel because her trial attorney did not consult with an expert witness, Ayers submitted the affidavit of John J. Lentini, a renowned forensic arson expert.  Lentini concludes "unequivocally and to a reasonable degree of professional certainty" that:

1). "The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology,"

2). "Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan,"

3). "Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways," and

4). "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard."

Stark County, Case No. 2021CA00134                                          22

Lentini Affidavit at ¶ 9.  Mr. Lentini is highly critical of the state's expert Fire Inspector

Reginal Winters.

{¶64} At trial Fire Inspector Winters testified concerning his knowledge and

experience as follows,

Q.     How long have you been a Fire Inspector/Fire Investigator?

A.     I've been - - five years with the City of Massillon, been on the

fire department for ten.

Q.     And prior to your employment at the City of Massillon, were

you employed elsewhere as a firefighter?

A.     Yes, sir, fifteen years with the City of Orrville.

Q.     Now, if you would, could you tell these ladies and gentlemen

what a fire inspector's duties are?

A.      Fire inspector's duties are we do public safety. We  also  go

through commercial buildings ensuring safety, making sure the fire

extinguishers, exit lights are lit, and we also give approval for new buildings

and stuff like that.     We work with the building department.  We also are

in charge of fireworks, certifying them and stuff like that, to inspect the site

to make sure it's safe for the community.

Q.     How about the other part of your job description that you

previously entail detailed that you had, would you explain that to these

folks?

Stark County, Case No. 2021CA00134                                              23

> A.    As a Fire Investigator, my job is to come in and determine origin and cause.  The cause being what happened, the origin is where the fire started at.

> Q.    Did you have to undergo specialized training in order to hold a position as that of which you just described?

> A.    Yes, sir.

> A.    What type of training, first of all, did you have to undergo?

> A.    First of all, I had to get my certified Fire Inspector.  You have to be a certified Fire Inspector.  And then from there you have to - - it's two stages.  You have a basic Fire Investigator and then you have an advanced Fire Inspector course you have to take.

> Q.    Let's talk about the certified Fire Inspector training first.  What does that entail?

> A.    That entails looking at multiple burn scenes, learning the scientific methodology of how different things burn as far as oils, gas, electrical fires, the synthetic fires as far as people using open flames to fires, candles, paper.  And we look at the different patterns the fire makes, the different charring of wood and stuff like that to make our determination whether - - what caused the fire, whether it was mechanical, accidental, or incendiary.

> Q.    Do you have to go to classes for that?

> A.    Yes, sir.

> Q.    And how long were those classes?

Stark County, Case No. 2021CA00134                                                    24

      A.     My first class as a basic investigator, it was 32 hours.  The second part of advanced was - - it was 40 hours.

      Q. Did you successfully complete all those classes?

      A.     Yes, sir.

      Q.     And then at the end of those classes, do you have to take a test?

      A.     Yes, sir.

      Q.     And did you successfully pass all those tests?

      A.     Yes, sir.

      Q.     So, you are now a certified arson Investigator?

      A.     Yes.

      Q.     And that's within the State of Ohio?

      A.     Yes, sir.

      Q.     Once you complete that training, do you have to continue to update your education?

      A.     Yes, sir.

      Q.     What do you have to do?

      A.     We have to - - well, we take like different seminars.    One seminar I attend is the International Firefighters Association of Arson Investigators in Columbus.   It's an annual Fire Investigator course weeklong.   We have to maintain 32 hours in a three-year period of continuing education.

Stark County, Case No. 2021CA00134                                                 25

      Q.    And as you sit here today, are you current in all your requirements to be a certified arson investigator?

      A.    Yes, sir.

      Q.    You indicated that you've held that position with the Massillon Police [sic] Department for five years.    Could you estimate the number of fires you've investigated within those five years?

      A.    I would say approximately 30.

      Q.    And have you testified before in the courts of Stark County as an expert in the cause and origin of fires?

      A.    Yes, sir.

      Q.    And has that testimony been accepted by the courts?

      A.    Yes, sir.

1T. at 225-229.

{¶65}  In *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, the Supreme Court observed,

      Neither special education nor certification is necessary to confer expert status upon a witness. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Baston,* 85 Ohio St.3d 418, 423, 709 N.E.2d 128. *Pursuant to Evid.R. 104(A), the trial court determines whether a witness qualifies as an expert,* and that determination will be overturned only for an abuse of discretion.

Stark County, Case No. 2021CA00134                                      26

> *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v.*
>
> *Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444.

Id. at ¶46 (emphasis added). Ayers does not argue in her petition for post-conviction relief that the trial court abused its discretion by qualifying Fire Inspector Winters as an expert witness.

{¶66} In the case at bar, the undisputed facts at trial were that a fire occurred on a mattress located in the basement that caused damage to the residence. The disputed facts at trial were whether Ayers stared the fire intentionally or accidentally, or, whether the 3-year-old child started the fire.

{¶67} Mr. Lentini's affidavit does not exonerate Ayers or reduce her culpability. In other words, Mr. Lentini does not opine that 1). the fire was of accidental origin; 2). a person could not have intentionally started the fire; or 3). having only one ignition point rules out that the fire was started intentionally. To answer those questions the jury must necessarily look to the other evidence present by the state during Ayers's jury trial.

{¶68} Ayers's father testified he had previously discussed finances with her, and the fact she had not been contributing to the household financial situation. Mr. Ayers told Ayers that he was planning to move to West Virginia. Jeff Ayers testified that Ayers became more aggressive toward him and began to make threats to the point that he feared for the safety of his family. 1T. at 309-310. Jeff Ayers testified that Ayers threatened to burn the house down. Id. He became so concerned that he called his sister, aunt and the landlord and told them that Ayers was threatening to burn the house

Stark County, Case No. 2021CA00134                                                    27

down. 1T. at 310. The fire occurred on the day that he left the home for West Virginia.
1T. at 312.

{¶69} Additionally, a neighbor of Ayers, Jason Pandrea, testified he heard Ayers

threaten her father with burning the house down if he ever left. 1T. at 339. Pandrea

testified that Ayers "meant it." 1T. at 341.

{¶70} The jury viewed the video of Ayers's statement to Fire Inspector Winters

and Patrolman Curtis Rucker from the Massillon Police Department. 1T. at 195; 201.

State's Exhibit 1. The jury was shown pictures of the scene after the fire had occurred.

{¶71} Inspector Reginald Winters was the state's expert. 1T. at 225. Winters did

not find evidence of a cigarette as the cause of the fire. 1T. at 240. Winters identified the

State's Photograph Exhibits that he took of the scene of the fire. 1T. at 243; 2T. at 273,

275. Winters was able to exclude cigarettes, natural gas, accelerants, and an electrical

cause for the fire. 1T. at 248- 249. Winters testified the cause of the fire was incendiary

(open flame) and a person or persons started the fire. 1T. at 250.

{¶72} The jury heard Ayers's statement to Massillon Paramedic Richard Annen

that she was running upstairs to get her son when the fire started in the basement. 1T.

at 186. Ayers initially told Annen that the child started the fire; however, she later claimed

that she might have fallen asleep. 1T. at 206-207. Annen looked in the child's mouth

and on his face and found no evidence of soot, which would indicate that the child had

been near the fire. Id. at 185. He found evidence of soot on Ayers. 1T. at 186-187.

{¶73} At the hospital, Ayers claimed to be in the basement folding clothes when

she noticed her son playing with a lighter on the mattress. 2T. at 261. When asked how

she could see a small fire on the bed with the chimney, hot water tank and furnace

Stark County, Case No. 2021CA00134                                    28

blocking her view from her position near the clothes dryer she was unable to answer.  2T.

at 263.

{¶74}  The jury also had audio recordings of calls made by Ayers while she was in

jail.  Exhibit 2.  This Court notes that State's Exhibit 2 is a disk containing 34 phone calls

that Ayers made from the jail while she was awaiting trial.  However, only "snippets" from

two calls were played for the jury and admitted into evidence.  2T. at 397-398.  The state

never identified the specific portion of the calls that were played for the jury and admitted

into evidence.

{¶75}  It is not unusual in a case in which highly technical, medical or other

specialized evidence is presented for the experts presented by each party to criticize the

other's training, methodology, and/or conclusions.  When a so-called "battle of experts"

takes place during a jury trial such criticisms go to the weight not the admissibility of each

expert's opinion.  An expert witness is not required to be the best witness on the subject.

*Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159, 383 N.E.2d 564(1978).

(Citations omitted.)

{¶76}  The majority of Lentini's opinion centers on his belief that Winters is not

qualified, or did not use the techniques that Lentini believes are the best practice.  When

viewed in this light, Lentini's affidavit has only limited probative value.  His opinion does

not exonerate Ayers or reduce her culpability.  He opines only that Fire Inspector

Winters's expert testimony was "unreliable, unscientific, and at odds with generally

accepted fire investigation methodology."  Lentini Affidavit at ¶32.  Lentini's opinion does

not affect the other testimony and evidence that was presented during Ayers's jury trial.

Stark County, Case No. 2021CA00134                                    29

{¶77}  In light of the evidence produced that did not depend upon expert testimony and the entire record in this case, we hold that Ayers has not shown a reasonable probability that but for counsel's unprofessional errors, the result of her trial would have been different.  *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989).  The testimony of Lentini could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.  Ayers was not denied her right to due process and fair trial by counsel's failure to consult an expert witness.

*2). Defense counsel failed to challenge false and unsupported testimony offered by the state's expert & 3). Defense counsel failed to object to testimony that should have been barred under Ohio Crim.R.16(K).*

{¶78}  Ayers next argues that she received ineffective assistance of trial counsel because defense counsel did not object or otherwise challenge Fire Inspector Winters's testimony.

{¶79}  In her direct appeal, Ayers raised the following Assignment of Error,

"II. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DUE TO TRIAL COUNSEL'S FAILURE TO REVIEW THE APPROPRIATE DISCOVERY MATERIALS IN PREPARATION FOR TRIAL."

*State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402, ¶15.

{¶80}  We further note that counsel's failure to object to Fire Inspector Winters's testimony is evident from the record.  The entire Executive Summary prepared by Winters was read into the record during the jury trial.  2T. at 297.  Defense counsel acknowledged

Stark County, Case No. 2021CA00134                                    30

receiving the report. Id. at 299. The report does not indicate the fire had two points of

origin. 2T. at 297. Ayers was indigent. The record contains no evidence that the defense

requested the trial court provide funds to consult with an expert witness.

{¶81}  In the case at bar, Ayers was represented in her direct appeal by new

counsel. Counsel in that appeal could have cited to the testimony and records contained

in the court file to support a claim of ineffective assistance of trial counsel in failing to

object or challenge Fire Inspector Winters's testimony. To overcome the *res judicata* bar,

the evidence must show that the petitioner could not have appealed the constitutional

claim based on the information in the original trial record. *State v. Cole*, 2 Ohio St.3d 112,

443 N.E.2d 169 (1982), syllabus. Ayers has failed in this burden.

{¶82}  As Ayers could have raised and fully litigated this issue on direct appeal,

this court concludes that the trial court did not err in finding that trial counsel's failure to

object or challenge Fire Inspector Winters's testimony is barred by *res judicata.*

### Second Ground for Relief

{¶83}  In her Second Ground for Relief, Ayers claims the prosecutor committed

misconduct by failing to disclose Fire Inspector Winters's conclusion that the fire had two

point of origin in violation of Crim.R. 16(K).

{¶84}  The entire Executive Summary prepared by Winters was read into the

record during the jury trial. 2T. at 297. Defense counsel acknowledged receiving the

report. Id. at 299. The report does not indicate the fire had two points of origin. 2T. at

297.

{¶85}  In the case at bar, Ayers was represented in her direct appeal by new

counsel. Counsel in that appeal could have cited to the testimony and records contained

Stark County, Case No. 2021CA00134                                          31

in the court file to support a claim of ineffective assistance of trial counsel in failing to object or challenge the state's failure to disclose Fire Inspector Winters's testimony concerning the fire's two points of origin. Ayers was indigent. The record contains no evidence that the defense requested the trial court provide funds to consult with an expert witness.

{¶86} To overcome the *res judicata* bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982), syllabus. Ayers has failed in this burden.

{¶87} As Ayers could have raised and fully litigated this discovery issue on direct appeal, this Court concludes that the trial court did not err in finding that this issue was barred by *res judicata.*

### Third Ground for Relief

{¶88} In the Third Ground for Relief set forth in Ayers's petition for post-conviction relief, Ayers contends that her right to compulsory process was violated by the state's discovery violation, i.e. failing to disclose Fire Inspector Winters's conclusion that the fire had two point of origin in violation of Crim.R. 16(K).

{¶89} Defense counsel was in possession of Fire Inspector Winters's Executive Summary, and his draft report prior to trial. Thus, the defense was on notice that the state would present expert testimony prior to trial. Nothing impeded the defense from obtaining its own expert witness. The proffered testimony of Ayers's attorneys submitted, as Exhibit L to her petition, does not indicate that her trial attorneys would have retained an expert

witness had they received Fire Inspector Winters's conclusion that the fire had two points of origin before trial.

{¶90} The entire Executive Summary prepared by Winters was read into the record during the jury trial. 2T. at 297. Defense counsel acknowledged receiving the report. Id. at 299. The report does not indicate the fire had two points of origin. 2T. at 297.

{¶91} In the case at bar, Ayers was represented in her direct appeal by new counsel. Counsel in that appeal could have cited to the testimony and records contained in the court file to support a claim of ineffective assistance of trial counsel in failing to object or challenge Fire Inspector Winters's testimony, or to retain and present its own expert at trial. To overcome the *res judicata* bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982), syllabus. Ayers has failed in this burden. The issue of whether Ayers was denied compulsory process by the state's failure to disclose Fire Inspector Winters's conclusion that the fire had two points of origin before trial could have been raised in her direct appeal.

{¶92} As Ayers could have raised and fully litigated this issue on direct appeal, this Court concludes that the trial court did not err in finding that this issue was barred by *res judicata*.

### Fourth Ground for Relief

{¶93} In the Fourth Ground for Relief Ayers asserts a claim of actual innocence.

{¶94} Ayers does not assert a claim of actual innocence based upon DNA evidence as set forth in R.C. 2953.23(A)(2).

Stark County, Case No. 2021CA00134                                                    33

{¶95} The United States Supreme Court has ruled that under the United States

Constitution, an actual-innocence claim "is not itself a constitutional claim," *Herrera v.*

*Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). *Accord, State v.*

*Apanovitch,* 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶26. In *State v. Willis,*

the Court explained,

> In *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203
>
> (1993), the United States Supreme Court held that "a claim of 'actual
>
> innocence' is not itself a constitutional claim." Id. at 404, 113 S.Ct. 853. "[A]
>
> claim of 'actual innocence' is not itself a constitutional claim, but instead a
>
> gateway through which a habeas petitioner must pass to have his otherwise
>
> barred constitutional claim considered on the merits."  Nevertheless, the
>
> court was willing to "assume, for the sake of argument in deciding [the] case,
>
> that a truly persuasive demonstration of 'actual innocence' made after trial
>
> would render the execution of a defendant unconstitutional, and warrant
>
> federal habeas relief if there were no state avenue open to process such a
>
> claim." Id.
>
> Interpreting *Herrera, supra,* the First District Court of Appeals held
>
> that a petitioner was not entitled to post-conviction relief unless he showed
>
> a violation of rights that were constitutional in dimension, which occurred at
>
> the time that the petitioner was tried and convicted. *State v. Campbell,* 1st
>
> Dist. Hamilton No. C–950746, 1997 WL 5182 (Jan. 8, 1997).  The court
>
> stated:

[N]ewly discovered evidence is, by definition, that "which the defendant could not with reasonable diligence have discovered and produced at trial." Crim.R. 33(A)(6); * * * A claim of actual innocence based on newly discovered evidence will, therefore, not provide substantive grounds for post-conviction relief, because "it does not, standing alone, demonstrate a constitutional violation in the proceedings that actually resulted in the conviction." * * * Campbell's claims of actual innocence were thus not cognizable in a postconviction proceeding. *Citing State v. Powell*, 90 Ohio App.3d 260, 264, 629 N.E.2d 13 (1993).

Other Ohio courts have similarly held that a claim of actual innocence does not constitute a substantive ground for post-conviction relief. *State v. Bound*, 5th Dist. Guernsey No. 04 CA 8, 2004-Ohio-7097, 2004 WL 2988294, *State v. Wat*son, 126 Ohio App.3d 316, 323, 710 N.E.2d 340 (12th Dist. 1998), *State v. Loza*, 12th Dist. Butler No. CA96–10–214, 1997 WL 634348 (Oct. 13, 1997).

6th Dist. Lucas Nos. L-15-1098, L-15-1101, 2016-Ohio-335, 58 N.E.3d 515, ¶15-¶17.

{¶96}  We further note that this Court has previously found that Ayers's convictions are not against the weight or the sufficiency of the evidence.  *State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402, ¶26.

{¶97}  Accordingly, the trial court did not abuse its discretion in denying Ayers's petition based on actual innocence.

Stark County, Case No. 2021CA00134                                    35

### Fifth Ground for Relief

{¶98} In her Fifth Claim for Relief, Ayers argues that but for Fire Inspector Winters's false, unsupported and/or materially misleading testimony she would not have been convicted.

{¶99} It is not unusual in a case in which highly technical, medical or other specialized evidence is presented for the experts presented by each party to criticize the other's training, methodology, and/or conclusions. When a so-called "battle of experts" takes place during a jury trial such criticisms go to the weight not the admissibility of each expert's opinion.

{¶100} An expert witness is not required to be the best witness on the subject. *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 159, 383 N.E.2d 564(1978). (Citations omitted.) In *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, the Supreme Court observed,

> Neither special education nor certification is necessary to confer expert status upon a witness. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Baston,* 85 Ohio St.3d 418, 423, 709 N.E.2d 128. *Pursuant to Evid.R. 104(A), the trial court determines whether a witness qualifies as an expert*, and that determination will be overturned only for an abuse of discretion. *State v. Hartman,* 93 Ohio St.3d at 285, 754 N.E.2d 1150; *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444.

Stark County, Case No. 2021CA00134                                          36

Id. at ¶46 (emphasis added).

{¶101} When viewed in this light, Lentini's affidavit has only limited probative value. His opinion does not exonerate Ayers. The majority of Lentini's opinion centers on his belief that Winters is not qualified, or did not use the techniques that Lentini believes are the best practice. He opines only that Fire Inspector Winters's expert testimony was "unreliable, unscientific, and at odds with generally accepted fire investigation methodology." Lentini Affidavit at ¶32. Lentini's opinion does not affect the other testimony and evidence that was presented during Ayers's jury trial. Mr. Lentini does not opine: 1). the fire was of accidental origin; 2). a person could not have intentionally started the fire; or 3). having only one ignition point rules out that the fire was started intentionally. To answer those questions the jury must necessarily look to the other evidence present by the state during Ayers's jury trial.

{¶102} In light of the evidence produced that did not depend upon expert testimony and the entire record in this case, we hold that Ayers has not shown a reasonable probability that but for counsel's unprofessional errors, the result of her trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989). The testimony of Lentini could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Ayers was not denied her right to due process and fair trial by Fire Inspector Winters's testimony.

{¶103} We further note that this Court has previous found that Ayers's convictions are not against the weight or the sufficiency of the evidence. *State v. Ayers,* 5th Dist. Stark No. 2013 CA 00034, 2013-Ohio-5402, ¶26.

Stark County, Case No. 2021CA00134                                           37

### Sixth Ground for Relief

{¶104} In her Sixth Ground for Relief Ayers recasts her previous arguments as well as asserting due process and cruel and unusual punishment claims under the Ohio Constitution.

{¶105} The claims under the state constitution fail for the reasons set forth above in our disposition of Ayers's First through Fifth Grounds for Relief.

### Conclusion – Post conviction relief

{¶106} In *Harrington v. Richter,* the United States Supreme Court discussed the prejudice prong of the *Strickland* test,

> A reasonable probability is a probability sufficient to undermine confidence in the outcome." *[Strickland]*, at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

562 U.S. 86, 104,131 S.Ct. 770, 178 L.Ed.2d 624(2011).

{¶107} In light of the evidence produced that did not depend upon expert testimony and the entire record in this case, we hold that Ayers has not shown a reasonable probability that but for counsel's unprofessional errors, the result of her trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989).

{¶108} Accordingly, we hold that Ayers has not shown by clear and convincing evidence that a constitutional error occurred during her jury trial, and that no reasonable

Stark County, Case No. 2021CA00134                                    38

fact-finder would have found her guilty but for the constitutional error at trial.  R.C. 2953.23(A)(1)(b).

{¶109} Therefore, the trial court correctly concluded that it lacked jurisdiction to consider Ayers's untimely petition for post-conviction relief.

{¶110} Ayers's Second Assignment of Error is overruled.

I. & III.

{¶111} In her First Assignment of Error, Ayers maintains that she relied upon her trial attorneys to discover and investigate evidence necessary to prepare her defense at trial and her reliance upon her attorneys unavoidably prevented her from discovering both the flaws in the state's arson theory and her lack of a fair trial.

{¶112} In Ayers's Third Assignment of Error, she claims that the trial court erred by denying her a hearing on her motion for leave because she presented a "prima facie" showing of unavoidable delay under Crim.R.33(B).

**Standard of Appellate Review.**

{¶113} Crim.R. 33(B) provides that if a defendant fails to file a motion for a new trial within 120 days of the jury's verdict, he or she must seek leave from the trial court to file a delayed motion.  Crim.R. 33(B) does not give a deadline by which a defendant must seek leave to file a motion for a new trial based on the discovery of new evidence.  *State v. Bethel,* __Ohio St.3d __, 2022-Ohio-783, __N.E.3d ___, ¶53, ¶55.

{¶114} To obtain leave, the defendant must show by clear and convincing proof that he or she was unavoidably prevented from discovering the evidence within the 120 days.  *State v. Lordi*, 149 Ohio App.3d 627, 2002–Ohio–5517, 778 N.E.2d 605(7th Dist.), ¶ 26–27.  Clear and convincing proof is that which will produce in the mind of the trier of

fact a firm belief or conviction as to the facts sought to be established. *In re Adoption of Holcomb,* 18 Ohio St .3d 361, 368, 481 N.E.2d 613(1985); *Lordi, supra,* at ¶ 26.

{¶115} A party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence. *State v. Bethel,* 2022-Ohio-783, ¶21.

{¶116} "To warrant the granting of a motion for a new trial on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result of a new trial if granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370(1947), syllabus. *Accord, State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227(1993), syllabus; *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶85. A trial court abuses its discretion in granting a defendant a new trial without first finding by clear and convincing evidence that the defendant was unavoidably prevented from discovering the evidence within the one hundred twenty-day time frame established by Crim.R. 33(B). *State v. Georgekopoulos*, 9th Dist. Summit No. C.A. 21952, 2004-Ohio-5197, ¶8.

{¶117} The decision whether to grant a new trial on grounds of newly discovered evidence falls within the sound discretion of the trial court. *State v. Hawkins*, 66 Ohio St.3d at 350, 612 N.E.2d 1227. We cannot reverse unless there has been a gross abuse

Stark County, Case No. 2021CA00134                                    40

of that discretion, and whether that discretion has been abused must be disclosed from the entire record. *State v. Petro,* 148 Ohio St. at 507- 508, 76 N.E.2d 370, *quoting State v. Lopa*, 96 Ohio St. 410, 411, 117 N.E. 319(1917).

{¶118} Trial courts should subject Crim.R. 33(A)(6) new trial motions to the closest scrutiny:

> Applications for new trials on the ground of newly discovered evidence are not, however, favored by the courts, for the reason that the moving party has generally had ample opportunity to prepare his case carefully and to secure all of the evidence before the trial.   Such applications, whether in a court of law or in a court of equity, are entertained with reluctance and granted with caution, not only because of the danger of perjury, but also because of the manifest injustice in allowing a party to allege that which may be the consequence of his own neglect in order to defeat an adverse verdict.  In order to prevent, as far as possible, the fraud and imposition which defeated parties may be tempted to practice as a last resort to escape the consequence of an adverse verdict, an application setting up the discovery of new evidence should always be subjected to the closest scrutiny by the court.   The applicant is required to rebut the presumption that the verdict is correct and that there has been a lack of due diligence and to establish other facts essential to warrant the granting of a new trial upon the ground of newly discovered evidence.  The rule to be deduced from the cases is that where newly discovered evidence is of such conclusive nature, or of such decisive or preponderating character, that it

would with reasonable certainty have changed the verdict or materially

reduced the recovery, a new trial should be granted if it is satisfactorily

shown why the evidence was not discovered and produced at the time of

the trial.

*Taylor v. Ross*, 150 Ohio St. 448, 450–51, 83 N.E.2d 222, 224 (1948), *quoting* 39

American Jurisprudence, 163, Section 156; *accord Domanski v. Woda*, 132 Ohio St. 208,

6 N.E.2d 601 (1937).

{¶119} "The question of whether to decide a motion on the supporting evidence

filed with the motion or to hold an evidentiary hearing is within the discretion of the trial

court." *United States v. O'Dell*, 805 F.2d 637, 643 (6th Cir.1986); *State v. Sutton*, 2016-

Ohio-7612, 73 N.E.3d 981, ¶ 13 (8th Dist.).

**Issue for Appellate Review:** *Whether the trial court abused its discretion in*

*denying Ayers's motion for leave to file a motion for a new trial filed beyond 120 days of*

*the jury's verdict without a hearing.*

{¶120} For the trial court to have jurisdiction to entertain the ineffective assistance

of trial counsel claim alleged in the motion for leave to file a motion for a new trial, Ayers

first had to establish that she was "unavoidably prevented from discovery of the facts" on

which she relies.

{¶121} We find it unnecessary to reach this issue. Assuming arguendo that Ayers

would be entitled to a hearing on her motion for leave to file a motion for a new trial, the

hearing would be an exercise in futility. We have concluded in our discussion of Ayers's

petition for post-conviction relief, Assignment of Error 2, supra, that, in light of the

evidence produced at Ayers's jury trial that did not depend upon expert testimony, and

Stark County, Case No. 2021CA00134                                              42

the entire record in this case, Ayers has not shown a constitutional error occurred during

her jury trial and that no reasonable fact-finder would have found her guilty but for the

constitutional error at trial. R.C. 2953.23(A)(1)(b).

{¶122} Because Ayers's failed to meet her burden under R.C. 2953.23(A)(1)(b),

Ayers's motion for a new trial would be without merit, therefore rendering moot a hearing

on her motion for leave to file a motion for a new trial. *State v. Bethel,* __Ohio St.3d __,

2022-Ohio-783, __N.E.3d ___, ¶59 - ¶60. Therefore, the trial court did not abuse its

discretion in overruling Ayers's motion for leave to file a motion for a new trial without

holding an evidentiary hearing on the motion.

{¶123} Ayers's First and Third Assignments of Error are overruled.

{¶124} For the foregoing reasons, the judgment of the Stark County Court of

Common Pleas is affirmed.

By Gwin, J.,

Wise, Earle, P.J., and

Hoffman, J., concur

_W. Scott Gwin_

HON. W. SCOTT GWIN

_Earle E. Wise_

HON. EARLE E. WISE, JR.

_William B. Hoffman_

HON. WILLIAM B. HOFFMAN

WSG:clw 0519

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | ON APPEAL FROM THE STARK |
| APPELLEE, | : | COUNTY COURT OF APPEALS, |
| | : | FIFTH APPELLATE DISTRICT |
| | : | |
| V. | : | |
| | : | |
| KAYLA AYERS, | : | COURT OF APPEALS |
| | : | CASE NO. 2021CA134 |
| APPELLANT. | : | |

---

## NOTICE OF APPEAL OF APPELLANT KAYLA AYERS

---

Brian C. Howe (86517) (COUNSEL OF RECORD)
Mark Godsey
The Ohio Innocence Project
Rosenthal Institute for Justice
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, Ohio 45221
Brian.Howe@uc.edu

      COUNSEL FOR APPELLANT KAYLA AYERS

Kyle Stone (95140)
Vicki L. DeSantis (75716)
Stark County Prosecuting Attorney's Office
110 Central Plaza South, Ste. 510
Canton, Ohio 44702
vldesantis@starkcountyohio.gov

      COUNSEL FOR APPELLEE STATE OF OHIO

**EXHIBIT 52**

<u>**Notice of Appeal of Appellant Kayla Ayers**</u>

Appellant Kayla Ayers hereby gives notice of appeal to the Supreme Court of Ohio from the judgment of the Ohio Court of Appeals Fifth Appellate District, Stark County, entered in case No. 2021CA134 on June 6, 2022.

This case involves a felony criminal conviction, substantial constitutional questions, and is one of public or great general interest.

Respectfully Submitted,

/s/ Brian Howe
Brian Howe (0086517)
Attorney for Appellant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was served upon the Stark Co. Prosecuting Atty's Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via electronic mail to vldesantis@starkcountyohio.gov on this 19th day of July, 2022.

/s/ Brian Howe
Attorney for Appellant

IN THE SUPREME COURT OF OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | ON APPEAL FROM THE STARK |
| APPELLEE, | : | COUNTY COURT OF APPEALS, |
| | : | FIFTH APPELLATE DISTRICT |
| | : | |
| V. | : | COURT OF APPEALS |
| | : | CASE NO. 2021CA134 |
| KAYLA AYERS, | : | |
| | : | |
| APPELLANT. | : | |

---

MEMORANDUM IN SUPPORT OF JURISDICTION
OF APPELLANT KAYLA AYERS

---

Brian C. Howe (86517) (COUNSEL OF RECORD)
Mark Godsey
The Ohio Innocence Project
Rosenthal Institute for Justice
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, Ohio 45221
Brian.Howe@uc.edu

    COUNSEL FOR APPELLANT KAYLA AYERS

Kyle Stone (95140)
Vicki L. DeSantis (75716)
Stark County Prosecuting Attorney's Office
110 Central Plaza South, Ste. 510
Canton, Ohio 44702
vldesantis@starkcountyohio.gov

    COUNSEL FOR APPELLEE STATE OF OHIO

**EXHIBIT 53**

TABLE OF CONTENTS

EXPLANATION OF WHY THIS IS A CASE OF PUBLIC OR GREAT
GENERAL INTEREST AND INVOLVES A SUBSTANTIAL
CONSTITUTIONAL QUESTION……………………………………………….. 1

STATEMENT OF THE CASE AND FACTS………………………………………. 2

ARGUMENT IN SUPPORT OF PROPOSITIONS OF LAW

    **Proposition of Law No. I**:  A court cannot reject a Crim.R.33 motion
    for new trial that has not been filed……………………………………………. 5

    **Proposition of Law No. II**:  The "no reasonable fact-finder" standard
    of R.C. 2953.23 does not apply to new trial motions under Crim.R.33…….. 7

    **Proposition of Law No. III**: Where trial counsel fails to consult an
    independent expert and fails to object to the State's inadmissible and
    prejudicial expert testimony, that counsel's ineffectiveness undermines
    all confidence in the jury's verdict and deprives the defendant of her
    Sixth Amendment right to a fair trial…………………………………………….. 9

    **Proposition of Law No. IV**:  When newly discovered evidence outside
    of the trial record demonstrates constitutional defects during the trial
    process, res judicata will not bar those constitutional claims in a collateral
    post-conviction proceeding or a new trial motion under Crim.R.33……….. 12

    **Proposition of Law No. V**: State misconduct in adducing unreported
    expert conclusions at trial, along with reliance on unscientific and
    unsupported expert testimony to convicted a defendant with a colorable
    claim of actual innocence, robs that defendant of her right to compulsory
    process and due process of law under the Sixth and Fourteenth Amendments,
    and subjects her to cruel and unusual punishment within the meaning
    of the Eighth Amendment…………………………………………………….. 13

APPENDIX

    Opinion of the Fifth District Court of Appeals (June 6, 2022)

<u>**EXPLANATION OF WHY THIS CASE IS A CASE**</u>
<u>**OF PUBLIC OR GREAT GENERAL INTEREST**</u>

Under Ohio Criminal Rule of Procedure 33(B), can an Ohio appellate court rule on a motion for new trial that has not yet been filed?  In March 2022, this Court decided *State v. Bethel*, ___ Ohio St.3d ___, 2022-Ohio-783, ___ N.E.3d ___, which held that Ohio courts must abide by the two-step procedure set forth in the text of Crim.R.33(B).  Specifically, courts must decide whether to grant leave to file a motion for new trial *before* reaching the merits of that motion.  "[U]ntil a trial court grants leave to file a motion for a new trial, the motion for a new trial is not properly before the court." *Bethel* at ¶ 41.

Ms. Ayers was not permitted to file a motion for new trial.  Instead, the trial court denied her motion for leave, *inter alia*, on grounds that she was not "unavoidably delayed" from discovering the evidence she wished to present.  On appeal, the Fifth District Court of Appeals declined to decide whether leave should have been granted pursuant to Crim.R.33(B).  Instead, the appellate court analyzed what it believed would be the content of Ms. Ayers's future motion for new trial—a motion that was not part of the record.   The appellate court then used an inapplicable statutory standard to conclude that Ms. Ayers's future motion for new trial would be an "exercise in futility," and it thereby upheld the trial court's decision denying her leave to file that motion.

The Fifth District's error, if left uncorrected, threatens to warp and muddle the well-established procedural application of Crim.R. 33 in the lower courts, and to eradicate procedural safeguards for criminal defendants by rewriting the Ohio Rules of Criminal Procedure.  In fact, barely four months after *Bethel*, Ohio appellate courts are already split on the issue of how and whether to consider the underlying merits of a claim prior to granting leave to file a motion for new trial.  *See, e.g., State v. Howard*, 1st Dist. Hamilton No. C-210285, 2022-Ohio-2159 at ¶ 23

1

(finding a trial court erred by analyzing the merits of a motion for new trial without first determining whether to grant leave to file the motion pursuant to Crim.R.33(B)). The Court should accept this case to clarify and reaffirm its holding in *Bethel*, and to prevent further misapplication of Crim.R.33(B).

### STATEMENT OF CASE AND FACTS

In October 2012, Kayla Ayers was at home with her young son when her mattress in the basement of the home caught fire. The fire was quickly extinguished. In early 2013, Ms. Ayers was convicted of aggravated arson, based primarily on expert testimony that the fire had two distinct points of origin, and therefore could not have been accidentally started by a cigarette or by Ayers' young son.

At trial, Ms. Ayers' trial counsel neither consulted with its own fire expert, nor objected to previously undisclosed "expert" conclusions offered at trial. As a result, the first time an independent arson expert reviewed the matter was in 2019, as part of an investigation by the Ohio Innocence Project.

That review found that "the expert testimony presented to the jury *** was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." The State's expert was "not qualified to investigate fires," and he "disregarded the guidance" of the textbook on which he claimed his conclusions were based. Most importantly, the State's "two points of origin" theory was and is "unsupportable by any generally accepted methodology."

Once she became aware of the flaws in her trial, Ms. Ayers attempted to these issues in a Motion for Leave and a Petition for Postconviction Relief. The trial court denied both on procedural grounds, finding that Ms. Ayers could not show she was "unavoidably prevented" from discovering the independent arson analysis that supported her 2020 filings.

In fact, Ms. Ayers lacked the means and the ability to independently uncover evidence of the State's flawed arson testimony and her own attorneys' ineffectiveness. She was unavoidably prevented from discovering the evidence supporting her postconviction filings, and the trial court's decision should be reversed.

John Lentini is one of the foremost forensic arson experts in the United States. He is the former chair of the Forensic Science Committee for the International Association of Arson Investigators, and he was selected by the U.S. Justice Department to serve on a planning panel to recommend national standards for fire and arson investigation. *Affidavit of John Lentini*, ("Lentini Affidavit") attached as Exhibit O to *Petition for Postconviction Relief*, at ¶ 4-5. Lentini wrote one of the primary textbooks on fire investigation, Scientific Protocols for Fire Investigation, which is currently in its third edition. *Id.* at ¶ 6. He also served as a principal Member of the National Fire Protection Association, and for twenty years he served on the technical committee responsible for drafting the *NFPA 921, Guide to Fire and Explosion Investigation*— the same guide Inspector Winters supposedly relied on for his procedures and conclusions. *Id.* at ¶ 4.

In 2019, Mr. Lentini reviewed the 2013 testimony and summary conclusions of Inspector Winters and produced a report. According to Lentini's analysis, "the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." *Id.* at ¶ 32. None of Lentini's conclusions were ever put before either the Court or the jury during Ms. Ayers' original trial.

On April 13, 2020, Ms. Ayers filed a *Motion for Leave to File a Motion for New Trial* ("Motion for Leave") and a *Petition for Postconviction Relief*. Both filings raised constitutional

issues based on the newly-discovered Lentini report, including, *inter alia*, that her trial attorneys were constitutionally ineffective.

On November 2, 2021, the trial court entered a "Judgment Entry Denying Defendant's Petition for Post-Conviction Relief and Motion for Leave to File for New Trial." *11/02/21 Judgment Entry*. Regarding the Petition for Postconviction Relief, the trial court held that Ms. Ayers "was not unavoidably prevented from discovering the facts upon which she relie[d] to present her claims for relief" pursuant to R.C. 2953.23(A). *Id*. at 4.

The trial court also denied Ms. Ayers' Motion for Leave to File a Motion for New Trial, on grounds that Ms. Ayers did not show by clear and convincing evidence "that she was prevented from filing a motion for new trial or discovering the evidence she now, eight years later, requests to present." *Id*. On November 29, 2021, Ms. Ayers filed a timely Notice of Appeal.

On June 6, 2022, the Fifth District affirmed the trial court's denial of Ms. Ayers' Motion for Leave to File a Motion for New Trial and *Petition for Postconviction Relief*. *State v. Ayers*, 5th Dist. Stark No. 2021CA00134, 2022-Ohio-1910. The Fifth District affirmed the denial of Ms. Ayers' motions and petitions asserting that Ms. Ayers' was barred by *res judicata* because she did not raise and litigate her ineffective assistance of counsel claim or discovery concerns on direct appeal. *Id.* at ¶¶ 82; 87; 92.

The Fifth District added that regardless of whether Ms. Ayers was "unavoidably prevented from discovery of the facts" on which she relies, it was "unnecessary to reach the issue" because Ms. Ayers' fails to show by clear and convincing evidence that no reasonable factfinder would have found her guilty but for her ineffective assistance of counsel at trial. *Id*. at ¶ 60.

4

<u>PROPOSITION OF LAW NO. I</u>

<u>A COURT CANNOT REJECT A CRIM.R. 33 MOTION FOR A NEW TRIAL WHICH THE MOVANT HAS NOT FILED.</u>

Delayed motions for a new trial based on newly discovered evidence under Crim.R. 33(B) require a two-step procedure. First, the movant must file a motion for a new trial to file a motion for a new trial, setting forth clear and convincing proof that she was unavoidably prevented from discovering her new evidence within the 120-day period. Crim.R. 33(B). If the movant presents a prima facie case showing unavoidable prevention, then she must be allowed a hearing on that issue. *See State v. Barnes*, Fifth Dist. Muskingum No. CT2017-0092, 2018-Ohio-1585, ¶ 36; *State v. Smith*, 1st Dist. Hamilton No. C-190485, 2020-Ohio-6718, ¶ 17; *State v. Bentley*, 66 N.E.3d 180, 2016-Ohio-3290, ¶ 10-13 (11th Dist.); *State v. Warren*, 86 N.E.3d 728, 2017-Ohio-853, ¶ 51 (2nd Dist.). Once leave has been granted, the movant then has seven days to file her motion for new trial addressing the merits of her claim.

This Court's recent decision in *Bethel* affirmed, in no uncertain terms, that, "until a trial court grants leave to file a motion for a new trial, the motion for a new trial is not properly before the court." *Bethel* at ¶ 41. This Court rebuked the District Court of Appeals for denying Mr. Bethel's motion for a new trial "on its merits," even though "the court never permitted Bethel to file that motion" in the first place. *Id.*

In *Bethel*, this Court held that the lower courts erred by denying Mr. Bethel's motion for leave to file a motion for new trial. After determining that leave was appropriate, however, the Court turned to the merits of Mr. Bethel's motion for new trial, <u>which had been submitted *instanter* along with his motion seeking leave</u>. This Court held that it was not necessary to remand the case for further proceedings, because the *Brady* claim presented by Bethel's *extant* motion for new trial was without merit.

5

*Bethel*, then, provides  guidance to lower courts in analyzing a motion for leave to file a motion for new trial.  On one hand, a court may not reach the merits of a potential motion for new trial until it has first decided whether leave should be granted pursuant to Crim.R.33(B).  On the other hand, if a trial court improperly denies a motion for leave under Crim.R.33(B), the Bethel decision suggests that remand is not always appropriate—so long as the motion for new trial is already before the appeals court and can be analyzed for the first time on appeal.

In this matter, the appellate court failed to follow *Bethel*'s guidance. In its opinion, the appellate court never addressed whether Ms. Ayers had been unavoidably prevented from filing her motion for a new trial—the only question presented in a motion for leave and the only issue properly before it with regards to Crim.R.33.  Because Ms. Ayers was denied the opportunity to file a motion for new trial, the Fifth District did not and could not cite an *instanter* motion for a new trial. Instead, the Fifth District did what this Court cautioned against in *Bethel* and attempted to analyze a future motion for new trial, without deciding whether Ms. Ayers had been improperly denied leave to file that motion in the first place.  If a trial court cannot rule on a motion for a new trial "until [it] grants leave to file" that motion, *Bethel* at ¶ 41, then the Court of Appeals certainly cannot rule on a New Trial Motion that is not even in the record.

Within just a few months of the Bethel decision, a split has already developed between Ohio District Courts of Appeal regarding how and whether to consider the merits of a motion for new trial when considering an initial motion for leave under Crim.R.33(B).  The First District understood that *Bethel* meant what it said, and held accordingly in its recent decision in *State v. Howard*, 1st Dist. Hamilton No. C-210285, 2022-Ohio-2159 at ¶ 23 ("The new-trial motion was not properly before the court because the common pleas court had not granted leave to Howard to file a motion for a new trial.); *see also State v. Martin*, 2022-Ohio-2372, ¶ 9 (citing *Howard* at ¶

23).  The Fifth District has now come to the opposite conclusion, by circumventing the two-step process set forth by Crim.R.33(B) and analyzing a motion that Ms. Ayers was not permitted to file.

How should Ohio litigants in the Fifth District now approach filing a motion for new trial under Crim.R.33(B)?  The first step of the Crim.R.33(B) process—which should focus entirely on the movant was "unavoidable delayed" from discovering evidence within 120 days of trial—now always carries a risk of morphing into an argument on the merits of a future motion.  Litigants must raise and present any merits arguments at the initial motion for leave stage—not because the merits arguments are relevant to the "unavoidable delay" analysis, but because it will be impossible for movants to predict when a court might look beyond the first-step, and analyze future, unfiled motion.

This Court should accept this case to clarify its *Bethel* decision and make clear (1) that the lower courts must adhere to the two-step process in assessing Crim.R. 33(B) motions, and (2) that the lower courts cannot address the merits of a Motions for a New Trial which the movant has not submitted.

## <u>PROPOSITION OF LAW NO. II</u>

## <u>THE "NO REASONABLE FACTFINDER" STANDARD OF OHIO R.C. 2953.23(A)(1)(B) DOES NOT APPLY TO NEW TRIAL MOTIONS UNDER CRIM.R. 33.</u>

Not only did the appellate court purport to analyze an unfiled motion for new trial, but it rejected that hypothetical motion for new trial using an incorrect standard.  Specifically, the Fifth District applied the "no reasonable factfinder" standard of R.C. 2953.23(A)(1)(b) to reject Ms. Ayers's future motion for new trial.

Ohio permits defendants to raise postconviction constitutional error through both R.C. 2953.21-.23 and through Crim.R. 33. Because these two procedural devices spring from different

soil and address different concerns, claims brought under them are assessed separately and under distinct standards. *Cf. State v. Apanovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, 121 N.E.3d 351, ¶ 39 ("The authority to proceed under Crim.R. 33 empowers a court to provide relief only under that rule. * * * Crim.R. 33 did not empower the trial court to 'consider and decide the [Post-Conviction Relief] Petition.'"); *State v. Lee*, 10th Dist. Franklin No. 05AP-229, 2005-Ohio-6374, ¶ 13 ("this court and others have at least implicitly found that the Crim.R. 33(B) procedure for new trial motions exists independently from the R.C. 2953.21 procedure for post-conviction petitions").

The standard for materiality in granting a new trial under Crim.R. 33(B) is facially different and markedly more lenient than the "no reasonable fact-finder" standard enshrined in R.C. 2953.23(A)(1)(b). Generally, the materiality standard for a delayed motion for new trial is whether the newly discovered evidence "discloses a strong probability" of a changed verdict at a new trial, *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), at syllabus (interpreting Crim.R. 33 motions based on newly-discovered evidence).  The test is even more lenient for constitutional errors, where the test contains its own "due process" standard.  *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898, 911 (1988); *Bethel*, 2022-Ohio-783, at ¶ 59 (applying the "constitutional standard" to a Brady claim raised pursuant to Crim.R.33).  Until *Ayers*, no Ohio district court has applied the stringent "no reasonable fact-finder" test to Crim.R.33.

Because Ms. Ayers was not permitted to submit her motion for new trial, the appropriate standard for relief for motions under Crim.R.33 was never briefed or argued by any party below. Perhaps as a result, the Fifth District applied an incorrect standard, holding that "[b]ecause Ayers failed to meet her burden under R.C. 2953.23(A)(1)(b), Ayers' motion for a new trial would be without merit." *Ayers*, 2022-Ohio-1910, at ¶ 121 (citing *Bethel* at ¶ 59-60) (emphasis added).

This procedural mistake could have serious ramifications if permitted to stand. Applying R.C. 2953.23 to motions for new trial has no basis in either the text of Criminal Rule 33 or in this Court's prior precedent.   To the contrary, the Fifth District's opinion contravenes both *Petro* and *Johnston*, in favor of an entirely novel rule requiring lower courts to apply the "no reasonable fact-finder" standard to all motions under Crim.R.33(B). The Court should accept jurisdiction to ensure that its precedents are uniformly and properly applied across the State of Ohio.

## PROPOSITION OF LAW NO. III

**WHERE TRIAL COUNSEL FAILS TO CONSULT AN INDEPENDENT EXPERT AND FAILS TO OBJECT TO THE STATE'S INADMISSABLE, PREJUDICIAL EXPERT TESTIMONY, THAT COUNSEL'S INEFFECTIVE ASSISTANCE UNDERMINES ALL CONFIDENCE IN THE JURY'S VERDICT AND DEPRIVES THE DEFENDANT OF HER SIXTH AMENDMENT RIGHT TO A FAIR TRIAL.**

Defense counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also State v. Johnson*, 24 Ohio St. 3d 87, 89, 494 N.E.2d 1061, 1063 (1986). When defense counsel fails to consult an independent expert in a case that is likely to be won or lost on expert testimony, his assistance may be deemed so ineffective as to deprive the defendant of a fair trial within the meaning of the sixth amendment. *See Harrington v Richter*, 562 U.S. 86, 106, 131 S.Ct. 770 (2011) ("Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence[.]"); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007). In *Richey*, the Sixth Circuit accepted an ineffective-assistance-of-trial-counsel claim based on statements from experts consulted after trial, which averred that the State's arson "expert" had "used flawed scientific methods not accepted in the fire-investigation community." *Richey* at 348.

Ms. Ayers' trial counsel did not simply fail to produce expert testimony as evidence at trial—itself a potential basis for an ineffective assistance of counsel claim. *See Harrington* at 106.

9

Rather, he subjected Ms. Ayers to "that most egregious type" of ineffective assistance by "altogether fail[ing] to hire an expert," even for a consultation. *Richey* at 362. When the State relies upon scientific testimony, such a failure places defense counsel below any conceivable standard of professional conduct. The deficiency in Ms. Ayers' case is especially inexcusable, as a defense attorney in Ohio may consult with an expert privately at state expense. *See State v. Kopchak,* Fifth Dist. Muskingum No. CT2017-0036, 2018-Ohio-1136, ¶ 21.

In upholding the dismissal of Ms. Ayers's Petition for Postconviction Relief, the Fifth District held that Ms. Ayers did not satisfy the jurisdictional requirement that no reasonable factfinder would have convicted her but-for the ineffectiveness of her trial counsel.  Specifically, the court held that Ms. Ayers had not met this threshold with regards to whether her trial counsel's failures "undermine[d] confidence in the verdict." *Ayers*, 2022-Ohio-1910, at ¶ 75.

This holding fails to appreciate the role of experts in Ms. Ayers's trial and in criminal cases more broadly.  At Ms. Ayer's original trial, the State's arson expert played a critical role.  This expert testified—unchallenged—that the fire could not have been accidentally set by Ms. Ayers's son, as she claimed, because the fire had multiple ignition points.  In fact, this testimony was unscientific, unsupported, and false.  *Affidavit of John Lentini*, attached as Exhibit O to *Petition for Postconviction Relief*, at ¶ 9, 32. Ms. Ayers's trial attorneys, however, not only failed to consult an independent expert who would have undermined the State's theory, but they conceded the "scientific accuracy" of the erroneous arson conclusions.  They also failed to recognize that the State had not disclosed its "two points of origin" theory prior to trial, and they failed to object to this undisclosed expert testimony pursuant to Crim.R.16(K). *See State v. Batin*, Fifth Dist. Stark No. 2004CA0128, 2005-Ohio-36, ¶ 59-65.  But-for this ineffectiveness, no reasonable jury would have convicted Ms. Ayers.

When trial counsel fails to take such elementary steps to combat the State's most compelling evidence, his actions so "undermine[] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. The Fifth District's assessment of the impact of this new evidence was fatally flawed; but for defense counsel's failure to consult an expert and failure to object to the State's expert, no reasonable factfinder would have accepted the fallacious and unscientific testimony of "expert" Investigator Winters. Mr. Lentini's affidavit clearly and convincingly satisfies the Constitutional standard for materiality under *Strickland*, the "strong probability" standard of *Petro*, 148 Ohio St. 505, 76 N.E.2d 370, syllabus (interpreting Crim.R. 33(B)), and the "no reasonable factfinder" standard of R.C. 2953.23(A)(1)(b).

These deficiencies in representation not only undermined the integrity of the verdict at Ms. Ayers' trial, but also unavoidably prevented her from demonstrating that prejudice within the statutory period of R.C. 2953.23(A)(1)(a) and Crim.R. 33(B). Ms. Ayers could not have been expected to find and consult with arson experts like Mr. Lentini from her prison cell. She could not have been expected to perform an independent, post-trial arson investigation within the first 365 days of being wrongfully declared guilty. In this way, she was unavoidably prevented from discovering the evidence upon which she must now rely. While Mr. Lentini may have been able to provide his affidavit had he been consulted at the time of trial, both Crim.R. 33(B) and R.C. 2953.23(A)(1)(a) ask whether the petitioner/defendant was unavoidably prevented from finding the evidence upon which she must rely—not whether affiant was. Just because Mr. Lentini's testimony was available, does not mean it was available to Ms. Ayers from her prison cell.

<u>**PROPOSITION OF LAW NO. IV**</u>

<u>**WHEN NEWLY DISCOVERED EVIDENCE OUTSIDE OF THE TRIAL RECORD DEMONSTRATES CONSTITUTIONAL DEFECTS DURING THE TRIAL PROCESS, RES JUDICATA WILL NOT BAR THOSE CONSTITUTIONAL CLAIMS IN A COLLATERAL POST-CONVICTION PROCEEDING OR A NEW TRIAL MOTION UNDER CRIM.R. 33.**</u>

When a petitioner submits evidence *dehors* the trial record with her post-conviction petition, that evidence will generally render the motion "sufficient * * * to avoid dismissal on the basis of *res judicata*." *State v. Cole*, 2 Ohio St.3d 112, 114, 443 N.E.2d 169 (1982); *see also, e.g., State v. Weaver*, 114 N.E.3d 766, 2018-Ohio-2509, ¶ 21 (5th Dist.); *State v. Selmon,* Fifth Dist. Richland No. 15CA83, 2016-Ohio-723, ¶ 43. In its opinion below, the Fifth District relied upon the exception to this general rule, also voiced in *Cole*, which holds that res judicata will overcome this presumption <u>only</u> when a petitioner's ineffective-assistance-of-trial-counsel claim could have been settled without recourse to evidence outside the record. *Ayers*, 2022-Ohio-1910, at ¶¶ 50, 81, 86, 91 (citing *Cole* at syllabus).

But the *Cole* court only applied this exception after finding the petitioner's new evidence to be "so contrived * * * as to constitute no credible evidence" at all, and where "[t]he record refute[d] the gravamen of each of [the petitioner's] contentions." *Cole* at 114. Here, the Fifth District itself described Mr. Lentini, whose affidavit undergirded Ms. Ayers' claims, as "a renowned forensic arson expert." *Ayers* at ¶ 63. Mr. Lentini's affidavit laid bare the unscientific, substandard analysis of the State's central expert. *Id.* And the Fifth District cited no evidence in the record to vindicate trial counsel's competency or to "refute the gravamen" of Ms. Ayers' claims of ineffective assistance. Therefore, the lower courts erred in ruling that Ms. Ayers' claims were barred under the doctrine of res judicata. This Court should clarify and reaffirm *Cole*'s presumption that post-conviction constitutional claims, when supported by evidence outside the record, are not res judicata, unless the record itself is clearly sufficient to decide them.

## PROPOSITION OF LAW NO. V

**STATE MISCONDUCT IN ADDUCING UNREPORTED EXPERT CONCLUSIONS AT TRIAL, ALONG WITH RELIANCE ON UNSCIENTIFIC AND UNSUPPORTED EXPERT TESTIMONY TO CONVICT A DEFENDANT WITH A COLORABLE CLAIM OF ACTUAL INNOCENCE, ROBS THAT DEFENDANT OF HER RIGHT TO COMPULSORY PROCESS AND DUE PROCESS OF LAW UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, AND SUBJECTS HER TO CRUEL AND UNUSUAL PUNISHMENT WITHIN THE MEANING OF THE EIGTH AMENDMENT.**

At trial, the State adduced from its expert witness that the fire had two points of origin, and therefore could not have been accidentally set by her son, as claimed by the defense. But defense counsel had never seen and could not have prepared for this surprising evidentiary revelation. The State's willful violation of Ohio Crim.R. 16(K) constitutes misconduct on the part of the prosecutors, resulting in great prejudice to Ms. Ayers. Had this powerful and false evidence been excluded, there would have been much more than a "reasonable probability" of a different verdict. See, *United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976). Such prejudice robbed Ms. Ayers of the Due Process of Law guaranteed in the fourteenth amendment.

Further, this misconduct stripped Ms. Ayers of her sixth amendment right to compel witnesses to testify in her defense and contradict the State's unscientific expert testimony. *Cf. United States v. Foster*, 128 F.3d 949, 953 (6th Cir.1997); *Webb v. Texas*, 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). By springing such allegedly scientific conclusions on Ms. Ayers at trial, the State robbed Ms. Ayers of her chance to research those conclusions and present witnesses in her defense—an opportunity guaranteed by the sixth amendment.

Because of the State's successful effort to blindside Ms. Ayers' defense counsel with these conclusions, the jury heard and based its verdict on unscientific and misleading evidence. According to the Supreme Court of the United States, a conviction based on "unreliable and prejudicial" evidence that is "illusory or deceptive" in nature deprives her to Due Process. *Stein v. New York*, 346 U.S. 156, 192, 73 S.Ct. 1077, 1097, 97 L.Ed. 1522 (1953) (overruled on other

grounds); *Barefoot v. Estelle*, 463 U.S. 880, 925, 103 S. Ct. 3383, 3411, 77 L. Ed. 2d 1090 (1983)

(J. Marshall, dissenting); *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

As discussed above in Proposition of Law II, the testimony of Inspector Winters was

fundamentally and demonstrably flawed. It deprived the jury of the opportunity to reach a just and

informed verdict, and consequently stripped Ms. Ayers of her right to Due Process of Law under

the fourteenth amendment. As a result, Ms. Ayers, a defendant with a colorable claim of actual

innocence, was wrongfully branded as guilty in the eyes of the law.

## CONCLUSION

For the reasons discussed above, this case involves a felony criminal matter, matters of

public and great general interest, and substantial constitutional questions. The appellant requests

that this court accept jurisdiction in this case so that the important issues presented will be reviewed

on the merits.

Respectfully Submitted,

/s/ Brian Howe
Brian Howe (0086517)
Attorney for Appellant Kayla Ayers
THE OHIO INNOCENCE PROJECT
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040
(513) 556-0752
Brian.Howe@uc.edu

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon the Stark Co. Prosecuting Atty's
Office, 110 Central Plaza, S# 510, Canton, Ohio 44702 via electronic mail to
vldesantis@starkcountyohio.gov on this 19th day of July, 2022.

/s/ Brian Howe
Attorney for Appellant

IN THE SUPREME COURT OF OHIO
COLUMBUS, OHIO

STATE OF OHIO,                    )        CASE NO. 2022-0886
                                  )
          Plaintiff-Appellee,     )
                                  )
  -vs-                            )
                                  )
KAYLA AYERS,                      )
                                  )
          Defendant-Appellant.    )

JURISDICTIONAL APPEAL FROM
THE OHIO COURT OF APPEALS FOR STARK COUNTY
FIFTH APPELLATE DISTRICT
CASE NO. 2021CA00134

---

MEMORANDUM IN RESPONSE
OF PLAINTIFF-APPELLEE, THE STATE OF OHIO

---

KYLE L. STONE (0095140),
PROSECUTING ATTORNEY,
STARK COUNTY, OHIO

By:    Vicki L. DeSantis
       Sup. Ct. Reg. No. 0075716
       Assistant Prosecuting Attorney
       Appellate Division
       110 Central Plaza South Suite 510
       Canton, Ohio 44702
       (330) 451-7897
       (330) 451-7965 (facsimile)
       vldesantis@starkcountyohio.gov

       Counsel for Plaintiff-Appellee

Brian C. Howe
Sup. Ct. Reg. No. 0086517
The Ohio Innocence Project
Rosenthal Institute for Justice
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, Ohio 45221
(513) 556-0752
Brian.Howe@uc.edu

Counsel for Defendant-Appellant

**EXHIBIT 54**

# TABLE OF CONTENTS

Page

WHY THE CASE SHOULD NOT BE ACCEPTED FOR REVIEW ..........................................1

STATEMENT OF THE CASE AND FACTS ..............................................................................3

ARGUMENT
**PROPOSITION OF LAW NO 1**
**A COURT CANNOT REJECT A CRIM.R. 33 MOTION FOR NEW TRIAL THAT HAS NOT BEEN FILED**..................................................................................................................5

**PROPOSITION OF LAW NO II**
**"THE "NO REASONABLE FACT-FINDER" STANDARD OF R.C. 2953.23 DOES NOT APPLY TO NEW TRIAL MOTIONS UNDER CRIM.R. 33**.................................................10

**PROPOSITION OF LAW NO III**
**WHERE TRIAL COUNSEL FAILS TO CONSULT AN INDEPENDENT EXPERT AND FAILS TO OBJECT TO THE STATE'S INADMISSIBLE AND PREJUDICIAL EXPERT TESTIMONY, THAT COUNSEL'S INEFFECTIVENESS UNDERMINES ALL CONFIDENCE IN THE JURY'S VERDICT AND DEPRIVES THE DEFENDANT OF HER SIXTH AMENDMENT RIGHT TO A FAIR TRIAL**...................................................11

**PROPOSITION OF LAW NO IV**
**WHEN NEWLY DISCOVERED EVIDENCE OUTSIDE OF THE TRIAL RECORD DEMONSTRATES CONSTITUTIONAL DEFECTS DURING THE TRIAL PROCESS, RES JUDICATA WILL NOT BAR THOSE CONSTITUTIONAL CLAIMS IN A COLLATERAL POST-CONVICTION PROCEEDING OR A NEW TRIAL MOTION UNDER CRIM.R. 33** ...................................................................................................13

**PROPOSITION OF LAW NO V**
**STATE MISCONDUCT IN ADDUCING UNREPORTED EXPERT CONCLUSIONS AT TRIAL, ALONG WITH RELIANCE ON UNSCIENTIFIC AND UNSUPPORTED EXPERT TESTIMONY TO CONVICTED [SIC] A DEFENDANT WITH A COLORABLE CLAIM OF ACTUAL INNOCENCE, ROBS THAT DEFENDANT OF HER RIGHT TO COMPULSORY PROCESS AND DUE PROCESS OF LAW UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, AND SUBJECTS HER TO CRUEL AND UNUSUAL PUNSISHMENT WITHIN THE MEANING OF TH EIGHTH AMENDMENT** ................................................................................................................14

CONCLUSION.............................................................................................................................15

CERTIFICATE OF SERVICE ....................................................................................................16

## TABLE OF AUTHORITIES

## CASES

*BND Rentals, Inc. v. Dayton Power & Light Co.*, 2nd Dist. No. 28543, 2020-Ohio-4484, 158 N.E.3d 993 ............................................................................................................................ 10

*Gillam v. Johnson*, 2d Dist. Mont. No. 18379, 2000 Ohio App. LEXIS 4855 (Oct. 20, 2000) ... 10

*Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 .......................................... 11

*State ex rel. Sommers v. Perkins Local Schools Bd. of Edn.*, 2017-Ohio-7991, 98 N.E.3d 1117 (6th Dist.) ................................................................................................................................ 10, 15

*State v. Ayers*, 5th Dist. Stark No. 2013CA00034, 2013-Ohio-5402 ...................................... 4, 11

*State v. Ayers*, 5th Dist. Stark No. 2021CA00134, 2022-Ohio-1910 .............................. 1-2, 5,7,14

*State v. Barnes*, 5th Dist. Muskingum No. CT2017-0092, 2018-Ohio-1585 ................................ 7

*State v. Bethel*, 10th Dist. Franklin No. 19AP-324, 2020-Ohio-1343 ............................................ 9

*State v. Bethel*, 2022-Ohio-783, 166 Ohio St.3d 1510, 2022-Ohio-1687, 187 N.E.3d 564..1-2, 5-6

*State v. Davis*, 5th Dist. Licking No. 09-CA-0019, 2012-Ohio-32 ............................................. 13

*State v. Frase*, 5th Dist. Licking No. 99CA32, 1999 WL 668717........................................... 8, 13

*State v. Golden*, 10th Dist. No. 09AP-1004, 2010-Ohio-4438 ..................................................... 8

*State v. Howard*, 10th Dist. Franklin No. 15AP-161, 2016-Ohio-504, 59 N.E.3d 685 ............. 9-10

*State v. Lanier*, 2nd Dist. No. 2009 CA 84, 2010-Ohio-2921 ....................................................... 6

*State v. Marshall*, 5th Dist. Richland No. 00CA26, 2000 WL 1289402 ........................................ 8

*State v. McNeal*, ---Ohio St.3d---, 2022-Ohio-2703, ---- N.E.3d --- (June 6, 2022)........................ 1

*State v. Morgan*, 3d Dist. Shelby No. 17-05-26, 2006-Ohio-145..................................................... 6

*State v. Parker*, 178 Ohio App.3d 574, 2008-Ohio-5178, 899 N.E.2d 183 .................................... 6

*State v. Petrone,* 5th Dist. Stark No. 2013 CA 00213, 2014-Ohio-3395...................................... 12

*State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995)................................................... 12

*State v. Roberts*, 2022-Ohio-844................................................................................................. 12

*State v. Smith*, 5th Dist. Delaware No. 18 CAA 03 0020, 2019-Ohio-1339.................................. 3

*State v. Snyder*, 5th Dist. Licking No. 10CA0010, 2010-Ohio-3588 .......................................... 12

*State v. Somers*, 5th Dist. Muskingum No. CT2019-0020, 2019-Ohio-3157.............................. 15

*State v. Waddy*, 10th Dist. Franklin No. 15AP-397, 2016-Ohio-4911, 68 N.E.3d 381 ................. 7

*State v. Walden,* 19 Ohio App.3d 141, 483 N.E.2d 859 (1984)...................................................... 6

*State v. Williams*, 74 Ohio App.3d 686, 695, 600 N.E.2d 298 (1991).......................................... 13

## STATUTES AND RULES

Crim.R. 33 ..................................................................................................................... 4, 12

Crim.R. 33(B) .....................................................................................................................4

R.C. 2953.21 ......................................................................................................................4

R.C. 2953.23 ..................................................................................................................... 4

R.C. 2953.23(A) ................................................................................................................ 5

R.C. 2953.23(A)(1) ........................................................................................................... 6

S.Ct.Prac.R. 7.02(A), (C)(2) ............................................................................................ 3

## WHY THIS CASE SHOULD NOT BE ACCEPTED FOR REVIEW

The Court of Appeals, Fifth Judicial District, properly decided *State v. Ayers*, 5th Dist. Stark No. 2021CA00134, 2022-Ohio-1910 (*Ayers II*)[1], affirming the conviction of Defendant-Appellant, Kayla Ayers. She told people she would set her house on fire and then set her house on fire, while her three-year-old son was with her. Plaintiff-Appellee, the State of Ohio, submits that the trial court's decision is consistent with established law and that the appellate court properly affirmed the decision below. Ayers has not presented any legitimate issue for this Court to review. This case involves a felony conviction, but Ayers's five propositions of law fail to identify a substantial constitutional question or a question of great private or public interest.

Ayers incorrectly claims the appellate court did not follow *State v. Bethel*, 2022-Ohio-783, *reconsideration denied*, 166 Ohio St.3d 1510, 2022-Ohio-1687, 187 N.E.3d 564, in deciding this case. To the contrary, not only did the appellate court follow *Bethel*, but it cited to it on numerous occasions. See *Ayers II* at ¶¶ 57, 113, 115, 122. Ayers also suggests this Court needs to reclarify *Bethel*, however, this Court recently did this in *State v. McNeal*, ---Ohio St.3d---, 2022-Ohio-2703, --- N.E.3d --- (June 6, 2022).

The State submits that Ayers undercuts her own argument by arguing the facts of the case, which is the very thing that she blames the appellate court for doing. Yet, Ayers continues to fail to show that she was unavoidably prevented from discovering this *alleged* new evidence, and instead misconstrues the appellate court's analysis (of findings of fact and conclusions of law of her petition for post-conviction relief) as analyzing her motion for new trial. After having thoroughly determined that "the trial court correctly concluded that it lacked jurisdiction to

---

[1] *State v. Ayers*, 5th Dist. Stark No. 2013CA00034, 2013-Ohio-5402 (*Ayers I*).

consider Ayers's untimely petition for post-conviction relief," *Ayers II* at ¶ 109, the court then moved to Ayers's *motion for leave* and correctly stated, "Ayers first had to establish that she was 'unavoidably prevented from discovery of the facts' on which she relies". *Ayers II* at ¶ 120. Nevertheless, the appellate court found that to hold a hearing on a motion for leave to file a motion for a new trial, would be an exercise in futility. The court stated —

> We have concluded *in our discussion of Ayer's petition for post-conviction relief,* Assignment of Error 2, supra, that, in light of the evidence produced at Ayers's jury trial that did not depend upon expert testimony, and the entire record in this case, Ayers has not shown a constitutional error occurred during her jury trial and that no reasonable fact-finder would have found her guilty but for the constitutional error at trial.

*Ayers II* at ¶ 121. The court then found "the trial court did not abuse its discretion in overruling Ayers's motion for leave to file a motion for a new trial without holding an evidentiary hearing on the motion". *Ayers II* at ¶ 122.

Although the appellate court relied on *Bethel* for much of its decision, the within case is much different from *Bethel*. Here unlike *Bethel,* the trial court properly ruled on the motion for leave, not the motion for new trial. Next, the trial court found that Ayers was *not unavoidably prevented* from discovering the alleged 'new evidence' within the rule. Finally, this case did not involve a *Brady* violation. The evidence Ayers calls "new evidence" was merely "newly created evidence" based upon the same evidence introduced at trial. Moreover, attempts to impeach an expert is not new evidence. Ayers had ample opportunity to obtain forensic evidence to support her claim of innocence, but waited over seven years to do so.

This is not a case in which Ayers truly alleges she has discovered new, potentially exculpatory evidence, rather it is a request to move for a new trial wherein Ayers would present additional evidence of her own in an attempt to rebut evidence the State presented during the trial.

2

Instead, she obtained the opinion of another arson expert who is basing his opinions on the same evidence introduced at trial. "Yet, with reasonable, diligence before or during h[er] trial, [s]he could have discovered and could have presented the evidence that [s]he now labels as 'new.'" *State v. Smith*, 5th Dist. Delaware No. 18 CAA 03 0020, 2019-Ohio-1339, ¶ 19. "That kind of evidence cannot rightly be described as evidence that [s]he was 'unavoidably prevented' from discovering before now." *Id.* at ¶ 19-21 (concurring "with the trial court's well-reasoned analysis" in denying leave to file a motion for new trial).

In support of a jurisdictional appeal, the Rules of Practice of the Supreme Court of Ohio require that an appellant file a memorandum, inter alia, containing a "thorough explanation of why a substantial constitutional question is involved, why the case is of public or great general interest, or, in a felony case, why leave to appeal should be granted[.]" S.Ct.Prac.R. 7.02(A), (C)(2). Ayers had the burden, but failed to show she was unavoidably prevented from timely filing her motions. The Supreme Court of Ohio should not accept this case for review because it does not involve a substantial constitutional question or a question of great private or public interest.

## STATEMENT OF THE CASE AND FACTS

Evidence at trial demonstrated that Ayers told two people—her father, Jeff Ayers, and Jason Pandrea that she would "burn the motherfucker [house] down," if her father left the house. Tr., Vol I, 175; Tr. Vol. II, 310, 339, 341. Jeff Ayers told his daughter he was moving out. Tr., Vol II, 309-310. Jeff Ayers moves out October 3, 2012, in the early morning, and the house is set on fire that evening. Tr., Vol. II, 311-312. Ayers set the fire, but tries to blame her three-year-old son. No one but Ayers, and her three-year-old son, were home at the time of the fire. A neighbor saw the boyfriend, and Ayers's other two children leave the house earlier. Tr., Vol. II, 357-358. The

3

neighbor then saw Ayers running towards her house with her son yelling Bubba started the fire. Tr., Vol. II, 359. The defense did not put on any witnesses at trial.

On January 30, 2013, the jury found Ayers guilty on one count of aggravated arson and one count of child endangerment. Docket. The trial court sentenced Ayers to seven years' incarceration and Ayers has since served that sentence. Ayers filed a direct appeal of her conviction in *State v. Ayers*, 5th Dist. Stark No. 2013CA00034, 2013-Ohio-5402 (Ayers I)[2] that was affirmed by the Fifth District on December 9, 2013. On June 27, 2013, Ayers filed a motion for appointment of counsel to represent her on a petition for postconviction relief "*in obtaining additional evidence that was not presented on my behalf at the time of my trial*". This was denied. Docket.

On April 23, 2020, Ayers moved the trial court for leave to file a motion for new trial, pursuant to Crim.R. 33(B), which requires a finding that she was "unavoidably prevented" from discovering evidence to support a motion for a new trial within 120 days from her conviction. Her motion for leave to file a motion for a new trial came 2,627 days after her conviction, which is 2,507 days beyond the 120-day period Crim.R. 33 provides.

On that same day, Ayers filed a petition for post-conviction relief. Because Ayers's petition for PCR was just as untimely, under R.C. 2953.21, she had to show under R.C. 2953.23 that, (1) she was unavoidably prevented from discovery of the facts upon which her claim relies and (2) by clear and convincing evidence, that no reasonable fact-finder would have found her guilty but for

---

[2] Ayers appealed her conviction and sentence in February of 2013 with two assignments of error: "The appellant's convictions for one count of aggravated arson in violation of R.C. 2909.02 and one count of endangering children in violation of R.C. 2919.22 were against the manifest weight and sufficiency of the evidence" and "[t]he appellant was denied effective assistance of counsel due to trial counsel's failure to review the appropriate discovery materials in preparation for trial." *Ayers I* at ¶¶ 14, 15. Specifically, with regards to assignment of error number two, Ayers argued that her trial counsel did not effectively challenge/cross-examine the State's arson expert, Mr. Winters, regarding his reports. *Id.* at ¶ 29.

4

the constitutional error at trial. *Bethel* at ¶ 20.

The trial court issued an entry on November 2, 2021, dismissing the petition on jurisdictional grounds, as untimely and not falling within any exceptions of R.C. 2953.23(A). Secondarily, the court found her claims in the petition were barred by *res judicata*. Regarding Ayers's motion for leave to file a motion for new trial, the trial court found that she failed to make the requisite showing that she was unavoidably prevented from discovering the evidence she sought to present in a motion for new trial, and denied same.

## ARGUMENT

## PROPOSITION OF LAW NO. I

### A COURT CANNOT REJECT A CRIM.R. 33 MOTION FOR NEW TRIAL THAT HAS NOT BEEN FILED.

Ayers claims the appellate court denied her motion for a new trial instead of first ruling on her motion for leave. However, Ayers misreads the court's decision. The court actually affirmed the trial court's ruling denying Ayers's motion for leave to file a motion for new trial. In *Ayers II*, the court stated the following standard of review:

> Crim.R. 33(B) provides that if a defendant fails to file a motion for a new trial within 120 days of the jury's verdict, he or she must seek leave from the trial court to file a delayed motion. Crim.R. 33(B) does not give a deadline by which a defendant must seek leave to file a motion for a new trial based on the discovery of new evidence. *State v. Bethel*, —— Ohio St.3d ——, 2022-Ohio-783, —— N.E.3d – ——, ¶53, ¶55.

> {¶114} To obtain leave, the defendant must show by clear and convincing proof that he or she was unavoidably prevented from discovering the evidence within the 120 days. *State v. Lordi*, 149 Ohio App.3d 627, 2002-Ohio-5517, 778 N.E.2d 605 (7th Dist.), ¶ 26–27. Clear and convincing proof is that which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985); *Lordi*, supra, at ¶ 26.

> A party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial

5

and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence. *State v. Bethel*, 2022-Ohio-783, ¶21.

*Ayers II* at ¶113-¶115.

To seek a new trial more than 120 days after the verdict based on new evidence, "[t]he 'unavoidably prevented' requirement in Crim.R. 33(B) mirrors the 'unavoidably prevented' requirement in R.C. 2953.23(A)(1)." *Bethel,* 2022-Ohio-783, ¶ 59; *State v. Parker*, 178 Ohio App.3d 574, 2008-Ohio-5178, ¶ 16, 899 N.E.2d 183, quoting *State v. Morgan*, 3d Dist. Shelby No. 17-05-26, 2006-Ohio-145, ¶ 7. "'[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence.'" *Parker,* supra, quoting *State v. Walden,* 19 Ohio App.3d 141, 483 N.E.2d 859 (1984) . A trial court may not "consider the merits of the motion for a new trial until it makes a finding of unavoidable delay." *State v. Lanier*, 2nd Dist. No. 2009 CA 84, 2010-Ohio-2921, ¶17. In other words, until a trial court has granted a defendant leave to file a delayed motion for new trial, the motion for a new trial is not properly before the court. *Bethel* at ¶ 41.

Here, the trial court properly found that Ayers's motion for leave was not only untimely, but that "[Ayers] cannot show by clear and convincing evidence that she was prevented from filing a motion for new trial or discovering the evidence she now, eight years later, requests to present". JE. 11/2/21. No exception applied to allow her to file her motion for a new trial. Ayers filed a direct appeal, and although she did argue ineffective assistance of counsel, she did not raise the issues of ineffective assistance of counsel in not using or consulting with an expert, nor that the State's expert was unqualified to give opinions on causes and origins of fire. In fact, Ayers never objected at trial

6

to the qualifications of the State's expert, which rendered her argument a plain error review. The mere possibility of grounds for impeachment of an expert by another expert is simply a "battle of experts". *Ayers II* at ¶ 75. During the appellate court's discussion of Ayers's petition for post-conviction relief, the court found that nothing in Ayers's expert report would have changed the outcome of the case—specifically that Ayers's expert's report, from Mr. Lentini, did not exonerate Ayers or reduce her culpability, and there was more than sufficient evidence produced at trial, that did not depend upon expert testimony, for a jury to find Ayers guilty. *Id.* at ¶¶ 67, 76-77.

In her motion for leave, Ayers downplayed the significance of her burden in filing a motion beyond the 120-day timeframe. *See State v. Barnes*, 5th Dist. Muskingum No. CT2017-0092, 2018-Ohio-1585, ¶ 26, citing *State v. Waddy*, 10th Dist. Franklin No. 15AP-397, 2016-Ohio-4911, 68 N.E.3d 381, ¶ 13. Rather than demonstrating unavoidable delay in discovering what she claims as new evidence, Ayers pulled the merits of her would-be motion for a new trial in as a basis for granting leave to file such a motion.

Although Ayers failed to raise this issue in her direct appeal or in a timely postconviction proceeding, Ayers now attempts to justify her failure to exercise reasonable diligence on the alleged ineffective assistance of her trial counsel. Not only did Ayers fail to demonstrate that alleged error in the record, but she essentially asserts that she is excused from demonstrating unavoidable delay by contending trial counsel was ineffective. Even if this were an appropriate juncture at which to raise an ineffective assistance of counsel argument, which it is not, Ayers fails to set forth any legitimate basis for claiming unavoidable delay in the 120 days following the conviction or the more than seven intervening years until she filed the present motion. Neither Ayers's motion for leave nor the affidavits appended to her motion provided "clear and convincing" proof that she was "unavoidably prevented" from discovering this alleged new evidence within the 120-day period.

7

Ayers's own affidavit failed to demonstrate the exercise of reasonable diligence in the discovery of any facts unavailable within the timeframe for filing a motion for new trial based on new evidence. *See* Exhibit K to motion for leave. She attributes her delay to her inability—while incarcerated—to pay for an arson expert or get a public defender to represent her for postconviction proceedings. She also cites to her limited education and lack of knowledge regarding arson investigations.

Ayers has never presented sufficient evidence to show, by clear and convincing proof, how she was unavoidably prevented from obtaining an expert within the 120 days for a new trial (or 180 days to file a PCR[3] petition), let alone for over seven years. She first needed to overcome this hurdle. It is insufficient for Ayers to claim that "she was unavoidably prevented from discovering the alleged newly discovered evidence in a timely manner due to her incarceration [or] her lack of knowledge as to the law * * *." *State v. Frase*, 5th Dist. Licking No. 99CA32, 1999 WL 668717 at *2 (Holding "the fact of her incarceration, by itself, does not equate to clear and convincing proof that she was unavoidably prevented from discovering the evidence within the time parameters set forth in Crim.R. 33(B)."); see also *State v. Golden*, 10th Dist. No. 09AP-1004, 2010-Ohio-4438, ¶ 16 (Finding that appellant's incarceration "clearly did not impede his ability to discover" a statement made to police when appellant "admits that he obtained the summary of [the] police interview while incarcerated in state prison."). Further, a defendant's alleged lack of education, knowledge, and access to postconviction counsel does not excuse delay in obtaining evidence. *State v. Marshall*, 5th Dist. Richland No. 00CA26, 2000 WL 1289402, *2 (rejecting defendant's contention "that he was unavoidably prevented from discovering [] evidence since he

---

[3] Effective: July 6, 2010 to March 22, 2015.

was 'functionally illiterate[,] * * * unable to understand the law, and [] the assistance of counsel due to his incarceration[.]'").

Ayers never explained what investigatory steps she took, to find new evidence, and to this day, she still cannot explain how this evidence is "new" rather than "newly created" and why her claims would not be barred by *res judicata*. Ayers had the opportunity to argue impeachment of the State's expert and failure to obtain her own expert on direct appeal, albeit on a plain error review. Because these issues were known at the time of trial, and confirmed by her own filing of June, 2013, requesting counsel to file a PCR, they cannot be considered new evidence. *State v. Bethel*, 10th Dist. Franklin No. 19AP-324, 2020-Ohio-1343, ¶¶ 19, 20, appeal allowed, 159 Ohio St.3d 1487, 2020-Ohio-4232, 151 N.E.3d 633, aff'd by, 2022-Ohio-783 (conclusory allegations are insufficient, as is evidence that merely impeaches or contradicts the former evidence.) "The defendant cannot claim evidence was undiscoverable simply because no one made efforts to obtain the evidence sooner." *Id.*

Ayers argues there is a split among the district courts of appeal as to how to apply the *Bethel* decision. To the contrary, the courts that have cited to *Bethel* have been consistent, even if the facts varied. Ayers contends the trial court should apply the reasoning of the Tenth District Court of Appeals in *State v. Howard* to hold that reasonable diligence did not require Ayers, as a criminal defendant, to independently discover evidence that should have been investigated and uncovered by competent trial counsel. See *State v. Howard*, 10th Dist. Franklin No. 15AP-161, 2016-Ohio-504, 59 N.E.3d 685. However, the circumstances of *Howard* are incongruent to the facts and circumstances of the present case. In *Howard*, the court found the trial "court did not determine if Howard was unavoidably prevented from timely discovering the facts upon which he

now relies or timely filing his new-trial motion." Unlike here, the *Howard* court's denial of the motion for leave was not supported by competent, credible evidence. *Id.* at ¶24.

The present case is distinguishable upon several grounds, chief among them is that the trial court did find that Ayers was *not* unavoidably prevented from filing her motion for leave. Thus, on the record before us, the appellate court did not decide the motion for new trial, but rather properly affirmed the trial court's decision denying her motion for leave. Although the appellate court did not elaborate on the facts of the motion for leave, it did cite to the proper law. "The fundamental questions in an appeal are, one, whether the appealed decision itself is erroneous and, two, whether that error is prejudicial. A decision that achieves the right result must be affirmed, even if the wrong reasoning is used to justify the decision, because an error in reasoning is not prejudicial." *BND Rentals, Inc. v. Dayton Power & Light Co.*, 2nd Dist. No. 28543, 2020-Ohio-4484, 158 N.E.3d 993, ¶ 65 (noting the established principle that appellate courts may affirm based on reasoning that differs from that of the trial court), citing *State ex rel. Sommers v. Perkins Local Schools Bd. of Edn.*, 2017-Ohio-7991, 98 N.E.3d 1117, ¶ 26 (6th Dist.). Further, the trial court's decision should be affirmed if it is supported by competent, credible evidence. *Gillam v. Johnson*, 2d Dist. Mont. No. 18379, 2000 Ohio App. LEXIS 4855 (Oct. 20, 2000), *34. In the present case, there was competent, credible evidence found by the trial court to deny Ayers's motion for leave.

Ultimately, Ayers's motion for leave to file a motion for new trial was not timely filed and the trial court correctly denied same. The court of appeals appropriately affirmed that decision. Ayers fails to show any prejudice. The State asks this Court to reject Proposition of Law No. I.

## PROPOSITION OF LAW NO. II

**THE "NO REASONABLE FACT-FINDER" STANDARD OF R.C. 2953.23 DOES NOT APPLY TO NEW TRIAL MOTIONS UNDER CRIM.R. 33**

The appellate court *did not* analyze the motion for new trial, and did not use this standard in deciding the motion for leave to file a motion for new trial. Again, Ayers misinterprets the court's opinion. The court, while discussing Ayers's Assignment of Error No. III, as to whether the trial court should have held an evidentiary hearing on her motion for leave, stated,

> Assuming arguendo that Ayers would be entitled to a hearing on her motion for leave to file a motion for a new trial, the hearing would be an exercise in futility. We have concluded in our discussion of Ayers's petition for post-conviction relief, Assignment of Error 2, supra, that, in light of the evidence produced at Ayers's jury trial that did not depend upon expert testimony, and the entire record in this case, Ayers has not shown a constitutional error occurred during her jury trial and that no reasonable fact-finder would have found her guilty but for the constitutional error at trial. R.C. 2953.23(A)(1)(b).

> Because Ayers's failed to meet her burden under R.C. 2953.23(A)(1)(b), Ayers's motion for a new trial would be without merit, therefore rendering moot a hearing on her motion for leave to file a motion for a new trial. *State v. Bethel*, —— Ohio St.3d ——, 2022-Ohio-783, —— N.E.3d ——, ¶59 - ¶60. Therefore, the trial court did not abuse its discretion in overruling Ayers's motion for leave to file a motion for a new trial without holding an evidentiary hearing on the motion.

*Ayers II* at ¶¶ 121-122.

The State asks this Court to reject Proposition of Law No. II.

## PROPOSITION OF LAW NO. III

**WHERE TRIAL COUNSEL FAILS TO CONSULT AN INDEPENDENT EXPERT AND FAILS TO OBJECT TO THE STATE'S INADMISSIBLE AND PREJUDICIAL EXPERT TESTIMONY, THAT COUNSEL'S INEFFECTIVENESS UNDERMINES ALL CONFIDENCE IN THE JURY'S VERDICT AND DEPRIVES THE DEFENDANT OF HER SIXTH AMENDMENT RIGHT TO A FAIR TRIAL.**

Ayers claims her trial counsel was ineffective by not hiring, consulting or using an arson expert at trial, or objecting to the State's expert qualifications, yet Ayers failed to raise either issue on direct appeal in *Ayers I.* Ayers cites to *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624, but *Harrington* does not stand for the proposition that Ayers suggests. Harrington stood for the proposition that the "state court's determination that counsel was not deficient in not

11

consulting blood evidence experts was not an unreasonable application of *Strickland*[.]" *Id.* at paragraph two of the syllabus. Instead, Ayers cites to the dissenting opinion.

Nevertheless, the question here is not whether the attorney's actions fell outside the wide range of reasonable professional assistance, but whether Ayers was able to show that she was unavoidably prevented from timely filing her motion for leave. Ayers admits the trial court did not find unavoidable delay. Ayers's memorandum at 1.

Ayers has not presented sufficient evidence to show that she could not, with reasonable diligence, have obtained an expert opinion, which is based on facts and information that was available during trial and in the 120-day period following her conviction. *See State v. Snyder*, 5th Dist. Licking No. 10CA0010, 2010-Ohio-3588, ¶ 33 (Rejecting defendant's claim of newly discovered evidence (a handwriting expert) when it was "clear from the motion itself that this is not newly discovered evidence, but new evidence not brought up at trial."). Ayers "failed to demonstrate by clear and convincing evidence that [she] had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Petrone*, 5th Dist. Stark No. 2013 CA 00213, 2014-Ohio-3395, ¶ 80. The trial court properly found that Ayers failed to show clear and convincing evidence to explain how she was unavoidably prevented from discovering the evidence before the 120-day period of Crim.R. 33 elapsed. *Roberts*, 2022-Ohio-844 at ¶ 37. Moreover, debatable strategic and tactical decisions may not form the basis of an ineffective assistance of counsel claim, even if a better strategy had been available. *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). The decision whether to call a witness is generally a matter of trial strategy, and, absent a showing of prejudice,

does not deprive a defendant of effective assistance of counsel. *State v. Williams*, 74 Ohio App.3d 686, 695, 600 N.E.2d 298 (1991).

An untimely allegation of ineffective assistance of counsel does not constitute clear and convincing evidence that a defendant was unavoidably prevented from discovering "new evidence" in the form of an expert opinion to contradict testimony presented during trial. *See State v. Davis*, 5th Dist. Licking No. 09-CA-0019, 2012-Ohio-32, ¶ 14-16 (Affirming denial of leave to file a motion for new trial because, while "trial counsel's ineffectiveness may or may not be grounds for a new trial, it does not demonstrate [an appellant] was unavoidably prevented from procuring [an expert]'s testimony in the 120 days after the trial.").

Ayers makes the blanket, circular argument that the alleged ineffectiveness of her trial counsel prevented her from discovering said alleged ineffectiveness within 120 days of her conviction. This contention appears to be premised upon the perceived difficulties an incarcerated defendant may face, post-conviction, in developing an evidentiary basis for a claim of ineffective assistance of counsel based on evidence outside the trial record. However, as discussed above, this is not a basis for her untimely filings.

The State asks this Court to reject Proposition of Law No. III.

## **PROPOSITION OF LAW NO. IV**

**WHEN NEWLY DISCOVERED EVIDENCE OUTSIDE OF THE TRIAL RECORD DEMONSTRATES CONSTITUTIONAL DEFECTS DURING THE TRIAL PROCESS, RES JUDICATA WILL NOT BAR THOSE CONSTITUTIONAL CLAIMS IN A COLLATERAL POST-CONVICTION PROCEEDING OR A NEW TRIAL MOTION UNDER CRIM.R. 33.**

An expert report that merely disagrees with the State's expert's testimony and opinions (based on the same evidence at trial), in order to rebut or impeach, is not new evidence. *State v. Frase*, 5th Dist. Licking No. 99CA32, 1999 WL 668717, *1. Ayers's expert presented no new fire

13

analysis that did not exist at the time of trial; no new, state of the art technology that he could not have offered within 120 days from her conviction. Despite the attempt to circumvent the issue, the prerequisite to filing a delayed motion for leave to file a new trial motion or a petition for post-conviction relief is a finding of unavoidable delay in timely discovering the evidence. The trial court determined Ayers "was not 'unavoidably prevented from discovering the facts upon which she relies to present her claims for relief.' *** [T]here is no new federal or state right that applies[,]'" nor could she "show by clear and convincing evidence that but for the constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense for which she was convicted." JE. 11/2/21 at 4. The trial court, thus, dismissed on jurisdictional grounds, while secondarily finding her claims were barred by *res judicata* and were without merit.

The appellate court affirmed, while providing its own findings of fact and conclusions of law. In addition, the appellate court stated, "To overcome the *res judicata* bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record. Ayers has failed in this burden". (Cite omitted.) *Ayers II* at ¶ 81, 86, 91. Because Ayers was aware that her counsel failed to get an expert and failed to object to the State's expert's qualifications at trial, or in a direct appeal, her claims were further barred by *res judicata.*

The State asks this Court to reject Proposition of Law No. IV.

## PROPOSITION OF LAW NO. V

**STATE MISCONDUCT IN ADDUCING UNREPORTED EXPERT CONCLUSIONS AT TRIAL, ALONG WITH RELIANCE ON UNSCIENTIFIC AND UNSUPPORTED EXPERT TESTIMONY TO CONVICTED[SIC] A DEFENDANT WITH A COLORABLE CLAIM OF ACTUAL INNOCENCE, ROBS THAT DEFENDANT OF HER RIGHT TO COMPULSORY PROCESS AND DUE PROCESS OF LAW UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, AND SUBJECTS HER TO CRUEL AND UNUSUAL PUNISHMENT WITHIN THE MEANING OF THE EIGHTH AMENDMENT.**

14

Ayers argues the facts of the trial below, but refuses to establish how she was unavoidably prevented from bringing this information to the court, in either a direct appeal, a timely motion for new trial, or a petition for post-conviction relief, for over seven years. Moreover, Ayers had the opportunity to bring witnesses to trial and to request funds for an expert, which she never did. If she knew she did not set fire to her house, then she would have known this evidence at trial. Ayers premises part of her claim on newly discovered evidence on prosecutorial misconduct. Any alleged prosecutorial misconduct that she claims regarding the State's expert's report and opinions would have been part of the record in this case. Ayers had the opportunity to raise any of these issues at trial, or on direct appeal, but chose not to do so. The State submits she forfeited this issue. In *State v. Somers*, 5th Dist. Muskingum No. CT2019-0020, 2019-Ohio-3157, ¶ 21, where the appellant also had the opportunity to raise the claim of prosecutorial misconduct at trial or in a direct appeal, the court found such claims barred under the doctrine of *res judicata*.

The State asks this Court to reject Proposition of Law No. V.

## CONCLUSION

Ayers failed to prove by clear and convincing evidence that she was unavoidably prevented from discovering, within the prescribed time periods, the evidence she is relying on to support her motion and petition. Accordingly, the trial court did not abuse its discretion in denying Ayer's motion for leave to file a motion for new trial and petition for post-conviction relief, or holding a hearing. The Fifth District Court of Appeals properly affirmed the decision. Ayers merely alleges issues of a *personal*, not *public* or *general*, interest and her memorandum fails to call attention to any constitutional question. Based upon the foregoing law and argument, this Honorable Court should reject Appellant's five propositions of law and decline jurisdictional review.

15

Respectfully submitted,

**KYLE L. STONE, #0095140**
**PROSECUTING ATTORNEY**
**STARK COUNTY, OHIO**

By:

Vicki L. DeSantis
Sup. Ct. Reg. No. 0075716
Assistant Prosecuting Attorney
Appellate Division
110 Central Plaza South Ste. 510
Canton, Ohio 44702-1413
(330) 451-7897
(330) 451-7965 (Fax)
vldesantis@starkcountyohio.gov

Counsel for Plaintiff-Appellee

## CERTIFICATE OF SERVICE

A copy of the foregoing MEMORANDUM IN RESPONSE was sent by electronic mail,

this 18th day of August, 2022, to Brian Howe, counsel for Defendant-Appellant, at

Brian.Howe@uc.edu.

Vicki L. DeSantis (0075716)
Counsel for Plaintiff-Appellee

16

Supreme Court of Ohio Clerk of Court - Filed September 27, 2022 - Case No. 2022-0886

# The Supreme Court of Ohio

| State of Ohio | | Case No. 2022-0886 |
|---|---|---|
| v. | | E N T R Y |
| Kayla Ayers | | |

Upon consideration of the jurisdictional memoranda filed in this case, the court declines to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).

(Stark County Court of Appeals; No. 2021CA00134)

Maureen O'Connor
Chief Justice

**The Official Case Announcement can be found at http://www.supremecourt.ohio.gov/ROD/docs/**

**EXHIBIT 55**

## 🖹 Case Information

## KAYLA JEAN AYERS

Assigned to Judge Farmer in Stark County Common Pleas Court

## 2012CR1567

### Charges

1. 2909.02 (A) (2) [F2] AGGRAVATED ARSON
2. 2919.22 (A) [M1] ENDANGERING CHILDREN

### Name

AYERS, KAYLA JEAN

### Date of Birth

Feb 10, 1988

### Address

815 4TH ST NW
CANTON, OH 44703

### Case Status

Found guilty on January 28th 2013.

### Next Action

None

### Sentence

7 years in jail.

### Attorney

BRIAN HOWE
BRIAN HOWE

### Money Owed

| Total | Payments | Balance |
|---|---|---|
| $2,588.39 | $133.35 | $2,455.04 |

## 📋 Docket

| ▲ Date | Docket Entry |
|---|---|
| Oct 15, 2012 | DEFENDANT BOUND OVER FROM MASSILLON MUNICIPAL COURT, ON Oct 12, 2012 |
| Oct 15, 2012 | BINDOVER RECEIVED FROM MASSILLON MUNICIPAL COURT, 2012CRA02598 2909.02A2 AGGRAVATED ARSON F2 |
| Oct 15, 2012 | NOTICE OF BINDOVER SENT TO STARK COUNTY SHERIFF. |

**EXHIBIT 56**

| ▲Date | Docket Entry |
|-------|--------------|
| Oct 15, 2012 | DEFENDANT KAYLA AYERS ARRESTED ON October 04, 2012 |
| Oct 15, 2012 | DEFENDANT WAS REPRESENTED IN MASSILLON MUNICIPAL COURT BY FLYNN, BETH |
| Oct 15, 2012 | ON OCT 5, 2012 DEFENDANT HELD IN LIEU OF $50,000.00 TEN PERCENT |
| Oct 26, 2012 | SUBPOENA GRAND JURY - FILED |
| Oct 29, 2012 | SUBPOENA GRAND JURY - RETURNED SERVED |
| Nov 6, 2012 | INDICTMENT FILED. DEFENDANT INDICTED ON CHARGES OF 2909.02 (A) (2) AGGRAVATED ARSON F2; 2919.22 (A) ENDANGERING CHILDREN M1; |
| Nov 6, 2012 | ARRAIGNMENT SET ON 11-09-2012 |
| Nov 6, 2012 | WARRANT ON INDICTMENT AND COPY OF INDICTMENT ISSUED 11-06-2012 TO KAYLA JEAN AYERS BY SHERIFF TO BETH A FLYNN BY HAND DELIVERY |
| Nov 6, 2012 | CASE RANDOMLY ASSIGNED TO JUDGE COURTROOM 3 |
| Nov 7, 2012 | WARRANT ON INDICTMENT RETURNED ON 11-07-2012; SERVED ON 11-06-2012 BY SHERIFF |
| Nov 7, 2012 | INDICTMENT RETURN - SERVED 11/06/2012 |
| Nov 9, 2012 | KRISTINA POWERS APPOINTED ATTORNEY FOR KAYLA JEAN AYERS. HONORABLE COURTROOM 3 ASSIGNED JUDGE. PRETRIAL DATE SET. DEFENDANT KAYLA JEAN AYERS PLEAD NOT GUILTY. |
| Nov 9, 2012 | PRETRIAL ON 11/19/2012 08:00 AM. NOTICES SENT. |
| Nov 9, 2012 | HEARING DISPOSITION SHEET FILED. TRIAL DATE SET. NEXT APPEARANCE SET. |
| Nov 9, 2012 | FINAL PRETRIAL HEARING ON 11/26/2012 08:00 AM. NOTICES SENT. |
| Nov 9, 2012 | TRIAL ON 12/03/2012 09:00 AM NOTICES SENT. |
| Nov 9, 2012 | COURT REPORTER CERTIFICATE FILED |
| Nov 9, 2012 | DEFENDANT'S - REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 9, 2012 | DEFENDANT'S - REQUEST FOR BILL OF PARTICULARS - WITH PROOF OF SERVICE FILED. |
| Nov 14, 2012 | STATE'S BILL OF PARTICULARS FILED WITH PROOF OF SERVICE FILED. |
| Nov 14, 2012 | STATE'S - REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 14, 2012 | STATE ' RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 15, 2012 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Nov 19, 2012 | HEARING DISPOSITION SHEET FILED. HEARING HELD. NO CHANGE IN STATUS. LEAVE SET FOR TRIAL. |

| ▲Date | Docket Entry |
|-------|--------------|
| Nov 19, 2012 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Nov 26, 2012 | HEARING DISPOSITION SHEET FILED. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Nov 26, 2012 | FINAL PRETRIAL HEARING RESCHEDULED FROM 11/26/2012 08:00 AM TO 12/03/2012 08:00 AM NOTICES SENT. |
| Nov 26, 2012 | HEARING DISPOSITION SHEET FILED. TRIAL SET FOR 12-3-2012 IS CONTINUED UNTIL FURTHER ORDER OF THE COURTENTRY TO FOLLOW. |
| Nov 27, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Nov 27, 2012 | PRETRIAL ON 11/28/2012 11:00 AM. NOTICES SENT. |
| Nov 28, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Nov 28, 2012 | TRIAL ON 12/27/2012 08:00 AM. NOTICES SENT. |
| Nov 28, 2012 | FINAL PRETRIAL HEARING RESCHEDULED FROM 12/03/2012 08:00 AM TO 12/17/2012 08:00 AM NOTICES SENT. |
| Nov 29, 2012 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Nov 29, 2012 | COURT REPORTER CERTIFICATE FILED |
| Nov 30, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Nov 30, 2012 | PRETRIAL ON 12/03/2012 08:00 AM. NOTICES SENT. |
| Nov 30, 2012 | ORDER RELEASING MEDICAL RECORDS |
| Dec 3, 2012 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Dec 3, 2012 | PRETRIAL ON 12/10/2012 08:00 AM. NOTICES SENT. |
| Dec 7, 2012 | SUBPOENA - FILED OFF BRIAN MUNTEAN BY SHERIFF; CHRIS THOMAS BY ORDINARY MAIL W/OUT CERT OF MAILING; CHRIS THOMAS BY CERTIFIED MAIL (###447202012CR15671005!!!); JENNIFER CONLEY BY SHERIFF; KAREN BALL BY SHERIFF; JASON PANDREA BY SHERIFF |
| Dec 10, 2012 | HEARING DISPOSITION SHEET FILED. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Dec 10, 2012 | FINAL PRETRIAL HEARING RESCHEDULED FROM 12/10/2012 08:00 AM TO 12/17/2012 08:00 AM NOTICES SENT. |
| Dec 10, 2012 | SUBPOENA - RETURNED SERVED 12/10/2012 OFF BRIAN MUNTEAN; JENNIFER CONLEY; KAREN BALL; JASON PANDREA; |
| Dec 12, 2012 | COURT REPORTER CERTIFICATE FILED |
| Dec 12, 2012 | SUBPOENA - FILED OFF CURTISS RICKER BY SHERIFF |

| ▲ Date | Docket Entry |
|---|---|
| Dec 13, 2012 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Dec 13, 2012 | SUBPOENA - RETURNED SERVED 12/13/2012 OFF CURTISS RICKER; |
| Dec 14, 2012 | STATE'S RECEIPT OF DISCOVERY |
| Dec 14, 2012 | DEFENDANT'S - MOTION IN LIMINE FILED - WITH PROOF OF SERVICE FILED. |
| Dec 14, 2012 | DEFENDANT'S RECEIPT OF DISCOVERY |
| Dec 17, 2012 | HEARING DISPOSITION SHEET FILED. COURT ORDERED COMPETENCY EVALUATION ENTRY TO FOLLOW. |
| Dec 17, 2012 | STATUS HEARING SET ON 01/07/2013 08:00 AM NOTICE SENT. |
| Dec 17, 2012 | COURT REPORTER CERTIFICATE FILED |
| Dec 28, 2012 | ORDER DIRECTING THE EVALUATION OF DEFENDANT'S COMPETENCE TO STAND TRIAL |
| Jan 11, 2013 | HEARING DISPOSITION SHEET FILED. |
| Jan 11, 2013 | PRETRIAL SET ON 01/14/2013 08:30 AM NOTICE SENT. |
| Jan 14, 2013 | HEARING DISPOSITION SHEET FILED. TRIAL DATE SET. |
| Jan 14, 2013 | TRIAL ON 02/04/2013 09:00 AM NOTICES SENT. |
| Jan 14, 2013 | SUBPOENA - RETURNED NOT SERVED CHRIS THOMAS; |
| Jan 15, 2013 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Jan 15, 2013 | STATE'S - MOTION IN LIMINE FILED - WITH PROOF OF SERVICE FILED. |
| Jan 16, 2013 | HEARING DISPOSITION SHEET FILED. NEXT APPEARANCE SET. |
| Jan 16, 2013 | FINAL PRETRIAL HEARING ON 01/23/2013 08:30 AM. NOTICES SENT. |
| Jan 16, 2013 | HEARING DISPOSITION SHEET FILED. CASE RESCHEDULED ON COURT'S ORAL MOTION. |
| Jan 16, 2013 | TRIAL RESCHEDULED FROM 02/04/2013 09:00 AM TO 01/28/2013 09:00 AM NOTICES SENT. |
| Jan 17, 2013 | SUBPOENA - FILED INVEST REGGI WINTERS BY SHERIFF; JASON PANDREA BY SHERIFF; OFF BRIAN MUNTEAN BY SHERIFF; JENNIFER CONLEY BY SHERIFF; OFF CURTISS RICKER BY SHERIFF; CA CAPT R ANNEN BY SHERIFF; JOHN TYRRELL BY SHERIFF; REP STARK COUNTY JAIL BY SHERIFF; BRENNAN SCOTT BY SHERIFF; RECORDS CUSTODIAN AFFINITY MEDICAL CENTER BY SHERIFF; CHRIS THOMAS BY ORDINARY MAIL W/OUT CERT OF MAILING; JEFF AYERS BY ORDINARY MAIL W/OUT CERT OF MAILING; JEFF AYERS BY CERTIFIED MAIL (###260412012CR15671022!!!) |
| Jan 17, 2013 | DEFENDANT'S RECEIPT OF DISCOVERY |

| ▲ Date | Docket Entry |
|--------|-------------|
| Jan 18, 2013 | SUBPOENA - FILED MARY DECK BY SHERIFF |
| Jan 22, 2013 | SUBPOENA - RETURNED SERVED 01/20/2013; INVEST REGGI WINTERS; CAPT R ANNEN; JOHN TYRRELL; OFF BRIAN MUNTEAN; JENNIFER CONLEY; KAREN BALL; JASON PANDREA; OFF CURTISS RICKER; 01/17/2013 REP STARK COUNTY JAIL; 01/20/2013 BRENNAN SCOTT; 01/22/2013 RECORDS CUSTODIAN AFFINITY MEDICAL CENTER; |
| Jan 22, 2013 | SUBPOENA - RETURNED SERVED 01/21/2013 MARY DECK; |
| Jan 22, 2013 | LETTERS - PSYCHIATRIC |
| Jan 22, 2013 | STATE ' SUPPLEMENT TO RESPONSE TO REQUEST FOR DISCOVERY - WITH PROOF OF SERVICE FILED. |
| Jan 23, 2013 | HEARING DISPOSITION SHEET FILED. HEARING HELD. NO CHANGE IN STATUS. LEAVE SET FOR TRIAL. |
| Jan 25, 2013 | DEFENDANT'S - MOTION IN LIMINE FILED - WITH PROOF OF SERVICE FILED. |
| Jan 30, 2013 | SENTENCING FORM FILED ADDRESSING INCARCERATION AND CONVEY. FINAL SENTENCING ENTRY TO FOLLOW.. |
| Jan 30, 2013 | WARRANT TO CONVEY |
| Jan 30, 2013 | THE COURT ORDERS THE DEFENDANT TO BE INTERVIEWED BY RE-ENTRY PROGRAM BEFORE THE DEFENDANT IS TRANSPORTED. |
| Jan 30, 2013 | APPOINTMENT OF COUNSEL FOR APPEALS - GEORGE URBAN |
| Jan 30, 2013 | COURT REPORTER CERTIFICATE FILED |
| Jan 30, 2013 | JURY VERDICT FILED - FINDING OF GUILTY |
| Jan 31, 2013 | CONFIRMATION OF RE-ENTRY EVALUATION. |
| Feb 1, 2013 | JURY PANEL USAGE RECORD FILED |
| Feb 1, 2013 | FOUND GUILTY - DEFENDANT SENTENCED TO. MARYSVILLE JAIL ; ON CT # 1 (AGGRAVATED ARSON) FOR 7 YEAR(S) ; ON CT # 2 (ENDANGERING CHILDREN) FOR 180 DAY(S) CONC. WITH CT# : 1, FOR A TOTAL OF 7.0 YEARS INCARCERATION DEFENDENT MAY BE ELIGIBLE TO EARN DAYS OF CREDIT UNDER THE CIRCUMSTANCES SPECIFIED IN O.R.C 2967.193ANY POST RELEASE CONTROL IMPOSED. ENTITLED JAIL TIME CREDIT. OHIO REVISED CODE SECTION 2933.41 AFTER THE APPROPRIATE TIME PERIOD EVIDENCE TO BE DESTROYED PAY COSTS AND ANY MONITORING FEESPURSUANT TO ORC 120.36, IF THE DEFENDANT REQUESTED OR WAS PROVIDED REPRESENTATION BY THE STARK COUNTY PUBLIC DEFENDER, A $25.00 NON-REFUNDABLE APPLICATION FEE IS ASSESSED. NOTIFIED OF RIGHT TO APPEAL. |
| Feb 1, 2013 | NOTICE OF FELONY CONVICTION(S) SENT TO BOARD OF ELECTIONS |
| Feb 1, 2013 | DNA TEST REQUIRED PURSUANT TO O.R.C. 2901.07 |

| ▲ Date | Docket Entry |
|---|---|
| Feb 6, 2013 | WARRANT TO CONVEY RETURNED - SERVED 02/05/2013 DELIVERED DEFENDANT TO OHIO REFORMATORY FOR WOMEN. STARK COUNTY SHERIFF. |
| Feb 14, 2013 | JAIL TIME CREDIT (125) DAYS |
| Feb 20, 2013 | DEFENDANT'S NOTICE OF APPEAL FILED - COURT OF APPEALS 2013CA00034 WITH PROOF OF SERVICE FILED. |
| Feb 20, 2013 | DEFENDANT'S DOCKETING STATEMENT FILED |
| Feb 20, 2013 | DEFENDANT'S PRAECIPE FOR TRANSMISSION OF RECORD WITH PROOF OF SERVICE FILED. |
| Feb 20, 2013 | DEFENDANT'S PRAECIPE FOR TRANSCRIPT WITH PROOF OF SERVICE FILED. |
| Feb 20, 2013 | DEFENDANT'S - REQUEST FOR FUNDS - WITH PROOF OF SERVICE FILED. |
| Feb 22, 2013 | SUBPOENA - RETURNED NOT SERVED JEFF AYERS; |
| Feb 22, 2013 | JUDGMENT ENTRY - GRANTING - REQUEST FOR FUNDS |
| Mar 26, 2013 | TRANSCRIPT COST |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS FILED - VOLUME 2 |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS FILED - VOLUME 3 |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS FILED - VOLUME 1 |
| Apr 4, 2013 | STATEMENT SENT TO INSTITUTION FOR $3978.39. |
| Jun 27, 2013 | DEFENDANT'S AFFIDAVIT OF INDIGENCY |
| Jun 27, 2013 | DEFENDANT'S - MOTION FOR APPOINTMENT OF COUNSEL - WITH PROOF OF SERVICE FILED. |
| Jun 28, 2013 | JUDGMENT ENTRY - DENYING - MOTION FOR APPOINTMENT OF COUNSEL |
| Oct 18, 2013 | CRIM PAYMENT RECEIVED FROM OHIO REFORMATORY FOR WOMEN - RECEIPT NO :CR147630 IN THE AMOUNT OF: $4.06 |
| Dec 9, 2013 | JUDGMENT AFFIRMED - COURT OF APPEALS 2013CA00034 |
| May 8, 2014 | JUDGMENT ENTRY - DENYING - DEFENDANT'S MOTION TO STAY EXECUTION & COLLECTION OF COSTS |
| May 13, 2014 | AFFIDAVIT OF INDIGENCY |
| May 14, 2014 | DEFENDANT'S - MOTION TO STAY EXECUTION AND COLLECTION OF COSTS |
| May 14, 2014 | JUDGMENT ENTRY - DENYING - MOTION TO STAY EXECUTION AND COLLECTION OF COSTS |
| May 28, 2015 | DEFENDANT'S - MOTION FOR CREDIT OF COMMUNITY SERVICE HOURS EARNED TOWARD PAYMENT OF FINES, COURT COSTS, AND/OR RESTITUTION |

| ▲Date | Docket Entry |
|-------|--------------|
| May 29, 2015 | JUDGMENT ENTRY - DENYING - MOTION FOR CREDIT OF COMMUNITY SERVICE HOURS EARNED TOWARD PAYMENT OF FINES, COURT COSTS, AND/OR RESTITUTION |
| Oct 19, 2015 | DEFENDANT'S - MOTION TO REDUCE OR MODIFY SENTENCE - WITH PROOF OF SERVICE FILED. |
| Oct 20, 2015 | JUDGMENT ENTRY - DENYING - MOTION TO REDUCE OR MODIFY SENTENCE |
| Oct 27, 2015 | DEFENDANT'S - MOTION TO REDUCE OR MODIFY SENTENCE (LETTER FORM) |
| Oct 27, 2015 | JUDGMENT ENTRY - DENYING - MOTION TO REDUCE OR MODIFY SENTENCE |
| Nov 9, 2015 | LETTER FROM DEFENDANT REGARDING COURT COSTS |
| Nov 18, 2015 | JUDGMENT ENTRY - DENYING - REQUEST FOR PAYMENT PLAN |
| Mar 4, 2016 | DEFENDANT'S - MOTION TO SUSPEND COLLECTION OF COURT COSTS UNTIL RELEASE FROM PRISON (LETTER FORM) |
| Mar 7, 2016 | JUDGMENT ENTRY - DENYING - MOTION TO SUSPEND COLLECTION OF COURT COSTS UNTIL RELEASE FROM PRISON (LETTER FORM) |
| Oct 20, 2016 | CRIM PAYMENT RECEIVED FROM OHIO REFORMATORY FOR WOMEN - RECEIPT NO :CR184492 IN THE AMOUNT OF: $2.24 |
| Dec 27, 2016 | LETTER TO JUDGE FARMER |
| Jan 6, 2017 | LETTER TO JUDGE FARMER REGARDING COURT COSTS AND FINES |
| Jan 6, 2017 | JUDGMENT ENTRY: THE COURT DID ORDER THAT THE DEFENDANT PAY COURT COSTS ASSOCIATED WITH THIS MATTER |
| Jan 12, 2017 | CRIM PAYMENT RECEIVED FROM OHIO REFORMATORY FOR WOMEN - RECEIPT NO :CR187274 IN THE AMOUNT OF: $2.05 |
| Feb 15, 2017 | LETTER TO JUDGE FARMER FILED |
| Feb 15, 2017 | JUDGMENT ENTRY - DENYING - (LETTER) MOTION FOR PAYMENT PLAN AND REQUEST TO WAIVE COURT COSTS |
| Feb 12, 2018 | DEFENDANT'S - MOTION FOR JUDICIAL RELEASE - WITH PROOF OF SERVICE FILED. |
| Feb 12, 2018 | JUDGMENT ENTRY - DENYING - MOTION FOR JUDICIAL RELEASE |
| Dec 4, 2019 | FIRST NOTICE FOR FAILURE TO PAY FINE, COURT COSTS, AND/OR RESTITUTION, $4003.04 DUE IMMEDIATELY |
| Dec 20, 2019 | APPLICATION FOR PAYMENT PLAN AND AGREEMENT SIGNED. MONTHLY PAYMENT OF $25.00 WITH THE FIRST PAYMENT DUE BY JAN 05, 2020. |
| Dec 20, 2019 | ADDRESS CHANGED BY MLJOHN |
| Dec 20, 2019 | PHONE INFORMATION CHANGED BY MLJOHN |

| ▲ Date | Docket Entry |
|--------|--------------|
| Mar 6, 2020 | SECOND NOTICE FOR FAILURE TO PAY FINE, COURT COSTS, AND/OR RESTITUTION, MISSED PAYMENTS OF $4003.04 ARE DUE IMMEDIATELY |
| Apr 13, 2020 | DEFENDANT'S - MOTION FOR POST CONVICTION RELIEF - WITH PROOF OF SERVICE FILED. |
| Apr 13, 2020 | DEFENDANT'S - MOTION FOR LEAVE TO FILE MOTION FOR NEW TRIAL - WITH PROOF OF SERVICE FILED. |
| Apr 13, 2020 | APPEARANCE FILED. - HOWE, BRIAN ** FAX FILED ** |
| Apr 14, 2020 | FINAL NOTICE FOR FAILURE TO PAY FINE, COURT COSTS, AND/OR RESTITUTION, MISSED PAYMENTS OF $4003.04 ARE DUE IMMEDIATELY |
| Apr 16, 2020 | CRIM PAYMENT RECEIVED FROM KAYLA AYERS - RECEIPT NO :CR234209 IN THE AMOUNT OF: $75.00 |
| Apr 16, 2020 | ADDRESS CHANGED BY LJK |
| Apr 17, 2020 | JUDGMENT ENTRY STATE OF OHIO SHALL FILE RESPONSE TO MOTION FOR A NEW TRIAL ON OR BEFORE MAY 29, 2020 |
| Apr 17, 2020 | JUDGMENT ENTRY STATE OF OHIO SHALL FILE RESPONSE TO POST CONVICTION RELIEF ON OR BEFORE MAY 29, 2020 AND THE DEFENDANT MAY REPLY ON OR BEFORE JUNE 19, 2020 |
| Apr 24, 2020 | DEFENDANT'S- EXHIBITS FOR MOTION FOR LEAVE TO FILE MOTION FOR NEW TRIAL |
| May 18, 2020 | DEFENDANT'S - MOTION FOR FIRST AMENDED PETITION FOR POST CONVICTION RELIEF - WITH PROOF OF SERVICE FILED. |
| Jun 17, 2020 | FIRST NOTICE FOR FAILURE TO PAY FINE, COURT COSTS, AND/OR RESTITUTION, MISSED PAYMENTS OF $2442.29 ARE DUE IMMEDIATELY |
| Jun 19, 2020 | CRIM PAYMENT RECEIVED FROM KAYLA AYERS - RECEIPT NO :CR237171 IN THE AMOUNT OF: $50.00 |
| Jul 17, 2020 | STATE'S - MOTION FOR CONTINUANCE - WITH PROOF OF SERVICE FILED. |
| Jul 17, 2020 | JUDGMENT ENTRY - GRANTING - MOTION FOR CONTINUANCE ON OR BEFORE AUGUST 31, 2020 |
| Aug 31, 2020 | MOTION FOR ENLARGEMENT OF TIME TO FILE RESPONSE. - WITH PROOF OF SERVICE FILED. |
| Sep 1, 2020 | JUDGMENT ENTRY - GRANTING - MOTION FOR ENLARGEMENT OF TIME TO FILE RESPONSE - UP TO AND INCLUDING SEPTEMBER 25, 2020. |
| Sep 25, 2020 | MOTION FOR EXTENSION OF TIME TO RESPOND TO PETITION FOR POST-CONVICTION RELIEF MOTION FOR LEAVE TO FILE NEW TRIAL MOTION MOTION FOR NEW TRIAL - WITH PROOF OF SERVICE FILED. |
| Sep 28, 2020 | JUDGMENT ENTRY - GRANTING - EXTENSION OF TIME UP TO AND INLCUDING FRIDAY OCTOBER 16, 2020 TO FILE RESPONSES IN THIS MATTER. |

| ▲ Date | Docket Entry |
|--------|--------------|
| Oct 16, 2020 | MOTION FOR EXTENSION OF TIME TO RESPOND TO PETITION FOR POST-CONVICTION RELIEF - WITH PROOF OF SERVICE FILED. |
| Oct 19, 2020 | JUDGMENT ENTRY - GRANTING - MOTION FOR EXTENSION OF TIME TO RESPOND TO PETITION FOR POST-CONVICTION RELIEF. UP TO AND INCLUDING FRIDAY, OCTOBER 23, 2020. |
| Oct 23, 2020 | MOTION FOR EXTENSION OF TIME TO RESPOND TO PETITION FOR POST-CONVICTION RELIEF - WITH PROOF OF SERVICE FILED. |
| Oct 26, 2020 | JUDGMENT ENTRY - GRANTING - MOTION FOR EXTENSION OF TIME TO RESPOND TO PETITION FOR POST-CONVICTION RELIEF. UP TO AND INCLUDING FRIDAY, NOVEMBER 6, 2020. |
| Dec 1, 2020 | STATE'S - MOTION FOR EXTENSION OF TIME TO RESPOND TO PETITION FOR POST-CONVICTION RELIEF MOTION FOR LEAVE TO FILE NEW TRIAL MOTION MOTION FOR NEW TRIAL - WITH PROOF OF SERVICE FILED. |
| Dec 3, 2020 | JUDGMENT ENTRY - GRANTING - MOTION FOR EXTENSION OF TIME TO RESPOND TO PETITION |
| Dec 21, 2020 | STATE'S - MOTION TO DISMISS PETITION FOR POST-CONVICTION RELIEF - NOT TIMELY FILED - WITH PROOF OF SERVICE FILED. |
| Dec 21, 2020 | STATE ' REPLY TO MOTION FOR LEAVE TO FILE MOTION FOR NEW TRIAL - WITH PROOF OF SERVICE FILED. |
| Dec 31, 2020 | DEFENDANT'S - MOTION FOR EXTENSION OF TIME - WITH PROOF OF SERVICE FILED. ** FAX FILED ** |
| Jan 5, 2021 | JUDGMENT ENTRY - GRANTING - MOTION FOR EXTENSION OF TIME; DEFENDANT MAY FILE BEFORE JANUARY 8, 2021 |
| Jan 8, 2021 | DEFENDANT 'S RESPONSE IN OPPOSITION TO PLAINTIFF-RESPONDENT'S MOTION TO DISMISS PETITION FOR POSTCONVICTION RELIEF - WITH PROOF OF SERVICE FILED. ** FAX FILED ** |
| Jan 8, 2021 | DEFENDANT'S - REPLY IN SUPPORT FOR MOTION TO LEAVE TO FILE MOTION FOR NEW TRIAL - WITH PROOF OF SERVICE FILED. ** FAX FILED ** |
| Jan 21, 2021 | STATE'S - MOTION FOR EXTENSION OF TIME - WITH PROOF OF SERVICE FILED. |
| Jan 22, 2021 | JUDGMENT ENTRY - GRANTING - EXTENSION TO AND INCLUDING THURSDAY, FEBRUARY 11, 2021. |
| Feb 10, 2021 | DEFENDANT'S - MOTION FOR EXTENSION OF TIME - WITH PROOF OF SERVICE FILED. |
| Feb 12, 2021 | JUDGMENT ENTRY - GRANTING - MOTION FOR EXTENSION OF TIME UP TO AND INCLUDING THURSDAY, FEBRUARY 18, 2021 |
| Feb 19, 2021 | STATE'S - MOTION FOR EXTENSION OF TIME - WITH PROOF OF SERVICE FILED. |

| ▲ Date | Docket Entry |
|--------|--------------|
| Feb 22, 2021 | JUDGMENT ENTRY - GRANTING - MOTION FOR EXTENSION OF TIME UP TO AND INCLUDING THURSDAY, FEBRUARY 25, 2021 |
| Feb 22, 2021 | STATE ' SUPPLEMENT TO RESPONSE TO PETITION FOR POST CONVICTION RELIEF AND MOTION FOR LEAVE TO FILE MOTION FOR NEW TRIAL - WITH PROOF OF SERVICE FILED. |
| Mar 31, 2021 | DEFENDANT'S - MOTION FOR LEAVE TO FILE SUPPLEMENTAL RESPONSE - WITH PROOF OF SERVICE FILED. ** FAX FILED ** |
| Mar 31, 2021 | DEFENDANT 'S - PROPOSED SUPPLEMENTAL REPLY BRIEF - WITH PROOF OF SERVICE FILED. ** FAX FILED ** |
| Nov 2, 2021 | JUDGMENT ENTRY - DENYING - MOTION FOR POST CONVICTION RELIEF AND MOTION FOR LEAVE TO FILE NEW TRIAL |
| Nov 29, 2021 | DEFENDANT'S NOTICE OF APPEAL FILED - COURT OF APPEALS WITH PROOF OF SERVICE FILED. |
| Nov 29, 2021 | DOCKETING STATEMENT FILED |
| Nov 29, 2021 | DEFENDANT'S - PRAECIPE AND NOTICE TO COURT REPORTER - WITH PROOF OF SERVICE FILED. |
| Jun 6, 2022 | JUDGMENT AFFIRMED - COURT OF APPEALS 2021CA00134 |
| Jul 20, 2022 | DEFENDANT'S NOTICE OF APPEAL FILED - OHIO SUPREME COURT 2022-0886 WITH PROOF OF SERVICE FILED. |
| Aug 19, 2022 | ADDRESS CHANGED BY MLJOHN |
| Oct 14, 2022 | JUDGMENT ENTRY FROM SUPREME COURT: COURT DECLINES TO ACCEPT JURISDICTION OF THE APPEAL 2022-0886 |
| Dec 27, 2022 | ADDRESS CHANGED BY MLJOHN |

---

### 📋 Case Information

## STATE OF OHIO VS. KAYLA J. AYERS
Stark County Common Pleas Court

## 2013CA00034

**Case Type**

Court of Appeals

**Filed On**

Feb 22, 2013

**Case Status**

Closed on December 9th 2013.

**Next Action**

None

**Financials**

| Costs | Payments | Balance |
|-------|----------|---------|
| $0.00 | | |

**Lower Court Case Info**

Case # 2012CR1567 Assigned to Judge Farmer, Kristin At Common Pleas Court

**Panel Judges**

**Parties**

| Type | Name / Address | Attorney |
|------|----------------|----------|
| Appellant | AYERS, KAYLA J | GEORGE URBAN |
| Appellee | STATE OF OHIO STATE OF OHIO | STARK COUNTY PROSECUTOR |

---

### 📄 Docket

| ▲ Date | Docket Entry |
|--------|--------------|
| Feb 22, 2013 | NOTICE OF APPEAL FILED ON 2/20/2013 COMMON PLEAS COURT CRIMINAL CASE 2012CR1567 - JUDGE FARMER'S DECISION OF 1/28/2013 - DUE 04-01-2013 |
| Feb 22, 2013 | APPELLANT'S DOCKETING STATEMENT FILED. REGULAR CALENDAR WITH TRANSCRIPT |
| Feb 22, 2013 | APPELLANT'S PRAECIPE TO CLERK |

**EXHIBIT 57**

| ▲ Date | Docket Entry |
|--------|--------------|
| Feb 22, 2013 | ORIGINAL PAPERS AND DOCKET SHEET FROM CRIMINAL DIVISION |
| Feb 22, 2013 | APPELLANT'S PRAECIPE TO COURT REPORTER FOR TRANSCRIPT OF PROCEEDINGS FILED (IN LOWER CT) |
| Feb 22, 2013 | APPELLANT'S NOTICE OF INABILITY TO SECURE COSTS BY PREPAYMENT |
| Feb 22, 2013 | COPY OF NOTICE OF APPEAL SENT TO GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; |
| Mar 27, 2013 | TRANSCRIPT OF PROCEEDINGS - 3 VOL. |
| Apr 3, 2013 | RECORD TRANSMITTED NOTICE SENT TO GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; |
| Apr 18, 2013 | APPELLANT'S MOTION FOR EXTENSION OF TIME TO FILE BRIEF |
| Apr 23, 2013 | JUDGMENT ENTRY - EXTENSION OF TIME TO FILE APPELLANT BRIEF 5-13-13 |
| Apr 23, 2013 | COPY OF JUDGMENT ENTRY SENT TO GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; |
| May 13, 2013 | APPELLANT'S MOTION FOR EXTENSION OF TIME TO FILE BRIEF.JE. |
| May 23, 2013 | JUDGMENT ENTRY - EXTENSION OF TIME TO FILE APPELLANT BRIEF 6-3-13 |
| May 23, 2013 | COPY OF JUDGMENT ENTRY SENT TO GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; |
| Jun 3, 2013 | APPELLANT'S MOTION FOR EXTENSION OF TIME TO FILE BRIEF.JE. |
| Jun 7, 2013 | JUDGMENT ENTRY - EXTENSION OF TIME TO FILE APPELLANT BRIEF 6-24-13 |
| Jun 7, 2013 | COPY OF JUDGMENT ENTRY SENT TO GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; |
| Jun 24, 2013 | BRIEF OF APPELLANT |
| Jul 15, 2013 | APPELLEE'S MOTION FOR EXTENSION OF TIME TO FILE BRIEF.JE. |
| Jul 18, 2013 | JUDGMENT ENTRY - EXTENSION OF TIME TO FILE APPELLEE BRIEF 8-5-13 |
| Jul 18, 2013 | COPY OF JUDGMENT ENTRY SENT TO STARK COUNTY PROSECUTOR BY ORDINARY MAIL; GEORGE URBAN BY ORDINARY MAIL; |
| Aug 5, 2013 | APPELLEE'S MOTION FOR EXTENSION OF TIME TO FILE BRIEF.JE. |
| Aug 7, 2013 | JUDGMENT ENTRY - EXTENSION OF TIME TO FILE APPELLEE BRIEF 8-15-13 |
| Aug 7, 2013 | COPY OF JUDGMENT ENTRY SENT TO GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; |
| Aug 15, 2013 | APPELLEE'S MOTION FOR EXTENSION OF TIME TO FILE BRIEF.JE. |

| ▲ Date | Docket Entry |
| --- | --- |
| Aug 19, 2013 | JUDGMENT ENTRY - EXTENSION OF TIME TO FILE APPELLEE BRIEF 8-22-13 |
| Aug 19, 2013 | COPY OF JUDGMENT ENTRY SENT TO GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; |
| Aug 22, 2013 | BRIEF OF APPELLEE |
| Aug 22, 2013 | JUDGMENT ENTRY - ORAL ARGUMENT SET FOR 10-24-13 11:00AM |
| Aug 22, 2013 | COPY OF ORAL ARGUMENT SCHEDULE, JUDGMENT ENTRY SENT GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; |
| Dec 9, 2013 | OPINION |
| Dec 9, 2013 | JUDGMENT ENTRY - TRIAL COURT JUDGMENT AFFIRMED |
| Dec 9, 2013 | COPY OF OPINION SENT TO GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; JUDGE FARMER BY HAND DELIVERY; |
| Dec 20, 2013 | APPELLANT'S MOTION FOR EXTRAORDINARY ATTORNEY FEES |
| Dec 20, 2013 | JUDGMENT ENTRY - AWARDING EXTRAORDINARY ATTORNEY FEES |
| Dec 20, 2013 | JUDGMENT ENTRY - AWARDING OF ATTORNEY FEES |
| Dec 20, 2013 | COPY OF JUDGMENT ENTRY SENT TO GEORGE URBAN BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY ORDINARY MAIL; STARK COUNTY PROS. BY HAND DELIVERY |
| Dec 23, 2013 | ATTORNEY FOR APPELLANT'S MOTION FOR EXTRAORDINARY ATTORNEY FEES |
| Dec 23, 2013 | JUDGMENT ENTRY GRANTING MOTION FOR EXTRAORDINARY FEES |
| Dec 23, 2013 | JUDGMENT ENTRY - AWARDING OF ATTORNEY FEES TO ATTORNEY GEORGE URBAN IN THE AMOUNT OF $1,111.50 |
| Feb 4, 2014 | FIRST COST BILL, INVOICE #31699 ISSUED TO OHIO REFORMATORY FOR WOMEN IN THE AMOUNT OF $146.38 |
| Mar 4, 2014 | FILES RETURNED TO CRIMINAL DIVISION |

## 📑 Case Information

## STATE OF OHIO VS. KAYLA AYERS
Stark County Common Pleas Court

## 2021CA00134

**Case Type**

Court of Appeals

**Filed On**

Nov 29, 2021

**Case Status**

Closed on October 14th 2022.

**Next Action**

None

**Financials**

| Costs | Payments | Balance |
|---|---|---|
| $0.00 | | |

**Lower Court Case Info**

Case # 2012CR1567 Assigned to Judge Farmer, Kristin At Common Pleas Court

**Panel Judges**

**Parties**

| Type | Name / Address | Attorney |
|---|---|---|
| Appellant | AYERS, KAYLA | BRIAN HOWE |
| Appellee | STATE OF OHIO STATE OF OHIO | STARK COUNTY PROSECUTOR |

## 📄 Docket

| ▲Date | Docket Entry |
|---|---|
| Nov 29, 2021 | DEPOSIT DR169357 RECEIVED FROM BRIAN C HOWE |
| Nov 29, 2021 | ORIGINAL PAPERS AND DOCKET SHEET FROM CRIMINAL DIVISION - 2 FILES -3TRANS |
| Nov 29, 2021 | RECEIPT NO DR169358 VOIDS RECEIPT NO DR169357. RECEIPT NO DR169357 DATED 11/29/21 WAS INCORRECTLY PROCESSED WITH THE AMOUNT OF 103.00 THE CORRECT AMOUNT IS $90.00 |

**EXHIBIT 58**

| ▲ Date | Docket Entry |
|--------|--------------|
| Nov 29, 2021 | DEPOSIT DR169359 RECEIVED FROM BRIAN C HOWE |
| Nov 29, 2021 | NOTICE OF APPEAL FILED ON 11/29/2021 COMMON PLEAS COURT CRIMINAL CASE 2012CR1567 - JUDGE FARMER'S DECISION OF 11/2/2021 - DUE 01-08-2022 |
| Nov 29, 2021 | APPELLANT'S DOCKETING STATEMENT FILED. REGULAR CALENDAR WITH TRANSCRIPT |
| Nov 29, 2021 | APPELLANT'S PRAECIPE TO COURT REPORTER FOR TRANSCRIPT OF PROCEEDINGS FILED (IN LOWER CT) |
| Nov 29, 2021 | COPY OF NOTICE OF APPEAL SENT TO BRIAN HOWE BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY HAND DELIVERY; |
| Jan 11, 2022 | RECORD TRANSMITTED NOTICE SENT TO BRIAN HOWE BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY HAND DELIVERY; |
| Jan 24, 2022 | APPELLANT'S MOTION TO SUPPLEMENT THE RECORD AND FOR EXTENSION OF TIME TO FILE BRIEF. NO JE. |
| Feb 14, 2022 | JUDGMENT ENTRY - CLERK SHALL TRANSMIT COMPLETE TRIAL TRANSCRIPTS INCLUDING OPENING AND CLOSING STATEMENTS AND ALL EXHIBITS. APPELLANT'S BRIEF SHALL BE FILED ON OR BEFORE 2-22-2022. |
| Feb 14, 2022 | COPY OF JUDGMENT ENTRY SENT TO BRIAN HOWE BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY HAND DELIVERY; |
| Feb 22, 2022 | EXHIBITS FILED - 1 ENVELOPE. |
| Feb 22, 2022 | BRIEF OF APPELLANT |
| Mar 8, 2022 | APPELLEE'S MOTION FOR EXTENSION OF TIME TO FILE BRIEF.JE. |
| Mar 25, 2022 | MAGISTRATE'S ORDER - MATTER SET FOR REMOTE ORAL ARGUMENT ON 5-3-2022 AT 10:10AM. |
| Mar 25, 2022 | COPY OF ORAL ARGUMENT SCHEDULE, MAGISTRATE'S ORDER SENT TO BRIAN HOWE BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY HAND DELIVERY; |
| Mar 29, 2022 | JUDGMENT ENTRY - EXTENSION OF TIME TO FILE APPELLEE BRIEF 4-4-22. |
| Mar 29, 2022 | COPY OF JUDGMENT ENTRY SENT TO BRIAN HOWE BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY HAND DELIVERY; |
| Apr 4, 2022 | BRIEF OF APPELLEE |
| Apr 11, 2022 | REPLY BRIEF OF APPELLANT |
| Jun 6, 2022 | OPINION |
| Jun 6, 2022 | JUDGMENT ENTRY - TRIAL COURT JUDGMENT AFFIRMED |
| Jun 6, 2022 | COPY OF OPINION SENT TO ATTY BRIAN HOWE BY ORDINARY MAIL; STARK COUNTY PROSECUTOR BY HAND DELIVERY; JUDGE FARMER BY HAND DELIVERY; |

| ▲ Date | Docket Entry |
|--------|--------------|
| Jul 20, 2022 | NOTICE OF APPEAL-OHIO SUPREME COURT FLED ON 7-19-22 ASSIGNED CASE 2022-0886 |
| Jul 20, 2022 | COPY OF NOTICE OF APPEAL SENT TO JUDGE FARMER BY HAND DELIVERY; |
| Sep 21, 2022 | FILES RETURNED TO CRIMINAL DIVISION |
| Oct 14, 2022 | OHIO SUPREME COURT DECLINES JURISDICTION TO HEAR APPEALS |
| Oct 14, 2022 | COPY OF JUDGMENT ENTRY SENT TO JUDGE FARMER BY HAND DELIVERY; |
| Dec 12, 2022 | REVISED COST BILL, INVOICE 64908 ISSUED TO KAYLA AYERS IN THE AMOUNT OF $24.26 |

# THE SUPREME COURT OF OHIO
## CASE DOCKET

State of Ohio v. Kayla Ayers

**Case Information**

| | | |
|---|---|---|
| **Number** | | 2022-0886 |
| **Type** | | Jurisdictional Appeal |
| **Date Filed** | | 07/19/2022 |
| **Status** | | Disposed |
| | | |
| **Prior Jurisdiction** | | Stark County, 5th District Court of Appeals |
| **Prior Decision Date** | | 06/06/2022 |
| **Prior Case Numbers** | | 2021CA00134 |

**Parties**

Kayla Ayers; Appellant
    *Represented by:*
        Howe, Brian Church (86517), Counsel of Record
        Godsey, Mark Adrian (74484)

State of Ohio; Appellee
    *Represented by:*
        DeSantis, Vicki Lynn (75716), Counsel of Record
        Stone, Kyle Loren (95140)

**Docket**

| Date Filed | Description | Filed By |
|---|---|---|
| 07/19/2022 | Notice of appeal of Kayla Ayers | Appellant |
| 07/19/2022 | Lower court decision | Appellant |
| 07/19/2022 | Memorandum in support of jurisdiction | Appellant |
| 07/20/2022 | Electronic copy of notice of appeal sent to the clerk of the court of appeals | |
| 08/18/2022 | Memorandum in response to jurisdiction | Appellee |
| 09/27/2022 | **DECISION: Jurisdiction declined. See announcement at 2022-Ohio-3322 (https://supremecourt.ohio.gov/rod/docs/pdf/0/2022/2022-ohio-3322.pdf).** | DISPOSITIVE |
| 10/14/2022 | Copy of entry sent to lower court clerk | |

End of Docket

**EXHIBIT 59**