UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KAYLA JEAN AYERS, | : | CASE NO. 5:20-cv-1654 |
| | : | |
| Petitioner, | : | JUDGE SARA LIOI |
| | : | |
| v. | : | Magistrate Judge Carmen E. Henderson |
| | : | |
| DIRECTOR, OHIO DEPARTMENT | : | |
| OF REHABILITATION & | : | |
| CORRECTION, | : | |
| | : | |
| Respondent. | : | |

**PRE-TRIAL/JURY TRIAL/SENTENCING HEARING**

In the Court of Common Pleas
For Stark County, Ohio
Case No. 2012 CR 1567

Tr. Vol. 1

Respectfully submitted,

Dave Yost
Ohio Attorney General

s/Maura O'Neill Jaite
Maura O'Neill Jaite (#0058524)
Senior Assistant Attorney General
Ohio Attorney General's Office
Criminal Justice Section
150 E. Gay Street, 16th Floor
Columbus, Ohio 43215
(614) 644-7233
(866) 485-4071 (fax)
maura.jaite@ohioattorneygeneral.gov
*Respondent's Attorney*

1

1   IN THE COURT OF COMMON PLEAS

2   STARK COUNTY, OHIO

3   CASE NO. 2012 CR 1567

4   2013 CA 00034

5   STATE OF OHIO,              )
                                )
6                   Plaintiff,  )   TRANSCRIPT OF
                                )   PROCEEDINGS
7   versus                      )
                                )
8   KAYLA J. AYERS,             )   VOLUME NO. I
                                )
9                   Defendant.  )

10

11      BE IT REMEMBERED, That upon the

12   hearing of the above entitled matter in the

13   Court of Common Pleas, Stark County, Ohio,

14   before the Honorable Kristin G. Farmer,

15   Judge, and commencing on January 28, 2013,

16   the following proceedings were had:

17          - - - - - - - - - -

18

19

20   VICKI I. DENNEWITZ, RPR

21   OFFICIAL COURT REPORTER

22   STARK COUNTY COURTHOUSE

23

24

25

1        APPEARANCES:

2

3           On Behalf of the Plaintiff:

4

5           Stark County Prosecutor's Office

6

7           Dennis Barr, Assistant Prosecutor

8           Toni Schnellinger,

9           Assistant Prosecutor

10         Stark County Office Building

11         Suite 510

12         Canton, Ohio  44702

13

14         On Behalf of the Defendant:

15

16         Stark County Public Defender's Office

17

18         Matthew Kuhn, Attorney at Law

19         April Bible, Attorney at Law

20         201 Cleveland Avenue South

21         Canton, Ohio  44702

22

23

24

25

3

I N D E X

VOIR DIRE:

   By The Court          Page 27

   By Mr. Barr           Page 87

   By Mr. Kuhn           Page 119

OPENING STATEMENTS:

   By Ms. Schnellinger  Page 170

   By Mr. Kuhn           Page 176

-   -   -   -   -   -   -   -   -   -

STATE'S WITNESSES

| | DX | CX | RDX | RCX | FDX |
|---|---|---|---|---|---|
| Richard Annen | 181 | 189 | | | |
| Curtis Ricker | 195 | 202 | | | |
| Michael Canfora | 210 | 218 | | | |
| Reginald Winters | 225 | | | | |

4

<u>P R O C E E D I N G S</u>

- - - - - - - - -

THE COURT:  Go on the record now.
This matter is 2012 CR 1567, State of Ohio
versus Kayla Ayers.

Let the record reflect that
counsel for the -- for the State, Attorney
Barr and Attorney Schnellinger, are present
as well as counsel for the Defendant,
Attorney Kuhn and Attorney Bible.  And the
Defendant is present in the courtroom at
this time.

I'll just indicate for the record
that the attorneys have had the opportunity
to review the cards and the questionnaires
for the prospective jurors, and while they
have been provided, the names of the
jurors -- just for identification purposes,
they are to refer to the prospective jurors
by their number only.  And all questions
are to be asked of every one of the entire
panel of the prospective jurors, not just
those that are in the box.

With respect to the prospective
jurors, counsel will be given an unlimited

number of challenges for cause.  Each side

will have four peremptory challenges with

respect to the twelve members of the panel,

and one peremptory challenge with respect

to each alternate.

I have been provided with a list

of witnesses and exhibits from the State of

Ohio.  And just for the purposes of

identification and for the purpose of

asking the jurors if anyone knows any of

the potential witnesses, those are in fact

the entire list of witnesses that need to

be identified at this time?

MR. BARR:  They are, Your Honor.

THE COURT:  Okay, thank you.  And

I will also note for the record that prior

to going on the record in this matter, the

Court discussed Juror number 10, who is an

employee of the court, and Juror number 79

who is here, but has mono.  And it's my

understanding that the counsel have agreed

to dismiss both Jurors number 10 and Juror

number 79 for cause and that is with the

agreement of the parties; is that correct?

MR. BARR:  Yes, Your Honor.

1          MR. KUHN:  Yes, thank you, Judge.

2          THE COURT:  Okay.  Now, before we

3     go any further, I do have two motions in

4     limine, one by the State of Ohio and the

5     other -- there were actually two filed by

6     the Defendant, but I think that they're

7     both -- one was with prior counsel and one

8     with current counsel.  I think that they

9     both seek to keep out the same evidence.

10         At this time, Attorney Barr, do

11    you have any response to the Defendant's

12    motion in limine?

13              (Thereupon, Mr. Barr and Ms.

14              Schnellinger had a discussion off

15              the record.)

16         MR. BARR:  Well, Your Honor,

17    obviously we don't intend to go there with

18    our case, that is not relevant.  However,

19    in the statement that she gave to Detective

20    Ricker, there's mention of Child Prevention

21    [sic] Services being involved because of

22    the fire and things like that, and I don't

23    think that reflects anything on her

24    parenting skills or anything of that

25    nature, and it would go to Brennan as well

1 as the Defendant.   So that's the only area

2 that

3 we -- we're not going to elicit the

4 testimony, but it does come out in that

5 area.

6    THE COURT:   Okay, thank you.

7 Attorney Kuhn.

8    MR. KUHN:   Thank you very much,

9 Judge.   You are correct that there are two

10 motions filed, one by Attorney Powers and

11 then most recently the one that I filed,

12 and they do cover similar evidence or

13 testimony or anticipated testimony.

14    I just wanted to be I guess a

15 little bit more specific with regard to the

16 allegations of lice infestation.   You know,

17 I think the officer may testify as to my

18 client doing some laundry, I guess just

19 sort of in a general sense as opposed to I

20 hope the officer wouldn't testify that

21 she -- that my client said she was doing

22 laundry because of the lice infestation.

23    And in addition, I guess to

24 clarify, I do understand that CPS probably

25 gets involved when there is a fire and

1    someone's charged with something like this,

2    and I guess I wanted to prevent any

3    testimony regarding prior involvement with

4    CPS.

5              THE COURT:  Okay.

6              MR. KUHN:  So that was the purpose

7    of my motion.

8              THE COURT:  Okay.  And Attorney

9    Barr, you don't intend on --

10             MR. BARR:  No.  I think, Judge, I

11   mean, you know, again, in that statement

12   Kayla herself brings up the lice issue.

13   But, I mean, lice is a problem with

14   everybody.  Last year I had to go through

15   that problem with my kids, they got it from

16   school and all that.

17             THE COURT:  Right.

18             MR. BARR:  So I don't think it

19   reflects on her parenting skills.  We don't

20   intend to use it in that fashion.

21             As far as doing laundry, the

22   Defendant herself says, I was downstairs

23   doing laundry and that's when the fire

24   started.  So it's all germane to this.

25   But, again, we're not going to stand up and

1    argue, oh, she's a bad parent because she's

2    doing laundry and her kids had lice.  We

3    don't intend to do that.

4              THE COURT:  Okay.  So it's not

5    your intention to elicit any testimony from

6    the officers with respect to the dirty

7    house or the lice infestation?

8              MR. BARR:  No.

9              THE COURT:  Just anything that she

10   did say in her statement?

11             MR. BARR:  Yes.

12             THE COURT:  Okay.  Well, with

13   respect to that, anything that she did make

14   in her statement can come in.  Any

15   testimony elicited from any witness

16   regarding any of these facts with respect

17   to CPS's involvement, beyond the instant

18   matter, whether it's through prior

19   dealings, the lice infestation, or the

20   house, none of that will come in, okay?

21             MR. KUHN:  Thank you, Judge.

22             THE COURT:  Yep.  Now with respect

23   to the State's motion in limine, I guess,

24   Attorney Kuhn, do you have any response to

25   that?

1          MR. KUHN:  If I could have just a

2    moment, Judge.

3          THE COURT:  Sure.

4          (Thereupon, Mr. Kuhn had a

5          discussion with Ms. Bible off the

6          record.)

7          MR. KUHN:  Thank you, Judge.  We

8    do understand Prosecutor Barr's motion

9    here, and we don't intend to introduce any

10   evidence to that effect.  Thank you.

11         THE COURT:  All right.  Very good.

12   The motion will be sustained.  We are going

13   go pick up the jury at this time.

14         Let me just note for the record

15   that this Court previously ordered, upon

16   its own motion, a competency evaluation on

17   the Defendant.  And the Defendant has

18   refused to cooperate with that evaluation.

19   Given that the law states there's a

20   presumption that everyone who comes before

21   it is competent, unless shown otherwise,

22   the Court does find that by her refusal to

23   cooperate with the competency evaluation,

24   the Court finds the Defendant is competent

25   to testify -- competent to stand trial in

1  this matter.

2   Is there anything that anybody

3  wishes to add with respect to that?

4   MR. BARR:  Not with respect to

5  that, Your Honor, but I do have a couple

6  housekeeping things I'd like to bring to

7  the Court's attention.

8   THE COURT:  Okay.

9   MR. BARR:  One is, there will be

10  some jail calls or portions of jail calls

11  played.  I believe that counsel for the

12  Defendant is willing to stipulate to the

13  authenticity of the calls so we don't have

14  to call in Mary Deck from the jail.  Is

15  that correct?

16   MS. BIBLE:  That's correct, Your

17  Honor, I did talk to the Prosecutors about

18  that.

19   THE COURT:  Okay.

20   MR. BARR:  And secondly, Your

21  Honor, Miss Ayers did give a statement on

22  October 4th, a noncustodial statement, to

23  Officer Ricker and Reggie Winters, the

24  arson investigator at the Massillon Police

25  [sic] Department.  That was both video and

audio recorded.  However, there was -- on

the original, there's a period of about 20

minutes where Miss Ayers sits in the room

by herself, nobody talks to her.  One

officer comes in and checks her purse.  And

then also on the original, the officers

leave the room and Officer Ricker comes

back in and then decides at that point in

time that he's going to conduct what could

be a custodial -- custodial interrogation

and begins to Mirandize Miss Ayers, and she

invokes her Miranda rights which would be

improper to put before the jury.

            So we have obtained an edited copy

of that original statement.  That will

start when the interview starts, and it

does not contain that Miranda warning and

her refusal to go further under Miranda --

            THE COURT:  Okay.

            MR. BARR:  -- so as to speed

things along.

            THE COURT:  Okay.

            MR. KUHN:  Judge, we would, I

guess, agree to the edited version.

            THE COURT:  Okay.

1         MR. KUHN:  I guess from a personal

2  standpoint, I would like to maybe call to

3  the jury's attention that it is an edited

4  version and there's 20 minutes --

5         THE COURT:  Very good.

6         MR. KUHN:  -- where Ms. Ayers is

7  seated in an interrogation room by herself

8  so that that fact I guess isn't overlooked.

9         THE COURT:  I guess what I would

10  just suggest to the jury that there may

11  appear to be lapses in time or what appears

12  to have been portions cut out, that the

13  statement has been edited to play in

14  accordance with the Rules of Evidence,

15  you're not to make any assumptions or draw

16  any conclusions by the fact that an edited

17  version is being played.  Is that

18  acceptable?

19         MR. BARR:  That's acceptable, Your

20  Honor.

21         MR. KUHN:  Yes, Judge, thank you.

22         THE COURT:  All right.  Anything

23  further?

24         MR. BARR:  No, Your Honor.  Thank

25  you.

1    THE COURT: Okay. Attorney Kuhn?

2    MR. KUHN: Nothing at this time,

3    Judge.

4    THE COURT: Okay, thank you. All

5    right. And we will go off the record until

6    the jury is brought up.

7    Just so that you all know, you'll

8    be have -- you'll each have 30 minutes for

9    voir dire, 30 minutes for an opening

10   statement, 30 minutes for a closing

11   statement, and the State can decide in what

12   manner you wish to rebut, obviously no more

13   than 20 and 10, okay?

14   MR. BARR: Uh-huh.

15   THE COURT: And feel free not to

16   take all of it, too.

17   (Thereupon, the prospective jurors

18   entered the courtroom at 9:25

19   a.m.)

20   THE COURT: All right. Thank you,

21   you may be seated.

22   All right. Good morning to all of

23   you. My remarks this morning are addressed

24   to those of you who have been called as

25   prospective jurors in this case. I welcome

1   you to the Stark County Court of Common

2   Pleas.  I am Judge Kristin Farmer, and I

3   will be presiding over this matter for

4   which you have been summonsed.

5           You've already met my Magistrate

6   and bailiff, Lori Flowers.  Much of your

7   time here is going to be spent in her care.

8   If at any time you have any needs which we

9   can help you with, she will be more than

10  happy to help you and see how we can

11  accommodate you.

12          Also present in the courtroom,

13  sitting in front of me, is the court

14  reporter, Vicki Dennewitz.  It's her job to

15  make a complete record.  She's typing down

16  everything that is said in the courtroom

17  this morning.  But in -- in the absence of

18  Magistrate Flowers, she is also a contact

19  person for you should you have any

20  information that you need to relay [sic] to

21  the Court.

22          Now, it's the Court's intention

23  that your service as jurors, or prospective

24  jurors this morning, be a rewarding

25  experience.  We know that your service

1    poses some inconvenience, especially when

2    days like today and there's a lot of bad

3    weather and no one wants to get out of bed,

4    let alone come on down here.  But we do

5    appreciate it and we do believe that you

6    recognize that your jury service here today

7    is vital to our American system of justice.

8    It's both a legal obligation and a civic

9    duty, and it's a sacrifice required by our

10    system of Government.

11          Now, you all have been summonsed

12    for a case and it is a criminal case.  It's

13    entitled the State of Ohio versus Kayla

14    Ayers.  And at this time I'm going to ask

15    the attorneys in the case to identify

16    themselves, and in the case of the

17    Defendant to identify the Defendant as

18    well.  State of Ohio.

19          MR. BARR:  Thank you, Your Honor.

20    Good morning, ladies and gentlemen, my name

21    is Dennis Barr, I work for the Stark County

22    Prosecutor's office.  Seated with me is Ms.

23    Toni Schnellinger, she's also an Assistant

24    Prosecutor.

25          THE COURT:  Thank you.

1              Attorney Kuhn.

2              MR. KUHN:  Good morning, folks, my

3    name is Matt Kuhn.  This is my colleague,

4    April Bible.  And this is my client, Kayla

5    Ayers.

6              THE COURT:  Thank you.

7              Now before we go on, because

8    sometimes this question comes up later, but

9    I'd rather get it out of the way first, is

10   anyone having any difficulty hearing or

11   seeing any of the parties or myself?  Okay,

12   very good.

13             How is the temperature?  Is it

14   cold, too hot?

15             UNIDENTIFIED JUROR:  Little cool.

16             THE COURT:  Little cool?  Okay.

17   We can adjust the thermostat and hopefully

18   it will take the chill out of here.  Monday

19   morning, the courtroom's been empty all

20   weekend, so it takes a little bit of time

21   to warm up.  If at any time any of you then

22   get too hot, just let us know and we'll do

23   our best to accommodate you, okay?

24             Now, jury service may be strange

25   to you so a short explanation is in order.

1   Those who participate in a trial must do so

2   in accordance with established rules.

3   That's true of the witnesses, of the

4   lawyers, of the Judge, and it's equally

5   true of you as jurors.

6           The lawyers are going to present

7   the evidence according to the rules.  I, as

8   the Judge, am going to enforce those rules

9   and determine what evidence may be

10  admitted.  You, as jurors in this case,

11  will be the sole judges of the facts, the

12  credibility of the witnesses, and the

13  weight to be given to the testimony.

14          The State of Ohio and the

15  Defendant are entitled to jurors who

16  approach this case with open minds and

17  agree to keep their minds open until a

18  verdict is reached.

19          Jurors must be as free as humanly

20  possible from any bias, prejudice, or

21  sympathy, and must be not -- must not be

22  influenced by any preconceived ideas as to

23  the facts or as to the law.

24          Now, although you are -- may be

25  qualified to serve as a juror in this case,

1    there could be something about your past,

2    about a relationship that you've had that

3    may make it difficult for you, embarrassing

4    for you to serve as a juror in this case,

5    and it may disqualify you as serving as a

6    juror in this case.

7            Now, a trial starts with the

8    selection of a jury.  And as prospective

9    jurors, you will be questioned to determine

10   your qualifications in this case.  Our

11   purpose is to obtain a fair and impartial

12   jury.  And since this is an important part

13   of the trial, you are required to take an

14   oath before questions are asked.

15           And at this time I would ask

16   Magistrate Flowers to administer the oath

17   to the prospective jurors.

18           THE BAILIFF:  If you could please

19   stand and raise your right hands.

20           - - - - - - - - - -

21           (Thereupon, the oath was

22           administered to the prospective

23           jurors by the Bailiff.)

24           THE BAILIFF:  Thank you.  Please

25   be seated.

1              THE COURT:  Now, is there anyone

2      in the prospective jury panel who was not

3      able to take the oath as administered by

4      the Court?  Okay.  Very good.

5              Now at this time, as I indicated,

6      the Court and counsel are going to ask you

7      some questions.  These questions are not

8      designed to pry into your personal affairs,

9      but to discover if you have any knowledge

10     of this case, if you have any preconceived

11     opinion that you cannot lay aside, or if

12     you have any experience that might cause

13     you to identify with either side.  These

14     questions are necessary to ensure each

15     party an impartial jury.

16             I'm going to ask all of you to

17     listen closely to the questions.  And if

18     you are silent in response, it will

19     indicate a negative answer.  If, however,

20     any one or more of you believe your answer

21     to be otherwise, please make that fact

22     known to the Court or to the attorney who

23     asked the question by raising your hand.

24             Now, for those of you who are

25     seated here as prospective jurors, we're

1    going to select twelve jurors to serve on

2    the panel and two alternates to serve in

3    this case.

4            When the Court and counsel address

5    you and ask you questions, they're going to

6    do so by your juror number only.  And we

7    don't do this to impersonalize the process,

8    but out of respect for your privacy.  We

9    feel that just addressing you by your

10   numbers only is the best route.

11           And while the attorneys have all

12   the information that you filled out this

13   morning with respect to prior jury service

14   and the questions that were asked of you,

15   they don't have your names.  So there's --

16   the only way they know how to refer to you

17   is by your juror number.

18           Another reason that we do this is

19   that there could be two Mr. Smiths in this

20   panel.  And so that we are clear as to whom

21   we are talking to and who is responding to

22   a question, we just ask that you use your

23   numbers so that we're talking to the right

24   person.

25           Now, when these questions are

asked by either the Court or by the
counsel, I'm going to ask that regardless
of where you're seated, if you're seated up
in the box or if you're seated out in the
gallery there, that you answer the question
if you feel it is appropriate to do so.
And, again, if you do have a response to a
question, just raise your hand so that we
can call on you.

Now, I'm going to say this and as
soon as the questions start, you're going
to say, well, she was just kidding, but
these questions are not designed to pry
into your personal affairs.  However, by
the very nature, they're going to.  So, if
at any point in time you are sitting out
there and you believe that you have an
answer to a question that's been asked, but
you don't want to share it with everyone in
the courtroom just because it is personal,
you have a right to come up to the bench
and have what's known as a sidebar
conference.  And at the sidebar conference
it will be the attorneys, myself, and any
juror who feels it's appropriate.  We'll

have a short discussion about your answer
to a question, the court reporter will
write down everything that is said, but it
will be outside the hearing of all of the
other prospective jurors.

And if you are eventually selected
as a juror in this case, you're going to
notice that perhaps from time to time,
during the trial, the Court and counsel
will have a sidebar conference.  Most of
the time this is done to deal with
evidentiary issues and matters that need to
be discussed outside of the hearing of the
jury.

So if, during the trial, any
sidebar conference does come up, I just ask
that you not all lean this way and try to
hear what we're saying, but just be patient
with us and know that we are working on
this case as quickly as possible.

Now, when the question -- after
we're done questioning all of you, I am
going to meet with the attorneys and they
are going to go over what are known as
challenges.  A challenge is a particular

1    way in which a jury -- juror, excuse me, is

2    excused from any further service.  Now,

3    there are two types of challenges given to

4    the parties.  The first is known as a

5    challenge for cause.  And that challenge

6    may arise out of some relationship that you

7    have with a party, a witness, or even an

8    attorney in this case, or because of some

9    experience that you might have had or

10   belief or conviction that you hold.  It may

11   become apparent, just on the surface, that

12   this would not be an appropriate case for

13   you to serve as a juror.  Again, that's

14   known as a challenge for cause.

15         The second type of challenge

16   that's given to each party is known as a

17   peremptory challenge.  And under most

18   circumstances, when exercising a peremptory

19   challenge, the counsel does not have to

20   give a reason why he's asking -- why he or

21   she, in this case, is asking for a

22   particular juror to be excused.  So while

23   you may have sat here and listened to all

24   the questions that we've given to you, and

25   you may never have answered a question, but

1    all of a sudden you find yourself being

2    excused and perhaps, after you breathe a

3    sigh of relief, you may wonder, well, what

4    did I do wrong, why am I not chosen?  And

5    at this point I'm guaranteeing you that you

6    did nothing wrong, there's nothing about

7    you that wouldn't mean that you couldn't

8    serve as a juror in another case, there's

9    just something about maybe an experience

10   that you hold or have had or some

11   conviction that you may hold that would

12   make it just not this case the right case

13   for you to sit on.  Again, it doesn't mean

14   that you wouldn't be qualified to serve as

15   a juror in any other case.

16       All right.  Now, you're probably

17   all wondering, how long am I going to be --

18   have to be here if I'm selected as a juror.

19   And at this point in time I'm anticipating

20   that the trial in this case will take two

21   days, both today and tomorrow.  However, if

22   you are chosen as a juror, your

23   deliberations could take you past Tuesday.

24   And I have no control over that, that's up

25   to you as the jury, how long it takes for

1      you to deliberate.

2              There may be some long hours

3      involved and it may take longer than the

4      two days, although I'm not anticipating

5      that at this time.  You will all be given

6      time to contact any family or friends or

7      change any plans that you might have had.

8              Now, does the anticipated length

9      of this trial cause any problems for

10     anybody, the two day commitment?

11             JUROR #27:  Maybe.

12             THE COURT:  Okay.  That's fine.

13     Juror number 27, okay.  And what kind of

14     problem will you have?

15             JUROR #27:  Work related.

16             THE COURT:  Court related?

17             JUROR #27:  Work related.

18             THE COURT:  Do you have something

19     pressing at work, or deadlines?

20             JUROR #27:  Yeah, I mean, it

21     probably involve like nonpublic material of

22     information I wouldn't be able to discuss

23     here.

24             THE COURT:  Okay.  Do you have

25     meetings or something set for these two

1  days that you cannot change?

2  JUROR #27:  Not meetings

3  specifically.

4  THE COURT:  Okay.  Engagements, is

5  that a better term?

6  JUROR #27:  I would just say

7  deadlines.

8  THE COURT:  Deadlines, okay.  Very

9  good.  And are you -- is anybody -- and

10  this goes along with Juror number 27,

11  anybody not going to be paid for their

12  service here today at work?  Okay.

13  Juror number 27, these deadlines

14  that you have, are they so pressing that

15  you think that you would not be able to

16  give this matter your full time and

17  attention?

18  JUROR #27:  Yeah, I mean, it's

19  kind of -- it's judgmental.  You know, it's

20  kind of borderline.  I think I can, you

21  know, today and tomorrow possibly, but if

22  it's extended beyond that, it might cause

23  difficulty.

24  THE COURT:  Okay.  All right,

25  thank you for sharing that.

1          Anybody else have any kind of

2   issues with respect to the time in this

3   case?  Okay.

4          Now, are any of you no longer

5   residents of Stark County?  Anybody moved

6   out of the county lately and no longer

7   living in Stark County?

8          For any of you is English not your

9   native language?  Okay.

10         Have any of you served as a juror

11  in any other court of record within Stark

12  County within the past 12 months?  All

13  right.

14         How many of you out there have

15  ever served on a criminal jury before?

16  Anybody?  Okay.  I thought I'd get more

17  answers from that.

18         Let's start up here with Juror

19  number 28; is that correct?

20         JUROR #28:  Yes.

21         THE COURT:  All right.  Now, do

22  you remember what the nature of the charge

23  was in that case?

24         JUROR #28:  It was -- I believe it

25  was theft in a nighttime dwelling.

1          THE COURT:  Okay.

2          JUROR #28:  And it was quite a few

3   years ago so --

4          THE COURT:  Okay.  More than ten?

5          JUROR #28:  We're talking '80s.

6          THE COURT:  Okay, very good, thank

7   you.  Do you remember if that was in Stark

8   County, or was it --

9          JUROR #28:  No, it was in Stark

10  County.

11         THE COURT:  All right, very good.

12  Do you remember if you deliberated to a

13  verdict.

14         JUROR #28:  Yes, we did have a

15  verdict.

16         THE COURT:  Okay.  Was it guilty

17  or not guilty?

18         JUROR #28:  It was guilty.

19         THE COURT:  All right.  Now, do

20  you believe that you can put aside whatever

21  you heard in that case and the law that was

22  given to you in that case and decide this

23  case solely on the evidence presented to

24  you and the law as I give it to you?

25         JUROR #28:  Yes, I do.

1    THE COURT:  All right.  Very good.

2    Thank you.

3    Now, let me see, who else didn't I

4    get out there?  I've got -- oh, okay, very

5    good.  And you are Juror number 18?

6    JUROR #18:  18.

7    THE COURT:  All right.  And you

8    served on a criminal jury before?

9    JUROR #18:  Yes, it was a murder

10   trial.

11   THE COURT:  Murder trial?  All

12   right.  Do you remember exactly when it

13   was?

14   JUROR #18:  Late '70s.

15   THE COURT:  All right.  And was it

16   in Stark County?

17   JUROR #18:  Yes.

18   THE COURT:  Do you recall if you

19   deliberated to reach a verdict?

20   JUROR #18:  Yes, we did.

21   THE COURT:  And what was that

22   verdict?

23   JUROR #18:  We acquitted the

24   person.

25   THE COURT:  Okay, very good.  And

just like Juror number 28, do you believe
that you could put aside the evidence that
you heard in that case and the law that was
given to you in that case and decide this
case solely on the evidence presented in
this case and the law as I give it to you?

JUROR #18: Yes.

THE COURT: Okay. Thank you.

Did I get everybody in the jury
box up front? Okay. Let's start with the
front row, anybody in the front row? Okay.
Juror number -- is it 33?

JUROR #33: 33.

THE COURT: Okay. And similar
questions, do you remember what kind of
charge was involved?

JUROR #33: Theft.

THE COURT: Okay. Do you recall
when?

JUROR #33: Shooting involved.
I'm not sure what --

THE COURT: All right. Do you
recall when that was?

JUROR #33: 2000-ish.

THE COURT: Okay. And in Stark

County?

JUROR #33:  Stark County, yes.

THE COURT:  And did you deliberate to reach a verdict?

JUROR #33:  Yes, we did.

THE COURT:  And what was that verdict?

JUROR #33:  Not guilty.

THE COURT:  Not guilty.  And do you believe that you can put aside the evidence and the law that was given to you in that case and determine a verdict in this case solely based upon the evidence presented to you in this case as well as the law that's given to you in this case?

JUROR #33:  Absolutely.

THE COURT:  All right.  Very good, thank you.

And I believe, is it Juror number 34?

JUROR #34:  Yes.

THE COURT:  All right.  Similar questions, do you remember what kind of charge was involved?

JUROR #34:  Drug possession.

1     THE COURT:  Okay.  And approximate

2     date?

3     JUROR #34:  About 2005.

4     THE COURT:  Okay.  And in Stark

5     County, in this courthouse?

6     JUROR #34:  Right here, this

7     courthouse.

8     THE COURT:  And do you remember

9     what the verdict was?

10    JUROR #34:  I was an alternate,

11    but in the end it was guilty.

12    THE COURT:  Okay.  And, again, can

13    you put aside the evidence and the law that

14    was given to you in that case and determine

15    this case solely upon the evidence that's

16    presented here today and tomorrow as well

17    as upon the law that I give to you in this

18    case?

19    JUROR #34:  Yes.

20    THE COURT:  Okay.  I know I sound

21    like a broken record asking the same

22    questions, but, again, they are necessary

23    to ensure that we get to any sort of bias

24    or prejudice involved.

25    And is it Juror number 38?

1             JUROR #38:  Yes.

2             THE COURT:  All right.  Similar

3  questions, do you remember what the charge

4  was?

5             JUROR #38:  It was a malpractice

6  trial.

7             THE COURT:  Okay.  So it was

8  actually a civil trial?

9             JUROR #38:  Yes.

10            THE COURT:  Okay.  And do you

11  recall when that was?

12            JUROR #38:  In the '80s.

13            THE COURT:  In the '80s.  And was

14  that in Stark County?

15            JUROR #38:  Yes.

16            THE COURT:  Did you deliberate in

17  that case to reach a verdict?

18            JUROR #38:  Yes.

19            THE COURT:  And do you recall what

20  that verdict was?

21            JUROR #38:  Guilty, I guess.

22            THE COURT:  Okay.  So you found

23  for the plaintiff --

24            JUROR #38:  Yes.

25            THE COURT:  -- did you award

1    money?

2              JUROR #38:  Yes.

3              THE COURT:  Okay.  And I do have a

4    question I'm going to ask sort of so that I

5    don't have to repeat this to everyone and

6    put them to sleep, but of all people who

7    served in a civil jury so when I do ask

8    that question keep in mind that it will be

9    directed to you since you did serve on a

10   civil jury, okay?

11             JUROR #38:  Okay.

12             THE COURT:  All right.  How about

13   down here, anyone serve in a criminal case

14   before?

15             JUROR #49:  Theft.

16             THE COURT:  Theft?  And you are

17   Juror number --

18             JUROR #49:  49.

19             THE COURT:  -- 39?

20             JUROR #49:  49.

21             THE COURT:  49, okay.  And it was

22   a theft case?  Do you recall approximately

23   when that was?

24             JUROR #49:  I think it was

25   probably ten years ago.  Roughly.

1      THE COURT:  Okay.  Which is hard

2   to believe, but that was around 2000?

3      JUROR #49:  Yeah.

4      THE COURT:  And in Stark County?

5      JUROR #49:  Yeah.

6      THE COURT:  And did you deliberate

7   to reach a verdict?

8      JUROR #49:  Yeah.  It was guilty.

9      THE COURT:  Guilty?  All right.

10  And, again, do you believe that you can put

11  aside the evidence and the law that was

12  given to you in this case -- in that case

13  and determine a verdict in this case

14  solely --

15      JUROR #49:  Yeah.

16      THE COURT:  -- based on the

17  evidence and the law as I give to you?

18  Very good, thank you.

19      Anybody else in the front row who

20  served on a criminal jury before?  Okay.

21      How about the second row?  All

22  right.  And you are Juror number 55?

23      JUROR #55:  Yes.

24      THE COURT:  And do you remember

25  what the nature of the charge was?

1          JUROR #55:  Drugs.

2          THE COURT:  Drugs.  And an

3   approximate time?

4          JUROR #55:  I think in 2005.

5          THE COURT:  Okay.  In Stark

6   County?

7          JUROR #55:  Yeah.

8          THE COURT:  And do you recall if

9   you deliberated to reach a verdict?

10          JUROR #55:  Guilty.

11          THE COURT:  Guilty.  And, again,

12   do you believe you can put aside that --

13   the evidence that you heard there and the

14   law that was given to you there and

15   determine this case solely based upon the

16   evidence that you hear in this courtroom

17   and the law as I give it to you?

18          JUROR #55:  Yes.

19          THE COURT:  All right.  Very good.

20   Anybody else in the second row?  And you

21   are -- are you 72?

22          JUROR #69:  No, 69.

23          THE COURT:  69.  All right.  Do

24   you recall what the charge was?

25          JUROR #69:  Theft.

1    THE COURT:  Theft.  And do you

2    recall when it was?

3        JUROR #69:  Late '70s, early '80s.

4        THE COURT:  All right.  And in

5    Stark County?

6        JUROR #69:  Yes.

7        THE COURT:  And did you -- do you

8    recall if you deliberated to reach a

9    verdict?

10       JUROR #69:  Yes.  Guilty.

11       THE COURT:  Guilty.  And, again,

12   as with everyone before you, can you agree

13   with me to put aside all the evidence and

14   law that was given to you in that case and

15   apply the law as I give it to you to the

16   facts and the evidence that's presented to

17   you in this case?

18       JUROR #69:  Yes.

19       THE COURT:  Thank you.

20       Anybody else in the second row,

21   criminal case?  Okay.  Very good.

22       All right.  Let's talk about civil

23   cases.  Anybody in the panel ever served as

24   a juror on a civil case before?  Okay.  And

25   you are Juror number 16?

1      JUROR #16:  Yes.

2      THE COURT:  All right.  And do you

3  recall what kind of case that was involved?

4      JUROR #16:  I think it might have

5  been like a domestic case.

6      THE COURT:  Okay.  Do you recall

7  how long ago that was?

8      JUROR #16:  The '90s.

9      THE COURT:  '90s.  And was that in

10  Stark County?

11      JUROR #16:  Yes.

12      THE COURT:  And do you remember

13  what your verdict was?

14      JUROR #16:  Not guilty.

15      THE COURT:  Not guilty.  All

16  right.  And, again, do you believe you can

17  put aside all the facts and the law given

18  to you in that case and apply it solely --

19  apply it solely to the law as I state it to

20  you in this case to the facts as you find

21  them in this case?

22      JUROR #16:  Yes.

23      THE COURT:  All right.  Anybody

24  else in the jury box ever served on a

25  civil?  Oh, Juror number 18, you're a

1    popular girl.

2              JUROR #18:  It was an insurance

3    case.

4              THE COURT:  Okay.  Do you recall

5    when it was?

6              JUROR #18:  I think the early

7    '80s.

8              THE COURT:  All right.  And in

9    Stark County?

10             JUROR #18:  Yes.

11             THE COURT:  And do you recall if

12   you deliberated to reach a verdict?

13             JUROR #18:  Yes.

14             THE COURT:  And did you find for

15   the plaintiff or the defendant, do you

16   recall?

17             JUROR #18:  You know, I really

18   don't remember.

19             THE COURT:  Okay.  Do you remember

20   if you awarded money?

21             JUROR #18:  No, we did not.  I

22   think we did -- I think we refused it now

23   that I think about it.

24             THE COURT:  All right.  Thank you.

25             All right.  Anybody else in a

civil jury?

How about out in the gallery there, anybody ever served as a juror in a civil case?  Okay.  Juror number 39?

JUROR #39:  Yeah.

THE COURT:  Okay.  Do you recall what the nature of the case was?

JUROR #39:  It was an auto accident and they were being sued.

THE COURT:  Okay.  Do you recall when that was, approximately?

JUROR #39:  Around late '90, maybe early 2000.

THE COURT:  All right.  And that was in Stark County as well?

JUROR #39:  Yes.

THE COURT:  Do you remember if you deliberated to reach a verdict?

JUROR #39:  I was an alternate juror.

THE COURT:  Okay.

JUROR #39:  And the Judge sent us home because he told us how it would probably go, it was a chiropractic scam. Like he wasn't there in the courtroom.

1          THE COURT:  Okay.

2          JUROR #39:  And I think they

3     didn't -- they didn't get any money awarded

4     to them.

5          THE COURT:  Okay.  Thank you.

6          Anybody else in the front row, a

7     civil trial?  Okay.

8          In the back row?  Oh, you're

9     popular too, huh?  And what -- do you

10    remember what the nature of the case was?

11         JUROR #55:  Domestic.

12         THE COURT:  Okay.  And was

13    that -- do you recall when that was?

14         JUROR #55:  I think later '80s.

15         THE COURT:  All right.  And in

16    Stark County as well?

17         JUROR #55:  Yeah.

18         THE COURT:  And did you deliberate

19    to reach a verdict?

20         JUROR #55:  Yeah.

21         THE COURT:  Do you recall what

22    that verdict was?

23         JUROR #55:  Guilty.

24         THE COURT:  Guilty.  And, again,

25    are you able to put aside the facts and the

law that was given to you in that case and

determine this case solely upon the

evidence?

JUROR #55:  Yes.

THE COURT:  Okay, thank you.

Anybody else in the second row?

All right.

Now, my questions are going to

be -- this question is directed to anyone

who served as a juror in a civil case

before because there is substantial

differences between serving in a civil case

and serving in a criminal case, this is

particularly true with respect to the

burden of proof which is placed upon the

prosecution in this case.

In a civil case, we say that the

plaintiff has to prove the facts by a

preponderance of the evidence.

In a criminal case, the Defendant

is presumed to be innocent and before she

can be found guilty, the prosecution must

prove all the elements of the offense for

which she is charged beyond a reasonable

doubt.

1      If the jury has any doubt -- any

2   reasonable doubt I should say, not just any

3   doubt, any reasonable doubt, the Defendant

4   must be acquitted.

5      Will each of you agree that you

6   will be able to set aside the instructions

7   which you heard in the previous civil case,

8   knowing that now a civil case differs

9   substantially from a criminal case in the

10  burden of proof, and try this case based

11  solely upon the instructions as I give them

12  to you and the law which you find in this

13  case?  Can everyone agree with me that they

14  can do that?  Okay, very good.

15     Now, has anyone been convicted of

16  a serious offense; that is, a felony

17  offense?  And obviously keep in mind you do

18  have the right to a sidebar if it's

19  something that you don't wish to discuss

20  with everyone.  Anybody been convicted of a

21  serious offense, a felony offense?  Okay.

22  Is that Juror number 38?

23          JUROR #72:  72.

24          THE COURT:  72.  I am really bad

25  at keeping track here.  If it's something

1    you would like to have at a sidebar, we can

2    come up and we can talk about it, or if you

3    feel okay talking about it, that's fine.

4    What offense --

5              JUROR #72:  Cultivation of

6    marijuana.

7              THE COURT:  Okay.  Do you know

8    when that was?

9              JUROR #72:  Three years ago.

10             THE COURT:  Okay.  Are you

11   currently on any probation or parole?

12             JUROR #72:  No.

13             THE COURT:  And was there anything

14   about your experience in that case which

15   would cause you to believe that this would

16   not be a good case for you to sit on as a

17   fair and impartial juror?  No?

18             JUROR #72:  No.

19             THE COURT:  Okay.  You believe

20   that you can put aside the facts in your

21   case and judge this case solely upon the

22   law which I give to you and the facts as

23   you find them?

24             JUROR #72:  Yes.

25             THE COURT:  And is there anything

1    about your experience in your case that

2    would cause you to side with either the

3    prosecution or the defense?  And it's

4    okay -- like, again, there's no wrong

5    answers, no one's going to think any

6    differently of you, all we want are

7    truthful answers.

8            JUROR #72:  Right.  I don't know.

9    I don't think.

10           THE COURT:  Okay.  Now, do you

11   recognize either Attorney Barr or Attorney

12   Schnellinger as having been involved in

13   your case?

14           JUROR #72:  No.

15           THE COURT:  And was that in Stark

16   County?

17           JUROR #72:  Yes.

18           THE COURT:  All right.  And I

19   thank you for your candor in answering

20   those questions.

21           Okay.  Do any of you have any

22   physical or mental conditions at this time

23   which might cause you to not be able to

24   serve as a juror in this case?  Anybody

25   have difficulty sitting for a long time,

1    anybody's mind distracted by a sick kid,

2    sick parents, relatives, anything like

3    that?  Okay, back in the back, is that

4    Juror number 66?

5            JUROR #61:  61.

6            THE COURT:  61.  Told you I'm not

7    very good at this.

8            JUROR #61:  I have trouble sitting

9    up for a long time because I broke my neck

10   in a car accident.

11           THE COURT:  Okay.  And I'm sure

12   sitting on those very comfortable benches

13   is only making it that much easier for you,

14   correct?

15           JUROR #61:  Yes.

16           THE COURT:  Now, if you are chosen

17   as a juror you will get the luxury of

18   having to sit in one of our luxurious seats

19   up here and you will be given time to

20   stretch -- stand up and stretch, you can do

21   that whenever you feel it's necessary.

22           With those sorts of

23   accommodations, do you think that you would

24   be able to give this case your full time

25   and attention, or is it just something that

1    you just can't sit?

2              JUROR #61:  Yeah, I'll be fine.  I

3    mean, I could wear my brace if I had to.

4              THE COURT:  All right, thank you.

5              Anybody have -- I know we went

6    over this earlier.  Okay, Juror number 26.

7              JUROR #26:  Yeah.

8              THE COURT:  Okay.  And what kind

9    of issue are you having?

10             JUROR #26:  Back problems.

11             THE COURT:  Back problems?

12             JUROR #26:  Yeah.

13             THE COURT:  Is it hard for you to

14   sit for a long time?

15             JUROR #26:  Sit for a long time.

16   Car accidents.

17             THE COURT:  Okay.  Even with the

18   super comfortable chairs up there --

19             JUROR #26:  Yeah, it's still a

20   problem.

21             THE COURT:  Okay.  If you're given

22   accommodations as far as being able to

23   stand up and stretch whenever you feel it's

24   necessary, will that help?

25             JUROR #26:  Somewhat.  I crack my

1    back sometimes.

2         THE COURT:  Okay.  And is there

3    anything about your back problem that you

4    think you wouldn't be able to give this

5    case your full time and attention while

6    you're here?

7         JUROR #26:  In between.

8         THE COURT:  In between?  Okay,

9    thank you.

10        Anybody else?  As we went over

11   this before -- oops, there we go down

12   there.  Okay, Juror number 50?

13        JUROR #50:  Yes.

14        THE COURT:  Okay.  What kind of

15   issues are you having?

16        JUROR #50:  I had a heart stent in

17   about two months ago and I'm on meds that

18   sort of, you know, make me drowsy.  I

19   wouldn't be able to take them if I served

20   on a jury.

21        THE COURT:  Do you think that that

22   medication would cause you to have trouble

23   giving this case your full time and

24   attention?

25        JUROR #50:  Well, the blood

1    pressure medicine especially sort of makes

2    me drowsy.  And I never take it when I have

3    someplace to go.

4              THE COURT:  Well, okay.  Well, we

5    don't want you to not take the medicine.

6    You think it would be difficult to give

7    this case your full time and attention?

8              JUROR #50:  I think I could if it

9    didn't last that long.

10             THE COURT:  And as I indicated

11   earlier, the trial itself is not expected

12   to take past the two days, but whether or

13   not the jury deliberates longer than that,

14   I -- that's not up to me.

15             JUROR #50:  I'm also in cardiac

16   rehab.

17             THE COURT:  Okay.  Do you have

18   appointments scheduled?

19             JUROR #50:  Yes.  Actually today

20   and tomorrow and Thursday.

21             THE COURT:  Do you -- are you able

22   to change those if you need to?

23             JUROR #50:  No, there's actually a

24   waiting list to get on those at Aultman

25   Hospital.

1    THE COURT:  All right.  All right.

2 Thank you.  Anybody else?

3    All right.  Now, as I previously

4 stated this is a criminal case and it is

5 entitled the State of Ohio versus Kayla

6 Ayers.  Attorney Kuhn has identified Miss

7 Ayers for you.  Has anybody out in the

8 panel ever heard of or are you familiar

9 with Kayla Ayers?  Okay.

10    And, again, Miss Ayers is

11 represented by Attorneys Matthew Kuhn and

12 April Bible.  Has anyone heard of or know

13 of either Attorney Kuhn or Attorney Bible?

14 Okay.

15    And the State, again, is

16 represented by Attorney Dennis Barr and

17 Attorney Toni Schnellinger.  Now, please

18 raise your hand or indicate if you have a

19 response to whether or not you either know

20 of Attorney Barr or Attorney Schnellinger

21 or had any contact, or if they look

22 familiar to either one of you.  Okay.

23 And you're Juror number 49?

24    JUROR #49:  Yeah.

25    THE COURT:  Okay.  Which one looks

1    familiar to you?

2                  JUROR #49:  Barr, Dennis Barr.

3                  THE COURT:  Okay.  And how -- does

4    he just look familiar, or --

5                  JUROR #49:  A friend of a friend.

6                  THE COURT:  Okay.  Now, is there

7    anything about your knowledge of Attorney

8    Barr or your relationship, regardless how

9    distant it may be with him, that would

10   cause you to think that this would not be a

11   case where you could be a fair and

12   impartial juror?

13                 JUROR #49:  No.

14                 THE COURT:  You're able to put

15   aside whatever you know of him and decide

16   this case solely upon the evidence

17   presented?

18                 JUROR #49:  (Juror nodding head up

19   and down.)

20                 THE COURT:  Okay.  Anybody else,

21   any of the attorneys or the Defendant

22   herself look familiar or believe that you

23   may know them?

24                 Okay.  Now, I've indicated that

25   this is a criminal case, and a criminal

53

1    case begins with the filing of an

2    indictment.  And the indictment just sets

3    forth allegations.  And I'm going to read

4    to you, in essence, what the allegations in

5    this case are.  Now, keep in mind these are

6    only allegations, none of these allegations

7    at this point have been proven.  But I'm

8    going to just read to you sort of a

9    description of the charges for which the

10   Defendant is charged so in case you may

11   have heard anything about the events

12   leading up to it or if anything sounds

13   familiar, you can let us know and we can

14   follow-up.

15         So, the Defendant is charged with

16   two counts, the first count being

17   Aggravated Arson.  And specifically it's

18   alleged that on the 3rd day of October,

19   2012, Kayla Ayers, by means of fire or

20   explosion, knowingly caused physical harm

21   to 185 26th Street Southeast, Massillon, in

22   Stark County, Ohio, which was an occupied

23   structure.

24         All right.  And she's also charged

25   with one count of Endangering Children.

1          And that specifically alleges that on the

2          3rd day of October, in 2012, Kayla Ayers

3          did recklessly, being the parent, guardian,

4          custodian, person having custody or

5          control, or person in loco parentis of

6          three children under 18 years of age, did

7          create a substantial risk to the health or

8          safety of such children by violating a duty

9          of care, protection, or support.  And that

10         is alleged to have occurred in Stark

11         County, Ohio.

12              Now, to the best of your

13         recollection, I know that this was a while

14         back, have any of you read or heard

15         anything about this case?  All right.

16         Anybody recall ever reading any newspaper

17         articles or hearing anything on the radio

18         or any TV about this case?  All right.

19         Very good.

20              Again, to these charges the

21         Defendant has pled not guilty, and it will

22         be the question of whether the

23         Defendant -- of whether the Defendant is

24         guilty or not guilty that you will decide

25         if you're chosen as a juror in this case.

1        Having heard the charges that have
2    been filed against the Defendant, is there
3    any member of the jury panel who feels that
4    he or she cannot give this Defendant a fair
5    trial because of the nature of the charges
6    against her?  Okay.  And you are Juror
7    number 21?
8        JUROR #21:  Correct.
9        THE COURT:  All right.  Is it
10   something that you feel comfortable
11   discussing in front of --
12       JUROR #21:  Sure.  I have three
13   small children; four, two, and the daughter
14   that was born on the date of the
15   allegations so kind of impartial to those
16   children and things happening to kids and
17   putting them in danger.
18       THE COURT:  Okay.  Do you believe
19   that this would not be a good case for you
20   to --
21       JUROR #21:  Probably not.
22       THE COURT:  Okay.  And do you
23   think it would be difficult for you to be
24   fair and impartial in this case?
25       JUROR #21:  Absolutely.

1      THE COURT:  All right.  Thank you

2  for your candor.

3      Anybody else, after having heard

4  the allegations, believe that this might

5  not be the best case for them to be a juror

6  on?  Okay.  And you are Juror number 72?

7      JUROR #72:  72.

8      THE COURT:  All right.  And,

9  again, is it something you feel comfortable

10  talking about?

11      JUROR #72:  I don't feel

12  comfortable with being judge -- children.

13      THE COURT:  Okay.  Do you believe

14  that it would be hard for you to be fair

15  and impartial in this case?

16      JUROR #72:  Yes.  It would, yes.

17      THE COURT:  Because it involves

18  children?

19      JUROR #72:  Yes.

20      THE COURT:  All right.  Thank you

21  also for your candor.

22      Anybody else?  All right.  And you

23  are Juror number 26?

24      JUROR #26:  Yeah.  I feel the same

25  way.  I got two kids of my own, I feel the

1    same exact way as that guy down there and

2    the guy over there, the same way.

3              THE COURT:  Okay.  You could not

4    be a fair and impartial juror in this case?

5              JUROR #26:  No, ma'am.

6              THE COURT:  All right, thank you.

7    Thank you for your candor as well.

8              All right.  Anybody have similar

9    feelings like that or feelings that are

10   somewhat different, but still they think

11   this might not be the right case for them?

12   All right.  Very good.

13             Now, do any of you out there have

14   any personal interest of any kind in this

15   case, whether it be the outcome or anything

16   like that?  All right.

17             Now, during the trial in this

18   case, the following witnesses may be called

19   to testify on behalf of the parties, I'm

20   going to read those names to you:  Officer

21   Ricker of the Massillon Police Department,

22   Mike Canfora of the Massillon Fire

23   Department, Captain Annen of the Massillon

24   Fire Department, Inspector Winters of the

25   Massillon Fire Department.  And the

1    following individuals:  Brennan Scott,

2    Karen Ball, Jennifer Conley, Jeff Ayers,

3    Jason Pandrea.  Any of those names sound

4    familiar to any of you?

5              Now, having said that -- oh, I

6    have somebody over here.  All right, thank

7    you.  Juror number 22 [sic]?

8              JUROR #24:  Jeff Ayers.

9              THE COURT:  Okay.

10             JUROR #24:  I had a student named

11   Jeff Ayers.

12             THE COURT:  And where was that?

13             JUROR #24:  Sandy Valley Local.

14             THE COURT:  All right.  Do you

15   recall when that was?

16             JUROR #24:  The early '70s.

17             THE COURT:  That always amazes me

18   about teachers, no matter how long ago it

19   was, you always -- and you remember their

20   names and you could probably tell me where

21   they sat in the classroom and everything

22   that you did teach them.

23             Is there anything about your

24   knowledge -- and I don't know that this is

25   the same Jeff Ayers.

1          JUROR #24:  Right.

2          THE COURT:  But is there anything

3    about your knowledge of the Jeff Ayers that

4    you were involved with which would cause

5    you maybe to not be the best juror in this

6    case?

7          JUROR #24:  No, I don't think so.

8          THE COURT:  Okay.  And you could

9    still be fair and impartial?

10         JUROR #24:  Yes, ma'am.

11         THE COURT:  And you believe that

12   you could decide the case just on the facts

13   and not any relationship that you may have

14   had with him?

15         JUROR #24:  Yes, ma'am.

16         THE COURT:  And you wouldn't give

17   his testimony any more weight than you

18   would somebody else simply because you knew

19   him?

20         JUROR #24:  No, ma'am.

21         THE COURT:  All right, thank you.

22         Anybody else, any of those names

23   sound familiar?  Okay.  We'll start up

24   here.  Juror number 6 -- no, 5?

25         JUROR #5:  Reggie Winters.

1      THE COURT:  Okay.  And how do you

2  know Mr. Winters?

3      JUROR #5:  Just through the work

4  places.  I worked in the school system and

5  he used to come to the schools and --

6      THE COURT:  Okay.  Is there

7  anything about your relationship or

8  knowledge of Mr. Winters that you would

9  have difficulty being a fair and impartial

10  juror in this case?

11      JUROR #5:  No.

12      THE COURT:  All right.  And -- and

13  can you agree with me that you would not

14  give his testimony any more weight or find

15  him more credible just because of the

16  relationship that you had?

17      JUROR #5:  I would not.

18      THE COURT:  Okay.  All right.

19  Anybody in the jury box?  Okay.  Let's go

20  to the first row.  And you are Juror number

21  53?

22      JUROR #53:  Yes, ma'am.

23      THE COURT:  Okay.  And who sounds

24  familiar to you?

25      JUROR #53:  The witness, the last

1    one, can you spell the last name to make

2    sure it's not the same person?

3              THE COURT:  Sure.  The last person

4    was Jason Pan -- Pandrea.  I'll have --

5              JUROR #53:  Yes.

6              THE COURT:  P-A-N-D-R-E-A.

7              JUROR #53:  I know him.

8              THE COURT:  Okay.  And how do you

9    know Mr. Pandrea?  And am I saying it right

10   if you know him?

11             JUROR #53:  My niece's husband's

12   brother.  Family.

13             THE COURT:  Husband's brother,

14   okay.  Is there anything about your

15   knowledge or your relationship with the

16   witness that would cause you to believe

17   that you could not be fair and impartial in

18   this case?

19             JUROR #53:  No.

20             THE COURT:  Do you believe that

21   you could put aside your knowledge and your

22   relationship and determine this case solely

23   based upon the evidence that's presented?

24             JUROR #53:  Yes, I could.

25             THE COURT:  And would you be

1      more -- would you be inclined to give Mr.

2      Pandrea's testimony more weight just

3      because you know him and not because of

4      what -- the evidence presented?

5              JUROR #53:  No, ma'am.

6              THE COURT:  Okay.  Thank you.

7              The second row, anybody in the

8      second row?  Okay.  And you are Juror

9      number 33?  32?

10             JUROR #59:  59.

11             THE COURT:  59, okay.

12             JUROR #59:  The name Jennifer

13     Conley sounds familiar.

14             THE COURT:  Okay.

15             JUROR #59:  I think I had gone to

16     school with her.

17             THE COURT:  All right.  And where

18     did you go to school?

19             JUROR #59:  Timken Senior High

20     School.

21             THE COURT:  Okay.  Do you recall

22     when you would have known her?

23             JUROR #59:  '93 to '95.

24             THE COURT:  Okay.  Now, is there

25     anything about your knowledge of Miss

1    Conley that would cause you to believe that

2    this would not be a good --

3         JUROR #59:  No, I just know her

4    face if it is the same Jennifer.

5         THE COURT:  Okay.  And you believe

6    you can put your relationship aside and

7    render a verdict based on the evidence?

8         JUROR #59:  Yes, ma'am.

9         THE COURT:  And you wouldn't be

10   inclined to give her testimony any more

11   weight just because you know her?

12        JUROR #59:  No.

13        THE COURT:  All right.  Thank you.

14        Anybody else in the back row?  All

15   right.

16        Now, as we go through the trial

17   and you may all of a sudden realize, oh, I

18   do know that person, maybe you didn't know

19   their name, maybe you didn't know or it

20   didn't sound familiar, maybe you knew them

21   under a different name, but can you all

22   agree with me that if you do recognize

23   someone as we go through this case that you

24   could raise your hand as soon as you

25   recognize them, you don't have to wait

1    until they finished testifying and don't

2    feel like you're interrupting anything

3    because, like I said, our goal here is to

4    give the Defendant a fair and impartial

5    jury.  Can you all agree with me that you

6    can do that if you do eventually recognize

7    a witness?  Okay.

8         Now, the fact that the Defendant

9    is here in court for trial or that the

10   charges have been filed against her is not

11   evidence whatsoever of her guilt.  The

12   jurors are to consider only evidence that's

13   properly received in the courtroom in

14   determining whether the Defendant is guilty

15   or not guilty.

16        The Defendant has been arraigned

17   and has entered a plea of not guilty which

18   is a complete denial making it necessary

19   for the prosecution, acting through the

20   prosecuting attorneys, to prove beyond a

21   reasonable doubt the case against the

22   Defendant.  And until and unless this is

23   done, the presumption of innocence

24   prevails.  Everyone agree with me that they

25   can follow that principle of law?  All

1    right, very good.

2            Now, have any of you or any member

3    of your family or close friend, to your

4    knowledge, ever been charged for or charged

5    with an offense similar to the ones

6    involved in this case; that would be

7    Aggravated Arson and Endangering Children?

8    Okay.  And Juror number 59?

9            JUROR #59:  (Juror nodding head up

10   and down.)

11           THE COURT:  And do you recall --

12   again, keeping in mind you have the right

13   to a sidebar.

14           JUROR #59:  It was my cousin.  It

15   was child endangerment.

16           THE COURT:  Okay.

17           JUROR #59:  It was probably back

18   in the '80s.  I mean, I would have been in

19   junior high, I really don't remember.

20           THE COURT:  Do you recall what the

21   outcome of that charge was?

22           JUROR #59:  I think she was found

23   guilty.

24           THE COURT:  All right.  Now, is

25   there anything about your cousin's case,

1    keep in mind that they're different than

2    the case and the facts before us, that

3    would cause you to believe that you could

4    not be fair or impartial in this case?

5              JUROR #59:  No, I would be fair

6    and open-minded.

7              THE COURT:  Okay.  Thank you very

8    much.

9              Anybody else have any sort of

10    circumstances similar to that?  All right.

11             Have you or any member of your

12    family or any close friends, to your

13    knowledge, ever been a complaining witness

14    or a victim in a case similar to the one

15    that we're here for today?  Okay.  Very

16    good.

17             Now, have any of you or any member

18    of your family or any close friend, to your

19    knowledge, had any law enforcement training

20    or experience or been a member of or

21    employed by a law enforcement agency?  And

22    by law enforcement agency I mean any police

23    department, sheriff's office, Highway

24    Patrol, District Attorney's office, City

25    Attorney's office, Attorney General's

1    office, United States Attorney's office,

2    FBI, anything like that?  Anybody have a

3    family member, friend?  Okay.

4            Let's start up here in the box.

5    And are you Juror number 81; is that

6    correct?

7            JUROR #12:  12.

8            THE COURT:  12, okay.  And

9    who -- how do you think this question

10   applies to you?

11           JUROR #12:  Well, my sister is --

12   she works for the CIA.

13           THE COURT:  Okay.

14           JUROR #12:  But she is retired.

15           THE COURT:  Which is a relief to

16   you, huh?

17           JUROR #12:  Yes.

18           THE COURT:  Okay.  And is there

19   anything about your sister's experience in

20   the CIA, your knowledge of what she did, or

21   your opinion of law enforcement in general,

22   that would cause you to believe you could

23   not be fair and impartial in this case?

24           JUROR #12:  No.

25           THE COURT:  All right.  And,

1    again, I indicated that there are both city

2    police officers and people from the fire

3    department involved in this case.  Do you

4    believe you can put your knowledge, your

5    relationship with your sister aside and be

6    a fair and impartial juror?

7          JUROR #12:  Yes, yes.

8          THE COURT:  Would the fact that

9    any of the witnesses involve law

10    enforcement, would any of that fact cause

11    you to believe their testimony just because

12    of the nature of their employment?

13          JUROR #12:  Yes.

14          THE COURT:  It would?

15          JUROR #12:  No.  No, ma'am, I'm

16    sorry.  No, none.

17          THE COURT:  Very good.  Thank you.

18          Let's go to the first row.

19    Anybody have any knowledge or relationship

20    with law enforcement?  All right.  We'll

21    start down here and work our way down.

22          And you are Juror number 30?

23          JUROR #30:  Yes.  My cousin was

24    married to the deceased Sheriff

25    Papadopoulos's brother.

1           THE COURT:  Okay.  To his -- I

2     need a chart for that one.  But -- so she

3     was married to the brother of the sheriff?

4           JUROR #30:  Right.

5           THE COURT:  Okay.  Anything

6     about your knowledge --

7           JUROR #30:  It would not influence

8     me in any way whatsoever.

9           THE COURT:  Okay.  You believe you

10     can be fair and impartial?

11           JUROR #30:  Right.

12           THE COURT:  All right.  And first

13     row again.  Juror number 33?

14           JUROR #33:  Yes.

15           THE COURT:  And how do you think

16     that question applies to you?

17           JUROR #33:  My husband is a

18     retired police officer and he also retired

19     from the United States Marshal's office.

20           THE COURT:  You, too, are relieved

21     I'm sure.

22           JUROR #33:  Oh, yeah.

23           THE COURT:  And given his

24     employment and given his experience, do you

25     believe that you can be fair and impartial

1        in this case?

2                JUROR #33:  Absolutely.

3                THE COURT:  All right.  And you

4        can put aside anything that he may have

5        told you about evidence or anything like

6        that and apply the law only as I give it to

7        you and the facts as you find them?

8                JUROR #33:  Absolutely.

9                THE COURT:  And the fact that law

10       enforcement is involved as witnesses in

11       this case, would you automatically give

12       their testimony more weight than anybody

13       else just based upon your husband's

14       experience?

15               JUROR #33:  No.

16               THE COURT:  Okay.  Thank you.

17               All right.  And again in the front

18       row, and you're Juror number 38?

19               JUROR #44:  44.

20               THE COURT:  I'm sorry, I missed

21       it?

22               JUROR #44:  44.

23               THE COURT:  44.  Okay.  And how

24       does this question apply to you?

25               JUROR #44:  My brother-in-law's a

1      police officer.

2              THE COURT:  And where is he a

3      police officer?

4              JUROR #44:  In Tallmadge.

5              THE COURT:  Given your

6      relationship with your brother-in-law and

7      things that he may have told you about what

8      evidence is and what the law is, can you

9      put all that aside and be a fair and

10     impartial juror in this case?

11             JUROR #44:  Uh-huh.

12             THE COURT:  Okay.  Can you apply

13     the law only as I give it to you and not as

14     any idea or belief that has been expressed

15     to you about what the law is?

16             JUROR #44:  Yes.

17             THE BAILIFF:  I think there was

18     some responses in the box that you missed,

19     Your Honor.

20             THE COURT:  Okay.  I will come

21     back.  But thank you for bringing that to

22     my attention.

23             Would you automatically give a law

24     enforcement officer's testimony more

25     credibility just based upon the fact that

1          they are a law enforcement officer?

2               JUROR #44:  Uh-huh.

3               THE COURT:  You would?

4               JUROR #44:  Uh-huh.

5               THE COURT:  Okay.  Given that law

6     enforcement is involved in this case, do

7     you believe that you could not be fair and

8     impartial?

9               JUROR #44:  No.

10              THE COURT:  No?

11              JUROR #44:  I mean, I could be

12    fair, yes.

13              THE COURT:  Okay.  You could be

14    fair, but you believe that you would tend

15    to view the law enforcement's testimony --

16              JUROR #44:  I'm sorry, I

17    misunderstood.

18              THE COURT:  Because I asked it

19    awkwardly I'm sure.  So you could be fair

20    and impartial in this case, apply the law

21    as I give it to you?  And the fact that law

22    enforcement will give testimony, you won't

23    automatically give their testimony

24    automatic credibility just because of what

25    they do?

1              JUROR #44:  Right.

2              THE COURT:  Okay.  Thank you.

3              Anybody else in the front row?

4    How about the back row?  Whoa, all right.

5    Is it Juror number 75?

6              JUROR #75:  Yes.

7              THE COURT:  Okay.  And what's

8    your -- how do you believe that question

9    applies to you?

10             JUROR #75:  I have two uncles, one

11   with a law background, he's an attorney,

12   and the other I think is a detective or on

13   their way to becoming a detective.

14             THE COURT:  All right.  Now, with

15   respect to the attorney, is he an attorney

16   in Stark County?

17             JUROR #75:  I believe so.  Or he

18   used to be.  I think he -- I'm not sure of

19   his title now, but he used to be.

20             THE COURT:  And do you know his

21   name?

22             JUROR #75:  Mike Puterbaugh.

23             THE COURT:  Okay.  And the

24   relative who is a detective, is he a

25   detective in Stark County?

1       JUROR #75:  No, Ellet.

2       THE COURT:  He's where?

3       JUROR #75:  Ellet.  No, he's not

4 Stark County.

5       THE COURT:  Okay.  So is he in

6 Ohio?

7       JUROR #75:  Yes.

8       THE COURT:  Now, with respect to

9 that and your knowledge and your

10 relationship with those individuals, do you

11 believe you could be fair and impartial in

12 this case?

13       JUROR #75:  Yes.

14       THE COURT:  Do you -- will you

15 automatically give law enforcement

16 testimony automatic credibility just

17 because of what they do and your knowledge?

18       JUROR #75:  No.

19       THE COURT:  All right.  Thank you.

20 And Juror number 76?

21       JUROR #76:  (Juror nodding head up

22 and down.)

23       THE COURT:  My same questions to

24 you, how do you believe this question

25 applies?

1        JUROR #76:  My brother was Chief

2   of Police.  He's retired now.

3        THE COURT:  And where was that?

4        JUROR #76:  Beach City.

5        THE COURT:  Beach City.  And is

6   there anything about your relationship with

7   your brother-in-law [sic] that would cause

8   you to believe that you could not be a fair

9   and impartial juror?

10       JUROR #76:  No.

11       THE COURT:  And you would agree

12  with me that you would not automatically

13  give law enforcement testimony automatic

14  credibility just because they're in law

15  enforcement?

16       JUROR #76:  No.

17       THE COURT:  All right.  Very good.

18  And Juror number -- I think the whole

19  entire row.  Juror number 78?

20       JUROR #78:  I didn't.

21       THE COURT:  Oh, you might be the

22  only one.  Okay.  How about 81?

23       JUROR #81:  Yeah.  I literally

24  spent three weeks in the Ohio Peace

25  Officers training.

1          THE COURT:  Okay.  Is there

2    anything about your experience in that,

3    going through that process, that you

4    believe that you could not be a fair and

5    impartial juror in this case?

6          JUROR #81:  No.

7          THE COURT:  And can you agree with

8    me that you will apply the law as I give it

9    to you and not the law that was given to

10   you at the Peace Officers Training Academy,

11   or as you recall it?

12         JUROR #81:  I can agree.

13         THE COURT:  Okay.  And as with the

14   other folks, is there anything about your

15   relationship with maybe any of the officers

16   that you became friends with through that

17   training that you believe that you would

18   automatically give automatic credibility to

19   a law enforcement officer just because of

20   what they do?

21         JUROR #81:  No.

22         THE COURT:  Okay.  Very good.  And

23   you believe you could be fair and impartial

24   in this case?

25         JUROR #81:  Yes.

1      THE COURT:  Very good.  And Juror
2  number 83?
3      JUROR #83:  Yes.
4      THE COURT:  How do you believe
5  this question applies to you?
6      JUROR #83:  I have a friend and a
7  coworker that are both cops.
8      THE COURT:  All right.  Are they
9  in Stark County?
10      JUROR #83:  The coworker, I don't
11  know where she works.  My friend is in
12  Stark County, though.
13      THE COURT:  Okay.  And is there
14  anything about your relationship with
15  either your friend or your coworker there
16  that would cause you to automatically
17  believe the testimony of any law
18  enforcement officer just because of what
19  they do?
20      JUROR #83:  No.
21      THE COURT:  And you believe you
22  could be fair and impartial in this case?
23      JUROR #83:  Yes, I do.
24      THE COURT:  And Juror number 85,
25  did you have your hand up too?

1          JUROR #85:  No.

2          THE COURT:  No?  Okay, very good.

3   Now, I appear to have missed some people up

4   here.  Okay, let's start with Juror number

5   16?

6          JUROR #16:  My husband's nephew

7   works for the CIA.

8          THE COURT:  Okay.  Is there

9   anything about your relationship with your

10  husband's nephew that would cause you to

11  believe that you would not be able to be

12  fair and impartial in this case?

13         JUROR #16:  No.

14         THE COURT:  And, again, would you

15  tend to believe the testimony of any police

16  officer just based upon what they do?

17         JUROR #16:  No.

18         THE COURT:  Okay, very good.  And

19  Juror number 21?

20         JUROR #21:  I have an uncle that's

21  a retired Chief of Police from Uniontown.

22  And I have a brother-in-law that is

23  currently on the Marlboro -- Marlington, I

24  guess, Police Department.  My father is a

25  firefighter at Marathon Refinery, on their

1  ERT team.  I'm supposed to start on the ERT

2  team, in their refinery team, in June.

3         THE COURT:  Oh, okay.  Is there

4  anything, aside from what you've already

5  stated, that based upon these relationships

6  that you have that you believe that this

7  would not be a good case for you to be a

8  juror?

9         JUROR #21:  Not that part of it,

10  no.

11         THE COURT:  Okay.  So just based

12  upon your prior answers, you believe you

13  could not be fair and impartial, but this

14  part --

15         JUROR #21:  This part, no.

16         THE COURT:  -- you would be okay

17  with?

18         JUROR #21:  Yeah.

19         THE COURT:  Would you tend to

20  believe the testimony of any law

21  enforcement officer or anyone with the fire

22  department just because of the nature of

23  what they do?

24         JUROR #21:  No.

25         THE COURT:  Okay.  Very good.

80

Thank you.

Anybody else in the box that I might have missed?  Okay.  Anybody -- here we go.

JUROR #35:  I wanted to go back towards the last question.  You kind of moved past before I raised my hand.

THE COURT:  Oh, sure.

JUROR #35:  There was an acquaintance in school that's been charged with arson.  He lit the fire to a commonplace in the dormitory.

THE COURT:  Okay.  And you are Juror number?

JUROR #35:  35.

THE COURT:  35?

JUROR #35:  Yes.  He was accused of that anyhow.

THE COURT:  Is there anything about your knowledge of that charge or what you have been going through with that charge that would cause you to believe that you could not be fair and impartial in this case?

JUROR #35:  No.

1          THE COURT:  And is there any

2     understanding about the law that applies in

3     that case or the facts that apply in that

4     case that -- and your understanding of that

5     that would cause you to follow that law as

6     opposed to the law in which I give you in

7     this case and the facts in which you are to

8     apply?

9          JUROR #35:  No.

10          THE COURT:  Okay.  And you believe

11     you could be fair and impartial?

12          JUROR #35:  Yes.

13          THE COURT:  Okay.  And somebody

14     else had their -- okay.  And you're Juror

15     number 76?

16          JUROR #76:  Yeah.

17          THE COURT:  Okay.  And what -- do

18     you have something to add to your

19     original --

20          JUROR #76:  As far as the fire

21     department, I didn't realize you asked

22     about the fire department.  I have a son

23     and daughter-in-law and a coworker on the

24     fire department.

25          THE COURT:  Okay.  Now, is there

1   anything about your relationship with them

2   that would cause you to automatically

3   believe the testimony of anybody from a

4   fire department just because of the nature

5   of what they do?

6              JUROR #76:  No.

7              THE COURT:  And with the

8   understanding there will be people from the

9   fire department testifying, you believe

10  that you could be fair and impartial in

11  this case?

12             JUROR #76:  (Juror nodding head up

13  and down.)

14             THE COURT:  Okay.  And maybe I

15  should have done that to begin with, to

16  expand it upon to include all fire

17  departments.  Does that change anybody's

18  response, or anybody have anything they

19  want to add?  Okay.

20             Now, again, this is sort of

21  directed towards everybody because it -- I

22  really only asked it of people who had a

23  relationship, but would all of you be able

24  to listen to the testimony of a police

25  officer, or any peace officer, and measure

1    it by the same standards that you would use

2    to test the credibility of any other

3    witness?  Okay.

4        Would you have any difficulty or

5    embarrassment in returning a verdict for or

6    against the side which had a police officer

7    or other peace officer, including fire

8    departments, as witnesses?  Okay.

9        Have you or any member of your

10    family or close friend, to your knowledge,

11    had any experience as an attorney or

12    working in a law office or any office of

13    any court?  Anybody work for an attorney or

14    work for the court?  Okay.

15        Again, do any of you know or are

16    any of you related to any of the parties to

17    this case or to any of the attorneys who

18    represent them?

19        Okay.  Do any of you know anyone

20    in the court system?  Anybody know me, and

21    I apologize if I don't recognize you, my

22    bailiff or Magistrate, the court reporter,

23    any court personnel, or Clerk's office

24    personnel?  Okay.

25        Now, it's important that I have

1    your assurance that you will, without

2    reservation, follow my instructions and

3    rulings on the law and will apply that law

4    to this case.   To put it somewhat

5    differently, whether you approve or

6    disapprove of my rulings or instructions,

7    it's your solemn duty to accept, as

8    correct, these statements of law.   You may

9    not substitute your own idea of what the

10   law is or what you think it ought to be.

11        Will all of you follow the law as

12   given to me -- given to you by me in this

13   case?   Everybody will agree with me that

14   they can do that?   Okay.

15        Now, this sometimes arises, kind

16   of unique to our county, but are any of you

17   related to anybody on the panel, or do any

18   one of you know anybody else who's on the

19   panel with you?   So just take a look around

20   and see if you recognize anyone, familiar

21   with anyone.   Okay.   Oh, okay, Juror number

22   55?

23        JUROR #55:   I know 53.

24        THE COURT:   You know Juror number

25   53?   And 53, you know Juror number 55?

1    Okay.  Will it create any problem, your

2    relationship or knowledge of each other, if

3    you serve on the same jury?

4         JUROR #53:  (Juror shaking head

5    from side to side.)

6         JUROR #55:  (Juror shaking head

7    from side to side.)

8         THE COURT:  Okay.  And would you

9    be offended if either one of you are

10   excused for whatever reason?

11        JUROR #55:  No.

12        THE COURT:  No?  Okay.  Very good.

13        Anyone else?  Okay, Juror number

14   28 and who --

15        JUROR #6:  28.

16        THE COURT:  You recognize -- okay.

17   Juror number 28, and is it Juror number 6?

18        JUROR #6:  Right.

19        THE COURT:  Okay.  Same questions,

20   will there be any problem if the two of you

21   are seated on the same jury?

22        JUROR #6.  No.

23        JUROR #28:  No.

24        THE COURT:  No?  Okay.  And will

25   either of you be offended if the other one

1      is excused from service?

2                  JUROR #28:  No.

3                  JUROR #6:  No.

4                  THE COURT:  No?  Very good.

5                  The Court is going to instruct you

6      as to the burden of proof, and I've kind of

7      given you a brief description of the

8      differences between a civil burden of proof

9      and a criminal burden of proof, required to

10     prove the issues and the facts of this

11     case.  Is there any one of you that cannot

12     follow the instructions of the Court in

13     that respect?  All right.

14                  In arriving at a verdict in this

15     case, is there any one of you that cannot

16     lay aside such matters as race, religion,

17     or sympathy?  None of these are to have any

18     effect on your deliberations in this case.

19     Okay.

20                  Now, do you know of any other

21     reason, because sometimes I don't ask all

22     the right questions, or has anything

23     occurred during this question period, other

24     than what's already been stated, that makes

25     you think that you doubt whether or not you

1    could be completely fair and impartial as a

2    juror in this case, or if there's some

3    reason why you believe that you should not

4    be a juror in this case, again, other than

5    what's already been stated?  All right.

6              At this time the parties are going

7    to ask you questions.  The Plaintiff will

8    address you first.  So, Attorney Barr.

9              MR. BARR:  Thank you, Your Honor.

10             May it please the Court, Ms.

11   Schnellinger, counsel for Defendant.  Good

12   morning again, folks.  As I told you

13   earlier, my name is Dennis Barr and I work

14   for the Stark County Prosecutor, John

15   Ferrero, as does Ms. Schnellinger.  And we

16   represent the State of Ohio and the

17   citizens of Stark County throughout these

18   proceedings.

19             First off, I just want to ask you

20   real quick, does anybody know anybody that

21   works in the Stark County Prosecutor's

22   office?  Okay, good.

23             I'm going to do -- I'm sorry, did

24   you raise a hand?

25             JUROR #49:  Yeah.  Currently?

1          MR. BARR:  Currently, or even in
2     the past.
3          JUROR #49:  Yeah, a friend of
4     mine.
5          MR. BARR:  Who would that be?
6          JUROR #49:  Chris Newlon.
7          MR. BARR:  Chris Newlon, okay.
8     That's how I've seen you before, okay.
9          JUROR #49:  Yeah.
10          MR. BARR:  Is there anything about
11     that relationship that, you know, Chris
12     used to work for us --
13          JUROR #49:  No.
14          MR. BARR:  -- and anything that's
15     going to cause you to be unable to be fair
16     and impartial?
17          JUROR #49:  No.
18          MR. BARR:  No?  And your number
19     again, sir?
20          JUROR #49:  49.
21          MR. BARR:  Okay.  Thank you.
22          THE COURT:  Mr. Barr, you also had
23     one right there, too.
24          MR. BARR:  Right here?  Okay.
25     Your number?

1          JUROR #38:  Through my work, I've
2     worked with several of the Prosecutors in
3     the office, Katie Chawla.
4          MR. BARR:  And you work up at
5     Akron Children's Hospital, right?
6          JUROR #38:  I do.
7          MR. BARR:  And your number, ma'am?
8          JUROR #38:  38.
9          MR. BARR:  38, okay.  Is there
10     anything about that relationship that as
11     you're sitting there now saying, well, I
12     can't be fair and impartial in this case?
13          JUROR #38:  No.
14          MR. BARR:  Okay.  You can set that
15     aside?
16          JUROR #38:  Yes.
17          MR. BARR:  Thank you very much.
18     Anybody else?
19          I'm going to do some questioning
20     myself and I'm going to try to be as brief
21     as possible.  And I want to mostly talk
22     about some principles of law that apply to
23     every criminal case that's tried in the
24     State of Ohio.  And I want to talk to you
25     about your views and your attitudes about

those principles of law.  And I want to
apologize because I'm going to kind of ask
my questions this way, have to turn my back
on you folks, and that's kind of rude, and
I apologize for that.  So if you can't hear
me, throw something at me or holler my name
so I speak up a little bit, okay?

And, again, just like the Judge
said, we're not here to pry into your
personal lives or to embarrass you.  We
come in here with one simple goal in mind,
and that's to put 12 or 14 people in this
box that can be fair and impartial.  And
that means fair and impartial to the
Defendant, because she's the person on
trial, but it also means that you are to be
fair and impartial to the State of Ohio
because both sides deserve a jury of fair
and impartial people.  And that's the only
reason behind this questioning.

It's also important that you know
now that there are no correct answers.
Okay.  Can't say anything wrong, so don't
be afraid to say anything if something
comes up and you're sitting there thinking,

1    wow, that just doesn't sit right with me,

2    raise your hand and we'll talk about it.

3    And maybe we can allay your fears, and

4    maybe we can't.  And if we can't, maybe

5    you'll be asked to be excused.  That

6    doesn't mean you're a bad person, just

7    means that maybe this isn't the case for

8    you.  But you can't say anything wrong.  So

9    if something is sitting there bothering you

10    that we talked about, raise your hand and

11    we'll try to fix it.  And if we can't, then

12    we'll settle it some other way.

13        And as when the Judge said that if

14    you want to talk about it in private, raise

15    your hand, we'll come up here and talk

16    about it in private.  Only those of us in

17    the conversation will know what we talked

18    about.

19        How many of you all watch TV; Law

20    & Order, CSI, and all that stuff?  Okay.

21    Have you all figured out by now that this

22    ain't television?  Because you've been here

23    an hour, and the show would be over.  Okay.

24    But sometimes I worry that juries watch

25    those things and they think they're real,

1    that those little gadgets they have on CSI

2    really exist.  Do you all understand that's

3    Hollywood?  That maybe some of that stuff

4    exists, but they take it a little bit

5    further and make it a little more -- more

6    interesting so you'll watch the show.

7         Is anybody going to hold us to

8    those burdens that you see on television?

9    You understand this is the reality series,

10   this isn't TV?  Everybody okay with that?

11        The Judge talked to you a little

12   bit about the burden of proof, and I want

13   to talk a little bit about it too.  The

14   burden of proof is proof beyond a

15   reasonable doubt.  That is the highest

16   burden of proof in our criminal justice

17   system, and it ought to be.  Ought to be a

18   very high burden.  And at some point in

19   time she's going to read you all the

20   precise legal definition of proof beyond a

21   reasonable doubt.  And I want you to listen

22   to it very, very carefully, because when

23   you hear it what you're not going to hear

24   is it's proof beyond all doubt, it's proof

25   beyond a shadow of a doubt, it's proof

1    beyond every doubt.  That is not proof

2    beyond a reasonable doubt.  It's proof

3    beyond a reasonable doubt.  It's not an

4    impossible burden.  It's a high burden, but

5    it's not impossible.

6         Juror number 13, sir, let me ask

7    you this:  Would you agree with me, sir,

8    that the best way for you to know what

9    happened in any given situation is to see

10    it with your own two eyes?

11         JUROR #13:  Probably would be.

12         MR. BARR:  Probably would be?

13         JUROR #13:  Uh-huh.

14         MR. BARR:  You were there and you

15    saw it --

16         JUROR #13:  Yeah.

17         MR. BARR:  -- and you wouldn't

18    have any doubt at all about what you saw,

19    would you?

20         JUROR #13:  No.

21         MR. BARR:  Okay.  On October 3rd,

22    2012, about 8:00 until about 8:30 in the

23    evening, were you anywhere near 185 26th

24    Street Southeast in Massillon, Ohio?

25         JUROR #13:  No, sir.

1      MR. BARR:  You weren't around,

2   were you?

3      JUROR #13:  No.

4      MR. BARR:  So you didn't see what

5   happened, did you?

6      JUROR #13:  Nope.

7      MR. BARR:  So it would be nearly

8   impossible for us, as Prosecutors, to erase

9   all doubt from your mind or prove anything

10  beyond a shadow of a doubt or beyond all

11  doubt; wouldn't it?

12      JUROR #13:  Would be.

13      MR. BARR:  Everybody agree with

14  that?  Everybody understand now why the law

15  requires proof beyond a reasonable doubt?

16  That's our burden.  We want you to hold us

17  to that, okay, but we don't want you to

18  take us beyond that because a lot of times

19  people say, oh, it's got to be beyond a

20  shadow of a doubt, or all doubt.  That's

21  not our job here.  Everybody understand

22  that?  Everybody going to hold us to that

23  burden?

24      Let's think about it this way, how

25  many of you have children?  Okay.  All

1    right.  Juror number 6, sir, when you

2    decided to have that first child, did you

3    talk about it with your significant other;

4    spouse, wife, whatever?

5         JUROR #6:  Yes.

6         MR. BARR:  Okay.  Did you have

7    some doubts whether it was time to have a

8    child?

9         JUROR #6:  Well, my children are

10   grown, they're in their 40s.

11        MR. BARR:  Okay.  But I'm trying

12   to get you to think back to that moment

13   when you decided to have that first child.

14   It was a big moment in your life; wouldn't

15   you agree?

16        JUROR #6:  Yes.

17        MR. BARR:  And did you and your

18   wife or the --

19        JUROR #6:  Yeah, my wife.

20        MR. BARR:  It was your wife?

21   Okay.  You never know these days, you know.

22   But did you guys discuss that and say, hey,

23   I think it's time, let's try to have a

24   child?

25        JUROR #6:  We just had a child.

1              MR. BARR:  Just had it?  Okay.

2      All right.  Anybody recall having a

3      discussion about that time in your life?

4      Juror number -- I think you're 21, right?

5              JUROR #21:  Correct.

6              MR. BARR:  Okay.  Big moment in

7      your life?

8              JUROR #21:  Big moment.

9              MR. BARR:  Wanted to make sure

10     everything was in place and you were ready

11     for it, right?

12             JUROR #21:  Correct.

13             MR. BARR:  And did you discuss

14     that?

15             JUROR #21:  Yes, we did.

16             MR. BARR:  Okay.  And did you use

17     reason and common sense and your life's

18     experiences to come to that conclusion?

19             JUROR #21:  Sure.

20             MR. BARR:  And in doing that, did

21     you erase all the reasonable doubts that

22     you had about it?

23             JUROR #21:  Most of them.

24             MR. BARR:  Most of them?

25             JUROR #21:  You always have a

1    little fear.

2         MR. BARR:  Sure.  But you didn't

3    worry about flying monkeys coming down from

4    the Wizard of Oz, or anything like that; is

5    that right?

6         JUROR #21:  Did not.

7         MR. BARR:  You looked at where you

8    were in your life, used your common sense,

9    and said, yeah, now is the time?

10        JUROR #21:  Right.

11        MR. BARR:  Okay.  So you erased

12   all the reasonable doubts?

13        JUROR #21:  Right.

14        MR. BARR:  And went ahead and did

15   it, right?

16        JUROR #21:  Right.

17        MR. BARR:  Well, that's what we

18   ask you folks to do as jurors.  Okay, use

19   your reason, use your common sense, use

20   your life's experiences, and decide, at the

21   end of this case, after you've heard all

22   the evidence and the Judge gives you the

23   law, that the State's proven the case

24   beyond a reasonable doubt.  Are you all

25   willing to accept that responsibility?

1          Aggravated Arson, serious crime,

2     but you know that if I was up here trying a

3     theft case with Ms. Schnellinger, the

4     burden of proof would be exactly the same.

5     Does everybody understand that?  It doesn't

6     change because the crime sounds more

7     serious.  Everybody agree with that?

8     Excuse me, I think I'm getting a little bit

9     of what's going down -- or around here so.

10          Now the Judge also read to you the

11     indictment.  And this is the indictment.

12     And when we, as Prosecutors, get this

13     indictment, we have to do -- we have to

14     break it down into what's referred to as

15     the elements of the crime.  I could read

16     you this indictment, it's got a lot of

17     flower -- flower -- flowery language and

18     legalese in it, but we break it down into

19     the simple elements because that's what we

20     have to prove beyond a reasonable doubt.

21          And in this case those elements,

22     with respect to Aggravated Arson, are

23     jurisdiction and identification.  That

24     means it happened here in Stark County so

25     you all can hear the case, that means that

1       Kayla Ayers is the person that did it, and

2       it means we have to prove that she

3       knowingly, by means of fire, caused

4       physical harm to 185 26th Street Southeast

5       which was an occupied structure.  Those are

6       the elements of arson that we -- aggravated

7       arson that we have to prove beyond a

8       reasonable doubt.

9               And with respect to child

10      endangering, it's jurisdiction.  Again,

11      that it happened here so you all can try

12      [sic] it.  Identification, that she's the

13      person that did it.  And that she

14      recklessly, being the parent of children

15      under 18, created a substantial risk to the

16      health or safety of those children by

17      violating a duty of care, protection, or

18      support.  Those are the elements of child

19      endangering.

20              Now, what didn't I say?  What

21      element is missing from all of those

22      elements?  How about motive?  Because

23      everybody always wants to know why somebody

24      did something, right?  Well, you know what,

25      the Judge is going to tell you, we don't

1    have to prove motive.  And, again, think

2    about it this way, use reason, common

3    sense, and your life's experiences.

4         How many of you all, besides

5    myself, have gotten a speeding ticket?  I

6    know it's a little embarrassing.  How many

7    have gotten one?  Okay.  Did anybody fight

8    that ticket?  Go to court and say, darn it,

9    I wasn't speeding?  Anybody do that?  No?

10   You all signed the ticket, sent it in, paid

11   your fine.

12        Well, let's assume this.  Juror

13   number 27, I'm going to ask you a couple

14   questions.  Let's assume you wanted to

15   fight that ticket, that you thought you

16   weren't speeding, okay?  So you go to

17   court, show up in court, and you would

18   expect a police officer to be there, right?

19        JUROR #27:  (Juror nodding head up

20   and down.)

21        MR. BARR:  And you would expect

22   that police officer to have to take the

23   stand and testify that he was in his duly

24   marked patrol car, using his duly

25   calibrated radar, and that the speed limit

1    was 35 miles an hour and his radar clocked

2    your vehicle going 45 miles an hour, and

3    that it happened here in Stark County,

4    Ohio.  You would expect him to have to say

5    that stuff, wouldn't you --

6                 JUROR #27:  Yes.

7                 MR. BARR:  -- to prove that you

8    were speeding, right?  Would you expect him

9    then to have to say, And, Your Honor, when

10   I walked up to the window to talk to the

11   gentleman driving the car, he rolled his

12   window down and he said, I got to get home

13   because my wife's pregnant and she's having

14   a baby, would you expect him to have to say

15   that?

16                 JUROR #27:  No, not unless that

17   was a fact of the situation.

18                 MR. BARR:  He wouldn't have to say

19   that because he doesn't have to prove why

20   you're speeding, does he?  He just has to

21   prove, this is the speed limit, this is how

22   fast you were going, and this is how I

23   determined it, right?

24                 JUROR #27:  Yep.

25                 MR. BARR:  Do you agree with that?

1              JUROR #27:  Yeah.

2              MR. BARR:  No motive.  Same thing

3    here.  That means you can listen to all

4    this evidence, you can go back into that

5    jury room and apply the law that the Judge

6    gives you, and you can find Kayla Ayers

7    guilty as charged in both counts and walk

8    out of here and be scratching your head and

9    saying, gee, I wonder why she did that.

10   And if you are, that doesn't mean we

11   failed, do you understand that, that that

12   is not a burden that is imposed by the

13   State of Ohio in any criminal case.

14   Everybody understand that?  Everybody back

15   here?  Everybody willing to accept that?

16             There's another thing we can't do,

17   and the Judge touched upon this, but I want

18   to touch upon it again, and that is that

19   this courtroom is no place for sympathy or

20   prejudice or bias.  Okay.  You're going to

21   hear that Kayla is a young woman with three

22   children.  And you're going to hear

23   evidence that Kayla Ayers set a fire.  And

24   I submit to you the State of Ohio is going

25   to prove beyond a reasonable doubt that

1  she's guilty of all these charges.  And

2  when we do, you can't go back there and

3  say, you know what, the State has proven

4  its case, but, gosh, she's a young woman

5  and she's got three kids and we can't find

6  her guilty.  Do you understand you cannot

7  do that, folks?  Absolutely cannot do that.

8  Can you all promise the State of Ohio

9  you'll set that aside?

10  There's a number of ways that we

11  prove cases.  One is through the use of

12  physical evidence, and that's stuff you can

13  see, you can feel, you can touch, you can

14  carry with you back into that room to

15  assist you in your deliberations, and

16  you'll see some in this case.

17  And there's also this thing called

18  circumstantial evidence.  And I like to

19  explain it to you this way:  Let's say that

20  you live here in Ohio and neither of

21  your -- none of your neighbors have snow

22  machines to make snow.  So it's a December

23  night and you're going to go to bed and you

24  close the back curtains, and you notice as

25  you close the curtains, you comment to

yourself, gee, it's December 5th and it
hasn't even snowed yet, what a great
winter.  You close the curtains and you go
to bed.  Wake up the next morning and you
open those windows and there's a fresh
blanket of snow and there's some footprints
across your backyard.

Now, you were sleeping and you
open that window, and when you do open that
window, Juror number 24, what can you infer
from opening that window happened while you
were sleeping?

JUROR #24:  It snowed.

MR. BARR:  It snowed.  And you see
the footprints, so what happened there?

JUROR #24:  Someone was on the
property.

MR. BARR:  Somebody walked through
your property, right?  You didn't see it
happen, though, did you?  But from that
evidence that you were given, you're
allowed to make those inferences; aren't
you?  Okay.  That's what circumstantial
evidence is, folks.  It can be a piece of
physical evidence, it can be testimony that

1    you hear from this witness stand and you're

2    allowed to make inferences from it.  The

3    Judge is going to tell you that.  Everybody

4    comfortable with the concept of

5    circumstantial evidence?

6         Now, the Judge is also going to

7    tell you this:  In the State of Ohio, the

8    law says that direct evidence, which is

9    evidence you hear here from the witness

10   stand, and circumstantial evidence are of

11   equal weight.  They both have the same

12   value in this courtroom.  Do you all

13   understand that?

14        Now, of course, you're the ones

15   that are going to make the inferences when

16   the push comes to shove.  We're going to

17   argue what they ought to be, but it's your

18   decision in the end.  But do you understand

19   that they are of equal weight?  Can you all

20   apply equal weight to circumstantial

21   evidence and direct evidence?  Will you all

22   do that?  Everybody back here do that?

23        And the final way is through what

24   we call direct evidence.  This is the big

25   job that we ask you all to do, and the

Judge has touched on it a little bit, but direct evidence is from witnesses, and they're going to walk in here, they're going to sit in this chair, they're going to raise their right hand, they're going to take an oath, and they're going to tell you what they heard or what they saw or what they did in regards to October 3rd of 2012 in this case.  And your job is to listen to them and your job is to judge their credibility because the Judge will tell you that you can believe any part of a witness's testimony, all of a witness's testimony, anything you want, basically, based upon your assessment of their credibility.

That sounds like an awesome responsibility; doesn't it?  Like a daunting task.  But, again, let's think about it using reason and common sense and our life's experiences.  We aren't asking you folks to do anything you haven't been doing every day of your life since you were able to understand and comprehend the English language.  Because if you go home

1   tonight and your friend calls you, or your

2   spouse says something to you, oh, you know

3   what I saw today, and you choose to believe

4   them, why do you believe them?  Because you

5   find them credible, right?  Everybody agree

6   to that?  You do this every day.  Now we're

7   just asking you to do it with strangers in

8   a courtroom.  Everybody willing to accept

9   that responsibility?

10          Anybody sitting there saying right

11  now, okay, Mr. Barr, I know what you're

12  saying, but I can't be asked to do that, I

13  can't judge people's credibility?  Anybody

14  feeling that way?  The Judge will tell you

15  there's some tests you can use to judge

16  their credibility.  She'll explain those to

17  you.

18          The Judge alluded to the fact that

19  trials are conducted by rules, and they

20  are.  And we're lawyers and we know those

21  rules.  And so at some point during this

22  trial there may be some things happen that

23  are called objections.  There may be a

24  witness on the stand and I may ask a

25  question and they may object, or they may

1    be asking the questions and we may object.

2    And sometimes I wonder, gee, does the jury

3    think we're trying to hide things?  Trying

4    to keep things from them?  But you

5    understand there's rules?

6         And what we're doing when we're

7    objecting is basically saying, Judge,

8    under -- the rules under which we try cases

9    by, is that a fair and permissible

10   question?  Can you imagine if we had to say

11   that instead of objection?  So we say

12   "Objection."  And that's all we're saying

13   when we say that.  And then the Judge will

14   say "Overruled" in which case she's done

15   her job which is to decide what evidence

16   comes in, or "Sustained" in which case you

17   won't hear the answer.

18        One thing you can't do is if you

19   don't hear the answer, you can't say, gee,

20   I wonder what they would have said.  I bet

21   they would have said this.  You understand

22   you can't do that?

23        If we object ten times in this

24   trial and they never object, are you going

25   to hold that against us, the State of Ohio?

Anybody?

Let's switch it around.  If they object ten times and we never object, are you going to hold it against the Defendant? You understand those are just part of the procedures that goes on?

Here's one of the toughest things I think we could ever ask a jury to do. And that is, sometimes the question's asked, the answer's given, and then the answer itself is objectionable and so we object.  And the Judge sustains -- or they object, and the Judge sustains it, and then she looks to you folks and she says, Ladies and gentlemen of the jury, I instruct you to disregard that answer.  But you've already heard it.  And when she says that, she means it.  That means when you go back in that room and you have the evidence and you have the law, you can't sit back there and say, you know what, I'm willing -- I'm convinced beyond a reasonable doubt, but remember that one answer the Judge told us to disregard?  I'm going to change my verdict because of that.  Do you understand

1    that you absolutely, positively cannot do

2    that, folks?  If Judge Farmer tells you you

3    are to disregard an answer, you must not

4    let that answer be a factor in your

5    deliberations.  Can you all promise us

6    you'll do that?

7        I got a couple individual

8    questions for you.  And, again, I'm not

9    picking on you, but sometimes the Judge

10   doesn't go far enough in the questioning to

11   make us feel comfortable.  And I want to

12   start out with Juror number 27.  Sir, you

13   said you're okay today and tomorrow, but if

14   it gets into Wednesday, it's going to kind

15   of be a little bit of pressing on your

16   mind?

17       JUROR #27:  It makes it difficult,

18   yeah.

19       MR. BARR:  Okay.  Let me ask you

20   this, I think you'll get this case sometime

21   tomorrow, but as long as it takes a jury to

22   come up with a verdict, nobody can tell.

23   So let's say you get this case tomorrow

24   afternoon sometime and you're back there

25   deliberating and it gets close to the time

1    you would be going home and you guys

2    haven't reached a verdict and we may have

3    to bring you back Wednesday morning.  Let's

4    say that you're the only one that isn't

5    agreeing with the 11 others, no matter

6    which way it is because it has to be

7    unanimous, okay?  You know, it's 4:30 on

8    Tuesday and you don't really want to be

9    here Wednesday, but you really don't agree

10   with those other folks, you going to change

11   your mind just so you can get to work on

12   Wednesday?

13            JUROR #27:  No.

14            MR. BARR:  You wouldn't do that?

15            JUROR #27:  No.

16            THE COURT:  Okay.  You can promise

17   me that?

18            JUROR #27:  Yeah.  You know, when

19   it's impacting people's lives, you know,

20   I'll stay.

21            MR. BARR:  Okay.  All right.  And

22   you're okay today and tomorrow?

23            JUROR #27:  Yeah.

24            MR. BARR:  There's nothing on your

25   mind right now that you're sitting there

1    thinking, gee, I wish I was at work -- I

2    won't put it that way, I know you probably

3    wish you were at work.  But that, you know,

4    is going to take your attention away from

5    what you hear here because while you're in

6    here these are the most important things?

7         JUROR #27:  Yep.

8         MR. BARR:  Thank you very much for

9    your honesty.

10        Now I have to put my glasses on

11   because I write real little when I'm in the

12   courtroom and I write real big when I'm

13   not.

14        Juror number 50, sir, you

15   indicated that you have some medical

16   appointments today and tomorrow?

17        JUROR #50:  Yes.

18        MR. BARR:  And they were pretty

19   difficult to get?

20        JUROR #50:  They're difficult to

21   make.  Once you get the appointments, you

22   know, they're set up.

23        MR. BARR:  Right.  What time's

24   your appointment today?

25        JUROR #50:  9:15.

1          MR. BARR:  So you already missed

2    that one?

3          JUROR #50:  Right.

4          MR. BARR:  Okay.  Okay.  If you

5    have to miss the one tomorrow, is it going

6    to cause you any major problems?

7          JUROR #50:  It won't except that,

8    you know, the procedure that they go

9    through would be interrupted.

10          MR. BARR:  Okay.  As you're

11    sitting here now, are you concerned about

12    missing that one tomorrow that you may not

13    be able to focus on the evidence?

14          JUROR #50:  I can focus on the

15    evidence, but I am also concerned about --

16          MR. BARR:  Missing your

17    medication?

18          JUROR #50:  -- missing the

19    medication.

20          MR. BARR:  And that makes you

21    drowsy?

22          JUROR #50:  The one specific one

23    does, yes.  I have about four to take.

24          MR. BARR:  It's probably important

25    that you take that one that makes you

1    drowsy?

2         JUROR #50:  Probably.

3         MR. BARR:  Would it concern you if

4    you had to miss it?

5         JUROR #50:  Well, there's specific

6    direction on the medicine not to

7    discontinue so it would concern me to miss.

8         MR. BARR:  Okay.  Would it concern

9    you enough that you would probably be

10   thinking about that instead of maybe

11   listening to the evidence?

12        JUROR #50:  No.

13        MR. BARR:  No?  You're sure about

14   that?

15        JUROR #50:  Yes.

16        MR. BARR:  Okay.  Thank you, sir.

17        Juror number 66, you indicated you

18   had a student by the name of Jeff Ayers?

19        JUROR #24:  24.

20        MR. BARR:  24.  Why did I -- 24,

21   okay.  I'm sorry about that.

22        The Jeff Ayers that is going to

23   testify I believe is from North Canton.

24        JUROR #24:  Okay.

25        MR. BARR:  Okay.  And it's

1    probably not the same Jeff Ayers.

2         JUROR #24:  Okay.

3         MR. BARR:  But if it would be, you

4    heard the Judge say that let us know.

5    Would you do that?

6         JUROR #24:  Sure.

7         MR. BARR:  And if it is, I think

8    you've already told the Judge that it's not

9    going to be any problem with your ability

10   to be fair and impartial in listening to

11   the evidence, is that a fair statement?

12        JUROR #24:  No, sir.

13        MR. BARR:  Thank you, sir.

14        Juror number -- let me try and get

15   this number right -- 53, you know Jason?

16        JUROR #53:  Yes.

17        MR. BARR:  He's your niece's

18   husband's brother?

19        JUROR #53:  Yes.

20        MR. BARR:  How often do you see

21   him?

22        JUROR #53:  It's been ten years,

23   eleven years maybe since I've seen him.

24        MR. BARR:  So you don't see a lot

25   of him?

1      JUROR #53:  No, they live in

2  Massillon, I live in Canton.

3      MR. BARR:  So the fact that he's

4  somehow related to you, and I can't figure

5  that out, I just repeated what you said,

6  but it isn't going to cause you a problem?

7      JUROR #53:  No.

8      MR. BARR:  And you've never had

9  any bad blood between you and Mr. Pandrea

10  or anything like that?

11      JUROR #53:  No.

12      MR. BARR:  Thank you.

13      JUROR #53:  You're welcome.

14      MR. BARR:  Juror number 59 I think

15  knows Jennifer from high school.  Is that

16  you?

17      JUROR #59:  Yes.

18      MR. BARR:  Okay.  All right.

19      JUROR #59:  I've lost my number,

20  I'm sorry.

21      MR. BARR:  Sorry, I got one wrong

22  and I get paid to do this.

23      You know Jennifer from high

24  school?  Did you guys hang out in high

25  school?

1          JUROR #59:  No.  I would know her
2     face simply.
3          MR. BARR:  Just crossed in the
4     hallway?  Never had a problem with her?
5          JUROR #59:  No.
6          MR. BARR:  So nothing about that
7     relationship is going to cause you to be
8     unable to be fair and impartial?
9          JUROR #59:  No, sir.
10          MR. BARR:  Okay.  Thank you.
11          Juror number 75, your uncle,
12     Michael Puterbaugh, did Michael ever tell
13     you about the time he worked in our office?
14          JUROR #75:  Vaguely.  Nothing in
15     detail.
16          MR. BARR:  Nothing in detail?  So
17     there's nothing about anything that he said
18     that causes you to sit here and say, oh,
19     geez, I don't want to watch these
20     Prosecutors in action, I know things about
21     them that other people don't know?
22          JUROR #75:  No.
23          MR. BARR:  Nothing like that?  All
24     right.  So no problem sitting here and
25     being a juror?

1          JUROR #75:  Right, no problem.

2          MR. BARR:  Thank you.

3          One of those rules, ladies and

4  gentlemen, that we conduct these trials by

5  is this, this is our only chance to talk to

6  you.  The rest of the time we're going to

7  talk at you.  And when we see you in the

8  hallway, if you're selected as a juror,

9  we're not going to say, Hey, how you doing?

10  What about the Cavs?  Or what's this

11  weather doing?  We're not going to do that.

12  We're going to ignore you like we don't

13  know you.  Not because we think we're

14  better than you, but I think you see the

15  logic.  We shouldn't be talking to jurors

16  once they're seated.  So this is my last

17  opportunity to talk with you.  It's her

18  last opportunity to talk with you.

19          So before I sit down, based upon

20  anything I've said or anything the Judge

21  said, do you have any questions for me?

22  Okay.  If not, then I would like to thank

23  you all for your patience and your

24  attention.

25          THE COURT:  Thank you, Attorney

1    Barr.

2              Attorney Kuhn.

3              MR. KUHN:  Thank you, Judge.

4              Opposing counsel, ladies and

5    gentlemen.  Good morning.  Again, my name

6    is Matt Kuhn and I'm representing Kayla

7    Ayers today.  I do have my co-counsel,

8    Attorney Bible, with me.

9              And I think the Judge and

10   Prosecutor Barr have done a fine job of

11   getting some information from you folks.

12   And, again, this process is designed to

13   make sure that we are getting that fair and

14   impartial group that our society has

15   determined is most appropriate for a

16   criminal trial.

17             And so, you know, sometimes it

18   might sound like I'm beating a dead horse

19   here asking you about the burden of proof,

20   and this and that, but it's an integral

21   element or part of this process that we

22   have to go through.  And in order to do my

23   job effectively, I have to make sure that

24   I'm ensuring my client is getting a fair

25   trial here.

1          Let's just vote right now.  Juror
2   number 2, we're going to vote, guilty or
3   not guilty right now?  What do we think?
4          JUROR #2:  Couldn't tell you.
5          MR. KUHN:  You couldn't tell me?
6   Okay.  Good answer.  Number 5, any ideas?
7          JUROR #5:  No.
8          MR. KUHN:  No answer just yet?
9          Number 6?
10          JUROR #6:  No answer.
11          MR. KUHN:  No answer yet?  Okay,
12   Juror number 9?
13          JUROR #9:  No answer.
14          MR. KUHN:  Does anybody know what
15   answer I'm looking for here?
16          JUROR #9:  Innocent until proven
17   guilty.
18          MR. KUHN:  Innocent until proven
19   guilty, right.
20          So now, Juror number 2, do you
21   want to change your vote?
22          JUROR #2:  Innocent until proven
23   guilty.
24          MR. KUHN:  Okay.  Not guilty at
25   this point, right, because you're presumed

1    innocent until you're proven guilty beyond

2    a reasonable doubt.

3         You might think, well, boy, Matt's

4    a jerk, why would he -- why would he trick

5    these nice folks.  But I do that to

6    illustrate this point that maybe when we

7    walked in here, we thought, boy, I wonder

8    what that young lady did.  I wonder -- you

9    know, I wonder what crime it is that she

10   has committed.  Okay.  And maybe that's an

11   okay thing to think.  Maybe when we read

12   The Repository, or listen to the news, we

13   think, okay, they caught the bank robber,

14   that's great.  And maybe, just sort of in

15   our daily lives, maybe that's an okay way

16   to look at things.  Okay.  But in the

17   criminal court context, or the criminal

18   court setting, it's a little bit different.

19        As jurors, you have to be kind of

20   in a different mindset.  And, again, we

21   have this thing where you're presumed to be

22   innocent until you're proven guilty.  So if

23   we had to vote right now, obviously it

24   would be not guilty, okay?

25        And this is kind of hoke, but I

1    like to explain to juries and potential

2    jurors that maybe there's this sort of

3    pretend machine or gauge called the

4    guilt-o-meter, okay?  And so if we didn't

5    know, you know, if she was innocent or

6    guilty, maybe we would think the

7    guilt-o-meter's at 50 percent right now,

8    straight up, and it's going to tip one way

9    or the other depending on what evidence we

10   hear.  Does it sound like it could be a

11   decent way to gauge innocence or guilt?

12   Juror number 6, that sound okay?  Like

13   maybe it would be straight up and it would

14   tip one way or the other?

15        JUROR #6:  Yes, after you heard

16   the evidence.

17        MR. KUHN:  Okay.  But since we've

18   talked about how we're presumed innocent,

19   do we think the guilt-o-meter is at 50

20   percent right now?

21        JUROR #6:  Yes.

22        MR. KUHN:  Okay.  Juror number 5,

23   do you have another idea?

24        JUROR #5:  It's at not guilty.

25        MR. KUHN:  It's at zero right now,

1    right, because we haven't seen any -- any

2    evidence or any testimony to this point.

3    So right now, the guilt-o-meter is still at

4    zero and it's got to go all the way up.

5    Okay.  All the way up to proof beyond a

6    reasonable doubt, okay?

7         Mr. Barr brought up speeding

8    tickets, and I think a number of you raised

9    your hand that you had, in your lifetime,

10   gotten a speeding ticket.  Unfortunately, I

11   have as well.  And nobody felt like they

12   weren't speeding?  Did anybody feel that

13   way, that maybe the cop got it wrong?

14   Anybody?  Just me?  Okay.

15        I had an experience where I feel

16   that the officer did get it wrong.  Was I

17   speeding?  Yep, sure was.  Okay.  Was it

18   the miles over that the officer said?  I

19   didn't think so.  Okay.  And so I did

20   object to that, I had a problem with that.

21   But at the end of the day, I paid my

22   ticket, okay?  And so maybe I thought that

23   was splitting hairs.  Now, you've heard

24   that this is an arson case, an aggravated

25   arson case, not a speeding ticket.  This is

1    a little bit different than splitting

2    hairs, okay?

3              And so does anybody think that an

4    officer could get something wrong?  Ma'am,

5    I think -- is it Juror 33?

6              JUROR #33:  Yes.

7              MR. KUHN:  You indicated that your

8    husband was in law enforcement; is that

9    correct?

10             JUROR #33:  Yes.

11             MR. KUHN:  Okay.  I think you

12   indicated that you could, you know, put

13   that aside and still view officers who

14   might testify as you would anybody else?

15             JUROR #33:  Yes.

16             MR. KUHN:  Do you think an officer

17   could -- could get something wrong?

18             JUROR #33:  Anybody could get

19   something wrong.

20             MR. KUHN:  Any human being, right,

21   because we're prone to error?

22             JUROR #33:  Yes.

23             MR. KUHN:  Okay.  We know that.

24   If you've ever -- has anybody ever walked

25   down the street and you think you see your

1  buddy and you call their name, or maybe you

2  rush up to them, and it turns out you're

3  wrong?

4      Juror number 21, I think I see you

5  kind of nodding your head, have you ever

6  done that?

7      JUROR #21:  Absolutely.

8      MR. KUHN:  You know, it's not a

9  big deal, but you thought you saw something

10 and you were wrong, right?  Okay.

11     Juror 18, has that ever happened

12 to you?

13     JUROR #18:  Yes.

14     MR. KUHN:  Okay.  As human beings,

15 were sort of prone to those kind of errors,

16 right?  Okay.

17     Okay.  We did hear that this case

18 here is going to involve an allegation of a

19 fire being set.  Okay.  Does anybody have

20 any sort of particular emotional feelings

21 when they hear about this notion of a fire

22 being set?  Is that emotional to anybody?

23 Okay.

24     Has anybody ever been a victim

25 of -- oh, I'm sorry.  Yes, sir?  And if

1  you'd prefer to say it at a sidebar, keep

2  that in mind.  But you said that does apply

3  to you?

4           JUROR #6:  Yes.

5           MR. KUHN:  Okay.

6           JUROR #6:  It's been a long time,

7  but there was a guy who set a fire to a

8  person's house, and it was my neighbor

9  actually and he was an elderly guy.  And me

10 and another guy retained the guy who set

11 the fire until the police came.  And I had

12 to go up to the police office, Downtown

13 Canton here, City Hall, and filled out

14 reports.  And this guy was out before I --

15 they let me out, he was already walking the

16 street.  And he said that -- they said -- I

17 said, I went back up there.  They says,

18 well -- I said, why did you let him out and

19 you had me fill out all this paperwork?

20 And they said, well, what you were saying

21 wasn't enough to convict anybody.

22           MR. KUHN:  Okay.  And so would you

23 say that was a bad experience you had?

24           JUROR #6:  Well, yeah, because the

25 guy did do it.

MR. KUHN:  Okay.  Would that experience you had maybe lead you to jump to the conclusion that anybody accused of setting a fire, you know, is guilty of it?

JUROR #6:  No.

MR. KUHN:  Okay.

JUROR #6:  Only thing is, this guy had a problem with setting fires, this wasn't the only fire.

MR. KUHN:  Okay.  So would that experience you had influence how you would listen to the evidence or interpret the evidence here today?

JUROR #6:  Probably not.

MR. KUHN:  Okay.  Now, Prosecutor Barr indicated that they -- the State of Ohio has the full burden on them to prove this case beyond a reasonable doubt.  Does anybody think that's maybe not fair or not appropriate, that maybe some burden should be placed on Kayla and myself?  Okay.

I might sound nervous up here. When I public speak, sometimes I get a little -- a little antsy beforehand, get a little anxious.  Does anybody else have

1    that feeling when they're set to speak in

2    public?  Juror number 28, is it?

3              JUROR #28:  Yes.

4              MR. KUHN:  Okay.  So --

5              JUROR #28:  It's a normal thing.

6              MR. KUHN:  Okay.  So it's a normal

7    thing?  And so has anybody ever heard that

8    you have the right to remain silent?  Have

9    we ever heard that phrase before?  You

10   understand that that applies here in the

11   courtroom here today as well?

12             Juror, is it -- let's see -- 69?

13   Juror 69 -- okay, I'm sorry, 66.  Were you

14   sort of nodding that you've heard of that,

15   the right to remain silent?  And you think

16   it may apply here today; is that right?

17             JUROR #66:  Uh-huh.

18             MR. KUHN:  If Kayla decided not to

19   speak today or tell her side of things, or

20   tomorrow, would you hold that against her?

21             JUROR #66:  No.

22             MR. KUHN:  Okay.  Would you

23   understand that's her right to remain

24   silent?

25             JUROR #66:  Right.

1       MR. KUHN:  Okay.  And that maybe

2   if she did have to testify she would be

3   nervous and there's a couple wise and

4   crafty Prosecutors here who would be

5   questioning her to maybe get her mixed up

6   and maybe get her to say the wrong thing?

7       JUROR #66:  It could happen.

8       MR. KUHN:  Okay.  Does anybody

9   like to cook?  Okay, Juror -- is it 22?

10      JUROR #22:  Uh-huh, yes.

11      MR. KUHN:  Okay.  You like to

12  cook?

13      JUROR #22:  Yes.

14      MR. KUHN:  Okay.  And so you've

15  made some recipes in your lifetime?

16      JUROR #22:  Yes.

17      MR. KUHN:  Okay.  If you were to

18  leave out a main ingredient, would you

19  still have the same product, the same dish?

20      JUROR #22:  It just depends.  If

21  you're making cookies and you leave out

22  Baking Soda, then it's not going to come

23  out right.

24      MR. KUHN:  You're not going to

25  have cookies?

1        JUROR #22:  You'll have them, but

2   they just won't taste right.

3        MR. KUHN:  You'll have something

4   less than cookies?

5        JUROR #22:  Right.

6        MR. KUHN:  That notion sort of

7   applies here today as well.  The State of

8   Ohio does have that full burden of proof

9   beyond a reasonable doubt and they are

10  going to try to prove these elements of the

11  crimes they've alleged, okay?  And if they

12  leave one out, or they can't quite make

13  that burden on one of the elements, you

14  folks will be instructed that you have to

15  acquit Ms. Ayers of that charge, okay?

16       Just like when you make a recipe,

17  the State of Ohio is going to be trying to

18  make a recipe of proving these charges

19  beyond a reasonable doubt and each and

20  every element of them.  And I want you all

21  to sort of envision them as being like

22  ingredients in the recipe, okay?  So if one

23  of them is lacking, you have to acquit on

24  that.  You won't -- you won't have your

25  completed dish that you'd be preparing.

1        Has anybody ever been wrongly

2   accused of something?  Nothing ever?  Yes,

3   Juror 6, can you tell us about that?

4        JUROR #6:  Well, I'm retired, I

5   retired last month, and I got accused of

6   doing something that I did not do.  But the

7   people who accused me said that I was the

8   only one that could have done it because

9   they had some charts and they had some

10  graphs which is just, to me, just charts

11  and graphs.  But I was written up and

12  disciplined for something that I did not

13  do.  And there was just no way for me to

14  make it right.

15       MR. KUHN:  Right.  So you had --

16       JUROR #6:  So I had to live with

17  it.  But I did -- but I did not do what I

18  was accused of doing.

19       MR. KUHN:  Okay.  And you denied

20  doing it, right?

21       JUROR #6:  I sure did.

22       MR. KUHN:  That's about all you

23  could do, right?

24       JUROR #6:  Yeah.  But I also asked

25  them for -- to show me, give me some

1    evidence or can you prove what you're

2    saying.  And they says, well, you're the

3    only one.  It's like something -- you go

4    outside and somebody's car is parked next

5    to yours, it's got a scratch on it, they

6    say, well, your car is next door -- next to

7    mine so you're the only one that could have

8    done it.  You say, well, I don't know

9    anything about it.

10                MR. KUHN:  Right.  And it would be

11   difficult to prove that you didn't do it,

12   right?

13                JUROR #6:  Yeah, right.

14                MR. KUHN:  That was actually one

15   of the examples I was going to use.  I was

16   going to give one of the potential jurors

17   here a hard time and say that they had

18   parked beside me today, opened their car

19   door into my car door today and damaged my

20   vehicle.  And so that's interesting that

21   you bring that up.

22                Juror 27, you did that to me this

23   morning, do you remember doing that?

24                JUROR #27:  I don't remember.

25                MR. KUHN:  No?  Okay.  Where did

1    you park?

2            JUROR #27:  In the parking garage.

3            MR. KUHN:  Right.  And that's

4    where I'm parked.  You're right beside

5    me so now --

6            JUROR #27:  I'm on the top,

7    though.

8            MR. KUHN:  Yeah, that's where mine

9    was, too.  So I've accused you so now I've

10   proven that he did it, right?  Is that

11   right, sir?

12           JUROR #27:  No.

13           MR. KUHN:  Probably not, right?

14   What if I bring in a couple buddies of mine

15   that say, yeah, you know, we were there,

16   Juror 27 did it, does that prove it?

17           JUROR #27:  No.

18           MR. KUHN:  Okay.  What if I

19   brought in a photograph that showed my

20   vehicle was, in fact, damaged, does that

21   prove it?

22           JUROR #27:  No.

23           MR. KUHN:  No, right?  So you've

24   denied having done that.  Obviously I'm

25   giving you a hard time there, but I want

you to keep in mind what sorts of things --
and, Juror number 6, you mentioned what
sorts of proof or evidence you would want
to see in that situation where you've
denied the wrongdoing, okay?  Unfortunately
for Juror number 6, you weren't in a court
of law, you weren't in the criminal justice
system where we have this standard of proof
beyond a reasonable doubt, you were in some
other setting.

Another example I was going to use
was when I was in elementary school,
another buddy and I were playing and he
said a bad word, okay?  And a lunch lady,
everybody remember lunch ladies, okay, one
of them overheard it and she, I guess, must
of scanned over in our direction and knew
that it was either my buddy or myself.
Okay.  And so we both had to go in and
have -- instead of being able to go out for
recess, we had to sit in the classroom and
write a certain number of times, you know,
I won't use a bad word.  And I had denied
doing that, but I was punished as though I
had done it, okay?  My point of that story

1     is that those might be the rules or the

2     standards of proof required for a

3     playground dispute, okay, if the lunch lady

4     says it is so.

5          Here in the criminal justice

6     system we have a different standard of

7     proof required, proof beyond a reasonable

8     doubt.  If all you needed was an allegation

9     or a police officer's testimony that that's

10    what happened, we wouldn't have juries, we

11    wouldn't have courts, it would already be

12    done.

13         Does that make sense to everybody?

14    Juror number -- is it 12?

15         JUROR #12:  Yes.

16         MR. KUHN:  Does that make sense,

17    that just because a cop says it doesn't

18    make it so?

19         JUROR #12:  Yes.

20         MR. KUHN:  Do you think -- do you

21    think that's maybe how it should be?

22         JUROR #12:  No.

23         MR. KUHN:  Okay.  Why not?

24         JUROR #12:  Well, you really need

25    more info, more information on it, than

1          just saying.

2                    MR. KUHN:  Okay.  So maybe we need

3          something a little bit more?

4                    Juror number 24?

5                    JUROR #24:  Yes.

6                    MR. KUHN:  You indicated that you

7          think you may have had Jeff Ayers as a

8          student?

9                    JUROR #24:  I had a Jeff Ayers.

10                   MR. KUHN:  Okay.  I think it may

11         be the same, I'm not sure.  I think he may

12         have previously been from -- did you say

13         Sandy Valley area?

14                   JUROR #24:  Yes.

15                   MR. KUHN:  Okay.  So that may be

16         the same guy.  But you indicated that aside

17         from the name, you don't really remember

18         him; is that correct?

19                   JUROR #24:  Oh, I remember him.

20                   MR. KUHN:  Okay.  Are your

21         recollections positive or negative?

22                   JUROR #24:  He was a funny kid.

23                   MR. KUHN:  Okay.  I had an

24         experience where I ran into a high school

25         teacher of mine a couple years back, I was

1  playing softball down at Willig Fields, if

2  anyone knows where that is, and a friend of

3  mine on the team knew one of my high school

4  teachers, and I hadn't seen her for some

5  period of time.  And when I saw her, I was

6  immediately embarrassed because maybe you

7  would say I was a funny kid.  I used to

8  like to work on my stand-up material during

9  class, you know, try to give all my buddies

10  a good laugh so they weren't learning

11  anything.

12         And the way I remembered it was

13  that I was probably a pain to her, probably

14  a problem student, you know.  And so when

15  she came up, I sort of introduced myself,

16  she didn't remember me, okay?  And so this

17  thing that I thought was memorable, maybe

18  in a bad way, she didn't even remember it

19  at all.  So I think different people can

20  remember things differently.  Maybe some

21  folks would think something is significant,

22  and other folks wouldn't even think twice

23  about it.

24         So when you say that this Jeff

25  Ayers was a funny guy, is that a good funny

1    or a bad funny?

2              JUROR #24:  Good funny.

3         MR. KUHN:  Okay.  That sounds

4    good.

5              Okay.  We had talked about how

6    this standard or this burden of proof

7    beyond a reasonable doubt is the same

8    degree of certainty that you would want to

9    use in your most important personal

10   affairs.  Prosecutor Barr talked about

11   maybe deciding when to have children, or

12   perhaps even when or where to purchase a

13   home, maybe where to invest your life

14   savings.  Okay.  Very crucial decisions

15   that everybody has to make.

16             And I would really like you to

17   focus on that when you are making your

18   decision today or tomorrow, that this is

19   not only important to Ms. Ayers and myself,

20   it's important to the criminal justice

21   system that you do give it that very high

22   degree of certainty, that moral certainty.

23   Does that make sense to everybody?  Okay.

24             Can everybody promise me that if

25   you're selected as a juror, you will follow

1   Judge Farmer's instructions with regard to

2   listening to the testimony and how to

3   deliberate?  Can anybody not promise me

4   that?  Thank you.

5            THE COURT:  All right.  Thank you,

6   Attorney Kuhn.

7            Now, again, I don't always ask all

8   the right questions, and the attorneys

9   sometimes don't ask the right questions,

10  too, but after having listened to all of

11  our questions, if you could all just take a

12  minute to think if there's any reason

13  whatsoever as to why you think you could

14  not be a fair and impartial juror in this

15  case other than what has already been

16  stated.  Anybody think of anything?  Okay,

17  very good then.

18           If you are not selected as a juror

19  in this case, you're going to have to turn

20  your badge back in to Magistrate Flowers.

21  The jury commission has indicated that you

22  will need to call back in again tonight

23  after 5.

24           So with that then, the Court and

25  counsel are going to approach at the bench

1    to discuss jury selection.  I know we've

2    been sitting here a long time so I know

3    that you're -- and they're not the most

4    comfortable seats, I'll admit, so if you

5    feel the need to stand up and stretch your

6    legs a little bit while we discuss, feel

7    free to do so.  Again, we'll be discussing

8    this at a sidebar and don't all try to

9    listen.

10              Okay, you have a question?

11              JUROR #61:  May we use the

12   restroom quickly and come back, or is there

13   not time?

14              THE COURT:  I think that's fine.

15   If you do need to -- there's restrooms down

16   on this floor.  If you go out of the

17   courtroom and then turn to the left, and

18   then there's -- it says victim witnesses,

19   back in that hallway there's restrooms back

20   there.  Okay, so if you do need to use the

21   restroom, go ahead.  Just remember to come

22   back, okay?

23              Counsel, you want to approach?

24              - - - - - -

25              (A conference was held at the

1               bench outside the hearing of the

2               prospective jurors.)

3                    - - - - - -

4               THE COURT:  It's been a long time

5     for them to be sitting.  Let's go through

6     the challenges for cause.

7               MR. BARR:  Okay.  I have Juror

8     number 21 who indicates he couldn't be fair

9     and impartial because it involved small

10    children.  Juror number 72 for the same

11    reason.  And Juror number 26 for the same

12    reason.

13             THE COURT:  Okay.  Any objection

14    to 26?

15             MR. KUHN:  No.

16             THE COURT:  So 21 --

17             THE BAILIFF:  22 will go into 21's

18    spot.

19             THE COURT:  72, that's back there.

20    And 26.

21             THE BAILIFF:  28 will go into 26's

22    spot.  We'll fill those at the end then.

23             THE COURT:  Yeah, okay.  Did you,

24    Attorney Kuhn, have any challenges for

25    cause other than those that are already

1    stated?

2              MR. KUHN:  Judge, I would say

3    Juror 50.

4              MR. BARR:  Okay.  I don't think,

5    but if he's willing to excuse him, I'm

6    willing to join in that.

7              THE COURT:  At first he did, but

8    sort of brought it back.  But if it's

9    consented to, that's fine.  I think there

10   was enough.

11             MR. BARR:  I have no more for

12   cause.

13             THE COURT:  Okay.

14             MR. KUHN:  You didn't say 27, did

15   you?

16             MR. BARR:  No, I did not.

17             MR. KUHN:  I think he kind of did

18   the same thing where he initially said he

19   didn't think he would be able to, and then

20   I think backpedaled on that.

21             THE COURT:  That was 72 you think?

22             MR. KUHN:  I thought that was 27

23   who had the deadlines.

24             THE BAILIFF:  He has work.

25             THE COURT:  He has work, but he

said that -- he was rehabilitated to say he
could put that aside.

I will tell you, just because
Christmas just happened, that the lady in
the back works at Toys "R" Us and she
didn't seem to know who I was, I think I
may know her well because I'm there the
whole time.  If you want me to ask her, I
can.  I don't know her name other than I
saw her several times at Christmas, okay?

Anybody else for cause?

MR. BARR:  None from the State,
Your Honor.

THE BAILIFF:  Wondered why she
looked so familiar to me.

MR. KUHN:  None from us.

THE COURT:  Then we'll go back and
do peremptories from the bench.  Give them
a couple minutes to trickle back in.

(End of conference at the bench.)

- - - - - - - - - -

THE COURT:  Counsel, approach for
a minute.

- - - - - -

(A conference was held at the

144

1       bench outside the hearing of the

2       prospective jurors.)

3              - - - - - -

4              THE COURT:  I think we'll just

5    take a lunch break, so if you think 11:30

6    to 12:30 --

7              MR. BARR:  The only thing is, I

8    had some witnesses coming at 12:30 I'll

9    need to talk to because I thought we would

10   be at lunch.  I don't know if we could do

11   openings, and then take a lunch.  Is that

12   all right?

13             MR. KUHN:  That would be fine

14   except my client needs to use the restroom.

15             THE COURT:  What we were going to

16   do is pick a jury, I'll give them a brief

17   break, I have to give the court reporter a

18   break, take a 10 or 15 minute recess, then

19   start up.

20             MR. BARR:  Okay.

21             THE COURT:  Hopefully by about

22   12:30 we will be ready to take a lunch

23   break.

24             MR. KUHN:  Sounds good.

25             MR. BARR:  Thank you, Judge.

1   (End of conference at the bench.)

2   - - - - - - - - - -

3   THE COURT:  If everybody could

4   take a look around and make sure your

5   neighbor's still with us and they came

6   back.  Anybody notice a missing neighbor?

7   Okay, very good then.

8   At this time the Court is going to

9   excuse the following jurors for cause:  And

10  that would be Jurors number 21, Jurors

11  number 72, Jurors number 26, and Juror

12  number 50.  At this time those jurors can

13  hand their badges to Magistrate Flowers.

14  And, again, you will need to call back in

15  tonight after 5.  Yep, you're free to go.

16  JUROR #72:  Thank you.

17  THE COURT:  And Juror number 50,

18  you're free to go, too, okay?  Thank you

19  for your services this morning.  I know it

20  was a tough road to get in here, but we do

21  appreciate it.  And just remember to call

22  back in.

23  Very good.  Now we are going to

24  begin the musical chairs portion of our

25  program.  And at this point we're going to

1    fill our box back up.

2          THE BAILIFF:  Juror number 27, if

3    you could please take the seat that was

4    previously occupied by Juror number 21.

5          And Juror number 28, if you could

6    just take the seat right next to you there

7    that was occupied by Juror number 26.

8          THE COURT:  Okay.  At this time

9    the State may exercise a peremptory

10   challenge.

11         MR. BARR:  Thank you, Your Honor.

12   At this time the State would thank and

13   excuse Juror number 12.  Thank you, ma'am.

14         THE COURT:  Okay.  Juror number

15   12, you can hand your badge, again, to

16   Magistrate Flowers.  And remember to call

17   in tonight after 5.  And thank you for

18   coming in today.

19         THE BAILIFF:  Juror number 30, if

20   you could please take the seat that was

21   previously occupied by Juror number 12.

22         THE COURT:  Okay.  Mr. Kuhn?

23         MR. KUHN:  Thank you, Judge.  At

24   this time we would like to thank and excuse

25   Juror number 27 please.

1      THE COURT:  Okay.  Juror number

2   27.  Again, hand your badge --

3      THE BAILIFF:  Juror number 32.

4      THE COURT:  -- and call back in

5   tonight after 5:00, okay?

6      THE BAILIFF:  Right up here in the

7   top row.

8      THE COURT:  Mr. Barr?

9      MR. BARR:  Thank you, Your Honor.

10  At this time the State of Ohio would thank

11  and excuse Juror number 18.  Thank you,

12  ma'am.

13     THE COURT:  Okay.  Juror number

14  18, you are excused.  Just hand your badge

15  back to Magistrate Flowers.  Remember to

16  call back in tonight after 5.

17     THE BAILIFF:  Juror number 33.

18  You can come this way.  Just watch your

19  step on the cord.

20     THE COURT:  Attorney Kuhn?

21     MR. KUHN:  Juror -- Judge, thank

22  you.  At this time we would like to thank

23  and excuse Juror number 5 please.

24     THE COURT:  Okay, Juror number 5,

25  you are excused.  Thank you for your

1   service this morning.  Hand your badge back

2   in and remember to call tonight after 5.

3   THE BAILIFF:  Juror number 34.

4   THE COURT:  And watch the cord

5   there on your way out.  And just watch the

6   cords on your way up.

7   Attorney Barr?

8   MR. BARR:  At this time, Your

9   Honor, the State of Ohio would thank and

10  excuse Juror number 32.  Thank you, ma'am.

11  THE COURT:  Well, that seems to be

12  the unlucky seat there, or lucky depending

13  on your perspective.

14  THE BAILIFF:  Juror number 35.

15  THE COURT:  Just remember to call

16  back in tonight after 5.

17  Okay, Attorney Kuhn?

18  MR. KUHN:  We would pass, Judge,

19  thank you.

20  THE COURT:  All right, thank you.

21  Attorney Barr?

22  MR. BARR:  Thank you, Your Honor.

23  At this time the State would thank and

24  excuse Juror number 6.  Thank you very

25  much, sir.

1    THE COURT: All right. Juror

2    number 6, you are excused. Thank you for

3    your service this morning, and remember to

4    call back in tonight after 5.

5    THE BAILIFF: Juror number 38.

6    THE COURT: Attorney Kuhn?

7    MR. KUHN: Thank you, Your Honor.

8    We would like to excuse Juror 38 please.

9    THE COURT: You don't even get a

10   chance there. Thank you number -- Juror

11   number 38 for your service this morning.

12   Just remember to call back in tonight after

13   5.

14   THE BAILIFF: Juror number 39.

15   Come around this way. Watch your step

16   please.

17   THE COURT: Okay. At this time we

18   are going to select an alternate -- two

19   alternate jurors. The role of the

20   alternate jurors is very important; in the

21   event that one of our regular jurors is

22   unable to complete his or her service in

23   this case, the alternate juror will then

24   step in to serve as a regular juror. It's

25   very important that the alternate juror

1    listens attentively to these proceedings

2    and assume, unless you're told otherwise,

3    that you're going to deliberate upon a

4    verdict in this case.

5         And at this point Jurors number --

6    is it 44?

7         THE BAILIFF:  Uh-huh.

8         THE COURT:  44 and 49 are our

9    alternate jurors.  At this time does the

10   State wish to exercise a peremptory

11   challenge with respect to either of the

12   alternate jurors?

13        MR. BARR:  No, Your Honor, thank

14   you.

15        THE COURT:  All right.  And

16   Defendant?

17        MR. KUHN:  No, thank you, Judge.

18        THE COURT:  All right, thank you.

19   Then Jurors number 44 and 49, you can come

20   on down, you are our alternate jurors.

21        THE BAILIFF:  Juror number 44,

22   you'll take the front seat.  And Juror

23   number 49, you'll be in the back seat.

24        THE COURT:  All right.  Very good.

25   It appears as though we have a jury

selected in this case.  At this time I'd

ask Magistrate Flowers to swear in the

jury.

THE BAILIFF:  If you could please

stand and raise your right hand.

- - - - - - - - -

(Thereupon, the jury panel was

sworn in by the Bailiff.)

- - - - - - - - -

THE BAILIFF:  Thank you.

THE COURT:  All right.  You may be

seated.  And was anyone unable to take the

oath as administered by the Court?  The

Court notes no one.

All right.  We have selected and

seated a jury in this case.  The Court

would like to thank all of you for your

service here this morning and for all the

attention that you have given us.  I know

that it's been a long morning, but it's

only through individuals like yourself that

we ensure that our system of justice

continues to work.

If you are not selected as a juror

today, please, you're free to go, you're

1    free to stay if you'd like, but you can

2    hand your badge to Magistrate Flowers.

3           Again, the jury commission has

4    indicated that you will need to call

5    tonight after 5.  So, again, thank you for

6    your cooperation.  If you are not chosen,

7    you may leave.

8           (Thereupon, the prospective jurors

9           not chosen exited the courtroom

10          at 11:38 a.m.)

11          THE COURT:  All right.  Very good.

12   We have had a long morning already.  At

13   this time we're going to take about a 15

14   minute recess, give you time if you need to

15   change anything or make any plans, you can

16   contact your family and let them know that

17   you were selected and that you will be here

18   for two days.  If you have childcare

19   arrangements or any arrangements that need

20   to be made.

21          But during the recess, you're not

22   to let anyone to discuss the trial with you

23   or in your presence.  Do not discuss the

24   case among yourselves.  And do not form or

25   express any opinion on the case until it is

1    finally submitted to you.

2        We'll meet you back in the jury

3    assembly room, which is the room where you

4    started off this morning, in about 15

5    minutes.

6        Feel free, again, to get something

7    to drink.  You're obviously -- you're more

8    than welcome to bring any drinks that you'd

9    like to back into the courtroom with you,

10    we just ask no food, okay?

11        There is a snack stand downstairs

12    for your convenience.  And, like I said, if

13    you do need to make a call to let your

14    family know where you are, you are free to

15    do that, but keep in mind my admonition

16    that you can't talk about the case.  So you

17    can tell them, I was selected as a juror, I

18    can't talk about the case so don't even ask

19    me about the case.  But whatever

20    arrangements need to be made can be made.

21        Again, we'll meet you back in the

22    jury room in about 15 minutes.  When you

23    come back, we're going to go through some

24    preliminary instructions and we're going to

25    do opening statements, and then we'll break

1    for lunch, okay?

2         So with that then, you are excused

3    and we'll see you in about 15 minutes.

4         And I just want to note that the

5    clock, in case anybody is keeping track,

6    the clock over there is approximately six

7    minutes fast.  So right now I have the time

8    as 11:32.  So you have 15 minutes from

9    11:32, okay?

10        THE BAILIFF:  All rise.

11         - - - - - - - - - -

12        (Court recessed at 11:32 a.m. and

13         reconvened at 11:52 a.m., and the

14         following proceedings were had.)

15        THE COURT:  You may be seated.

16   Welcome back, ladies and gentlemen.  On

17   your chairs you will find a binder, and

18   inside the binder you'll find notepaper as

19   well as some preliminary instructions.

20        With respect to the preliminary

21   instructions, I do have instructions that,

22   in accordance with law, I must give you.

23   And I figure instead of listening to me

24   reading to you, you are free to read along.

25   Obviously you don't have to, you can listen

to my instructions, but because they are specific in nature, I will be reading them to you.  So at this point if you want to turn to the preliminary instructions then we'll get started.

It's important that you be fair and attentive throughout the trial.  Do not discuss this case among yourselves or with anyone else.  Do not permit anyone to discuss it with you or in your presence. Do not form or express any opinion on the case until it's finally submitted to you. More difficult for you to understand is that you may not discuss this case among yourselves until it's finally submitted to you.

You will receive the opening statements, the evidence, the arguments of counsel, and the law from the Court in that order.  It would be unfair to discuss the case among yourselves before you receive everything necessary to reach an informed decision.  You must explain this rule, prohibiting discussion of the case, to your family and friends.  When the trial is

over, you will be released from this
instruction.  At that time you may, but are
not required to, discuss the case and your
experiences as a juror.  Until that moment,
you must control your natural desire to
discuss the case both here and at home.

The Court instructs you not to
converse with the attorneys, parties, or
witnesses during the trial.  Likewise, the
participants in the trial must not converse
with you.  If anyone should attempt to
discuss the case with you, report the
incident to the Court or to the bailiff
immediately.

You may not investigate or attempt
to obtain additional information about this
case outside the courtroom.  It's highly
improper for any one of you to attempt to
do so.

You are instructed not to read,
view, or listen to any report in the
newspaper, radio, television, or Internet,
including social media, such as Facebook
and Twitter, on the subject of this trial.
Do not permit anyone to read or comment

1    upon the evidence received in the

2    courtroom.  If you should acquire

3    information from an outside source, you

4    must not report it to the other jurors and

5    you must disregard it in your

6    deliberations.  In addition, you should

7    report the outside source of information to

8    the bailiff or to the Court at the first

9    opportunity.

10          Ladies and gentlemen of the jury,

11   the Court and counsel will work on your

12   case for trial as efficiently as possible.

13   Sometimes delays occur, however, through no

14   one's fault.  Motions come up during the

15   trial that must be heard outside the

16   hearing of the jury.  Witnesses may be

17   late.  At other times other cases,

18   unrelated to the case on trial, come before

19   the Court for emergency action and need

20   immediate attention.

21          There may be times when you are

22   sitting in the jury room not hearing

23   evidence, but that does mean we have

24   forgotten you or that the Court is not

25   busy.  I apologize for any such delays in

1    advance, and the Court will keep you

2    informed about these matters.

3         The procedure for the trial is

4    controlled by statute.  First, counsel for

5    the State of Ohio outlines what he or she

6    expects the evidence will be.  Counsel for

7    the Defendant then may state what his or

8    her evidence will be.  These opening

9    statements are not evidence; they are

10   previews of the claims of each party

11   designed to help you follow the evidence

12   and understand the case as it is presented.

13        In the presentation of the

14   evidence, the State of Ohio proceeds first.

15   Thereafter, the Defendant may offer

16   evidence, and the State of Ohio may offer

17   rebuttal evidence.  The trial itself

18   concludes with the arguments of counsel and

19   the instruction of law by the Court.  Then

20   you will deliberate upon your verdict.

21        Before we hear the opening

22   statements of counsel and begin to take

23   evidence, I believe it would be helpful if

24   you were to have some additional

25   preliminary instructions to follow in

listening to and considering the evidence
which you will hear in this case.

Later, after you have heard all of
the evidence and closing arguments of
counsel, I will give you further
instructions covering additional law which
you are to follow in this case.  It is the
duty of the Judge to instruct you in the
law, and it's your duty to follow the law
as I will state it to you both now and at
the conclusion of all the evidence.

First of all, it's your exclusive
duty to decide all questions of fact
submitted to you.  In connection with this
duty, you must determine the effect and
value of the evidence.  You must not be
influenced by -- in your decision by
sympathy, prejudice, or passion toward any
party, witness, or attorney in the case.

If, in these instructions or in
the instructions which I will give to you
at the conclusion of the evidence, any
principle or idea is repeated or stated in
varying ways, no emphasis thereon is
intended and none must be inferred by you.

1       Therefore, you must not single out any

2       particular sentence or individual point or

3       instruction and ignore the others, but,

4       rather, you are to consider all of the

5       instructions as a whole and are to consider

6       each instruction in relation to all the

7       other instructions.

8              The fact that I give you some of

9       the instructions now and some at the

10      conclusion of the evidence has no

11      significance as to their relative

12      importance, nor has the order in which I

13      give you the instructions.

14             The attorneys, of course, will

15      have active roles in the trial.  They will

16      make opening statements to you, question

17      witnesses, and make objections.  And,

18      finally, will argue the case as the last

19      step before you hear my final instructions

20      and commence your deliberations.  Remember

21      that attorneys are not witnesses, and since

22      it is your duty to decide the case solely

23      on the evidence which you see or hear in

24      the case, you must not consider as evidence

25      any statement of an attorney made during

the trial.  There is an exception, and that
is if the attorneys agree to any fact.
Such agreement, stipulation, or admission
of fact will be brought to your attention,
and you may then regard such fact as being
conclusively proved without the necessity
of further evidence of such fact.

If a question is asked and an
objection to the question is sustained, you
will not hear the answer and you must not
speculate as to what the answer might have
been or as to the reason for the objection.

If an answer is given to a
question and the Court then grants a motion
to strike out the answer, you are to
completely disregard such question and
answer and not consider them for any
purpose.  A question in and of itself is
not evidence and may be considered by you
only as it supplies meaning to the answer.

Any fact in this case must be
proven by either direct or circumstantial
evidence.  Direct evidence means exactly
what the name implies.  That is, it is
evidence which directly proves a fact

without having to infer that fact from some other fact. Direct evidence is usually the testimony given by a witness who has seen or heard the facts to which he or she testifies. It includes exhibits admitted into evidence during the trial.

Circumstantial evidence, on the other hand, is the proof of facts by direct evidence from which you may infer a fact in question.

For example, if the question of fact in a given case is whether or not Johnny ate the cherry pie, testimony by a witness that he or she saw Johnny put the pie in his mouth and eat it would be direct evidence of such fact. However, if a witness testifies that he or she arrived in the kitchen only to see Johnny standing there with an empty pie tin in his hand and cherry pie on his face, that would be circumstantial evidence of the fact that Johnny ate the pie.

The law requires no distinction between direct and circumstantial evidence as to the degree of proof required, and

1    either type of evidence, or a combination

2    of them, may prove facts.  Each is accepted

3    as a reasonable method of proof, and each

4    is respected for convincing force as it may

5    carry.

6         As jurors, you have the sole and

7    exclusive duty to decide the credibility of

8    the witnesses who testify in this case,

9    which simply means that it is you who must

10   decide whether to believe or disbelieve a

11   particular witness and how much weight, if

12   any, to give to the testimony of each

13   witness.

14        In determining these questions,

15   you will apply the tests of truthfulness

16   which you apply in your daily lives.  These

17   tests include the appearance of each

18   witness on the stand; his or her manner of

19   testifying; the reasonableness of the

20   testimony; the opportunity he or she had to

21   see, hear, and know the things concerning

22   which he or she testified; his or her

23   accuracy of memory; frankness, or lack of

24   it; intelligence, interest and bias, if

25   any; together with all the facts and

circumstances surrounding the testimony. Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.

You are not required to believe the testimony of any witness simply because it was given under oath. You may believe all or any part of the testimony of any witness.

You should not decide any issue of fact merely on the basis of the number of witnesses who testify on each side of such issue. Rather, the final test in judging evidence should be the force and weight of the evidence, regardless of the number of witnesses on each side of an issue. The testimony of one witness believed by you is sufficient to prove any fact.

Also, discrepancy in a witness's testimony or between his or her testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time. You are

certainly all aware of the fact that two persons who are witnesses to an incident may often see or hear it differently.  In considering a discrepancy in a witness's testimony, you should consider whether such discrepancy concerns an important fact or a trivial one.

If you conclude that a witness has willfully lied in his or her testimony as to a material fact, you may distrust all of that witness's testimony, and you would then have the right to eject all of that witness's testimony, unless, from all of the evidence, you believe that the probability of truth favors his or her testimony and other particulars.

During this trial the jurors will be permitted to take notes.  The Court has provided you with a pen and a folder containing paper for your convenience.  For years, the practice of juror note taking has been discouraged.  It was believed that taking notes may distract your mind from the evidence that's being presented.  Another reason was that the best note taker

1   might have more influence on other jurors

2   than is appropriate.  I suggest you take

3   notes when there is a pause in testimony.

4   Remember, each of you must individually

5   determine the issues in this case.

6          At the end of the case, in

7   deliberations, your collective minds will

8   then reach a verdict.  Please understand

9   that testimony cannot be repeated, nor the

10  trial delayed, to permit accurate note

11  taking.  It is your responsibility to

12  listen to the testimony.

13         There is no requirement to take

14  notes.  Again, the Court instructs you that

15  you will have to rely on your collective

16  memories as to the testimony that you have

17  heard.  You will not be provided with a

18  transcript of the testimony and it will not

19  be repeated.

20         Please write your juror number on

21  the front page of your folder at this time.

22  The bailiff will collect the folders.  Your

23  notes will be redistributed to you when we

24  reconvene.  You may not remove the folder

25  from the courtroom.  However, during jury

1       deliberations, you may have your notes with

2       you in the jury room.

3             All notes are confidential and for

4       consideration of the jury only.  After you

5       have concluded your deliberations, your

6       notes will be collected and destroyed.

7             The burden of proving the elements

8       of the offense charged is upon the

9       prosecution.  The Defendant is presumed

10      innocent until his -- until her guilt is

11      established beyond a reasonable doubt.  The

12      Defendant must be found not guilty unless

13      the State of Ohio produces evidence which

14      convinces you beyond a reasonable doubt of

15      every essential element of the offense

16      charged in the complaint.

17             Reasonable doubt is present when,

18      after you have carefully considered and

19      compared all the evidence, you cannot say

20      you are firmly convinced of the truth of

21      the charge.  Reasonable doubt is a doubt

22      based on reason and common sense.

23      Reasonable doubt is not mere possible

24      doubt, because everything relating to human

25      affairs or depending on moral evidence is

1    open to some possible or imaginary doubt.

2         Proof beyond a reasonable doubt is

3    proof of such character that an ordinary

4    person would be willing to rely and act

5    upon it in the most important of his or her

6    own affairs.

7         If, after a full and impartial

8    consideration of all of the evidence, you

9    are firmly convinced of the truth of the

10   charge, the State of Ohio has proved its

11   case beyond a reasonable doubt.  If you are

12   not firmly convinced of the truth of the

13   charge, you must find the Defendant not

14   guilty.

15        Testimony of the Defendant:  It is

16   not necessary that the Defendant take the

17   witness stand in her own defense.  The

18   Defendant has a constitutional right not to

19   testify.  If, in fact, the Defendant does

20   not testify, you must not consider that for

21   any purpose.  However, if the Defendant

22   does testify, the testimony of the

23   Defendant is to be weighed by the same

24   rules that apply to other witnesses.

25        This concludes -- concludes my

preliminary instructions to you, and I hope

that they will be of some assistance to you

in listening to and considering the

evidence.  Please keep these instructions

in mind as you listen to the evidence and

statements of counsel.  I may give you

additional instructions during the trial.

And when the evidence and closing

arguments are concluded, I will give you

additional instructions on the law which

you are to follow, together with the

instructions you have just heard and any

given during the conduct of the trial.

At this time the parties will be

afforded the opportunity to give you an

opening statement.  Counsel for the State

of Ohio and the Defendant may have an

opening statement.  Again, opening

statements of counsel are concise and

orderly descriptions of each side's claims

and defenses and the evidence counsel

expects to produce in support of those

claims and defenses.  They are not

evidence.  Each side will address you once

during opening statement with the State of

1    Ohio going first.

2          Attorney Schnellinger.

3          MS. SCHNELLINGER:  Your Honor,

4    counsel.  Ladies and gentlemen of the jury,

5    thank you so much for your time and

6    attention thus far.

7          I'm going to give you a brief

8    overview of the facts of the case so you

9    have an idea of what happened on October

10   3rd, 2012 when this woman, this woman here,

11   when she lit her house on fire with her

12   3-year-old son and herself inside.

13         Throughout the trial witnesses and

14   evidence may be presented out of order.

15   This will give you an overview or some

16   guidance about the evidence that will be

17   presented.

18         Defendant lived at 185 26th Street

19   Southeast in Massillon, Stark County, Ohio.

20   Her father had rented this house and he

21   lived there with his girlfriend and her two

22   children.  The Defendant and her boyfriend

23   and their three children also lived there.

24         Now, at the actual time of the

25   fire, everyone else was gone and had been

1   gone for some time, everyone except the

2   Defendant and her 3-year-old son.  Her

3   father and his family had left that day,

4   they left that day and went to West

5   Virginia because they were going to move

6   there.  They were going down there to make

7   arrangements for that move.

8           The Defendant's boyfriend, a man

9   by the name of Brennan Scott, he had come

10   home at about 5:00, he had come home with

11   his boss, they came back to the house to

12   pick up the boss's children, and then the

13   four of them left.  So the boyfriend, the

14   boss, and his kids all left, it was about

15   5:00.

16           Defendant's oldest two children

17   had left around 6:15, two little girls,

18   they left on a church bus.  It was a

19   Wednesday.  So only the Defendant and her

20   3-year-old son remained at the house.

21           Now, about 6:30, a member of a

22   local church, Karen Ball, had arrived at

23   the Defendant's residence to pick up the

24   Defendant and also the 3-year-old son to

25   take them to church.  This was a regular

1   arrangement every Wednesday.  Now, they
2   went separate from the other two girls.
3           Now Karen went to the door and she
4   knocked.  No one answered.  Karen could
5   hear a dog barking.  She could see in the
6   house, she could see the Defendant's purse
7   and other things that the Defendant goes
8   nowhere without.  She could see that stuff
9   inside the house.  She also heard someone
10  in the house say "shh."  Karen saw no
11  vehicles in the driveway.  Karen waited a
12  short time.  Eventually she left, went to
13  church.
14          Karen goes to church and
15  participates in services.  But when she
16  left, she didn't feel right.  The pit of
17  her stomach didn't feel right.  She didn't
18  feel right about the Defendant.  So she
19  left church early and decided to go back to
20  the Defendant's house, about 8 p.m.  She
21  drived -- she drives down the Defendant's
22  street, she can see the house and she sees
23  a glow from the basement windows, a
24  flickering light.  She can see that the
25  basement is on fire.

1       She goes to the door, she pounds

2       on the door.  Nobody answers.  She runs

3       around the house.  Now, I will tell you

4       Karen at this time was physically disabled,

5       she wasn't walking that fast.  So when I

6       say run, she was walking really slow, she

7       was using a cane at that time, but she got

8       around to the other side of the house,

9       pounds on that door, all she hears is a dog

10      barking the time that she's there, about

11      ten minutes.  So she starts to go back to

12      her car, she's going to get her cane, she's

13      going to try to get help.

14      The Defendant finally exits the

15      house.  Karen can see the 3-year-old son.

16      He had come out of the house, but she

17      doesn't see the other two children.  She

18      didn't know where they were.  She asked the

19      Defendant, Where are the girls?  Defendant

20      never tells her.

21      Jennifer Conley comes over, she's

22      a neighbor.  She comes over to help.  One

23      of those neighbors calls 911.  Both Karen

24      and Jennifer, they describe the Defendant

25      as smelling like marijuana and acting, in

1    their opinion, weird or bizarre.

2          Thankfully, Massillon Fire

3    Department arrives, they put the fire out.

4    The fire started in the basement in a

5    mattress and it spread up to the ceiling

6    and into the first floor, just the floor

7    part.

8          The fire was started in two

9    separate and distinct places on that

10   mattress, two separate starts.

11         When the Defendant is asked what

12   happened, she gives multiple stories.

13   From, Bubba started the fire, that's what

14   she calls her 3-year-old son, to Brennan

15   started the fire, to her dad started the

16   fire.  I'll remind you, Brennan wasn't

17   there, wasn't at the house, and neither was

18   her father.  They started the fire.

19         However, right before this fire

20   when Defendant told -- when the Defendant's

21   father told her that he was going to move,

22   he was going to move without her, Defendant

23   told her father, If you leave me again, I

24   will burn this house down.  If you leave me

25   again, I'll burn this house down.

1    Defendant leaves -- or Defendant's father

2    leaves to go to West Virginia to move, she

3    burns the house down, she lights it on

4    fire.

5        The crimes or the charges you will

6    be asked to consider is aggravated arson

7    and endangering children.  Now, I know

8    they've been gone over, but they're very

9    important, these elements.  On October 3rd,

10   2012, 185 26th Street Southeast, Massillon,

11   Stark County, Ohio, the Defendant, by means

12   of fire or explosion, obviously I've

13   already told you it's fire, knowingly

14   caused physical harm to that residence.

15       Endangering children, same date,

16   same place.  The Defendant recklessly,

17   being the parent, guardian, custodian of

18   children under 18, created a substantial

19   risk to their health and safety.

20       After you've heard all the

21   testimony, seen the evidence, follow the

22   law, which will be given to you by Her

23   Honor, and follow your oath, we will ask

24   you to come back with a finding of guilty

25   of one count of aggravated arson and one

1      count of endangering children.  Thank you.

2                THE COURT:  Thank you.

3                Attorney Kuhn.

4                MR. KUHN:  Thank you, Your Honor,

5      opposing counsel.  Ladies and gentlemen of

6      the jury, good afternoon now.  I'll try to

7      be brief here.

8                The State of Ohio is going to call

9      a number of witnesses today and they're

10     going to introduce some evidence.  I'll

11     predict they'll probably have a video for

12     you to view, maybe some photographs.  And

13     the Prosecutor's made a number of promises

14     to you here this early afternoon with

15     regard to what we will hear and what we

16     will take away from these witnesses, from

17     their testimony.

18               And it's my position that when

19     they're putting together their recipe for

20     the two crimes alleged, that being

21     aggravated arson and endangering children,

22     they're going to come up at least one

23     ingredient short of the recipe.  They are

24     not going to be able to prove that Kayla

25     knowingly set that home on fire.  Was there

1    a fire?  Yes.  Did she deliberately set it?

2    No.

3        This was an accident.  We're going

4    to hear some testimony today and I predict

5    it will involve the possibility that it was

6    due to my client's son getting access to a

7    cigarette lighter.  We'll also hear some

8    evidence to indicate that perhaps she had

9    fallen asleep with a cigarette and that the

10   fire stemmed from that behavior.  It's very

11   unfortunate, but it is not a crime, it is

12   an accident.

13       The State of Ohio is going to

14   indicate that my client's story changed

15   from when she was initially interviewed

16   through today, that her story somehow

17   changed or she deviated.  It didn't.  She

18   denied setting the fire from the very

19   beginning.  She never once indicated she

20   set that house on fire.

21       I want you to pay very close

22   attention to the witnesses and the

23   testimony that you hear today.  I'm sure

24   you will because you've promised me that

25   you will give it the same amount of

1    consideration and require that same degree

2    of certainty that you would require in your

3    most important personal affairs, things

4    like when to have children.

5    The State of Ohio cannot prove

6    this case today.  We've heard the phrase

7    that if the glove don't fit, you must

8    acquit.  I won't do that.  There's no glove

9    in this case.  I will say, if the elements

10   don't fit, you must acquit.  If the

11   ingredients aren't there, you must acquit.

12   In this case, they cannot show

13   that Ms. Ayers knowingly set that structure

14   on fire.  There are going to be

15   discrepancies in the reports from the fire

16   department.  We're going to hear about

17   that.

18   We're going to hear that I believe

19   there was a shotty investigation conducted.

20   We're going to hear from some friends and

21   neighbors, maybe even some relatives of Ms.

22   Ayers.  Nobody was there at the time,

23   nobody saw how that fire started.

24   And the State of Ohio, even though

25   they said my client lit her house on fire,

1    they don't know how that fire started and

2    they cannot prove that to you.  Thank you.

3         THE COURT:  All right.  Ladies and

4    gentlemen, at this time you've heard the

5    opening statements of counsel as well as my

6    preliminary instructions.  At this point we

7    are going to take a lunch recess for one

8    hour.  We're going to reconvene at 1:30.

9         Again, during the lunch recess, do

10    not permit anyone to discuss the trial with

11    you or in your presence.  Do not discuss

12    the case among yourselves.  And do not form

13    or express any opinion on the case until

14    it's finally submitted to you.

15         You are free to leave the building

16    for lunch, just make sure you do come back.

17    And we'll reconvene again at 1:30 in the

18    jury assembly room which is where you

19    reported this morning as well as for the

20    morning break.  And we'll start up with

21    testimony and evidence presented by the

22    State of Ohio.  Okay.

23         THE BAILIFF:  All rise.  You can

24    leave your notebooks on your chairs.

25            - - - - - -

1      (Thereupon, a luncheon recess was

2      taken at 12:20 p.m. with the

3      proceedings resuming at

4      1:30 p.m.)

5       - - - - - -

6    AFTERNOON SESSION

7    THE COURT:  It's come to the

8 Court's attention that one of the seated

9 jurors in this matter has requested that

10 the video screen on the Defense table be

11 moved so that they can see the Defendant.

12    Attorney Kuhn, do you have any

13 objection with that video screen being

14 moved?  Do you have any objection?

15    MR. KUHN:  No.  No, that's fine,

16 Judge.

17    THE COURT:  Okay.  Let the record

18 reflect -- Attorney Barr, any objection?

19    MR. BARR:  No, Your Honor.

20    THE COURT:  All right.  That the

21 screen has been moved out of the direct

22 view of the Defendant and moved off to the

23 side, and hopefully that clarifies whatever

24 issue existed.

25    THE BAILIFF:  All rise.

1          (Thereupon, the jury reentered

2          the courtroom at 1:40 p.m.)

3          THE COURT:  Welcome back again,

4     ladies and gentlemen.  At this time the

5     opening statements of counsel have been

6     presented, the State of Ohio may call its

7     first witness.

8          MS. SCHNELLINGER:  Thank you, Your

9     Honor.  The State would call Captain Annen

10    to the stand.

11         THE COURT:  Okay.

12              RICHARD ANNEN

13    who, after being first duly sworn,

14    testified as follows:

15         THE COURT:  Okay.  Attorney

16    Schnellinger, you may inquire.

17           DIRECT EXAMINATION

18    BY MS. SCHNELLINGER:

19  Q  Thank you.

20          Can you please state your name for

21    the record?

22  A  Richard Annen, A-N-N-E-N.

23  Q  And how are you employed?

24  A  City of Massillon as a Captain paramedic.

25    Fire department.

1   Q   Are you specifically assigned to the fire

2       department, would that be correct?

3   A   Correct.

4   Q   How long have you worked in that capacity?

5   A   Thirty-one years.

6   Q   Have you held any other jobs with the

7       Massillon Fire Department?

8   A   I was a paramedic before I was promoted to

9       Captain.

10   Q   So can you describe your current duties and

11       responsibilities as a Captain?

12   A   I am in charge of Station 4, our fire --

13       our squad and our engine company.

14   Q   Approximately how many firefighters work

15       for you?

16   A   At my station there's two, and on our shift

17       there's eleven.

18   Q   Did you respond to a fire on October 3rd,

19       2012 at a residence located at 185 26th

20       Street Southeast in Massillon, Stark

21       County, Ohio?

22   A   Correct.

23   Q   When you respond to a fire, does each

24       individual fireperson, fireman have a job

25       or a duty when they go there?

1   A   Yes, it depends on how we arrive or as we

2       take assignments at that point in time,

3       correct.

4   Q   Okay.  And on this particular fire, what

5       were -- what were your jobs and

6       responsibilities?

7   A   I was the senior Captain so I took over as

8       a -- operations of the fire ground.  The

9       Assistant Chief, he's the instant

10      commander, I take over operations of the

11      fire ground.

12  Q   What does that mean?

13  A   Means I take care of extinguishment fire,

14      overhaul, victims, controlling the -- of

15      the firefighters that are there, I do the

16      operational work.

17  Q   Okay.  So you basically -- would I be

18      correct in saying you run things?

19  A   Correct.

20  Q   Can you describe for the jury what you did

21      when you got there?

22  A   When I got there, I was informed by the

23      pump operator that they had a basement fire

24      and that there was a crew in the basement

25      putting the fire out.  The Assistant Chief

1    had went up the street to check on the

2    victims.

3          So I took over the operation, I

4    made sure that they -- I went to the head

5    of the steps, yelled down to the crew that

6    was down there do they have the fire out.

7    They said yes.  And I said -- told -- had a

8    second crew coming in to set up ventilation

9    so we could get the smoke out of the

10   basement so we could see what we had going

11   on.  And I got the third crew to come in to

12   go search the house just to make sure no

13   one was still in the residence.

14   Q    Okay.  After that, what did you do?

15   A    Assistant Chief came back to me at that

16   point in time and told me that the lady --

17   the woman that was in the house was injured

18   and go up and check her and make sure she

19   was okay.

20   Q    What did you do?

21   A    I walked up to the neighbor's to the north,

22   the house to the north, seen a female

23   sitting on the porch with a towel wrapped

24   around her hand, a little girl that was

25   there holding a cat, and two or three

1    neighbors that were standing there.  So I

2    talked to them.  She said that the little

3    girl was not in the house at the time, she

4    had just came home on a bus.  But the

5    little boy was in the house and the female

6    were in the house.

7  Q  What did you do next?

8  A  I said, Where's the boy at?  He was inside,

9    they brought him out quickly.  I looked at

10    him.  He really didn't appear to be in any

11    distress, didn't really appear too much --

12    was in the fire very long so I really

13    wasn't too concerned about him --

14  Q  Can I stop you real quick?

15  A  Sure.

16  Q  What -- did you notice anything about him

17    at all?  Did you notice any exposure to any

18    kind of smoke or fire?

19  A  Didn't appear to be, no.  Didn't appear

20    that he had any soot or smoke on him.  So I

21    really wasn't too concerned about him at

22    that time.  Then I turned my attention to

23    the female.

24  Q  Okay.  And if I could stay with the little

25    boy a little bit longer, what did you do to

1       check him?

2   A   Looked in his mouth and his face just to

3       see if he was discolored in any way, shape

4       or form because the amount of smoke that

5       was in the basement, I would have thought

6       if he was there, would have had

7       substantial -- because, I mean, smoke was

8       heavy, I couldn't -- I couldn't even -- at

9       the head of the steps, I had to have an air

10      bag on.  I couldn't even go part way down

11      the steps because the smoke was that bad.

12  Q   Okay.  And you saw no evidence of any soot

13      or smoke which you would have expected to

14      see?

15  A   No.

16  Q   Now, you said you moved on to the female?

17  A   Yes.  I checked her, she had a cut on her

18      hand.  I said, well, I was going to walk

19      her back down to our rescue squad that had

20      got there.  So I took her back down to our

21      rescue squad.  I asked her what happened.

22      She said that she was running with a glass

23      and fell, broke the glass, cut her hand.  I

24      said, Where were you running?  She said, I

25      was running upstairs to get my son.  I

1              said, Okay.  At that time I got her to the

2              rescue squad, turned her over to them.

3                       I think she's the one that

4              mentioned to us did we find the dog.  And I

5              said, What kind of dog?  She said, A

6              smaller one.  I said no, we hadn't at that

7              point in time.  So I went and found two of

8              my crew members, told them to go back in

9              the house again and search to find the dog.

10             And they went back in and found the dog

11             laying in his bed.  So they brought him out

12             to her, and the squad took over with her

13             and took her to the hospital.

14     Q      Okay.  Going to back up a little bit.  Can

15             you describe the female's demeanor?  How

16             was she acting?

17     A      She was very confused to me.  She wasn't

18             really talking appropriate.  She was

19             confused of what was going on.  She

20             had -- I mean, she -- you could obviously

21             tell she had been in the fire, she had a

22             little bit of soot on her and stuff so she

23             had obviously been in the basement.  I --

24             no doubt that she had been down there, no

25             doubt she had broke something and cut her

1    hand because there was blood like on the

2    walls upstairs and stuff.  So, I mean, I

3    really didn't think too much of it at that

4    point in time, I was more concerned getting

5    her to the rescue squad and getting back to

6    make sure we had the fire out.

7  Q    Okay.  Did you do anything else while you

8       were at the fire -- or while you were at

9       the scene?

10 A    Then I waited for Inspector Winters to show

11      up.  Once we had the fire knocked down, and

12      it's really not expanding, we wait for him

13      so that he can see things in their state

14      that they're in rather than us try to tear

15      stuff out.  We try to remove everything

16      from the house to put the fire out.

17              So we waited for him.  He came,

18      did his inspection and said I could finish

19      overhauling the house.  At that point in

20      time we had to remove the upstairs

21      bathroom, the fire went up through the

22      floor had got into the walls in the

23      upstairs bathroom.  We had to take out the

24      entire flooring, the toilet, everything

25      out, because, you know, fire spread -- fire

1        goes up, you know, it keeps climbing until

2        it finds its highest points.  So we just

3        had to keep working at it.  So we were

4        probably there a couple hours digging out

5        the fire that was in the house.

6  Q   Was the little boy, the 3-year-old, was he

7        treated at all?

8  A   I don't believe so, no, because he was

9        fine.  The neighbor said she would watch

10       him and call us back if -- because I said

11       we were going to be there for the next

12       three or four hours so if he did develop

13       anything, please come get us immediately.

14  Q   And there was no call back?

15  A   No.

16           MS. SCHNELLINGER:  Your Honor, may

17       I have a moment?

18           THE COURT:  Yes.

19           MS. SCHNELLINGER:  Thank you.

20       Your Honor.  I have nothing further, thank

21       you.

22           THE COURT:  Thank you.

23           Attorney Kuhn.

24           MR. KUHN:  Thank you, Your Honor.

25               CROSS-EXAMINATION

1          BY MR. KUHN:

2      Q   Good afternoon, sir, how are you today?

3      A   Good, sir, how are you?

4      Q   Not too bad, thank you.

5              You indicated you were at the

6          scene for a couple hours?

7      A   I believe we were there a couple hours,

8          yes, I think.

9      Q   Do you recall what time you arrived?

10     A   No, I don't --

11     Q   Do you recall what time you left?

12     A   We were probably there three -- from the

13         time of the alarm, no, I don't really --

14         didn't really keep track of the times.

15     Q   So when you say a couple or a few hours, do

16         you know, two hours, three hours?

17     A   No, I can't -- time is not relevant at that

18         point in time.

19     Q   Okay.  Was it dark out while you were

20         there?

21     A   Yes.

22     Q   The whole time?

23     A   It was early evening when we got there, I

24         think it was just getting dark, and it was

25         dark out when we left, yes.

191

1    Q    Okay.  Now I think you testified that my

2          client indicated that she cut her hand on a

3          glass?

4    A    Correct, that's what she said.

5    Q    Okay.  And I think you said it was while

6          running upstairs that this occurred?

7    A    She was running.  I don't know whether she

8          was running up -- she was running to go

9          upstairs to find her son.

10    Q    Okay.  Is it possible she slipped while

11          still in the basement?

12    A    Probably -- I didn't get into it.  She

13          fell, she obviously cut her hand, and that

14          was my attention that she had a cut on her

15          hand.

16    Q    Okay.  And you indicated that somebody

17          else, is it Sergeant Winters?  Is that his

18          title?

19    A    Inspector Winters.

20    Q    Inspector Winters?

21    A    Correct.

22    Q    You said he comes in and does an

23          investigation then; is that correct?

24    A    Correct.

25    Q    So that's not part of your job?

1   A   No, sir.  My job is to preserve the scene

2       until he gets there.

3   Q   Okay.  Did you enter the basement at all?

4   A   Yes, sir.

5   Q   Did you see a gas can laying around?

6   A   I did not.

7   Q   Did you see a lighter fluid container?

8   A   Not to my recollection, no, sir.

9   Q   Did you see anything like that?

10   A   Not to my recollection.

11   Q   Okay.  And did you -- did you go on the

12       other levels of the house as well?

13   A   I was on the first floor in through to the

14       bathroom, behind the kitchen to check for

15       extension.

16   Q   Did you see any gas cans or lighter fluid

17       there?

18   A   Not that I can recollect, no, sir.

19   Q   Okay.  Did you smell gasoline?

20   A   I didn't because we had vented the place

21       out by the time -- I mean, I had a heavy --

22       heavy exhaust fan in the basement, had the

23       windows broke out.  I mean, it was vented

24       out pretty clear when I went down.

25   Q   Okay.  You indicated that you felt there

1          should have been substantial soot on the

2          little boy if he had been down there?

3   A   There should have been, correct.  I would

4          assume that that much smoke in the

5          basement, yes, sir.

6   Q   Okay.  So anybody that was in the basement

7          would -- should probably have substantial

8          soot on them; is that right?

9   A   Should have some soot on them depending on

10         the length of time they were in the

11         basement.

12  Q   Okay.  I think you said substantial soot;

13         is that right?

14  A   Should have some soot on them, yes, if they

15         were in the basement, yes.  If they had

16         been -- again, it depends on the length of

17         time they were down there.  I don't know,

18         you know -- if they were there when the

19         fire immediately started and ran out, I

20         don't know.  I mean, you just -- you know,

21         you just got to determine by the length of

22         time of exposure.

23              MR. KUHN:  Okay.  I think that's

24         all I have.  Thank you.

25              THE WITNESS:  Thank you, sir.

1          THE COURT:  Thank you, Attorney

2     Kuhn.

3          Attorney Schnellinger or Attorney

4     Barr?

5          MS. SCHNELLINGER:  I have nothing

6     further, Your Honor, thank you.

7          THE COURT:  Okay.  Does anybody

8     wish to reserve the right to recall this

9     witness?

10          MS. SCHNELLINGER:  No, Your Honor.

11          THE COURT:  Thank you, Officer,

12     you are excused.

13          MR. BARR:  Officer Ricker.

14          THE COURT:  Sir, do you want to

15     come up to the witness stand and raise your

16     right hand.

17               CURTIS RICKER

18     who, after being first duly sworn,

19     testified as follows:

20          THE COURT:  Go ahead and have a

21     seat and just adjust the microphones so

22     they're a little close around your mouth so

23     we can hear exactly what you're saying,

24     okay?

25          THE WITNESS:  Okay.

|    |   | |
|----|---|--|
| 1  |   | THE COURT:  Thank you. |
| 2  |   | DIRECT EXAMINATION |
| 3  |   | BY MR. BARR: |
| 4  | Q | If you would, sir, state your name and |
| 5  |   | spell your last name for the court |
| 6  |   | reporter. |
| 7  | A | My name's Curtis Ricker, last name spelling |
| 8  |   | R-I-C-K-E-R. |
| 9  | Q | And by whom are you employed? |
| 10 | A | City of Massillon Police Department. |
| 11 | Q | How long have you been employed in that |
| 12 |   | capacity? |
| 13 | A | Twenty-four years. |
| 14 | Q | To what division or unit are you currently |
| 15 |   | assigned within that department? |
| 16 | A | The patrol division. |
| 17 | Q | How long have you been assigned to that |
| 18 |   | division? |
| 19 | A | Nineteen of my twenty-four years. |
| 20 | Q | The other five years, were you assigned to |
| 21 |   | the Detective Bureau? |
| 22 | A | Yes. |
| 23 | Q | Were you employed as a City of Massillon |
| 24 |   | Police Officer on October 4th, 2012? |
| 25 | A | Yes, sir. |

1   Q   Do you recall the shift that you were

2       working that day?

3   A   Day shift.

4   Q   And day shift runs from when to when?

5   A   6 a.m. to 2 p.m.

6   Q   Early on in the course of that shift, were

7       you asked to go to 185 26th Street

8       Southeast?

9   A   Yes.

10   Q   Is that located in the City of Massillon,

11       Stark County, State of Ohio?

12   A   Yes.

13   Q   Upon your arrival there -- well, first of

14       all, can you tell me what type of building

15       is located at that address?

16   A   It's a private residence.

17   Q   And upon your arrival there, were other

18       people present?

19   A   Yes.

20   Q   Do you recall who was present?

21   A   Fire Investigator Reggie Winters of the

22       Massillon Fire Department.  And I'm not

23       sure of the gentleman's name, he was an

24       occupant of the residence.

25   Q   Okay.  Approximately how long did you

1      remain there at the residence at that time?

2  A   I believe somewhere in the area of 30

3      minutes.

4  Q   And while there, did you learn that there

5      had been a fire there the night before?

6  A   Yes.

7  Q   After you leave, do you have an occasion to

8      go back to that residence?

9  A   Yes.

10  Q   And what brought you back to that

11      residence?

12  A   I responded back to the residence upon

13      request of Sergeant Greenfield.

14  Q   And he's your superior officer?

15  A   Yes.

16  Q   When you went back to that residence, what

17      were you asked to do?

18  A   I was asked to interview Kayla Ayers

19      regarding a fire at that residence.

20  Q   What steps did you take to make sure that

21      happened?

22  A   We asked Miss Ayers if she would willingly

23      come down to the police department and talk

24      to us regarding the fire.  She agreed to do

25      so.  We did transport her down to the

1        station.

2    Q   Did you transport her in your vehicle?

3    A   Yes.

4    Q   And when you get her to the station, where

5        do you take her?

6    A   We took her down to the Detective Bureau.

7    Q   Do you have rooms in the Detective Bureau

8        that people can sit in and wait?

9    A   Yes.

10   Q   And are those rooms equipped with audio and

11       video recording?

12   A   Yes.

13   Q   Now, did you interview her right away when

14       you got there?

15   A   No.

16   Q   What were you waiting on?

17   A   We were waiting for Investigator Winters to

18       show up.

19   Q   Approximately how long did it take for him

20       to arrive?

21   A   Twenty, twenty-five minutes.

22   Q   And after he arrived, did you then go into

23       that room and interview Kayla Ayers?

24   A   Yes.

25   Q   Before going in there, did you turn on the

| 1 | | recording equipment? |
| 2 | A | Yes. |
| 3 | Q | Was that equipment actually turned on when |
| 4 | | she was first placed in the room? |
| 5 | A | Yes. |
| 6 | Q | So there was a period of about 20 to 25 |
| 7 | | minutes where nothing happened? |
| 8 | A | That's correct. |
| 9 | Q | And then you and Officer Winters went in |
| 10 | | and spoke to Kayla? |
| 11 | A | Yes. |
| 12 | Q | And that was recorded with the machines at |
| 13 | | the Massillon Police Department? |
| 14 | A | Yes. |
| 15 | Q | Have you used those machines before? |
| 16 | A | Some of them. |
| 17 | Q | Okay.  Those machines on this day, were |
| 18 | | they working properly? |
| 19 | A | Yes. |
| 20 | Q | I'm going to show you an envelope that is |
| 21 | | marked as State's Exhibit 1.  Do you |
| 22 | | recognize that envelope? |
| 23 | A | Yes. |
| 24 | Q | What is that envelope? |
| 25 | A | It's our evidence container that the disk |

200

1          for the interview, the recorded disk the

2          interview was contained in and submitted to

3          evidence.

4     Q    When you refer to the disk, you mean the

5          recording, the video and audio recording,

6          of your interview with Kayla Ayers on

7          October 4th, 2012?

8     A    That's correct.

9               MR. BARR:  Your Honor, I'd ask

10         permission to play the interview.

11              THE COURT:  Yes.  Ladies and

12         gentlemen, right now you're going to watch

13         a video of the interview in question.  We

14         will adjust the lights and the blinds, but

15         you ever watch a movie on TV, it always

16         says, Edited for Content?  Well, this video

17         you're going to be watching is edited for

18         content as well.

19              There have been prior rulings by

20         the Court with respect to playing this

21         videotape so you may notice some lapse in

22         time, or you may notice big pauses where

23         there's -- it sounds like maybe there

24         should be something said and you just can't

25         hear it.  You're not to make any inferences

1       from the fact that there are pauses or

2       there's a time delay with respect to the

3       video.

4              This video has been obviously

5       edited for your approval and your content.

6       So, again, don't draw any inferences or

7       make any conclusions about what was cut out

8       or what should be playing.  It is going --

9       it is being played in accordance with the

10      Court's ruling on the video, okay?

11             (Thereupon, the videotape

12                 was played for the jury.)

13             THE BAILIFF:  Sorry, Your Honor,

14      technical difficulties over here.

15             (Thereupon, the videotape

16                 was played for the jury.)

17      BY MR. BARR:

18  Q   Officer Ricker, you just sat and watched

19      that whole recording there.  Is that a true

20      and accurate recording of your conversation

21      with Kayla Ayers on October 4th, 2012?

22  A   Yes.

23  Q   And the gentleman that was in that room

24      with you, that's Inspector Winters?

25  A   That's correct.

1   Q   And do you see Kayla Ayers here in the

2       courtroom, sir?

3   A   Yes, I do.

4   Q   Okay.  Could you point to her and tell me

5       what she's wearing please?

6   A   Wearing a black top, under the table looks

7       like brown slippers and white socks.

8            MR. BARR:  Your Honor, ask the

9       record to reflect the identification of the

10      Defendant.

11           THE COURT:  The record will so

12      reflect.

13           MR. BARR:  Could I have a moment,

14      Your Honor?

15           THE COURT:  Yes.

16           MR. BARR:  No further questions,

17      Your Honor.

18           THE COURT:  Thank you.

19           Attorney Kuhn.

20           MR. KUHN:  Thank you, Your Honor.

21               CROSS-EXAMINATION

22   BY MR. KUHN:

23   Q   Good afternoon, sir.

24   A   Good afternoon.

25   Q   How are you today?

1   A   Not too bad.  A little warm.

2   Q   Okay.  That was a voluntary statement that

3       Kayla was giving you; is that correct?

4   A   Correct.

5   Q   And what date was that statement taken?

6   A   I believe we said it was October 4th.

7   Q   Okay.  Do you recall the date of the fire?

8   A   I believe it was the day before.

9   Q   Okay.  Was it the evening before?

10  A   I believe so.  I didn't respond to it.

11  Q   And what time did she come into your

12      station and give that statement?

13  A   I believe it was around 11:00, 11:30 maybe.

14  Q   Okay.  So maybe 14 hours after the fact?

15  A   Roughly.

16  Q   Okay.  And you went out and collected Kayla

17      and brought her in; is that correct?

18  A   Yes.

19  Q   Okay.  And that was at the request of, was

20      it Sergeant Greenfield?

21  A   That's correct.

22  Q   Okay.  When she came -- well, let me back

23      up.  Did you speak to her on the 3rd?

24  A   No.

25  Q   Okay.  Did you see her on the 3rd?

1   A   No.

2   Q   Did you -- you went to the scene of the

3       fire, though, on the 3rd?

4   A   Not on the 3rd, no.

5   Q   You weren't there on the 3rd whatsoever?

6   A   No, I was not.

7   Q   Okay.  And when you -- when you went out to

8       round up Kayla, you found her at the home

9       where the fire occurred?

10  A   Correct.

11  Q   Okay.  Did you go inside that home?

12  A   Yes.

13  Q   Was there damage to the home?

14  A   I could see what appeared to be minor smoke

15      damage, I'm not a firefighter, but we went

16      there because the house was being occupied

17      against the rule -- or the order of the

18      fire department.  So I entered the side

19      door and was just in that room which

20      appeared to be like a dining room.

21  Q   Okay.  And did it smell like smoke?

22  A   Yes.

23  Q   Okay.  Was there water from fire hoses?

24  A   No, not that I had seen.

25  Q   Okay.  Did you go down to the basement at

1      all?

2   A  No.

3   Q  Okay.  So you didn't do any sort of

4      investigation of the premises, did you?

5   A  No, I did not.

6   Q  Okay.  Was your role in the investigation

7      really just limited to the interview we

8      just witnessed?

9   A  Yes.

10  Q  Okay.  So you didn't speak to any other

11     witnesses personally?

12  A  No.

13  Q  Okay.  You didn't speak to the little boy?

14  A  No.

15  Q  Okay.  When you went to the home, was it --

16     did it appear to be cluttered?

17  A  The room I stood in I didn't see any what

18     you would consider clutter I guess.

19  Q  Okay.  Did you smell gasoline?

20  A  No.

21  Q  Did you see any gas cans or lighter fluid

22     containers laying around?

23  A  No.

24  Q  Okay.  You didn't do any sort of crime

25     scene investigation regarding, let's say,

1     the electrical wiring of the home, did you?

2   A   No, I did not.

3   Q   Okay.  Okay.  Would you say that in that

4     video Kayla denied purposely setting the

5     fire from start to finish?

6   A   That question was never directly asked of

7     her.  I don't think we got a direct answer

8     on how it started at all.

9   Q   Okay.  But she -- she denied purposely

10     starting that fire, correct?

11        MR. BARR:  Objection, asked and

12     answered, Your Honor.

13        THE COURT:  Sustained.

14   BY MR. KUHN:

15   Q   Okay.  Kayla said she assumed her son

16     started the fire, right?

17   A   Yes.

18   Q   Did she tell you her son was familiar with

19     cigarette lighters?

20   A   Yes.

21   Q   Kayla denied smoking any marijuana before

22     the fire, right?

23   A   Correct.

24   Q   Okay.  And you guys kind of went round and

25     round, as Investigator Winters said, about

```
 1            a couple different things really, right?
 2   A        Yes.
 3   Q        Okay.  And one of which was maybe, what
 4            does the word recent marijuana use mean; is
 5            that right?
 6   A        Correct.
 7   Q        Okay.  Kayla denied making any threats
 8            towards her father; is that right?
 9   A        Yes.
10   Q        And she said that any discrepancies between
11            what she was telling you and maybe what she
12            told Officer Muntean would be due to being
13            confused or mistaken; is that correct?
14   A        Yes.
15   Q        Okay.  Eventually Kayla comes around and
16            says she may have fallen asleep; is that
17            right?
18   A        Yes.
19   Q        Do you frequently work with the fire
20            department out there?
21   A        No.
22   Q        Okay.  Have you sort of done many arson
23            cases in your career?
24   A        Nope.
25   Q        Okay.  Do you think this is the first one?
```

1    A    I think I had maybe two others.

2    Q    Okay.  Were they a while ago?

3    A    Yes.

4    Q    Okay.  And did you say you've worked in the

5         Detective Bureau as well?

6    A    Yes.

7    Q    Okay.  And so are you trained in ways to

8         talk to folks and convince them to give you

9         information?

10   A    No.

11   Q    You don't have any training to -- on how to

12        interview witnesses or suspects?

13   A    Nope.

14   Q    There's no training whatsoever?

15   A    I've never had training on that.

16   Q    Oh, okay.  You indicated in the video

17        there, I think one of the things you said

18        to Kayla was that you don't think she

19        purposely set fire to the house.  Do you

20        recall saying that?

21   A    Yes.

22   Q    Were you lying at that time?

23   A    No.

24   Q    Okay.  But you said you think maybe she did

25        carelessly sort of create this situation

1      where the fire occurred; is that correct?

2  A   Possibly.

3  Q   And even if the child had done it, it was

4      sort of due to this carelessness of Kayla;

5      is that correct?

6  A   Potentially.

7  Q   Okay.

8              MR. KUHN:  That's all I have,

9      thank you.

10             THE COURT:  Thank you, Attorney

11     Kuhn.

12             Attorney Barr?

13             MR. BARR:  No questions, Your

14     Honor.

15             THE COURT:  Okay.  Would anyone

16     like to reserve the right to recall this

17     witness?

18             MR. BARR:  No, Your Honor.

19             THE COURT:  Attorney Kuhn?

20             MR. KUHN:  I don't believe so.

21     Thank you, Judge.

22             THE COURT:  Okay.  Thank you,

23     Officer Ricker, you can step down, you are

24     excused.

25             THE WITNESS:  Thank you.

THE COURT:  Okay.  Attorney Barr, you want to call your next witness?

MR. BARR:  Certainly, Your Honor.

THE COURT:  If you feel the need, ladies and gentlemen, to stand up and -- is it too warm in here?  A little?  Some say yes, some say no.  We'll turn it down just a little bit and see if maybe we get some air going in here.  And if it gets too cold, just let us know and we'll adjust it, okay?

MR. BARR:  Your Honor, at this time the State would call Firefighter Mike Canfora.

<u>MICHAEL J. CANFORA</u>

who, after being first duly sworn, testified as follows:

<u>DIRECT EXAMINATION</u>

BY MR. BARR:

Q   Sir, if you would, state your name and spell your last name for the court reporter please.

A   Michael J. Canfora, C-A-N-F-O-R-A.

Q   And by whom are you employed?

A   Yes, I'm employed at the City of Massillon

1      Fire Department.

2    Q    How long have you been employed in that

3         capacity?

4    A    Sixteen years in March.

5    Q    Were you employed in that capacity on or

6         about the 3rd day of October in the year

7         2012?

8    A    Yes.

9    Q    Now, what kind of shifts do firefighters

10        work?

11   A    Twenty-four hours on duty, forty-eight

12        hours off duty.

13   Q    So if you're working on the 3rd of October,

14        you were on the 24-hour shift?

15   A    Correct.

16   Q    During the course of that shift, do you

17        recall at about 8:21 p.m. being dispatched

18        to 185 26th Street Southwest?

19   A    Yes.

20   Q    That's Massillon, Stark County, Ohio?

21   A    Yes.

22   Q    How far is that from your station?

23   A    Approximately a mile and a half.  A mile,

24        mile and a half.

25   Q    Do you recall approximately what time you

1      may have arrived at the scene?

2   A  I'm not real clear on exactly what time we

3      showed up, no.

4   Q  What unit or what truck do you ride on to

5      get there?

6   A  That evening I was in the back on engine

7      211.

8   Q  And was engine 211 the first to arrive on

9      the scene?

10  A  Yes, it was I believe.

11  Q  So you arrive on the scene, what do you do?

12  A  Me personally?

13  Q  Yes, sir.

14  A  I exited the truck, began getting my

15     personal protective gear in order, gloves,

16     hood, buttoning up.  Another firefighter

17     grabbed the line, the hose line.  I helped

18     flag out some hose, then I went to the door

19     with Captain Tyrell and we entered the

20     structure.

21  Q  When you say flag out the hose, what's that

22     mean?

23  A  When we pull it off the truck, it often

24     kind of ends up in a pile or something.

25     And for the water to get through all those

1    bends and kinks, you have to straighten the

2    line out.

3  Q   So you get the line straightened out, you

4    go to the door with Captain Tyrell, and do

5    you recall which door you entered the

6    premises through?

7  A   I believe it was the south entrance.

8  Q   And when you open that door and you go in,

9    where are you at in the house?

10 A   There was a small landing right in front of

11   us and to our right there was steps down,

12   and in front of us there was steps up.

13 Q   Okay.  Now as you enter that house, can you

14   tell where the fire is?

15 A   We had a pretty good idea.  We -- we could

16   tell something was going on in the

17   basement.

18 Q   So is that the first place you go?

19 A   Yes.

20 Q   And what's it like visibility-wise as you

21   go down those steps?

22 A   Smoke beginning to bank from ceiling down.

23   The visibility wasn't that poor, but was

24   beginning -- you know, was worsening as we

25   were in there.  It banks from the top down

1    so it just takes the slow process of --

2  Q  When you -- when you say it banks from the

3    top down, can you describe what you mean by

4    that to the jury here?

5  A  The fire starts burning, the smoke

6    naturally rises.  And if you're in an

7    enclosed room, what will happen is the

8    smoke will hit the ceiling and begin

9    spreading across the top of the ceiling

10    until it gets to the walls and then it will

11    start to bank down the walls, is what we

12    call it, until eventually predominantly the

13    entire room will fill if it's not vented

14    properly.

15  Q  So banking down just means it can't go any

16    higher so it's going to come back --

17  A  Right.

18  Q  -- down towards the ground?

19  A  Yes.

20  Q  So the smoke's banking down.  When you get

21    down to the steps, do you see any fire?

22  A  No, not -- not initially, no.

23  Q  What do you do?

24  A  We had a left turn because there was a wall

25    to our right, there was a wall in front of

1    us.  We were on hands and knees.  We still

2    had some good visibility from about mid

3    room down so we could make out some

4    structures, like a clothes basket in front

5    of us.  We went -- we advanced perhaps 15

6    feet, saw the orange glow of the fire, and

7    then turned and opened the hose on it.

8  Q  Were you able to extinguish the fire at

9    that time?

10 A  Yes.

11 Q  Then what's the next step once you get the

12    fire extinguished?

13 A  Once I shut the line down, Captain Tyrell

14    ordered me to stay in position and he came

15    out behind me to scout ahead for any more

16    open flame or hot spots or anything we may

17    have missed.

18 Q  Did you locate any?

19 A  We located a couple hot spots, glows.

20    Couldn't really tell, because of the smoke,

21    exactly what those things were.  Could just

22    pick up some smoke and glow -- glowing from

23    little -- a couple locations.  You know,

24    opened the line up real quick and hit

25    those.

1    Q    Excuse me.  Once you get all the hot spots

2         or the glows out, what's the next step, as

3         a firefighter, that you all take with

4         regards to that basement area?

5    A    Ventilation to begin to start to clear that

6         smoke out of there.

7    Q    And were you able to successfully ventilate

8         that area?

9    A    Other firefighters did.  I wasn't involved

10        with that.

11   Q    Once -- once you do that, what's your next

12        involvement in this fire?

13   A    My personal next involvement?

14   Q    Yes.

15   A    I exited the basement when my bottle --

16        there's an alarm on my bottle when my air

17        is running out.  I exited, went back out to

18        the truck and got another bottle.  And I

19        was assigned to another task on the first

20        floor after the basement.  And I worked in

21        a bathroom on the first floor after that.

22   Q    That bathroom that you worked in on the

23        first floor, was it above the area where

24        the fire had been extinguished?

25   A    Yes, correct.

1   Q   Was there damage to that second -- or that

2       first floor bathroom?

3   A   Yes.

4   Q   What kind of damage?  Could you describe

5       that for these folks please?

6   A   There was damage underneath the toilet.

7       The crew that was in there removed the

8       toilet, and where the flange and the drain

9       and all of that come through the floor, you

10      could see some charring, some black wood

11      around the floor around the hole there.

12  Q   Is that what you all refer to as overhaul

13      after the fire is out, you go around and

14      look to see where there's any other hot

15      spots or damage that could have occurred?

16  A   Pretty much.  At that point I believe we

17      were still in an extinguish it --

18      extinguish mode where we were believing

19      that things had gotten into the walls and

20      ceilings.  But, yes, it's pretty much all

21      part of overhaul.

22  Q   Do you have to tear out walls sometimes?

23  A   Yes, walls and floors and seals.

24  Q   Did you have to tear out some walls in that

25      bathroom to make sure the fire wasn't

1    spreading?

2  A   The bathroom I believe there were some

3      walls.  I know the floor, we took a

4      chainsaw to the floor, and I believe we cut

5      a piece on the -- I wasn't the only one in

6      the bathroom, we would take turns.

7  Q   Okay.  You had -- you're not an arson

8      investigator?

9  A   No, sir.

10 Q   You're simply the guy that puts them out,

11     correct?

12 A   Simply that guy, yes.

13          MR. BARR:  Thank you.  No further

14     questions.

15          THE COURT:  Attorney Kuhn?

16          MR. KUHN:  Thank you, Judge.

17              CROSS-EXAMINATION

18 BY MR. KUHN:

19 Q   How you doing today, sir?

20 A   Good afternoon.

21 Q   You indicated that you're just sort of the

22     firefighter; is that correct?

23 A   Correct.

24 Q   And so you don't prepare any sort of report

25     after the fact; is that also correct?

1    A    Correct.

2    Q    Okay.  When you arrived on scene, it sounds

3         like you were one of the main guys to get

4         in there and get down to the basement; is

5         that correct?

6    A    Correct.

7    Q    Could you see when you got down there?

8    A    Partially.

9    Q    Okay.  Were -- I presume you're wearing a

10        mask?

11   A    Correct.

12   Q    Do you have a flashlight on your helmet or

13        anything?

14   A    Not me in particular, I don't personally

15        have a flashlight.  It hangs on my coat.

16   Q    Okay.  And so were you utilizing that at

17        the time?

18   A    No.

19   Q    Okay.  Were there any lights on in the

20        basement?

21   A    Not that I could see, no.

22   Q    Okay.  So what light there was, where was

23        that coming from?

24   A    I believe it was coming from the origin of

25        the fire.

1   Q   Okay.  So just the glow of the fire?

2   A   Correct.

3   Q   Okay.  And how long would you say you were

4       at the scene from first arrival until you

5       guys packed up and left?

6   A   Boy, I definitely kind of lose time during

7       these things.  I think we were there maybe

8       two hours.

9   Q   Okay.

10  A   A couple hours all told, I'm not really

11      sure.

12  Q   Okay.  Of that let's say two hours, how

13      much time do you think you were actually

14      inside the home?

15  A   Oh, I'd say probably at least three-fourths

16      of that.

17  Q   Okay.  When you're in the scene of a fire,

18      do you look around for things that might be

19      of interest to the police or maybe your

20      investigator who does look into making a

21      report after the fact?

22  A   We are taught to disturb as little as

23      possible until it's investigated, if

24      there's an investigation that's warranted.

25  Q   Okay.  Did you observe any gas cans?

| | | |
|---|---|---|
| 1 | A | I did not. |
| 2 | Q | Okay. Any lighter fluid containers? |
| 3 | A | I did not. |
| 4 | Q | Okay. Did you notice any smoke detectors? |
| 5 | A | I did not. |
| 6 | Q | Could you hear any going off? |
| 7 | A | I did not. |
| 8 | Q | Are you aware if there were in the house? |
| 9 | A | No, I'm not. |
| 10 | Q | Okay. Did the house appear to be |
| 11 | | cluttered? |
| 12 | A | No, I wouldn't say that. |
| 13 | Q | Okay. So it didn't seem like a hoarder |
| 14 | | lived there or anything like that? |
| 15 | A | No, I wouldn't say that. |
| 16 | Q | Okay. You didn't interview any witnesses |
| 17 | | or anything like that, did you? |
| 18 | A | No, sir. |
| 19 | Q | Okay. Are you fairly certain the fire |
| 20 | | started in the basement? |
| 21 | A | I am certain there was fire in the |
| 22 | | basement. |
| 23 | Q | Okay. Were you involved in rescuing any |
| 24 | | dogs or cats from the home? |
| 25 | A | No, sir. |

1   Q      Did you smell gasoline at any point while
2          you were there?
3   A      No, sir.
4   Q      Did you speak with my client, Ms. Ayers,
5          while you were there?
6   A      No, I did not.
7   Q      Okay.
8                   MR. KUHN:  That's all I have.
9          Thank you.
10                  THE COURT:  Thank you, Attorney
11         Kuhn.
12                  Attorney Barr?
13                  MR. BARR:  No, Your Honor, no
14         further questions, thank you.
15                  THE COURT:  Okay.  Does anybody
16         wish to reserve the right to recall this
17         witness?
18                  MR. BARR:  No, Your Honor.
19                  MR. KUHN:  No, thank you, Judge.
20                  THE COURT:  Okay.  Thank you, sir.
21         You may step down and you are excused.
22                  Counsel, if you could approach for
23         a minute.
24                  - - - - -
25                  (A conference was held at the

1    bench outside the hearing of the

2    jury.)

3         - - - - - -

4         THE COURT:  Who do you have left?

5         MR. BARR:  I have Inspector

6    Winters.  He may be a little while so if

7    you want to take a little break right now,

8    now would be a good time.

9         THE COURT:  It's just we can't go

10   past 4:30 today.

11        MR. BARR:  I would like to at

12   least get him started.  And if we have to

13   break, we have to break.

14        THE COURT:  That's fine.

15        (End of conference at the bench.)

16        - - - - - - - - - -

17        THE COURT:  At this time we're

18   going to take a short recess, give you time

19   to stretch your legs, use the restroom, get

20   something to drink.  We'll take about a ten

21   minute recess.

22        We are going to conclude today at

23   4:30.  So we are going to try to get in one

24   witness as much as we can.  To the extent

25   we don't finish with him today, we will

1      resume again with him tomorrow.

2            Tomorrow, just so that you know,

3      I'm going to ask you to report at 8:45 back

4      to the jury room and we'll get started

5      around 9, okay?

6            So during this break, do not

7      permit anyone to discuss the trial with you

8      or in your presence.  Do not discuss the

9      case among yourselves.  And do not form or

10     express any opinion on the case until it is

11     finally submitted to you.

12            And, again, we'll take about a 10

13     minute recess.  According to my watch here,

14     it is 3:38 so at about 3:50 we'll meet you

15     in the jury room, okay?

16                  THE BAILIFF:  All rise.

17                  - - - - - - - - - -

18            (Court recessed at 3:38 p.m. and

19             reconvened at 3:53 p.m., and the

20             following proceedings were had.)

21            THE COURT:  You may be seated, and

22     the State of Ohio may call its next

23     witness.

24            MR. BARR:  Your Honor, at this

25     time the State would call Inspector

```
1              Winters.
2                    REGINALD WINTERS
3       who, after being first duly sworn,
4       testified as follows:
5                    DIRECT EXAMINATION
6       BY MR. BARR:
7    Q  Sir, once you get situated, if you would
8       tell everybody your name and spell your
9       last name for the court reporter please.
10   A  Reginald Winters, W-I-N-T-E-R-S.
11   Q  And, Mr. Winters, what is your occupation?
12   A  Fire Inspector/Fire Investigator.
13   Q  How long have you been a Fire
14      Inspector/Fire Investigator?
15   A  I've been -- five years with the City of
16      Massillon, been on the fire department for
17      ten.
18   Q  And prior to your employment at the City of
19      Massillon, were you employed elsewhere as a
20      firefighter?
21   A  Yes, sir, fifteen years with the City of
22      Orrville.
23   Q  Now, if you would, could you tell these
24      ladies and gentlemen what a fire
25      inspector's duties are?
```

1    A    Fire inspector's duties are we do public

2         safety.  We also go through commercial

3         buildings ensuring safety, making sure the

4         fire extinguishers, exit lights are lit,

5         and we also give approval for new buildings

6         and stuff like that.  We work with the

7         building department.  We also are in charge

8         of fireworks, certifying them and stuff

9         like that, to inspect the site to make sure

10        it's safe for the community.

11   Q    How about the other part of your job

12        description that you previously entail --

13        detailed that you had, would you explain

14        that to these folks?

15   A    As a Fire Investigator, my job is to come

16        in and determine origin and cause.  The

17        cause being what happened, the origin is

18        where the fire started at.

19   Q    Did you have to undergo specialized

20        training in order to hold a position as

21        that of which you just described?

22   A    Yes, sir.

23   Q    What type of training, first of all, did

24        you have to undergo?

25   A    First of all, I had to get my certified

1      Fire Inspector.  You have to be a certified

2      Fire Inspector.  And then from there you

3      have to -- it's two steps.  You have a

4      basic Fire Investigator and then you have

5      an advanced Fire Investigator course you

6      have to take.

7  Q  Let's talk about the certified Fire

8      Inspector training first.  What does that

9      entail?

10  A  That entails looking at multiple burn

11      scenes, learning the scientific methodology

12      of how different things burn as far as

13      oils, gases, electrical fires, the

14      synthetic fires as far as people using open

15      flames to fires, candles, paper.  And we

16      look at the different patterns the fire

17      makes, the different charring of wood and

18      stuff like that to make our determination

19      whether -- what caused the fire, whether it

20      was mechanical, accidental, or incendiary.

21  Q  Do you have to go to classes for that?

22  A  Yes, sir.

23  Q  And how long were those classes?

24  A  My first class as a basic investigator, it

25      was 32 hours.  The second part of advanced

1    was -- it was 40 hours.

2    Q    Did you successfully complete all those

3         classes?

4    A    Yes, sir.

5    Q    And then at the end of those classes, do

6         you have to take a test?

7    A    Yes, sir.

8    Q    And did you successfully pass all those

9         tests?

10   A    Yes, sir.

11   Q    So you are now a certified arson

12        investigator?

13   A    Yes.

14   Q    And that's within the State of Ohio?

15   A    Yes, sir.

16   Q    Once you complete that training, do you

17        have to continue to update your education?

18   A    Yes, sir.

19   Q    What do you have to do?

20   A    We have to -- well, we take like different

21        seminars.  One seminar I attend is the

22        International Firefighters Association of

23        Arson Investigators in Columbus.  It's an

24        annual Fire Investigator course week long.

25        We have to maintain 32 hours in a three

1          year period of continuing education.

2      Q   And as you sit here today, are you current

3          in all your requirements to be a certified

4          arson investigator?

5      A   Yes, sir.

6      Q   You indicated that you've held that

7          position with the Massillon Police [sic]

8          Department for five years.  Could you

9          estimate the number of fires you've

10         investigated within those five years?

11     A   I would say approximately 30.

12     Q   And have you testified before in the courts

13         of Stark County as an expert in the cause

14         and origin of fires?

15     A   Yes, sir.

16     Q   And has that testimony been accepted by the

17         courts?

18     A   Yes, sir.

19             MR. BARR:  Your Honor, I'd offer

20         Inspector Winters as an expert at this

21         time.

22             THE COURT:  Thank you.  Based upon

23         the testimony, I do find the witness is

24         qualified to render opinion testimony.

25             MR. BARR:  Thank you, Your Honor.

BY MR. BARR:

Q    You talked about all the training you went

through, Inspector Winters.

A    Yes.

Q    And is that because there are certain ways

that fires burn that can tell you how a

fire started?

A    Yes, sir.

Q    Could you explain that to these folks in

terms that they could understand maybe?

A    What we look for is what we call a fire

pattern which is a V-pattern.  That would

indicate where a fire started at, it would

also show the heaviest where -- we look for

the heaviest spot that fires burn.  There

is some times where a fire has burnt so hot

that we look at it as undetermined.

      But the biggest tell-tale sign for

us that we look for is a fashionable

V-pattern is a tell-tale sign, which it

goes out and then it mushrooms up.  And

then we also look at like the ceiling

because that would also indicate where a

fire burnt the hottest as far as the

degrees and stuff like that.  Each fire has

1    its own tell sign.  We look at what's

2    there, whether it's electric, whether it's

3    gasoline, whether it's natural gas.  We try

4    to rule out everything before we make our

5    determination of that fire.

6    Q    What are the three things a fire needs to

7         burn?

8    A    It needs fuel, oxygen, and heat.

9    Q    And you indicated earlier that part of your

10        job was determining whether a fire was

11        incendiary, or accidental, or undetermined?

12   A    Yes.

13   Q    What does incendiary mean?

14   A    Incendiary means open flame, whether it's a

15        lighter, whether it's a torch, whether it's

16        a match.  That means somebody has took an

17        open flame and put it to that product in a

18        lineal fire.

19   Q    How about accidental, what's that?

20   A    Accidental is when maybe I -- I put a

21        cigarette butt out in the trash can and

22        forgot about it, or I fell asleep with it.

23        Or I knocked the candle over.  Or the dog

24        knocks something over.  Or I left something

25        on the stove and ran down to the store.

1      And that's what we look at as accidental

2      as we do an investigation, do the interview

3      with the homeowners or occupant of the

4      residence.

5   Q  And then there's also a fire -- I think you

6      mentioned a fire using accelerants?

7   A  Yes.

8   Q  What would an accelerant be?

9   A  Accelerant would mean like gasoline, some

10     kind of type of ignitable liquid, lighter

11     fluids, you know, using a propane tank, any

12     kind of thing that's ignitable that you

13     take an open flame to and you can ignite it

14     to burn fast.  And usually with ignitable

15     liquids, they burn hotter faster because

16     the gas will burn, give you a flash fire

17     where it will ignite fast.  Because of the

18     vapor density of it, it will flash and it

19     will go out automatically.

20  Q  Have you been to fires where gasoline and

21     other accelerants were used?

22  A  Yes, sir.

23  Q  And even though the fire's been

24     extinguished and the gas is all burnt, can

25     you still smell the gas in the room?

1   A   Yes, we usually -- I was at one that I can

2       tell you about that I was there and as soon

3       as we walked in, you could definitely smell

4       a strong odor of gasoline that had been

5       used with a trail and stuff like that.

6   Q   Have you been to fires where, say, a

7       cigarette was left on a mattress?

8   A   Yes.

9   Q   And have you been able to find any portion

10      of that cigarette that's left behind after

11      the fire has been extinguished?

12  A   Yes, a cigarette butt.  A cigarette butt

13      will -- either the fibers that they use to

14      make a cigarette, the synthetics in it,

15      that usually melts and it melts in a form

16      of where it's like a hard -- I describe it

17      as far as like plastic.  Fibers like a

18      fiberglass kind of type of material where

19      it burnt hard and it's still in the shape

20      of a cigarette except it will curl up.

21  Q   So even though the mattress is burnt, you

22      can still dig through that mattress and

23      find a cigarette butt?

24  A   Yes, sir.  Yes.

25  Q   When -- as an arson investigator, when

1    you're asked to determine a cause and

2    origin of a fire, do you have a certain

3    procedure that you follow when you go to a

4    scene?

5  A  Yes.

6  Q  Could you tell us what that procedure is?

7  A  Once I'm dispatched to a scene, I meet with

8    the officer in charge.  I will get a brief

9    description of what's going on, where the

10   fire started at, who was there, and stuff

11   like that.  I won't talk to any other

12   occupants, I won't talk to no other

13   firefighters.  I will do a visible

14   clockwise around the area, whether it's a

15   house -- I'll walk around the house, look

16   at it, I will go through the house inside,

17   do a walk-through.  Then I will go back

18   out, I will grab my camera and I will

19   photograph starting from the front of the

20   house.  In the fire service, we label each

21   side of the house; we use A, B, C, D side,

22   and that's how we determine who's in charge

23   of the area.

24         So I'll start at the A side and go

25   clockwise if it allows me to walk all the

1    way around the house.  Or I will do a

2    clockwise then come back and also

3    photograph.  And then I will also

4    photograph the entire house from upstairs

5    to downstairs to the basement, depending on

6    the different levels.

7         And then from there I will go

8    ahead and I will start my investigation

9    wherever the origin is at of the fire.  And

10   I will determine by going through and I

11   do -- we do it through a process of

12   elimination.  We're eliminating electric, I

13   will look at the electrical panel and

14   determine if any breakers are kicked in

15   that area.  I will look for any gas

16   hookups, see if there's any kind of gas

17   leaks in there.  I will look for any kind

18   of things that look suspicious as far as

19   lighters.  As far as gasoline, you can

20   pretty much smell and stuff like that is

21   how we do everything that go there.

22        Once I come up with my

23   determination, then I will go out and find

24   the resident and I will talk to them to see

25   what their story is and try to put this

1    together because it's all a puzzle when we

2    are figuring it out.  We're going there to

3    investigate.  Nobody's guilty until we

4    figure out what it is.  Once we determine

5    it's arson, then we also notify the

6    Massillon PD and they work with us hand in

7    hand.

8    Q    Why is it that you don't talk to anybody

9         before you go in except the Chief or the

10        firefighter in charge?

11   A    I don't want somebody to put something in

12        my head that's not there or their

13        assumption of what they think it is.  I

14        want to be able to give the accurate --

15        most accurate, my decision, what I came up

16        with without being altered by anybody else.

17   Q    Were you called out on October 3rd, 2012

18        and asked to respond to a residence located

19        at 185 26th Street Southwest in Massillon,

20        Stark County, Ohio?

21   A    Yes, sir.

22   Q    Do you recall where you were at when you

23        got that call?

24   A    I was at home.

25   Q    Okay.  And what do you do after you get the

1        call?

2    A   Usually what I do is I -- depending on if

3        I'm doing something in the house or

4        whatever, make sure that was done, I'll get

5        in my personal vehicle and drive to the

6        station.

7            Once I get to the station, I'll

8        gather up everything that I need.  Most of

9        the time everything's in my vehicle, but

10       I'll make sure I don't need no pencil,

11       paper, extra whatever.  And then I'll jump

12       in my vehicle and I'll notify dispatch that

13       I'm en route to the scene.

14   Q   When you arrived on the scene, do you

15       recall approximately what time it was that

16       evening?

17   A   It was 2148 which was 8:48.

18   Q   8:48 p.m.?

19   A   p.m.

20   Q   And who did you talk to when you arrived on

21       the scene?

22   A   Upon arriving on the scene, I met up with

23       Captain Annen.  At that time he had advised

24       me that they had had a basement fire where

25       a mattress was at, and there were two

1    occupants in the house at the time of the

2    fire.

3  Q    So after receiving that information, what

4    do you do?

5  A    I -- he had also advised me that one of the

6    occupants had cut their hand and had been

7    transported to the hospital.  After that I

8    went on ahead and I grabbed my camera and

9    started with my clockwise outside.  And

10   then I went down to the fire scene where

11   the fire was at, checked that out, went

12   back upstairs, took pictures of the first

13   floor, then I went up to the second floor,

14   photographed it.  Then I went back down to

15   the basement, checked it out.  I went back

16   to my truck and grabbed some equipment,

17   some digging tools and stuff like that I

18   use to sift through the fire.

19       As I was also photographing, I

20   photographed the electrical meter which was

21   right at the bottom of the steps, I also

22   photographed the electrical panel.  The

23   electrical panel I photographed due to see

24   any electrical breakers that had been

25   kicked due to a shortage or something like

1    that.  There was no breakers kicked at that

2    area.  So I proceeded on over to the bed

3    which was located on the west wall of the

4    basement.

5  Q  What did you observe about that bed?

6  A  It was -- the mattress was fully engulfed

7    with flames.  The box spring was still

8    intact, but it still had a little bit of

9    covering on it and stuff like that, but it

10    was charred on top of it.

11  Q  Did you then conduct an examination to

12    determine if you could find the origin of

13    that fire?

14  A  Yes.  We -- I had checked the top of the

15    spring which was much -- not left of

16    anything.  We also raised the spring, took

17    the spring up slowly, had the guys lift it

18    up for me, and I combed the area looking to

19    see if I could see any residue because

20    there was signs of cigarette butts like

21    somebody had smoked.  They were on the

22    nightstand with the lighter.  So I checked

23    that area to make sure nobody didn't fall

24    asleep in bed or somebody throw a cigarette

25    and it was succinctly dropped.

1   Q   Did you find anything in your search that

2       would indicate to you this was a result of

3       a cigarette being left on the mattress?

4   A   No, sir.

5   Q   What other steps did you take after you

6       observed those findings?

7   A   After that I stepped back, I looked and I

8       started looking at the mattress springs

9       itself, and I started noticing the mattress

10      itself had an unusual burn pattern to it.

11  Q   What do you mean by unusual burn pattern?

12  A   Well, I had noticed that the -- which would

13      have been the east end of the bed, towards

14      the east end on the north side, had a

15      heavier char pattern where the springs --

16      what we call -- I'll try to explain it to

17      you, it's called calcination.  It's

18      basically where the fire burned so hot that

19      it will turn the springs white and they'll

20      collapse.  And on that end I had noticed

21      where the fire had burnt the hottest and it

22      traveled westward.  Like it was -- that's

23      where, right there, made a conclusion that

24      I had a fire start there that was low and

25      it started there and traveled west toward

1      the wall because that's where the material

2      was at, that it was consuming as it was

3      burning.

4   Q   Okay.

5   A   Upon that I found a V-pattern where the

6      mattress on the south was a post that was

7      up against it, which was a low V-pattern,

8      which I thought was, okay, out of the

9      ordinary.

10  Q   Okay.  When you say "out of the ordinary,"

11     what do you mean by that?

12  A   There was a makeshift door between the post

13     and the bed that looked like an area that

14     was cordoned off for like a little play

15     area, but the area itself didn't look like

16     it was habitable for anybody to be playing

17     in it because it was an open drain there

18     with no cover overtop of it.

19          So once I continued further

20     investigating, I noticed that the burn was

21     real low, the post sat on probably a 6-inch

22     concrete pad that was right in line with

23     the bottom of the box spring, met up

24     together, and somebody would have to lean

25     over, light that area too.  And so at the

1           same time when that area started burning,

2           it burnt up and it burned across the bed

3           leaving a perfect V-pattern that way, too.

4      Q    So the portion of the bed where you saw the

5           springs, I think you referred to it as

6           oxidizing?

7      A    Calcination.

8      Q    Calcination?

9      A    Yeah.

10     Q    Okay.  From the fire starting at that

11          point, this point over here by the pole,

12          were two different points of origin?

13     A    Yes, sir.

14     Q    Inspector Winters, I'm going to put up on

15          this screen, and it should hopefully, if I

16          know how to do this, show up right in front

17          of you.

18     A    Okay.

19     Q    Try to -- this is marked as State's Exhibit

20          3C.  Do you recognize that photograph?

21     A    Yes, sir.

22     Q    Okay.  Now, you described an area that you

23          referred to as calcination?

24     A    Calcination where --

25     Q    Can you describe that in what's depicted in

1         this photograph for me?  And if you need

2         that little stylus, there's a little stylus

3         there, you can actually draw on the screen.

4   A    Okay.

5   Q    I hope.  Is it working?  There you go.

6   A    (Witness drawing on the screen.)

7   Q    Can you all see that?

8   A    Just go softly.  Right here, where I got

9         this green line at, that's going to be the

10        indication right there where I was talking

11        about, the east end of the bed.  As you can

12        see right there, the springs, how they're

13        collapsed, you can see where it's buckling

14        at, down through there, that's where the

15        springs collapsed, where it burnt the

16        hottest.  You can also see the wood on the

17        box spring and see where it had burnt the

18        hottest there, where a fire had been

19        started right in that area there.

20   Q    So that evidence that you see there

21        indicates to you what as in regards to the

22        origin or the beginning point of this fire?

23   A    That right there gives me a origin spot of

24        the fire.

25   Q    Okay.  I'm going to show you what's been

1       marked as State's Exhibit 3D.  Can you tell

2       me what's depicted in that photograph?  Let

3       me get those green lines off of there for

4       you.

5    A  Yes.  Up top, on the west end of the bed

6       against the wall there, that was a bean

7       bag.

8    Q  That large lump?

9    A  That large lump was a bean bag filled with

10      feathers.

11   Q  And we're talking about this area?

12   A  Yes.

13   Q  Okay.

14   A  And then over on the south wall, we got the

15      west wall and then you look over to the

16      left, there's a wood post you can see right

17      there.

18   Q  And that's this area?

19   A  Yes.

20   Q  Okay.

21   A  Right there was another origin.  Below

22      there, once we removed the mattress spring

23      and the box spring, you have a clear point

24      of a V-pattern.

25   Q  Okay.  Let me show you what's been marked

1      as State's Exhibit 3E.  Now, is that the

2      bed frame after the mattress and box

3      springs had been removed?

4  A    Yes, sir.

5  Q    Okay.  And what's this area here?

6  A    That area right there is where, as you can

7      see, there's water droplets right there.

8      There was a soil pipe that went to the

9      upstairs bathroom, that melted and

10     water -- that was full of water.  So when

11     the plastic melted and burnt down, that

12     caught fire right here on top of that bean

13     bag.  It didn't go anywhere, it pretty much

14     stopped there and started burning upward.

15     So we had to rule that out that that wasn't

16     the cause of the fire.

17  Q    And this post over here is the post you

18     referred to in the previous picture?

19  A    Yes.  If you look at it, you have the

20     concrete floor, you go up and you have

21     concrete, kind of pyramid, and then right

22     there you can see a clear point of the

23     V-pattern that I was telling you about, the

24     starting point right there, the origin.

25  Q    And I'll show you what's been marked as

```
 1              State's Exhibit 3F.  Is that a close-up of
 2              that?
 3    A         Yes, sir.
 4    Q         And when you talk about the V-pattern, are
 5              you referring to this area right in here?
 6    A         Yes.
 7    Q         And that indicates what to you as a
 8              trained -- or a certified arson
 9              investigator?
10    A         That is telling me the point of origin of a
11              fire consistent where the fire started.  It
12              started low and it started climbing the
13              post with the heavy charring and stuff like
14              that.
15    Q         Does fire burn down?
16    A         No, not necessarily.  You will have a drop
17              down, but a fire is not going to burn
18              across and then down, down, downward.
19    Q         So the other side of the bed, the other
20              corner where the calcination was, couldn't
21              have caused this damage over here to this
22              post?
23    A         No.
24    Q         And I want to show you what's been marked
25              as State's Exhibit 3G.  And what's depicted
```

1       in that photograph?

2    A  This is the box spring, this is -- which

3       is -- the S is marking the south side where

4       that was the side that was against the

5       wooden post.  You can see here where the

6       fire started, but it also started burning

7       outward.  This was all protected, this area

8       right here was protected by the mattress.

9       So this is radiant heat damage right here,

10      got some charring along the wood frame

11      there where the fire burnt out that way and

12      it didn't go no farther.  You can actually

13      see on the north side the pattern that the

14      fire took on the north side of the wall and

15      the mattress.

16   Q  Okay.  So if we were to put the mattress on

17      top of here as it was in the basement, this

18      side over here would be where the

19      calcination occurred?

20   A  Yes.

21   Q  And then this side over here would be the

22      pole where the V-pattern was?

23   A  Yes.

24   Q  Do those photos truly and accurately depict

25      what you observed on October 3rd of 2012?

1    A    Yes, sir.

2    Q    Just show you this, what's been marked as

3         State's Exhibit 3I, and direct your

4         attention to this area of the photographs.

5         What's depicted up there?

6    A    That is a picture of the rafters and the

7         floor joists on the first floor.  That

8         right there, just above that, was a

9         restroom on the first floor that the fire

10        had what we call extension, it had impinged

11        in between the wood and the pipes in the

12        crawl space that went up through that the

13        guys had to extinguish the fire on the

14        first floor.

15   Q    This area here, would it had to have all

16        been replaced after this fire?

17   A    Yes.

18   Q    Okay.  Did you, while you were in that

19        basement, notice the odor of any

20        accelerants?

21   A    None at all.  Not even natural gas, a

22        natural gas smell or anything like that,

23        any kind of leak.

24   Q    And you indicated that you checked the

25        electrical panel?

1   A   Yes.

2   Q   And it was fine?

3   A   The electrical panel, we didn't get any --

4       didn't see any kind of arcing wires.  There

5       was some electrical above that area, but

6       that was all due to the radiant heat and

7       the flames coming up from the bottom up.

8   Q   And the gas line was intact?

9   A   The gas line was not attacked.  Our water

10      line got attacked due to the fire, the

11      water line had heated up and had melted and

12      broke.  That's actually what put some of

13      the fire out.

14  Q   I think you misunderstood my question.

15  A   I'm sorry.

16  Q   The gas line was intact, there were no gas

17      leaks --

18  A   Yeah, the gas line was intact.  I'm sorry,

19      sir.

20  Q   That's all right.  So based upon the

21      investigation and your training, your

22      education and experience, did you, to a

23      reasonable degree of scientific certainty,

24      form an opinion as to the origin and cause

25      of this fire?

1    A    Yes.

2    Q    Okay.  And how many origins were there?

3    A    There were two.

4    Q    And that's based on your certified arson

5         opinion?

6    A    Yes.

7    Q    And what was the cause of this fire?

8    A    The cause of the fire was incendiary, it

9         was open flame.  A person or persons with

10        the act of open flame started this fire.

11   Q    So it wasn't a cigarette butt left on a

12        mattress?

13   A    No.

14             MR. BARR:  Your Honor, I think

15        this might be a good time to stop right

16        here, if you don't mind.

17             THE COURT:  Okay.  Very good.

18        That's fine.

19             All right.  Ladies and gentlemen,

20        we are going to adjourn for today and we'll

21        start back up tomorrow morning with the

22        continuing testimony from Inspector

23        Winters.

24             But, again, I'm going to remind

25        you that during the evening recess do not

1    permit anyone to discuss the trial with you

2    or in your presence, do not discuss the

3    case among yourselves, and do not form or

4    express any opinion on the case until it's

5    finally submitted to you.

6         And this is probably the hardest

7    time to abide by this instruction because

8    you're all going to go home and everyone's

9    going to wonder, what did you do today?

10   What kind of case are you on?  You know,

11   who's involved?  And at this point in time

12   I'm going to take the blame, just tell them

13   that the Judge said I can't talk about it.

14   And she said that, you know, I'm prohibited

15   from talking about it.  Once the trial is

16   over, I'll be happy to tell you all about

17   it, but I just can't talk about it right

18   now.

19        And, again, more importantly as

20   well is my instruction in the beginning

21   that you're not to look at any newspaper

22   articles about this case, read anything

23   about it either on the Internet or do any

24   sort of research on your own.  You are

25   prohibited from doing that and you have

1    taken an oath not to do anything like that.

2    So don't read anything in the newspaper

3    about it, don't let anybody tell you about

4    it, don't look up anything or any of the

5    terms related to this.  And just pretty

6    much stay off the Internet because you

7    never know what you might find when you

8    start looking.

9         With that, we are adjourned for

10   the day.  And, again, if you could report

11   at 8:45 tomorrow and we will start back up

12   at 9, okay?  Have a good evening.

13        THE BAILIFF:  All rise.

14        (Thereupon, the jury exited

15        the courtroom at 4:21 p.m.)

16   MR. KUHN:  Judge, one very brief

17   matter if I could please.

18        THE COURT:  Sure.

19        MR. KUHN:  If you could just

20   instruct the State's witness that he's not

21   to speak with Prosecutor Barr.  I'm sure

22   they wouldn't do anything improper, but

23   maybe he's not aware of that.

24        THE COURT:  Okay.  And I'm sure,

25   Attorney Barr, you'll explain that to him?

253

1          MR. BARR:  Yes, Your Honor, I

2     will.

3          MR. KUHN:  Thank you, Judge.

4          THE COURT:  Sorry I had to have

5     you here all day, Inspector Winters, now

6     tell you you can't talk to anybody, but

7     we'll see you first thing tomorrow, okay?

8     Thank you.

9               - - - - - -

10          (Thereupon, court adjourned at

11          4:22 p.m. on January 28, 2013)

```
 1                 C-E-R-T-I-F-I-C-A-T-E

 2

 3          I, Vicki I. Dennewitz, a

 4    Registered Professional Reporter and Notary

 5    Public in and for the State of Ohio, do

 6    hereby certify that I reported in Stenotypy

 7    the testimony had; and I do further certify

 8    that the foregoing is a true and accurate

 9    transcription of said testimony.

10

11

12

13              Vicki I. Dennewitz, RPR

14

15

16

17

18

19

20          All exhibits are being held by the

21    Evidence Administrator and are available

22    upon advance request.

23

24

25
```

1    IN THE COURT OF COMMON PLEAS

2    STARK COUNTY, OHIO

3    CASE NO. 2012 CR 1567

4    2013 CA 00034

5    STATE OF OHIO,            )
                               )
6              Plaintiff,      ) TRANSCRIPT OF
                               ) PROCEEDINGS
7         versus              )
                               )
8    KAYLA J. AYERS,           ) VOLUME NO. II
                               )
9          Defendant.          )

10

11         BE IT REMEMBERED, That upon the

12    hearing of the above entitled matter in the

13    Court of Common Pleas, Stark County, Ohio,

14    before the Honorable Kristin G. Farmer,

15    Judge, and commencing on January 29, 2013,

16    the following proceedings were had:

17              - - - - - - - - -

18

19

20    VICKI I. DENNEWITZ, RPR

21    OFFICIAL COURT REPORTER

22    STARK COUNTY COURTHOUSE

23

24

25

1     APPEARANCES:

2

3        On Behalf of the Plaintiff:

4

5     Stark County Prosecutor's Office

6

7     Dennis Barr, Assistant Prosecutor

8     Toni Schnellinger,

9     Assistant Prosecutor

10    Stark County Office Building

11    Suite 510

12    Canton, Ohio  44702

13

14       On Behalf of the Defendant:

15

16    Stark County Public Defender's Office

17

18    Matthew Kuhn, Attorney at Law

19    April Bible, Attorney at Law

20    201 Cleveland Avenue South

21    Canton, Ohio  44702

22

23

24

25

<u>I  N  D  E  X</u>

<u>STATE'S WITNESSES</u>

| | DX | CX | RDX | RCX | FDX |
|---|---|---|---|---|---|
| Reginald Winters | 259 | 278 | 296 | | |
| Jeff Ayers | 306 | 313 | | | |
| Brennan Scott | 320 | 329 | | | |
| Jason Pandrea | 333 | 341 | | | |
| Jennifer Conley | 353 | 366 | | | |
| Karen Ball | 370 | 390 | | | |

STATE RESTS:  Page 393

DEFENSE RESTS:  Page 394

<u>CLOSING ARGUMENTS:</u>

    By Ms. Schnellinger &

    Mr. Barr        Pages 420 & 449

    By Mr. Kuhn       Page 435

1       I N D E X   C O N T I N U E D

2     CHARGE OF THE COURT   Page 404

3

4         STATE'S EXHIBITS

5                 MARKED    RECEIVED

6  Exhibit 1

7  (Audio recording)     B/A     399

8  Exhibit 1A

9  (Unedited statement)    B/A     N/O

10  Exhibit 2

11  (Jail calls)      B/A     399

12  Exhibit 3A-Q

13  (Photos)       B/A     399

14

15         DEFENSE EXHIBITS

16               MARKED    RECEIVED

17  Exhibit A (Report)    B/A    N/O

18  Exhibit D (Executive Summary) B/A    N/O

19  Exhibit E (Statement)    B/A    N/O

20

21  B/A = By Attorney

22  N/O = Not Offered

23

24

25              - - - - - - -

P R O C E E D I N G S

- - - - - - - - - -

(Thereupon, the jury entered

the courtroom at 9:10 a.m.)

THE COURT:  Okay.  Good morning,

and you may be seated.

Nice to see everyone came back.  I

hope that you all had a good evening and

that nobody gave you too hard of a time

about not being able to talk about this

case.

But at this time we're going to

resume with the testimony of Inspector

Winters.

MR. BARR:  Thank you, Your Honor.

THE COURT:  Good morning,

Inspector Winters, you can have a seat up

there.  And I'll remind you that you're

still under oath with respect to your

testimony, okay?

DIRECT EXAMINATION-Continued

BY MR. BARR:

Q     Good morning, sir.

A     Good morning.

Q     I think when we left off yesterday, you had

1    just indicated to the jury your opinion in

2    regard to the scene and the cause and the

3    origin of the fire at 185 26th Street

4    Southwest.  After reaching that conclusion,

5    did you leave the scene?

6  A    Yes, I did.

7  Q    And where did you go?

8  A    I went to Affinity Hospital.

9  Q    Who was present at Affinity Hospital?

10  A    Kayla Ayers.

11  Q    Was anybody else present with Miss Ayers at

12    that time?

13  A    When I arrived at the hospital, no.  It

14    was -- also I had a Sergeant Muntean from

15    the Massillon Police Department meet me

16    there, too.

17  Q    All right.  Was she being treated for an

18    injury?

19  A    Yes.

20  Q    What was that injury?

21  A    She had a laceration on her thumb and on

22    her index finger.

23  Q    While at the hospital, did you have an

24    occasion to speak to Miss Ayers?

25  A    Yes, I did.

1  Q   And do you see Miss Ayers here in the

2      courtroom, sir?

3  A   Yes, I do.

4  Q   Could you point to her and tell me what

5      she's wearing?

6  A   She is wearing a black sweater and jeans.

7          MR. BARR:  Your Honor, ask the

8      record to reflect the identification of the

9      Defendant.

10         THE COURT:  The identification is

11     so reflected on the record.

12     BY MR. BARR:

13 Q   Could you tell the jury the content of that

14     conversation that you had with Miss Ayers

15     at the hospital?

16 A   Yes.  When I arrived there, I introduced

17     myself, told her who I was, Investigator

18     Winters from the Massillon Fire Department,

19     I was doing an investigation of her fire.

20     I asked her what happened, what was in the

21     basement.  She said she was in the basement

22     folding clothes at the time and she had

23     noticed her son, Bubba, which is Brennan

24     Junior Scott, he was over at the bed

25     playing with a lighter.

1          I asked her at that time did she

2     ever try to get the lighter back at any

3     time --

4          THE COURT REPORTER:  I'm sorry?

5     I'm sorry, I didn't hear that part.  I

6     asked her at that time did she ever try to?

7          THE WITNESS:  To attempt to --

8     make an attempt to get the lighter from

9     him.  And she stated -- did not reply at

10    that time.

11         I also presented to go ahead and

12    asked her -- after that I asked her what

13    alerted her of the fire.  She said she seen

14    a red glow.  And I asked her to describe

15    the size of the fire, and she said it was

16    about the size of a cup, real small.

17         And so I said, What did you do

18    once you seen the fire?  She said she

19    grabbed a blanket and she started fanning

20    it.  And she said when that didn't work,

21    she ran over to the washing machine,

22    grabbed a glass of water and threw it on

23    it.  I said, What happened then?  She goes,

24    It didn't go out.  So she goes, I ran back

25    and she got another glass of water.  And on

the way back to the bed, she tripped and fell with the glass in her hand and that's how she sustained a cut on her hand.

So then I asked her, I said -- I asked her where -- the point that she was standing at the dryer, how can she see Brennan playing with a lighter due to the chimney, the hot water tank, and the furnace blocking that view where the bedroom -- the bed was set up on the west wall. She paused for a second and said she didn't know. So I said, Okay.

I asked her where was Brennan at the time of the fire. And she said he was standing at the bed. And I said, Okay. Then what happened next? And she said, Well, he was with me the whole time, he never left with me so he was in there the whole time that the fire was going and stuff like that. And then she also made the statement that the fire grew in size quickly.

I said, At that time did you think about alerting the fire department? She said she could not find her phone. I said,

1       Did you think about getting out of the

2       house?  She said that -- she didn't

3       answer any -- didn't respond.  Her stories

4       kept changing the entire time while I was

5       interviewing her.

6             She was more lethargic, as I

7       recollect, on her vitals.  Her pulse was

8       138, her BP was 104 over 40 -- or over 64,

9       which was -- pupils were dilated, glossy.

10      I asked her had she had been on -- drinking

11      any --

12            MR. KUHN:  Your Honor, I'd object

13      to this answer, it seems to be kind of a

14      narrative response to what Mr. Barr was

15      asking.  Thank you.

16      BY MR. BARR:

17    Q   Did you ask her any further --

18            THE COURT:  Sustained.  Just

19      rephrase the question.

20            MR. BARR:  I'm sorry, Your Honor.

21            THE COURT:  That's okay.

22      BY MR. BARR:

23    Q   Did you ask her any further questions?

24    A   Yes, I did.

25    Q   What did you ask her?

1  A    I asked her -- I asked her if she had

2       attempted to -- the next question was,

3       attempted to leave the house.  And she said

4       no -- did not reply at that time.

5            And then from there I asked her if

6       she -- if she had been drinking at all.

7       She replied no.  I said, Are you on any

8       kind of meds?  And she goes, Yes, I'm on my

9       Adderall for my ADHD.  I said, Okay.

10      Nothing else?  She says, No.  I says, Have

11      you taken anything today?  She goes, No.  I

12      said, All right.

13           Then we proceeded to -- Officer

14      Muntean proceeded to question her on the

15      facts of Brennan and asked her why she was

16      so lethargic, and she could not answer that

17      question.

18           MR. KUHN:  Your Honor, I would

19      object to this as to what Officer Muntean

20      may or may not have asked my client.

21           THE COURT:  Sustained.

22      BY MR. BARR:

23  Q   Were you present when Officer Muntean asked

24      her questions?

25  A   Yes, sir.

1   Q   And was she able to respond to those

2        questions?

3   A   No, sir.

4   Q   She indicated to you that the size -- that

5        the fire was about this big when she first

6        saw it (Indicating)?

7   A   Yes, sir.

8   Q   Based on your training, your education and

9        your experience, if someone had dumped a

10       cup of water on a fire of that size would

11       it have extinguished it?

12   A   Yes, it would have smother -- smothered it.

13   Q   Now, she indicated that it caught on rather

14       fast.  Have you done tests on mattresses

15       and burning mattresses and things?

16   A   I have looked up on National Testing,

17       they've done tests on mattresses as far as

18       a cigarette goes and stuff like that.

19       Mattresses have a rating on them that

20       they -- like a fire retardant that they're

21       supposed to basically -- it's a fire

22       retardant, basically that it will still

23       burn but it will slow burn.  And like I

24       said, cigarettes placed on there it will be

25       hours before that cigarette is able to --

1     the phenomenon that a fire goes through,

2     basically the materials and glues and stuff

3     that are used to make that material, will

4     heat up the vapors and then it's the vapors

5     itself that once they get to their boiling

6     point, everything has a boiling point, like

7     a pot of water, once it gets to that point,

8     it will go ahead and ignite and get bigger

9     in size.

10            So basically with her fanning that

11    fire, it gave -- the fire triangle, it gave

12    that fire what it needed, more oxygen, so

13    it helped it in size grow faster.

14  Q   A fire lit in the fashion that it's your

15    opinion that this was an incendiary fire --

16  A   Yes, sir.

17  Q   -- means an open flame was used to light

18    that mattress, and you observed the damage

19    to the mattress?

20  A   Yes.

21  Q   Do you have an opinion, sir, as to how long

22    that mattress would have been burning prior

23    to the arrival of the fire department?

24  A   I estimated the mattress was probably

25    burning approximately about 10 to 12

1   minutes.

2 Q Now, did you notice any indications on

3   Kayla that she'd been in a fire or in a

4   home involved in a fire?

5 A When we were at the hospital, I did swab

6   Kayla's arms, hands, and stuff like that,

7   to see if I picked up any soot.  I did take

8   tips and swabbed her nostrils.  I got very

9   light soot out of her nostrils.

10 Q Did you smell anything on her person, of

11   her --

12 A I could not smell anything as far as soot

13   or smoke.

14 Q You indicated that she told you where she

15   was standing --

16 A Yes.

17 Q -- when she observed the fire?

18 A Yes.

19 Q Now, you had been in that basement and you

20   had taken photographs; is that correct?

21 A Yes, sir.

22     MR. BARR:  Lori, could I have the

23   docucamera, please?

24   BY MR. BARR:

25 Q And I've put here on this screen State's

| 1 | | Exhibit 3A.  Can you see that? |
| 2 | A | Yes, sir. |
| 3 | Q | Okay.  And what area of the basement is |
| 4 | | that? |
| 5 | A | That right there is the -- be the east wall |
| 6 | | of the basement.  The first thing you see |
| 7 | | there is the dryer with folded clothes on |
| 8 | | top of it. |
| 9 | Q | Now, did you also take a picture standing |
| 10 | | from that vantage point and looking over to |
| 11 | | the area of the fire? |
| 12 | A | Yes, sir. |
| 13 | Q | Okay.  And I want to show you what's been |
| 14 | | marked as State's Exhibit 3B.  Do you |
| 15 | | recognize that photograph? |
| 16 | A | Yes, that is me standing along the east |
| 17 | | wall looking west at the area where she had |
| 18 | | indicated she seen Brennan with the |
| 19 | | lighter. |
| 20 | Q | Okay.  Now, in this photograph there's a |
| 21 | | mattress over here; is that correct? |
| 22 | A | Yes. |
| 23 | Q | That's not the mattress that caught on |
| 24 | | fire? |
| 25 | A | That is correct, that is not the fire -- |

1          the mattress that caught on fire.

2     Q    The fire area would be over to this side of

3          the picture?

4     A    Yeah, more to the west to north corner of

5          the basement.

6     Q    And standing from that vantage point, you

7          can't see anything?

8     A    No.

9     Q    After you spoke to Kayla, where did you go

10         next?

11    A    We left the res and went back to the fire

12         scene with Officer Muntean, and he wanted

13         to take a look at the scene and walk him

14         through what happened and stuff like that.

15              And then from there we went to the

16         neighbor's house where the kids were

17         staying, Brennan Junior, and I talked with

18         him.  And when talking with him, I did not

19         observe any soot on him, any soot in his

20         nostrils.  He had no burn marks on his

21         hands of any signs of being in a fire.

22    Q    Okay.  After speaking to Brennan, did you

23         do any more that night with regards to this

24         fire?

25    A    No, we didn't.

1   Q       The next day, October 4th, 2012, do you

2           continue your investigation?

3   A       Yes, sir.

4   Q       What do you do?

5   A       I arrived at work about 8:00.  About 8:15,

6           I receive a call from Miss Jennifer who

7           advised me that Miss Ayers and her

8           boyfriend had returned to the residence

9           with the kids.  That night before we had

10          advised them that the house was inhabitable

11          due to the electric being damaged, the soil

12          pipe being damaged, and the amount of smoke

13          damage throughout the whole house.

14                  And on my arrival -- on my way to

15          the scene, the dispatcher had called me and

16          advised me that Massillon PD was already on

17          the scene for a call.

18                  Once I got there, I met -- I ran

19          into Officer Ricker, and he said everything

20          was fine here.  And I said, They're not

21          allowed to be in here.  We advised them the

22          night before that the house was

23          inhabitable, that they could not stay here.

24                  So at that time I notified East

25          Ohio Gas Company, I went ahead and notified

1    Ohio Edison to have the utilities shut off.

2    I also notified the building department and

3    health department to have the house posted.

4    And also notified the owner of the

5    residence to show up so we could secure the

6    property.

7  Q   And did you take steps to secure that

8    property?

9  A   Yes, sir.

10 Q   While you were there securing that

11   property, did you speak to any other people

12   involved in this case?

13 A   Yes, I spoke with a Jeff Ayers, Kayla's

14   dad.

15 Q   At some point in time did you then go to

16   the Massillon Police Department?

17 A   Yes, sir.

18 Q   And did you sit in on that interview with

19   Officer Ricker?

20 A   Yes, I did.

21 Q   Go back to the fire scene, you indicated

22   that Kayla had a lacerated right hand?

23 A   Yes, sir.

24 Q   While you were in that scene taking

25   pictures of the whole area, did you notice

1         any blood?

2   A    There -- the only spot of blood that we

3         noticed in the area -- where we found the

4         broken glass, there was no blood on the

5         floor.  We did notice blood splatters on

6         the hot water tank and we noticed blood

7         splatter on the washing machine.  And then

8         we noticed blood -- a blood trail as

9         somebody's walking up -- back up the steps

10        on the right side of the wall.  And then we

11        also noticed somebody coming back down

12        stairs, back down the steps, on the west

13        wall and on the south wall going back down

14        the steps of blood.  And then we also

15        observed blood throughout the kitchen and

16        on the kitchen table.

17   Q    Okay.  I want to show you what's been

18        marked as State's Exhibit 3J.  Do you

19        recognize that photograph?

20   A    Yes, sir.

21   Q    Can you tell me what's depicted in that

22        photograph?

23   A    That is dry blood from the fire scene that

24        night.

25   Q    And what's been marked as State's Exhibit

1        3K.  Can you tell me what's depicted in

2        that photograph?

3  A    That is blood located in the kitchen there

4        I do believe, yes.

5  Q    State's Exhibit 3L.  It might show up

6        better.

7  A    That is also blood in the kitchen.

8  Q    And 3M?

9  A    That is also a bloody handprint.

10  Q    And 3N?

11  A    That is the blood splatter also in the

12        kitchen.

13  Q    3O?

14  A    That is also blood splatter in the kitchen.

15  Q    And was it also on the floor here?

16  A    It was -- yes, it was on the floor.

17  Q    I don't think it shows up in that

18        photograph because of the glare.  Let me

19        try to get that glare off of there.

20  A    Yes, right there on the floor right there.

21  Q    You talking about down in here, in this

22        area?

23  A    Yes.  Yeah, right there.

24  Q    Was that throughout the kitchen area?

25  A    Yes.

1   Q   Show you what's been marked as State's

2       Exhibit 3P.

3   A   That is the back side door that goes out to

4       the north, out to the backyard.  Blood

5       there on the doorknob and at the door

6       there.

7   Q   And State's Exhibit 3Q?

8   A   That is also the north door that enters out

9       the back door, blood.

10  Q   And when you say "enters out the back

11      door," which street would that be on?

12  A   That north would be -- it goes into the

13      backyard.

14  Q   Into the backyard?

15  A   Yes.

16  Q   Show you -- I'm going to have to blow this

17      one up a little bit for you.  Is that a

18      picture of 185 3rd [sic] Street Southwest

19      in Massillon?

20  A   It would be 26th Street.

21  Q   Or 26th Street Southwest in Massillon?

22  A   Yeah.  That would be on the south side of

23      the house.  That's the door that -- the

24      south door that enters out on Connecticut

25      Street.

1   Q   Okay.  We're talking about this door right

2       here?

3   A   Yes.

4   Q   Then where would be the north door be?

5   A   It would be -- if you go to the west side

6       of the house, it would be around the

7       corner.

8   Q   Okay.  Which side would be the west side

9       area?

10  A   My stylus is not working.  Go to -- go to

11      your left.

12  Q   The left side of the picture, up in this

13      area?

14  A   Yes, yes.

15  Q   So that's the door that goes into the

16      kitchen?

17  A   Yeah, on the back side of the house.

18  Q   Okay.  Do those photos fairly and

19      accurately depict the scene as you observed

20      it on October 3rd of 2012?

21  A   Yes, sir.

22  Q   After the conversation with Detective

23      Ricker and yourself, Kayla Ayers was

24      allowed to leave; is that correct?

25  A   Yes.

1    Q    Did you later obtain warrants?

2    A    Yes, we went and seen the prosecuting

3         attorney at Massillon Courts and took all

4         the stuff we had and advised him --

5         explained the case to the attorney and

6         stuff like that.  And he went ahead and

7         gave us -- granted us permission for the

8         warrant to go pick Miss Ayers up.

9    Q    And was she picked up later that day?

10   A    Yes, sir.

11   Q    Since that date, have you had an

12        opportunity to listen to any recorded phone

13        calls between Kayla and other individuals?

14   A    Yes, sir.

15   Q    Okay.  And do you -- you've spoken with

16        Kayla two times?

17   A    Yes.

18   Q    When you heard those phone calls, did you

19        recognize her voice?

20   A    Yes, I did.

21   Q    I'm going to play something right now, or

22        my co-counsel is, I want you to listen to

23        that.

24                  (Thereupon, an audio recording

25                  was played for the jury.)

1    BY MR. BARR:

2  Q    Do you recognize that voice?

3  A    Yes, that is Kayla Ayers.

4         MR. BARR:  Could I have one

5    moment, Your Honor?

6         THE COURT:  Yes, you may.

7         MR. BARR:  Could I have that

8    docucamera back please, Ms. Flowers?  Thank

9    you.

10    BY MR. BARR:

11  Q    There we go.  Inspector Winters, with

12    respect to photograph 3H, you see this door

13    here that I've just circled?

14  A    Yes, sir.

15  Q    Where does that door lead to?

16  A    That door leads to the basement and it also

17    leads to the kitchen.

18         MR. BARR:  Thank you.  No further

19    questions.

20         THE COURT:  Thank you, Attorney

21    Barr.

22         Attorney Kuhn, you may now

23    cross-examine.

24         MR. KUHN:  Thank you, Judge.

25         CROSS-EXAMINATION

BY MR. KUHN:

Q   How you doing today, sir?

A   Real good.

Q   Okay.  You indicated that you went out and met with Kayla the night of the fire; is that correct?

A   That's correct, sir.

Q   Approximately what time did you meet up with her?

A   That was around 2117.

Q   2117?  Okay.  And so was that the first thing you did when you got there?

A   No.  When I first got to the scene?  No. When I first got to the scene, I met with Captain Annen, and Captain Annen had advised me of the situation we had with the fire and stuff like that.  And he also advised that Kayla had been injured attempting to put the fire out.  And we had -- they had the medics take care of her and send her to the hospital for further treatment.

Q   Okay.  So you met with Captain Annen, and is that when you took the photos?

A   After I met with Captain Annen, I did my

1      normal routine where I do my clockwise walk

2      around, take photographs of the house.  I

3      start with A side, B side, C side, D side.

4      And then I basically -- from there I

5      entered through the house, went into --

6      upstairs -- through the south door off of

7      Connecticut Street, went up the steps,

8      photographed the first floor, the second

9      floor, then worked my way back down to the

10     basement and observed the fire scene,

11     photographed that area and stuff like that.

12  Q  Okay.  And so after you do all that, then

13     you went to the hospital and met up with

14     Kayla?

15  A  Yes, I advised dispatch to send me a police

16     officer which we -- once we do an

17     investigation, once I determined that this

18     is a possible arson fire, I always notify

19     the Massillon Police Officer to meet me

20     with that person who I'm talking to as a

21     further witness.

22  Q  Okay.  And when you met with Kayla, did you

23     smell any alcohol on her person?

24  A  No, sir.

25  Q  Okay.  Did you smell marijuana?

1    A      No, sir.

2    Q      Okay. Did you smell smoke from the fire?

3    A      No, sir.

4    Q      Okay. And you indicated you did check her

5         arms and her hands for soot?

6    A      I checked her, yeah, for soot.

7    Q      And there was none present, right?

8    A      There was none present.

9    Q      Okay. And you checked her nostrils; is

10        that correct?

11    A      Yes, and I got a light coating of soot out

12        of her nostrils.

13    Q      Okay. Wouldn't that be consistent with

14        somebody who smokes cigarettes?

15    A      Not the dark sooty smoke.

16    Q      Well, you said it was light, though, right?

17    A      Like gray -- light gray is what I picked

18        out. Somebody that smokes, you're going to

19        get a nicotine color out of her nostrils.

20    Q      Okay. When -- you say you did speak with

21        the 3-year-old boy; is that correct?

22    A      Yes, sir.

23    Q      Okay. And did you record that conversation

24        in any way?

25    A      No, sir, because Officer Muntean was

| | | |
|---|---|---|
| 1 | | present at the time of questioning him, we |
| 2 | | were out on the front porch. |
| 3 | Q | Was Officer Muntean taping the conversation |
| 4 | | in any way -- |
| 5 | A | No, sir. |
| 6 | Q | -- with a body microphone or video camera? |
| 7 | A | No, no. |
| 8 | Q | Did you attempt to have the 3-year-old |
| 9 | | light a lighter? |
| 10 | A | Yes, we did. |
| 11 | Q | Okay.  Was he able to do that? |
| 12 | A | He took both hands and held the lighter and |
| 13 | | he was able to do it. |
| 14 | Q | Okay.  So he seemed to be familiar with the |
| 15 | | object? |
| 16 | A | Yeah. |
| 17 | Q | Okay.  Okay.  Now, did you prepare a report |
| 18 | | relating to this fire? |
| 19 | A | Yes, sir. |
| 20 | Q | Okay.  It's a written report; is that |
| 21 | | right? |
| 22 | A | Yes, sir. |
| 23 | Q | Okay.  And is part of the report called an |
| 24 | | Executive Summary? |
| 25 | A | Yes. |

1    Q    And what is the Executive Summary?

2    A    That is the process that we use for

3         scientific -- we use NFPA 921 which is a

4         guide for fire investigations.  And that is

5         to help us make sure that we cover all

6         points of the fire scene and --

7    Q    Okay.  So is the Executive Summary, is that

8         something that you create before you do

9         your investigation or after you do it?

10   A    That's after I do the investigation.

11   Q    Okay.

12   A    When I'm doing my report, that's after.

13        Once I've collected everything, that's when

14        I basically give my brief synopsis of what

15        I determined the fire scene to be.

16   Q    Okay.  And so if there was one of these

17        reports created in regards to the fires --

18        fire at Miss Ayers's house --

19   A    Yes.

20   Q    -- it would have been created by you; is

21        that correct?

22   A    Yes, sir.

23   Q    Okay.  Do you recall, in your Executive

24        Summary, if you stated the fire originated

25        on the first floor of the home?

1   A    Fire had started on the basement floor of

2        the home.

3   Q    Okay.  If I showed you the Executive

4        Summary, would that help refresh your

5        memory?

6   A    Yes.

7   Q    Okay.

8             MR. KUHN:  Your Honor, may I

9        approach the witness?

10            THE COURT:  Yes, you may.

11            MR. KUHN:  Thank you.

12            MR. BARR:  May I see that?

13            MR. KUHN:  Sure.  This has

14        previously been marked Defendant's Exhibit

15        D.

16            THE COURT:  That was Defendant

17        Exhibit what, I'm sorry?

18            MR. KUHN:  D, Judge.

19   BY MR. KUHN:

20   Q    Sir, I'm going to hand you now what has

21        previously been marked Defendant's Exhibit

22        D.  If you could check on the second line

23        the Executive Summary.  Sir, does that seem

24        to indicate that the fire originated on the

25        first floor of the building?

1   A   No, sir, somebody made a typo.

2   Q   That's a typo?  Okay.

3           Okay.  And, do you know, did this

4   Executive Summary also say the materials

5   first ignited were blankets on the bed?

6   A   Yes.

7   Q   Okay.

8   A   There was some remnants left on the bed on

9   the fire scene.

10  Q   Okay.  So it was a typo as to where the

11  fire originated --

12  A   Yes, sir.

13  Q   -- in your report?

14  A   Yes.

15  Q   Okay.  And Ms. Ayers did deny setting this

16  fire all along; didn't she?

17  A   Yes.

18  Q   Okay.  What year was this home built?

19  A   Not right offhand I don't know, sir.

20  Q   Do you think it's a newer home or an older

21  home?

22  A   It's an older home.

23  Q   Okay.  And did you check out the wiring of

24  the home?

25  A   Yes.

1    Q    Okay.  Do you know when it was updated, if

2         ever?

3    A    The -- I had talked with the owner prior to

4         Mr. Ayers moving in, he didn't know exactly

5         what date, but the wiring had been updated.

6         He had just updated the wiring.

7    Q    Okay.  Did he have a professional

8         contractor do that, or did he do it

9         himself?

10   A    Looking at the electrical panel, there

11        was a -- the City of Massillon, any time

12        you have electrical work done, you have to

13        have it done by a licensed contractor, and

14        Ohio Edison requires that the electrical

15        inspector come out and inspect the wiring

16        and the panel and put a stamp of approval

17        before Ohio Edison will even put the meter

18        back on.

19   Q    Okay.  That stamp was on there?

20   A    Yes.

21   Q    There was a furnace in the basement; is

22        that correct?

23   A    Yes, sir.

24   Q    Okay.  Do you know how old that furnace

25        was?

1  A    No, sir.

2  Q    Okay.  Same thing with the water heater?

3  A    Yeah, I don't know how old that was.

4  Q    And the washer and dryer were down there as

5        well?

6  A    Yes, sir.

7  Q    Were there any light fixtures?

8  A    There was one light fixture right above the

9        post right beside the bed.

10 Q    Okay.  Was it intact?

11 A    It was intact.  There was no -- I had

12       checked the wiring for arcing or any

13       shortage out and that's when I had also

14       checked the panel for any breakers that

15       were kicked.

16 Q    Okay.  So was the only broken glass you

17       found from on the floor where Ms. Ayers

18       said she fell?

19 A    That was the only broken glass.

20 Q    There weren't any broken light bulbs or

21       anything like that?

22 A    No, sir.  Usually in a fire, a light bulb

23       will melt.

24 Q    Okay.  Were there any lights turned on down

25       there?

1    A    At that time when I got there to the scene,

2         the guys had turned off the main power

3         switch which we do so we don't get guys

4         electrocuted if they're spraying any of the

5         lines, with bare wiring and stuff like

6         that.

7    Q    Okay.  So the only lighting you had was

8         with your flashlights?

9    A    The flashlights and the electrical -- we

10        were running electrical off our fire truck.

11   Q    Okay.  Okay.  I think -- in your report, is

12        there a part of the general report you fill

13        out that asks whether age was a factor?

14   A    I would have to say I don't recollect there

15        is.

16   Q    Okay.  Now you did, with Officer Muntean,

17        interview Ms. Ayers the night of the fire;

18        is that correct?

19   A    Yes, sir.

20   Q    Okay.  And she all along indicated it was

21        her belief that Brennan set the mattress on

22        fire?

23   A    That is correct, sir.

24   Q    Okay.  Now, when you talk about the guide

25        that you use to determine these things, it

1    talks about levels of scientific certainty;

2    doesn't it?

3  A   Yes.

4  Q   Okay.  And so if we were to put a number on

5    that, what number would it be?

6  A   I really couldn't put a number with it.

7  Q   Okay.  And that's because it's not a

8    perfect science; is that correct?

9  A   I can't even -- I can't even say -- answer

10    that question.

11  Q   Okay.  And so when you -- when you make up

12    your report, basically what it boils down

13    to is that this is your opinion what

14    occurred, correct?

15  A   That's what we are supposed to put, our

16    opinion.

17  Q   Okay.

18  A   It is my solely [sic] opinion.

19  Q   Okay.  And so you indicated that you

20    believe the mattress probably burned for 10

21    to 12 minutes; is that correct?

22  A   Yes, sir.

23  Q   And how long do you think it took from the

24    neighbor's calling 911 for the fire

25    department to arrive?

1    A    I estimated from Miss Ball from the church,

2         who arrived around approximately 8:00,

3         8:05, 8:06, from her time till she walked

4         around the house, knocked on the door, she

5         first arrived, she -- on the Connecticut

6         side, she noticed flames inside the window,

7         and immediately went to the doors, knocked

8         on the doors, she went on the south side of

9         the house then she walked to the north side

10        of the house.  Our guys took approximately

11        7 to 8 minutes from the time of the call

12        from dispatch.

13   Q    Okay.  So the 10 to 12 minutes would sort

14        of be pretty close there, right?

15   A    Yes, sir.

16   Q    Okay.  You entered the basement after the

17        fire was extinguished; is that correct?

18   A    Yes, sir.  Yes, sir.

19   Q    So at that point had they vented the

20        basement so that there wasn't smoke in

21        there and you could see?

22   A    Yes, they had -- they vented the glass

23        block window on the south side of the

24        house, which was on the Connecticut side.

25   Q    Okay.  And you indicated that apparently at

1      that point you tell them, hey, you can't

2      come back into this -- you can't live here

3      anymore --

4   A  Right.

5   Q  -- until it gets fixed up?

6   A  Right.  It was inhabited due to the heavy

7      smoke damage.  The fire had extended into

8      the first floor bathroom, into the walls,

9      the water pipes had been broken, so -- from

10     due to the radiant heat from the fire.

11  Q  Okay.  So you wouldn't want people living

12     there?

13  A  No.

14  Q  I mean, couldn't they retrieve personal

15     belongings?

16  A  We allow them to retrieve personal

17     belongings.

18  Q  Okay.  So you got some sort of call they

19     were back in there?

20  A  Yeah.

21  Q  That would seem to me like they're probably

22     getting photo albums and --

23  A  That morning they were asleep -- officers

24     found them asleep upstairs and found them

25     asleep on the first floor.

1   Q    Okay.  And what time was that again?

2   A    That was approximately -- I would say I got

3        the call around 8:15 I do believe.  And

4        from driving time from the station took me

5        about 15, 20 minutes, but then the

6        dispatcher advised me PD was already on the

7        scene for another call.

8   Q    Okay.  So you do your investigation the

9        night of the fire?

10   A    Uh-huh.

11   Q    How much time do you suppose had passed

12        between Kayla being taken away to the

13        hospital and when you finally meet up with

14        her to talk?

15   A    I'm saying probably 40 to 45 minutes.

16   Q    Okay.  When you were doing your

17        investigation, you didn't observe any gas

18        cans laying around, did you?

19   A    No, sir.

20   Q    Any lighter fluid containers?

21   A    No, sir.

22   Q    Okay.  Did you observe any cigarette

23        lighters laying around?

24   A    Yes, sir.

25   Q    Did you observe smoke detectors in the

1          house?

2    A     The smoke detectors were missing.

3    Q     They were missing?

4    A     They were missing.

5    Q     Okay.  Did you talk to the homeowner about

6          that?

7    A     Yes, sir.

8    Q     Okay.  What did he say?

9    A     They were home -- they were -- at the time

10         of rental, when he signed that lease and

11         everything, the detectors were intact.

12   Q     Okay.  So there were no working smoke

13         detectors --

14   A     No, sir.

15   Q     -- in the home?  Okay.

16               I think in your report you may

17         have made reference to household solvents;

18         is that correct?

19   A     Household solvents?

20   Q     Yes, as possibly being the accelerant for

21         the fire?  No?

22   A     No.

23   Q     Did you make reference to gasoline?

24   A     No.

25   Q     Okay.  Did you make a reference to

1    ignitable liquid vapors, gasoline?

2 A  No, sir.

3 Q  Okay.  If I -- maybe you didn't prepare

4    this.  If I showed you a document entitled

5    Conclusion, and at the bottom it says,

6    Massillon Prevention Bureau, Inspector

7    Reginald Winters, would that refresh your

8    recollection?

9 A  Yes.

10     MR. KUHN:  Your Honor, may I

11    approach the witness?

12     THE COURT:  Yes, you may.

13  BY MR. KUHN:

14 Q  Thank you.

15     Sir, I'm handing you what has

16    previously been marked Defendant's Exhibit

17    A.  Do you recognize this document, sir?

18 A  Yes, sir.

19 Q  Okay.  And is that the conclusion to your

20    report?

21 A  That is my report and that is a template

22    that we used that did not get taken out.

23 Q  Okay.  So this doesn't necessarily apply to

24    Ms. Ayers's fire?

25 A  That is correct, sir.

1   Q    Okay.  It's just an extra document from the

2          template --

3   A    Right, we can plug in -- it has a standard

4          format, you take out whatever your

5          materials that was used.  That material on

6          the template doing -- also the report gets

7          proofread by the Captain of our division,

8          and we obviously missed that.

9   Q    Okay.  Because it does make reference to

10         the fire originating in the basement on the

11         bed, but this is something else, this

12         wasn't supposed to be in there; is that

13         right?

14   A    That wasn't supposed to be there.  That was

15         supposed to be there, first materials

16         ignited were materials on the bed.

17   Q    Okay.  So the real summary, I guess, would

18         be the Executive Summary?

19   A    Yes, sir.

20   Q    That's the ultimate conclusion you draw?

21   A    Yes.  Yes.

22   Q    Okay.  And you said it's your opinion the

23         ignition source for the fire was some type

24         of open flame, right?

25   A    Yes, sir.  That could be a lighter, that

1          could be a torch.

2    Q     Okay.  And that's your opinion?

3    A     That is my opinion, sir.

4                MR. KUHN:  Okay.  I think that's

5          all I have.  Thank you, sir.

6                THE WITNESS:  Thank you.

7                THE COURT:  Thank you, Attorney

8          Kuhn.

9                Attorney Barr, you may redirect.

10               MR. BARR:  Thank you, Your Honor.

11         May I have your exhibits please?

12               MR. KUHN:  Sure.

13                    REDIRECT EXAMINATION

14         BY MR. BARR:

15   Q     Mr. Winters?

16   A     Yes, sir.

17   Q     You use computers?

18   A     Yes, sir.

19   Q     Are you really good at them?

20   A     No, sir.

21   Q     Me neither.  Do those computers contain

22         your reports and these templates that

23         you've talked about?

24   A     Yes.

25   Q     And sometimes you punch things up and you

```
 1            put things in and you forget to change
 2            everything?
 3     A      Yes, sir.
 4     Q      But when all is said and done, do you have
 5            a final original cause and origin report
 6            that you keep in your file?
 7     A      Yes, sir.
 8     Q      Do you have that with you by chance?
 9     A      Yes, sir.
10     Q      Could you pull it out?  Could you flip to
11            the Executive Summary in your final -- and
12            this is the final original report, correct?
13     A      Yes.
14     Q      Maintained by your office in the Fire
15            Prevention Bureau --
16     A      Yes.
17     Q      -- as a record and normal course of
18            business, and you keep this and preserve
19            this forever, correct?
20     A      That is correct, sir.
21     Q      Could you read to me the Executive Summary
22            contained in your final original report
23            after all the typos --
24                 MR. KUHN:  Judge, I'm going to
25            object to this.  Is this a document I've
```

1    received?

2              MR. BARR:  Yes, it is, Mr. Kuhn.

3              THE COURT:  Could you approach

4    please?

5              MR. KUHN:  Sure.

6                    - - - - - -

7              (A conference was held at the

8              bench outside the hearing of the

9              jury.)

10                   - - - - - -

11             MR. BARR:  Provided in discovery,

12   Your Honor, the origin and cause report,

13   and I'm asking him to read this based upon

14   the cross-examination of documents that I

15   believe he received from Massillon

16   Municipal Court that were not the final

17   report and contain typographical errors.  I

18   believe the jury needs to know this.

19             THE COURT:  Okay.  Do you want to

20   take a look at this?

21             MR. KUHN:  Yeah, if I could.

22             MR. BARR:  There is the discovery

23   number 15, 2012, it indicates origin and

24   cause from Massillon Fire Department.  The

25   document he has, we don't have in our file.

1       This is the only document we could have

2    given him.

3            THE COURT:  Do you want to check

4    your file?

5            MR. KUHN:  Yeah, I'll do that real

6    quick.

7            THE COURT:  Okay.

8         (End of conference at the bench.)

9            - - - - - - - - - -

10            THE COURT:  Ladies and gentlemen,

11   this is one of those times where I'm going

12   to ask you to be patient while we need to

13   address some issues.  If you feel the need

14   to stand up and stretch for a little bit,

15   go ahead and feel free do so, okay?

16            MR. KUHN:  If we signed for them,

17   we signed for them.

18            THE COURT:  If you could approach

19   for just a minute.

20            MR. BARR:  Mr. Kuhn.

21            - - - - - -

22            (A conference was held at the

23            bench outside the hearing of the

24            jury.)

25            - - - - - -

1          THE COURT:  Put on the record with

2     respect to the document with which Mr.

3     Winters is being currently examined

4     regarding it appears as though the Defense

5     did sign for the report, and, therefore,

6     you are permitted to cross-examine him.

7          MR. BARR:  Thank you.

8          THE COURT:  Or direct.

9          MR. BARR:  Thank you.

10        (End of conference at the bench.)

11             - - - - - - - - - -

12   BY MR. BARR:

13   Q    Mr. Winters, if you would, I believe I

14        asked you to read your final original copy

15        of your Executive Summary to this jury,

16        would you do that?

17   A    Yes.  After examination of the fire scene

18        it was determined the fire originated in

19        the basement on the bed.  After examination

20        of the fire scene, interviewing witnesses,

21        interviewing the insured and using the

22        levels of scientific certainty as discussed

23        in the 2011 edition of NFPA 921; A Guide

24        for Fire and Explosion Investigation, it is

25        my opinion the ignition source for the fire

| | | |
|---|---|---|
| 1 | | was some type of open flame.  The materials |
| 2 | | first ignited were blankets on the bed. |
| 3 | | The act or omission that brought the |
| 4 | | ignition source and the materials first |
| 5 | | ignited together was the deliberate act of |
| 6 | | a person or persons.  Using these elements |
| 7 | | of a fire cause, the cause of the fire is |
| 8 | | incendiary. |
| 9 | Q | And that is in the original final report? |
| 10 | A | Yes, sir. |
| 11 | Q | And the exhibits, Defendant's Exhibit A and |
| 12 | | Defendant's Exhibit D, that Mr. Kuhn showed |
| 13 | | you are not contained in that report? |
| 14 | A | That is correct, sir. |
| 15 | Q | Thank you, Mr. Kuhn. |
| 16 | | Mr. Kuhn asked you about your |
| 17 | | opinion, and that opinion's based on your |
| 18 | | training and education that you've |
| 19 | | received? |
| 20 | A | Yes, sir. |
| 21 | Q | It's based on the years, the five years, |
| 22 | | and 30-some fires that you've investigated? |
| 23 | A | Yes, sir. |
| 24 | Q | And it's also based on the physical |
| 25 | | evidence that you saw at the fire scene? |

1   A    That is correct, sir.

2   Q    Now, you have previous -- previously told

3         this jury that you believe there were two

4         points of origin; is that correct?

5   A    That is correct, sir.

6   Q    And when this docucam catches up with me, I

7         want you to look at that photograph.  This

8         is State's Exhibit 3C.  Which point of

9         origin is that?

10   A    That is -- would be the east side of the

11         bed on the north side of the mattress

12         spring.

13   Q    Okay.  Showing you what's been marked as

14         State's Exhibit 3E.  And with respect

15         to -- where is the second point of origin

16         in that photograph?

17   A    On the post, wood post, what we call

18         consider -- what we call a V-pattern on the

19         south side.  That would be the south side

20         of the bed.

21   Q    Based upon the evidence that you observed

22         there, sir, do you have an opinion as to

23         which of those points of origin started

24         first?

25   A    Yes, sir.

1    Q    Which one?

2    A    The one on the post was started first.  The

3         one at the second -- the one on the south

4         side, north side of the bed, was started

5         second.

6    Q    Okay.  Now this is a door; is that correct?

7    A    Yes, sir.

8    Q    And that door was there?

9    A    That door was there.

10   Q    Okay.  Now, how big was Brennan?

11   A    I'd say about that tall (Indicating).

12   Q    Would he be able, in your opinion, to lift

13        his leg up over that door?

14   A    No, sir.

15   Q    So he would have had to crawl over that

16        bed --

17   A    Yes.

18   Q    -- start that fire on that side --

19   A    Yes.

20   Q    -- then crawl over while it's burning --

21             MR. KUHN:  Your Honor, I object to

22        this as being beyond the scope of my

23        cross-examination.

24             MR. BARR:  I believe it's within

25        the scope, Your Honor.

```
1              THE COURT:  May you approach
2    please?
3              - - - - - -
4              (A conference was held at the
5              bench outside the hearing of the
6              jury.)
7              - - - - - -
8              THE COURT:  Mr. Barr?
9              MR. BARR:  Well, Your Honor, Mr.
10   Kuhn asked him several questions about
11   Brennan starting the fire, and I think I'm
12   allowed to clear up that.  In the State's
13   opinion, it's physically impossible for
14   Brennan to have started this fire.
15             THE COURT:  Mr. Kuhn?
16             MR. KUHN:  Judge, I asked if the
17   little boy knew how to work a lighter.
18             THE COURT:  I'll allow it.
19             MR. BARR:  Thank you.
20             (End of conference at the bench.)
21             - - - - - - - - - -
22   BY MR. BARR:
23   Q    Back to my question.  The original point of
24        origin right here?
25   A    Yes, sir.
```

1   Q   Then someone would have to crawl across the

2       bed and start another fire over here --

3   A   Correct.

4   Q   -- while this one was lit?

5   A   Correct.

6   Q   You said you spoke to Brennan?

7   A   Yes, sir.

8   Q   As a result of speaking to Brennan, did you

9       continue your investigation into who

10      started this fire?

11  A   Yes, sir.

12              MR. BARR:  Thank you.  No further

13      questions.

14              THE COURT:  Attorney Kuhn,

15      anything further?

16              MR. KUHN:  No, thank you, Judge.

17              THE COURT:  Okay.  Anybody wish to

18      reserve the right to recall this witness?

19              MR. BARR:  No, Your Honor.

20              MR. KUHN:  No, thank you, Judge.

21              THE COURT:  Thank you, Inspector

22      Winters, you are excused.

23              THE WITNESS:  Thank you.

24              THE COURT:  The State can call its

25      next witness.

1             MS. SCHNELLINGER:  Thank you, Your

2   Honor.  The State would call Jeff Ayers.

3                 <u>JEFF AYERS</u>

4   who, after being first duly sworn,

5   testified as follows:

6             THE COURT:  You may inquire.

7             MS. SCHNELLINGER:  Thank you, Your

8   Honor.

9              <u>DIRECT EXAMINATION</u>

10  BY MS. SCHNELLINGER:

11  Q   Will you please state your name for the

12      record?

13  A   Jeff Ayers.

14  Q   Sir, do you know an individual by the name

15      of Kayla Ayers?

16  A   Yes.

17  Q   How do you know her?

18  A   She's my daughter.

19  Q   Do you see her in the courtroom?

20  A   Yes.

21  Q   Can you point her out and describe her for

22      the Court and jury?

23  A   I'm sorry?

24  Q   Can you point her out and describe her for

25      the Court and jury?

1     A     Yes, that's my daughter over there in the

2           black shirt (Indicating).

3                   MS. SCHNELLINGER:  Your Honor, may

4           the record so reflect?

5                   THE COURT:  The record will

6           reflect the identification.

7     BY MS. SCHNELLINGER:

8     Q     Now, where were you living in the very

9           beginning of October of 2012?

10     A     185 26th Street Southeast, Massillon.

11     Q     And who lived there with you?

12     A     My girlfriend Tonya, our two girls, and

13           Kayla, Brennan, that's her boyfriend, her

14           three children, and -- yeah, that's it.

15     Q     Now, how long had you lived there?

16     A     I moved in there January 3rd, last year,

17           which was 2012.

18     Q     Now did all of you move in at that time?

19     A     No, just me and Tonya and the girls.

20     Q     And when did Kayla's family join you?

21     A     I believe in May.

22     Q     And what was the situation, were you

23           renting this or did you --

24     A     Yes, I was renting it.

25     Q     While you were living in Massillon, what --

1    describe the relationship between you and

2    the Defendant.

3  A  Between me and Kayla?

4  Q  Yes.

5  A  Pretty good.

6  Q  At some point did it deteriorate at all?

7  A  Yes, it did start to deteriorate.

8  Q  And at some point did you think -- did you

9    reconsider the living arrangement?

10  A  Yes.

11  Q  Why?

12  A  Well, because I felt like she was a grown

13    woman with her own family and she needed to

14    take care of them on her own, that I

15    couldn't take care of her and her family

16    for the rest of her life.  She needed to

17    step up and get her own home.

18  Q  Did you tell the Defendant this?

19  A  Yes.

20  Q  What were her reactions?

21  A  At first she would say that she had a

22    place, she had been talking to different

23    housing authorities and stuff, and that she

24    had a place to go, and just none of it ever

25    happened.

1   Q   Did you continue to try to talk to her

2       about the situation?

3   A   Yes, I did.

4   Q   Did she ever give you a different reaction?

5   A   Yes, the more assertive I got, the worst

6       she got.

7   Q   You mean the more assertive about her

8       moving out?

9   A   Yes.

10   Q   And what do you mean the worst she got?

11   A   Um-m, increasingly she would lie and say

12       that she had a place and she was going here

13       and she was going there.  And, um-m, the

14       more assertive I would get, the more

15       aggressive she would get to the point she

16       would tell me she wasn't leaving at all,

17       that she was going to live there and she

18       was going to kick me out of there.  And --

19   Q   At some point did you decide to leave?

20   A   Yes, I did.

21   Q   And why did you decide to leave?

22   A   Because I -- I couldn't get her to step up

23       and do anything on her own.  And she

24       started making threats and I didn't feel

25       safe there anymore and I figured the only

1     thing I could do was if she wasn't going to

2     leave, I was going to leave.

3  Q   What were those threats?

4  A   Just give me a second.

5  Q   Take your time.

6  A   She told me that she wasn't going to leave

7     and before she would leave she would burn

8     the mother fucker down, in that -- in those

9     words.  And it started getting scary to me.

10    I mean, my girlfriend's pregnant, we have

11    little kids in the house.  And so prior to

12    the fire that actually did happen, possibly

13    up to a week, I don't know, I called my

14    sister and my aunt and the landlord and I

15    told them the threats she was making and it

16    was starting to scare me, I didn't know

17    what to do.

18         And I finally come to the

19    decision, I said, well, if she's not going

20    to leave, then I'm going to leave, I got to

21    get out of here.  I know she didn't have a

22    car so I figured if I get, you know, 50 or

23    a hundred miles away, she's not going to

24    follow me.  Maybe then she would step up

25    and realize, you know, she had to do

1    something to take care of her family.  And,

2    you know, there's a million organizations

3    out there for a single woman with children.

4    There's a million of them.  I mean, all you

5    have to do is reach out and ask and they'll

6    put you in a place to live and take care of

7    you.  And that's -- that's what my hope

8    was.

9  Q  And what did you do?

10 A  I went down to West Virginia to where I

11   have some friends that I've worked for over

12   the years because they have several

13   apartments down there.  So I went down

14   there because -- well, to be frank with

15   you, I knew I wouldn't have to have a

16   deposit and all the upfront money that it

17   takes to move into a place these days.  So

18   I figured I'd go down there because I would

19   have work down there to do and it would be

20   far enough away to where, you know,

21   everybody else would have to step up and do

22   their own thing.

23 Q  When -- what day did you go down there?

24 A  Um-m, I believe it was October 3rd.

25 Q  And was that the day of the fire?

1    A    That was the day of the fire, yes.

2    Q    Do you recall when you left?

3    A    Yes, I left about 4:30 that day.  And the

4         only reason I remember that is because I

5         would see how long it actually takes you to

6         get there and how many miles it is and that

7         kind of thing.  Normally I would not have

8         remembered something like that, but I do

9         actually remember what time I left that

10        time.

11   Q    Okay.  And did you tell your daughter you

12        were going?

13   A    Yes.

14   Q    How did you find out about the fire?

15   A    Jennifer called me.

16   Q    And who is Jennifer?

17   A    That's my next door neighbor.

18   Q    And where were you when you found out?

19   A    I was on my way back from West Virginia.

20        At what point, I really don't recall.  I'm

21        going to say somewhere in the Uhrichsville

22        area, maybe Tappan Lake.  I'm really not

23        clear exactly where I was at.

24   Q    When you got that phone call and heard the

25        news, what did you do?

1   A   I think I went into shock a little bit. I

2       just continued on my way home and I just --

3       I didn't know what to do. I just -- I

4       guess I just had to see it to believe it.

5       I don't really know. I just continued on

6       my way back.

7   Q   Did you eventually talk to the police about

8       your daughter's threats to you?

9   A   Yes.

10  Q   And you gave them a statement?

11  A   Yes.

12          MS. SCHNELLINGER: May I have a

13      moment, Your Honor?

14          THE COURT: Yeah, you may.

15          MS. SCHNELLINGER: Your Honor, I

16      have nothing further. Thank you.

17          THE COURT: Thank you.

18          Attorney Kuhn, you may inquire.

19          MR. KUHN: Thank you, Judge.

20                  CROSS-EXAMINATION

21      BY MR. KUHN:

22  Q   Good afternoon, sir, how are -- or good

23      morning rather.

24  A   I've been better, but thank you for asking.

25  Q   Okay. Where do you live right now, sir?

1   A   I live in Uhrichsville.

2   Q   Okay.  How far away is that?

3   A   About 50 miles, 50 miles or so, yeah.

4   Q   But the date of the fire, you were going

5       down to West Virginia?

6   A   Yes.

7   Q   Okay.  Did you just decide against moving

8       down there?

9   A   Well, I didn't want to live in West

10      Virginia to start with, I wanted to live in

11      Ohio.  But, like I said before, there was

12      people I knew down there that I have worked

13      for previously, I knew they had apartments.

14      So that was my best option at the moment,

15      yes.

16  Q   Okay.  When you were living up here in

17      Massillon, what were you doing for a

18      living?

19  A   Odd jobs.

20  Q   Okay.

21  A   I had worked for Nickles Bakery at one

22      point and I couldn't continue that because

23      of the different scheduling and everything

24      else, it was just too much.

25  Q   Was Kayla's boyfriend helping out with the

1   bills at all?

2 A A little bit, yeah.  He contributed some

3   money to help, yes.

4 Q Okay.  Was Kayla in charge of keeping the

5   house clean?

6 A No.

7 Q Did she prepare meals for you?

8 A Well, no, not really.  We all did, but

9   not -- she didn't particularly -- she

10   wasn't our caretaker or nothing like that.

11 Q Okay.  So you were on the road when you got

12   the call saying that there had been a fire?

13 A Yes.

14 Q Did Kayla ever indicate to you an intent to

15   keep the home after you left?

16 A Yeah, she did, but I knew that -- there was

17   no way that was going to happen.

18 Q Okay.  Did you -- did you have some sort of

19   renter's insurance on the place?

20 A None.

21 Q Do you know if Kayla did?

22 A No.

23 Q Do you know if the house had working smoke

24   detectors in it?

25 A No, it did not.

1  Q   And why didn't it?

2  A   I don't know.

3  Q   Were they there --

4  A   Well, because I mean -- with me, I cook a

5      lot and, as silly as it might sound,

6      they're annoying to me, very annoying,

7      because as soon as you get something -- you

8      burn toast in the house and it goes off,

9      and you end up taking the battery out of

10     them.  And I just -- for my whole life I

11     haven't had smoke detectors because of

12     that.  They're annoying.

13  Q   So you purposely disconnected them?

14  A   No, there wasn't any to start with.

15  Q   Okay.  So when you moved in, there were

16     none?

17  A   None.

18  Q   Okay.  And you indicated you have a child

19     on the way; is that correct?

20  A   Yes, that's correct.

21  Q   How many -- you have your girlfriend, a

22     child on the way, how many other kids do

23     you have?

24  A   Two that live with us.

25  Q   So just Kayla and two more and one on the

1          way?

2    A     I'm sorry, say that again.

3    Q     So you have Kayla --

4    A     I have my daughter Kayla, I have my son

5          Jeffrey, I have -- my brother's two kids is

6          who they are.  Tonya is actually my

7          sister-in-law, she was.  My brother passed

8          away a little over a year ago and I took

9          them on, and it is what it is.

10   Q     Now you two are having a child together?

11   A     Now -- now we're actually together, yes.

12   Q     Okay.  You and Kayla argue a lot while she

13         lived with you?

14   A     Sometimes, yes.

15   Q     Okay.  Would you guys argue about money?

16   A     Yeah.  Among other things, yeah.

17   Q     Okay.  Do you think you have a substance

18         abuse issue, a problem?

19   A     I'm an alcoholic, yes.

20   Q     Okay.  Did you ever express that to any of

21         the neighbors or anything?

22   A     Yeah, I believe so.

23   Q     Okay.  Did you ever demand that Kayla bring

24         you alcohol?

25   A     No.

1  Q    Okay.  Was the money that her boyfriend

2       provided ever used to purchase alcohol for

3       you?

4  A    Well, that's possible I guess, but you got

5       to figure, you know, we're paying all the

6       bills in the house so whatever money he's

7       giving me is basically about a teardrop in

8       a bucket compared to what it costs.

9  Q    Okay.

10 A    So what I actually did with the money that

11      was coming in wasn't even mad money, wasn't

12      even play money, it was very little, to say

13      the least.

14 Q    Okay.

15 A    You know, he -- in other words, he comes

16      home and hands me 25 to $40.00 a week, and

17      I'm paying 1,200 a month in this house for

18      the bills and utilities, not to mention

19      food.  Kind of like handing you a $5 bill

20      and saying, here, drive to Canada.  So what

21      you do with that $5 bill is pretty much up

22      to you.

23 Q    So you said you sort of became increasingly

24      more assertive?

25 A    Yes.

1   Q   Okay.  Could you, I guess, interpret that
2       as being mean?
3   A   No, you could interpret that as being tough
4       love and assertive because my daughter has
5       three children and she needs to support
6       them.
7   Q   Okay.  Do you know if she was enrolled in
8       some programs here in Stark County?
9   A   None.
10  Q   Do you know if her children were in a
11      daycare program?
12  A   Yes, they were.
13  Q   And that was through I think the Department
14      of Job and Family Services?
15  A   Yes, yes.
16  Q   And that was to get her freed up so she
17      could work; is that correct?
18  A   Yes.
19  Q   So she was enrolled in a program then,
20      right?
21  A   Well, yeah.  Yeah, in that, yes, but I
22      thought you were talking about another type
23      of program.
24  Q   Okay.
25              MR. KUHN:  I think that's all I

1    have.   Thank you.

2              THE COURT:   Thank you, Attorney

3    Kuhn.

4              Attorney Schnellinger?

5              MS. SCHNELLINGER:   We have nothing

6    further, thank you.

7              THE COURT:   Anybody wish to

8    reserve the right to recall this witness?

9              MR. KUHN:   No, thank you, Judge.

10             THE COURT:   State?

11             MR. BARR:   Thank you, Your Honor.

12             THE COURT:   Sir, you can step down

13    and you are excused.

14             THE WITNESS:   Thank you.

15             MR. BARR:   State would call

16    Brennan Scott, Your Honor.

17             THE COURT:   Okay.

18             THE BAILIFF:   Please raise your

19    right hand.

20                   BRENNAN SCOTT

21    who, after being first duly sworn,

22    testified as follows:

23              DIRECT EXAMINATION

24    BY MR. BARR:

25    Q    Good morning, sir.

1   A   Good morning.

2   Q   If you would, would you state your name and

3       spell your first name for this lady right

4       here please?

5   A   Spell my first name?

6   Q   Yeah.

7   A   My name's Brennan, B-R-E-N-N-A-N, Scott.

8   Q   Scott spelled the typical way, S-C-O-T-T?

9   A   Yes, sir.

10  Q   Okay.  Brennan, where do you live right

11      now?

12  A   10026 Johnsford Road.

13  Q   And what city's that in?

14  A   Beach City.

15  Q   Beach City?  Who do you live with?

16  A   Brittany Smeyres.

17  Q   How long you been living there?

18  A   Well, I stay with Matt and Teoni Gamble.

19      Been there almost a week now.

20  Q   Okay.  Where did you grow up?

21  A   Leesville, South Carolina.

22  Q   And when you lived -- how long did you live

23      in South Carolina?

24  A   All my life until about a year ago.

25  Q   Until about a year ago?  When you lived in

| | | |
|---|---|---|
| 1 | | South Carolina, did you meet a girl by the |
| 2 | | name of Kayla Ayers? |
| 3 | A | Yes, sir. |
| 4 | Q | How did you meet her? |
| 5 | A | She was -- her and her dad lived beside my |
| 6 | | friend, and we started talking. |
| 7 | Q | Do you recall how old you are when you -- |
| 8 | | you were when you started that? |
| 9 | A | Seventeen. |
| 10 | Q | Did you guys become boyfriend and |
| 11 | | girlfriend? |
| 12 | A | Yes, sir. |
| 13 | Q | Did you have children? |
| 14 | A | Yes, sir. |
| 15 | Q | How many children? |
| 16 | A | Three. |
| 17 | Q | What are their names? |
| 18 | A | Layla, Nevaeh, and Brennan. |
| 19 | Q | And do you refer to Brennan -- it's Brennan |
| 20 | | Junior, right? |
| 21 | A | Yes, sir. |
| 22 | Q | Do you refer to him as some other name? |
| 23 | A | Bubba. |
| 24 | Q | Bubba?  So nobody calls him Brennan? |
| 25 | A | No, most of them call him Bubba. |

| | | |
|---|---|---|
| 1 | Q | Okay.  How old are your daughters? |
| 2 | A | Five, four.  My son's three. |
| 3 | Q | Did there come a time you and Kayla moved |
| 4 | | to Ohio? |
| 5 | A | Yes, sir, we did. |
| 6 | Q | Do you recall approximately when that was? |
| 7 | A | It was like -- it was last year, like a |
| 8 | | week or two before Christmas. |
| 9 | Q | And when you moved to Ohio, who did you |
| 10 | | stay with? |
| 11 | A | We moved into Cadiz.  It was Jeff's |
| 12 | | brother's old house. |
| 13 | Q | Okay.  And who was living there then? |
| 14 | A | Me, Kayla, and the kids. |
| 15 | Q | Was anybody else living with you? |
| 16 | A | Kathy Wills, her brother's mom. |
| 17 | Q | How long did you stay in Cadiz? |
| 18 | A | Four months almost. |
| 19 | Q | And then where did you move to? |
| 20 | A | Her dad's. |
| 21 | Q | Her dad's?  And her dad is Jeff? |
| 22 | A | Jeff Ayers. |
| 23 | Q | And do you know what city that was in? |
| 24 | A | Massillon. |
| 25 | Q | Okay.  Can you see that picture on that |

| | | |
|---|---|---|
| 1 | | screen before you? |
| 2 | A | Yes, sir. |
| 3 | Q | Is that -- that's State's Exhibit 3H.  Does |
| 4 | | that house look familiar? |
| 5 | A | That's the house we moved to from Cadiz to |
| 6 | | there. |
| 7 | Q | And so you moved into that house and who |
| 8 | | all lived there? |
| 9 | A | Her dad, Tonya, their two kids, me, Kayla, |
| 10 | | and our three kids. |
| 11 | Q | When you got to Massillon, did you work? |
| 12 | A | Yes, sir. |
| 13 | Q | Was it steady work? |
| 14 | A | For the most part, yes, sir. |
| 15 | Q | Where did you work when you first got here? |
| 16 | A | I did auto detail and mechanic and body |
| 17 | | work for a car lot. |
| 18 | Q | In October of 2012, were you still living |
| 19 | | in that house that's depicted in that |
| 20 | | picture? |
| 21 | A | Yes, sir. |
| 22 | Q | So that was the place you came home to |
| 23 | | every night? |
| 24 | A | Yes, sir. |
| 25 | Q | Woke up there every morning? |

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | In October of 2012, where were you working? |
| 3 | A | Newman Roofing. |
| 4 | Q | Where did your boss live? |
| 5 | A | 10026 Johnsford Road. |
| 6 | Q | How -- so in October of 2012, how would |
| 7 | | your boss get to work? |
| 8 | A | I was picking him up. |
| 9 | Q | So you were driving him to work? |
| 10 | A | Yes, sir. |
| 11 | Q | I want to take your attention back to |
| 12 | | October 3rd, 2012.  Did you go to work that |
| 13 | | day? |
| 14 | A | Yes, sir. |
| 15 | Q | And did you take your boss to work that |
| 16 | | day? |
| 17 | A | Yes, sir. |
| 18 | Q | Do you recall what time you all might have |
| 19 | | left? |
| 20 | A | What, in the morning? |
| 21 | Q | Yeah. |
| 22 | A | Probably 8:00. |
| 23 | Q | Do you recall where you worked that day? |
| 24 | A | We was in -- heading towards Wooster. |
| 25 | Q | When -- when your boss would work -- did he |

1       have a wife or girlfriend that lived with
2       him?
3    A  Yes, sir.
4    Q  Did they have kids?
5    A  Yes, sir, two.
6    Q  Did his wife or girlfriend work?
7    A  Yes, sir.
8    Q  Where would his kids stay when you and the
9       boss worked and his girlfriend worked?
10   A  School.
11   Q  School?  Where would they go after school?
12   A  We -- we picked them up.
13   Q  Where did you take them?
14   A  The day of this incident he took them over
15      to this house on the picture, and Kayla
16      watched her while we had to run to Akron to
17      do another job.
18   Q  Okay.  So you went to work with your boss?
19   A  Yes, sir.
20   Q  His kids went to school?
21   A  Yes, sir.
22   Q  Then you all picked them up from school?
23   A  Yes, sir.
24   Q  And took them to 185 26th Street Southwest?
25   A  Yes, sir.

1    Q    And left them with Kayla?

2    A    Yes, sir.

3    Q    Then you guys go and finish another job?

4    A    Yes, sir.

5    Q    After you finished that job, did you have

6         to pick up any more kids?

7    A    Yes, sir.

8    Q    Who did you have to pick up?

9    A    Well, I come back -- I took Kayla to go

10        pick up my kids from day care, it was a

11        little bit before 6:30 I think, and then

12        came back and me and him took him home.

13   Q    So you went and picked your children up at

14        day care?

15   A    Yes, sir.

16   Q    Why did they have to be home before 6:30?

17   A    Because they went to church.

18   Q    And how would they get to church?

19   A    The church bus.

20   Q    The church bus would pick them up?

21   A    Yes, sir.

22   Q    Did you have them home there in time for

23        that church bus?

24   A    Yes, sir.

25   Q    After the church bus picked them up, where

1          did you go?

2    A     I left before the church bus came.

3    Q     Okay.  And where did you go?

4    A     Back to my boss's house.

5    Q     And what did you do there?

6    A     Hung out with my boss, played

7          PlayStation -- Xbox with his son and him.

8    Q     How long did you stay there?

9    A     It must have been two hours, two and a

10         half.

11   Q     Where did you go when you were done playing

12         Xbox with the boss's son?

13   A     I came home.

14   Q     And what did you see when you came home?

15   A     The whole corner lot was full of fire

16         department.

17   Q     So what did you do?

18   A     I went and checked over there, and Kayla

19         was getting in the ambulance.  The

20         ambulance was leaving and when the

21         ambulance left, I went and checked on my

22         kids.

23   Q     Were your kids okay?

24   A     Yes, sir.

25   Q     Where were they at?

| | | |
|---|---|---|
| 1 | A | At the neighbor's, Jennifer's. |
| 2 | Q | Jennifer's house? |
| 3 | A | Yes, sir. |
| 4 | Q | Did you start this fire? |
| 5 | A | No, sir. |
| 6 | | MR. BARR:  No further questions, |
| 7 | | Your Honor. |
| 8 | | THE COURT:  Thank you. |
| 9 | | Attorney Kuhn? |
| 10 | | MR. KUHN:  Thank you, Judge. |
| 11 | | CROSS-EXAMINATION |
| 12 | | BY MR. KUHN: |
| 13 | Q | Good morning, sir, how are you today? |
| 14 | A | How are you? |
| 15 | Q | You indicated you have children with Kayla; |
| 16 | | is that correct? |
| 17 | A | Yes, sir. |
| 18 | Q | You said you have three children? |
| 19 | A | Three kids. |
| 20 | Q | Have you two ever been married? |
| 21 | A | No, sir. |
| 22 | Q | Are you currently in a romantic |
| 23 | | relationship? |
| 24 | A | I'm in a relationship. |
| 25 | Q | I'm sorry? |

330

```
1    A    I'm in a relationship.

2    Q    With Kayla?

3    A    No.

4    Q    Okay.  With somebody else?

5    A    Yes, sir.

6    Q    Okay.  And you say you live in Massillon

7         nowadays; is that correct?

8    A    Navarre, Beach City.

9    Q    At the time of the fire were you living in

10        that house with Kayla and the kids --

11   A    Yes, sir.

12   Q    -- and everybody?

13   A    Yes, sir, I was.

14   Q    So at that time you were in a romantic

15        relationship with Kayla?

16   A    With Kayla, yes.

17   Q    Okay.  Did you get to observe Kayla and her

18        father interact regularly?

19   A    Yes, sir.

20   Q    Okay.  Did they argue a lot?

21   A    Yes, sir.

22   Q    Okay.  Would you say they had a good

23        relationship?

24   A    It was -- it was good, but rocky.

25   Q    Was Jeff ever mean to Kayla?
```

| | | |
|---|---|---|
| 1 | A | It was kind of a little of both. |
| 2 | Q | Okay.  Was he ever mean to you? |
| 3 | A | Not really. |
| 4 | Q | Okay.  Did he say you weren't contributing |
| 5 | | enough to the house? |
| 6 | A | No, sir.  He never really told me stuff |
| 7 | | like that. |
| 8 | Q | Would he say that about Kayla? |
| 9 | A | He said -- he complained to her about what |
| 10 | | was going on. |
| 11 | Q | Okay.  Did you contribute financially to |
| 12 | | the house? |
| 13 | A | Yes, sir. |
| 14 | Q | How much would you say you chipped in? |
| 15 | A | Maybe 2, 250, maybe 300 a month. |
| 16 | Q | Okay.  You indicated when this fire |
| 17 | | occurred you were at your boss's home? |
| 18 | A | Yes, sir. |
| 19 | Q | How far away from that -- from your house |
| 20 | | is he? |
| 21 | A | About 20, 25 minutes depending on traffic. |
| 22 | Q | Where does he live? |
| 23 | A | Beach City. |
| 24 | Q | So you had to go from Beach City up to |
| 25 | | Massillon? |

1   A      Yes, sir.

2   Q      Okay.  Is there a child support order

3          currently for the children you have with

4          Kayla?

5   A      No, sir.

6                  MR. BARR:  Objection.

7                  THE COURT:  Sustained.

8   BY MR. KUHN:

9   Q      Do you know where Jeff was when the fire

10         occurred?

11  A      He was, I think, on his way back from West

12         Virginia.

13  Q      Okay.

14                 MR. KUHN:  I think that's all I

15         have, thank you.

16                 THE COURT:  Thank you, Attorney

17         Kuhn.

18                 MR. BARR:  No further questions,

19         Your Honor.

20                 THE COURT:  Anybody wish to

21         reserve the right to recall this witness?

22                 MR. BARR:  No, Your Honor.

23                 MR. KUHN:  No, thank you, Judge.

24                 THE COURT:  Thank you, sir, you

25         can step down, you are excused.

1                    THE WITNESS:  Thank you, ma'am.

2                    THE COURT:  Thank you.

3                    State want to call its next

4          witness.

5                    MS. SCHNELLINGER:  Your Honor, the

6          State would call Jason Pandrea.

7                    THE BAILIFF:  Please raise your

8          right hand.

9                    <u>JASON PANDREA</u>

10         who, after being first duly sworn,

11         testified as follows:

12                   THE COURT:  You may inquire.

13                   MS. SCHNELLINGER:  Thank you, Your

14         Honor.

15                   <u>DIRECT EXAMINATION</u>

16         BY MS. SCHNELLINGER:

17    Q    Can you please state your name and spell

18         your last name for the record?

19    A    Jason Pandrea, P-A-N-D-R-E-A.

20    Q    Jason, where do you live?

21    A    214 Gnau Avenue.

22    Q    And what city is that in?

23    A    Perry, Massillon.

24    Q    And where are you from?

25    A    I'm from Massillon.

1    Q      You're from Massillon?  Did you live there
2           your whole life?
3    A      Yes.
4    Q      And were you living at that residence in
5           October of last year?
6    A      Yes.
7    Q      And who lives there with you?
8    A      My mom, my dad, my wife and children.
9    Q      How many children do you have that stay
10          with you?
11   A      I have three.
12   Q      What are their ages?
13   A      Ten, nine, and two.
14   Q      How close is the residence that you
15          currently live in to 185 26th Street
16          Southeast in Massillon?
17   A      About a half a mile.
18   Q      Now, the family that was living there in
19          October of last year, the Ayers family, did
20          you know them?
21   A      Yes, I do.
22   Q      How did you know them?
23   A      I met them through a friend of theirs,
24          Daniel.
25   Q      Do you recall when you met them?

| | | |
|---|---|---|
| 1 | A | It was approximately three, four months |
| 2 | | ago. |
| 3 | Q | Three or four months ago from now? |
| 4 | A | Yeah. |
| 5 | Q | Are you currently working right now? |
| 6 | A | I do landscaping. |
| 7 | Q | And you actually have a conviction for |
| 8 | | pandering, a felony of the second degree; |
| 9 | | and corruption of another with drugs, a |
| 10 | | felony of the fourth degree; is that |
| 11 | | correct? |
| 12 | A | I do. |
| 13 | Q | And that was back in 2003; is that right? |
| 14 | A | Yes. |
| 15 | Q | And you finished probation in 2006? |
| 16 | A | Yes. |
| 17 | Q | Now you stated you knew the Ayers family; |
| 18 | | is that correct? |
| 19 | A | Yes. |
| 20 | Q | Did you know all of them? |
| 21 | A | Not -- I knew the dad, the stepmom, and |
| 22 | | Kayla and Brennan. |
| 23 | Q | So not so much the kids? |
| 24 | A | I knew the kids also, yes. |
| 25 | Q | Okay.  What was your relationship with |

| 1 | | Jeff? |
|---|---|---|
| 2 | A | A friend. |
| 3 | Q | Okay.  How close were you? |
| 4 | A | We -- we're pretty close. |
| 5 | Q | Okay.  What about Kayla, the Defendant? |
| 6 | A | Kayla and I had a good relationship. |
| 7 | Q | And what kind of relationship is that? |
| 8 | A | More of a friend relationship. |
| 9 | Q | Did that friendship ever go into something |
| 10 | | else? |
| 11 | A | Yes, it did. |
| 12 | Q | And what was that something else? |
| 13 | A | Sexual relationship. |
| 14 | Q | Do you recall when that started? |
| 15 | A | About two and a half months after I knew |
| 16 | | the family. |
| 17 | Q | Is that relationship still going on? |
| 18 | A | No. |
| 19 | Q | How did it end? |
| 20 | A | Um-m, I had talked to one of my friends and |
| 21 | | he had said that she was getting attached |
| 22 | | and -- or she had said that I was getting |
| 23 | | attached, to one of my friends, and I told |
| 24 | | my friend that I wasn't attached.  And at |
| 25 | | that point I ended the relationship. |

1   Q   Were you married at the time?

2   A   Yes, I was.

3   Q   Is your wife aware of your affair?

4   A   No, she's not.

5   Q   Even to this date is she aware of your

6       affair?

7   A   No.

8   Q   There seems to be a little confusion about

9       the time because you said you met them

10      three or four months ago.

11  A   Uh-huh.

12  Q   Three or four months ago would be October

13      of 2012.  Does that sound right, or was it

14      before that?

15  A   It was approximately three and a half, four

16      months, somewhere around there, yeah.

17  Q   Okay.  So were you -- when do you think the

18      relationship ended?  Do you know the month?

19  A   I'm not positive.

20  Q   Okay.  Were you made aware at some point

21      that there was a fire at the Ayers

22      residence?

23  A   Yes, I was.

24  Q   And at the time of the fire, was your

25      relationship still going on?

338

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Were you still friendly with the Ayers |
| 3 | | family? |
| 4 | A | Yes, I was. |
| 5 | Q | Did you still go to the house? |
| 6 | A | Yes. |
| 7 | Q | And who did you see when you went to the |
| 8 | | house? |
| 9 | A | Jeff and Brennan. |
| 10 | Q | How did you find out about the fire at the |
| 11 | | house? |
| 12 | A | The day after my friend Brandon had told |
| 13 | | me. |
| 14 | Q | So you found out the day after the fire? |
| 15 | A | Right. |
| 16 | Q | How often do you think you were at the |
| 17 | | house with the family? |
| 18 | A | I'd go over about every weekend.  Yeah. |
| 19 | Q | And did you have occasion to be around the |
| 20 | | Defendant and her father? |
| 21 | A | Yes. |
| 22 | Q | And did you ever -- what would -- how would |
| 23 | | you describe their relationship? |
| 24 | A | It was -- it was good.  I mean, I didn't |
| 25 | | see no problem with it. |

1   Q    Did you ever see any arguments between

2         them?

3   A    Yeah.  One night I did, yes.

4   Q    Was that right before the fire?

5   A    Um-m, it was approximately a week or so

6         before the fire.  I had talked to him the

7         night before the fire, though, and there

8         was no indication of anything going on at

9         the time.

10   Q    What about the fight that you overheard,

11         can you tell us about that?

12   A    Um-m, I was talking to her dad about the

13         boat and how much it would be to get it

14         back running.  And her dad was upset

15         because it was going to take so much, and

16         talking about he -- they're in financial

17         situations at the time, and how -- how

18         Brennan and them aren't paying rent and how

19         basically they was having a hard time with

20         the -- financially.  And that pretty much

21         Kayla come up and basically said that if

22         Jeff ever left her again, she would burn

23         the house down.

24   Q    So you heard Kayla say this?

25   A    Yes.

1   Q   And do you see the person that said this in

2        the courtroom?

3   A   Yes, I do.

4   Q   Could you identify her for the Court and

5        the jury?

6   A   Kayla Ayers.

7   Q   Can you describe what she's wearing?

8   A   She's wearing black and Bob Barker sandals

9        and white jeans -- or, I'm sorry, blue

10       jeans.

11  Q   Thank you.

12             MS. SCHNELLINGER:  Your Honor,

13       will the record reflect he's identified the

14       Defendant?

15             THE COURT:  Yes, so reflected.

16  BY MS. SCHNELLINGER:

17  Q   When you heard the Defendant say those

18       words to her father, can you describe her

19       emotions?

20  A   Um-m, it was like she meant it, but she

21       didn't.

22  Q   Was she laughing?

23  A   It was more -- yeah, it was more kind of a

24       laugh or a joke kind of thing.

25  Q   Okay.  But she meant it?

1    A     But she meant it.

2                    MS. SCHNELLINGER:  Thank you, Your

3          Honor, I have nothing further.

4                    THE COURT:  Okay, thank you.

5                    Attorney Kuhn?

6                    MR. KUHN:  Thank you, Judge.

7                    CROSS-EXAMINATION

8          BY MR. KUHN:

9    Q     Good morning, sir, how are you today?

10   A     Good, thanks.

11   Q     Good.  You indicated that you are a felon,

12         is that correct, sir?

13   A     Yes, sir.

14   Q     Okay.  And I think the Prosecutor asked if

15         you were convicted of something called

16         pandering; is that right?

17   A     Right.

18   Q     That's not really the name of the offense,

19         is it?

20   A     Yeah, it was pandering --

21                   MR. BARR:  Objection.

22                   MS. SCHNELLINGER:  Objection.

23                   THE COURT:  Approach please.

24                   - - - - - -

25                   (A conference was held at the

1        bench outside the hearing of the

2        jury.)

3                - - - - - -

4            THE COURT:  I'm going to note your

5        objection.

6            MS. SCHNELLINGER:  It is the name

7        of the offense.  I think he's trying to

8        make it worse, and it's asked and answered.

9        Been through this.

10           MR. KUHN:  Your Honor, it's

11       pandering with child pornography.

12           MS. SCHNELLINGER:  It is not the

13       pandering with child pornography at all.

14           MR. KUHN:  Pandering --

15           MS. BIBLE:  Pandering sexual

16       oriented material involving minors, that is

17       the name of the offense.

18           THE COURT:  He's entitled to

19       present the entire name of the offense, not

20       the abbreviated one.

21           MS. SCHNELLINGER:  I would ask it

22       be accurate.

23           MS. BIBLE:  He's reading it from

24       CJIS.

25           MR. KUHN:  I'm reading it from the

1        CJIS printout.

2                    MS. SCHNELLINGER:  I can provide

3        him with the Judgment Entry.

4                    THE COURT:  Do you have it?

5                    MS. SCHNELLINGER:  Uh-huh.

6                    THE COURT:  You can read it from

7        the Judgment Entry.

8                    MR. KUHN:  Okay, thank you.

9                    (End of conference at the bench.)

10                   - - - - - - - - - -

11       BY MR. KUHN:

12   Q   Okay, sir, let me rephrase that.  The

13       offense you were convicted of, is its true

14       name, its complete name pandering sexually

15       oriented matter involving a minor?

16   A   I believe it was gross sexual imposition

17       involving a minor.

18   Q   Okay.  I guess I don't have that here

19       before me, I'll take your word for it.  I

20       appreciate you being honest with me.

21                   You indicated you did have a

22       sexual relationship with Kayla; is that

23       correct?

24   A   Yeah.

25   Q   Okay.  Did she know about your criminal

1   history?

2 A Yes, she did.

3 Q Okay.  And you -- what month do you think

4   that relationship occurred in?

5 A I'm sorry?

6 Q Your relationship with Kayla, when do you

7   suppose that occurred?

8 A Well, when did it -- I'm not positive.

9   With -- within the three -- four months

10   that I've known her.  It was like two --

11   two months after I've known her.

12 Q Okay.  So you don't know if it was like

13   October, November, or December?

14 A I'm not positive about that.

15 Q Okay.  Would you say you guys are friends

16   nowadays?

17 A I mean, do I want to see her go to jail?

18   No.  I mean, do I care for her?  Yeah.  Do

19   I want to be here?  No.  But I wish the

20   best for her as far as her life goes, yeah.

21 Q Okay.  Are you friends with Jeff still?

22 A Yeah.

23 Q Okay.  Were you guys kind of buddies then?

24 A Yeah.

25 Q Is that how you met Kayla?

1   A   Pretty much I met her through Brennan and

2       Jeff, yes.

3   Q   Okay.  Okay.  Now you made a statement to

4       the police that you heard this threat; is

5       that correct?

6   A   Yes.

7   Q   Okay.  And did you tell them that you heard

8       it the day before the fire happened?

9   A   No.  What I meant to put in the statement

10      was, I had talked to them the day before

11      the fire happened.  I associated with them

12      the day before the fire happened.

13  Q   When you say "with them," you mean Kayla

14      and her father?

15  A   Well, yeah.  I've associated with Brennan.

16      Actually he come up to my house.

17  Q   Okay.  Are you still on good terms with

18      him?

19  A   Yeah.

20  Q   Okay.  Does he know that you guys had a

21      relationship?

22  A   I'm not sure.

23  Q   Okay.  So you told the police that you

24      heard this threat the day before the fire

25      happened?

1  A  I believe that's not what I put in the
2     statement.  I believe that I put in the
3     statement that I had talked to them the day
4     before the fire.
5  Q  Okay.  So --
6  A  I didn't indicate that I talked to them and
7     she had said that the day before the fire.
8  Q  I'm sorry?
9  A  I didn't indicate that she -- I didn't say
10     that she had talked to -- or she had said
11     that the day before the fire.  I had just
12     said that I -- in the statement, I had
13     talked to them the day before.
14  Q  Okay.  If I showed you the statement that
15     you wrote to the police, would you
16     recognize it?
17  A  Yes.
18  Q  Okay.
19        MR. KUHN:  Your Honor, may I
20     approach the witness?
21        THE COURT:  Yes, you may.
22        MR. BARR:  It's okay, we have it,
23     thank you.
24  BY MR. KUHN:
25  Q  Okay.  I'm marking -- I'm handing you

1             what's previously been marked Defendant's

2             Exhibit E.  Can you tell me if you

3             recognize that document?

4   A      Yes, I do.

5   Q      Okay.  And can you -- can you tell me, does

6             it say that you heard the threat?

7   A      Yeah, it states it in there, yes.

8   Q      Okay.  And can you tell me what day it says

9             you heard that threat?

10   A      It doesn't say a day.

11   Q      Okay.

12   A      I didn't put a date on it.

13   Q      Okay.  It says you're at their house on

14             October 2nd and it says you were helping

15             him with the boat, right?

16   A      Yeah, it was the day before.

17   Q      Okay.  So it says you were there on the 2nd

18             helping him with the boat, you heard the

19             argument and you heard the threat; is that

20             correct?

21   A      Yes, it is.

22   Q      Okay.  So that says you heard the threat on

23             October 2nd; is that correct?

24   A      Yes.  It states that in my statement, yes.

25   Q      Okay.  And is that true?

1    A    I'm sorry, I didn't hear the threat on that

2         day, sir, but I did hear the threat.

3    Q    Okay.  So the threat wasn't that day?

4    A    No.

5    Q    When was it?

6    A    I'm not sure what day it was, but it -- I

7         did hear the threat.

8    Q    Okay.  So the threat was some other day?

9    A    Right.

10   Q    Even though you said it was on October 2nd?

11   A    I didn't mean to put it as October 2nd.

12   Q    Okay.  So that was a typo?

13   A    Right.

14   Q    Okay.  Okay, so that's not what you meant

15        when you wrote that?

16   A    Right.  I'm sorry.

17             MR. KUHN:  That's all I have,

18        thank you.

19             THE COURT:  Thank you, Attorney

20        Kuhn.

21             State of Ohio?

22             MS. SCHNELLINGER:  Thank you, Your

23        Honor, but I have nothing further.

24             THE COURT:  Anybody wish to

25        reserve the right to recall this witness?

1          MR. KUHN:  No, thank you, Judge.

2          MS. SCHNELLINGER:  No, thank you.

3          THE COURT:  Thank you, sir, you

4     may step down, you are excused.

5          Ladies and gentlemen, at this time

6     we're going to take a 15 minute recess,

7     give you time to stretch your legs, use the

8     restroom if you need to.

9          Again, do not discuss this case

10    among yourselves, do not permit anyone to

11    discuss it with you or in your presence.

12    And do not form or express any opinion on

13    the case until it is finally submitted to

14    you.

15         It is 10:38, we'll take about a 15

16    minute recess and we'll meet you back in

17    the jury room about 5 till 11 and continue

18    with the testimony in this case, okay?

19         THE BAILIFF:  All rise.

20         (Thereupon, the jury exited

21          the courtroom at 10:38 a.m.)

22         THE COURT:  All right.  There's

23    just two things I want to put on the

24    record.  One, I just want to note for the

25    record that both during yesterday's portion

1    of the trial as well as today's trial the

2    Defendant has been in, for lack of a better

3    word, street clothes the entire time, in

4    jeans and a black T-shirt, and she has not

5    been in any restraint in front of the jury.

6          Also I'll note that there was an

7    observer in today's trial that made hand

8    gestures towards the Defendant on two

9    separate occasions.  She was then warned

10   not to make any other gestures, and she

11   persisted, during the testimony of Jeffrey

12   Ayers, to shake her head and make gestures

13   that suggested her agreement or

14   disagreement with the things that he said.

15   She was subsequently asked to leave and has

16   been escorted out of the courtroom, okay?

17   Just so that that's on the record.

18          We'll take a brief recess, again,

19   and we'll meet you back here at about 5

20   till.

21          MR. KUHN:  Thanks, Judge.

22          THE COURT:  Thank you.  Also you

23   have all had a chance to look at the jury

24   instructions and they're okay with the

25   exception --

1            MR. KUHN:  Yes, Judge.  I don't

2    know if I would spot an error in there

3    anyway, but they look good to me.

4            THE COURT:  I am going to change

5    the Judge's name and the date of the

6    verdict form.  I also want you to know that

7    I -- the way I give my instructions, I'll

8    give the instructions of law first, then

9    give you the opportunity to make your

10   closing statement, and finish up with the

11   deliberating instruction.  So they will

12   have the instructions of law first.

13                - - - - - - - - - -

14           (Court recessed at 10:40 a.m. and

15            reconvened at 11:00 a.m., and the

16            following proceedings were had.)

17           THE COURT:  We do have the

18   instructions finalized, give you copies if

19   there aren't any other additional changes.

20   And at this time is everybody ready?

21           MR. BARR:  Yes, Your Honor.

22           THE COURT:  Okay.  And who was

23   your next witness?

24           MS. SCHNELLINGER:  Jennifer

25   Conley, Your Honor.

1          THE COURT:  Jennifer, okay.  It's

2     my hopes to finish all the witnesses before

3     lunch, if you think that's possible?

4          MS. SCHNELLINGER:  Yes.

5          THE COURT:  And then we'll do a

6     lunch break, we'll do just the preliminary

7     law and the instructions, with respect to

8     the actual charges, you can make your

9     closing arguments, and then I'll give the

10    deliberating instructions after that, okay?

11         And you'll each have a half an

12    hour for closing.  Again, feel free not to

13    take that whole time.  And you can split it

14    up however you want, but at the very most

15    20 and 10.

16         MS. SCHNELLINGER:  So the most

17    would be 10 for rebuttal?

18         THE COURT:  Right.

19         MS. SCHNELLINGER:  Okay, just

20    making sure.

21         (Thereupon, the jury reentered

22             the courtroom at 11:07 a.m.)

23         THE COURT:  All right.  Thank you,

24    and you may be seated.

25         At this time the State can call

1        its next witness.

2                MS. SCHNELLINGER:  Thank you, Your

3        Honor.  The State would call Jennifer

4        Conley.

5                THE COURT:  Okay.

6                THE BAILIFF:  Please raise your

7        right hand.

8                    JENNIFER CONLEY

9        who, after being first duly sworn,

10       testified as follows:

11               THE COURT:  You may inquire.

12               MS. SCHNELLINGER:  Thank you.

13                  DIRECT EXAMINATION

14       BY MS. SCHNELLINGER:

15   Q   Will you please state your name and spell

16       your last name for the record?

17   A   Jennifer Conley, C-O-N-L-E-Y.

18   Q   Ma'am, where do you reside?  Where do you

19       reside?

20   A   Oh, 173 26th Street Southeast, Massillon,

21       Ohio.

22   Q   How long have you lived there?

23   A   Seven years.

24   Q   And who do you live there with?

25   A   My husband and four children.

```
1    Q    What are the age ranges of your children?
2    A    From 18 to 10.
3    Q    Are you currently employed?
4    A    Yes.
5    Q    What do you do for a living?
6    A    Nursing.
7    Q    Are you currently in school also?
8    A    Yes.
9    Q    And for what?
10   A    To finish my degree in RN.
11   Q    How close is your residence to 186 [sic]
12        26th Street Southwest in Massillon?
13   A    Right next door.
14   Q    Are your properties right -- are they right
15        next to each other?
16   A    They're a little bit apart, but pretty
17        close.  They live like right there
18        (Indicating).
19   Q    Okay.  So the properties butt up against
20        each other?
21   A    Yeah.
22   Q    So true neighbors?
23   A    Yeah, they're true neighbors, yeah.
24   Q    An do you know the family that lived there
25        last year in 2012?
```

1   A   Yes.

2   Q   And can you describe your relationship with

3       them?

4   A   Um-m, we talked.  I mean, we were

5       neighborly.  I, you know, helped them out

6       with a few things.  We never had any

7       problems or anything.

8   Q   Okay.

9   A   It was more of a neighborly communication.

10  Q   Okay.  And did you know everybody that

11      lived there?

12  A   Yes.

13  Q   And did you become aware of a fire at this

14      neighbor's residence on October 3rd, 2012?

15  A   Yes, I was at home.

16  Q   How long were you home that day?

17  A   I was home that whole day.

18  Q   Whole day?  Now, from your -- from your

19      home, how well can you see the house, your

20      neighbor's house, to be exact?

21  A   Um-m, I can see it -- there's a pretty open

22      view in my dining room.  I have a bay

23      window that's pretty big that you can see

24      directly over there.  There's no trees or

25      anything in the way.

1    Q    Okay.  Do you remember what you were doing

2          that day?

3    A    I was sitting at home watching TV.

4    Q    And did you have occasion to observe your

5          neighbors that day?

6    A    I mean, if I -- yeah, with the kids because

7          the children play outside and my own

8          children.  So when I walked through the

9          dining room, I'm always looking out that

10         window.

11    Q    Now, do you recall the coming and goings of

12         the people next door, your neighbors?

13    A    Yes.

14    Q    And these are the Ayers to be exact, the

15         Ayers family?

16    A    Yes.

17    Q    Do you remember seeing anybody outside the

18         house that day?

19    A    I remember seeing two children outside that

20         I didn't -- wasn't sure of who they were.

21    Q    Okay.

22    A    They were playing next door in the yard.

23    Q    You saw two children, they didn't live

24         there?

25    A    No.

1    Q    Had you seen them before?

2    A    No.

3    Q    Do you recall the time of day they were

4         there?

5    A    They were there -- I'm not sure what time

6         they got there, but I know approximately

7         what time they left.

8    Q    Okay.  What were the circumstances around

9         when they left?

10   A    Um-m, as in?

11   Q    How did they leave?  Did they just walk

12        away or what happened?

13   A    Oh, no, I saw a truck pull up, I saw

14        Brennan get out of the truck and there was

15        another gentleman, I wasn't sure who it

16        was, and the children got in that truck.

17   Q    And you said you recall the time they left?

18   A    Uh-huh.

19   Q    What time was that?

20   A    It was approximately 5:30-ish.

21   Q    Okay.

22   A    Yeah.  It was before the kids went to

23        church.

24   Q    Okay.  When -- tell me about going to

25        church.  What do you mean by that?

1   A    Um-m, there's a church bus that picks up
2        the children on Wednesday evenings about 10
3        after 6 or a quarter after 6.  And I know
4        it was prior that I saw Brennan and them
5        get in that truck and leave before the
6        church -- you know, they came.
7   Q    So they left before the church bus came
8        through?
9   A    Right.
10  Q    Okay.  After Brennan and the unknown
11       gentleman and unknown kids left, did you
12       see any activity at the house?
13  A    No.
14  Q    What was the next activity you saw?  Was it
15       the church bus?
16  A    Right, I saw the two girls get on the
17       church bus with my own daughter at the
18       time.
19  Q    Which two girls?
20  A    Kayla's two girls.
21  Q    Okay.  After the church bus, did you -- was
22       there any other activity at the house?
23  A    No, everything was quiet.
24  Q    Okay.  Did you see anybody else arrive?
25  A    No.

1    Q    What do you remember happening in your

2          neighborhood next?

3    A    Um-m, I was sitting in the living room, the

4          window -- the front window was cracked open

5          a little bit, and it was about 8:00, and I

6          kept hearing -- I heard some screaming and

7          a lot of commotion outside.  So I looked

8          out my front window and I didn't see

9          anything.  And then as I went to the back

10         of the house, I saw Kayla -- or I saw

11         somebody standing outside.  And I went out

12         the back door and looked over and said,

13         Kayla, what's going on?  And as she was

14         coming towards me, the back of my property

15         with her son, and said that he -- that

16         Bubba started the fire, Bubba started the

17         fire.

18    Q    What did you do?

19    A    At that time I had my husband take the

20         little boy into the house and I noticed

21         that her hand was bleeding pretty bad.  And

22         then my husband gave me the phone because

23         he was on the phone with 911 dispatch.  So

24         I was trying to speak with them, and then

25         dealing with her hand, and then also we

|    |   |                                                    |
|----|---|----------------------------------------------------|
| 1  |   | were trying to put her Pit Bull up because          |
| 2  |   | we knew the fire department was coming.             |
| 3  | Q | Okay.  Where was the Pit Bull?                      |
| 4  | A | It was out running in the yard.                     |
| 5  | Q | Okay.  Now where were you when you were             |
| 6  |   | doing all this stuff?                               |
| 7  | A | I was on -- I was at their property --              |
| 8  |   | their residence, Kayla's residence, at that         |
| 9  |   | time.                                               |
| 10 | Q | Where exactly on the property?                      |
| 11 | A | On the side of the house, which would be            |
| 12 |   | like their backyard.                                |
| 13 | Q | Okay.  So what did you do next?                     |
| 14 | A | Um-m, after we got the dog tied up, my              |
| 15 |   | husband brought us a bunch of wrap -- or            |
| 16 |   | towels and stuff, and I was wrapping up her         |
| 17 |   | hand.  Karen was asking her where the other         |
| 18 |   | two girls were, where her children were,            |
| 19 |   | the other two, because she didn't know             |
| 20 |   | where they were.                                    |
| 21 |   | Kayla was -- she wasn't able to              |
| 22 |   | really respond to her.  All she kept doing          |
| 23 |   | was repeating was she going to lose -- Am I         |
| 24 |   | going to lose my kids, am I going to lose           |
| 25 |   | my kids?  We kept telling her repeatedly,           |

```
 1              don't worry about that, that wasn't
 2              something to worry about at that time.  I
 3              was more concerned about her hand.
 4      Q       Where did Karen come from?
 5      A       She came from the property.  Her car was
 6              parked in the driveway.
 7      Q       Did you see her arrive?
 8      A       No, I did not.
 9      Q       Okay.  Describe the Defendant's -- I'm
10              sorry.  Do you see the individual you
11              referred to as Kayla in the courtroom?
12      A       Yes.
13      Q       Can you point her out for the Court and the
14              jury?
15      A       She's sitting right over here.
16      Q       Describe what she's wearing.
17      A       All black and a pair of jeans, kind of
18              looks dark over there.
19                      MS. SCHNELLINGER:  May the record
20              reflect she has identified the Defendant?
21                      THE COURT:  The record will so
22              reflect.
23      BY MS. SCHNELLINGER:
24      Q       Can you describe the Defendant's demeanor
25              that night?
```

```
 1    A    She was -- she was very upset.  She just
 2         wasn't -- she wasn't there, like she
 3         just -- it's so hard to -- I'm having a
 4         terrible time describing it, but she would
 5         kind of like go into like a blank stare at
 6         times, and then she would come back and be
 7         very upset and agitated and worrying about
 8         losing her children.
 9    Q    Okay.  Did you notice anything else about
10         her?
11    A    Yeah, there was a strong burnt smell -- it
12         was like a marijuana smell with like a
13         burnt smell to it, but I don't --
14    Q    Do you know where it was coming from?
15    A    That was coming from her breath when she
16         was sitting on my front porch, and I was
17         holding her arm at that time.
18    Q    So you were holding onto her?
19    A    Yeah, I had to hold onto her, she was
20         bleeding pretty good.
21    Q    You said it smelled like burnt marijuana?
22    A    Uh-huh, yeah.
23    Q    Have you had occasion to be around the
24         smell of burning marijuana before?
25    A    Yeah.
```

1    Q    So you know what it smells like?

2    A    Right.

3    Q    Now, you said your husband took the

4         3-year-old boy, Bubba --

5    A    Uh-huh.

6    Q    You refer to him as Bubba?

7    A    Yes.

8    Q    Took him into the house?

9    A    Correct.

10    Q    Did you have any contact with him?

11    A    Not until after Kayla went to the hospital

12         I did.

13    Q    When you had contact with him, how was he

14         acting?

15    A    He was real shy, stand-offish a little.  He

16         had a lot of blood from -- on his shirt,

17         and we were getting him cleaned up and

18         putting our daughter's clothes on him.

19    Q    Did you do anything else that night

20         regarding the fire?

21    A    No.

22    Q    Did you do anything else regarding the

23         children?

24    A    Um-m, yes, we kept the two children that

25         came home from the church bus and the

```
 1              little boy at that time.

 2    Q    You kept them at your house?

 3    A    Yes, we kept them there, yeah.

 4    Q    They stayed with you?

 5    A    They stayed with us for ten days until

 6         family members from South Carolina could

 7         come get them so they wouldn't have to go

 8         to foster care.

 9    Q    You said the two other girls came home on

10         the church bus?

11    A    Uh-huh.

12    Q    When did that happen?

13    A    That happened about 8:30.  Usually the

14         church bus is there between 8:30 and 20

15         till 9.

16    Q    And that's when they showed up?

17    A    Yes.

18    Q    Is the fire department there at that time?

19    A    Yes.

20    Q    Now, after the fire, do you recall talking

21         to the Defendant on the phone or --

22    A    Yes.

23    Q    -- talking to her on the phone a couple

24         days after the fire?

25    A    Yes.
```

1    MS. SCHNELLINGER:  With the

2    Court's permission, I would like to play

3    part of that phone call.

4         THE COURT:  Okay.

5         MS. SCHNELLINGER:  One second.

6         (Thereupon, the audiotape

7              was played for the jury.)

8         THE COURT:  I don't know if they

9    can hear it very well.

10        Can you all hear that?

11        JUROR #30:  No.  It says

12   presentation mode is off on this screen.

13        THE BAILIFF:  Your Honor, if we

14   could maybe have the computer person come

15   down?

16        THE COURT:  Sure.  Bear with us

17   just a little bit.  Technology is a

18   wonderful thing, when it works.

19        Can you hear it now okay?

20        (Thereupon, the audiotape

21             was played for the jury.)

22   BY MS. SCHNELLINGER:

23   Q    Were you able to hear that?

24   A    Yeah.

25   Q    And you stated you had a conversation with

1        the Defendant, Kayla, a couple days after

2        the fire; is that correct?

3  A    Correct.

4  Q    Do you recognize the voice on that?

5  A    Yes.

6  Q    And whose voice was that?

7  A    Kayla Ayers.

8           MS. SCHNELLINGER:  If I could have

9  one moment?

10         THE COURT:  Yes, please.

11         MS. SCHNELLINGER:  I have nothing

12  further, Your Honor, thank you.

13         THE COURT:  Okay.  Thank you.

14         Attorney Kuhn, you may inquire.

15         MR. KUHN:  Thank you.

16             CROSS-EXAMINATION

17  BY MR. KUHN:

18  Q    Good morning, ma'am, how you doing today?

19  A    Good, good.

20  Q    You're Kayla's neighbor; is that correct?

21  A    Correct.

22  Q    Sounds like you're pretty helpful through

23  this whole ordeal; is that right?

24  A    I try to be.

25  Q    Good.  You indicated that you smelled

1        something that you thought might be

2        marijuana coming from Kayla?

3  A    I stated that there was a burnt smell of

4        marijuana.

5  Q    Some kind of burnt smell, right?

6  A    Uh-huh.

7  Q    Have you ever been around a mattress fire?

8  A    Yes.

9  Q    So you know and you recall what the smell

10       of a burnt mattress is?

11  A    Yes, I do.

12  Q    Okay.  When were you around a mattress

13       fire?

14  A    My in-laws had them.

15  Q    Okay.  They have mattress fires?

16  A    Uh-huh.

17  Q    Like a recreational type thing?

18  A    No, it's not a recreational thing.  But

19       I've been there when -- you know, they get

20       rid of the mattresses or the family members

21       will take the mattresses down there because

22       they have a big farm.  But this wasn't

23       coming from her clothes, this was coming

24       from her breath that I was very close to.

25  Q    Okay.  Did her clothing have a smell to

```
 1              you?

 2    A         Huh-uh.

 3    Q         Did her hair?

 4    A         No.

 5    Q         Okay.  Did you smell smoke at any time?

 6    A         It was a lot coming from the house at that

 7              time.

 8    Q         Did Bubba smell like smoke?

 9    A         No.

10    Q         Okay.  And Bubba was brought over almost

11              immediately to your home; is that correct?

12    A         Right.

13    Q         You said you had Bubba and the other kids

14              for ten days?

15    A         Yes.

16    Q         Okay.  And you said you're in nursing; is

17              that correct?

18    A         Correct.

19    Q         Are you a nurse somewhere?

20    A         Yes.

21    Q         Where's that?

22    A         Astoria.

23    Q         Is that like --

24    A         It's a rehabilitation place.

25    Q         Okay.  Do you know if Bubba was familiar
```

1      with cigarette lighters?

2  A   When he was in our house over those ten

3      days, actually all of the kids did it, if

4      they seen a lighter laying around, they

5      immediately picked it up and brought it to

6      us.

7  Q   Okay.  So they knew there was some

8      significance about lighters; is that

9      correct?

10 A   Yes.  Yes.

11 Q   Did you ever see Bubba try to light a

12     lighter?

13 A   No.

14 Q   Okay.  But you did see him with one in his

15     hands; is that correct?

16 A   If he seen one in our house, yeah, he

17     brought it to us.

18 Q   So he would pick it up and bring it over to

19     you?

20 A   Uh-huh.

21              MR. KUHN:  I think that's all I

22     have.  Thank you.

23              THE COURT:  Thank you, Attorney

24     Kuhn.

25              Any redirect?

1   MS. SCHNELLINGER:  No, Your Honor,

2   thank you.

3   THE COURT:  And anybody wish to

4   reserve the right to recall this witness,

5   or is she excused?

6   MR. KUHN:  No, Your Honor.

7   MS. SCHNELLINGER:  No, thank you.

8   THE COURT:  All right, ma'am, you

9   may step down, you are excused.

10   MR. BARR:  At this time, Your

11   Honor, the State would call Karen Ball.

12   THE COURT:  Okay.

13   THE BAILIFF:  Ma'am, if you would

14   just come over to the witness stand, raise

15   your right hand.

16   KAREN BALL

17   who, after being first duly sworn,

18   testified as follows:

19   THE COURT:  Attorney Barr, you may

20   inquire.

21   MR. BARR:  Thank you, Your Honor.

22   DIRECT EXAMINATION

23   BY MR. BARR:

24   Q   Ma'am, if you would, state your name and

25   spell your last name for the court reporter

| | | |
|---|---|---|
| 1 | | please. |
| 2 | A | Karen Ball, B-A-L-L. |
| 3 | Q | Karen, where do you live? |
| 4 | A | Navarre. |
| 5 | Q | And who do you live with? |
| 6 | A | My husband and son. |
| 7 | Q | Are you employed anywhere right now? |
| 8 | A | No, I'm not. |
| 9 | Q | Where were you last employed? |
| 10 | A | I was employed at NeuroCare. |
| 11 | Q | Did you retire from NeuroCare? |
| 12 | A | Yes, I had to take a medical retirement. |
| 13 | Q | How many children do you have? |
| 14 | A | Seven. |
| 15 | Q | Seven? |
| 16 | A | Uh-huh. |
| 17 | Q | And some of those are adopted? |
| 18 | A | Yes, two of them are adopted. |
| 19 | Q | Do you attend church regularly? |
| 20 | A | Yes, I do. |
| 21 | Q | And what church do you attend? |
| 22 | A | Cornerstone Baptist. |
| 23 | Q | How long have you been going to |
| 24 | | Cornerstone? |
| 25 | A | Since 1989. |

1   Q   Does Cornerstone have what they call a bus

2       ministry?

3   A   Yes, we do.

4   Q   What is a bus ministry?

5   A   A bus ministry is an outreach program that

6       we go into areas and we, with permission of

7       parents, pick up children and take them to

8       church.

9   Q   When you take those children to church, do

10      you also try to get to know their parents?

11   A   Yes, we do.  We try to get a rapport with

12      the parents.

13   Q   As a result of your participation in that

14      bus ministry, did you meet an individual by

15      the name of Kayla Ayers?

16   A   Yes, I did.

17   Q   Do you see Kayla in the courtroom today?

18   A   Yes, I do.

19   Q   Could you tell me what color shirt she has

20      on please?

21   A   I believe it's black.

22          MR. BARR:  Your Honor, let the

23      record reflect she's identified the

24      Defendant.

25          THE COURT:  The record will so

1      reflect.

2      BY MR. BARR

3    Q   Did Kayla's children attend the bus

4        ministry?

5    A   Yes.

6    Q   As a result, did you meet Kayla?

7    A   Yes, I did.

8    Q   When do you recall first meeting Kayla?

9    A   It was last summer.  I believe it was in

10       July.

11   Q   Okay.

12   A   I believe it was in July.

13   Q   Now, how do you go about meeting the

14       children's parents?  Do you go to their

15       home, do you -- what do you do?

16   A   Yes, we weekly go -- the children that go

17       on the bus, we make a weekly visit to the

18       house, we go to the house, knock on the

19       door, we talk to the parents to keep the

20       parents informed of what's going on.

21   Q   And were you by yourself when you first met

22       Kayla, or was somebody with you?

23   A   No, the very first time I met Kayla, our

24       pastor's wife and another lady was with me.

25   Q   And after that first time, did you continue

| | | |
|---|---|---|
| 1 | | to meet Kayla? |
| 2 | A | Yes. |
| 3 | Q | How often would you see her? |
| 4 | A | I would see her about once a week. |
| 5 | Q | Was there a special night that you would |
| 6 | | see her, or would it vary? |
| 7 | A | No, it would vary.  It depended on what her |
| 8 | | schedule was and what mine was. |
| 9 | Q | During that time, from the time you met her |
| 10 | | till -- until up until October 3rd, did her |
| 11 | | children continue to participate in the bus |
| 12 | | ministry? |
| 13 | A | Oh, yes. |
| 14 | Q | Did there come a time when you would start |
| 15 | | to see Kayla more than once a week? |
| 16 | A | Yes, that was -- I believe it was around |
| 17 | | the end of August. |
| 18 | Q | And how often would you see her then? |
| 19 | A | I was -- we actually saw her about twice a |
| 20 | | week. |
| 21 | Q | Okay.  And what was the purpose of seeing |
| 22 | | her twice a week? |
| 23 | A | We were meeting to do various things to |
| 24 | | help if she needed to go someplace, but the |
| 25 | | main goal was for us to have a Bible study |

1        together.

2   Q   Did you do a lot of Bible studying?

3   A   Actually, no.

4   Q   What did it end up being more of?

5   A   Talking about Kayla, her life, and, you

6        know, things that she wanted to do.  So the

7        Bible study itself was very short.

8   Q   Did that continue all the way up until

9        October 3rd of 2012?

10   A   Yes.

11   Q   So you met her in July and your

12        relationship with her continued up until

13        October the 3rd of 2012.

14           Do you recall between those months

15        approximately how many times Kayla actually

16        attended church with you?

17   A   I believe -- I'm not positive, but I think

18        it was six times.

19   Q   Now, do you go every Wednesday and Sunday?

20   A   Every Wednesday and Sunday, yes, I do.

21   Q   Did you have occasion to see Kayla on

22        Tuesday, October 2nd?

23   A   I don't -- I'm trying to think, but I don't

24        think it was actually Tuesday.  I believe

25        it was Monday, the 1st.

1    Q    Okay.  And where did you see Kayla?

2    A    I went to her house and picked her up to go

3         to -- I think it's called Stark Metro

4         Housing.

5    Q    Okay.  Why were you going there?

6    A    Um-m, Kayla was going to need to leave

7         where she was staying, and I was trying to

8         get her to a place that maybe she could

9         find housing for her and her children.

10   Q    Were you aware of why Kayla needed to leave

11        where she was staying?

12   A    The reason that I was told was her dad, who

13        rented the house, and Tonya and the kids

14        were leaving, and that they were to also

15        leave.

16   Q    Okay.  Now when you saw her on October 1st,

17        which would have been Monday, did you make

18        plans to go to church with her that week?

19   A    Yes, I did.

20   Q    What night were you going to go to church

21        with her?

22   A    Wednesday.

23   Q    Now, would Kayla ride the bus?

24   A    No, Kayla was anxious on the bus so that's

25        why I was picking her and the children up.

1   Q    When -- when Kayla would go to church,

2          would you pick her up and take her to

3          church?

4   A    Yes.

5   Q    Were there times that you went to get her

6          and she wasn't there to go to church?

7   A    Yes.

8   Q    On -- so if you saw her on Monday, October

9          1st, and the plans for church would have

10         been Wednesday, October 3rd --

11   A    Yes.

12   Q    -- when you said you would pick her and the

13         kids up, would that include the older

14         girls?

15   A    No, it was only Kayla's three children that

16         I picked up.

17   Q    But on Wednesday, October 3rd, were you

18         planning on picking up Kayla's older girls,

19         too?

20   A    Yes, I was planning on picking up Kayla and

21         her three children.

22   Q    Okay.  Do you recall about what time you

23         got there to pick her up?

24   A    Yes, it was about 6:30.

25   Q    I'm going to --

1    MR. BARR:  Ms. Flowers, can I have

2    the docucamera please?

3    THE BAILIFF:  Sure.

4    MR. BARR:  Thank you.  In just a

5    minute, hopefully.

6    BY MR. BARR:

7    Q    Can you see that on the screen there?

8    A    Yes, I can.

9    Q    That is what has been marked as State's

10   Exhibit 3H.  Do you recognize that?

11   A    Yes, that's the house Kayla was living in.

12   Q    So you say you got there about 6:30 on

13   Wednesday, October 3rd to pick her up?

14   A    Yes, yes.

15   Q    Which door did you go to?

16   A    This door that's on your far right-hand

17   side.  It's like the basement door.

18   Q    I'm going to circle that one.  That one

19   (Indicating)?

20   A    Yes, that one.

21   Q    And what happened when you knocked on that

22   door?

23   A    Um-m, I knocked on the door, but nobody

24   answered at first, but the dog came to the

25   window and was barking.

1   Q      Uh-huh.

2   A      And I heard like a shush -- shushing, like

3          "shh," and I knocked again, nobody came,

4          and then so I went to the other door.

5   Q      And the other door you're referring to, is

6          that this door over here?

7   A      Yes.  Which -- um-m, the kitchen door.

8   Q      Okay.

9   A      It's -- yeah, it was right behind there.

10  Q      Now, when you knocked on the kitchen door,

11         what did you hear?

12  A      Um-m, I didn't hear anything but the dogs

13         barking.

14  Q      Did you see anything?

15  A      Only -- only the big white dog.

16  Q      Did you see anything while you were

17         knocking at either door --

18  A      Um-m, I did on the -- on the deck that was

19         there, that little deck, there's like a

20         wicker couch or chair, and Kayla's purse

21         that I had seen her carry quite often and a

22         backpack that I thought might have been

23         Layla's.

24  Q      Did anybody ever come to the door?

25  A      No.

1    Q    So what do you do?

2    A    After I had knocked twice, I went down the

3          steps to my car.  Um-m, as I was getting to

4          my car, I wanted to get my cane because I

5          had saw this flickering and I could -- and

6          I also smelled a little like smoke --

7    Q    Let me back you up here.

8    A    Okay.

9    Q    This is when you went to pick her up for

10        church?

11    A    This is -- no, I'm sorry.  When I went to

12        pick her up -- I'm sorry.

13    Q    That's okay.

14    A    When I went to pick her up, I left that

15        door, that back door, I was headed to my

16        car, and the neighbor stopped me.

17    Q    Okay.  Did you have a conversation with the

18        neighbor?

19    A    Yes, I did.

20    Q    And then did you continue on to church?

21    A    Um-m, yes.  I left there -- it was about 10

22        till 7 when I left there.

23    Q    As a result of that conversation with the

24        neighbor, did you think that Kayla was in

25        the house?

1   A   Yes.

2   Q   But you went to church?

3   A   Yes.

4   Q   What time does church start?

5   A   Starts at 7.

6   Q   And what time does church end?

7   A   It ends at 8.

8   Q   Did you stay all the way until 8:00?

9   A   Not quite 8.  I -- they were giving closing
10      prayer and I left.

11  Q   Why did you leave a little bit early?

12  A   Because I was uneasy about Kayla not
13      answering the door.  I just felt very
14      uneasy and I wanted to go back to check.

15  Q   Did you drive straight from the church to
16      Kayla's residence?

17  A   I drove straight from the church to Kayla's
18      house.

19  Q   And where did you park?

20  A   And I parked in the drive because -- that's
21      where I park was in the drive.

22  Q   Okay.

23  A   The reason I parked in the drive, as I came
24      down Connecticut and I saw that door, I saw
25      in that window flickering.

| 1 | Q | Okay.  And you're saying -- when you say |
| 2 | | the window, you're referring to this window |
| 3 | | right here (Indicating)? |
| 4 | A | That window there, yes. |
| 5 | Q | That's a basement window? |
| 6 | A | That's a basement window. |
| 7 | Q | You saw some flickering? |
| 8 | A | Yes. |
| 9 | Q | Now, let me ask you about this, Karen.  At |
| 10 | | that time you indicated, the first time you |
| 11 | | were there, that you have a cane? |
| 12 | A | Yes, I have a walking stick I have to |
| 13 | | use -- I had to use. |
| 14 | Q | Were you having some trouble walking back |
| 15 | | then? |
| 16 | A | Yes, quite a bit. |
| 17 | Q | So when you see the flickering, you park |
| 18 | | your car, what do you do? |
| 19 | A | I parked my car and I went to this basement |
| 20 | | door, that's what I call basement door, |
| 21 | | because that's normally where she would |
| 22 | | come out.  And I knocked on the door and I |
| 23 | | jiggled the handle, and nobody answered. |
| 24 | Q | Did the dogs bark? |
| 25 | A | The dogs were barking. |

1   Q   When you say "the basement door," we're
2       referring to this door?
3   A   Yes, that one.
4   Q   Did you knock more than once?
5   A   I -- yes, I did.
6   Q   Did you holler or scream or do anything?
7   A   I kept saying, Kayla, Kayla.
8   Q   Did anybody respond?
9   A   No, just the dogs barking.
10  Q   So what do you do then?
11  A   Okay, then I went from that door and I
12      walked over to the kitchen door where that
13      like little deck is.  Yeah.
14  Q   That's that door (Indicating)?
15  A   And I knocked on that door and said --
16      asked, Kayla, Kayla?  And nobody answered,
17      only the dog barking.  And I jiggled the
18      door, but it wouldn't open.
19  Q   Again, did you knock more than once?
20  A   I knocked more than once.
21  Q   And I believe you indicated when you were
22      there the first time you saw a purse and a
23      backpack on the wicker chair or couch or
24      something --
25  A   Yes.

| | | |
|---|---|---|
| 1 | Q | -- on that deck? |
| 2 | A | Yes. |
| 3 | Q | Was that still there? |
| 4 | A | I don't remember if it was or not. |
| 5 | Q | After you knocked on that -- what you've |
| 6 | | referred to as the kitchen door and you've |
| 7 | | knocked on this other door, how much time |
| 8 | | do you think has elapsed? |
| 9 | A | That's probably close to ten minutes. |
| 10 | Q | Is it because it took you so long to walk |
| 11 | | at that time? |
| 12 | A | Yes, because I was having a lot of |
| 13 | | difficulty in walking. |
| 14 | Q | After you get no response at the kitchen |
| 15 | | door, what do you do? |
| 16 | A | I went down to my car personally to get my |
| 17 | | cane.  And I was going to go to the |
| 18 | | neighbor's house and -- because I didn't |
| 19 | | have a cell phone.  That's what I did next. |
| 20 | Q | Now, when you get to your car, tell me what |
| 21 | | happens. |
| 22 | A | Um-m, I got to my car and I was trying to |
| 23 | | get my stick out and I heard this "thump |
| 24 | | thump" and I looked up and it was Kayla, |
| 25 | | she had come down the stairs and she came |

1          in and like slammed up against my car door,

2          and stated that -- she said, Mrs. Ball,

3          call 911, Bubba set the house on fire.

4     Q    Mrs. Ball, call 911, Bubba set the house on

5          fire?

6     A    Yes.

7     Q    Did you see Bubba at that time?

8     A    I saw what I believed was him because it

9          was dusk, but the little figure on that

10         deck.

11    Q    Okay.  And when you say the deck, are you

12         referring to this area up here?  Or back

13         here?

14    A    Um-m, back over here by the kitchen door.

15    Q    And this is the kitchen door, right?

16    A    Yes.

17    Q    Okay.  And from where your car was parked,

18         you could see over there?

19    A    Yes, my car was in the driveway at that

20         time.  I had pulled into the driveway.

21    Q    Okay.  So you saw Bubba on the deck at that

22         time?

23    A    Yes.

24    Q    So Kayla comes out and tells you, Mrs.

25         Ball, call 911, Bubba set the house on

1      fire, what happens next?

2    A    I immediately, as fast as I could, went

3         over to the neighbor's and pounded on his

4         door and asked him to please call 911, that

5         their house was on fire.  And he responded

6         to it.

7    Q    Now do you go back to your car at that

8         point?

9    A    I went back to -- I went around my car to

10        Kayla.

11   Q    And does anybody else show up?

12   A    Um-m, as I'm yelling, I see people around

13        and I'm yelling that their house is on

14        fire.  I saw Jen Conley and some people

15        over there and told them that the house was

16        on fire, and then we realized -- then I

17        realized Kayla's hand was all bloody, and I

18        yelled at her we needed something for

19        Kayla's hand, it was bleeding.

20   Q    Do you stay at your car, or do you go

21        somewhere else?

22   A    No, we went to the car.  There was a truck

23        cap sitting, and that's where we were

24        standing in front of.

25   Q    Okay.  Where was Bubba at that time, do you

1       recall?

2   A   I remember seeing him standing over there

3       by Mrs. Conley and the other people that

4       were standing there.

5   Q   Okay.  What's Kayla doing at this time?

6   A   She's, um-m, just really just like nervous,

7       just not really doing anything.  And I

8       asked her, where are the girls because I

9       didn't know they had gotten on the church

10      bus because I was supposed to pick them up.

11      And she did not respond to me.  And I sat

12      her on the cap, the truck cap, and I kept

13      asking her, Where are the girls, where are

14      the girls?  And she did -- just didn't

15      respond.  And Mrs. Conley came over then

16      and said, It's okay, I saw the girls get on

17      the bus.

18  Q   Do you stay there with Kayla?

19  A   Yes.

20  Q   Do you ever take her anywhere else?

21  A   At that point the dog was kind of growling

22      and I'm saying, We have to get the dog on

23      its chain.  And so the dog was not happy

24      with me so Jen was more used to the dogs,

25      and Kayla and her got the dog on the chain.

1    As they were doing that, um-m, I

2    saw the bus starting down the road so I

3    took off over to the bus to tell them, you

4    know, get the girls off and move the bus

5    because the fire department was on its way.

6  Q  Okay.  The fire department eventually

7    arrives?

8  A  Yes.

9  Q  Do you -- do you stay there longer?

10 A  Yes.  After the girls -- some of the kids

11    got the two little girls back into Jen's

12    house, and I drove back to Kayla and we go

13    and sit on Jen's front porch on the steps.

14 Q  And what is Kayla doing at that point in

15    time?

16 A  Well, she's rocking back and forth and her

17    hand, it was wrapped, but she's like non --

18    not really responding.  She's more like

19    rocking back and forth.

20    And then what she -- the fireman

21    came over to ask her some questions.  And

22    she, at first, wasn't really responding,

23    and we were rubbing her back.  Jen said,

24    You need to answer his questions, you know.

25    And then she looked at me and asked me if

1    she was going to lose her children now.

2  Q  Okay.  Did she say that to you more than

3    once?

4  A  Yes.  Um-m, after they had talked to her,

5    um-m, and the paramedics I think that came

6    and they wanted to get her over to that so

7    they could treat her, I walked with the one

8    fireman with her over there.  And as we

9    were walking over there she asked me again,

10   Mrs. Ball, am I going to lose my children

11   now?

12 Q  Did you ever get to see Bubba that night up

13   close?

14 A  I did not see him up close, no.

15 Q  After this, did you continue to have

16   contact with Kayla?

17 A  Yes.  When she was over at the Stark County

18   Jail, I did visit her over there.

19          MR. BARR:  If I could have one

20   minute, Your Honor.

21          THE COURT:  Yes, you may.

22          MR. BARR:  No further questions,

23   Your Honor.

24          THE COURT:  Thank you.

25          Attorney Kuhn, you may inquire.

1          MR. KUHN:  Thank you, Judge.

2               CROSS-EXAMINATION

3     BY MR. KUHN:

4   Q    Good morning, ma'am, how are you today?

5   A    Okay.

6   Q    Good.  Sounds like you've been pretty

7        helpful to Ms. Ayers throughout this whole

8        ordeal; is that right?

9   A    Well, I tried.  I tried.

10  Q    Good.  You indicated that Kayla, I guess,

11       didn't answer you about where the girls

12       were when you asked her?

13  A    Right.

14  Q    Okay.  And is it possible that that's

15       because she was confused because the girls

16       were at church where she thought maybe you

17       would have seen them?

18  A    Um-m, I -- anything's possible.  Yeah, that

19       could be possible.

20  Q    Okay.  When you were chauffeuring Ms. Ayers

21       around, did she ever mention trying to rent

22       that home on her own?

23  A    Okay, on Tuesday, I had called and talked

24       to her to make sure things were okay and we

25       were still set for Wednesday.  And that is

1  when she told me that she would not be

2  leaving there, that she was going to take

3  over renting that when her dad left.  And I

4  asked her if she had talked to the

5  landlord, and she had not talked to him at

6  that -- but she was convinced that that's

7  what he was going to allow her to do was

8  for her to take over the house.

9 Q Okay.  So it's your belief that that was

10  her intent?

11 A Yes.

12 Q Okay.  When you were at the home the night

13  of the fire, did you notice any gas cans

14  laying around?

15 A No, I didn't.

16 Q You said you did speak with Kayla that

17  evening, though, right, after the fire?

18 A Yes, I did.

19 Q Did she smell like gasoline?

20 A No, I didn't smell gasoline.

21 Q Okay.  Did you go in that house at all that

22  night?

23 A No, I didn't.

24 Q Did Kayla tell you that -- where her injury

25  came from?

1  A    What she told me was -- when I asked her,

2       you know, what happened, she said that she

3       cut her hand on a glass that she was trying

4       to put the fire out with.  She was getting

5       the water from the washer.

6  Q    Okay.

7            MR. KUHN:  I think that's all I

8       have, thank you.

9            MR. BARR:  No further questions.

10           THE COURT:  Okay.  Anybody wish to

11      reserve the right to recall this witness at

12      all?

13           MR. BARR:  No, thank you.

14           MR. KUHN:  No, Judge.

15           THE COURT:  Thank you, ma'am, you

16      may step down, you are excused.

17           MR. BARR:  May we approach, Your

18      Honor?

19           THE COURT:  Yes, you may.

20                 - - - - - -

21           (A conference was held at the

22           bench outside the hearing of the

23           jury.)

24                 - - - - - -

25           MR. BARR:  Subject to the

1    admission of our State's Exhibits, we are

2    prepared to rest.

3              THE COURT:  Okay.  Do you want to

4    do your exhibits now?  Do you intend on

5    calling any witnesses?

6              MR. KUHN:  We do not intend.

7              THE COURT:  Why don't we do this,

8    you can say that you rest and then you can

9    say that you don't intend to call any

10   witnesses, give them lunch, and then deal

11   with your exhibits.

12             (End of conference at the bench.)

13                - - - - - - - - - -

14             THE COURT:  All right.  State of

15   Ohio, you can call any more witnesses that

16   you do have.

17             MR. BARR:  Your Honor, at this

18   time, subject to the admission of marked

19   State's Exhibits, we are prepared to rest.

20             THE COURT:  Okay, thank you.

21   State having rested subject to the

22   admission of its exhibits, Attorney Kuhn,

23   at this time you can call your first

24   witness.

25             MR. KUHN:  Your Honor -- if I can

1    just have a moment?

2              THE COURT:  Yes, you may.

3         MS. BIBLE:  Can we approach?

4              THE COURT:  Yes.

5              - - - - - -

6         (A conference was held at the

7         bench outside the hearing of the

8         jury.)

9              - - - - - -

10        MS. BIBLE:  We rest.  For the

11   Court of Appeals, he has to make his

12   motion.

13             THE COURT:  Go ahead.

14        MR. KUHN:  Judge, at this point I

15   would make my Rule 29 motion for acquittal.

16             THE COURT:  It is denied.

17        (End of conference at the bench.)

18             - - - - - - - - - -

19             THE COURT:  Okay.  At this time,

20   Attorney Kuhn, you may call any witnesses

21   that you do have.

22        MR. KUHN:  Thank you, Judge, at

23   this time we would rest.  Thank you.

24             THE COURT:  Very good.  Ladies and

25   gentlemen, you have heard all the evidence

1    you are going to hear in this case.  At

2    this point we are going to take a lunch

3    recess, and we're going to reconvene at

4    1:00.  When we reconvene, I will give you

5    some instructions of law with respect to

6    the charges and the law that applies to

7    those charges.  Then the attorneys in the

8    case will have the opportunity to make

9    closing statements to you.

10        The State will go twice because it

11   bears the burden of proof in this case.

12   After that, I will give you some

13   deliberating instructions, and then you

14   will begin your deliberating process.

15        Now you've been on my schedule for

16   the past two days, and once you go back to

17   deliberate, I'm on your schedule.  So you

18   can take as much time as you need in

19   considering this case, but that is my plan

20   for the rest of the afternoon.

21        So hopefully you will have this

22   case by at least 2:30, okay?  And then what

23   you do with it after that is up to you.

24        All right.  So we're going to take

25   a lunch break at this point, we'll

1    reconvene and pick you up in the jury room

2    again at 1:00.

3              THE BAILIFF:  All rise.

4              THE COURT:  Oh, I'm sorry.  Again,

5    I know I'm going to sound like a broken

6    record, during the lunch recess do not

7    allow anyone to talk about the case in your

8    presence, do not discuss the case among

9    yourselves.  And, again, don't form or

10   express any opinion as to your decision in

11   this case until it is finally given to you

12   after we go through the instructions and

13   closing statements, okay?

14             (Thereupon, the jury exited

15              the courtroom at 11:58 a.m.)

16             THE COURT:  Okay.

17             MR. BARR:  Sorry.

18             THE COURT:  That's okay.

19             MR. BARR:  Off the record.

20             (Thereupon, a discussion

21              was had off the record.)

22             MR. BARR:  At this time, Your

23   Honor, the State would move for

24   introduction into evidence of State's

25   Exhibit 1 and State's Exhibit 1A.  And let

1    me explain that, State's Exhibit 1 is the

2    edited copy --

3              THE COURT:  Okay.

4              MR. BARR:  -- of the statement

5    that we played in the courtroom.  And I

6    intend to introduce that for the jury.  1A

7    is the unedited version which I'm just

8    entering for appellate purposes and for the

9    record.

10              THE COURT:  Okay.

11              MR. BARR:  And, of course, the

12    envelope will not go back.  It's marked as

13    State's Exhibit 1, but it won't go back to

14    the jury.

15              THE COURT:  Okay.

16              MR. BARR:  State's Exhibit 2 which

17    are the jail calls which, if the jury wants

18    to listen to those, the bailiff will have

19    to play them for them because there's only

20    snippets of those calls that were played.

21              And then State's Exhibits 3A

22    through Q which are photographs of the

23    crime scene.  And I believe counsel for

24    Defendant has had an opportunity to review

25    those exhibits.

1                THE COURT:  Okay.  With respect to

2   the State's Exhibits, do you have any

3   objection?

4                MR. KUHN:  I don't have any

5   objection, Judge, I guess I just wanted to

6   make sure that the jury would only be

7   permitted to view the edited videotape --

8                THE COURT:  Yes.

9                MR. KUHN:  -- and only listen to

10   the very short snippets of the jail calls?

11                THE COURT:  And so it's my

12   understanding, with respect to Exhibit 2,

13   there's only two phone calls?

14                MS. SCHNELLINGER:  Yes, Your

15   Honor.

16                THE COURT:  The only two there

17   were played.  That's all there is on that

18   tape?

19                MS. SCHNELLINGER:  Oh, no, no, no,

20   there's multiple phone calls on there, but

21   only two were played, and only short

22   portions of them.

23                THE COURT:  And those would be the

24   only portions that would be permitted to be

25   played.

1       MR. BARR:  Yes.  And we can give

2   the bailiff specific instructions as to

3   where those start and where they stop so

4   that you can pull them up and identify them

5   by date and time.

6       THE COURT:  And they're easily

7   identifiable?

8       MR. BARR:  Yes, yes.

9       THE COURT:  Okay.  She's shaking

10  her head like she knows what she's doing.

11  That's okay.

12      THE BAILIFF:  I'm a lawyer, not a

13  computer technologist.

14      THE COURT:  I know.  You're a Jack

15  of all trades, you do it all.

16      All right.  But then no objections

17  to State's Exhibit 1 and 1A, will both be

18  admitted.  However, the jury will only be

19  given State's Exhibit 1.  State's Exhibit 2

20  and State's Exhibits 3A through 3Q will

21  also be admitted.

22      All right.  Attorney Kuhn?

23      MR. KUHN:  Thank you, Judge.  Just

24  at this time, having rested, we would renew

25  our Rule 29(A) motion for acquittal.

1      THE COURT:  And that motion will

2   be denied.

3      MR. KUHN:  Thank you, Judge.

4      THE COURT:  Do you have any

5   exhibits that you want to introduce?

6      MR. KUHN:  No, I don't believe so,

7   Judge, thank you.

8      MS. BIBLE:  You need those,

9   because you marked those.

10      THE COURT:  Well, if you don't

11   want them to go back to the jury, I guess

12   they don't have to.

13      MR. BARR:  Well, but she needs

14   them for the appellate purposes.

15      (Thereupon, a discussion

16          was had off the record.)

17      THE COURT:  I have A, D, and E.

18      MR. KUHN:  I'm sorry, what was it,

19   Judge?

20      THE COURT:  I have A, D, and E.

21      MR. KUHN:  A, D, and E?

22      THE COURT:  Does that jibe with

23   what you have?

24      MR. KUHN:  Here's E.

25      MR. BARR:  The other two were from

1    the fire report.

2              MR. KUHN:  Right.

3              THE COURT:  And if, for whatever

4    reason, you want to introduce that for

5    whatever potential -- not obviously for the

6    jury, but if you want to make it part of

7    the record, for whatever purpose you may

8    eventually have for it, that's fine.

9              MR. KUHN:  Have to find them

10   first.

11             MR. BARR:  I gave them back to

12   you; didn't I?

13             MR. KUHN:  I'm sure you did.

14             THE BAILIFF:  Do you want me to

15   get these ready?

16             THE COURT:  Yes.  And during the

17   lunch break, it is our intention to make

18   copies of the jury instructions.  Have you

19   had an opportunity to take a look at those?

20   Do you have any issues with those?

21             MS. BIBLE:  No.

22             THE COURT:  The only changes we

23   made was really to change the name, the

24   Judge's name, the item in the instruction

25   which respect to a witness's criminal

1   conviction, and change the date on the

2   verdict form as well as just change the

3   layout a little bit to incorporate with

4   respect that I do them a little differently

5   than Judge Brown, and I instruct first and

6   then give you the opportunity to do your

7   closing statement, okay?

8           MS. BIBLE:  Okay.

9           THE BAILIFF:  I'm going to fix

10  this on page 6, it fell outside the line,

11  and then make copies.

12          THE COURT:  Very good.  Okay.

13          MR. KUHN:  Back at 1, is that the

14  idea?

15          THE COURT:  Back at 1.

16          MR. KUHN:  Okay, thank you.

17          THE COURT:  If you just want to

18  make your copies --

19          MR. KUHN:  Sounds great, thank

20  you.

21                  - - - - - -

22          (Thereupon, a luncheon recess was

23          taken at 12:07 p.m. with the

24          proceedings resuming at

25          1:05 p.m.)

1                              - - - - - -

2                         AFFERNOON SESSION

3                         THE COURT:  With respect to the

4        jury instructions, does anybody have any

5        additions, corrections, changes that they

6        wish to make?

7                         MR. BARR:  No, Your Honor.

8                         MR. KUHN:  No, thank you, Judge.

9                         THE COURT:  And before we go get

10       the jurors, if you could just double-check

11       what we have up here to go back to the jury

12       so that way we know that only the things

13       that are supposed to go back are going

14       back, okay?

15                         MS. SCHNELLINGER:  I put three or

16       four over here.

17                         (Thereupon, the jury reentered

18                         the courtroom at 1:10 p.m.)

19                         THE COURT:  All right.  Thank you,

20       you may be seated.

21                         The parties having rested in this

22       matter, you've heard all of the evidence

23       that you are going to hear in this case.

24       At this time I am going to read to you the

25       instructions of law that apply to this

1    case.  After that, you will have the

2    opportunity to hear the closing statements

3    by the parties, which will be followed by

4    my instructions with respect to your

5    deliberations in this matter.

6         You all have been provided a copy

7    of the jury instructions, they should have

8    all been on your chairs.  If there

9    isn't -- if there is someone out there who

10   hasn't gotten a copy, just let us know and

11   we'll get you a copy.

12        Again, I have provided these

13   copies with you so you don't have to sit

14   here and listen to me.  You can read along,

15   if you choose to.  If you don't, that's

16   fine, too, okay?

17        Members of the Jury:  You have

18   heard the evidence and the arguments of

19   counsel.  It is now my duty to instruct you

20   on the law which applies in this case.  The

21   Court and the jury have separate functions.

22   You decide the disputed facts and the Court

23   provides the instructions of law.  It is

24   your sworn duty to accept these

25   instructions and to apply the law as it is

405

now given to you.  You are not permitted to change the law, nor to apply your own conception of what you think the law should be.

Indictment.  This case began with the filing of an indictment.  The indictment informed the Defendant that she had been charged with certain offenses.  The fact that it was filed may not be considered by you for any other purpose.  The plea of not guilty is a denial of the charges and puts in issue all of the essential elements of each offense.

Presumption of innocence.  The Defendant is presumed innocent until her guilt has been established beyond a reasonable doubt.  The Defendant must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offenses charged in the indictment.

Reasonable doubt.  Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly

1  convinced of the truth of the charge.

2  Reasonable doubt is a doubt based on reason

3  and common sense.  Reasonable doubt is not

4  mere possible doubt, because everything

5  relating to human affairs or depending on

6  moral evidence is open to some possible or

7  imaginary doubt.  Proof beyond a reasonable

8  doubt is proof of such character that an

9  ordinary person would be willing to rely

10 and act upon it in the most important of

11 his or her own affairs.

12       If after a full and impartial

13 consideration of all the evidence, you are

14 firmly convinced of the truth of the

15 charge, the State has proved its case

16 beyond a reasonable doubt.  If you are not

17 firmly convinced of the truth of the

18 charge, you must find the Defendant not

19 guilty of such charge.

20       Evidence.  What is evidence?

21 Evidence is all the testimony received from

22 the witnesses, the exhibits admitted during

23 the trial, and any facts which the Court

24 requires you to accept as true.

25       Evidence may be direct or

circumstantial or both. Direct evidence is the testimony given by a witness who has seen or heard the facts to which he or she testifies. It includes exhibits admitted into evidence during the trial.

Circumstantial evidence is the proof of facts or circumstances by direct evidence from which you may reasonably infer other related or connected facts, which naturally and logically follow, according to the experience of mankind.

To infer, or to make an inference, is to reach a reasonable conclusion of fact which you may, but are not required to, make from other facts which you find have been established by direct evidence. Whether an inference is made rests entirely with you.

Where the evidence is both direct and circumstantial, the combination of the two must satisfy you of the Defendant's guilt beyond a reasonable doubt as to the charge.

Direct evidence and circumstantial evidence are of equal weight. The evidence

1   does not include the indictment, the

2   opening statements or closing arguments of

3   counsel.  The opening statements and

4   closing arguments of counsel are designed

5   to assist you.  They are not evidence.

6          Objections.  Statements or answers

7   that the Court struck or which you were

8   instructed to disregard are not evidence

9   and must be treated as though you never

10  heard them.

11         You must not speculate as to why

12  the Court sustained the objection to any

13  question or what the answer to such

14  question might have been.  You must not

15  draw any inference or speculate on the

16  truth of any suggestion included in a

17  question that was not answered.

18         Credibility.  You are the sole

19  judges of the facts, the credibility of the

20  witnesses, and the weight of the evidence.

21         To weigh the evidence, you must

22  consider the credibility of the witnesses.

23  You will apply the tests of truthfulness,

24  which you apply in your daily lives.

25         These tests include:  The

appearance of each witness upon the stand;
the witness's manner of testifying; the
reasonableness of the testimony; the
opportunity the witness had to see, to
hear, and to know the things concerning
which the witness testified; the witness's
accuracy of memory; the witness's
motivation, that is, what did a particular
witness have to gain or lose by testifying
as he or she did; the witness's frankness,
or lack of it; intelligence, interest, and
bias, if any, together with all the facts
and circumstances surrounding the
testimony.  Applying these tests, you will
assign to the testimony of each witness
such weight as you deem proper.

You are not required to believe
the testimony of any witness simply because
he or she was under oath.  You may believe
or disbelieve all or any part of the
testimony of any witness.  It is your
province to determine what testimony is
worthy of belief, and what testimony is not
worthy of belief.

The testimony of one witness

1    believed by you is sufficient to prove any

2    fact.  Also, a discrepancy in a witness's

3    testimony or between his or her testimony

4    and that of others, if there are any, does

5    not necessarily mean that you should

6    disbelieve the witness, since people

7    commonly forget facts or recollect them

8    erroneously after the passage of time.  You

9    are all certainly aware of the fact that

10   two persons who are witnesses to an

11   incident may often see and hear things

12   differently.  In considering a discrepancy

13   in a witness's testimony, you should

14   consider whether such discrepancy concerns

15   an important fact or a trivial one.

16           Testimony was introduced that a

17   witness was convicted of a criminal act.

18   This testimony may be considered for the

19   purpose of helping you test the credibility

20   or weight to give to his or her testimony.

21   It cannot be considered for any other

22   purpose.

23           It is not necessary that the

24   Defendant take the stand -- take the

25   witness stand in her own defense.  She has

1    a constitutional right not to testify.  The

2    fact that the Defendant did not testify

3    must not be considered for any purpose.

4             Expert witness.  A certain witness

5    testified as an expert and gave an opinion.

6    Normally, a witness may not express an

7    opinion.  However, a person who follows a

8    profession or special line of work may

9    express an opinion because of his or her

10   education, knowledge, and experience in

11   that particular field.  That testimony is

12   admitted for whatever assistance it may

13   provide to help you to arrive at a just

14   verdict.

15            Questions have been asked in which

16   the expert witness was permitted to assume

17   that certain facts were true and to give an

18   opinion based upon that assumption.  You

19   must decide whether the assumed facts on

20   which the expert based his or her opinion

21   are true.  If any assumed fact was not

22   established by the greater weight of the

23   evidence, you will decide the effect of

24   that failure on the value of the opinion of

25   the expert.

1          Questions have also been asked of

2    the expert witness after he or she had

3    disclosed the underlying facts or data.  It

4    is for you, the jury, to decide if such

5    facts or data on which he or she based his

6    or her opinion are true, and you will

7    decide the weight to give such evidence.

8          As with other witnesses, upon you

9    alone rests the duty of deciding what

10   weight should be given to the testimony of

11   the expert witness.  In determining that

12   weight, you should take into consideration

13   the expert's skill, experience, veracity,

14   and knowledge of the facts of this case.

15   Also apply the usual rules for testing

16   credibility and determine the weight to be

17   given to that testimony.

18          Charges.  Count One, Aggravated

19   Arson, Revised Code Section 2909.02(A)(2).

20          The Defendant is charged with

21   Aggravated Arson.  Before you can find the

22   Defendant guilty, you must find beyond a

23   reasonable doubt that on or about the 3rd

24   day of October, 2012, in Stark County,

25   Ohio, Kayla Jean Ayers, by means of fire or

explosion, knowingly caused physical harm

to 185 26th Street Southeast, Massillon,

Ohio, an occupied structure.

Definitions:

Time:  That the offense charged

took place on or about the 3rd day of

October, 2012.  It is not necessary that

the State prove that the offense was

committed on the exact day as charged in

the indictment.  It is sufficient to prove

that the offense took place on a date

reasonably near the date claimed.

Venue:  That the offense charged

took place in Stark County, Ohio.  The

right of this Court to try the Defendant

depends upon proof that the offense was

committed in this county.

Knowingly:  A person acts

knowingly, regardless of her purpose, when

she is aware that her conduct will probably

cause a certain result or she is aware that

her conduct will probably be of a certain

nature.  A person has knowledge of

circumstances when she is aware that such

circumstances probably exist.

1          Since you cannot look into the

2     mind of another, knowledge is determined

3     from all the facts and circumstances in

4     evidence.  You will determine from these

5     facts and circumstances whether there

6     existed at the time in the mind of the

7     Defendant an awareness of the probability

8     that she was causing physical harm to 185

9     26th Street Southeast, Massillon, Ohio, an

10    occupied structure.

11         Cause:  The State charges that the

12    act or failure to act of the Defendant

13    caused physical harm to property.  Cause is

14    an essential element of the offense.  Cause

15    is an act or failure to act which in a

16    natural and continuous sequence directly

17    produces the physical harm to the property,

18    and without which it would not have

19    occurred.

20         The Defendant's responsibility is

21    not limited to the immediate or most

22    obvious result of the Defendant's act or

23    failure to act.  The Defendant is also

24    responsible for the natural and foreseeable

25    consequences or results that follow, in the

1    ordinary course of events, from the act or

2    failure to act.

3         Physical harm to property:

4    Physical harm to property means any

5    tangible or intangible damage to property

6    that, in any degree, results in loss to its

7    value or interferes with its use or

8    enjoyment.  Physical harm to property does

9    not include wear and tear occasioned by

10   normal use.

11        Occupied structure:  Occupied

12   structure means any house, building,

13   outbuilding, watercraft, aircraft, railroad

14   car, truck, trailer, tent, or other

15   structure, vehicle, or shelter, or any

16   portion thereof, which at the time is

17   occupied as the permanent or temporary

18   habitation of any person, whether or not

19   any person is actually present.

20        Count two, Endangering Children,

21   Revised Code Section 2919.22(A).

22        The Defendant is charged with

23   Endangering Children.  Before you can find

24   the Defendant guilty, you must find beyond

25   a reasonable doubt that on or about the 3rd

day of October, 2012, in Stark County,

Ohio, Kayla Jean Ayers, being the parent of

three children under eighteen years of age,

created a substantial risk to the health or

safety of such children by violating a duty

of care, protection, or support.

Definitions:

Time:  That the offense charged

took place on or about the 3rd day of

October, 2012.  It is not necessary that

the State prove that the offense was

committed on the exact day as charged in

the indictment.  It is sufficient to prove

that the offense took place on a date

reasonably near the date claimed.

Venue:  That the offense charged

took place in Stark County, Ohio.  The

right of this Court to try the Defendant

depends upon proof that the offense was

committed in this county.

Recklessly:  A person acts

recklessly when, with heedless indifference

to the consequences, she perversely

disregards a known risk that her conduct is

likely to cause a certain result or be of a

certain nature.  A person is reckless with respect to circumstances when, with heedless indifference to the consequences, she perversely disregards a known risk that such circumstances are likely to exist.

Risk:  Risk means a significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist.

Child:  Child means a person under eighteen years of age, or a mentally or physically handicapped person under twenty-one years of age.

Substantial risk:  Substantial risk means a strong possibility as contrasted with a remote or even a significant possibility, that a certain result may occur or that certain circumstances may exist.

Conclusion.  If you find that the State proved beyond a reasonable doubt all the essential elements of any one or both of the offenses charged in the separate counts of the indictment, your verdict must

1   be guilty as to such offense or offenses

2   according to your findings.

3          Not guilty:  If you find that the

4   State failed to prove beyond a reasonable

5   doubt any one of the essential elements

6   or -- of any one or both of the offenses

7   charged in the separate counts in the

8   indictment, your verdict must be not guilty

9   as to such offense or offenses according to

10  your findings.

11         Consider counts separately.  The

12  charges set forth in each count in the

13  indictment will constitute a separate and

14  distinct matter.  You must consider each

15  count and the evidence applicable to each

16  count separately and you must state your

17  findings as to each count uninfluenced by

18  your verdict as to the other counts.  The

19  Defendant may be found guilty or not guilty

20  of any one or all of the offenses charged.

21         Punishment and sympathy.  You may

22  not discuss or consider the subject of

23  punishment.  Your duty is confined to the

24  determination of whether the Defendant is

25  guilty or not guilty.  In the event you

1        find the Defendant guilty, the duty to

2        determine the punishment is placed, by law,

3        upon the Court.

4               You must not be influenced by any

5        consideration of sympathy or prejudice.  It

6        is your duty to carefully weigh the

7        evidence, to decide all disputed questions

8        of fact, to apply the instructions of the

9        Court to -- to apply the instructions of

10       the Court to your findings, and to render

11       your verdict accordingly.  In fulfilling

12       your duty, your efforts must be to arrive

13       at a just verdict.  Consider all the

14       evidence and make your findings with

15       intelligence and impartiality, and without

16       bias, sympathy or prejudice, so that the

17       State of Ohio and the Defendant will feel

18       that their case was fairly and impartially

19       tried.  If, during the course of the trial,

20       the Court said or did anything that you

21       consider an indication of the Court's view

22       on the facts, you are instructed to

23       disregard it.

24               At this time you're going to hear

25       the closing arguments of counsel, with the

1     State of Ohio going first, proceeded by

2     counsel for the Defendant.  And then the

3     counsel for the Plaintiff, the State of

4     Ohio, will have the opportunity to

5     readdress you one more time to make a

6     rebuttal argument.

7          At this time, Attorney

8     Schnellinger, you may give your closing

9     argument.

10         MS. SCHNELLINGER:  Thank you, Your

11    Honor.  Your Honor, I would like to reserve

12    the ten minute rebuttal time.

13         THE COURT:  Yes.

14         MS. SCHNELLINGER:  Your Honor,

15    counsel.  Ladies and gentlemen of the jury,

16    thank you for your time and attention thus

17    far.  What I would like to do is break down

18    the charges before you, the elements, and

19    then the facts that support those elements.

20         Let's start with the easy part,

21    the date and the venue.  There's been no

22    question that it was October 3rd, 2012, no

23    question this happened at 185 26th Street

24    Southeast, Massillon, Stark County, Ohio.

25         Let's move on specifically to

Aggravated Arson.  Defendant knowingly caused physical harm to property, an occupied structure, by means of fire or explosion.  No question there was fire.  No question there was physical harm.  The pictures show you the physical harm.  You can see the damage to the beams, you can see the damage to the wall, you saw the damage to the ceiling.

The house doesn't have to be burned to the ground, doesn't have to be anywhere close to physical harm.  The damage to the beams, damage to the ceiling, physical harm.

Occupied structure.  It's a habitation.  Jeff Ayers lived there with his family, the Defendant lived there with her family.  It's an occupied structure.

The main question for the Aggravated Arson is who started the fire.  But before we go to who, let's go to the second count.  Again, date and location are the same.  Recklessly, her Honor told you, with heedless indifference to the consequences.  Being a parent, guardian,

1   custodian of three children under eighteen,

2   a substantial risk to the health or safety

3   by violating a duty of care, protection, or

4   support.

5       No question the Defendant is a

6   parent to three children.  Bubba who was in

7   the home at the time of this fire, the

8   three children that were -- or two children

9   that were returning home.  But most

10   importantly, that child that was in that

11   house when that fire was lit.

12       Duty of care.  Common sense, as a

13   parent you have a duty of care to protect

14   your children from harm.  Either by

15   lighting the fire, letting that child stay

16   in the house, letting that child stay in

17   the house for ten minutes or more, it's

18   violating a duty of care.

19       Let's go back to who.  Approach

20   this like Inspector Winters, the arson

21   investigator, approached this.  Talked

22   about the cause and origin of this fire.

23   The origin, the mattress, started on a

24   mattress.  And Inspector Winters explained

25   where on this mattress.  There are two

separate and distinct points of origin.
I'll point those out to you again.  This
one right here (Indicating).  And then you
have a second one right there (Indicating).
Two separate and distinct points.

We have the origin, let's move on
to cause.  Inspector Winters, an expert in
arson investigations, described his
methods, what he ruled out.  What did he
rule out?  He ruled out electrical.  He
ruled out any accelerants.  Why?  Because
there's evidence that neither one of those
started the fire.  He ruled out accidental.

He explored all the possibilities,
and he specifically looked at whether or
not a cigarette could have started this.
Why did he look at that?  Well, he saw the
cigarette and the ashtray on the nightstand
in that room so he specifically went above
and beyond and looked at that as an option.

He explained that a cigarette that
had been left burning on a mattress, there
would still be remnants, would still be
there, he still could have found it.  He
found nothing.

1    I'll also remind you that common

2  sense, your common sense, doesn't fly out

3  the window when you walk in this courtroom.

4  If you fall asleep and you drop a cigarette

5  on a mattress, it starts a fire, right?

6  It's common sense.  It doesn't jump and

7  start another fire, it's not possible.

8    There are two separate and

9  distinct origins here according to the

10  expert, according to the pictures.  Fire

11  doesn't jump like that.

12    So everything was ruled out except

13  incendiary, and that was to a reasonable

14  degree of scientific certainty.  So we

15  ruled out all the other causes.  The only

16  remaining cause is an open flame; match,

17  lighter, a torch.

18    Let's move on to individuals.  We

19  can rule out a lot of individuals.  In

20  fact, we can rule out all but one.  Jeff

21  Ayers, they were gone.  Everyone says they

22  were gone.  They're in West Virginia when

23  they find out about the fire.

24    Brennan Scott, he was gone.  The

25  last time he was at that house was around

5:30. Who says that? Brennan said that, Jennifer Conley says that, the Defendant said that.

The other children, gone on the bus, went to church.

The only ones there? The Defendant and Bubba, the three-year-old son. And that three-year-old son was upstairs when that fire started. There is no physical evidence placing him at that fire, none. Defendant herself said, I had to go upstairs to find my son.

Now, Defendant told a lot of stories. Why is this more credible than the other ones? She didn't have time to manufacture it. Captain Annen on the stand said, I asked how you cut your hand. That's what she said -- he said, I asked the Defendant how she cut her hand. She said, I cut my hand when I was running upstairs to find my son.

Now, remember, the Defendant had evidence of being around fire. She had soot, she had soot in her nose. Brennan had nothing -- Bubba had nothing. No

1   evidence he was exposed to fire, no

2   evidence he was exposed to smoke, he had no

3   smoke inhalation, he was not under any kind

4   of distress whatsoever.  But we know he was

5   in a burning house for ten minutes.  We

6   know that he was at substantial risk to his

7   health and safety.  We know that.

8           Inspector Winters talked to Bubba,

9   examined him at the scene.  And he kept

10  investigating, looking for the person that

11  started that fire.  What does that tell

12  you?

13          And, again, common sense.  You

14  believe that first story that the Defendant

15  said, "Bubba started the fire," he would

16  have to hold a lighter like you remember

17  Inspector Winters demonstrating how he had

18  to hold that lighter?  He had to hold the

19  lighter, ignite the mattress, then go and

20  start a second fire, the whole time no

21  soot, no smoke, not getting burned?

22  Impossible.  They all told you, the

23  firefighters told you, he would have

24  something on him because if he was exposed

25  to that fire, that smoke, he would have

1   something on him.  He had nothing.  Because

2   remember when -- he has to start that

3   second fire, the first point of origin is

4   burning.

5        Only one person points the finger

6   at the three-year-old little boy, and

7   that's the Defendant.  One person.  No

8   other evidence supports that.  In fact, all

9   the evidence supports Bubba was nowhere

10   near it.

11        And why would a mother accuse her

12   three-year-old son of starting a fire?  She

13   knows he's not going to get in trouble,

14   he's three.  Place the blame on him, he's

15   three.

16        Now many people repeated those

17   words, "Bubba started the fire," but all

18   that origin -- all that came from was the

19   Defendant.  But if you recall, she only

20   said Bubba started the fire on the night of

21   the fire.  When she learned that didn't

22   make sense, the evidence didn't support

23   that, she changed her story; didn't she?

24   Bubba started the fire.  Then she learned,

25   yeah, that's not going to work, I assume

1    Bubba started the fire.  Then she said,

2    Well, I don't have anything to support

3    that.

4         What did she switch to?  I fell

5    asleep.  Accidental.  Evidence supports the

6    exact opposite of that.  Well, then what

7    did she go to?  My boyfriend, Brennan,

8    started the fire, or my dad started the

9    fire.

10        Only one person remains that could

11   have started this fire, and that's the

12   Defendant.  She was present at the fire,

13   she's the only person that had any physical

14   evidence about being around the fire; soot

15   in her nose, soot on her person.  Only one.

16        We need to talk about the behavior

17   and the lies told by the Defendant.  She's

18   a self-proclaimed fanatical Baptist, she

19   doesn't go to church the day of the fire.

20   The day of the fire was a Wednesday, she

21   didn't go to church.  Doesn't answer the

22   door when Karen comes to get her.  Clearly

23   a planned arrangement, doesn't answer the

24   door.

25        You heard on the tape, well, she

1    didn't go to church that night because
2    those other kids were there, the boss's
3    kids were there.  Well, she doesn't answer
4    the door and tell Karen, I can't go to
5    church, I'm sorry, I got these other kids
6    there.  She doesn't answer the door.  Why
7    doesn't she say that that day?  Because
8    those kids were not there.  Jennifer Conley
9    and Brennan both said those kids were gone
10   by the time the church bus got there.
11   Karen arrived after the church bus.  Can't
12   say that.
13        What she said on the taped
14   statement, complete and total fabrication
15   because the kids were gone by the time she
16   was supposed to go to church.  And they
17   were gone for at least an hour.
18        She could have easily gone to
19   church that night.  Why didn't she?  Well,
20   she was going to start that fire that
21   night.
22        Let's talk about her blaming
23   everybody else.  We already talked about
24   Bubba.  Let's talk about what she says
25   originally.  She says, I'm at the dryer,

1   I'm doing laundry, Bubba's over by the

2   mattress, I turn around and I see the fire

3   and I see him standing there.  This is the

4   picture taken if you're standing at the

5   dryer.  You cannot see that mattress that

6   burned.  It's impossible.

7           And she agreed -- if you listen to

8   the taped statement, she agrees, oh, you're

9   right, I can't see that.  So what does she

10  do?  Well, I assume that Bubba started the

11  fire.  Based on what?  Nothing.

12          Well, then when that gets flushed

13  out a little bit, then she says, I fell

14  asleep.  Inspector Winters explained to you

15  how that's impossible.  Then she moves on

16  to Brennan or her father.  Neither one of

17  them were there during this time period the

18  fire was started.

19          Why the multiple stories?  Got to

20  blame someone; don't you?  You have to

21  shift the blame to someone else.  If you're

22  guilty, got to point your finger at

23  somebody else.  But the truth doesn't have

24  different versions and the truth doesn't

25  get confused, and the truth doesn't blame

1     innocent people.

2            And let's not forget what she

3     promised her father, what she threatened

4     her father, If you leave me, I'll burn this

5     house down.  I believe she said, I'll burn

6     this mother fucking house down.  The father

7     was leaving, that day he went to West

8     Virginia, the day of the fire.

9            Now this is not like when you say,

10    Oh, my God, I'm going to kill you.  Or, I'm

11    going to kick your butt.  Those things

12    don't happen.  It's not the same thing.

13    This was a specific threat.  And this

14    wasn't, Dad, if you leave me, I will never

15    talk to you again.  Or, Dad, if you leave

16    me, you will never see your grandchildren

17    again.  This is, she threatens to burn the

18    house down and she tries to do it.

19    Completely different.  I make a threat and

20    I follow through.

21           Her statement concerned her

22    father, her own father, so much, it scared

23    him.  He told you that.  He's going to

24    leave his own house.

25           And then you have Karen Ball.

1     Karen Ball had such an uneasy feeling that

2     night when she went to pick up the

3     Defendant that she left church and went

4     back to the house.  Karen wasn't supposed

5     to be there, was she?  She wasn't expected

6     there, she wasn't supposed to be there.

7     You heard how much contact she had with the

8     Defendant.  She was supposed to pick her

9     up, take her to church that day.  She

10    wasn't supposed to come back.  She's the

11    only reason the fire department was called,

12    she's the reason the Defendant left the

13    house with the three-year-old because thank

14    God Karen came back.

15         But remember Karen had to knock on

16    doors and call for Kayla for ten minutes.

17    Ten minutes the Defendant stayed in that

18    house that was burning.  How do we know it

19    was burning?  Because when Karen came down

20    the street, she could see that it was

21    burning.  The house was on fire.

22         Kayla said at some point, I

23    grabbed my son and I ran out.  She didn't

24    run out the closest exit, did she?  No, she

25    went upstairs and eventually exits out the

1  kitchen door which is not the closest exit
2  if you're leaving the basement.
3          We know she's upstairs.  What is
4  she doing?  Blood everywhere, a pool of
5  blood on the table.  Why didn't she exit
6  that first door?
7          Again, the truth doesn't have
8  versions, it doesn't.  The Defendant is the
9  only one who threatened to burn that house
10  down.  The Defendant is the only one with
11  the opportunity.  She's the only one with
12  the ability to start this fire.  She's the
13  only one in that basement.
14          Two other things I would like to
15  point out to you.  One, the Aggravated
16  Arson is a knowingly act.  Her Honor
17  defined that for you, being aware that your
18  conduct may cause a certain -- will
19  probably cause a certain result.  I'll
20  point out to you the two separate points of
21  origin.  The knowingly act, it's not an
22  accident.
23          The Endangering Children is a
24  reckless standard, it's different.  She
25  doesn't have to knowingly endanger her

1   children, she just has to have indifference
2   to that fact.  So I want to point out the
3   difference.
4        The other important thing I want
5   to point out to you is when you consider
6   the credibility of the witnesses that were
7   on the stand, what was their motive to lie
8   to you, to be dishonest to you?  I submit
9   to you, there is none.  Karen and Jennifer,
10  what do they have to gain?  Jeff, you saw
11  him on the stand, he did not want to tell
12  you those ugly threats that his daughter
13  made to him, he didn't.  He wept.  He
14  didn't want to tell you those things.
15  Jason had everything to lose because he's
16  exposed in open court he's having an affair
17  on his wife, or had an affair on his wife
18  who didn't know.  And he tells you, I still
19  care about her, but he came here.
20       What does the Defendant have to
21  gain?  Everything.  Talk about
22  corroboration, State's witnesses, all of
23  them, they corroborated each other.  They
24  didn't conflict.  You listen to Brennan,
25  you listen to Jennifer, you listen to

1    Karen, consistent.  Defendant's own

2    statements are not even consistent with

3    themselves.  You can judge their

4    credibility on that.

5         I'm going to ask you to review the

6    testimony, the evidence, the law, and

7    follow your oath that was given to you, and

8    come back with a finding of guilty of one

9    count of Aggravated Arson and one count of

10   Endangering Children.  Thank you.

11        THE COURT:  Thank you.

12        Mr. Kuhn, at this time you may

13   give your closing argument.

14        MR. KUHN:  Thank you, Judge.

15        Opposing counsel.  Ladies and

16   gentlemen of the jury, thank you for

17   bearing with us.  It's been sort of a long

18   process here, and we do appreciate that.

19   I'll try not to take too much time, but I

20   do view this as being a very important part

21   of the process where I get to review some

22   things that I think were important through

23   the testimony that we heard and some of the

24   different exhibits that the State of Ohio

25   has shown us.

1    And the State of Ohio cannot prove
2  their case here today.  They cannot prove,
3  they have not proven, that Kayla Ayers
4  acted knowingly when this fire happened at
5  her residence.  Sometimes an accident is
6  just an accident.  And it is very
7  unfortunate -- I think it's a miracle that
8  no one was hurt aside from Kayla, Kayla was
9  the only person injured.  And I think the
10  arson investigator has a job where he
11  needs, every once in a while, to find an
12  arson.  If he never finds an arson, there
13  is no need to have an arson investigator.
14  So he's got to round up an arsonist every
15  once in a while.

16    I think he told us in the five
17  years he's been in Massillon, he's
18  investigated about 30 suspected arson
19  cases.  Every couple of months he
20  investigates one.

21    There is no way to know exactly
22  what happened the night of the fire, okay?
23  We've seen the photos.  There was a fire,
24  that's obvious.  How it started, we cannot
25  tell.  The arson investigator, Mr. Winters,

told us it was his opinion of what may have
happened.  It was his opinion that there
are two points where a fire started.  He
even was able to tell us which one started
first.  Think about whether you can
wholeheartedly believe that, or was that
just something we cannot know.  Think about
these things when you're deliberating.

I'd like to take you through some
of the other testimony we've heard.  I
think the first witness we heard from was
Captain Annen.  Seemed like a nice enough
fellow.  And actually that's something else
I would like to comment on, these folks
weren't lying when they came in here.

Mr. Winters wasn't lying, it is
his opinion.  Okay, I'm not saying he's a
liar when he comes in and says that's his
opinion, but it's not absolutely certain.
Okay, if it was, we wouldn't have a jury,
we wouldn't -- he would be the ultimate
authority on whether an arson has been
committed or not.  There would be no
criminal justice system, it would just be
Reggie Winters, arson decider, that would

1    be the end of it, okay.

2         Captain Annen, he comes in here,

3    he doesn't lie to us.  What he told us, he

4    thought he recalled Kayla slipped running

5    up the stairs.  When I cross-examined him,

6    I said, Isn't it possible she told you she

7    slipped in the basement and cut her hand on

8    the glass?  He said, Yeah, that is

9    possible.  Okay, he's not lying about any

10   of that.

11        He said he didn't observe any gas

12   cans, lighter fluid, anything incriminating

13   laying about, things you might expect to

14   find at the scene of an arson, okay?

15        I think next we had Firefighter

16   Canfora.  Again, seemed like a pleasant

17   fellow.  He said he's just a firefighter,

18   he doesn't do the investigating.  I asked

19   him if he had seen anything suspicious

20   laying around.  No, didn't see anything.  I

21   think I asked him if he had seen any smoke

22   detectors.  He didn't recall.  He said

23   they're instructed not to disturb the

24   scene.  So if there was something laying

25   around, Investigator Winters would have

spotted it at that time.

Then we had Officer Ricker from the Massillon Police Department.  Once again, seemed like a pretty nice guy.  He wasn't lying to us either.  We saw the very long, somewhat tedious, video.  I was about ready to confess that I had started the fire just to end the video.

MR. BARR:  Objection to what Mr. Kuhn was ready to do, Your Honor.

THE COURT:  Sustained.

MR. KUHN:  We watched the video, okay?  In the video, Officer Ricker says, Kayla, I don't believe you purposely set this fire, I think it was a result of being careless.  I asked him right over there, I asked him, I said, Sir, were you lying in the video when you say that?  He said, No, I wasn't.

This was an accident.  Very unfortunate, but it was not purposely set, it was not knowingly set, it was not aggravated arson, okay?

Firefighter Canfora also indicated that when we entered the basement, there

were no light fixtures that he noticed.
There were no lights on.  I think they
indicated it was nighttime, it was dark
out, probably smoky as well.  I asked him
if he had a mask on.  How could he see, did
he have a flashlight on his helmet?  He
said he had a flashlight attached to his
coat, but really the light was coming from
the fire.  Okay, so somehow when he entered
the basement, he could see the glow of the
fire, okay?  But yet when Kayla, in the
video, indicated that somehow she turned
and noticed the fire, we're to believe that
that's impossible.  Couldn't happen because
as we can see in the picture here, the
furnace is in the way, the furnace and the
water tank, okay?  But somehow the
firefighters could locate it, they could
see the glow, that's not weird.

Throughout the video we watched,
Kayla's story doesn't change.  The story
is, I didn't do this.  That's the story, I
did not do this.  That does not change.
She says, I did not purposely set the house
on fire.  She believed Bubba did.  Okay.

1    After, what was it, an hour or so, okay,

2    you know, I guess it's possible maybe I did

3    fall asleep.  You know, I guess if you

4    think that's more likely, okay, you know,

5    maybe I'm mistaken here, maybe I was

6    careless.

7         Officer Winters, Inspector

8    Winters, comes in.  He said he was on the

9    scene almost immediately after the fire.

10   He did his thorough inspection.  He even

11   went to the hospital to meet up with Kayla

12   at the hospital to talk to her.  The story

13   is the same thing, fire started don't know

14   how, getting water out of the washing

15   machine, running over, dumping it, running

16   back, slip, fall, cut hand.  It's the same

17   story.  It's the story she tells the

18   neighbor, it's the story she tells the

19   church lady, it's the story she tells

20   Officer Muntean, Mr. Winters, Mr. Ricker.

21   It's the same story every time, it doesn't

22   change.

23        Inspector Winters talked to Kayla

24   he said 40 minutes after she was

25   transported to the hospital.  He didn't

1    report smelling any marijuana, he didn't

2    report any alcohol smell.  Neither did

3    Officer Ricker, neither did any of the

4    firefighters we heard from.

5         Nobody recalled seeing any

6    gasoline cans laying around.  Nobody

7    reported seeing any empty lighter fluid

8    jugs.  Nobody really even reported seeing

9    any lighters laying around, okay?

10        But when I asked Investigator

11   Winters about whether Bubba could, in fact,

12   use a lighter, was he familiar with them or

13   is he too little?  He held his hands up and

14   went like this (Indicating) and indicated

15   that Bubba did, in fact, light the lighter

16   and he did know what they were, okay?

17        We then asked the neighbor lady,

18   Jennifer, again, seems like a very nice,

19   helpful lady, Is Bubba familiar with the

20   lighter?  Yes, he is.  Have you seen Bubba

21   holding a lighter?  Yes, I have.  When he

22   sees one, he picks it up and carries it to

23   me.

24        Quite a bit was made of the amount

25   of soot that was not found on Bubba, but

1    that was found on Kayla, okay?  Captain

2    Annen seemed to think that it might be a

3    little bit weird that Bubba did not have

4    substantial soot on him.  Whoever would

5    have set this fire would have had

6    substantial soot on them.  Kayla didn't

7    have that.  Investigator Winters checked

8    her out, he checked her arms and her hands,

9    no soot at all.  Checked her nostrils,

10   light soot.  Oh, yeah, she was in the fire,

11   I would think there would be some soot in

12   there.

13          We heard a couple jail calls,

14   okay?  In those conversations, I think we

15   were led to believe that some marijuana

16   substitute, K2 or spice, or something, was

17   involved.  We just heard that tiny little

18   snippet, okay?  There was no context to it.

19   The -- Miss Conley testified about whether

20   that was Kayla's voice, she didn't say the

21   context of that little sentence, that

22   phrase.  It didn't say, yeah, this happened

23   in association with the fire that occurred,

24   it didn't say this happened five years ago,

25   it didn't happen two days ago.  There was

1    no context for it.

2         I guess that was presented to us

3    so that sometime in Kayla's lifetime we

4    would be aware that maybe she tried a

5    marijuana alternative, but there was no

6    context.

7         There were no accelerants found.

8    Okay.  I think Investigator Winters said

9    that he believed the bed had been burning

10   for 10 to 12 minutes.  That sounds

11   plausible, that sounds like maybe the

12   amount of time it would take somebody to

13   notice a fire, run outside, call the fire

14   department, the fire department comes and

15   extinguishes it.  That doesn't sound out of

16   the ordinary.

17        We heard from Brennan Scott, the

18   father of Kayla's children.  He wasn't

19   there, he was playing video games at his

20   boss's house.  Wasn't there, doesn't know

21   what happened.

22        We heard from Kayla's father who

23   was really the renter of the home.  Again,

24   seemed like a decent guy, he wasn't there.

25   He was returning from a trip to West

Virginia, he doesn't know what happened.
He looked around the house, there were no
gas cans there.

I asked him about the smoke
detectors.  No, I purposely -- I try to
live my life without smoke detectors, okay?
No smoke detectors in the house.  Landlord
apparently told Mr. Winters there had been
smoke detectors.  Mr. Ayers says, no, you
know, that's not how it was, there never
were any, I'm aware of that, I prefer it
that way.  I have the small children in the
house, still don't want any smoke
detectors.

We heard from Jennifer Conley, the
neighbor.  She said that she smelled
something, it smelled burnt.  A burnt smell
coming from Kayla's breath.  Could it have
been the mattress fire?  No, no, no.  I
know what a mattress fire smells like,
couldn't have been that.  She told us that
she had seen Bubba with a lighter before,
she knows it's possible.

Then we heard from the church
lady, Karen Ball.  Again, seemed like a

1    real nice lady.  She seemed surprised by

2    the fact that somebody would hide from her

3    when she comes to pay them a visit.  Okay.

4    Some people might hide from, like, the

5    Jehovah's Witnesses when they're coming

6    around door-to-door, maybe kind of a

7    similar situation.  I'm just not in the

8    mood to deal with the church lady right

9    now.

10            She didn't detect any marijuana

11   smell.  She didn't see any gas cans laying

12   around.  Kayla didn't smell like gasoline.

13   She said, well, Kayla wasn't -- wasn't too

14   with it.  Maybe she was confused where the

15   girls are.  Kayla, where are your

16   daughters?  What do you mean?  Her

17   daughters were at church, that's where the

18   church lady was supposed to be at, how does

19   she not know this?  How -- how does the

20   church lady not know her daughters are at

21   church?  It sounds a little bit confusing.

22   It's not a strange response.

23            I talked during voir dire and the

24   opening about how there's an element

25   missing here, there's an ingredient missing

here.  And with regard to the aggravated

arson, that ingredient or element is

knowingly.  The State of Ohio had a very

high burden to meet.  They have not

successfully met that burden.  They cannot

prove Kayla knowingly committed the act of

aggravated arson.  They can show you all

the pictures in the world, they can bring

in all the phone calls in the world, they

can bring in all the inspectors in the

world, it's not going to change the fact

that they cannot prove that she knowingly

set that fire.

There are two plausible

alternative explanations; Bubba did it,

fell asleep with the cigarette.  Careless?

Sure.  Reckless?  Perhaps.  Knowingly?

Nope.  Can't prove it.

We heard about the bloody

handprint.  I'm not sure what that was

supposed to show us.  I guess that she took

sort of a poor route when exiting the home,

touched a few things, dribbled her blood

all over the place.  There's pets in there,

when she got out, she was concerned about

1    her children and dogs and the cat.

2              During voir dire, I talked a lot

3    about the guilt-o-meter, how it would start

4    at zero and maybe creep up depending on

5    what we've seen and heard the last two

6    days.  And in order for you to reach a

7    guilty verdict for aggravated arson, that

8    guilt-o-meter has to creep all the way up

9    to guilt to proof beyond a reasonable

10   doubt.  It has not crept up that far.  It

11   may have crept up some.

12             Officer Ricker wasn't even

13   convinced.  Investigator Winters said it

14   was his opinion that the manual that he

15   uses uses levels of scientific certainty,

16   not exact certainty, not complete proof.

17             This is a situation where an

18   accident is just an accident.  Unfortunate

19   though it may be, it sounds like the

20   firefighters did some great work, maybe

21   saved a couple pets, helped saved the

22   structure.  It sounds great.  And I

23   certainly wouldn't mean to imply that

24   they're lying to us because they're not.

25   This isn't an arson case.  Thank you.

1          THE COURT:  Thank you, Attorney

2     Kuhn.

3          Attorney Barr, at this time you

4     have ten minutes for your rebuttal

5     argument.

6          MR. BARR:  Thank you, Your Honor.

7          We have a criminal justice system

8     because criminals, even ones whose guilt

9     have been overwhelmingly proven to you,

10    like Kayla Ayers, don't always admit that

11    guilt.  And this system requires experts,

12    like Mr. Winters, who have to come in here

13    and give you your opinion -- their opinion

14    so that you can make decisions beyond a

15    reasonable doubt.

16          And to stand up here and to say

17    that Mr. Winters needs to find an arson

18    every once in a while to keep his job is

19    like saying every once in a while a cop has

20    to find somebody to commit a murder.  It's

21    ridiculous.  And then he wants to backtrack

22    on that and say, well, I don't want to call

23    him a liar.  But that's what he's doing.

24    He's saying that Mr. Winters came in here

25    and lied to you when he showed you the

1    physical evidence, when he showed you the

2    two points of origin where that fire

3    started.

4              There's one right there.  And

5    there's the second one right there.  But,

6    wait, oh, it's an accident.  An accident

7    that started twice.  So she must have been

8    smoking two cigarettes, one for each hand,

9    and then threw one on this side of the bed

10   and one on this side of the bed, when that

11   becomes her part of the story.

12             Captain Annen said she slipped

13   going upstairs to get her child.  It's not

14   important about whether she said she

15   slipped on the basement or on the steps.

16   What's important is she said she slipped

17   upstairs to get her child.  But Bubba was

18   downstairs, remember?  Because Bubba

19   started the fire, at least that's what

20   Kayla Ayers tells you that night, her first

21   story.

22             And, by the way, you ain't going

23   to hear -- you have those instructions,

24   read them.  Read through every single word,

25   you will not hear the word purpose

1    anywhere.  Purpose isn't a part of this

2    trial.  This trial is about, does somebody

3    know when they take a lighter and ignite

4    two spots on a bed, are they aware that

5    it's going to cause a fire and cause

6    physical harm.  That's all this is about.

7    You won't even see the word purpose in

8    those instructions.

9         And Bubba, Bubba with his lighter,

10   trying to light it like that.  But what did

11   Jennifer tell you?  When those kids were in

12   my house for ten days and they found a

13   lighter, the two girls brought me the

14   lighter, and then Bubba went over and tried

15   to light the mattress?  No, she didn't say

16   that.  She said all three of those kids, if

17   they found a lighter, they brought it to

18   me.  They didn't try to light it, they

19   didn't try to set the house on fire like

20   Kayla did.

21        And maybe you all do hide from

22   Jehovah's Witnesses, but I'll bet you don't

23   hide from people who you make plans with to

24   come over to pick you up to go to church on

25   Wednesday night.  You don't hide from them

1  because you know they're coming, and those

2  plans included the two girls.  Karen Ball

3  didn't know those girls were on that bus so

4  her concern was, I was supposed to pick all

5  of them up.  I see Bubba, I see Kayla, I

6  don't see the other girls, where are they?

7  Some of you probably go to church, you know

8  that the kids go off to one wing of the

9  building and we all go to the other.

10  Firefighter Canfora said they went

11  down and they moved around before they saw

12  that glow.  She's got x-ray vision, though,

13  she didn't have to move and see that fire.

14  In her other story, she could stand right

15  there at the washer and look right through

16  that cement beam and that furnace, and

17  everything else, and see that glow because

18  that's the picture that's standing -- when

19  you're standing at the washer looking at

20  where that fire was.

21  But, that's right, her story

22  didn't change, it never changed, because

23  first it was Bubba that night, Bubba

24  started it, and then she comes in the next

25  morning and then she says, well, I assume

1    Bubba started it because when I could see

2    through all this stuff here and I could see

3    that red glow, then I saw Bubba standing

4    over there, too.  Wow, Superman, x-ray

5    vision, see right through that stuff.  And

6    I could see Bubba standing there with the

7    glow.

8         Then when she was told, Kayla, you

9    can't see that from where you were.  Oh,

10   well, then I must have smelled it.  I must

11   have smelled it.  That's what alerted me, I

12   must have smelled it.  Listen to that tape,

13   watch it in case you didn't pay attention

14   the first time.  I must have smelled it.

15        That's not changing.  It goes from

16   Bubba did it the night before, then I

17   assume Bubba did it.  Now I saw Bubba

18   standing over there in the fire.  Oh, I

19   can't see it?  Okay.  Well, then I smelled

20   the smoke.  And then it goes to, Well,

21   maybe I didn't fall asleep.  That ain't a

22   changing story?  And then it goes to the

23   jail call, Well, dad or Brennan must have

24   set that fire.  Dad or Brennan must have

25   set it.

1    We can't prove she acted

2    knowingly?  Ladies and gentlemen, you see

3    this picture here and you're going to see

4    these other ones here, this one right here,

5    so in order for Bubba -- there's only two

6    other plausible explanations as it's been

7    stated, that it was a cigarette, but it had

8    to be two cigarettes because we got two

9    points of origin because fire doesn't hop

10   from one side to the other, so the other

11   plausible explanation is Bubba started the

12   fire.

13        So Bubba had to crawl over that

14   mattress and get over here first and light

15   this fire.  And then he can't crawl over

16   that door there because that's a door that

17   sits high, it's a regular door just like

18   that door right there, sitting on its side,

19   you know how hard it would be for you to

20   throw your leg over it and now you're going

21   to ask a three-year-old to crawl over that

22   without knocking it over?  So then he has

23   to crawl over that burning mattress and

24   come over here to the front side of it and

25   light this part on fire.  That's plausible?

1   No.

2      There's one plausible explanation

3   here. There's one person who's taken a

4   story and changed it every time she's

5   confronted with the physical evidence, the

6   physical evidence that contradicts

7   everything she says. And now that

8   guilt-o-meter is going from here to all the

9   way over here, to proof beyond a reasonable

10  doubt, because the only plausible

11  explanation in this case is that Kayla

12  Ayers took a lighter and lit that mattress

13  twice. The Baking Soda's been added to

14  these cookies, bake them, because Kayla

15  Ayers is guilty and it's proven beyond a

16  reasonable doubt. Thank you.

17     THE COURT: Thank you, Attorney

18  Barr.

19     At this point I'm going to

20  continue with my instructions of law. And

21  at this point we're on page 13 under the

22  Deliberation Instructions.

23     And at this time I'm going to ask

24  counsel, before I go on instructing the

25  jurors with reference to the procedure of

1    the deliberations, is there anything by way

2    of addition, subtraction, or amendment to

3    the charge as given?

4         MR. BARR:  No, Your Honor, not on

5    behalf of the State, thank you.

6         MR. KUHN:  No, thank you, Judge.

7         THE COURT:  All right.  Thank you.

8         All right, ladies and gentlemen,

9    your initial conduct upon entering the jury

10   room is a matter of importance.  It is not

11   wise immediately to express a

12   determination, to insist upon a certain

13   verdict, because if your sense of pride is

14   aroused, you may hesitate to change your

15   position even if you later decide you are

16   wrong.

17        Consult with one another, consider

18   each other's views and deliberate with the

19   objective of reaching an agreement, if you

20   can do so, without disturbing your

21   individual judgment.  Each of you must

22   decide this case for yourself, but you

23   should do so only after a discussion and

24   consideration of the case with your fellow

25   jurors.  Do not hesitate to change an

1    opinion if convinced that it is wrong.

2    However, you should not surrender honest

3    opinions in order to be congenial or to

4    reach a verdict solely because of the

5    opinions of the other jurors.

6          If during your deliberations you

7    have a question, it should be discussed in

8    the privacy of your jury room.  It should

9    not reflect the status of your

10   deliberations.  It should be reduced to

11   writing so that there will be no

12   misunderstanding as to what you request.

13   It should then be delivered to the bailiff

14   who will submit it to the Court.

15         You should confer with each other

16   in your deliberations and give careful

17   consideration to the views expressed by

18   each juror.

19         After your verdict is returned,

20   you may discuss this case with anyone, but

21   you are not required to do so.  Whether you

22   discuss this case with counsel or with

23   anyone else after you are discharged is a

24   matter of your own choice.

25         All right.  Now if you'll flip to

1    the last two pages of these instructions,

2    you're going to find the verdict forms.

3    You will have the actual verdict forms and

4    an envelope to place the verdict forms in,

5    but this is just for purpose of my

6    explanation of the verdict forms to you.

7        And these verdict forms read as

8    follows:  In the Court of Common Pleas,

9    Stark County, Ohio, State of Ohio,

10   Plaintiff, versus Kayla Jean Ayers,

11   Defendant, Case number 2012 CR 1567.  And

12   the first one is the verdict as to the

13   offense of Aggravated Arson.  Verdict form

14   reads as follows:  We, the jury in this

15   case, being duly impaneled and sworn, do

16   find, by proof beyond a reasonable doubt,

17   that the Defendant, Kayla Jean Ayers, and

18   after that there is a blank, and you're

19   instructed to enter either "guilty" or "not

20   guilty," depending on what your verdict is,

21   of the offense of Aggravated Arson as

22   charged in Count One of the indictment in

23   violation of Revised Code 2909.02(A)(2).

24       Each of us said jurors concurring

25   in said verdict signs his or her name

1   hereto this blank, fill in whichever date

2   you render this verdict, day of January,

3   2013.

4          And you'll notice that there are

5   12 lines.  In order to reach a verdict, you

6   must be unanimous, so all 12 jurors must

7   agree.  And as I will explain further, the

8   foreman or forewoman, whoever you would

9   decide is that person, will sign on the

10  first line as indicated.

11         Going on to the next page, page

12  20.  In Stark County -- Court of Common

13  Pleas, Stark County, Ohio, State of Ohio,

14  Plaintiff, versus Kayla Jeans Ayers,

15  Defendant.  Case number 2012 CR 1567,

16  verdict as to the offense of Endangering

17  Children.  We, the jury in this case, being

18  duly impaneled and sworn, do find, by proof

19  beyond a reasonable doubt, the Defendant,

20  Kayla Jean Ayers, again there is a blank

21  there for you to fill in either "guilty" or

22  "not guilty," depending on what your

23  deliberations shake out to be, of the

24  offense of Endangering Children as charged

25  in Count Two of the indictment in violation

1    of Revised Code 2919.22(A).

2         Each of us said jurors concurring

3    in said verdict signs his or her name

4    hereto this blank day of January, 2013.

5         And, again, there are 12 lines for

6    signatures, as all 12 jurors must agree in

7    order to reach a verdict. And, again, the

8    foreperson will sign on the first line.

9         Just so that you know, there are

10   two separate verdicts, you need to fill out

11   both of the verdicts. One pertains solely

12   to the count of Aggravated Arson and the

13   second one concerns solely the offense of

14   Endangering Children. So there are two

15   separate verdict forms, you must fill out

16   both when you reach a verdict with respect

17   to each one.

18        Are there any questions about

19   that? Okay.

20        All right. The Court will place

21   in your possession the verdict forms. The

22   foreman or forewoman will retain possession

23   of the verdict forms and return them to the

24   courtroom.

25        Upon your retirement, you will

immediately proceed to select one of your number as a foreman or forewoman.

The purpose in appointing or electing a foreman or forewoman is not because anyone has any greater weight or authority than anyone else, but it is so that somebody elected will be there to see that deliberations are carried on in an orderly fashion.

Also, there will be somebody to fill in whatever is needed whenever there is a blank or other matter to be filled in in connection with this case. It is also the responsibility of the foreman or forewoman to confine the discussions in the jury room to the evidence and the law in this particular case.

Whenever all twelve, again I repeat, all twelve jurors agree upon a verdict, you will sign the verdicts in ink and advise the bailiff. You will then be returned to the courtroom.

The rules of law, which were explained to you in these instructions, are binding upon the individual conscience and

1    judgment of each member of the jury.  It is

2    your duty as jurors to consult with one

3    another and to deliberate with a view to

4    reaching a common verdict.  Each of you

5    must decide this case for himself or

6    herself, but you should do so only after a

7    consideration of the views of your fellow

8    jurors and you should not hesitate to

9    change your opinion when others convince

10   you that you are in error.

11        You should, however, not be

12   influenced to vote any way on a question

13   submitted to you solely because the

14   majority of the jurors favor such a

15   decision.  Nor should a juror turn a deaf

16   ear to his or her associate jurors and,

17   without listening to their reasons or

18   arguments, obstinately stand upon his or

19   her own opinion.

20        It must be the object of all of

21   you to arrive at a common conclusion as to

22   the charge and to this end you should

23   deliberate together with calmness and in a

24   dispassionate manner being considerate of

25   each other's viewpoints on the evidence.

1    When you are in the jury room, you

2    will have with you the verdict forms that I

3    have just reviewed with you, and any

4    exhibits that have been admitted into

5    evidence.

6    This is an important case.  It's

7    important to the State of Ohio and it's

8    important to the Defendant.  So you will

9    take whatever time you feel is reasonably

10   necessary to fully consider all the issues

11   you are to decide.

12   If you do disperse, the admonition

13   we have been giving all along about not

14   talking about the case, not letting anyone

15   talk to you about the case is more

16   imperative than it ever was, so unless you

17   are together in the jury room, you shall

18   not discuss the case at all and even if you

19   are in the jury room, if one or the other

20   shall absent himself or herself for a

21   period of time, you would cease your

22   deliberations and discussions at that time

23   until everybody is present.

24   There is nobody in the world that

25   can tell how long it's going to take for

you twelve people to agree.  And, again, you all must agree.

If you have not agreed on a verdict by about 4:30 this afternoon, you may adjourn until 9 a.m. tomorrow morning for further deliberations.  However, should you prefer to continue your deliberations past 4:30 this afternoon, please advise my bailiff of such and she will make the necessary arrangements.

I'm not telling you to take that much time or to take any less time.  You take whatever time is necessary to properly consider all of the evidence and applicable law.

Whenever you do disperse, remember the admonition about not talking about the case.  This is especially imperative during breaks from deliberations.  Also, if your deliberations require lunch breaks and adjournments, the admonition applies during such periods.  And you know, as I've instructed you all along, while you're deliberating unless you are all twelve in the same room together deliberating, you're

1    not to permit anyone to discuss the case

2    with you or permit it to be discussed in

3    your presence.

4            And it's especially true of

5    deliberations that you stay away from any

6    sort of media; social media, Internet

7    media, print media, televised media with

8    respect to this case or any of the terms

9    that have been used in this case.  It would

10    be highly improper for any of you to make

11    such research upon yourselves.

12            At this time I'd ask counsel to

13    approach.

14                    - - - - - -

15            (A conference was held at the

16            bench outside the hearing of the

17            jury.)

18                    - - - - - -

19            THE COURT:  Juror number 35 is the

20    one who had the contact with the witness.

21    Do you want me to bring him up now so you

22    can question him?

23            MR. BARR:  Yeah, I think we should

24    for the record.

25            THE COURT:  It would be before I

1       dismiss the alternates.

2              (End of conference at the bench.)

3                    - - - - - - - - - -

4              THE COURT:  Juror number 35, if

5       you could come up here for a second.  I

6       don't mean to single you out, but I do have

7       something I would like to discuss with you.

8       And he's not in trouble, so don't worry.

9                    - - - - - -

10             (A conference was held at the

11             bench outside the hearing of the

12             jury.)

13                   - - - - - -

14             THE COURT:  It's come to our

15      attention that you had contact with a

16      witness.

17             JUROR #35:  Yes, I did, yeah.

18             THE COURT:  Did he ask you for a

19      lighter?

20             JUROR #35:  Yes.

21             THE COURT:  I'm sure at the time

22      you didn't notice he was a witness?

23             JUROR #35:  No.

24             THE COURT:  Did he make comments

25      to you about the case?

1  JUROR #35:  No, that was -- I gave

2  him the lighter, handed it to him.

3  THE COURT:  Anything about that

4  contact that you think this wouldn't be a

5  good case to reach a verdict, you could be

6  fair and impartial?

7  JUROR #35:  No, I didn't think

8  anything.

9  THE COURT:  Did you tell any of

10  the other members of the jury?

11  JUROR #35:  No.

12  THE COURT:  Do you want to ask any

13  questions?

14  MR. BARR:  No, Your Honor.

15  MR. KUHN:  No.

16  THE COURT:  I wanted to thank you

17  for bringing that to our attention, we do

18  appreciate it.  Okay.

19  (End of conference at the bench.)

20  - - - - - - - - - -

21  THE COURT:  All right.  At this

22  time I'm going to ask all twelve members of

23  the jury panel if they are able to proceed

24  to a deliberation in this case.  Everybody

25  okay to deliberate?

1          All right.  With that then, I
2     would like to thank our alternates --
3     alternate jurors, Jurors number 44 and 49
4     for your service.  Again, it's only through
5     people like you, who dedicate your time and
6     the attention that you've given to this
7     case, that you ensure our American system
8     of government continues to work.
9          You are dismissed.  Do they need
10    to call back in?
11          THE BAILIFF:  No.
12          THE COURT:  You will not need to
13    call back in, you are free.  You are
14    dismissed from this case.  However, you are
15    not dismissed from my admonition about
16    discussing the case until a verdict is
17    finally reached, okay?
18          I do, again, appreciate the time
19    and your efforts that you've given in this
20    matter.  I know sometimes it's hard to sit
21    there and listen when you're not sure that
22    you actually get to do all the fun work,
23    but we do appreciate it.
24          We do have a certificate of
25    service for you to take with you, as well

1    as an evaluation of how we did here today.

2    We have given you a self-addressed stamped

3    envelope to return it, if you feel so

4    inclined, just so that we know what we're

5    doing right or wrong and what needs to be

6    improved, okay?  So you are excused.  Thank

7    you again for your service.

8                    (Thereupon, Jurors 44 and 49

9                    exited the courtroom at 2:24

10                   p.m.)

11          THE COURT:  Okay.  And counsel,

12   the procedure that I have outlined for the

13   deliberations in this case, is that

14   satisfactory to each of you?

15          MR. BARR:  Yes, Your Honor.

16          MR. KUHN:  Yes, Judge.

17          THE COURT:  Okay.  With that then,

18   the case is in your hands.  Again, you will

19   have a copy of my instructions as well as

20   the verdict forms to be filled out, as well

21   as the exhibits that have been admitted.

22   And you'll notice that you'll have two CDs

23   back there that contain both the statement

24   and the phone calls that were made.  If at

25   any point during your deliberations you

1      feel the need to have those played, just

2      contact the bailiff and we'll make those

3      arrangements, okay?

4              All right.  With that then, you

5      are excused.

6              THE BAILIFF:  All rise.

7              (Thereupon, the jury went

8              to deliberate at 2:25 p.m.)

9              THE COURT:  Prior to sending the

10     exhibits back, we'll double check and make

11     sure that we have them.

12             With that then, if you're going to

13     go too far, let us know.  I guess you

14     really can't go too far.

15             MR. BARR:  We will be across the

16     street.

17             THE COURT:  Okay.  We'll give you

18     a call.

19             (Thereupon, the jury had a

20             question at 3:25 p.m.)

21             THE COURT:  All right.  The jury

22     has submitted the following question in

23     writing:  Based upon the testimony of Karen

24     Ball was purse & backpack inside home or

25     outside the home?

1     Present in the courtroom is Dennis

2  Barr and Toni Schnellinger on behalf of the

3  State, and Attorney Matt Kuhn and Attorney

4  April Bible on behalf of the Defendant.

5     Counsel, do you waive your

6  client's presence to address this?

7     MS. BIBLE:  Yes, Your Honor, since

8  I know what your response is going to be.

9     THE COURT:  It will be the Court's

10  response to the jurors that they are to

11  rely on their own collective memories in

12  making the determination as to the facts,

13  and they will not be entitled to a

14  transcript of the courtroom testimony.  Is

15  that fair enough?

16     MR. BARR:  Sounds fair.

17     MR. KUHN:  Sounds good.

18     THE COURT:  Okay.  Do you want me

19  to write it down, Lori?  This is the

20  Court's written response:  The Court

21  instructs you to rely on your collective

22  memory regarding the testimony of the

23  witnesses.  You will not be given a

24  transcript of the courtroom testimony.

25     MR. BARR:  Thank you.

1        (Thereupon, the jury reentered

2        the courtroom at 4:35 p.m.)

3        THE COURT:  Okay.  You may be

4   seated.

5        Ladies and gentlemen, it's my

6   understanding that at this time you wish to

7   cease your deliberations for today and

8   reconvene tomorrow.  Is it 9:00, or had you

9   picked a different time?

10        JUROR #33:  9:00.

11        THE COURT:  9:00, okay.  And my

12   only reason for bringing you back in, I

13   don't want to know the status of your

14   deliberations, but because it is so

15   important, especially during this part of

16   the trial, for you not to be influenced by

17   any outside source, I just wanted to

18   admonition you one more time that during

19   the evening recess, you are not to discuss

20   this matter with anyone or permit anyone to

21   discuss it in your presence.  Do not

22   discuss the case among yourselves.  And

23   don't form or express any opinion on the

24   case until it's finally submitted to you.

25        And, again, this is probably even

1    harder than last night was to have that

2    natural desire to want to talk to your

3    family and your friends about what you are

4    doing and your experience, and I'm

5    instructing you that you are not permitted

6    to do that under any circumstances.

7            I'm also instructing you that you

8    are not to view any media, whether it be

9    print media, television, radio, any

10   information from those sources on this

11   trial or any of the issues related to this

12   trial.

13           Additionally, with technology as

14   it is, I have to admonition with respect to

15   the Internet.  Do not do any searches on

16   the Internet with respect to any of the

17   issues in this case or to the case itself.

18   Do not go on Twitter or Facebook if

19   there -- to see any comments or ask any

20   questions about this case.

21           Essentially just put yourself in a

22   bubble.  Have a good night.  And, again,

23   you got to curb that natural desire to talk

24   to your loved ones about this case.  And

25   hopefully you'll be done tomorrow and

1    you'll be released from that instruction,

2    and you can talk to whomever you want or

3    not whomever you want.

4         But I just wanted to stress that

5    issue upon you because it is, in my

6    opinion, the hardest part to be

7    deliberating and to go home and be exposed

8    to all of those things out there and want

9    to do things, whether it be talk or you

10   want to find out more because you want to

11   make sure you're doing the right thing, but

12   I'm instructing you that you would not be

13   doing the right thing by looking at any

14   other source.  And you have my instructions

15   of law and that is the only source of law

16   that you are to follow, and the evidence

17   that you heard in the courtroom is the only

18   evidence that you are to consider, okay?

19        With that then, you are adjourned

20   with that admonition.  Have a good evening

21   and we'll see you back here sometime

22   tomorrow, okay?

23        THE BAILIFF:  All rise.

24        - - - - - -

25        (Thereupon, court adjourned at

475

4:38 p.m. on January 29, 2013)

476

C-E-R-T-I-F-I-C-A-T-E


I, Vicki I. Dennewitz, a

Registered Professional Reporter and Notary

Public in and for the State of Ohio, do

hereby certify that I reported in Stenotypy

the testimony had; and I do further certify

that the foregoing is a true and accurate

transcription of said testimony.




_____

Vicki I. Dennewitz, RPR






All exhibits are being held by the

Evidence Administrator and are available

upon advance request.

IN THE COURT OF COMMON PLEAS

STARK COUNTY, OHIO

CASE NO. 2012 CR 1567

2013 CA 00034

| | |
|---|---|
| STATE OF OHIO, | ) |
| | ) |
| Plaintiff, | ) TRANSCRIPT OF |
| | ) PROCEEDINGS |
| versus | ) |
| | ) |
| KAYLA J. AYERS, | ) VOLUME NO. III |
| | ) |
| Defendant. | ) |

BE IT REMEMBERED, That upon the

hearing of the above entitled matter in the

Court of Common Pleas, Stark County, Ohio,

before the Honorable Kristin G. Farmer,

Judge, and commencing on January 30, 2013,

the following proceedings were had:

- - - - - - - - - -

VICKI I. DENNEWITZ, RPR

OFFICIAL COURT REPORTER

STARK COUNTY COURTHOUSE

1         APPEARANCES:

2

3            On Behalf of the Plaintiff:

4

5            Stark County Prosecutor's Office

6

7            Dennis Barr, Assistant Prosecutor

8            Toni Schnellinger,

9            Assistant Prosecutor

10          Stark County Office Building

11          Suite 510

12          Canton, Ohio  44702

13

14          On Behalf of the Defendant:

15

16          Stark County Public Defender's Office

17

18          Matthew Kuhn, Attorney at Law

19          April Bible, Attorney at Law

20          201 Cleveland South

21          Canton, Ohio  44702

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I  N  D  E  X

VERDICT                    Page  482

SENTENCING                 Page  494

- - - - - - -

P R O C E E D I N G S

- - - - - - - - -

(Thereupon, the jury began

deliberating at 9:15 a.m.)

- - - - - -

(Thereupon, the jury reached a

verdict at 9:40 a.m. on

January 30, 2013 and the following

proceedings were had.)

- - - - - -

THE COURT:  Counsel approach for a

moment.

- - - - - -

(A conference was held at the

bench.)

- - - - - -

THE COURT:  Now, should the

verdict be guilty, does the State have a

recommendation as to a sentence?

MR. BARR:  It's an F2; isn't it?

MS. SCHNELLINGER:  Uh-huh.

MR. BARR:  So eight, seven, eight.

Seven years.

THE COURT:  Okay.  Anything you

want to talk about before we bring them in?

1          MR. KUHN:  I don't think so.

2     Thank you, Judge.

3          THE COURT:  All right.  Very good.

4          (End of conference at the bench.)

5          - - - - - - - - - -

6          THE COURT:  Just to let you know,

7     The Massillon Independent is here, not

8     right now, they're downstairs with the

9     cameras, and does anyone have any objection

10    to them being present in the courtroom?

11         MR. BARR:  No.

12         MR. KUHN:  No, Your Honor.

13         (Thereupon, the jury entered

14         the courtroom at 9:51 a.m.)

15         THE COURT:  Okay.  Good morning,

16    ladies and gentlemen, welcome back again,

17    and you may be seated at this time.

18         Now, have you picked someone of

19    your jury to be a foreperson?

20         JUROR #30:  We have.

21         THE COURT:  Okay.  And what is

22    your number?

23         JUROR #24:  24.

24         THE COURT:  Juror number 24?

25         JUROR #24:  Yes, ma'am.

1          THE COURT:  All right.  Now, Juror

2    number 24, have you -- has your jury

3    reached a verdict --

4          JUROR #24:  We have.

5          THE COURT:  -- in this case?  You

6    have?  All right.  Could you please hand

7    the verdict forms in the envelope to the

8    bailiff?

9          Okay.  The Court having reviewed

10   the verdict forms and hereby pronounces the

11   verdict as follows:  In the Court of Common

12   Pleas, Stark County, Ohio:  State of Ohio,

13   Plaintiff, versus Kayla Jean Ayers,

14   Defendant, Case number 2012 CR 1567,

15   verdict as to the offense of Aggravated

16   Arson:  We, the jury in this case, being

17   duly impaneled and sworn, do find, by proof

18   beyond a reasonable doubt, the Defendant,

19   Kayla Jean Ayers, guilty of the offense of

20   Aggravated Arson as charged in Count One of

21   the indictment in violation of Revised Code

22   2909.02(A)(2).

23         Each of us said jurors concurring

24   in said verdict signs his or her name

25   hereto the 30th day of January, 2013.  And

1    the verdict form is signed by all 12

2    members of the jury.

3         The next verdict form is as

4    follows:  In the Court of Common Pleas,

5    Stark County, Ohio, State of Ohio,

6    Plaintiff versus Kayla Jean Ayers,

7    Defendant, Case number 2012 CR 1567,

8    verdict as to the offense of Endangering

9    Children:  We, the jury in this case, being

10   duly impaneled and sworn, do find, by proof

11   beyond a reasonable doubt, the Defendant,

12   Kayla Jean Ayers, guilty of the offense of

13   Endangering Children as charged in Count

14   Two of the indictment in violation of

15   Revised Code 2919.22(A).

16        Each of us said jurors concurring

17   in said verdict signs his or her name

18   hereto the 30th day of January, 2013.  And

19   the verdict form is signed by all 12

20   members of the jury.

21        At this time I'm going to ask

22   counsel if they wish to approach and review

23   the verdict forms?

24        MR. BARR:  No, Your Honor.

25        MR. KUHN:  Yes, please, Judge.

1    THE COURT:  Okay.  You may

2    approach.

3    (Thereupon, counsel approached

4    and reviewed the verdict forms.)

5    MR. KUHN:  Thank you, Judge.

6    THE COURT:  Thank you.

7    And at this time does either the

8    State of Ohio or the Defendant request to

9    have the jury polled in this matter?

10    MR. KUHN:  Yes, please, Judge.

11    Thank you.

12    THE COURT:  Okay.

13    All right, ladies and gentlemen,

14    what I'm going to do now is what we refer

15    to as polling the jury.  And what this

16    means is I'm going to ask you each

17    individually whether or not you, in fact,

18    entered a guilty verdict with respect to

19    each count.

20    So if you could also -- I will

21    call you by your juror number, but if you

22    could also just say your juror number so we

23    have that on the record and what your

24    verdict was with respect to each count,

25    okay?

1          So I will start with Juror number

2  2, is this your verdict and is your verdict

3  guilty with respect to the offense of

4  Aggravated Arson?

5          JUROR #2:  Yes.

6          THE COURT:  And is your verdict

7  guilty as to the offense of Endangering

8  Children?

9          JUROR #2:  Yes.

10        THE COURT:  All right, thank you.

11        Juror number 34, is your verdict

12  as to the offense of Aggravated Arson

13  guilty?

14        JUROR #34:  Yes.

15        THE COURT:  And is your verdict as

16  to the offense of Endangering Children

17  guilty?

18        JUROR #34:  Yes.

19        THE COURT:  Juror number 39, is

20  your verdict as to the offense of

21  Aggravated Arson guilty?

22        JUROR #39:  Yes.

23        THE COURT:  And is your verdict as

24  to the offense of Endangering Children

25  guilty?

1   JUROR #39:  Yes.

2   THE COURT:  Thank you.

3   Juror number 30, is your verdict

4   as to the offense of Aggravated Arson

5   guilty?

6   JUROR #30:  Yes.

7   THE COURT:  And is your verdict as

8   to the offense of Endangering Children

9   guilty?

10  JUROR #30:  Yes.

11  THE COURT:  And, I apologize, I

12  skipped right over Juror number 9.  Juror

13  number 9, is your verdict to the offense of

14  Aggravated Arson guilty?

15  JUROR #9:  Yes.

16  THE COURT:  And is your verdict as

17  to the offense of Endangering Children

18  guilty?

19  JUROR #9:  Yes.

20  THE COURT:  Okay.  And I apologize

21  for skipping over you.

22  Now, Juror number 13, is your

23  verdict as to the offense of Aggravated

24  Arson guilty?

25  JUROR #13:  Yes.

1    THE COURT:  And is your verdict as

2    to the offense of Endangering Children

3    guilty?

4    JUROR #13:  Yes.

5    THE COURT:  Okay.  Juror number

6    16, is your verdict as to the offense of

7    Aggravated Arson guilty?

8    JUROR #16:  Yes.

9    THE COURT:  And is your verdict as

10   to the offense of Endangering Children

11   guilty?

12   JUROR #16:  Yes.

13   THE COURT:  Juror number 33, is

14   your verdict as to the offense of

15   Aggravated Arson guilty?

16   JUROR #33:  Yes.

17   THE COURT:  And is your verdict as

18   to the offense of Endangering Children

19   guilty?

20   JUROR #33:  Yes.

21   THE COURT:  Thank you.

22   Juror number 35, is your verdict

23   as to the offense of Aggravated Arson

24   guilty?

25   JUROR #35:  Yes.

1          THE COURT:  And is your verdict as

2     to the offense of Endangering Children

3     guilty?

4          JUROR #35:  Yes.

5          THE COURT:  Juror number 22, is

6     your verdict as to the offense of

7     Aggravated Arson guilty?

8          JUROR #22:  Yes.

9          THE COURT:  And is your verdict as

10    to the offense of Endangering Children

11    guilty?

12         JUROR #22:  Yes.

13         THE COURT:  Juror number 24, is

14    your verdict as to the offense of

15    Aggravated Arson guilty?

16         JUROR #24:  Yes.

17         THE COURT:  And is your verdict as

18    to the offense of Endangering Children

19    guilty?

20         JUROR #24:  Yes.

21         THE COURT:  And Juror number 28,

22    is your verdict as to the offense of

23    Aggravated Arson guilty?

24         JUROR #28:  Yes.

25         THE COURT:  And is your verdict as

1    to the offense of Endangering Children

2    guilty?

3              JUROR #28:  Yes.

4              THE COURT:  Thank you all.

5              Counsel, is that sufficient?

6              MR. KUHN:  Yes, thank you, Judge.

7              MR. BARR:  Yes, Your Honor, thank

8    you.

9              THE COURT:  Very good then.

10             Ladies and gentlemen, this does

11   conclude your service as jurors in this

12   case.  As I indicated to you earlier, you

13   are now dismissed from my instructions not

14   to discuss this case or your experience as

15   a juror in this case with anyone.  You may

16   discuss it, but you are not required to do

17   so.

18             In the event if someone should

19   approach you and -- to discuss this case

20   and you choose not to, but they continue to

21   insist or pressure you to talk to them,

22   please let us know and we'll take care of

23   that.

24             Again, I want to personally, both

25   for my own benefit as well as on behalf of

all the Judges in the Stark County Court of
Common Pleas, thank you for your service.
I know that it took a little bit longer
than we thought it was going to be, and I
appreciate your dedication and the fact
that you took this case very seriously.

Again, the service that you
rendered in this case was very important,
it was very important ensuring that both
the State and the Defendant were given a
fair trial.  And, of course, without people
like you, we wouldn't ensure that our
system of justice continues to work.  So
thank you, again, for your close attention
during the trial.

I am going to have you go back
into the jury room and I just want to talk
with you briefly and just again to
personally thank you for your service.

Before I dismiss the jury, is
there anything else?

MR. BARR:  No, Your Honor.

MR. KUHN:  I don't believe so,
Judge, thank you.

THE COURT:  All right.  You are

1    dismissed.

2                    (Thereupon, the jury exited

3              the courtroom at 10:00 a.m.)

4              THE COURT:  Before we proceed to

5    sentencing, I'm going to go back personally

6    to thank the jurors, and then we'll proceed

7    with the sentencing hearing, okay?

8                    (Thereupon, a recess was taken

9              at 10:05 a.m. to 10:10 a.m.)

10             THE COURT:  All right.  You may be

11   seated.

12             All right.  At this time the

13   verdicts having been rendered with respect

14   to each charge in this case, the Court is

15   going to proceed to a sentencing.

16             Now, Attorney Kuhn, is there

17   anything that either you wish to bring to

18   my attention prior to imposition of

19   sentence, or that your client wishes to

20   bring to my attention?

21             MR. KUHN:  Yes, please, Judge, if

22   I could make a brief statement.

23             THE COURT:  Sure.

24             MR. KUHN:  And I believe Ms. Ayers

25   would like to address the Court personally,

1   if she would be allowed to do so.

2          Judge, we're very saddened by the

3   jury's verdict.  Ms. Ayers still maintains

4   that she did not set this fire

5   intentionally and it may have been a result

6   of circumstances that she created.  She is

7   very upset by this entire situation.  I

8   think she does have hopes of reuniting with

9   her family at some point.  I'm hopeful that

10  would be sooner rather than later.

11         I did explain to Ms. Ayers that I

12  believe the State of Ohio is seeking prison

13  time in this case.  We're hopeful that you

14  might consider doing a presentence or a

15  post-sentence investigation to determine if

16  probation would be an appropriate fit for

17  Ms. Ayers.

18         I do believe she has some mental

19  health concerns that played into this

20  entire situation ranging from the

21  allegations against her and what she's been

22  convicted of up to and including her

23  failure to cooperate with the competency

24  evaluation.

25         I had another client previously

1    who refused to cooperate, and I think it's

2    sort of a telling sign.  I think it's an

3    indicator that she does have some serious

4    mental health issues, and hopefully the

5    Court and the criminal justice system can

6    help her with those.

7           And so at this time we're hoping

8    that you may consider the probation route,

9    the mental health treatment route, as

10   opposed to merely incarcerating her for

11   some period of time.  Thank you.

12           THE COURT:  Thank you.

13           Ms. Ayers, do you wish to make a

14   statement?

15           DEFENDANT AYERS:  Yes.

16           THE COURT:  And before you do say

17   anything, just maybe mention to your

18   attorney what you're going to say because

19   it could have implications down the road.

20   So I'll give you a minute just to talk to

21   him about what you want to say.

22           (Thereupon, the Defendant had a

23           discussion with Mr. Kuhn.)

24           DEFENDANT AYERS:  I took it all

25   the way to the box because I really didn't

1   do it so I was sure I wouldn't be found

2   guilty.  And I've just never been in

3   trouble before and I can't go to prison.

4   Please, I should have took a deal, but I

5   didn't want to because I knew that I would

6   win, I just knew.

7   I'll go -- I'll go anywhere but

8   prison.  Put me in a mental institute, I

9   don't care.  Please don't put me in prison.

10   THE COURT:  Okay.  Anything

11   further?

12   MR. KUHN:  I don't think so.

13   Thank you, Judge.

14   THE COURT:  All right.  At this

15   time it is the sentence of the Court that

16   the Defendant be sentenced to a term of

17   seven years imprisonment.  A prison term of

18   seven years.

19   At this time, Ms. Ayers, I'm going

20   to inform you that at the time you complete

21   your prison term, the Adult Parole

22   Authority will place you on a mandatory

23   period of post-release control for three

24   years.  It's important that you understand

25   that because if it's alleged, and

1  subsequently proven, that you did, in fact,

2  violate the terms and conditions of your

3  post-release control, your post-release

4  control could be revoked and you could be

5  returned to prison even though you served

6  your full stated prison term.

7  In such case, the amount of time

8  that you could be returned to prison could

9  be up to one half your stated prison term,

10  and that additional period of time could

11  run consecutively with any other prison

12  term which you were serving at the time.

13  And just to clarify that, with

14  respect to the count of Aggravated Arson,

15  it is the sentence of this Court a prison

16  term of seven years.  And because you are

17  indigent, any fines will be waived.

18  And it is the sentence of this

19  Court with respect to the Endangering

20  Children, which is a misdemeanor of the

21  first degree, that you be sentenced to 180

22  days to be served concurrently with the

23  sentence for the F2 Aggravated Arson term,

24  for a total prison term of seven years.

25  You will be able to earn days of

1   credit pursuant to the Ohio Revised Code

2   Section 2967.193.  These days of credit are

3   not automatically awarded, but must be

4   earned as set forth in that statute.  And

5   there is a limitation on the number of days

6   that you can earn.

7           At this time, Ms. Ayers, you have

8   the right to an appeal of your conviction.

9           Attorney Kuhn, would you be

10  willing to accept the appeal on behalf of

11  the Public Defender's office, or would you

12  like counsel to be appointed?

13          MR. KUHN:  Your Honor, we would

14  appreciate if you would appoint counsel in

15  this matter.

16          THE COURT:  The Court will appoint

17  private counsel to handle your appeal.  At

18  this time, subject to his ability, the

19  Court would appoint George Urban to handle

20  the appeal.

21          MR. KUHN:  Great, thank you,

22  Judge.

23          THE COURT:  All right.  Anything

24  further from either the State or from the

25  Defendant?

1           MR. BARR:  No, Your Honor, thank

2   you.

3           MR. KUHN:  Your Honor, my client

4   is curious if there's any chance that she

5   could be released before that seven year

6   date?

7           THE COURT:  She can file any

8   appropriate motion, I won't make any

9   guarantees with respect.  The only thing I

10   can guarantee is that any motion that is

11   filed will be taken under consideration.

12           MR. KUHN:  Great, thank you,

13   Judge.

14           THE COURT:  Okay.  And I'll also

15   indicate that the costs of prosecution will

16   be awarded against the State -- or not

17   against the State, I'm sorry, the

18   Defendant.  Okay.

19           MR. BARR:  Thank you, Your Honor.

20           MR. KUHN:  Thank you, Judge.

21           THE COURT:  Ms. Ayers, good luck

22   to you.

23           - - - - - -

24           (Thereupon, court adjourned at

25           10:25 a.m. on January 30, 2013)

```
1              C-E-R-T-I-F-I-C-A-T-E

2

3          I, Vicki I. Dennewitz, a

4   Registered Professional Reporter and Notary

5   Public in and for the State of Ohio, do

6   hereby certify that I reported in Stenotypy

7   the testimony had; and I do further certify

8   that the foregoing is a true and accurate

9   transcription of said testimony.

10

11

12          _____

13               Vicki I. Dennewitz, RPR

14

15

16

17

18

19

20          All exhibits are being held by the

21   Evidence Administrator and are available

22   upon advance request.

23

24

25
```