**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KAYLA AYERS,** | : | **Case No. 5:20-cv-01654** |
| | : | |
| **Petitioner,** | : | **Judge Sara Lioi** |
| | : | |
| **v.** | : | **Magistrate Judge Carmen E. Henderson** |
| | : | |
| **DIRECTOR, OHIO DEPARTMENT OF** | : | |
| **REHABILITATION &** | : | |
| **CORRECTIONS,** | : | |
| | : | |
| **Respondent.** | | |

---

**PETITIONER KAYLA AYER'S TRAVERSE TO RESPONDENT'S RETURN OF WRIT**

**EVIDENTIARY HEARING REQUESTED**

---

Brian C. Howe (0086517)
The Ohio Innocence Project
Rosenthal Institute for Justice
University of Cincinnati College of Law
P.O. Box 210040
Cincinnati, Ohio 45221
(513) 556-0752
Brian.howe@uc.edu


Counsel for Petitioner Kayla Ayers

1

Petitioner Kayla Ayers was convicted based on expert testimony that was fundamentally unreliable and unsupported.  Her own attorneys failed to investigate the claims against her, and as a result, they allowed this false evidence to be presented to the jury unchallenged.   Ms. Ayers should not be made to pay the price for her attorneys' unpreparedness or the State's misconduct in offering it, nor should she continue to face punishment for a conviction based on false evidence. She therefore respectfully requests the Court grant her Petition for Writ of Habeas Corpus.

## STATEMENT OF THE FACTS AND CASE

### A. The Fire

On October 3rd, 2012, at 8:21 P.M., the Massillon Fire Department received a report of a fire on 26th St. in Massillon, OH. (*Massillon Fire Department Summary Call Sheet*, Doc. 15-1, Ex.37 PageID#431). Multiple suppression units and an ambulance were dispatched. *Id.*  The first suppression units arrived at the house at 8:28 P.M. (*Id.*; *Massillon Fire Department Response Record,* Doc. 15-1, Ex.37 PageID#432.).  They quickly extinguished the fire, which was isolated to a mattress in the basement. (*Id.* at PageID#433).

The only people home at the time of the fire were Kayla Ayers ("Ms. Ayers") and her three-year-old son, Brennan Jr. (a.k.a. "Bubba"). *(Massillon Police Department Incident Report- Part 2* ("Incident Report"), Doc. 15-1, Ex.37, PageID#434).  Ms. Ayers sustained a laceration on her hand after she slipped and broke a glass of water while trying to extinguish the fire herself. (*Massillon Fire*

2

*Department EMS Run Report* ("EMS Report"), Doc. #15-1, Ex.37, PageID#435).

Brennan Jr. was completely unharmed. (Incident Report, Doc. 15-1, Ex. 37,

PageID#434).

Initial reports from the scene state that Kayla was disoriented and frantic

about the possibility of losing custody of her children. (Trial Transcripts ("Tr.") at

362; Doc. 15-2, PageID#1286). Her neighbor, Jennifer Conley, stated that Kayla

kept "repeating was she going to lose—Am I going to lose my kids, am I going to lose

my kids?" (*Id.* at 360, PageID#1284). She also reported that she thought she smelled

marijuana on Kayla's breath. (*Id.* at 362; PageID#1286). A member of Kayla's

church, Karen Ball, testified that Kayla had not answered the door when she

showed up earlier that day to take Brennan to church.  (*Id.* at 378-379,

PageID#1302-03).

Kayla was treated at Affinity Hospital and discharged that night. *EMS*

*Report* at 121-123. While at the hospital, Kayla was interviewed by Massillon Fire

Inspector Reginald Winters and Massillon Police Dept. Sgt. Muntean. (*Massillon*

*Fire Department Interview Report,* Doc. 15-1, Ex. 37, PageID#479). Initially, Kayla

claimed that she had been doing laundry in the basement, and when she turned

around, she noticed her son Brennan had started the fire. *Id*.

 Inspector Winters interviewed three-year-old Brennan Jr. later that evening.

(Tr. 270, Doc. 15-2, PageID#1194). Winters confirmed that Brennan Jr. was able to

light a cigarette lighter. (*Id.* at PageID#282). Although Brennan Jr. denied starting

the fire, he did confirm that his mother was sleeping just before the fire started.

(*Massillon Police Department Narrative Supplement* ("Narrative Supplement"), Doc.15-1, PageID#480).

The next day, the neighbor Jennifer Conley called police and told them that Kayla and her family were at the property in violation of the fire department's instructions. (Tr. 271, Doc. 15-2, PageID#1196). Two Massillon police officers arrived along with Inspector Winters. At the scene, Inspector Winters spoke with Jeff Ayers, Kayla's father. Jeff claimed that several weeks before, during a fight, Kayla told Jeff, "if you leave again, I'll burn this mf'er down." (*Massillon Fire Department Voluntary Statement,* Doc. 15-1, Ex.37, PageID#481). Another neighbor, Jason Pandrea, testifying about this same instance, said Kayla told her father she would "burn the mother fucker down." (Tr. 310, 339, Doc. 15-2, PageID#1234, 1263). According to Pandrea, "it was more kind of a laugh or a joke kind of thing," and "it was like she meant it, but she didn't." (*Id.* at PageID#1264).

Officers asked Kayla to come with them to the police station, where she was interviewed again. In the interview, Police Detective Ricker told Kayla he did not believe she set the fire intentionally, but instead suggested that Kayla must have started it due to her own carelessness. (*Kayla Ayers Police Station Interview*, Doc. 15-1, PageID#482)(video file). After questioning, Kayla admitted that she "may have fallen asleep" before the fire, but insisted that when she woke up she did what she could to put it out. (*Narrative Supplement*, Doc. 15-1, Ex.37, PageID#480).

That day, Kayla was arrested and charged with aggravated arson and endangering children. (*Docket*, Doc. 15-1, Ex. 56, PageID#907-08). She was unable

to post bail and would remain in jail for the next several months awaiting trial. (*Kayla Ayers Affidavit*  at ¶ 3, Doc. 15-1, Ex. 37, PageID#493).

## B. Pre-trial Disclosure and Trial

Kayla pleaded not guilty to all charges. (*Entry*, Doc. 15-1, PageID#275). The Stark County Public Defender's Office was appointed as counsel, and Attorney Kristina Powers was assigned. (*Id*.) Defense counsel made multiple requests for discovery in the months leading up to the trial. The defense requested discovery on November 9, 2012 – over two months before trial started. (*Demand for Discovery,* Doc. 15-1, Ex. 3, PageID#276-77).  They received discovery documents from the state on November 15, November 19, December 14, and January 17 – the last disclosure just nine days before trial.  (*Discovery Receipts,* Doc.15-1, Ex. 7, 8, 11, 13, PageID#286-95).

Throughout this period, Kayla remained in jail, and her trial was continued several times.  Trial was originally set for December 3, 2012 but was rescheduled first to December 27, 2012 and then again to February 4, 2013.  (*Docket*, Doc. 15-1, 56, PageID#908-11). The trial was rescheduled once more and finally held on January 28, 2013. (*Id*.).

In mid-January 2013, less than two weeks before trial, Kayla's defense was assigned to a new attorney at the public defender's office, Matthew Kuhn. In the 100 days leading up to trial, neither Ms. Powers nor Mr. Kuhn consulted with an independent arson expert.  (*Proffer of Testimony of Attorneys Kristina Powers and Matthew Kuhn*, Doc. 15-1, Ex.37, PageID#496).

1.    <u>Testimony & Conclusions of Inspector Reginald Winters</u>

The core of the State's case at trial was the testimony of Fire Inspector Reginald Winters.  Winters testified that he had approximately 70 hours of fire investigation classes, combined with just over ten hours per year of continuing education. (Tr. 227-228, Doc. 15-2, PageID#1151-52).

When he examined the fire in Kayla's home, Winters noticed an "unusual burn pattern" on the mattress, which he diagnosed as the first point of ignition:

> "Well, I had noticed that [the northeast side of the mattress] had a heavier char pattern where the springs—what we call—I'll try to explain it to you, it's called calcination.  It's basically where the fire burned so hot that it will turn the springs white and they'll collapse.  And on that end I had noticed where the fire had burnt the hottest and it traveled westward.  Like it was—there's where, right there, made a conclusion that I had a fire start there that was low and it started there and traveled west toward the wall because that's where the material was at, that it was consuming as it was burning."

(Tr. 240-241, PageID#1164-65.)

According to Winters, a separate and distinct ignition occurred near a wooden post, next to where a door had been leaning against the bed:

> "If you look at [the post], you have the concrete floor, you go up and you have concrete, kind of pyramid, and then right there you can see a clear point of the V-pattern that I was telling you about, the starting point right there, the origin.  *** [The V-pattern] is telling me the point of origin of a fire consistent [sic] where the fire started.  It started low and it started climbing the post with the heavy charring and stuff like that."

(Tr. 245-246, PageID#1169-70).

Winters confirmed that his "certified arson opinion" was that the fire started in two separate and distinct locations, and that the cause of the fire was "incendiary."[1] (Tr. 249-250, PageID#1173-74).

On cross examination, defense counsel questioned Inspector Winters about an initial Executive Summary and report from his office. (Tr. 282-285, Doc. 15-2, PageID#1206-09). The Initial Report claimed that the fire started on the first floor, and that ignitable liquid vapors or gasoline were used as an accelerant. (*Defendant's Trial Exhibit A*, Doc. 15-1, PageID#498). Winters acknowledged that the Initial Report was incorrect, but he explained that the summaries on these documents were "typo[s]," where old information from prior reports had not been removed. (Tr. 285, Doc 15-2, PageID#1209).

On redirect, the prosecution asked Inspector Winters to read his "final" Executive Summary. (Tr. 296, Doc 15-2, PageID#1220). Defense counsel objected, asking whether this document had been provided. At sidebar, the prosecution answered:

> Mr. Barr: Provided in discovery, Your Honor, the origin and cause report, and I'm asking him [Winters] to read this based upon the cross-examination of documents that I believe he [Mr. Kuhn] received from Massillon Municipal Court that were not the final report and that contain typographical errors. I believe the jury needs to know this.
>
> The Court: Okay. Do you want to take a look at this?

---

[1] Winters also testified that, although Kayla did not have any soot on her arms and hands, swabs of her nostrils supposedly showed "light soot." (Tr. 268, Doc 15-2, PageID#1192). Winters testified that he "did not observe" any soot when talking to Brennan Jr. at the neighbor's house later that night. (*Id.* at 270, PageID#1194). By that time, however, Jennifer Conley had already gotten Brennan "cleaned up" and changed his clothes. (Tr. 363, PageID#1287).

Mr. Kuhn:  Yeah, if I could.

Mr. Barr:  There is the discovery [November] 15, 2012, it indicates origin and cause from Massillon Fire Department.  The document he has, we don't have in our file.  This is the only document we could have given him.

Mr. Kuhn: Yeah, I'll do that real quick.
***

Mr. Kuhn:  If we signed for them, we signed for them.

The Court:  If you could approach for just a minute *** Put on the record with respect to the document with which Mr. Winters is being currently examined regarding it appears as though the Defense did sign for the report, and therefore, you are permitted to cross-examine him."

(Tr. 297-300, Doc. 15-2, PageID#1221-1224).

The State then asked Inspector Winters to read his entire Executive Summary into the record.  According to the Executive Summary, the fire was "incendiary" and started on the mattress:

"After examination of the fire scene it was determined the fire originated in the basement on the bed.  After examination of the fire scene, interviewing witnesses, interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of *NFPA 921; A Guide for Fire and Explosion Investigation*, it is my opinion the ignition source for the fire was some type of open flame.  The materials first ignited were blankets on the bed.  The act or omission that brought the ignition source and the materials first ignited together was the deliberate act of a person or persons.  Using these elements of a fire cause, the cause of the fire is incendiary."

(Tr. 300-301, Doc 15-2, PageID#1224-25).

Neither the Initial Report nor the final Executive Summary and Report mentioned Winters' conclusion that the fire had multiple points of origin.  (Tr. 297-301, Doc 15-2, PageID#1221-25). *See Defendant's Trial Exhibits A & D,* Doc.15-1,

Ex.37, PageID#488-89.)  After the confusion surrounding the Initial Report, defense

counsel did not offer any further objection to the substance of Winters' testimony,

nor did he challenge Winters' conclusion that the fire was started in two separate

places.

    2.   <u>Closing Arguments</u>

Winters' conclusion regarding the alleged multiple points of origin became

the centerpiece of the State's closing argument.  Specifically, the State argued that

if the fire had two separate and distinct points of origin, then an accidental fire was

practically impossible:

> "I'll also remind you that common sense, your common sense, doesn't
> fly out the window when you walk in this courtroom.  If you fall asleep
> and you drop a cigarette on a mattress, it starts a fire right?  It's
> common sense.  **It doesn't jump and start another fire, it's not
> possible**.  .*** **There are two separate and distinct origins here
> according to the expert, according to the pictures.  Fire doesn't
> jump like that.  So everything was ruled out except incendiary,
> and that was to a reasonable degree of scientific certainty.**"

(Tr. 426, Doc 15-2, PageID#1350)(emphasis added).

The two points of origin theory was also critical to the State's argument that

Brennan Jr. (a.k.a. "Bubba") could not have started the fire.  Specifically, the State

argued that Brennan Jr. would have gotten soot on him if he had started a second

fire while the first fire was already burning:

> "And, again, common sense.  You believe that first story that the
> defendant said, "Bubba started the fire," he would have to hold a
> lighter like you remember Inspector Winters demonstrating how he
> had to hold that lighter?  He had to hold the lighter, ignite the
> mattress, **then go and start a second fire, the whole time, no
> soot, no smoke, not getting burned**?  **Impossible.**  They all told
> you, the firefighters told you, he would have something on him because

if he was exposed to that fire, that smoke, he would have something on him.  He had nothing.  **Because remember when—he has to start that second fire, the first point of origin is burning**.”

(Tr. 426-427, Doc 15-2, PageID#1350-51) (emphasis added).

During its rebuttal, the State continued to stress the importance of Winters’

expert opinion in proving Kayla’s guilt:

“We have a criminal justice system because criminals, even ones whose guilt have been overwhelmingly proven to you, like Kayla Ayers, don’t always admit that guilt.  **And this system requires experts, like Mr. Winters, who have to come in here and give you your opinion—their opinion so that you can make decisions beyond a reasonable doubt.**”

(Tr. 449, Doc 15-2, PageID#1373) (emphasis added).  Again, the State emphasized

Winters’ conclusion regarding multiple points of origin ruled out an accidental fire:

“There’s one [point of origin] right there.  And there’s the second one right there.  But, wait, oh, it’s an accident.  An accident that started twice.  So she must have been smoking two cigarettes, one for each hand, and then threw one on this side of the bed and one on this side of the bed, when that becomes her part of the story.”

(Tr. 450, Doc 15-2, PageID#1374). The State also re-emphasized that, with a barrier

blocking a portion of the bed, three-year-old Brennan could not have lit the mattress

on fire in multiple places:

“[T]here’s only two other plausible explanations as it’s been stated, that it was a cigarette, but it had to be two cigarettes because we got two points of origin because fire doesn’t hop from one side to the other, so the other plausible explanation is Bubba started the fire.

So Bubba had to crawl over that mattress and get over here first and light this fire.  And then he can’t crawl over that door there because that’s a door that sits high, it’s a regular door just like that door right there, sitting on its side, you know how hard it would be for you to throw your leg over it and now you’re going to ask a three-year-old to crawl over that without knocking it over?  So then he has to crawl over that burning mattress and come over here to the front side of it and light this part on fire.  That’s plausible? No.”

(Tr.454-455, Doc 15-2, PageID#1378-79)

Defense counsel argued that the State had not proven its case beyond a reasonable doubt and insisted that the fire might have been started by Brennan or by an unattended cigarette butt. *(*Tr. 447, Doc 15-2, PageID#1371).  But Kayla's attorney did not attempt to counter any of the State's specific arguments regarding the fire's alleged multiple points of origin. (Tr. 447-448, Doc 15-2, PageID#1371-72). Instead, the defense asked the jury to note that Inspector Winters only claimed to offer "scientific certainty," not "absolute certainty." (Tr. 437-38, Doc 15-2, PageID#1361-62, Tr. 448, Doc 15-2, PageID#1372).  The jury returned a guilty verdict against Kayla on aggravated arson and endangering children charges. (Tr.482-483, Doc 15-2, Page ID#1406-07).

At sentencing, Kayla continued to maintain her innocence, explaining that she only went to trial "because I really didn't do it so I was sure I wouldn't be found guilty." (Tr. 493-494, Doc 15-2, PageID#1417-18). She was sentenced to seven years' imprisonment, with three years' post-release control. Throughout the investigation, trial, and appeals, Kayla has consistently maintained her innocence.  (*Ayers Affidavit at ¶11*, Doc.15-1, PageID#495).

**C.  2019 Report**

John Lentini is one of the foremost forensic arson experts in the United States.  He is the former chair of the Forensic Science Committee for the International Association of Arson Investigators, and he was selected by the U.S. Justice Department to serve on a planning panel to recommend national standards

for fire and arson investigation. (*Affidavit of John Lentini,* ("Lentini Affidavit"), at ¶¶4-5, Doc 15-1, Ex. 37, PageID#500-526). Lentini wrote one of the primary textbooks on fire investigation, <u>Scientific Protocols for Fire Investigation</u>, which is currently in its third edition. He also served as a principal Member of the National Fire Protection Association, and for twenty years he served on the technical committee responsible for drafting the *NFPA 921, Guide to Fire and Explosion Investigation*— the same guide Inspector Winters supposedly relied on for his procedures and conclusions. (*Lentini Affidavit* at ¶4- 6, Doc. 15-1, PageID#502-04).

In 2019, Mr. Lentini reviewed the 2013 testimony and summary conclusions of Inspector Winters and produced a report. According to Lentini's analysis, "the expert testimony presented to the jury by Mr. Winters was unreliable, unscientific, and at odds with generally accepted fire investigation methodology." (*Id.* at ¶ 32, PageID#517). Specifically, Lentini concludes "unequivocally and to a reasonable degree of professional certainty" that:

(1) "The proposition that this fire had two points of origin is unsupportable by any generally accepted methodology,"

(2) "Mr. Winters used circular logic to conclude that the fire could not have been set by Ms. Ayers's son Brennan,"

(3) "Despite claiming to follow NFPA 921, Mr. Winters disregarded its guidance in several important ways," and

(4) "Mr. Winters demonstrated by his testimony that he is not qualified to investigate fires per NFPA 1033, the generally accepted industry standard."

12

(*Id.* at ¶ 9, Page ID#504-05).

None of these conclusions were ever put before either the Court or the jury during Ms. Ayers's original trial.

### D. State Post-conviction Proceedings

On April 13, 2020, Ms. Ayers submitted two filings to the Court of Common Pleas for Stark County, Ohio: a *Motion for Leave to File a Motion for New Trial* pursuant to Ohio Crim.R.33(B), and a *Petition for Postconviction Relief* pursuant to Ohio Rev.Code 2953.21-23. (Doc. 15-1, Ex. 35 & 36, PageID#416-528) In these state proceedings, Ms. Ayers asserted claims of ineffective assistance of counsel, prosecutorial misconduct, actual innocence, and a violation of her due process rights by the State's use of inherently untrustworthy evidence. The State of Ohio received six separate extensions of time to respond, and the matter was eventually fully briefed by March 2021.

On November 2, 2021, the trial court entered a "Judgment Entry Denying Defendant's Petition for Post-Conviction Relief and Motion for Leave to File for New Trial." (Doc. 15-1, Ex. 46, PageID#723-28). Regarding the Petition for Postconviction Relief, the trial court held that it lacked jurisdiction to consider Ms. Ayers's claims because she "was not unavoidably prevented from discovering the facts upon which she relie[d] to present her claims for relief" pursuant to R.C. 2953.23(A). (*Id.* at 4, PageID#726). The trial court also found that, even if Ms. Ayers was unavoidably prevented from discovering the facts supporting her Petition, she "cannot show by clear and convincing evidence that but for the constitutional error

13

at trial, no reasonable fact finder" would have convicted her. (*Id*.) Although the trial court acknowledged that its findings deprived it of jurisdiction to consider the substance of the Petition, it further purported to find Ms. Ayers claims were "barred by res judicata and are without merit." (*Id*.)

The trial court also denied Ms. Ayers's Motion for Leave to File a Motion for New Trial, on grounds that Ms. Ayers did not show by clear and convincing evidence "that she was prevented from filing a motion for new trial or discovering the evidence she now, eight years later, requests to present." (*Id*.)  On November 29, 2021, Ms. Ayers filed a timely Notice of Appeal. (Doc. 15-1, Ex. 47, PageID#729).

On appeal, the Ohio Fifth District affirmed the denial of both Ms. Ayers's Petition for Postconviction Relief and her Motion for Leave to File a Motion for New Trial.  *State v. Ayers*, 5th Dist. Stark No. 2021CA00134, 2022-Ohio-1910. (2022 Fifth Dist. Opinion, Doc. 15-1, Ex. 51, PageID#826).  The court of appeals declined to reach the issue of whether Ms. Ayers was unavoidably prevented from having discovered the Lentini affidavit supporting her claim.  Instead, the appellate court held Ms. Ayers's petition for postconviction relief was properly denied, because it failed to satisfy the jurisdictional prerequisite set by Ohio Rev. Code 2953.23. Specifically, the appellate court held that Ms. Ayers had not proven by clear and convincing evidence, that but-for the alleged constitutional violations, no reasonable factfinder would have convicted her. (*Id*. at PageID#862-63).

With regards to the Motion for Leave to File a Motion for New Trial, the court of appeals declined to address the standard set forth in Ohio Crim.R.33.  Instead,

the appellate court held that, had Ms. Ayers been permitted to file a motion for new trial, the hypothetical future motion would be "an exercise in futility." (*Id*. at PageID#866-67)  Specifically, the appellate court stated a future motion for new trial would be rejected based on the "no reasonable factfinder" standard, normally applied to delayed or successive post-conviction petitions under Ohio Rev. Code Sec. 2953.23.

On July 19, 2022, Ms. Ayers filed a timely notice of appeal to the Ohio Supreme Court.  The court declined jurisdiction on September 27, 2022.  (Doc. 15-1, Ex. 52 – 55, PageID#868-906).

### E. Federal Habeas Proceedings

Ms. Ayers first filed her Petition for Writ of Habeas Corpus in the Federal District Court for the Northern District of Ohio on July 27, 2020. (Doc. 1).  On December 3, 2020, the Court granted Ms. Ayers's motion to hold her petition in abeyance while she pursued relief in Ohio court. On December 6, 2022, this Court lifted its stay and entered a scheduling order. (Doc. 13).

On December 19, 2022, Ms. Ayers filed her Amended Petition for Writ of Habeas Corpus.  (Doc. 14).  Respondent filed its Return of Writ on February 10, 2023.  (Doc. 15).

## I.  <u>JURISDICTION, VENUE, & CUSTODY</u>

Respondent concedes and the parties agree that this Court has continuing jurisdiction to hear Ms. Ayers's Petition for Writ of Habeas Corpus and that the Federal District Court for the Northern District of Ohio, Eastern Division is the

15

proper venue.  (Return, Doc 15, PageID#150-51).  Furthermore, although Ms. Ayers is not currently imprisoned, Respondent acknowledges that Ms. Ayers was in custody and/or postrelease control at the time of her initial filing, and both parties agree that, as a result of collateral consequences arising from her conviction, Ms. Ayers's Petition is not moot.  *Id.*

## II.    <u>STATUTE OF LIMITATIONS</u>

As discussed in detail in Appendix A to her Amended Petition, Ms. Ayers claims are timely.  (Appx. A, Doc #14-1, PageID 132-135).  In short, each of her claims relies on scientific evidence from an independent arson expert, obtained on July 29, 2019. Lentini Report.  This date—July 29, 2019—is the "date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D). Ms. Ayers's Petition was filed within one year of that date and is therefore timely.

In its Return, Respondent argues that § 2244(d)(1)(D) does not apply because Ms. Ayers's claims "are all based in the trial record and were immediately discoverable [at the time of trial]." (Return, Doc. #15, PageID 152.)  To the contrary, *none* of Ms. Ayers's claims are based on the trial record alone.  While the analysis differs slightly for each claim,[2] they all depend in some way on newly-discovered evidence showing that the State's key forensic conclusions were false, unsupported,

---

[2] Ms. Ayers discusses each claim's reliance on evidence outside the record below, in Sections III – VI.

and unscientific.  (Lentini Affidavit, Doc #15-1, PageID 500-526). The Lentini

Affidavit is the backbone of each and every one of Ms. Ayers present claims.

In the alternative, assuming § 2244(d)(1)(D) does apply, Respondent argues

that Ms. Ayers did not exercise "due diligence" in discovering the evidence

supporting her claims.  Respondent first insinuates that, in deciding "due diligence"

for purposes of § 2244(d)(1)(D), this Court should defer to the Ohio courts—

specifically, the finding by the state trial court that Ms. Ayers "did not show by

clear and convincing evidence that she was unavoidably prevented from discovering

the evidence she was trying to present." (Return, Doc #15, PageID 152) (internal

questions omitted).  This cannot be correct.

First, if deference were appropriate on the matter of diligence, the last

reasoned opinion issued by a state court was the 2022 opinion from the Ohio Fifth

District Appellate Court.  That court was willing to assume, arguendo, that Ms.

Ayers was "unavoidably prevented from the discovery of facts" on which her claims

rely.  (2022 Fifth Dist. Op. at ¶60. Doc #15-1, Page ID#844-45). Furthermore, and

more importantly, the statutory provision in (d)(1) is a question entirely of Federal

law, with different language and different binding precedent. It is not an issue the

state courts considered, nor would it have been binding on this Court if they had.

Respondent also argues that "*[p]ro se* status and pro se status [sic] are not

extraordinary circumstances that excuse a lack of due diligence." (Return, Doc. #15,

PageID#153); citing *Keeling v. Warden, Lebanon Correctional Inst.*, 673 F.3d 452,

464 (6th Cir.2012).  Respondent's citation relates to the Sixth Circuit's discussion of

"extraordinary circumstances" for equitable tolling purposes, not due diligence pursuant to 2244(d)(1)(D).  In fact, to the extent the Sixth Circuit discusses (d)(1)(D) in *Keeling*, the court explicitly recognizes that the later triggering date *does* apply to ineffective assistance of counsel claims, where the prisoner "could not have been aware of the factual predicate of the claim at the time that the [judgment] became final." *Id*. at 461.  Mr. Keeling himself was not denied relief because of his lack of diligence in discovering the factual predicate of his claim, but rather because, as evidenced by his own pleadings, he became aware of the factual predicate of his claim more than a year before filing his federal petition.  *Id*.

Respondent does not offer any explanation as to how Ms. Ayers could have discovered the factual predicates in the Lentini Affidavit on her own through "reasonable" diligence.  In the absence of any such explanation, this Court should not place the responsibility for ferreting out junk science on the shoulders of an indigent twenty-three-year old from her prison cell.  It was reasonably diligent for Ms. Ayers to trust that state prosecutors would not offer false evidence, and it was reasonably diligent for Ms. Ayers to trust her attorneys to investigate and challenge faulty forensic testimony. *Banks v. Dretke*, 540 U.S. 668, 696 (2004)("Ordinarily, we presume that public officials have properly discharged their official duties.").  The proper triggering deadline pursuant to 2244(d)(1)(D) is July 29, 2019.  The present petition was filed on July 27, 2020, three hundred and sixty-four days later.  It was timely filed under AEDPA.

18

Even if her claim were untimely, Ms. Ayers would be entitled to equitable tolling pursuant to *Holland v. Florida*, 560 U.S. 631, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010).  In its Return, Respondent notes that "the Supreme Court has never accepted pro se representation alone or procedural ignorance as excuse for prolong inattention" to a filing deadline. (Return, Doc. 15, PageID#156). The Supreme Court has, however, recognized that egregious claims of ineffective assistance of counsel can constitute "extraordinary circumstances" that justify tolling.  Here, Ms. Ayers's attorneys did not just fail to challenge the false assertions from Inspector Winters. They went further, conceding in closing arguments that Inspector Winters conclusions—now known to be false—were offered to "levels of scientific certainty." (Transcript, Doc#15-2, Page ID#1372).  Whatever post-conviction investigation can be expected of pro se prisoners, they cannot be and should not be expected to scrutinize complicated forensic issues that were seemingly *endorsed* by their own attorneys.  If the Court finds Ms. Ayers's claims to be untimely under AEDPA, equitable tolling should be applied.

### III.    FIRST CLAIM
### INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
### SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
### CONSTITUTION

As explained in the Appendix to her Amended Petition, Ms. Ayers's conviction rests on false evidence, entered into the record without objection, and affirmatively endorsed by her own attorneys. (Appx. A, Doc #14-1, PageID#116-129)**.**  Her claim for ineffective-assistance-of-counsel ("IAC Claim") is properly before this Court.  It has been exhausted in Ohio courts.  The claim is not

19

procedurally barred, it is timely, and there was no adjudication on the merits of the claim in state court.  Her IAC Claim is therefore ripe for de novo review by this Court.  Because Ms. Ayers's trial attorneys were objectively deficient, and because these deficiencies prejudiced Ms. Ayers at trial, her Petition should be granted.

### A. Ms. Ayers's IAC Claim Necessarily Relies on Evidence Outside the Record.

Multiple procedural issues before the Court depend on whether or not Ms. Ayers's present IAC Claim is (or would have been) justiciable on the trial record alone.  In large part, Respondent's procedural arguments address Ms. Ayers's IAC Claim on the (incorrect) assumption that it could have been raised through the regular direct appeal process. (*E.g.*, Return, Doc #15, PageID 173).  In fact, each part of the IAC Claim depends in some way on evidence outside the original trial record.

The merits of Ms. Ayers's IAC Claim are fully discussed in Appendix A to her Amended Petition.  In short, Ms. Ayers alleges that her attorneys were constitutionally ineffective insofar as they (1) failed to consult an independent arson expert on the key forensic issues in the case, (2) failed to challenge the false arson testimony offered by the State at trial, and (3) failed to object to the State's improper conduct in expert discovery.

The first issue—the failure to consult an independent arson expert— unquestionably relies on evidence outside the original trial record.  There was no evidence before the original trial court as to what actions, if any, Ms. Ayers's attorneys had taken with regards to the key forensic issues in the case.  On the

other hand, at least some part of the other deficient conduct took place on the record. It is apparent from the record, for example, that Ms. Ayers's attorneys failed to impeach the State's arson testimony and failed to challenge the State's misconduct in "sandbagging" key conclusions from their arson expert. (*E.g.*, Tr. 225-305, Doc. 15-2, PageID#1149-1229).

However, just because deficient conduct occurs on the record does not mean that the record, *by itself*, would necessarily support a claim of ineffective assistance of counsel. A successful claim for ineffective assistance requires a petitioner to prove multiple elements that may require context outside the record. For example, a petitioner must prove her attorney's conduct was not the result of justifiable strategic or tactical decision. *Strickland v. Washington*, 466 U.S. 668, 690 (1984) (courts should not generally second guess a defense attorney's "strategic choices made after thorough investigation of law and facts"). She must also show what would have happened but-for her attorneys' conduct, i.e., that she was actually prejudiced by the deficient performance. *Id.* at 694-95.

These legal elements typically call for proof outside the original trial record. If the State's arson conclusions had been accurate, for example, then Ms. Ayers would not have been prejudiced by her attorneys' failure to challenge it. Similarly, if Ms. Ayers's attorneys had made an informed decision that the State's "two points of origin" theory was "scientifically certain," then their performance was not deficient; an objection under Ohio evidentiary rules would have only delayed the inevitable.

21

It is only with context *outside* the record that Ms. Ayers's IAC Claim becomes viable.  Specifically, Ms. Ayers now has evidence that (1) the State's arson conclusions were false and could therefore have been strongly impeached, and (2) that her trial counsel had not done any research on these critical forensic issues.  With this context, her IAC Claim is complete.  The defense's failure to challenge the State's arson testimony was not harmless error—Inspector Winters' testimony could have been impeached as flawed, unscientific, and misleading on critical issues of fact.  Furthermore, the defense's decision not to object to the "two points of origin" conclusion on evidentiary grounds was not a strategic one—it was borne of complete ignorance of the forensic issues at play.

### B. Ms. Ayers IAC Claim is Exhausted

Ms. Ayers's IAC Claim was exhausted through state court filings in 2020, as appealed through the Ohio Supreme Court, and it is now ripe for review by this Court.

Ohio law provides two separate mechanisms for a state prisoner to raise ineffective assistance of trial counsel based on evidence outside the original trial record.[3]  First, a prisoner may file a Petition for Postconviction Relief pursuant to Ohio Rev. Code 2953.21.  These state postconviction petitions are governed by strict timing requirements, set forth by Ohio Rev. Code 2953.23.  The timing

---

[3] In Ohio, ineffective assistance of counsel claims can be raised on direct appeal if and only if they are justiciable based on the trial record alone.  Claims requiring evidence outside the trial record must be raised through either 2953.21 or Crim.R.33.  *White v. Warden, Ross Correctional Inst.*, 940 F.3d 270, 277 (6th Cir.2019)

requirements in Rev. Code 2953.23 are jurisdictional. *See, e.g., State v. Bethel*, 192 N.E.3d 470, 476 (Ohio 2022). If a delayed petition does not satisfy Rev. Code 2953.23, then Ohio courts do not have jurisdiction to consider or adjudicate the merits of the underlying claim. *Gumm v. Mitchell*, 775 F.3d 345, 362 (6th Cir.2014).

Separately, Ohio allows ineffective assistance of trial counsel claims based on evidence outside the record to be raised through a Motion for New Trial pursuant to Ohio Rule of Criminal Procedure 33. *See, e.g., State v. Lordi*, 140 Ohio App.3d 561, 569-70, 748 N.E.2d 566, 572-73 (Ohio 7th Dist.2000)("[A] defendant may validly assert the denial of effective assistance of counsel as a basis for new trial pursuant to Crim.R.33(A)(1) or ([A])(5)."). For motions based on newly discovered evidence, filed more than 120 days after trial, Ohio Crim.R.33 establishes a two-step process. First, a movant must demonstrate by clear and convincing evidence that she was unavoidably prevented from discovering the evidence on which her claim was based within 120 days of trial. Ohio Crim.R.33(B). Once the state court grants leave pursuant to Crim.R.33(B), the movant then has seven days to submit a Motion for New Trial and present the claim on its merits. *Id*. As above, Ohio courts do not have jurisdiction to consider the merits of a delayed Motion for New Trial until and unless leave has been granted. *Bethel*, 192 N.E.3d at 480 (Ohio 2022).

Here, upon obtaining the Lentini Affidavit on which her IAC claim is based, Ms. Ayers filed both a Delayed Petition for Postconviction Relief, (Doc. #15-1, PageID 529-662) (as amended), and a Motion for Leave to File a Motion for New

Trial.[4] (Doc #15-1, PageID 424-30).  Both filings were denied, and Ms. Ayers filed a timely appeal to the intermediate appellate court.  When the state appellate court upheld the denials, Ms. Ayers appealed again to the Ohio Supreme Court, which declined to accept jurisdiction over the case.  (Notice of Appeal, Doc #15-1, PageID 868-9).

At this time, there is nothing left to do to raise the IAC Claim before Ohio courts, and the claim is fully exhausted.  In its Return, Respondent argues that the IAC Claim is not exhausted because Ms. Ayers "did not raise an identical [claim] on direct appeal to the state appellate court" and "did not timely file a direct in [sic] the Ohio Supreme Court."  (Return, Doc #15, PageID 173).  Respondent's arguments are incorrect for several reasons.  First, Respondent appears to suggest that Ms. Ayers should have raised the IAC Claim—based on evidence outside the record—in her direct appeal.  This would have been impossible.  Not only was Ms. Ayers unaware of the "vital facts" supporting her claims during the pendency of her direct appeal, but even if she had been aware of the factual predicate of her current IAC Claim in 2013, she could not have supplemented the record to include, e.g., the Lentini

---

[4] Along with her Motion for Leave, Ms. Ayers attempted to file a proposed Motion for New Trial Instanter to the Stark County Clerk of Courts.  The clerk of courts refused to accept this filing, however, and the Proposed Motion for New Trial Instanter was never made part of the state court record. (Amended Petition, Doc #15-1, PageID 529, at fn.1). As a result, Ms. Ayers resubmitted those exhibits independently to the state clerk of courts and to an amended petition for postconviction relief.  *Id.* (Postconviction Exhibits, Doc #15-1, Ex. 37, PageID#431-528).

Affidavit, or any other outside evidence.[5]  *McGuire v. Warden, Chillicothe Corr. Inst.,* 738 F.3d 741, 751 (6th Cir. 2013)("On direct appeal, Ohio law limits the reviewing court to the record of the proceedings at trial.")(internal quotations omitted). Second, although Respondent frames its argument as going to exhaustion, it appears to be suggesting that Ms. Ayers procedurally defaulted her IAC Claim. Respondent's procedural default arguments are more fully addressed below.

For purposes of federal habeas review, a claim is exhausted when state remedies "are no longer available, regardless of the reason for their unavailability." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).   Ms. Ayers's IAC Claim is exhausted, and Respondents' arguments to the contrary are without merit.

### C. Ms. Ayers's IAC Claim is not procedurally defaulted.

In general, district courts may not review constitutional claims that were rejected in state court for failing to meet that state's procedural requirements.  The Sixth Circuit has adopted a four-part analysis to determine whether a claim is procedurally defaulted:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the

---

[5] Ms. Ayers's appellate counsel did raise a separate and unrelated ineffective assistance of counsel claim on direct appeal, that was then procedurally defaulted when Ms. Ayers failed to raise it to the Ohio Supreme Court.  *State v. Ayers*, 2013 WL 6506473 (Ohio 5th Dist.2013)(unpublished); (2013 Fifth Dist. Op., Doc #15-1, Ex. 24, PageID 366-373).  The ineffective assistance claim raised on direct appeal related to the fact that Ms. Ayers's trial counsel used the wrong report in preparing his cross examination of Inspector Winters.  *Id*.  The intermediate state appellate court denied the claim because Ms. Ayers could not prove that her trial attorney's deficiency was prejudicial based on the trial record.  Except for providing yet another example of Ms. Ayers's substandard representation at trial, this claim is not directly related to the IAC Claim currently before the Court.

> petitioner failed to comply with the rule. ... Second, the court must decide whether the state courts actually enforced the state procedural sanction. ... Third, the court must decide whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. ... [Fourth, the court must decide whether] there was cause for [the petitioner] to not follow the procedural rule and [whether] he was actually prejudiced by the alleged constitutional error.

*White v. Warden, Ross Correctional Inst.*, 940 F.3d 270, 275 (6th Cir.2019), citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986).  In analyzing whether a claim is procedurally defaulted, a federal court should look to the "last explained state court judgment."  *Id.*, *citing Stojetz v. Ishee*, 892 F.3d 175, 191 (6th Cir.2018).

Respondent correctly notes that the last reasoned state court decision on Ms. Ayers's IAC Claim is the 2022 decision from the Fifth District Ohio Court of Appeals.  (2022 Fifth Dist. Op., Doc. 15-1, Ex. 51, PageID#826-867.)  In that decision, the Fifth District held that it lacked jurisdiction to consider Ms. Ayers's state postconviction petition, pursuant to Ohio Rev. Code 2953.23.  (*Id*. at PageID#862.)  It also purported to uphold the denial of her state petition on grounds of res judicata and the merits of the claim.

Furthermore, the Fifth District upheld the denial of Ms. Ayer's motion for leave to present her IAC Claim through a delayed motion for new trial.  (2022 Fifth Dist. Op., Doc 15-1, Ex. 51, PageID#866-67.)  In upholding the denial of leave, the state appellate court held that it was "unnecessary" to reach the only issue properly before it pursuant to Crim.R.33(B): i.e., whether or not Ms. Ayers was "unavoidably prevented" from discovering the Lentini affidavit within 120 days of her conviction.

26

Nor did it find that IAC Claims were not cognizable in delayed motions for new trial. Instead, the court held that:

> [I]n light of the evidence produced at Ayers's jury trial that did not depend upon expert testimony, and the entire record in this case, Ayers has not shown a constitutional error occurred during her jury trial and that **no reasonable fact-finder would have found her guilty but for the constitutional error at trial. R.C. 2953.23(A)(1)(b). Because Ayers's failed to meet her burden under R.C. 2953.23(A)(1)(b), Ayers's motion for a new trial would be without merit, therefore rendering moot a hearing on her motion for leave to file a motion for a new trial.**

*Id*. (emphasis added)

This holding is flatly inconsistent with well-established Ohio law. Motions for new trial are governed by Ohio Crim.R.33. To the knowledge of undersigned counsel, no other Ohio appellate court has ever applied Ohio Rev. Code 2953.23(A)(1)(b) to a motion for new trial or a motion for leave to file a motion for new trial. The Fifth District's error was not a mere technicality. Ohio Rev. Code 2953.23(A)(1)(b)—normally applied as a jurisdictional threshold for delayed postconviction petitions—only permits consideration of claims where the prisoner can prove "by clear and convincing evidence" that, but-for the constitutional error at trial, "no reasonable factfinder" would have convicted. This is a very demanding requirement, inherently precluding many, if not most, claims of ineffective assistance of counsel that would otherwise be granted pursuant to Ohio Crim.R.33.

"While federal courts are typically barred from hearing a claim that was procedurally defaulted in state court, when a state erroneously relies upon its own rule of procedural default, the claim is not barred." *Post v. Bradshaw*, 621 F.3d 406,

423 (6th Cir.2010)(internal citations omitted), *citing Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir.2005).  Ms. Ayers could not anticipate or control the state court's clear misapplication of Ohio Rev. Code 2953.23(A)(1)(b) to her motion for leave to file a motion for new trial.  But-for the state court's erroneous procedural holding, Ms. Ayers would have been able to present her IAC Claim for resolution to the state courts.  Instead, because the state appellate court "erroneously relied" on Ohio Rev. Code 2953.23(A)(1)(b) to deny her motion for leave to file a motion for new trial, Ms. Ayers's IAC Claim is not barred and should be considered de novo.  [6]

> **D. In the alternative, if Ms. Ayers's IAC Claim were procedurally defaulted, cause exists to excuse the default under *Martinez v. Ryan* and *Trevino v. Thaler*, and Ms. Ayers was prejudiced by the constitutional error.**

As discussed above, the state appellate court misapplied Ohio procedure in denying her IAC Claim, and therefore the claim is not barred.  Even if her IAC Claim were procedurally defaulted, however, the default would not bar this Court's review under the fourth prong of the *Maupin* test.  Specifically, "there was cause for

---

[6]  A similar rationale applies to the state court's misapplication of Ohio's res judicata rules to deny her state petition for postconviction relief. As discussed at length above, Ms. Ayers's IAC Claim necessarily relies on evidence outside the record, and therefore res judicata is inapplicable under well-established Ohio law. *Post*, 621 F.3d at 424 ("because the state court misapplied the res judicata defense and did not decide it on the merits, the claim is not barred, and we must review it de novo."). The Court need not reach this issue, however, because (1) her IAC claim would have been independently justiciable on the merits through Ohio Crim.R.33, but-for the state appellate court's misapplication of Ohio law, and (2) the state appellate court held as a threshold matter that it lacked jurisdiction over Ms. Ayers's petition for postconviction relief pursuant to Rev. Codd 2953.23, meaning its purported holding applying res judicata to the petition was *void ab initio. See, infra*, Section III.F.

[the petitioner] to not follow the procedural rule and [she] was actually prejudiced by the alleged constitutional error." *Maupin*, 785 F.2d at 138 (6th Cir.1986).

The United States Constitution does not guarantee a criminal defendant the right to counsel in postconviction proceedings.  However, the Supreme Court has recognized that, under certain circumstances, ineffective assistance of postconviction counsel can be considered cause to excuse a procedural default. *Martinez v. Ryan*, 566 U.S. 1 (2012).  Specifically, in *Martinez*, the Supreme Court held that a procedural default should be excused if the petitioner can show:  (1) that she has a "substantial" claim of ineffective assistance of trial counsel, (2) that she had no counsel or ineffective counsel for the collateral postconviction proceeding, (3) that the collateral-review proceeding was the "initial" review of the claim, and (4) that state law requires the ineffective assistance of trial counsel claim be raised in an initial collateral review proceeding rather than on direct appeal. *White*, 940 F.3d 270, 276 (6th Cir.2019) citing *Martinez v. Ryan*, 566 U.S. 1, 9, 17 (2012).  In 2013, the Supreme Court expanded this rule to State procedures that technically allow ineffective assistance of trial counsel claims on direct appeal, but where "by reason of its design and operation, [the state procedure] makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 569 U.S. 413, 429 (2013).

In 2019, the Sixth Circuit Court of Appeals held that the *Martinez-Trevino* holdings can apply to Ohio claims of ineffective assistance of trial counsel. *White v.*

*Warden, Ross Correctional Inst.*, 940 F.3d 270 (6th Cir.2019).  Specifically, the Court recognized that, "Ohio law makes it virtually impossible for defendants to meaningfully raise an ineffective-assistance-of-trial-counsel claim on direct appeal if the claim relies on evidence outside the record." *Id*. at 277.  Under those circumstances, the Court found that the petitioner's lack of postconviction counsel constituted cause to excuse his procedural default under Ohio law.

Assuming Ms. Ayers's IAC Claim was procedurally defaulted for her failure to raise it within the time contemplated by Ohio Rev. Code 2953.23, she has clear cause under *Martinez-Trevino-White* to excuse the default.  First, as discussed at length below, she has a "substantial claim" of ineffective assistance of counsel.  She had no access to postconviction counsel during her time for filing a timely state petition,[7] and in fact, her motion requesting the appointment of postconviction counsel was expressly denied.  Because her IAC Claim rests on evidence outside the record, the initial review process must be channeled through postconviction relief, not direct appeal.  And, as in *White*, Ms. Ayers's deadline for filing a timely state postconviction petition expired before the appellate court decided her direct appeal.

Ms. Ayers's lack of postconviction counsel is cause to excuse her failure to file a timely petition for postconviction relief pursuant to R.C. 2953.23.  If the Court

---

[7] Here, under the former version of Ohio Rev. Code 2953.23, Ms. Ayers was required to file a petition for postconviction relief within 180 days of the filing of the record on direct appeal.  The record on her direct appeal was submitted on March 27, 2013, meaning her deadline to submit a timely state petition expired on September 23, 2013.  (Docket, Doc #15-1, Ex. 57, PageID#918)

finds Ms. Ayers IAC Claim is procedurally defaulted, then her lack of counsel is cause to excuse that default under *Martinez-Trevino-White*.

**E.  In the alternative, Ms. Ayers is actually innocent, and failing to consider her IAC Claim on procedural grounds would be a miscarriage of justice.**

As explained above in Section III.C, the state appellate court "erroneously relied" on Ohio Rev. Code 2953.23(A)(1)(b) to deny her motion for leave to file a motion for new trial, and therefore Ms. Ayers's IAC Claim is not procedurally defaulted.  Even if her IAC Claim were defaulted, however, Ms. Ayers is actually innocent of aggravated arson, and it would be a miscarriage of justice for this Court to refuse to consider her IAC Claim on procedural grounds.

The Supreme Court has recognized that a petitioner's "actual innocence" may warrant federal habeas review of otherwise defaulted constitutional claims, in order to avoid a "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 320-21 (1995).  A petitioner may use the *Schlup* gateway to overcome a procedural default if he or she presents the federal court with "new reliable evidence," which, taken in light of the complete body of evidence, would makes it "more likely than not that no reasonable juror would have convicted [her]." *Id*. at 327.

Here, Ms. Ayers has presented newly discovered evidence discrediting the State's key arson expert.  (Lentini Affidavit, Doc #15-1, Ex. 37, PageID#500-526). Without Winters' testimony, the State would have been left with only two pieces of circumstantial evidence.  First, Ms. Ayers initially told investigators she saw Brennan Jr. set the fire while she was doing laundry, but she later admitted that

she had been asleep.  (Narrative Supplement, Doc #15-1, PageID#614).  Second, weeks before the fire, Kayla "jokingly" told her father she would "burn this motherfucker down."  (Tr.310, 340, Doc #15-2, Page ID#1234, 1264).

This is far from overwhelming evidence of guilt.   Ms. Ayers correctly suspected that her neighbors were trying to have her children taken away, which explains why she was reluctant to admit she had been sleeping prior to the fire. (Tr.3 60, Doc #15-2, PageID#1284) ("All she kept doing was repeating was she going to lose—Am I going to lose my kids, am I going to lose my kids?").  And Ms. Ayers's "threat" was not a serious one.  The comment was made weeks before the actual fire, and even the State's own witness admitted that he did not think it was a genuine threat.  (*Id*. at PageID#1264) ("It was more kind of a laugh or a joke kind of thing," and "it was like she meant it, but she didn't.").

In fact, without Inspector Winters's faulty "two points of origin" theory, the evidence is more consistent with Ms. Ayers's innocence than her guilt:

- Although the State claimed Ms. Ayers's motive was anger at her father, the fire was centered on Kayla's own mattress, near where what appeared to be a "little play area."   (Tr.241, Doc #15-2, PageID#1165).

- Ms. Ayers' three-year-old son, Brennan Jr., confirmed to investigators that his mother was sleeping when the fire started. (Narrative Supplement, Doc #15-1, PageID#614).

32

- Brennan Jr. demonstrated to investigators that he could light a cigarette lighter on his own.  (*Id.*; Tr.282, Doc #15-2, PageID#1206).

- The *NFPA 921: A Guide for Fire and Explosion Investigation* recognizes that children are the source of over 7,100 fires per year, (Lentini Affidavit, ¶23, Doc #15-1, PageID#647), and

- Ms. Ayers did not watch the house burn or flee the scene.  Instead, she broke a glass and cut her own hand while trying to extinguish the fire herself.  (Tr.262-63, Doc #15-2, PageID#1186-87).

Without Winters's unscientific testimony, the remaining facts are completely consistent with an accidental fire, started by a curious and unattended child. In fact, that explanation is far more plausible than the alternative: that, in order to get revenge against her father, Ms. Ayers intentionally set fire to her own mattress and then injured herself trying to extinguish it.

Federal courts are often the final resort for state prisoners facing wrongful imprisonment, and the *Schlup* gateway recognizes that procedural concerns regarding comity must sometimes "yield to the imperative of correcting a fundamentally unjust incarceration."  *Schlup*, 513 U.S. at 320-21 (1995).  If the Court finds Ms. Ayers's IAC Claim is procedurally defaulted, and if it finds *Martinez-Trevino-White* does not apply to excuse the default, then it should apply *Schlup* to consider her claim on its merits.

### F. As a result of their procedural holdings, Ohio courts lacked authority to "adjudicate" the IAC Claim on its merits, and 28 U.S.C. 2254(d) does not apply.

28 U.S.C. 2254(d) reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States
> (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

An analysis of state court record for purposes of Sec. 2254(d) should focus on the "last reasoned opinion" from the state courts. *Ylst v. Nunnemaker*, 501 U.S. 797 (1991).

Here, the last-reasoned decision in state court was the 2022 decision from the Fifth District Ohio Court of Appeals.  In that decision, the appellate court held that Ms. Ayers's IAC Claim was procedurally barred because she  failed to file a timely petition for postconviction relief and failed to satisfy the requirements of Ohio Rev. Code 2953.23(A)(1)(b) for filing a delayed petition.  In the alternative, the appellate court purported to both deny the claim on its merits and deny it on res judicata grounds.

Normally, alternative merit holdings by state courts are entitled to AEDPA deference under Sec. 2254(d).  Here, however, the state appellate court did not actually issue an alternative holding on the merits.  Instead, by its own decision,

and pursuant to clear Ohio law, the court lacked jurisdiction to "adjudicate" the

merits of the IAC Claim.  *Gumm v. Mitchell*, 775 F.3d 345 (6th Cir. 2014).

In *Gumm*, the petitioner sought federal habeas review of a *Brady* claim. As in

this case, the state court purportedly denied Gumm's claim both on the merits and

on 2953.23 grounds.  Under those circumstances, the Sixth Circuit held that the

state court's purported merits analysis is not entitled to deference under Sec.

2254(d):

> This Court and others have held that where a state court decides
> a petitioner's claim on alternative grounds, one on the merits and
> the other on a procedural bar ruling, a federal habeas court may
> still review that court's merits analysis and apply AEDPA
> deference to that adjudication. However, this case is not such a
> case. Instead, the **Ohio courts have clearly indicated that §
> 2953.23 denies courts subject matter jurisdiction over
> claims that cannot meet the statute's stringent
> requirements. The Ohio courts have interpreted their own
> law to conclude that where a court lacks jurisdiction, any
> judgment on the merits is rendered void ab initio.** This
> Court should not reinterpret an issue of state law that has already
> been interpreted by the state courts. Therefore, we apply de novo
> review to Petitioner's Brady claim.

*Id*. at 362. (emphasis added).

The state appellate court specifically held that Ms. Ayers did not satisfy Ohio

Rev. Code 2953.23(A)(1)(b).  (Doc 15-1, Ex. 51, PageID#862-63).  Therefore,

according to the court, "the trial court correctly concluded that it lacked jurisdiction

to consider Ayers's untimely petition for post-conviction relief."  *Id*. Because the

state court admittedly lacked jurisdiction to consider the merits of the IAC Claim,

any purported merits adjudication is *void ab initio* and not entitled to AEDPA deference.

The same rationale applies to Ms. Ayers's attempt to raise her IAC Claim through a Motion for New Trial.  The Ohio Supreme Court has explicitly held that a state court lacks authority to consider the merits of a motion for new trial until it first considers whether leave is proper under Ohio Crim.R.33(B).  *State v. Bethel*, 192 N.E.3d 470, 480 (Ohio 2022)("[U]ntil a trial court grants leave to file a motion for a new trial, the motion for a new trial is not properly before the court.");  *State v. McNeal*, 201 N.E.3d 861, 861 (Ohio 2022)(in deciding an appeal of the denial of leave, the merits are "not properly before this court.");  *State v. Hatton*, ___ N.E.3d ___, 2022-Ohio-3991, ¶30 (Ohio 2022).  Even notwithstanding this precedent, the state appellate court could not have actually reached the merits of Ms. Ayers's IAC claim through her motion for new trial.  Because the trial court denied Ms. Ayers leave to file a motion for new trial pursuant to Crim.R.33(B), *no such motion was on the record to be considered*.  (See Amended Petition, fn.1, Doc #15-1, PageID#529).

Based on its own procedural holdings, the state court lacked authority to consider the merits of Ms. Ayers's claims.  As a result, its purported findings on the merits are void and are not entitled to deference pursuant to 28 U.S.C. 2254(d).[8] Instead, the Court should proceed to a de novo review of the merits.

---

[8] Even if 28 U.S.C. 2254(d) did apply, the Fifth District's analysis of Ms. Ayers's IAC Claim is an abjectly unreasonable application of clearly established Supreme Court precedent and an unreasonable application of the facts in light of the evidence presented to it.  Although the state court acknowledged the standard set forth in *Strickland*, it steadfastly ignored the explicit importance of Winters's "two points of

### G. Merits Analysis: Ms. Ayers was deprived of a fair trial as the result of ineffective assistance of her trial counsel.

As discussed at length in Appendix A to her Petition, Ms. Ayers's IAC Claim is squarely on point with binding Sixth Circuit precedent. *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007). In *Richey*, the Sixth Circuit considered the extent to which the U.S. Constitution requires criminal defense counsel to challenge and investigate faulty arson testimony.  The Sixth Circuit explicitly recognized that attorneys have an obligation to educate themselves on forensic matters important to the case, and that the "most egregious" claims of ineffective assistance involve lawyers who "altogether fail to hire [i.e., consult] an expert."  *Id*. at 362. Furthermore, the court recognized that ineffective-assistance claims involving experts do not turn on whether the non-expert evidence was "sufficient" to uphold the conviction, but whether the defense's failure to challenge faulty arson conclusions undermined confidence in the outcome. *Id*. at 364. ("Although the circumstantial evidence alone might have led to a conviction, the question before us is not one of the sufficiency of the evidence, but of undermining our confidence in the reliability of the result.")

---

origin" conclusion to the State's case, and it repeatedly returned to a "sufficiency of evidence" analysis, finding the Lentini affidavit would not have "exonerated" Ms. Ayers.  (*Id*. at PageID#851).  While this approach may make sense under the higher jurisdictional threshold of R.C. 2953.23, it contradicts Supreme Court precedent as set forth by *Strickland* and its progeny. Strickland, 466 U.S. at 694 (1984) ("An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.")

In its Return, Respondent fails to distinguish or even acknowledge *Richey*. Instead, Respondent argues that this Court "cannot second-guess Ayers' trial attorney's strategic decisions to not retain an arson expert and not present an arson expert as a defense witness."  (Return, Doc #15, PageID#209).  But Ms. Ayers's defense counsel did not make a "strategic decision" to remain ignorant about the key forensic issue in the trial.  To the contrary, defense counsel was simply unprepared to challenge the basic errors in Winters' arson conclusions.  Without any meaningful challenge, the State used those same faulty conclusions to "prove" the fire could not have been accidental.  And while there may be strategic justification for failing to *present* an expert witness, even in a case primarily dependent on forensic testimony, there is rarely a valid justification for refusing to *consult* with one. *Richey*, 498 F.3d at 363 (6th Cir.2007)(" The court could "discern no strategic reason why counsel would have so readily ceded [the existence of arson]"); *Dando v. Yukins*, 461 F.3d 791 (6th Cir.2006) (unpublished) ("Although courts are typically required to show heightened deference to an attorney's strategic decisions supported by professional judgment, where a failure to investigate does not reflect sound professional judgment, such deference is not appropriate.");  If Ms. Ayers's trial counsel did have a "strategy" that required remaining ignorant about what a competent independent expert would say as to the origin of the fire, Ms. Ayers should be able to inquire of that strategy at an evidentiary hearing.

Finally, Respondent argues that defense counsel is not required to present an expert witness when the attorney can "instead rely on cross examination and

closing arguments to impeach [expert] testimony." (Doc #15, PageID#208). This is true. If Ms. Ayers's trial attorney had sufficient knowledge and expertise regarding arson investigations, he might have been able to effectively impeach Inspector Winters himself, without calling an expert to testify. *See*, *e.g.*, *Jackson v. McQuiggin*, 553 Fed.Appx.575 (6th Cir.2014) (unpublished)(Failure to call arson expert was not ineffective because the defense attorney "considered the gains and losses associated with hiring an expert, she educated herself on principles of arson investigation, consulted with an arson expert, conferred with defense attorneys, and elicited concessions from [the expert] on cross-examination.").

But that is not what happened here. Defense counsel failed to impeach Inspector Winters on any of the critical flaws uncovered in the Lentini Report. The defense did not challenge Winters' misuse of basic terminology or inadequate qualifications. Most importantly, the defense failed to impeach Winters on his unsupported conclusion that the fire had "two points of origin." Prosecutors would go on to use this "two points of origin" theory in closing arguments to argue that it was "impossible" for Brennan Jr. to have set the fire. (Tr. 426-427, Doc #15-2, PageID#1350-51). In turn, for the defense's closing arguments, Ms. Ayers's counsel effectively *endorsed* Winters's faulty testimony, arguing that his conclusions were not offered to an "exact" certainty—merely using levels of "scientific certainty." (*Id.* at PageID#1372).

Again, defense counsel's failures were magnified, not necessarily because he did not present an independent arson expert, but because he failed to conduct any

39

research into the issue at all.  This is "that most egregious type [of ineffectiveness], wherein lawyers altogether fail to hire an expert." *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir.2007).  Ms. Ayers IAC Claim is meritorious and the Court should grant her Petition.

## IV.  SECOND CLAIM
## PROSECUTORIAL MISCONDUCT
## FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED
## STATES CONSTITUTION

### A. Ms. Ayers's Prosecutorial Misconduct Claim necessarily relies on evidence outside the record.

As with its response to the IAC Claim, Respondent's procedural arguments depend in part on the incorrect assertion that Ms. Ayers's prosecutorial misconduct claim was available to her on direct appeal, based on the trial record alone.  (E.g., Return, Doc #15, PageID#212-13).

A claim of prosecutorial misconduct is not grounds for relief unless the petitioner can demonstrate that the misconduct was prejudicial. Government misconduct prejudices a defendant when there is a "reasonable probability" that, but-for the State's misconduct, the result of trial would have been different.  *E.g., United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976). ("the Court has applied a strict standard of materiality, not just because [these cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.").

40

Assuming the State's failure to provide notice of Inspector Winters's conclusions amounted to cognizable prosecutorial misconduct, that misconduct would only be grounds for relief insofar as Ms. Ayers could show she was actually prejudiced by the misconduct.  In order to demonstrate prejudice, Ms. Ayers would have to show that (1) Winters's conclusions were faulty, and (2) that she could have successfully challenged those conclusions but-for the State's misconduct.  That argument was simply not available based on the trial record.

### B. Exhaustion, Procedural Default, and 2254(d) Deference.

Most of the same procedural arguments discussed infra with regards to Ms. Ayers's IAC Claim apply equally to her Prosecutorial Misconduct Claim.  She attempted to raise the claim both through a delayed petition for postconviction relief and a motion for new trial, and she appealed the denial of those claims through the Ohio Supreme Court.  The exhaustion arguments offered above in support of Ms. Ayers IAC Claim apply equally to her Prosecutorial Misconduct Claim.

Furthermore, as with her IAC Claim, Ms. Ayers's Prosecutorial Misconduct Claim is not procedurally defaulted, because the state appellate court improperly relied on Ohio Rev. Code 2953.23 to deny her motion for leave to file a motion for new trial.  "When a state erroneously relies upon its own rule of procedural default, the claim is not barred."  *Post v. Bradshaw*, 621 F.3d 406, 423 (6th Cir.2010).  In the alternative, the same *Schlup* argument offered in support of her IAC Claim would also excuse a potential procedural default for her Prosecutorial Misconduct Claim.

41

Finally, the state appellate court's procedural rulings deprived it of authority to consider the merits of Ms. Ayers's Prosecutorial Misconduct Claim, and the courts constitutional analysis is not entitled to deference under AEDPA. Instead, this Court should review the claim de novo.

### C. Merits Analysis

As discussed in Appendix A to Ms. Ayers's Amended Petition, state prosecutors appear not to have disclosed key portions of Inspector Winters conclusions prior to trial, in violation of state law. (Doc #14-1, PageID#129-30). If the Court finds that this misconduct (rather than defense counsel's ineffectiveness) deprived Ms. Ayers of the ability to challenge Inspector Winters's testimony, then the State's conduct also necessarily deprived her of a fair trial.

In its Return, Respondent argues that prosecutorial misconduct merits habeas relief only when it deprives the petitioner of a fair trial. (Doc #15, PageID 238), citing *Moore v. Mitchell*, 708 F.3d 760 (6th Cir.2013). But the misconduct here was not a passing improper remark by a prosecutor during closing arguments. As discussed at length in Appendix A to the Amended Petition, the State heavily relied on Winters's unsupported conclusions to "prove" the fire could not have been accidental. (Doc #14-1, PageID#126-28). If the prosecutor's misconduct prevented Ms. Ayers from challenging this faulty arson science, the fundamental fairness of the resulting trial would have been affected, and Ms. Ayers would be entitled to relief.

## V.    THIRD CLAIM: VIOLATION OF DUE PROCESS CONVICTION OBTAINED BY FUNDAMENTALLY UNRELIABLE AND INHERENTLY UNTRUSTWORTHY EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEEN AMENDMENTS TO THE UNITED STATES CONSTITUTION

### A. Ms. Ayers's Unreliable Evidence Claim depends on evidence outside the trial record.

As with prior claims, Respondent's analysis of Ms. Ayers's Third Claim ("Unreliable Evidence Claim") is based primarily on the argument that the claim could have been and should have been raised on the trial record alone.  This approach is particularly perplexing here, given that Ms. Ayers's Unreliable Evidence Claim is straightforwardly dependent on the 2019 Lentini Affidavit.

Inspector Winters's arson conclusions—and especially the conclusion that the fire had "two points of origin"—were effectively junk science.  John Lentini—an author of the NFPA 921 purportedly relied upon by Winters for his conclusions—found in 2019 that Winters conclusions were "unsupportable by any generally accepted methodology."  Lentini's analysis is obviously the foundation for Ms. Ayers's argument that her conviction improperly rests on "inherently unreliable testimony."  (Lentini Affidavit, Doc. 15-1, Ex. 37, PageID#500-526).

Of course, Mr. Lentini's analysis is not a part of the original trial record.  The trial record contains nothing at all suggesting Winters's testimony was unreliable.  As explained in detail above, this very fact is a core component of Ms. Ayers's IAC Claim.  It is unclear from the Return why Respondent believes the Unreliable Evidence Claim would have been apparent from the trial record.

43

B.     **Exhaustion, Procedural Default, and 2254(d) Deference.**

The same procedural arguments discussed infra with regards to Ms. Ayers's
Prosecutorial Misconduct Claim apply equally to her Unreliable Evidence Claim.
She attempted to raise the claim both through a delayed petition for postconviction
relief and a motion for new trial, and she appealed the denial of those filings
through the Ohio Supreme Court.  The exhaustion arguments offered above apply
equally to Ms. Ayers Unreliable Evidence Claim.

Furthermore, as with her IAC Claim, Ms. Ayers's Unreliable Evidence Claim
is not procedurally defaulted, because the state appellate court improperly relied on
Ohio Rev. Code 2953.23 to deny her motion for leave to file a motion for new trial.
"When a state erroneously relies upon its own rule of procedural default, the claim
is not barred." *Post v. Bradshaw*, 621 F.3d 406, 423 (6th Cir.2010).  In the
alternative, the same *Schlup* argument offered in support of her IAC Claim would
also excuse a potential procedural default for her Unreliable Evidence Claim.

Finally, the state appellate court's procedural rulings deprived it of authority
to consider the merits of Ms. Ayers's claim, and the court's constitutional analysis is
not entitled to deference under AEDPA.  Instead, this Court should review the
claim de novo.

 **B. Merits Analysis.**

In its Return, Respondent does not offer any arguments as to the merits of
Ms. Ayers's Unreliable Evidence Claim.  As a result, Ms. Ayers rests on her merits
argument as presented in Appendix A to the Amended Petition, and requests this

Court allow her to supplement her claim as appropriate with an evidentiary hearing.

## VI.    FOURTH CLAIM
### ACTUAL INNOCENCE
### FIFTH, EIGHTH AND FOURTEEN AMENDMENTS TO THE UNITED STATES CONSTITUTION

### A. Exhaustion, Procedural Default, and 2254(d) Deference.

Ms. Ayers's procedural arguments in support of her Actual Innocence Claim are the same as those provided in support of her IAC Claim (except that the *Martinez-Trevino-White* arguments only apply to her IAC Claim).  In short, Ms. Ayers's Actual Innocence Claim is exhausted. It is not barred by procedural default, and §2254(d) does not apply because the claim was not adjudicated on the merits.

### B. Merits Analysis

The Supreme Court has assumed, without deciding, that "a truly persuasive demonstration of actual innocence made after trial" could act as a freestanding constitutional claim. *Herrera v. Collins*, 506 U.S. 390, 416 (1993). Ms. Ayers acknowledges that a freestanding actual innocence claim has not yet been recognized by the Sixth Circuit, and that her other claims present a more straightforward path for relief.

But Ms. Ayers is actually innocent of the aggravated arson, and her conviction and ongoing punishment of a factually innocent person is a "constitutionally intolerable event." *Herrera* at 419 (O'Connor, J., concurring).  Ms. Ayers did not set the fire at her father's home, and she was only convicted as a result of State's junk science and her own attorney's shortcomings.  In light of the

newly-discovered Lentini Affidavit, there is now at least a preponderance of evidence that Ms. Ayers is factually innocent. Ms. Ayers has steadfastly maintained her innocence in this matter for over a decade. At minimum, she should be permitted a hearing to develop her Actual Innocence Claim.

## VII.    EVIDENTIARY HEARING

The Supreme Court has set forth clear rules regarding when evidentiary hearings are appropriate in federal habeas proceedings. First, if the state courts have already adjudicated the merits of a claim, then the federal courts are not permitted to expand the record at all. *Cullen v. Pinholster*, 563 U.S. 170 (2011). Instead, they are limited to that same factual universe that existed before the state court. If § 2254(d) does not apply to a claim, however, then a federal court may permit an evidentiary hearing—so long as the petitioner satisfies the requirements of §2254(e)(2).

28 U.S.C. § 2254(e)(2) limits the circumstances under which a federal court can conduct an evidentiary hearing on the merits of a claim being consider de novo. Those restrictions only apply, however, where a petitioner has otherwise "failed to develop the factual basis of a claim" in state court. *Michael Williams v. Taylor*, 529 U.S. 420 (2000). The Supreme Court has held that "failed to develop" implies actual fault; § 2254(e)(2) will not limit evidentiary hearings unless the record is underdeveloped because of the petitioner's "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id*. at 432. If a prisoner is unable to fully develop the state court record, despite his or her best efforts, then §

2254(e)(2) will not limit a court's ability to conduct an evidentiary hearing on his or her claim.  "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Schriro v. Landrigan*, 550 U.S. 465, 468, (2007).

Here, as discussed at length above, the state courts held that they lacked jurisdiction to reach the merits of Ms. Ayers's claims, and therefore this Court is not bound by the State record pursuant to §2254(d) or *Pinholster*.

Furthermore, Ms. Ayers did not "fail to develop the factual basis of her claim" in state court.  To the contrary, Ms. Ayers did everything possible to expand the record at every stage of her postconviction proceedings.  She requested a hearing with every filing before the Stark County trial court. (Motion for Leave, Doc 15-1, Ex 36, Page ID#424); (Amended PC Petition, Doc 15-1, Ex. 38, PageID#529, 535) She also raised the denial of these hearings as a separate assignment of error on appeal.  (Appeal Brief, Doc.15-1, Ex. 49, PageID 770-71).  Because an evidentiary hearing is not barred by either §2254(d) or §2254(e)(2), the Court may set one at its discretion.

In this case, an evidentiary hearing would be useful in reaching a proper determination of Ms. Ayers's claims.  For example, because Ms. Ayers was not permitted discovery or a hearing in State court, she was forced to proffer her attorneys conduct and experience in failing to prepare to challenge the State's arson expert.  (Proffer, Doc. 15-1, Ex. 37, PageID#496).  If, as Respondent suggests, those

attorneys had sound "strategic" reasons for their conduct in this matter, then they should be given an opportunity to explain those reasons.  Furthermore, because the state courts refused to permit Ms. Ayers a hearing, Inspector Winters has never been asked to testify regarding the findings in the Lentini Affidavit.  Respondent assumes the information contained in the Lentini Affidavit would have resulted in a stalemate, a "battle of the experts" at Ms. Ayers's trial.  It is possible, however, that Inspector Winters may agree with Lentini's conclusions and change his mind.  The best way to know what the effect an effective arson expert would have had in 2013 is to see what effect such an expert has today.  The Court should allow an evidentiary hearing on the merits of Ms. Ayers's claims.[9]

## VIII.   CONCLUSION

For the foregoing reasons, Petitioner Kayla Ayers respectfully requests this Court allow her to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases in Federal District Courts, order an evidentiary hearing, issue a writ of habeas corpus, and her release from state custody with the conviction vacated, or for Ms. Ayers to be retried within 90 days.  Further, Ms. Ayers requests this Court grant such other relief that would be appropriate and to dispose of the matters as law and justice require.

---

[9] Insofar as the Court finds it necessary, an evidentiary hearing may also be appropriate to reach a proper result on non-merits related issues.  The Court may order an evidentiary hearing on whether Ms. Ayers satisfied an actual innocence gateway under *Schlup v. Delo* or *McQuiggins v. Perkins*, or regarding her exercise of "due diligence" pursuant to 2244(d)(1)(D), or any other procedural / collateral issue.

Respectfully submitted,


/s/ Brian C. Howe
Brian C. Howe (0086517)
Attorney for Petitioner
Ohio Innocence Project
Univ. of Cincinnati College of Law
P.O. Box 210040
Cincinnati, OH  45221-0040
Phone:  513-556-0752
Fax:  513-556-0702
Brian.Howe@uc.edu

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing pleading was filed electronically via the Court's CM/ECF system on March 10, 2023, and a copy is available to opposing counsel via the Court's electronic notification system.

/s/ Brian C. Howe
Brian C. Howe