IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **KAYLA AYERS,** | : | Case No. 5:20-cv-01654 |
| | : | |
| Petitioner, | : | Judge Sara Lioi |
| | : | |
| v. | : | Magistrate Carmen E. Henderson |
| | : | |
| **DIRECTOR, OHIO** | : | |
| **DEPARTMENT OF** | : | |
| **REHABILITATION &** | : | |
| **CORRECTIONS** | : | |
| | : | |
| Respondent. | | |

**PETITIONER KAYLA AYERS'S OBJECTIONS TO THE MAGISTRATE'S REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. §636(b) and the Rules Governing Section 2254 Cases 8(b), Petitioner Kayla Ayers respectfully submits the following objections to the Magistrate Judge's Report and Recommendation ("R&R," Doc.# 18) issued on June 14, 2023, recommending dismissal of the Petition as untimely.

Specifically, Ms. Ayers objects to the Report and Recommendation's analysis regarding 28 U.S.C. § 2244(d)(1)(D), its analysis regarding equitable tolling, and its analysis regarding Ms. Ayers's actual innocence.

Under 28 U.S.C. § 636(b)(1)(C), Loc.R. 72.3(a), and Rules Governing Section 2254 Cases 8(b), any party may serve and file objections to findings and recommendations of the Magistrate Judge. This Court must make a *de novo* determination of those portions of the report to which objection is made. In support

1

of her objections, Ms. Ayers incorporates herein all of the facts and arguments contained in her Amended Petition for Writ of Habeas Corpus ("Petition," Doc. #14) and her Traverse (Doc # 16) in addition to the arguments below.

I. **The Report and Recommendation does not properly apply 28 U.S.C. § 2244(d)(1)(D) to Ms. Ayers's claims.**

28 U.S.C. § 2244(d) controls the timeliness of a federal habeas petition by a person in state custody. Petitions for writs of habeas corpus must be filed within one year of the latest of four possible triggering dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

For purposes of Petitioner's Objections, the primary issue is the application of § 2244(d)(1)(D)—that is, what is "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence?"[1] The Report and Recommendation acknowledges that John Lentini's

---

[1] Ms. Ayers does not dispute the Magistrate Judge's calculation of the date on which her conviction became final under § 2244(d)(1)(A), nor does she argue that her Petition is timely under that subsection. Instead, Ms. Ayers's Petition is timely

2

Report is the "factual predicate" of the claims presented in Ms. Ayers's Petition. (R&R, Doc #18, PageID#1511 at fn.5)("The Court has reviewed the claims and agrees that there is an argument to be made that Mr. Lentini's report relates to each claim.") As such, the remaining question is when this factual predicate (or a substantially similar expert report) could have been discovered by Ms. Ayers "through the exercise of due diligence."

### A. Pursuant to § 2244(d)(1)(D), Ms. Ayers was "reasonably diligent" given the "realities of the prison system."

In evaluating "due diligence" under 2244(d)(1)(D), courts must take into account a prisoner's specific circumstances and access to information. *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006). In *DiCenzi*, the issue was whether the petitioner exercised due diligence in first raising his claims several years after the expiration of his time for direct appeal, when neither the state trial court nor his trial attorney had informed him of his right to appeal. The Sixth Circuit noted that "had DiCenzi merely inquired of a court or a public defender regarding whether he had the right to an appeal, he could have found out that he did." *Id*. at 470. Despite the information in question being available with a simple inquiry, the Court refused to dismiss the petition as necessarily untimely. Instead, the Court noted that § 2244(d)(1)(D) "does not require the maximum feasible diligence, only 'due,' or reasonable, diligence." *Id*., quoting *Granger v. Hurt*, 90 Fed.Appx. 97, 100 (6th

---

because the latest applicable triggering date is the date on which the factual predicate became available to Ms. Ayers through due diligence, pursuant to § 2244(d)(1)(D).

3

Cir.2004)(unpublished). Furthermore, the diligence analysis requires courts take into account "the realities of the prison system" . *Id*. Under those circumstances, the Court remanded the case to the district court for specific factual development regarding when a "reasonably diligent" prisoner in DiCenzi's position would have discovered his appeal rights.

**B. The Report and Recommendation failed to properly consider whether Ms. Ayers was reasonably diligent in uncovering previously unknown flaws in Inspector Winters' testimony.**

The Report and Recommendation recommends the Court dismiss Ms. Ayers's petition as untimely because she "had several opportunities to raise her counsel's decision not to call an expert[2] and failed to do so." (R&R, Doc.#18, PageID#1512). Specifically, the Magistrate Judge found that "[s]ince she witnessed her trial—and the State's expert testify—she would have known it was possible to call an expert." *Id*. This finding misunderstands both the nature of Ms. Ayers's claims and the case law defining "due diligence."

Of course, Ms. Ayers could be reasonably expected to have known, before 2019, that it was "possible [for defendants, generally] to call an expert." But Ms. Ayers's argument regarding diligence is not that she only discovered that it was "possible to call an expert" in 2019. Instead, Ms. Ayers argues that her claims were not discoverable before 2019 with reasonable diligence because (1) she had no way

---

[2] The Report and Recommendation mischaracterizes Ms. Ayers's ineffective assistance of counsel claim as arguing that her attorneys were ineffective for failing to *call* an expert. In fact, her claim is that her attorneys were ineffective because, in a case that depended in large part on expert arson conclusions, they failed to even *consult* an expert.

4

to know whether her attorneys *should have* consulted with an expert, and (2) without assistance in obtaining the Lentini Report, she had no way to know what would have happened had they done so.

A defense expert need not be called to testify in every case. An attorney need not even *consult* with an expert in every case. If an attorney is independently knowledgeable in some forensic science, for example, then he or she would not need to consult an independent expert prior to trial. *See, e.g.*, *Jackson v. McQuiggin*, 553 Fed.Appx.575 (6th Cir.2014) (unpublished)(Failure to call arson expert was not ineffective because the defense attorney "considered the gains and losses associated with hiring an expert, she educated herself on principles of arson investigation, consulted with an arson expert, conferred with defense attorneys, and elicited concessions from [the expert] on cross-examination."). However, where the State's case depended in large part on junk science, and where the attorney himself was not capable of discerning whether the expert conclusions were flawed, then the attorney's failure to consult is deficient performance. Here, defense counsel did not discuss the possibility of producing an expert with Ms. Ayers prior to trial. (Affidavit of Kayla Ayers, Doc.#15-1, PageID#463-64). And simply observing the trial gave Ms. Ayers no insight into whether or not her attorneys' actions behind the scenes were intentional and tactical, or whether they were reckless and uninformed.[3]

---

[3] The Report and Recommendation states that "[p]etitioner cannot blame her counsel for failure to obtain the information in Mr. Lentini's report since *Petitioner* must demonstrate due diligence in obtaining the new factual predicate." (emphasis

5

Furthermore, even assuming her attorney's deficient performance was discoverable (or apparent) at trial, Ms. Ayers could not have immediately pursued her claims without knowing whether she was prejudiced as a result of those failures. *Strickland v. Washington*, 466 U.S. 668, 694-95 (1984). If Winters testimony had been accurate—if, for example, the fire actually did have two distinct points of origin-- then defense counsel's failure to consult an independent expert might not have impacted the trial. Any attempt to raise her present claims would have been denied for a lack of prejudice, no matter how egregious the lack of preparation. *See Hasan v. Galaza*, 254 F.3d 1150, 1155 (9th Cir.2001)( setting a 2244(d)(1)(D) triggering date prior to the time when a petitioner could have discovered prejudice "is analogous to holding that a tort claim accrued when the plaintiff had knowledge of her injury but before she had discovered the cause"). In short, even assuming that Ms. Ayers could have immediately determined that her attorneys were unprepared to evaluate Winters's conclusions, she could not have known whether this failure deprived her of constitutionally effective counsel at trial without knowing whether Winters's conclusions were true or false.

No layperson—using any level of diligence-- could have evaluated the soundness of Inspector Winters's testimony just by observing the trial. By

---

sic)(R&R, Doc. #18, PageID#1512). But Ms. Ayers is not disputing that 2244(d)(1)(D) turns on her own reasonable diligence. Her attorneys' failures are relevant—not because they excuse Ms. Ayers from having to exercise any diligence herself, but because trusting one's attorneys to evaluate and challenge the State's expert testimony *is what a reasonably diligent person would do in Ms. Ayers circumstances. See, e.g., Banks v. Dretke*, 540 U.S. 668, 696 (2004)("Ordinarily, we presume that public officials have properly discharged their official duties.").

definition, expert testimony "relates to matters beyond the knowledge or experience possessed by lay persons," and expert witnesses should have "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Ohio Evid.R.702. If Inspector Winters's arson science conclusions were readily subject to evaluation by Kayla Ayers in real time, then they would not be expert conclusions in the first place.

Ms. Ayers's diligence is supported by the fact that—throughout both the state and federal litigation—no court or party has ever detailed what, specifically, she should have done to obtain an independent forensic arson review, using reasonable diligence, from a state prison. Ms. Ayers has a 10th grade education. (Ayers Affidavit, Doc.#15-1, PageID#495). She has no knowledge or background in arson investigations. She was and remains indigent, and she was imprisoned throughout the relevant time period. Unlike the petitioner in *DiCenzi*, Ms. Ayers could not "merely inquire[ ] of a court or a public defender" to obtain an expert report on complicated issues of forensic arson science. *DiCenzi*, 452 F.3d at 470.

Should she have petitioned the state courts to appoint an attorney to review her case for possible postconviction claims? She did so and was summarily denied. (Motion for Appointment of Counsel & Decision, Doc.#15-1, PageID#375-78.) Does "reasonable diligence"—taking into account "the realities of the prison system"-- require Ms. Ayers to have independently researched arson science from prison, to the extent that she could have evaluated Winters' conclusions herself? Would it have been "reasonably diligent" to send letters to experts from prison, in the hopes

7

that one of them might review her case pro bono? While such responses are not theoretically impossible, they are much better examples of "maximum possible diligence" rather than "reasonable diligence" from someone in Ms. Ayers's circumstances.

The Sixth Circuit addressed similar issues in *Ege v. Yukins*, 485 F.3d 364, 373 (6th Cir.2007). In *Ege*, a Michigan habeas petitioner argued that her conviction unconstitutionally rested on unreliable bite mark testimony. *Id*. at 374. For support, she relied in-part on a letter from prosecutors obtained four years after her conviction, indicating that the State's bite mark expert had offered unreliable testimony in other cases. The warden argued Ege's claims were time barred, since bite mark testimony was "controversial" at the time of trial, and evidence undermining the expert could have been discovered earlier with due diligence pursuant to § 2244(d)(1)(D). *Id*. at 372-73.

The Sixth Circuit held that, while it was clear at trial that parts of the expert's testimony lacked *evidentiary* foundation, "we cannot say that it should have been similarly obvious to Ege that the *substance* of the physical evidence—at least as presented by Dr. Warnick—was complete bunk." *Id*. at 373. Instead, despite the controversy around bite mark testimony, the petitioner's discovery of evidence undermining the substance of the state's expert testimony was "entirely fortuitous [ ]." *Id*. Prior to uncovering the letter, petitioner "likely felt that she did not have a basis for pursuing her due process claim." *Id*. at 374. Regarding "sham" expert testimony, the Court analogized it to other kinds of false testimony and held that

8

"[i]n such cases, the petitioner could not have been reasonably expected to discover the misconduct during pretrial discovery or trial." *Id.* at fn.4.

*Ege* is applicable here. Not only would it have been extremely difficult for Ms. Ayers to have obtained the Lentini report sooner, it was incredibly fortuitous that she uncovered the flaws in Winters' testimony at all. Ms. Ayers steadfastly fought to prove her innocence, using every tool reasonably at her disposal. After her conviction, Ms. Ayers did not have the right to procure legal or expert assistance at state expense. She nevertheless sought the appointment of a postconviction attorney to review her case. That request was denied. Instead of giving up, she continued to assert her innocence and continued to reach out for help, including to the Ohio Innocence Project. As part of its review of her application, OIP sought an independent opinion on the soundness of Winters' conclusions and, in 2019, obtained a report from John Lentini, one of the authors of the NFPA 921. (Doc.#15-1, PageID#527-28). An independent review of trial testimony by world-renowned arson experts is not typically within the reach of postconviction prisoners in Ohio, no matter how diligent they are. Under these circumstances, it is unrealistic to accuse Ms. Ayers of being negligent or dilatory or to ask why she failed to obtain the evidence sooner. Given the "reality of the prison system," the complicated nature of the State's expert arson conclusions, and the limited resources available to Ms. Ayers during her imprisonment, it is a miracle she obtained an expert forensic review at all.

> **C. The Report and Recommendation incorrectly faulted Ms. Ayers for failing to raise her claims on direct appeal, when those claims rely**

9

**on evidence outside the original trial record and were not cognizable on direct appeal.**

The Report and Recommendation repeatedly asserts that Ms. Ayers was not diligent because she "neglected to raise the failure to obtain an expert as error on direct appeal." (R&R, Doc #18, PageID#1513). According to the Report, Ms. Ayers's "failure to pursue her claims on direct appeal, or through an application to reopen her direct appeal, further belies any due diligence in pursuing her rights." *Id.* at PageID#1514.).

As explained at length in Petitioner's Traverse, none of Ms. Ayers's claims were cognizable on direct appeal. (Traverse, Doc. #16, PageID #1438-39, 1442-44. "On direct appeal, Ohio law limits the reviewing court to the record of the proceedings at trial." *White v. Warden, Ross Correctional Inst.,* 940 F.3d 270, 277 (6th Cir.2019)(quoting *Morgan v. Eads*, 104 Ohio St.3d 142, 818 N.E.2d 1157, 1159 (2004)). Here, the trial record was completely silent regarding whether or not Ms. Ayers's trial attorneys had consulted an independent arson expert on their own, or whether they were independently qualified to evaluate arson testimony. And again, even if an appellate court had been willing to assume that defense counsel failed to consult an expert, each of Ms. Ayers claims requires a showing of some prejudice— some indication of how the trial might have been different had Winters' faulty conclusions been challenged or excluded. That evidence was not a part of the record on appeal.

It is true that Ms. Ayers raised an unrelated claim of ineffective assistance of counsel on appeal. (2013 Fifth Dist. Op., Doc #15-1, Ex. 24, PageID# 366-373).

10

Specifically, Ms. Ayers's trial counsel had prepared for trial using the *wrong expert report*, and he did not even see Winters' actual final report until after his cross examination. This failure was apparent from the trial record. The state appellate court, however, denied Ms. Ayers's claim—not because Ms. Ayers could not demonstrate her attorneys were objectively deficient, but *because Ms. Ayers could not prove prejudice based on the trial record. Id.* Specifically, there was no evidence in the record that her attorneys would have been able to impeach any of Winters' conclusions had they been appropriately prepared.

Without any independent evaluation of Winters' conclusions, and specifically without evidence showing Winters' conclusions could have easily been impeached as faulty, each of her current claims would have met a similar fate on direct appeal.[4]

## II. Even if Ms. Ayers petition were untimely under §2244(d)(1), she would be entitled to equitable tolling because the delay in this matter is directly attributable to "extraordinary circumstances."

In order for a court to apply equitable tolling to the limitations period on a federal petition for writ of habeas corpus, the petitioner must demonstrate "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010).

---

[4] Ms. Ayers's appointed appellate counsel was not ineffective for failing to investigate facts outside the trial record, or for failing to consider potential collateral means for challenging the conviction. Such claims would have been beyond the scope of direct appeal. The constitution guarantees Ms. Ayers effective counsel (at state expense) only for trial proceedings and on a single direct appeal, not in developing claims for collateral postconviction review.

11

Regarding Ms. Ayers's diligence, the Report and Recommendation mostly rehashes the analysis it offered pursuant to §2244(d)(1)(D). Specifically, the Magistrate Judge found that Ms. Ayers was not "pursuing [her] rights diligently" because she "has not indicated any attempt at retaining an expert report prior to July 2019," (R&R, Doc. #18, PageID#1513-14). Furthermore, the Report and Recommendation faulted Ms. Ayers for failing to submit her claims on direct appeal, finding that "her failure to pursue her claims on direct appeal, or through an application to reopen her direct appeal, further belies any due diligence in pursuing her rights." (R&R, Doc #18, PageID#1514.), Ms. Ayers has addressed her diligence at length above, *supra at Sec. I*, and reincorporates those arguments by reference here.

In terms of whether "extraordinary circumstances" exist to justify equitable tolling, the Report and Recommendation does not fairly characterize Ms. Ayers's arguments. It is well-established that "professional misconduct ... could amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling." *Holland*, 130 S.Ct. at 2562. Ms. Ayers concedes that ineffectiveness must actually be extreme to meet the standard for extraordinary circumstances under Holland. But the ineffectiveness here was "egregious behavior." Not only did Ms. Ayers attorneys fail to read Winters expert report, and not only did they completely fail to educate themselves or consult with an independent arson expert prior to trial, but in spite of their ignorance, they effectively endorsed Winters' faulty conclusions at trial—conceding that Inspector

12

Winters offered his conclusions about the fire to a "scientific certainty," not an "absolute certainty." (Tr. 437-38, Doc #15-2, PageID#1361-62, Tr. 448, Doc #15-2, PageID#1372).

Defense counsel's endorsement of the State's junk science was an extraordinary circumstance that hampered Ms. Ayers's ability to uncover her present claims. As discussed at length above, Ms. Ayers claims depend on complex expert arson evaluations, that Ms. Ayers would have had difficulty uncovering even under the best of circumstances. If her attorneys had conceded their ignorance, or even remained silent, it would have been extremely difficult for Ms. Ayers to uncover the flaws in Winters' testimony on her own. But her attorneys did not simply stay silent—instead they effectively endorsed Winters' faulty conclusions. The effect of this endorsement is that, to potentially meet the statutory deadline from Ms. Ayers's perspective post-trial, she would have to assume not only that the prosecutors and state's expert had erred, but that *even her own attorney* had improperly conceded Winters' conclusions and the source of the fire.

The Report and Recommendation does not analyze the effect of this conduct on Ms. Ayers ability to meet the statutory deadlines provided under §2244(d)(1). "Extraordinary circumstances" did hinder Ms. Ayers in this case, and even assuming that Ms. Ayers petition were not otherwise timely, the Court should apply equitable tolling to consider the merits of her claims.

**III.  Even if Ms. Ayers's Petition were otherwise untimely, the Court should consider her claims because there is credible, newly-discovered evidence of her innocence such that, today, no**

13

> **reasonable factfinder would find her guilty beyond a reasonable doubt.**

In its analysis of Ms. Ayers's actual innocence gateway claim, the Report and Recommendation assumes, arguendo, that the Lentini Report completely disproves the State's expert witness testimony at trial. (R&R, Doc. #18, PageID#1515). Even so, the Report and Recommendation suggests that Ms. Ayers cannot satisfy the McQuiggins v. Perkins standard because she "disregards the remainder of the State's argument." *Id*. Specifically, the Report points to three pieces of inculpatory evidence—(1) Ms. Ayers's alleged "threats" to burn the house down, (2) the allegation that Ms. Ayers "was the only person at the scene of the fire when it began" and "the only individual with soot on their person," and (3) the fact that Ms. Ayers changed her account to investigators. *Id*.

Ms. Ayers does not disregard any of these allegations. With regards to the alleged "threats," to "burn the motherfucker down," the State's own witness conceded that Ms. Ayers did not appear to be making a fully serious threat. (Doc. #15-2, PageID#1264) ("It was more kind of a laugh or a joke kind of thing," and "it was like she meant it, but she didn't."). Regarding the second allegation, Ms. Ayers was not in fact the only person at the scene of the fire when it started. Her young son, Bubba, was at the house, and knew how to work a lighter. (Doc #15-2, PageID#1206). And although Inspector Winters testified that he "did not observe" any soot when talking to Brennan Jr. at the neighbor's house later that night. (Id. at 270, Doc. #15-2, PageID#1194). By that time, however, Ms. Ayers's neighbor had already gotten Bubba "cleaned up" and changed his clothes. (Id. at PageID

14

#1287). Finally, Ms. Ayers correctly suspected that her neighbors were trying to have her children taken away, which explains why she was initially reluctant to admit she had been sleeping prior to the fire. (Tr.3 60, Doc #15-2, PageID#1284) ("All she kept doing was repeating was she going to lose—Am I going to lose my kids, am I going to lose my kids?"). .

In fact, the Report and Recommendation ignores many of the remaining facts that are more consistent with Ms. Ayers's innocence than her guilt. First, although the State claimed Ms. Ayers's motive was anger at her father, the fire was centered on Kayla's own mattress, near where what appeared to be a "little play area." (Tr.241, Doc #15-2, PageID#1165). Second, when police first interviewed Bubba, the night of the fire, he confirmed that his mother was asleep when the fire started. (Narrative Supplement, Doc #15-1, PageID#614). Third, research has shown children (presumably unattended children) are a common source of incendiary fires. (Lentini Affidavit, ¶23, Doc #15-1, PageID#647). And fourth, Ms. Ayers's did not flee the scene or watch the house burn—instead she injured herself trying to extinguish it. Setting fire to one's own mattress and then injuring oneself trying to extinguish it is hard to reconcile with the State's theory that Ms. Ayers started the fire out of anger over a weeks-old argument with her father. It is, however, perfectly consistent with the actions of a harried mother, panicking over a fire started by a curious and unattended child.

The circumstantial evidence in this matter is, at best, a wash. The State needed Winters to conclude that the fire had two points of origin in order to prove

the fire could not have been started by Ms. Ayers's young son. Without Winters "two points of origin theory," the facts are entirely consistent with an accidental fire started by her young son, and it is more likely than not Ms. Ayers would have been acquitted.

The question is not whether or not the State had a minimally sufficient case to support the conviction, but whether, taking into account all available evidence, reasonable jurors would have found Ms. Ayers guilty beyond a reasonable doubt. Ms. Ayers has met that burden, and even assuming her claims are untimely under 2244(d),

### IV. In the alternative, the Court should return the matter for an evidentiary hearing on the issues, or, if the Court adopts the Report and Recommendation, it should issue a certificate of appealability.

The Magistrate Judge did not grant Ms. Ayers request for an evidentiary hearing that could have developed the factual record further on multiple issues, including the timeliness of her petition. For reasons fully explained in her Traverse, Ms. Ayers qualifies for an evidentiary hearing under 28 U.S.C. § 2254(e)(2). (Traverse, Doc.#16, PageID# 1468-70.). As discussed above, the Court need not take additional evidence to determine whether Ms. Ayers was diligent in discovering the factual predicates for her claim. If, however, the Court believes that additional facts are necessary to aid in its determination of timeliness, it should return the matter to the Magistrate Judge and allow Ms. Ayers an opportunity to develop the record.

In the alternative, if the Court adopts the Report and Recommendation, a certificate of appealability should issue pursuant to 28 U.S.C. § 2253(c). A court should not deny a certificate of appealability "merely because it believes the applicant will not demonstrate an entitlement to relief." *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). The question, instead, is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id*. at 336, quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)(internal quotations omitted). Ms. Ayers has supported her timeliness arguments with relevant precedent, and to the extent that these facts raise novel issues, "reasonable jurists" could, at minimum, doubt whether dismissal is proper under these circumstances or whether the issues presented "were adequate to deserve encouragement to proceed further."

## V.　CONCLUSION

For reasons outlined above, Petitioner objects to the above-cited portions and aspects of the Magistrate Judge's Report and Recommendations, and respectfully requests the Court reject the recommendations and return the matter for further proceedings, or, in the alternative, remand the matter for an evidentiary hearing.

        Respectfully submitted,

        /s/ Brian C. Howe
        Brian C. Howe (0086517)
        Attorney for Petitioner
        Ohio Innocence Project
        Univ. of Cincinnati College of Law
        P.O. Box 210040
        Cincinnati, OH  45221-0040
        Phone:  513-556-0752
        Fax:  513-556-0702
        Brian.Howe@uc.edu

## **CERTIFICATE OF SERVICE**

    I hereby certify that a true and accurate copy of the foregoing pleading was filed electronically via the Court's CM/ECF system on July 12, 2023, and a copy is available to opposing counsel via the Court's electronic notification system.

        /s/ Brian C. Howe
        Brian C. Howe